# EXHIBIT 2

Dockets.Justia.com

 COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 21.4.2004
**C(2004)900 final**

**COMMISSION DECISION**

**of 24.03.2004**

**relating to a proceeding under Article 82 of the EC Treaty
(Case COMP/C-3/37.792 Microsoft)**

(ONLY THE ENGLISH TEXT IS AUTHENTIC)

(Text with EEA relevance)

**EN**                                                                      **EN**

# COMMISSION DECISION

## of 24.03.2004

### relating to a proceeding under Article 82 of the EC Treaty
### (Case COMP/C-3/37.792 Microsoft)

(ONLY THE ENGLISH TEXT IS AUTHENTIC)

(Text with EEA relevance)

THE COMMISSION OF THE EUROPEAN COMMUNITIES,

Having regard to the Treaty establishing the European Community,

Having regard to Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty[1], and in particular Article 3 and Article 15(2) thereof,

Having regard to the complaint lodged by Sun Microsystems, Inc. on 10 December 1998, alleging infringements of Article 82 of the Treaty by Microsoft and requesting the Commission to put an end to those infringements,

Having regard to the Commission decision of 1 August 2000 to initiate proceedings in Case IV/C-3/37.345,

Having regard to the Commission decision of 29 August 2001 to initiate proceedings in this case, and to join the findings in Case IV/C-3/37.345 to the procedure followed under this case,

Having given the undertaking concerned the opportunity to make known their views on the objections raised by the Commission pursuant to Article 19(1) of Regulation No 17 and Commission Regulation (EC) No 2842/98 of 22 December 1998 on the hearing of parties in certain proceedings under Articles 85 and 86 of the EC Treaty[2],

Having regard to the final report of the hearing officer in this case,

After consulting the Advisory Committee on Restrictive Practices and Dominant Positions,

---

[1]    OJ 13, 21.2.1962, p. 204/62. Regulation as last amended by Regulation (EC) No 1216/1999 (OJ L148, 15.6.1999, p.5).

[2]    OJ L 354, 30.12.1998, p. 18.

Whereas:

# 1    PARTIES TO THE PROCEEDINGS

## 1.1    Microsoft Corporation

(1)    Microsoft Corporation ("Microsoft"), a company based in Redmond, state of Washington, USA, manufactures, licenses and supports a wide variety of software[3] products for many computing devices.[4] Its turnover for the fiscal year July 2002 to June 2003 was USD 32,187 million[5] (EUR 30,701 million[6]) on which it earned net profits of USD 13,217 million[7] (EUR 12,607 million). Microsoft employs 55,000 people around the world. Microsoft Europe Middle East & Africa controls its activities in the European Economic Area ("EEA") from Paris La Défense. Microsoft is present in all countries within the EEA.

## 1.2    The complainant: Sun Microsystems, Inc.

(2)    Sun Microsystems Inc. ("Sun"), a company based in Palo Alto, California, USA, provides network computing infrastructure solutions that comprise computer systems (hardware and software), network storage systems (hardware and software), support services and professional and educational services.[8] Its turnover for the fiscal year July 2002 to June 2003 was USD 11,434 million (EUR 10,906 million[9]) on which it suffered a net loss of USD 2,378 million[10] (EUR 2,268 million). Sun employs some 36,100 people around the world. Sun is present in all countries within the EEA.

---

[3]    For a definition of computer terms such as software and hardware, PC, etc. see below at recitals (21) *et seq.*

[4]    Microsoft's Annual Report for US fiscal year ending June 2002, on page 1. See http://www.microsoft.com/msft/sec/FY02/10k2002.htm, printed on 24 January 2003.

[5]    Microsoft's Form 10-K Annual Report for the US fiscal year ending June 30, 2003, page 9. See http://www.sec.gov/Archives/edgar/data/789019/000119312503045632/d10k.htm, printed on 18 November 2003.

[6]    The exchange rate used for the year July 1, 2002-June 30, 2003 is EUR 1 = USD 1.0484. This is the average of the average quarterly exchange rates for the third and fourth quarters of 2002, and the first and second quarters of 2003 (0.9838, 0.9994, 1.0731, 1.1372). Source: Eurostat.

[7]    Microsoft's Annual Report for US fiscal year ending June 2002, on page 11. See http://www.microsoft.com/msft/sec/FY02/10k2002.htm, printed on 24 January 2003.

[8]    Sun's Form 10-K Annual Report for the US fiscal year ending June 30, 2003, on page 1. See http://www.sun.com/aboutsun/investor/annual_reports/sun_10k03.pdf, printed on 24 January 2003.

[9]    The exchange rate used for the year July 1, 2002-June 30, 2003 is EUR 1 = USD 1.0484. See footnote 8.

[10]    See Sun press release outlining annual results for US fiscal year ending June 2003, http://www.sun.com/smi/Press/sunflash/2003-07/sunflash.20030722.1.html, issued on 22 July 2003, printed on 18 November 2003.

5.3.1.4.2   Alleged absence of incentives to foreclose

(764)   As a way apparently to support its claim that its refusal is objectively justified, Microsoft contends that "*it is highly implausible that Microsoft had [...] the incentive to foreclose competitors through leveraging in the ways suggested by [the Commission's Statements of Objections]*". [909]

(765)   Microsoft's argument in this respect essentially relies on the "one monopoly profit" theory. According to this theory, under certain conditions (product A and product B are perfect complements with fixed ratios), it is not possible for a firm that is a monopolist in a product market A to increase its profits by securing a monopoly in the related product market B. The monopolist can in fact extract all the monopoly rent through pricing of the monopoly good on market A. "*This theorem [...] does not say that monopolists will not enter adjacent markets, merely that when they do it is likely to enhance efficiency*". [910]  Indeed, the more competitive market B is, the lower the price for the complementary good B, and the higher the price that consumers will be willing to pay for good A.

(766)   However, Microsoft's line of argumentation is flawed insofar as it postulates that no added profit can be gained from attaining a dominant position in the complementary (work group server) operating system market.  The inadequacy of the premise invalidates, in turn, the allegation that Microsoft has no economic incentive to use any anti-competitive means to expedite such a result.

(767)   First, the "one monopoly profit" theory relies on strong assumptions, which do not hold in this case.  In particular, the two products at stake must be perfectly complementary with fixed ratios.  This is not the case for client PC and work group server operating systems. Microsoft itself concedes that "*the assumptions of perfect complementarity with fixed ratios do not apply exactly to client and server operating systems*". [911]  For instance, a decision to invest in work group server operating system products may derive from a need to have a given number of users exchange and share more information, rather than from a need to accommodate more users and may thus not be coupled with a decision to buy more client PC operating system products.

---

[909]   See Microsoft's submission of 16 November 2001, NERA Report, Executive Summary, at paragraph E12.

[910]   See Microsoft's submission of 17 November 2000, NERA Report, at paragraphs 174-176.

[911]   See NERA report, attached to Microsoft's submission of 17 November 2000, in footnote 227 (paragraph 175). NERA further states that "*home computers generally do not connect to servers (except via the Internet); and computers hosting Web sites generally do not connect to clients (except via the Internet). To a great extent, the customers buying the client operating systems are not the same customers buying the server operating systems.*" (*ibid.*)

(768)    Second, even when product A and product B are perfectly complementary with fixed ratios, the "one monopoly profit" theory does not hold when keeping a firm in market B in check reinforces the dominant undertaking's dominant position in market A, erecting barriers against an actual or potential competitive threat in that market.

(769)    In this case, it cannot be excluded that in the future there will be companies challenging Microsoft's dominant position in the client PC operating system market. By having achieved a dominant position in the work group server operating system market, Microsoft secures a strategic "input" important for undertakings wanting to compete in the client PC operating system market, namely interoperability with the Windows work group servers. Indeed, a future competitor in the client PC operating system market will need to provide products interoperable with Microsoft's dominant work group server operating system. As such, by strengthening its dominant position in the work group server operating system market, Microsoft effectively reinforces the barriers to entry in the client PC operating system market.

(770)    There is yet another aspect that invalidates Microsoft's argument that it has no incentives to achieve dominance in the work group server operating system market. As Microsoft itself acknowledges, software markets are subject to "shifts of paradigms", of which the evolution from the original centralised computing approach to the modern approach of distributed computing, where processing power is distributed between servers and "fat clients", constitutes a good example.[912]   An evolution that would lead the IT industry back to a more server-centric (and "thin client") approach could in the long term threaten to strip Microsoft's overwhelming dominance on the client PC operating system market of its competitive importance.

(771)    Microsoft's internal communication bears witness to anxiety about this possibility: "*Sun, Oracle and Netscape are all pushing a new model of [almost] centralised computing. They all acknowledge that Microsoft holds tremendous sway over the desktop platform, so they all want to quickly strip as much value and spending as possible off the desktop and onto the server where they can charge premium prices and push their own platform offerings*".[913]  In view of the close links between the

---

[912]    See above at recitals (44) *et seq.*

[913]    Internal Microsoft memo drafted for Bill Gates by C++ General Manger Aaron Contorer of 21 February 1997 - see Sun's submission on evidentiary material of 11 August 1999 at Tab. 2 (Case IV/C-3/37.345 page 3703). In the same document, Aaron Contorer further recognises that this long term threat does not constitute a present competitive constraint to Microsoft: "*At the same time, [Microsoft's competitors] know [their model of centralised computing] is fundamentally wrong. There are good reasons why a big company in the 1990s uses thousands of small and midsize CPUs instead of one giant Cray supercomputer to do all the work. Centralized machines have poor price/performance when they get too large: they have high latency for ordinary interactive tasks like typing [...]; and they fail to take advantage of the principle of colocation – putting the processor close to the inputs and outputs it needs to work with*".

client PC operating system market and the work group server operating system market, Microsoft has an incentive to prevent entry by these identified rivals in the latter.

(772)    From the above it can be concluded that, contrary to Microsoft's contention, Microsoft has incentives to leverage its market power from the client PC operating system market into the work group server operating system market.

(773)    In fact, Microsoft's internal communication confirms not only the incentives of the company to attempt to eliminate competition on the work group server operating system market, but the fact that the strategy it intends to use is along the lines of the Commission's analysis of Microsoft's behaviour.

(774)    By way of illustration, the following communication between Microsoft executives underlines an awareness that Microsoft's client-side dominance would allow it to leverage into certain areas of the server operating system market: "*[Microsoft] has a huge advantage in the enterprise computing market by leveraging the dominance of the Windows desktop*".[914]

(775)    The following quote from the same e-mail thread demonstrates the rationale for capturing the work group server operating system market in order to use it as a bridgehead from which to take the leveraging strategy into the Internet: "*Dominance on the server infrastructure on the Internet is a tougher nut to crack [but] we just might be able to do it from the enterprise out if we could own the enterprise (which I think we can)*".[915]

(776)    More generally, were Microsoft to succeed in monopolising the work group network space, it could then replicate its leveraging strategy by denying interoperability to products that need to interoperate with the work group network as a whole. This could be the case for different servers that until now have mostly standard interfaces to the work group tier – for example database servers, Web servers – but on which Microsoft may further its strategy of imposing its own proprietary technology as the *de facto* standard.

(777)    A good example of elements on which such a strategy could rely is Active Directory. Once an organisation has, for instance, chosen to use Active Directory to manage the profiles of all its employees, it may become key for a number of software products,

---

[914]    E-mail by Doug Bayer (Senior Director Desktop and Business Systems Division) to Senior Director Steve Madigan, cc. C++ General Manager Aaron Contorer and Senior Technical Evangelist Mark Ryland. 29 May 1996. Sun's submission of evidentiary material of 11 August 1999, at Tab. 2 (Case IV/C-3/37.345, on pages 5793-5794).

[915]    Sun's submission of evidentiary material of 11 August 1999, at Tab. 2 (Case IV/C-3/37.345, on pages 5793-5794).

possibly outside the work group network realm, to interoperate (for example. to establish secure communication) with Active Directory.

(778)    Finally, Microsoft's internal communication confirms that Microsoft's executives view interoperability as a tool in this leveraging strategy: *"What we are trying to do is use our server control to do new protocols and lock out Sun and Oracle specifically [...]. Now, I don't know if we'll get to that or not, but that's what we are trying to do"*.[916]

5.3.1.5    Conclusion on refusal to supply

(779)    Microsoft has been enjoying a dominant (quasi-monopoly) position on the client PC operating system market for many years. This position of market strength enables Microsoft to determine to a large extent and independently of its competitors the set of coherent communications rules that will govern the *de facto* standard for interoperability in work group networks. As such, interoperability with the Windows domain architecture is necessary for a work group server operating system vendor in order to viably stay on the market.

(780)    Microsoft has diminished the level of disclosures that it makes concerning information necessary to achieve such interoperability. Microsoft has turned down a formal request by Sun concerning such interoperability information.

(781)    The data collected by the Commission show that there is a risk of elimination of competition in the work group server operating system market. Microsoft's market share has increased swiftly. The company has reached a dominant position in the relevant market. This position continues to be reinforced. Technologies that will lead to a further lock-in into Microsoft's products at the work group server and client PC level are quickly gaining traction in the market. The Commission's investigation has also produced evidence that establishes a causal link between the market evolution and the interoperability advantage enjoyed by Microsoft. Furthermore, there is no actual or potential substitute to disclosures by Microsoft of interoperability information.

(782)    Microsoft's refusal to supply has the consequence of stifling innovation in the impacted market and of diminishing consumers' choices by locking them into a homogeneous Microsoft solution. As such, it is in particular inconsistent with the provisions of Article 82 (b) of the Treaty.

(783)    The major objective justification put forward by Microsoft relates to Microsoft's intellectual property over Windows. However, a detailed examination of the scope

---

[916]    Transcript of a February 1997 speech by Bill Gates to Microsoft's sales force, in Sun's submission of 14 October 1999, at Tab. 5, on page MSS 505490 (Case IV/C-3/37.345 on page 5823).

of the disclosure at stake leads to the conclusion that, on balance, the possible negative impact of an order to supply on Microsoft's incentives to innovate is outweighed by its positive impact on the level of innovation of the whole industry (including Microsoft). As such, the need to protect Microsoft's incentives to innovate cannot constitute an objective justification that would offset the exceptional circumstances identified. Microsoft's other objective justification, which is that it has no incentive to engage in anti-competitive conduct with respect to interoperability, is not supported – and in fact is largely contradicted – by the evidence in this case.

(784)   In conclusion, Microsoft's refusal to supply interoperability information violates Article 82 of the Treaty.

5.3.1.5.1  Duration of the abuse

(785)   The abuse can only be established for the period where all its constitutive elements were in place.

(786)   Microsoft's refusal to supply can be established as of 6 October 1998. On that date, Microsoft refused in writing[917] the request by Sun, dated 15 September 1998.[918] It is also clear that Microsoft continues to refuse to supply such information – and that Microsoft's refusal to Sun is one instance in a general pattern of conduct.

(787)   The special responsibility that Microsoft did not sufficiently take into account when answering Sun's request derives from Microsoft's quasi-monopoly on the client PC operating system market. Indeed, Microsoft's refusal to supply relates to interface specifications that organise a network of Windows work group servers and client PCs and that, as such, are not attributable to one of the two products at stake (client PCs or work group servers), but rather represent a rule of compatibility between those two products. This means that the competitive significance of Microsoft's refusal – and hence, the ensuing infringement of Article 82 of the Treaty – derives from Microsoft's quasi-monopoly position in the client PC operating system market. Microsoft already enjoyed such a position of market strength when Sun made its request.

(788)   It is noteworthy that the fact that Microsoft has since achieved a dominant position on the work group server operating system market does of course bring additional strength to Microsoft's leveraging strategy and is a step towards the elimination of competition on this market. But it is not a constituent element of Microsoft's

---

[917]   See letter from Paul Maritz, Microsoft, to Richard Green, Sunsoft, Inc., dated 6 October 1998 (Case IV/C-3/37.345 pages 4788, 4789

[918]   See letter from Richard Green, Sunsoft, Inc. to Paul Maritz, Microsoft, dated 15 September 1998 (Case IV/C-3/37.345 page 4787).

(991)    As the Court of Justice held in *United Brands*, if the occupier of a dominant position established in the common market aims at eliminating competitors also established in the common market, it is immaterial whether this behaviour relates directly to trade between Member States once it has been shown that such elimination will have repercussions on the patterns of competition within the common market.[1257]

(992)    Microsoft's anti-competitive behaviour weakens effective competition on the markets for work group server operating systems and media players in an appreciable way. Microsoft's refusal to supply interface information brings about a risk of elimination of competition on the world-wide market for work group server operating systems. Microsoft's tying of WMP with Windows risks impairing the effective structure of competition in the world-wide market for media players.[1258]

(993)    Therefore, over the period considered, Microsoft's abuses of its dominance have had an appreciable effect upon trade between Member States within the meaning of Article 82 of the Treaty. For the same reasons, Microsoft's abuses of its dominance have had an appreciable effect upon trade between the Contracting Parties to the EEA within the meaning of Article 82 of the EC Treaty and Article 54 of the EEA Agreement.

## 6    REMEDIES AND FINES

### 6.1    Article 3 of Regulation 17

(994)    Where the Commission finds that there is an infringement of Article 82, it may, in accordance with Article 3 of Regulation 17, require by decision that the undertaking concerned brings such an infringement to an end. According to Article 5 of Council Regulation (EC) No 2894/94 of 28 November 1994 concerning arrangements for implementing the Agreement on the European Economic Area[1259] "*the Community rules giving effect to the principles set out in Articles 85 and 86 [now Articles 81 and 82] of the EC Treaty [...] shall apply mutatis mutandis*" in respect of the EEA.

(995)    A decision pursuant to Article 3 of Regulation No 17 may include an order to "*do certain acts or provide certain advantages which have been wrongfully withheld as well as prohibiting the continuation of certain action, practices or situations which are contrary to the Treaty*".[1260]    The Commission may require the undertaking

---

[1257]    Judgement of the Court of 14 February 1978 in Case 27/76, United Brands v Commission [1978] ECR 207, at paragraph 201.

[1258]    See Judgement of the Court of 15 May 1975, Case 71/74, Frubo, [1975] E.C.R. p. 563, at paragraph 38.

[1259]    OJ L 305, 30.11.1994, p.6.

[1260]    Judgement in Commercial Solvents , at paragraph 45. See also Magill, at paragraph 90.

concerned to submit to it proposals with a view to bringing the situation into conformity with the requirements of the Treaty.[1261]

(996)   The requirement that a remedy has to be effective[1262] empowers the Commission to enjoin a dominant company to refrain from adopting any measures having an equivalent effect as the conduct identified as abusive.[1263]

(997)   Finally, it is established case-law that the remedy must apply in relation to the infringement that has been established[1264] and be proportional[1265] to the infringement identified.[1266]

### 6.1.1   Remedy concerning refusal to supply

(998)   The natural remedy to Microsoft's abusive refusal to supply is an order to supply what has been refused.

---

[1261]   Judgement in <u>Commercial Solvents</u>, at paragraph 45.

[1262]   See, for example, Judgement in <u>Commercial Solvents</u>, at paragraph 46: "*In the present case, having established a refusal to sell incompatible with article 86, the Commission was entitled to order certain quantities of raw material to be supplied to make good the refusal of supplies as well as to order that proposals to prevent a repetition of the conduct complained of be put forward. In order to ensure that its decision was effective the Commission was entitled to determine the minimum requirements to ensure that the infringement was made good and that Zoja was protected from the consequences of it. In choosing as a guide to the needs of Zoja the quantity of previous supplies the Commission has not exceeded its discretionary power.*"

[1263]   Judgment of the Court of First Instance in <u>Tetra Pak II</u>, at paragraph 220. In its decision in Tetra Pak II, the Commission not only considered the contractual tying Tetra Pak had engaged in to be abusive and required its termination pursuant to Article 82 of the Treaty, but also ordered Tetra Pak in Article 3 of the decision to refrain from adopting measures having equivalent effect as the ones found unlawful. In Article 3 Tetra Pak was *inter alia* ordered to "*inform any customer purchasing or leasing a machine of the specifications which packaging cartons must meet in order to be used on its machines.*" (See Decision 92/163/EEC, Article 3(5) and Judgment of the Court of First Instance in <u>Tetra Pak II</u>, at paragraph 139.)
In <u>Hilti</u>, in addition to imposing a fine and requiring that the infringement be brought to an end, the Commission ordered that Hilti: "*shall refrain from repeating or continuing any of the acts or behaviour specified in Article 1 and shall refrain from adopting any measures having an equivalent effect.*" (Commission Decision 88/138/EEC in Cases IV/30.787 and 31.488 - Eurofix-Bauco v. Hilti (OJ L65, 11.3.1998, p.19, Article 3). See also Commission Decision 93/252/EEC in Cases No IV/33.440 Warner- Lambert/Gillette and Others and No IV/33.486 BIC/Gillette and Others (OJ L116, 12.5.1993, p.21) and Decision in British Midland and the judgment in <u>Commercial Solvents</u> , at paragraph 45.)

[1264]   See, for example, judgement in *Commercial Solvents*, at paragraph 45.

[1265]   The principle of proportionality is enshrined in Article 5(3) of the Treaty according to which "*any action by the Community shall not go beyond what is necessary to achieve the objectives of this Treaty*". The Court of Justice has interpreted this as meaning that measures adopted pursuant to Community law "*must not exceed what is appropriate and necessary to attain the objective pursued, and that where there is a choice between several appropriate measures, recourse must be had to the least onerous, and the disadvantages caused must not be disproportionate to the aims pursued*" (Case 15/83, <u>Denkavit</u>, [1984] ECR 2171, paragraph 25 and Case C-354/95, <u>The Queen v Minister for Agriculture, Fisheries and Food, ex parte National Farmers' Union and Others,</u> [1997] ECR I-4559, paragraphs 49 and 50).

[1266]   See, for example, judgement in *Magill*, at paragraph 93.

6.1.1.1    Order to disclose interoperability information for the development of interoperable products

(999)    Microsoft should be ordered to disclose complete and accurate specifications for the protocols used by Windows work group servers in order to provide file, print and group and user administration services to Windows work group networks. This includes both direct interconnection and interaction between a Windows work group server and a Windows client PC, as well as interconnection and interaction between a Windows work group server and a Windows client PC that is indirect and passes through another Windows work group server. The use of the term "specifications" makes clear that Microsoft should not be required to disclose its own implementation of these specifications, that is to say, its own source code. The term "protocol" relates to the rules of interconnection and interaction between instances of the Windows client PC operating system and the Windows work group server operating system.

(1000)    In defining the information to be disclosed, account must be taken of the fact that the presently marketed Windows client PC and work group server operating system products consist of different generations of the relevant Windows products and that over the course of time, successor versions and updates will be distributed, which may implement modified or altogether new variants of the relevant protocol specifications. In this respect, it must be borne in mind that an important criterion that customers will take into account when deciding to purchase a given work group server operating system product is whether that product is able to interoperate with their installed base of work group network products – which may include older products no longer marketed – and whether it can be expected to interoperate with the customer's future planned work group network.

(1001)    The importance of interoperability with products purchased in the past by customers and that they still use should be reflected by ensuring that the disclosure order relates to all products for which Microsoft still supports online self-help support, instead of focussing only on the ones that are still marketed by Microsoft.[1267]

---

[1267]    These are, for Microsoft's client PC operating system products: Windows 98, Windows 98 SE, Windows NT Workstation 4, Windows Me, Windows 2000 Professional, Windows XP Home Edition, Windows XP Professional. See, on Microsoft's Web site, *Windows Desktop Lifecycle Support and Availability Policy for Consumers*, printed on 12 December 2003 from http://www.microsoft.com/windows/lifecycle/desktop/consumer/default.mspx and *Windows Desktop Lifecycle Support and Availability Policy for Businesses*, printed on 12 December 2003 from http://www.microsoft.com/windows/lifecycle/desktop/business/default.mspx. For Microsoft's work group server operating system products, the corresponding products are: Windows NT Server 4.0, Windows 2000 Server and Windows 2003 Server Standard Edition. See on Microsoft's Web site, *Retiring Windows NT Server 4.0: Changes in Product Availability and Support*, printed on 12 December 2003 from http://www.microsoft.com/ntserver/ProductInfo/Availability/Retiring.asp, and *Windows Server Product Life-Cycle Policies*, printed on 12 December 2003 from http://www.microsoft.com/windows2000/support/lifecycle/.

(1002)   The importance of interoperability with planned future purchases means that the disclosure order should apply in a prospective manner to future generations of Microsoft's products.[1268]   Accordingly, the disclosed information will have to be updated each time Microsoft intends to bring to market new versions of its relevant products.   Furthermore, although the request by Sun focused on the Windows technologies that were relevant up until the Windows 2000 generation of Microsoft's products (simply by virtue of the point in time when it was made), this should not be a basis for limiting the scope of the disclosure order to these technologies.   As such, the relevant protocols should be defined according to the generic services (file, print and group and user administration) that have been identified as essential in the work group server operating system market.

(1003)   The objective of this Decision is to ensure that Microsoft's competitors can develop products that interoperate with the Windows domain architecture natively supported in the dominant Windows client PC operating system and hence viably compete with Microsoft's work group server operating system.   Microsoft should thus allow the use of the disclosed specifications for implementation in work group server operating system products.   The order to supply is therefore not limited to disclosing specifications but also encompasses authorising the implementation of such specifications in work group server operating system products.

(1004)   As outlined above in Section 5.3.1.1.2, this Decision does not contemplate compulsory disclosure of Windows source code as this is not necessary to achieve the development of interoperable products.   The disclosure order should concerns the interface specifications only.   Furthermore, as regards the subsequent use of the specifications, the specifications should also not be reproduced, adapted, arranged or altered, but should be used by third parties to write their own specification-compliant interfaces.   In any event, to the extent that this Decision might require Microsoft to refrain from fully enforcing any of its intellectual property rights, this would be justified by the need to put an end to the abuse.

---

[1268]   Similarly, in its decision in Commercial Solvents, the Commission's order to supply raw material was not limited to the quantities requested, but went further and required a longer term supply obligation. See Commission Decision 72/457/CEE in Case IV/26.911 Zoja/CSC – ICI, OJ L 299, 31.12.1972, p51: "*whereas as regards haw the identified infringement should be put to an end, the necessity to foresee the immediate delivery to ZOJA of certain amounts of raw material which would be sufficient, in view of ZOJA's last request, to fulfil the most urgent needs of that undertaking; whereas it is moreover adequate, in order to ensure effective conditions of competition, that ZOJA can benefit from a longer term supply*" ("*considérant, en ce qui concerne la manière dont il devra être mis fin à l'infraction constatée, la nécessité de prévoir la livraison immédiate à ZOJA d'une certaine quantité de matière première susceptible, compte tenu de la dernière demande de ZOJA, de satisfaire les besoins les plus urgents de cette entreprise ; que, d'autre part, il est opportun, pour assurer le maintien de conditions de concurrence effectives, que ZOJA puisse bénéficier d'un approvisionnement à plus long terme*").   The Court of Justice (see footnote 1262 above) confirmed that in that case the Commission "*was entitled [...] to order that <u>proposals to prevent a repetition of the conduct complained of</u> be put forward*" (emphasis added).

6.1.1.2    Reasonable and non-discriminatory terms, timeliness of the disclosures

(1005)    Microsoft must not be allowed to render the order to supply ineffective by imposing unreasonable conditions with respect to the access to, or the use of, the information to be disclosed.

(1006)    It should be stated that Microsoft must disclose the specifications and allow the use thereof on a *non-discriminatory* basis. If it was otherwise, the remedy would discriminate against undertakings[1269], thereby introducing new distortions of competition, and allow Microsoft to abuse its dominant position in relation to third parties. It would not achieve the objective of "*ensuring that competition in the common market is not distorted*"[1270]. The disclosures should be made to any undertaking having an interest in offering work group server operating system products.

(1007)    The requirements that the terms imposed by Microsoft be reasonable and non-discriminatory should apply on a forward-looking basis to the disclosures that will take place for successor products or updates of present products. Furthermore, these future disclosures should be made in a timely manner.

(1008)    The requirement for the terms imposed by Microsoft to be reasonable and non-discriminatory applies in particular:

    (i)    to the conditions under which Microsoft allows potential beneficiaries to evaluate the business value to them of implementing the disclosed specifications in their products; in that respect, there is a need to ensure that potential beneficiaries will have the opportunity to review, themselves or through third parties designated by them, the specifications to be disclosed; Microsoft should be able to impose reasonable and non-discriminatory conditions to ensure that this access to the disclosed specifications is granted for evaluation purposes only;

    (ii)    to any remuneration that Microsoft might charge for supply; such a remuneration should not reflect the "strategic value" stemming from Microsoft's market power in the client PC operating system market or in the work group server operating system market;

    (iii)    to restrictions that Microsoft may impose as to the type of products in which the specifications may be implemented; such restrictions should not create

---

[1269]    Thus, in Magill the Commission ordered ITP, BBC and RTE "*to supply each other and third parties on request and on a non-discriminatory basis with their individual advance weekly programme listings and by permitting reproduction of those listings by such parties*". (Article 2 of Commission Decision 89/205/EEC in Case IV/31.851 - Magill TV Guide/ITP, BBC and RTEOJ L 78, 21.3.1989, p. 43. In paragraph 27 of that Decision the Commission states: "*To confine an order for the supply of these listings to ITP, BBC and RTE, inter se, would discriminate against third parties wishing to produce a comprehensive weekly guide in a manner which would not be compatible with Article 86.*"

[1270]    Article 3(g) of the Treaty.

disincentives to compete with Microsoft, or unnecessarily restrain the ability of the beneficiaries to innovate;

(iv)    to the need for the terms imposed by Microsoft in the future to be sufficiently predictable; implementing the specifications will indeed constitute a significant investment, which competing work group server operating system vendors will not incur if they have no assurance that the terms under which they can make use of the disclosed specifications will remain reasonably stable.

(1009)    As regards the need for timeliness, the Commission takes the view that a suitable mechanism should take as a starting point the date when Microsoft already has a working and sufficiently stable implementation. For instance, as regards releases of new products, the reference should be the point in time when Microsoft makes such new products available to potential customers for beta testing purposes.

6.1.1.3   Timing

(1010)    Microsoft must have sufficient time to take the measures necessary to comply with the order to supply, not least because it will need to draw up the relevant specifications. The order to supply should therefore take effect at the latest after 120 days following the notification of this Decision.

6.1.2   *Remedy concerning tying*

6.1.2.1   Scope

(1011)    Under this Decision, Microsoft will have to offer a version of Windows for client PCs which does not include Windows Media Player. The remedy applies to Windows licensed directly to end users (home users via retail and corporate customers) and licensed to OEMs for sale in the EEA. Microsoft will retain the possibility to also offer to OEMs and end users a bundle of Windows and WMP.

(1012)    Microsoft must refrain from using any technological, commercial, contractual or any other means which would have the equivalent effect of tying WMP to Windows. The unbundled version of Windows must in particular not be less performing than the version of Windows which comes bundled with WMP, regard being had to WMP's functionality which, by definition, will not be part of the unbundled version of Windows. Should it prove that Microsoft demotes the performance of the unbundled version of Windows, thus rendering the remedy ineffective, the Commission retains the possibility to review the present decision and impose an alternative remedy that will put an end to the abuse.

(1013)    Microsoft's obligation under a remedy not to resort to measures having an effect equivalent to tying must furthermore rule out any of the following activities:

(i)  Microsoft must not hinder the performance of rival media players through selective, inadequate, or untimely disclosures of Windows APIs;[1271] in other words, Microsoft shall not reserve privileged interoperability with Windows to WMP, for instance by providing selective access to Windows APIs;

(ii)  Microsoft must not give WMP favourable treatment on Windows, for instance by providing on users' PCs for a WMP download link while such a link is not provided for competitors' products,[1272] or by promoting WMP in any other way over competitors' products through Windows;

(iii)  Microsoft must not give OEMs or users a discount conditional on their obtaining Windows together with WMP, or *de facto*, financially or otherwise, remove or restrict OEMs' or users' freedom to choose the version of Windows without WMP;

(iv)  Microsoft must not "punish" or "threaten" OEMs or users who obtain Windows without WMP;

(v)  Microsoft must not ship WMP tied with another Microsoft product which would exhibit a similar ubiquity as Windows (for example Microsoft Office).

(1014)  The above examples are enumerative and without prejudice as to what other conduct would amount to a measure equivalent in its harmful effects to tying.

6.1.2.2  Timing

(1015)  Given the way Microsoft has structured technically, contractually and commercially its offering of the bundled operating system and media player, an effective un-tying can only take place once Microsoft has unravelled the various links that tie these two products.

(1016)  However, it is also important that Microsoft's change of conduct occurs in a timely manner so as to restore undistorted competition in the media player market before tying affords WMP critical mass to tip the market due to the network effects that have been identified.

(1017)  In the light of the foregoing, Microsoft should be given 90 days to implement the remedy concerning tying.  90 days is a long enough period to implement the necessary changes, in particular the software-related ones, while not likely to be too late to prevent the market from tipping due to tying.

---

[1271]  Rivals must have access to all default settings for every instance of media player usage.
[1272]  There is for example an Automatic Update facility for Windows XP that can access users' PCs to deliver updates and downloads without a specific user request.

6.1.2.3   The remedy is sufficiently determined

(1018)   According to Microsoft, it "*would not be at all clear what software code Microsoft
was supposed to remove.*"[1273]  As Microsoft does not accept that WMP is a separate
product from Windows, its argument that there is no clear-cut notion about the WMP
code to be removed would seem consistent.[1274]

(1019)   But the foregoing cannot obfuscate that as of today, the code of Microsoft's
streaming media player application called WMP 9 is determined by choices that
Microsoft has made in the past. RealNetworks has shown that by removing WMP 9
application files from the Windows XP Embedded operating system,[1275] an intact
version of the operating system without the WMP code can be built.[1276]  Microsoft
argues that if *all* Media Code is removed,[1277] certain basic operating system
functionality such as the narrator function[1278] for the visually impaired would no
longer work.[1279]   However, this argument need not be further pursued as this
Decision does not order Microsoft to remove *all* media files in Windows but only the
ones which constitute WMP.  Importantly, these files contain the technologies which
have been identified as bringing about the foreclosure effect by virtue of WMP being
tied to Windows, namely the files that support the proprietary Microsoft codecs, file

---

[1273]   Microsoft's submission of 17 October 2003, on page 119.

[1274]   It is, however, noteworthy that at the Oral Hearing Microsoft presented a Windows operating system
version with *all* "Windows Media Code" removed.  This was done in order to show that removing the
"Windows Media Code" would break the Windows functionalities which rely on multimedia
capabilities contained in the code. (Microsoft Presentation, *Hearing in Case No COMP/C-3/37.792*, 13
November 2003, slide Z10. See also slides Z5 and Z6 "*What Windows Media Code Is*".)

[1275]   For Windows XP Embedded see recital (1028) *et seq.*

[1276]   RealNetworks's email of 20 January 2004, *Description of process used by RealNetworks to build the
operating system on the personal computers used during the Microsoft hearing and provided to the
European Commission*

[1277]   In order to remove *all* the Media Code "*Microsoft focused on Windows Media Player redistribution
packages - WMP6.4 and WMP9*".  Thus, Microsoft counts 186 files that should be removed
(Microsoft's submission of 19 January 2004, on page 2 and 5 and 6) while RealNetworks counts 89
plus 52 (i.e. 141) files (corresponding to components 8 – 11 of the appendix to Microsoft's letter of 19
January 2004; see RealNetworks' email of 22 January 2004).

[1278]   Microsoft's submission of 19 January 2004, on page 2 and Microsoft's submission of 7 February 2004,
on page 64.

[1279]   Earlier in the proceedings, Microsoft had claimed that "*it [was] clear that RealNetworks did not use
Windows XP Embedded to remove multimedia functionality from the operating system [...]  Instead,
RealNetworks at most removed certain user interface elements that enable end-user access to
multimedia functionality in Windows XP. [...]  Such a version of Windows XP removes end-user access
to Windows Media Player without removing the underlying multimedia functionality.*"  Alternatively,
the WMP code would have been brought back in again by the workings of the dependency checking
mechanism in Windows XP Embedded during the building of the RealNetworks version of Windows
XP Embedded. (Microsoft's submission of 1 December 2003, on page 30 to 32)  This no longer seems
to be Microsoft's line of argumentation: "*As Microsoft explained before the 23 January 2004 meeting,
there is no dispute that RealNetworks used Windows XP Embedded to build a custom runtime that
excluded a portion of the media playback functionality of Windows XP.*" (Microsoft's submission of 6
February 2004, on page 1)  In the meantime, RealNetworks had submitted further information on its
demonstration at the Oral Hearing, to which Microsoft had access.

formats and DRM formats and the WMP user interface.[1280]  Going forward, Microsoft - according to the remedy incorporated in the present Decision - will have to make sure that it does not tie these components with Windows.

(1020) Not included in these files are low-level operating system layer media components (such as components that support for example .wav formatted system sounds or "DirectShow" APIs[1281]); functionality such as for example the narrator function for the visually impaired will therefore not be disabled.[1282]

(1021) Last, but not least, Microsoft's argument that the files to be removed are arbitrary and simply reflect files that RealNetworks' RealPlayer does not rely on (while other media players may rely on these files) is invalid.[1283]  Not only does RealPlayer actually rely on Microsoft's proprietary codecs in order to play Microsoft .wma files (and removing these files therefore impacts RealPlayer)[1284] but in addition, the delineation of the code to be removed is in accordance with Microsoft's own designation of files as Windows Media files in Windows XP Embedded.[1285]

6.1.2.4   The remedy is proportionate

(1022) The requirement that Microsoft offers a version of Windows with WMP removed relates to the media code causes complementary media software and content to be platform-specific, that is to say, the software and the content will only run on Microsoft or Microsoft licensed platforms.  If these elements of WMP were not covered by not covered by the remedy order, the foreclosure effect that Microsoft's conduct brings about would be left unaddressed.

---

[1280]  The fact that these components support Microsoft proprietary technologies is important.  In contrast, the dissemination of open standard technology is different as there is no attendant lock-in effect (see the example of an HTML standard compliant reader engine in Windows (see for example Microsoft's submission of 21 October 2003 (M. Iansiti), at p. 12, 14 and 22)).

[1281]  Microsoft's submission of 7 February 2004, on page 57.  Microsoft states that it agrees with Entity T32 (Entity T32's response to Article 11 letter, at Question 3) that DirectShow is part of *Windows*.  Entity T32's response to Question 3 reads: "*[Entity T32] accesses some of the functions provided by Microsoft DirectShow for playing video files.  This is only indirectly related to Windows Media Player – DirectShow (sometimes also called "Windows Media Technologies") is part of Windows, but the Windows Media Player uses it as well.*"

[1282]  The inclusion of support for open file formats such as .wav or MIDI in Windows in 1992 did not entail a lock-in effect.

[1283]  Microsoft's submission of 19 January 2004, on page 3.

[1284]  See Microsoft's own submission of 6 February 2004, on page 3 and in the spreadsheet, item 9 "Play a WMA, WMV, MP3 file").  As Microsoft states itself, applications like MusicMatch Jukebox are able to play Microsoft proprietary .wma files because MusicMatch "*redistributes some of the media-related software in Windows XP*". (Microsoft's submission of 19 January 2004, on page 2)

[1285]  "*To keep the footprint of a given Windows XP Embedded runtime as small as possible for use in hardware devices with limited amounts of memory, it is possible to exclude a wide range of components from that runtime, including components labeled Windows Media Player.*" (Microsoft's submission of 7 February 2004, on page 65, emphasis added)

(1023)   The remedy will not hinder Microsoft's ability to market its media player nor will it restrain its behaviour other than prohibiting tying or measures having an equivalent effect. In particular, Microsoft will be able to continue to offer a bundle of Windows and WMP.

(1024)   In rejecting an un-tying remedy, Microsoft points out that "*there is no meaningful consumer demand for client operating systems without [multimedia] functionality.*"[1286]

(1025)   But the un-tying remedy does not mean that consumers will obtain PCs and operating systems without media players. Many of them are, in fact, likely to want to purchase a bundle including a PC, a client PC operating system and a media player from OEMs. The difference is that the configuration of such bundles will reflect what consumers desire and not what Microsoft imposes. Under the remedy, the user benefits which derive from obtaining a pre-installed bundle of an operating system *and* a media player will therefore *not* be eliminated whilst the ability to *choose* the media player component of the bundle will be restored.

6.1.2.4.1   Interdependencies between Windows and Windows Media Player

(1026)   Microsoft states that removing the WMP code would undermine the integrity of the operating system.[1287]   The code bases of Windows and WMP contain interdependencies in the sense that Windows makes calls to WMP APIs. If the Commission ordered the removal of *all* WMP related software then users could, for instance, not stream files, play back files on the hard disk, play a CD or a DVD and use the Media Bar in Internet Explorer.[1288]   In other words, Microsoft claims efficiencies for which the integration of WMP would be a precondition.

(1027)   The argument relying on essential and irreversible inter-dependencies between Windows and WMP cannot be accepted as an objective justification for tying. The existence of such inter-dependencies would be the result of a deliberate choice by Microsoft.[1289]   As such they could not pre-empt in themselves the Commission's assessment of the lawfulness of Microsoft's conduct under Article 82 of the Treaty.

(1028)   In any event, it is technically possible for Microsoft to have Windows handle the absence of multimedia capabilities caused by code removal (and the resulting effect on any interdependencies) in a way that does not lead to the breakdown of operating

---

[1286]   Microsoft's submission of 17 October 2003, on page 87.
[1287]   Microsoft's submission of 15 March 2001, on page 13.
[1288]   Microsoft's submission of 17 October 2003, on page 120-121. See also Hearing in Case No COMP/C-3/37.792, Microsoft Presentation, 13 November 2003, slide Z 10.
[1289]   Cf. Microsoft's submission of 7 February 2004, on page 64: "*That is because other parts of Windows XP were designed to call upon the media playback functionality that is part of the operating system [...]*"

system functionality. Windows XP Embedded is a case in point. It is described on Microsoft's homepage as the "componentised" version of Windows XP. According to Microsoft, Windows XP Embedded "*is based on the same binaries as Windows XP*" and "*includes all Windows 2000 technology, as well as the latest Windows XP technology.*"[1290]

(1029) Windows XP Embedded enables developers to deploy selected features of Windows so that the operating system is reduced in size according to the specific need of devices such as automatic teller machines and set-top boxes.[1291] Windows XP Embedded can be configured to span as little as 5 megabytes ("MB") of code.[1292] As the "integral" version of Windows XP Embedded contains WMP, which itself has $\geq$10 MB of code, a configured version of 5 MB can, by definition, not contain WMP.[1293] Windows XP Embedded can hence be configured not to include WMP without this harming the integrity of the non-media related operating system functionality, suggesting that Windows is designed to "gracefully" deal with interdependencies, that is to say, without undermining the functioning of the "rest" of the (in Microsoft's view) operating system.[1294]

(1030) Microsoft's contention that Windows XP Embedded is licensed for special purpose devices and not for general purpose PCs is immaterial in this regard, as Microsoft's licensing policy cannot detract from the technical reality that there is a version of Windows XP which has been designed with a view to making components removeable to reduce the footprint of Windows and to resolve dependency issues.[1295]

---

[1290]  See Microsoft's Windows Embedded homepage, Frequently Asked Questions, printed 15 May 2002.

[1291]  "*To keep the footprint of a given Windows XP Embedded runtime as small as possible for use in hardware devices with limited amounts of memory, it is possible to exclude a wide range of components from that runtime, including components labeled Windows Media Player.*" (Microsoft's submission of 7 February 2004, on page 65)

[1292]  See Microsoft's Windows Embedded homepage, Frequently Asked Questions, printed 15 May 2002.

[1293]  Windows Media Player 7.1 is a 10.187 MB program, taking 49 minutes to download (at http://www.microsoft.com/windows/windowsmedia/download/default.asp, printed 16 May 2002).

[1294]  Demonstration of RealNetworks at the Oral Hearing, *Case COMP/C-3/37.792-Microsoft*, 14 November 2003, slides 23-26. In the US, trial evidence was put forward but then not admitted because of procedural reasons that Windows XP worked well when WMP was removed. "*Even though I neither added nor changed any code to compensate for the removal of the Windows Media Player, removing the Windows Media Player did not cause a system crash for any application or function. It appears that a Windows XP operating system with the Windows Media Player removed continues to be very stable, even without adjustments to the remaining code.*" (J. Bach, May 2002, Civil Action No. 98-1233 (CKK) at paragraph 71). Microsoft avoids to state that Windows XP Embedded would break if WMP is removed, but points out that a general statement to the effect that Windows XP Embedded does *not* break would be "meaningless" as such a statement can "*only be made with reference to a particular runtime created using Windows XP Embedded [...]*" (Microsoft's submission of 7 February 2004, on page 65. See also Microsoft's submission of 6 February 2004, on page 5, first paragraph)

[1295]  Microsoft's submission of 17 October 2003 (NERA), at paragraph 79. See also "*Can I use an embedded operating system on my home computer? No. Microsoft does not license the embedded*

(1031)  Any efficiency implications of code removal would weigh heavier if Microsoft had shown that the integration of WMP was a precondition for these efficiencies. Microsoft has not provided evidence to that effect. While, in general, it is accurate that multimedia functionality cannot be called upon when it is not present on a client PC, other streaming media player vendors implement services such as "stream files", "play back files on the hard disk" and "play a CD or a DVD" by devising their own solutions.[1296]  Microsoft itself states that RealPlayer running on top of Windows XP Embedded without WMP – without further development work by RealNetworks - replaces 21 features that WMP normally offers.[1297]  Software developers can also rely on media player redistributable code (such as WMP redistributable) which exposes the corresponding APIs.[1298]  Microsoft's suggestion that "*[t]here is little point in documenting APIs or protocols if the software code that supplies the functionality exposed by those APIs and protocols is not present in the operating system*" would be odd if it was to mean that it only makes sense to document APIs if they are part of the operating system: WMP 9 was not part of the operating system when first introduced on the Internet and Microsoft still documented its APIs.[1299]

(1032)  If developers devise their own solutions or integrate a third party's redistributable code in their application, they do not depend on the presence of the media player on the user's client PC. The benefit for the customer is that these functionalities *are* provided, not that they are provided by the integrated WMP. Nothing in Microsoft's submissions points to evidence that end users could not enjoy this functionality through a bundle of Windows and a third party media player.

---

operating systems for use on a general-purpose personal computer.", *Windows Embedded Frequently Asked Questions*, http://www.microsoft.com/windows/Embedded/faq/default.asp, printed 3 December 2003.

[1296]  RealNetworks's submission of 18 December 2003, Annex. Microsoft itself does not claim that third parties' products cannot implement such functionality: "*For example, a media player vendor might decide to call upon Windows to play MP3 audio files but to rely on its own application to play MPEG-2 video files. [...] Even if one were to assume that third-party media players could replicate the media playback functionality supplied by Windows, [...]*" (Microsoft's submission of 7 February 2004, at pp. 60 and 64.)

[1297]  As regards the other 20 features that "*Microsoft intended the operating system to have*", Microsoft states that they are not available with WMP removed. Microsoft does, however, not state that they could not be developed and offered in other media players (assuming that Windows' APIs are sufficiently documented) or that Windows would not work, regard being had to the non-availability of these functionalities. (Microsoft's submission of 6 February 2004, on page 2)

[1298]  For example, through its Windows Media Player 9 Series Redistribution License, Microsoft offers software developers the possibility "*to redistribute the player as part of their application and from their Web site*". (*Redistributing and Licensing Windows Media Components*, September 2003, http://msdn.microsoft.com/library/default.asp?url=/library/en-us/dnwmt/html/lic_redist.asp, printed 23 December 2003.) This is what, for example, MusicMatch takes advantage of in its Jukebox application.

[1299]  Microsoft also states that "*RealNetworks media players expose some of their functionality through documented APIs*"; RealNetworks' media players are not present in the operating system *a priori*. (Microsoft's submission of 7 February 2004, on page 68)

286

(1033)  Moreover, it is obvious that if WMP is removed, certain multimedia functionalities that WMP normally delivers will not be available. But, firstly, another media player (or even WMP itself) implementing these functionalities can be installed on the PC. And, second, in any event, it is appropriate to differentiate between *technical* dependencies which would by definition lead to the non-functioning of the operating system and *functional* dependencies which can be dealt with "gracefully".

(1034)  It is interesting to note that a US Court of Appeals in a related (but not identical) context took issue with Microsoft's commingling of browser code with Windows to prevent OEMs and consumers from removing such browser code from a Windows PC under the legal doctrine of monopoly maintenance. The Court found that Microsoft had not proffered a justification for code-commingling, and concluded that Microsoft's conduct *"reduces rivals' usage share and, hence, developers' interest in rivals' APIs as an alternative to the API set exposed by Microsoft's operating system"* in an anticompetitive manner.[1300]

6.1.2.4.2  Interdependencies between Windows and third party applications

(1035)  According to Microsoft, content providers would be harmed as they invoke Windows Media Player APIs to play audio and video.[1301]  Code removal would also injure software developers who write applications that rely on WMP.[1302]  For example, RealNetworks' media player could no longer play video or audio files in the Windows Media format.[1303]  MusicMatch Jukebox would not work without WMP.[1304]

(1036)  However, the presence of WMP on a PC is not a precondition for content providers and software developers to rely on WMP functionality (see footnote 1298).

(1037)  As regards the impact of code removal on content providers, it is not an unusual situation that content providers implement solutions which examine what media player is installed on a user's PC, and that they foresee the necessary steps in case the presentation of their content requires a particular media player or a particular version of a given media player.[1305]  In a submission to the Commission, Microsoft confirms

---

[1300]  Judgment of 28 June 2001, United States Court of Appeals for the District of Columbia Circuit, *United States v. Microsoft*, No. 00-5212, on page 39.

[1301]  Microsoft's submission of 17 October 2003, on page 125.

[1302]  Microsoft's submission of 17 October 2003, on page 122.

[1303]  Microsoft's submission of 17 October 2003, on page 123.  Microsoft specifies that RealNetworks' player would not be able to do so if also the DirectShow APIs were removed.

[1304]  Microsoft's submission of 17 April 2002, NERA, on page 6.

[1305]  In the context of explaining the procedures and requirements for including Windows Media components in an application setup Microsoft states that a registry lookup is all developers need to do to determine which version of Windows Media Player is present on a PC. (*Redistributing Windows Media Components*, February 2003, http://msdn.microsoft.com/library/default.asp?url=/library/en-us/dnwmt/html/rediswmedc.asp)

that "*[w]hen users encounter content in a particular format on the Web, typically the Web site provides a button that directs users to the appropriate vendor's Web site, where they can download and install a new or updated copy of the media player free of charge.*"[1306]

(1038) For instance, content providers need to provide for the possibility that content based on Windows Media 9 Series is requested by a user who uses the older and not fully compatible version 6.4 of WMP.[1307] To provide for such an eventuality is a common industry practice used notably by Microsoft's competitors and Microsoft itself. It is not necessary to employ a significant programming effort to adapt a content provider's site so that it detects the possible absence of WMP and directs the user towards options of how to proceed.[1308]

(1039) RealNetworks demonstrated at the Oral Hearing that MusicMatch Jukebox and RealOne Player worked on a PC running Windows XP Embedded without WMP.[1309] As mentioned at recital (1028) *et seq.*, Windows XP Embedded offers customers *inter alia* the possibility to remove the WMP application via the Windows XP Embedded Target Designer.[1310]

(1040) In its demonstration, RealNetworks did not remove lower level media functionality (called "infrastructure" by Microsoft in the Windows XP Embedded Target Designer, e.g. DirectSound files[1311]). What was removed, however, was the WMP application as featured in the Target Designer including the codecs and file container files (including DRM).[1312] MusicMatch Jukebox could still play Windows Media files after WMP was removed as it contains the WMP redistributable.[1313]

(1041) Microsoft argues furthermore that "*if Windows ceased to be a consistent platform, software developers would tend to target particular versions of the operating system*

---

[1306] Microsoft's submission of 17 October 2003, NERA, at paragraph 48. An example of this is OD2 and Microsoft with a "Get Windows Media Player 9 Here" link on the website of the MSN Music Club (http://sib1.od2.com/common/frameset/frames.asp).

[1307] *Compatibility and Future Support for the Windows Media Player ActiveX Control*, January 2003, http://msdn.microsoft.com/library/default.asp?url=/library/en-us/dnwmt/html/6-4compat.asp, printed 23 December 2003. Content created using Windows Media 9 Series works with Windows Media Player 7 and later versions.

[1308] This was also confirmed in the Oral Hearing by Ms. Linda Averett, Microsoft, on questions of the Commission.

[1309] Presentation of RealNetworks at the Oral Hearing, *Case COMP/C-3/37.792-Microsoft*, 14 November 2003, slides 23-26.

[1310] RealNetworks's email of 20 January 2004, *Description of process used by RealNetworks to build the operating system on the personal computers used during the Microsoft hearing and provided to the European Commission*

[1311] These files (for example dsound.dll) are designated by Microsoft as operating system files in the properties/product name fields, and not as Windows Media files.

[1312] See RealNetworks's email of 22 January 2004.

[1313] See also Microsoft's own submission of 19 January 2004, on page 2.

288

*in developing their applications, hindering interoperability.*"[1314]  However, software developers need to target particular versions of WMP (and Windows) today.[1315]

(1042)  More fundamentally unacceptable is the further-reaching rationale seemingly underpinning Microsoft's argument:   Microsoft's dominance in the client PC operating system market uniquely enables Microsoft to leverage its market power through tying its streaming media player.  Microsoft's argument appears to be that for the sole reason that Microsoft has this option at its disposal, implementing it should not be of competitive concern.[1316]  By doing so, Microsoft would provide a focal point for software developers who build on media players.  This is not a legitimate line of conduct or argument under Community competition law as it distorts competition on the merits.

### 6.1.3   Monitoring Mechanism

(1043)  It must be ensured that the Commission will be in a position to efficiently oversee Microsoft's compliance with this Decision.  A mere reporting mechanism is not sufficient in that respect.  For instance, as regards the refusal to supply abuse, the accuracy and completeness of the specifications to be disclosed can only be ascertained on a case-by-case basis and by having the possibility to interrogate Microsoft's source code.

(1044)  The effective monitoring of Microsoft's compliance with this Decision will therefore have to be ensured by establishing a suitable monitoring regime including a monitoring trustee.  Microsoft will have to submit a proposal to that effect.  Guiding principles for Microsoft in this respect are outlined in the following.

(1045)  The primary responsibility of the Monitoring Trustee should be to issue opinions, upon application by a third party or by the Commission or *sua sponte*,[1317] on whether Microsoft has, in a specific instance, failed to comply with this Decision, or on any issue that may be of interest with respect to the effective enforcement of this Decision.

---

[1314]  See for example, Microsoft's submission of 17 October 2003, on page 83.

[1315]  "*Because there are multiple versions of Windows Media Player in use, you might choose to continue supporting multiple versions. The Windows Media Player 9 Series Software Development Kit (SDK) includes a sample that demonstrates how to detect which Player (and Web browser) the user has and then provide a Web page tailored for that user. If you choose this approach, you can be sure to provide the best experience for every user while getting the benefits of migrating your content to the latest platform.*" (Compatibility and Future Support for the Windows Media Player ActiveX Control, January 2003.   http://msdn.microsoft.com/library/default.asp?url=/library/en-us/dnwmt/html/6-4compat.asp, printed 23.12.2003.)

[1316]  See Microsoft's submission of 7 February 2004, on page 61 quoting Microsoft's response to the supplementary statement of objections and on page 64.

[1317]  The Monitoring Trustee should not only be reactive, but should play a proactive role in the monitoring of Microsoft's compliance.

(1046)  As regards interoperability, the Monitoring Trustee's responsibility should, in particular, involve assessing whether the information made available by Microsoft is complete and accurate, whether the terms under which Microsoft makes the specifications available and allows the use thereof are reasonable and non-discriminatory and whether the ongoing disclosures are made in a timely manner.

(1047)  As regards tying, the Monitoring Trustee's responsibility should, in particular, be to advise the Commission whether substantiated complaints by third parties about Microsoft's compliance with this Decision are well-founded from a technical point of view. In particular, but not exclusively,

   (i)    the Monitoring Trustee should advise whether Microsoft has unbundled WMP from Windows as ordered by this Decision;

   (ii)   the Monitoring Trustee should advise whether the unbundled version of Windows is less performing than any bundled version of Windows that Microsoft would continue to offer, regard being had to the fact that media functionality included in WMP would, by definition, not be part of the unbundled Windows;

   (iii)  the Monitoring Trustee should advise whether Microsoft hinders the performance of rival media players through selective, inadequate, or untimely disclosures of Windows APIs.

(1048)  Microsoft's proposal, which shall comprise a mandate for the Monitoring Trustee, should have regard to the following principles:

   (i)    the Monitoring Trustee should be designated by the Commission from a list of (legal) persons submitted by Microsoft; in submitting such a list, Microsoft should provide sufficient information for the Commission to verify that the proposed Monitoring Trustees can adequately fulfil his function; a procedure should be foreseen which allows the Commission to designate a Monitoring Trustee of its choosing in case it does not deem any of the persons proposed by Microsoft adequate for the task;

   (ii)   the Monitoring Trustee should be independent of Microsoft and provisions should be established to ensure that the Monitoring Trustee is not and will not become exposed to a conflict of interest; he should possess the necessary qualifications to carry out his mandate, and have the possibility to hire experts to carry out certain precisely defined tasks on his behalf;

   (iii)  provisions should be established in order to guarantee that the Monitoring Trustee has access to Microsoft's assistance, information, documents, premises and employees to the extent that he may reasonably require such access in carrying out his mandate;

   (iv)   the Monitoring Trustee should have full access to the source code of the relevant Microsoft products (any controversy as to the accuracy and completeness of the specifications that will be disclosed can only be resolved

290

> if the technical information is checked against the actual source code of
> Microsoft's products);

> (v)    all costs of establishment of the Monitoring Trustee, including a fair
> remuneration for the Monitoring Trustee's activities, should be borne by
> Microsoft.

*6.1.4    Consistency of the remedies with the Community's international obligations*

(1049)    According to Microsoft, the proposed remedies violate the Community's
international obligations. In this respect, Microsoft's argument is twofold.

(1050)    First, Microsoft argues that the remedy concerning the refusal to supply abuse would
violate the Community's obligations under the World Trade Organisation Agreement
on Trade-Related Aspects of Intellectual Property Rights[1318] ("the TRIPS
Agreement").[1319]    In Microsoft's view, the remedy *"implicates various intellectual
property rights protected by the TRIPS Agreement"* including *"at least patents,
copyright and trade secrets"*.[1320]    As regards copyright, Microsoft argues that a
compulsory disclosure of its copyright fails to meet the requirements which Article
13 of the TRIPS Agreement[1321] sets out for limitations and exceptions to
copyrights.[1322]    Concerning the other intellectual property rights protected by the
TRIPS Agreement, Microsoft does not further substantiate any possible violations of
the relevant obligations under the TRIPS Agreement.

(1051)    Second, Microsoft argues that to order the removal of WMP code would violate the
Community's obligations under the World Trade Organisation Agreement on
Technical Barriers to Trade[1323] ("the TBT Agreement").[1324]

(1052)    The Commission has carefully considered all of Microsoft's arguments and sees no
inconsistency between this Decision and the Community's international obligations,

---

[1318]    Agreement on Trade-Related Aspects of Intellectual Property Rights, Annex 1C of the Agreement
Establishing the World Trade Organization of 15 April 1994, OJ L 336, 23.12.1994, p. 214,
http://www.wto.org/english/docs_e/legal_e/27-trips.pdf.

[1319]    Microsoft's submission of 17 November 2000, at paragraphs 5 and 32; Microsoft's submission of 16
November 2001, at paragraph 168; Microsoft's submission of 17 October 2003, on page 11.

[1320]    Microsoft's submission of 17 November 2000, at paragraph 172 (footnotes omitted), see also, although
not in the context of the TRIPS Agreement, Microsoft's submission of 30 November 2003, on page 2:
*"There can be no doubt that the technology that Third SO would require Microsoft to divest or license
constitutes highly valuable intellectual property that is protected by trade secret, copyright and patent
laws."*

[1321]    Article 13 TRIPS "Limitations and Exceptions": *"Members shall confine limitations or exceptions to
exclusive rights to certain special cases which do not conflict with a normal exploitation of the work
and do not unreasonably prejudice the legitimate interests of the right holder."*

[1322]    Microsoft's submission of 17 November 2000, at paragraphs 174-180, and Annex Z, on page 7-12.

[1323]    Agreement on Technical Barriers to Trade, Annex 1A of the Agreement Establishing the World Trade
Organisation    of    15    April    1994,    OJ    L    336,    23.12.1994,    p.    86
http://www.wto.org/english/docs_e/legal_e/17-tbt.pdf.

[1324]    Microsoft' submission of 17 October 2003 (response to supplementary Statement of Objections), at
p.131-133.

since the action the Commission is taking under this Decision is fully consistent with its obligations under the WTO Agreements, in particular the TRIPS and the TBT Agreements. These agreements allow the imposition of an obligation to bring to an end the infringement identified in this Decision.

(1053) Furthermore, it is settled case-law that "*having regard to their nature and structure, the WTO agreements are not in principle among the rules in the light of which the Court is to review the legality of measures adopted by the Community institutions*".[1325] It also follows from this case-law that "*[i]t is only where the Community intended to implement a particular obligation assumed in the context of the WTO, or where the Community measure refers expressly to the precise provisions of the WTO agreements, that it is for the Court to review the legality of the Community measure in question in the light of the WTO rules*".[1326] In this case, these conditions are not satisfied and Microsoft can therefore not invoke the TRIPS Agreement or the TBT Agreement to challenge the legality of this Decision.

## 6.2    Article 15 (2) of Regulation 17 - Fines

(1054) Under Article 15 (2) of Regulation 17, the Commission may, by decision, impose fines upon undertakings or associations of undertakings where, either intentionally or negligently, they infringe Article 82 of the Treaty and/or Article 54 of the EEA Agreement. Such fines can be a sum from EUR 1,000 to EUR 1,000,000 or a sum in excess thereof, but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement.

(1055) In fixing the amount of the fine, the Commission must have regard to the gravity and duration of the infringement. In addition, the fine imposed should reflect any aggravating or attenuating circumstances.

(1056) In its reply to the supplementary Statement of Objections[1327] and at the Oral Hearing, Microsoft stated that the Commission should not impose any fine on Microsoft for the following reasons:

   (i)     Microsoft cannot be found to have infringed any provision of the Treaty;

   (ii)    in both the refusal to supply and the tying case, the Commission is applying a new rule of law;

   (iii)   the corresponding novel theories of liability are not ones that would have been apparent to Microsoft or anyone else in the software business;

---

[1325]   Judgement of the Court in Case C-149/96 Portugal v Council [1999] ECR I-8395, at paragraph 47; confirmed for the TRIPS Agreement in Judgment of the Court in Case C-491/01, British American Tobacco [2002] ECR I-11453, at paragraphs 154-156).

[1326]   Judgement of the Court in *Portugal v Council*, at paragraph 49.

[1327]   See Microsoft's submission of 17 October 2003, on pages 135 to 138.

(iv)   as regards tying, there is no event that can reasonably be said to have started the abuse;  the Commission suggests that such an event occurred in 1999 although multimedia playback functionality has been integrated in Windows since 1992.

(1057)   Those arguments cannot be accepted.  First, the arguments set out in this Decision constitute, in themselves, sufficient proof that Microsoft has intentionally or at least negligently infringed Article 82 of the Treaty and Article 54 of the EEA agreement.[1328]  Second, the Commission is not applying any new rule of law.  As far as the refusal to supply is concerned, this case is based on a constant practice as expressed and developed in previous cases including *Commercial Solvents*, *Télémarketing*, and *Magill*, among others.  The same goes for tying, for which cases like *Hilti* and *Tetra Pak II* should have constituted sufficient guidance for Microsoft.  In the absence of the application of any novel concept of competition law, and in view of the fact that the software industry is not exempted from the application of competition law, Microsoft should have been aware of the fact that it was infringing the competition rules of both the Treaty and the EEA Agreement.  Finally, as regards Microsoft's argument that the starting point for the tying abuse is doubtful, it has to be noted that an earlier starting point of the abuse would not have a bearing on whether a fine should be imposed or not.  At most, it should have an effect on the amount to be imposed for the duration of the infringement.  In any event, by choosing 1999 instead of 1998 or 1992, the Commission is limiting itself to the period for which, in view of the available evidence, the abuse of a dominant position is clearly established, and is not causing any prejudice to Microsoft.  Quite the contrary, since the longer the duration of the abuse, the larger the final amount of the fine would be.

(1058)   In summary, in view of the above considerations, the Commission concludes that Microsoft's conduct justifies the imposition of a fine.

### 6.2.1   The basic amount of the fine

(1059)   The basic amount of the fine is determined according to the gravity and duration of the infringement.

### 6.2.1.1   Gravity

(1060)   In its assessment of the gravity, the Commission takes into account the nature of the infringement, the actual impact on the market (where this can be measured) and the size of the relevant geographic market.

---

[1328]   See Judgment of the Court in Case 19/77 Miller International Schallplatten v Commission [1978] ECR 131, at paragraph 18.

6.2.1.1.1  Nature of the infringement

(1061)  Refusal to supply and tying by undertakings in a dominant position have already been ruled against on several occasions by the Court of Justice.[1329]

(1062)  It has been established in this Decision that Microsoft holds a dominant position in the client PC operating system market with a market share that is currently well above 90%.  The client PC operating system market, as well as the two other markets relevant to this case are characterised by strong direct and/or indirect network effects.[1330]

(1063)  In these circumstances, Microsoft has conducted a leveraging strategy which constitutes *two separate abuses*.

(1064)  As regards the refusal to supply abuse, Microsoft has engaged in a *general pattern of conduct* which focuses on the creation and sole exploitation of a range of privileged connections between its dominant client PC operating system and its work group server operating system, and on the disruption of previous levels of interoperability. The interoperability information at stake is indispensable for competitors to be able to viably compete in the work group server operating system market.[1331]

(1065)  Microsoft's abuse enables it to extend its dominant position to the market for work group server operating systems.   This market is in itself of significant value: it concerns products that are part of the basic infrastructure used by office workers around the world in their day-to-day work.  In addition, capturing the work group server operating system market is liable to have further effects detrimental to competition.  First, it would erect further barriers to entry in the client PC operating system market[1332] and limits the risk of a change of paradigm that could strip Microsoft's overwhelming dominance on the client PC operating system market of its competitive importance.[1333]  Second, it would provide a bridgehead from which Microsoft could further leverage its position into other areas of the server industry.[1334]

(1066)  As regards the second abuse, Microsoft's tying behaviour ensures that the ubiquity of its client PC operating system is shared by its streaming media player.  As described above, this creates disincentives for OEMs to ship third party streaming media

---

[1329]  See above at recital (1057). See also Commission Decision 2002/180/EC in Case Comp/C-1/37.859 - De Post - La Poste). OJ L 61, 2.3.2002, p. 32.
[1330]  For the streaming media player market, see above, at recitals (420) *et seq.* and at recitals (879) *et seq.* For the work group server operating system market, see above at recitals (516) *et seq.*
[1331]  See above, Section 5.3.1.2.2 and Section 5.3.1.2.3.
[1332]  See above, at recital (769).
[1333]  See above, at recitals (770) *et seq.*
[1334]  See above, at recitals (775) *et seq.*

players pre-installed on their PCs,[1335] and harms competition in the market for streaming media players.[1336]

(1067)   In addition, the abuse has significant effects on the competition landscape for the delivery of content over the Internet and on multimedia software. This is an important commercial sector at present, and will become even more so in the near future (as a source of revenues). Content providers and software developers focus increasingly on Windows Media Player and on Windows proprietary media formats and technologies, because they know that WMP is pre-installed on every Windows PC.[1337] This is notwithstanding the fact that other media players are of similar or even higher quality than WMP.[1338] Furthermore, domination of the streaming media player market may constitute a strategic gateway to a range of related markets, on some of which high revenues can be earned. Microsoft's strategy could lead to a situation where any company wishing to sell content (audio or video) in digital form in a secure way would need to pay a "toll" to Microsoft on each such transaction.[1339]

(1068)   For the reasons outlined above, this infringement constitutes by its nature a very serious infringement of Article 82 of the Treaty and Article 54 of the EEA Agreement.

6.2.1.1.2   Impact of the infringement

(1069)   The pattern of exclusionary leveraging behaviour engaged in by Microsoft has a significant impact on the markets for work group server operating systems and for streaming media players.

(1070)   As regards the market for work group server operating systems, the abuse has already contributed to Microsoft achieving a dominant position in that market, and risks eliminating competition on that market.[1340]

(1071)   As regard the market for streaming media players, the abuse has already contributed to Microsoft achieving a leading position in that market. Evidence described in this Decision suggests that the market may already be tipping in favour of WMP.[1341]

(1072)   In conclusion, the Commission considers that the impact of Microsoft's abuses on the relevant markets has been significant.

---

[1335]   See above at recital (851).
[1336]   See above, Section 5.3.2.1.4
[1337]   See above, Section 5.3.2.1.4.2
[1338]   See above, at recitals (947)-(951).
[1339]   See above, at recital (975) *et seq*.
[1340]   See above, Section 5.3.1.2.
[1341]   See above, Section 5.3.2.1.4.

6.2.1.1.3  Size of the relevant geographic market

(1073)  For the purposes of assessing the gravity of the abuses, the markets for client PC operating systems, for work group server operating systems and for media players, are EEA-wide in scope.

6.2.1.1.4  Conclusion on gravity

(1074)  On the basis of the above, it is apparent that the behaviour of Microsoft involves abuses of a dominant position that are particularly anti-competitive in their nature, and which have a significant impact on markets of strategic importance in the IT sector. In addition, Microsoft's behaviour affects the entire EEA. In view of these factors, it must be concluded that Microsoft has committed a very serious infringement of Article 82 of the Treaty and Article 54 of the EEA Agreement, for which the likely fine is above EUR 20 million.

(1075)  The initial amount of the fine to be imposed on Microsoft to reflect the gravity of the infringement should be, in light of the above circumstances, EUR 165,732,101.

(1076)  When calculating the initial amount of the fine, account should be taken of the necessity of setting the fine at a level that ensures that it has a sufficient deterrent effect. In order to do so, it is necessary to determine whether any upward adjustment of the initial amount is necessary. Given Microsoft's significant economic capacity,[1342] in order to ensure a sufficient deterrent effect on Microsoft, the initial amount should be adjusted upwards by a factor of 2 to EUR 331,464,203.

6.2.1.2  Duration

(1077)  Microsoft's refusal to supply abuse commenced in October 1998 and is still ongoing. Microsoft's tying abuse commenced in May 1999 and is still ongoing. For the

---

[1342]  Microsoft is currently the largest company in the world by market capitalisation. (see http://news.ft.com/servlet/ContentServer?pagename=FT.com/StoryFT/FullStory&c=StoryFT&cid=105 1390342368&p=1051389855198 and http://specials.ft.com/spdocs/global5002003.pdf - the Financial Times "World's largest Companies", updated on 27 May 2003, printed on 13 January 2004). According to the same measure, Microsoft has held a consistently high ranking in the list of the world's largest companies by market capitalisation, being the largest in 2000, the fifth largest in 2001, and the second largest in 2002 (see http://specials.ft.com/ln/specials/global5002a.htm (for 2000, printed on 24 January 2003), http://specials.ft.com/ft500/may2001/FT36H8Z8KMC.html (for 2001, printed on 24 January 2003), http://specials.ft.com/ft500/may2002/FT30M8IPX0D.html (for 2002, printed on 24 January 2003)). Microsoft's resources and profits are also significant. Microsoft's Securities and Exchange Commission filing for the US fiscal year July 2002-June 2003 reveals that it possessed a cash (and short-term investment) reserve of USD 49,048 million on June 30, 2003. As regards profits, this Securities and Exchange Commission filing indicates that in US fiscal year July 2002-June 2003, Microsoft earned profits of USD 13,217 million on revenues of USD 32,187 million (profit margin of 41%). For the Windows PC client PC operating system product during this period ("Client" product segment), Microsoft earned profits of USD 8,400 million on revenues of USD 10,394 million (profit margin of 81%).

purposes of the calculation of the fine, the overall duration of Microsoft's infringement is 5 years and 5 months, that is, an infringement of long duration.

(1078)  Consequently, the amount of the fine to be imposed on the basis of the gravity of the infringement should therefore be increased by 50% to take account of its duration. On that basis, the basic amount of the fine is EUR 497,196,304.

*6.2.2   Aggravating and attenuating circumstances*

(1079)  There are no aggravating or attenuating circumstances relevant to this Decision.

*6.2.3   Conclusion*

(1080)  In view of the considerations that have been outlined above, the final amount of the fine to be imposed on Microsoft is EUR 497,196,304.

HAS ADOPTED THIS DECISION:

*Article 1*

For the purpose of this Decision, the following definitions shall apply:

(1)    the term "*Interoperability Information*" means the complete and accurate specifications for all the *Protocols* implemented in *Windows Work Group Server Operating Systems* and that are used by *Windows Work Group Servers* to deliver file and print services and group and user administration services, including the Windows Domain Controller services, Active Directory services and Group Policy services, to *Windows Work Group Networks*;

(2)    the term "*Protocol*" means a set of rules of interconnection and interaction between various instances of *Windows Work Group Server Operating Systems* and *Windows Client PC Operating Systems* running on different computers in a *Windows Work Group Network*;

(3)    the term "*Timely Manner*" with respect to disclosure of protocol specifications means as soon as Microsoft Corporation has developed a working and sufficiently stable implementation of these specifications; by way of illustration, for protocols supported in a service pack or in a new version of a product, "*Timely Manner*" means as soon as the service pack or the new version is made available outside Microsoft Corporation for beta testing purposes;

(4)    the term "*Windows Client PC*" means a PC connected to a network and on which a *Windows Client PC Operating System* is installed;

(5)    the term "*Windows Client PC Operating System*" means any of the software products marketed by Microsoft Corporation as Windows 98, Windows 98 Second Edition, Windows Millennium edition, Windows NT Workstation 4.0, Windows 2000 Professional, Windows XP Home and Windows XP Professional, and updates (including, without limitation, security patches), upgrades and successors to the latter, as well as updates and upgrades of such successors;

(6)    the term "*Windows Media Player*" means the media code which Microsoft Corporation currently distributes as WMP in Windows XP Embedded (thus including components that support the Windows Media codecs, Windows Media file formats, WMDRM and the WMP User Interface); for future versions of the *Windows Client PC Operating System*, the term "*Windows Media Player*" shall cover the foregoing components;

(7)    the term "*Windows Work Group Network*" means any group of *Windows Client PCs* and *Windows Work Group Servers* linked together *via* a computer network;

(8)    the term "*Windows Work Group Server*" means a computer connected to a network and on which a *Windows Work Group Server Operating System* is installed;

(9)    the term "*Windows Work Group Server Operating System*" means any of the software products marketed by Microsoft Corporation as Windows NT Server 4.0, Windows 2000 Server and Windows Server 2003 Standard Edition, and updates (including,

without limitation, security patches), upgrades and successors to the latter, as well as updates and upgrades to such successors.

### Article 2

Microsoft Corporation has infringed Article 82 of the Treaty and Article 54 of the EEA Agreement by:

(a) refusing to supply the *Interoperability Information* and allow its use for the purpose of developing and distributing work group server operating system products, from October 1998 until the date of this Decision;

(b) making the availability of the *Windows Client PC Operating System* conditional on the simultaneous acquisition of *Windows Media Player* from May 1999 until the date of this Decision.

### Article 3

For the infringement referred to in Article 2, a fine of EUR 497,196,304 is imposed on Microsoft Corporation.

The fine shall be paid, within 3 months of the date of notification of this Decision, into Bank account No 001-3953713-69 (Code SWIFT GEBABEBB – Code IBAN BE71 0013 9537 1369) of the European Commission with FORTIS Bank, Rue Montagne du Parc 3, 1000 Brussels.

After the expiry of that period, interest shall automatically be payable at the interest rate applied by the European Central Bank to its main refinancing operations on the first day of the month in which this Decision was adopted, plus 3.5 percentage points, namely 5.50%.

### Article 4

Microsoft Corporation shall bring to an end the infringement referred to in Article 2 in accordance with Articles 5 and 6.

Microsoft Corporation shall refrain from repeating any act or conduct described in Article 2 and from any act or conduct having the same or equivalent object or effect.

### Article 5

As regards the abuse referred to in Article 2 (a):

(a) Microsoft Corporation shall, within 120 days of the date of notification of this Decision, make the *Interoperability Information* available to any undertaking having an interest in developing and distributing work group server operating system products and shall, on reasonable and non-discriminatory terms, allow the use of the *Interoperability Information* by such undertakings for the purpose of developing and distributing work group server operating system products;

(b) Microsoft Corporation shall ensure that the *Interoperability Information* made available is kept updated on an ongoing basis and in a *Timely Manner*;

(c) Microsoft Corporation shall, within 120 days of the date of notification of this Decision, set up an evaluation mechanism that will give interested undertakings a workable possibility of informing themselves about the scope and terms of use of the *Interoperability Information*; as regards this evaluation mechanism, Microsoft Corporation may impose reasonable and non-discriminatory conditions to ensure that access to the *Interoperability Information* is granted for evaluation purposes only;

(d) Microsoft Corporation shall, within 60 days of the date of notification of this Decision, communicate to the Commission all the measures that it intends to take under points (a), (b) and (c); that communication shall be sufficiently detailed to enable the Commission to make a preliminarily assessment as to whether the said measures will ensure effective compliance with the Decision; in particular, Microsoft Corporation shall outline in detail the terms under which it will allow the use of the *Interoperability Information*;

(e) Microsoft Corporation shall, within 120 days of the date of notification of this Decision, communicate to the Commission all the measures that it has taken under points (a), (b) and (c).

### *Article 6*

As regards the abuse referred to in Article 2 (b):

(a) Microsoft Corporation shall, within 90 days of the date of notification of this Decision, offer a full-functioning version of the *Windows Client PC Operating System* which does not incorporate *Windows Media Player*; Microsoft Corporation retains the right to offer a bundle of the *Windows Client PC Operating System* and *Windows Media Player*;

(b) Microsoft Corporation shall within 90 days of the date of notification of this Decision communicate to the Commission all the measures it has taken to implement point (a).

### *Article 7*

Within 30 days of the date of notification of this Decision, Microsoft Corporation shall submit a proposal to the Commission for the establishment of a suitable mechanism assisting the Commission in monitoring Microsoft Corporation's compliance with this Decision. That mechanism shall include a monitoring trustee who shall be independent from Microsoft Corporation.

In case the Commission considers Microsoft Corporation's proposed monitoring mechanism not suitable it retains the right to impose such a mechanism by way of a decision.

### *Article 8*

The Commission may at its sole discretion and upon a reasoned and timely request by Microsoft Corporation grant an extension of the various time limits provided for in Articles 5 and 6.

300

*Article 9*

This Decision is addressed to Microsoft Corporation, One Microsoft Way, Redmond, WA 98052, United States.

This Decision shall be enforceable pursuant to Article 256 of the EC Treaty and Article 110 of the EEA Agreement.

Done at Brussels, 24.03.2004

*For the Commission*

**Mario MONTI**
*Member of the Commission*

301