# EXHIBIT 13

Dockets.Justia.com

LATHAM & WATKINS LLP
  Daniel M. Wall (Bar No. 102580)
  Christopher S. Yates (Bar No. 161273)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Telephone:   (415) 391-0600
Facsimile:   (415) 395-8095

Attorneys for Daniel Harris

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* | CASE NO. 06-80038 JF (PVT) |
| Application of | DANIEL HARRIS' OBJECTIONS TO MICROSOFT CORPORATION'S SUBPOENA |
| MICROSOFT CORPORATION, | |
| Applicant. | Date:    March 21, 2006 and March 24, 2006 |
| | Time:    9:30 a.m. |
| | Place:   Covington & Burling One Front Street San Francisco, California 94111 |

Pursuant to Rules 30 and 45 of the Federal Rules of Civil Procedure, Non-Party

Daniel Harris hereby objects to Microsoft Corporation's ("Microsoft") Subpoena seeking

documents and deposition testimony ("Subpoena"). Due to the numerous infirmities with the

Subpoena, Mr. Harris will <u>not</u> appear for deposition or produce documents in response to the

Subpoena.

## PRELIMINARY STATEMENT

Based on an *ex parte* application to this Court, Microsoft has issued a subpoena

on Daniel Harris (a partner in the law firm Clifford Chance LLP) pursuant to 28 U.S.C. § 1782,

which permits but does not require U.S. courts to "provide assistance" to litigants in foreign legal

proceedings. Discovery under Section 1782 is not a matter of right, as would be the case were

1   the subpoenas issued in the course of U.S. litigation. Microsoft has the burden of establishing

2   that the Court, in its discretion, should permit the discovery. Furthermore, the Court is to

3   exercise its discretion pursuant to a set of factors unique to this setting, including the extent to

4   which the requested discovery would circumvent limitations on discovery in the relevant foreign

5   proceeding and whether the requested discovery is welcomed by the relevant foreign tribunal.

6   *See Intel Corp. v. Advanced Micro Devices, Inc.*, 524 U.S. 241, 264-5 (2004), *on remand,*

7   *Advanced Micro Devices, Inc. v. Intel Corp.*, No. 01-7033 MISC JW, slip op. at p. 4 (N.D. Cal.,

8   Oct. 4, 2004) (attached hereto as Exhibit 1).

9       Daniel Harris objects to the requested discovery in general and in numerous

10  particulars outlined below. Daniel Harris also intends to file a motion to quash on March 15,

11  2006. The European Commission, the relevant foreign tribunal, has also gone on record as

12  opposing the requested discovery, characterizing it as "an attempt to circumvent" its rules

13  regarding file access.

14                          **GENERAL OBJECTIONS**

15   **A.    Microsoft's subpoenas constitute an improper effort to circumvent**
16          **limitations on "file access" reflected in European Commission rulings**

17       Europe's antitrust enforcement agency, the Directorate General-Competition of

18  the Commission of the European Communities ("the Commission"), found in 2004 that

19  Microsoft had violated its antitrust laws. The Commission's 2004 decision mandated, *inter alia,*

20  that Microsoft provide certain interoperability information as part of the remedy for Microsoft's

21  violation of the European Commission's ("EC") antitrust laws. Importantly, Microsoft was

22  permitted to charge a reasonable royalty for protocol information. On December 21, 2005, the

23  Commission issued a "Statement of Objections" ("SO") finding that Microsoft had failed to

24  comply with various provisions of the Commission's 2004 decision. The December 21, 2005 SO

25  began a process whereby the Commission is essentially seeking to hold Microsoft in contempt

26  for failure to comply with its 2004 decision. This is the "foreign proceeding" in supposed aid of

27  which Microsoft seeks discovery from Mr. Harris.

28  ///

1          In the course of these contempt-like proceedings, Microsoft sought discovery

2    from the Commission concerning communications its competitors, including Oracle and its

3    attorneys, may have had with the Commission and a "Monitoring Trustee" the Commission

4    appointed to supervise Microsoft's compliance with the Commission's 2004 decision. The

5    Commission permitted certain discovery but, pursuant to its own procedural rules concerning

6    "file access," rejected some of Microsoft's requests. To the extent that Microsoft was, as a

7    matter of EC law, entitled to discovery of such communications, it has obtained such materials.

8    Daniel Harris therefore objects to the subpoena on the grounds that it is an improper effort to

9    circumvent the Commission's rulings regarding appropriate file access.

10        **B.**    **The Commission opposes Microsoft's effort to obtain the requested discovery**

11          In the *Intel v. AMD* case, the Supreme Court and Judge Ware of this Court held

12    that great weight was to be given to the Commission's views as to whether discovery sought

13    under Section 1782 would in fact constitute assistance to the foreign tribunal. *See Intel Corp. v.*

14    *Advanced Micro Devices, Inc.*, 524 U.S. 241, 264-5 (2004), *on remand, Advanced Micro*

15    *Devices, Inc. v. Intel Corp.*, No. 01-7033 MISC JW, slip op. at p. 4 (N.D. Cal., Oct. 4, 2004)

16    (denying discovery because the Commission opposed it); *see also Schmitz v. Bernstein Liebhard*

17    *& Lifshitz, LLP*, 376 F.3d 79 (2d Cir. 2004) (affirming denial of discovery under section 1782

18    where, *inter alia*, the German government opposed the discovery request). The Commission

19    opposes Microsoft's efforts to obtain this discovery through the U.S. legal system, as stated in

20    the letter to Oracle's European legal counsel from Philip Lowe, The Director-General of the

21    EC's Directorate-Competition (attached hereto as Exhibit 2). Indeed, the Commission's letter

22    notes that Microsoft's subpoena under Section 1782 is "apt to seriously harm the Commission's

23    investigation process and circumvent the European rules on access to file." Daniel Harris objects

24    to the Subpoena on the grounds that the Commission is not receptive to this Court's judicial

25    assistance.

26    ///

27    ///

28    ///

1

2

**C.    Microsoft's discovery requests seek privileged communications and work product in violation of the express terms of 28 U.S.C. § 1782**

3    Microsoft's discovery requests principally seek documents or evidence regarding

4    communications between Oracle, its lawyers and technical advisors, on the one hand, and the

5    Commission's professional staff and its Monitoring Trustee, on the other hand, concerning the

6    Commission's 2004 decision and Microsoft's compliance with that decision.  As noted,

7    communications with the Commission and the Monitoring Trustee are subject to the

8    Commission's rules on file access.  Everything else responsive to Microsoft's subpoenas is

9    subject to a privilege claim, since it consists of communications among Oracle and its lawyers

10    and technical advisors concerning Oracle's interest in licensing the technology pursuant to the

11    March 2004 Decision.  This is improper, since Section 1782 expressly precludes the discovery of

12    privileged communications.  *See* 28 U.S.C. § 1782: "A person may not be compelled to give his

13    testimony or statement or to produce a document or other thing in violation of any legally

14    applicable privilege."  Daniel Harris objects to the subpoena on the grounds that it seeks

15    privileged materials.  Daniel Harris will not produce any documents or provide testimony on

16    matters protected by the attorney-client privilege, the attorney work product doctrine, the

17    common interest privilege and/or any other privilege recognized in either the United States or the

18    EC.

19

20

**D.    Microsoft's overbroad discovery requests improperly seek to silence legitimate communications with the Commission regarding Microsoft's compliance with Commission decisions**

21    Oracle is a potential licensee of technical information provided under the 2004

22    decision.  Microsoft's grossly overbroad discovery requests improperly seek to silence Oracle's

23    right to communicate with the Commission regarding Microsoft's compliance with the 2004

24    decision.  Microsoft has issued subpoenas to each of the four companies that have reviewed its

25    interoperability disclosures pursuant to the procedures established by the Commission, and

26    counsel for the companies.  It is completely right and proper that these companies may

27    communicate their views of the adequacy of the disclosures to the Commission or the

28    Monitoring Trustee, and each should be able to do so without being subjected to discovery

1  demand from Microsoft.  In context, the subpoenas are retaliation for providing technical input to

2  the Commission and if permitted will chill not only the flow of information to the Commission in

3  this matter, but others as well.  Daniel Harris thus objects to the requested discovery.

4      **E.**     **Section 1782 does not permit discovery of documents located outside of the United States**

5

6          Daniel Harris objects to Microsoft's Subpoena to the extent it seeks documents

7  located outside of the United States (e.g., from Clifford Chance's office in Brussels).

8      **F.**     **Other General Objections**

9          Daniel Harris objects that the Subpoena is grossly overbroad and imposes undue

10  burden or expense in violation of Rules 26 and 45(c)(1) of the Federal Rules of Civil Procedure.

11          Daniel Harris objects to the Subpoena on the grounds that it seeks information

12  that is neither relevant to any "claim or defense of any party" nor reasonably calculated to lead to

13  the discovery of admissible evidence.

14          Daniel Harris objects to the Subpoena to the extent that it attempts or purports to

15  require disclosure of information and/or documents containing proprietary, confidential, and/or

16  private information, and declines to provide any such information and/or documents that could

17  subject Clifford Chance LLP, Mr. Harris or Oracle to competitive disadvantage or business

18  injury or violate confidentiality agreements or the privacy interests of third parties.

19          Daniel Harris objects to the Definitions, Instructions, Document Requests, and

20  Categories for Deposition to the extent they seek to impose obligations different from, or in

21  excess of, those created by the Federal Rules of Civil Procedure.

22          Daniel Harris objects to the Definitions, Instructions, Document Requests, and

23  Categories for Deposition to the extent they seek the production of documents not currently in

24  the possession of Clifford Chance, or otherwise seek to impose obligations exceeding those

25  required by law.

26  ///

27  ///

28  ///

**RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All documents that contain, constitute, reflect, evidence, or refer to any communication or correspondence between You and the Commission, whether on behalf of Oracle, another client, or yourself, relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Daniel Harris hereby incorporates his General Objections as if fully set forth herein. Daniel Harris further objects to this request for production on the grounds that: (1) it constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the attorney work product doctrine, the common interest privilege and/or any other privilege recognized in either the United States or the EC in violation of the express terms of Section 1782.

**REQUEST FOR PRODUCTION NO. 2:**

All documents that contain, constitute, reflect, evidence, or refer to any communication or correspondence between You and the Monitoring Trustee, whether on behalf of Oracle, another client, or yourself, relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Daniel Harris hereby incorporates his General Objections as if fully set forth herein. Daniel Harris further objects to this request for production on the grounds that: (1) it constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an

1    undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and

2    ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the

3    attorney work product doctrine, the common interest privilege and/or any other privilege

4    recognized in either the United States or the EC in violation of the express terms of Section

5    1782.

6    **REQUEST FOR PRODUCTION NO. 3:**

7    　　　　All documents that contain, constitute, reflect, evidence, or refer to any

8    communication or correspondence between You and OTR or any other consultant retained or

9    consulted by the Commission, whether on behalf of Oracle, another client, or yourself, relating to

10   the Interoperability Information or to the proper interpretation of the terms "Interoperability" or

11   "Interoperability Information" as used in the 2004 Decision.

12   **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

13   　　　　Daniel Harris hereby incorporates his General Objections as if fully set forth

14   herein.  Daniel Harris further objects to this request for production on the grounds that: (1) it

15   constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file

16   access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an

17   undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and

18   ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the

19   attorney work product doctrine, the common interest privilege and/or any other privilege

20   recognized in either the United States or the EC in violation of the express terms of Section

21   1782.

22   **REQUEST FOR PRODUCTION NO. 4:**

23   　　　　All documents that contain, constitute, reflect, evidence, or refer to any

24   communication between You and any other third party, whether on behalf of Oracle, another

25   client, or yourself, relating to the Interoperability Information or to the proper interpretation of

26   the terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.

27   ///

28   ///

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Daniel Harris hereby incorporates his General Objections as if fully set forth herein. Daniel Harris further objects to this request for production on the grounds that: (1) it constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the attorney work product doctrine, the common interest privilege and/or any other privilege recognized in either the United States or the EC in violation of the express terms of Section 1782.

**REQUEST FOR PRODUCTION NO. 5:**

All documents since March 24, 2004, that contain, constitute, reflect, evidence, or refer to any communication between You and the Commission, whether on behalf of Oracle, another client, or yourself, about Microsoft's compliance or alleged failure to comply with European Community competition laws, including without limitation the 2004 Decision, the Article 24(1) Decision, or the SO.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Daniel Harris hereby incorporates his General Objections as if fully set forth herein. Daniel Harris further objects to this request for production on the grounds that: (1) it constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the attorney work product doctrine, the common interest privilege and/or any other privilege recognized in either the United States or the EC in violation of the express terms of Section 1782.

///

///

1    **REQUEST FOR PRODUCTION NO. 6:**

2          All documents since March 24, 2004, that contain, constitute, reflect, evidence, or

3    refer to any communication between You and the Monitoring Trustee, whether on behalf of

4    Oracle, another client, or yourself, about Microsoft's compliance or alleged failure to comply

5    with European Community competition laws, including without limitation the 2004 Decision, the

6    Article 24(1) Decision, or the SO.

7    **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

8          Daniel Harris hereby incorporates his General Objections as if fully set forth

9    herein. Daniel Harris further objects to this request for production on the grounds that: (1) it

10   constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file

11   access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an

12   undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and

13   ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the

14   attorney work product doctrine, the common interest privilege and/or any other privilege

15   recognized in either the United States or the EC in violation of the express terms of Section

16   1782.

17   **REQUEST FOR PRODUCTION NO. 7:**

18         All documents since March 24, 2004, that contain, constitute, reflect, evidence, or

19   refer to any communication between You and OTR or any other consultant retained or consulted

20   by the Commission, whether on behalf of Oracle, another client, or yourself, about Microsoft's

21   compliance or alleged failure to comply with European Community competition laws, including

22   without limitation the 2004 Decision, the Article 24(1) Decision, or the SO.

23   **RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

24         Daniel Harris hereby incorporates his General Objections as if fully set forth

25   herein. Daniel Harris further objects to this request for production on the grounds that: (1) it

26   constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file

27   access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an

28   undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and

1    ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the

2    attorney work product doctrine, the common interest privilege and/or any other privilege

3    recognized in either the United States or the EC in violation of the express terms of Section

4    1782.

5    **REQUEST FOR PRODUCTION NO. 8:**

6    　　　　All documents since March 24, 2004, that contain, constitute, reflect, evidence, or refer to

7    any communication between You and any other third party, whether on behalf of Oracle, another

8    client, or yourself, about Microsoft's compliance or alleged failure to comply with European

9    Community competition laws, including without limitation the 2004 Decision, the Article 24(1)

10   Decision, or the SO.

11   **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

12   　　　　Daniel Harris hereby incorporates his General Objections as if fully set forth

13   herein.  Daniel Harris further objects to this request for production on the grounds that: (1) it

14   constitutes an improper effort to circumvent the Commission's rulings regarding appropriate file

15   access; (2) the Commission opposes the requested discovery; (3) it is overbroad and imposes an

16   undue burden; (4) it seeks documents located outside of the United States; (5) it is vague and

17   ambiguous; and (6) it seeks documents that are protected by the attorney-client privilege, the

18   attorney work product doctrine, the common interest privilege and/or any other privilege

19   recognized in either the United States or the EC in violation of the express terms of Section

20   1782.

21   　　　　**RESPONSES TO REQUESTS FOR DEPOSITION SUBJECTS**

22   **REQUEST FOR DEPOSITION SUBJECT NO. 1:**

23   　　　　Any communication or correspondence between You and the Commission,

24   whether on behalf of Oracle, another client, or yourself, relating to the Interoperability

25   Information or to the proper interpretation of the terms "Interoperability" or "Interoperability

26   Information" as used in the 2004 Decision.

27   ///

28   ///

1  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 1:**

2          Daniel Harris hereby incorporates his General Objections as if fully set forth

3  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

4  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

5  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

6  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

7  outside of the United States; (5) it is vague and ambiguous; and (6) it fails to "describe with

8  reasonable particularity the matters on which examination is requested."

9  **REQUEST FOR DEPOSITION SUBJECT NO. 2:**

10          Any communication or correspondence between You and the Monitoring Trustee,

11  whether on behalf of Oracle, another client, or yourself, relating to the Interoperability

12  Information or to the proper interpretation of the terms "Interoperability" or "Interoperability

13  Information" as used in the 2004 Decision.

14  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 2:**

15          Daniel Harris hereby incorporates his General Objections as if fully set forth

16  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

17  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

18  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

19  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

20  outside of the United States; (5) it is vague and ambiguous; and (6) it fails to "describe with

21  reasonable particularity the matters on which examination is requested."

22  **REQUEST FOR DEPOSITION SUBJECT NO. 3:**

23          Any communication or correspondence between You and OTR or any other

24  consultant retained or consulted by the Commission, whether on behalf of Oracle, another client,

25  or yourself, relating to the Interoperability Information or to the proper interpretation of the

26  terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.

27  ///

28  ///

1  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 3:**

2          Daniel Harris hereby incorporates his General Objections as if fully set forth

3  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

4  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

5  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

6  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

7  outside of the United States; (5) it is vague and ambiguous; and (6) it fails to "describe with

8  reasonable particularity the matters on which examination is requested."

9  **REQUEST FOR DEPOSITION SUBJECT NO. 4:**

10          Any communication between You and any other third party, whether on behalf of

11  Oracle, another client, or yourself, relating to the Interoperability Information or to the proper

12  interpretation of the terms "Interoperability" or "Interoperability Information" as used in the

13  2004 Decision.

14  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 4:**

15          Daniel Harris hereby incorporates his General Objections as if fully set forth

16  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

17  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

18  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

19  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

20  outside of the United States; (5) it is vague and ambiguous; (6) it fails to "describe with

21  reasonable particularity the matters on which examination is requested"; and (7) it seeks

22  information that is protected by the attorney-client privilege, the attorney work product doctrine,

23  the common interest privilege and/or any other privilege recognized in either the United States or

24  the EC in violation of the express terms of Section 1782.

25  **REQUEST FOR DEPOSITION SUBJECT NO. 5:**

26          Any communication since March 24, 2004, between You and the Commission,

27  whether on behalf of Oracle, another client, or yourself, about Microsoft's compliance or alleged

28  failure to comply with European Community competition laws, including without limitation the

1  2004 Decision, the Article 24(1) Decision, or the SO.

2  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 5:**

3          Daniel Harris hereby incorporates his General Objections as if fully set forth

4  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

5  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

6  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

7  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

8  outside of the United States; (5) it is vague and ambiguous; and (6) it fails to "describe with

9  reasonable particularity the matters on which examination is requested."

10  **REQUEST FOR DEPOSITION SUBJECT NO. 6:**

11          Any communication since March 24, 2004, between You and the Monitoring

12  Trustee, whether on behalf of Oracle, another client, or yourself, about Microsoft's compliance

13  or alleged failure to comply with European Community competition laws, including without

14  limitation the 2004 Decision, the Article 24(1) Decision, or the SO.

15  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 6:**

16          Daniel Harris hereby incorporates his General Objections as if fully set forth

17  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

18  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

19  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

20  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

21  outside of the United States; (5) it is vague and ambiguous; and (6) it fails to "describe with

22  reasonable particularity the matters on which examination is requested."

23  **REQUEST FOR DEPOSITION SUBJECT NO. 7:**

24          Any communication since March 24, 2004, between You and OTR or any other

25  consultant retained or consulted by the Commission, whether on behalf of Oracle, another client,

26  or yourself, about Microsoft's compliance or alleged failure to comply with European

27  Community competition laws, including without limitation the 2004 Decision, the Article 24(1)

28  Decision, or the SO.

1  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 7:**

2          Daniel Harris hereby incorporates his General Objections as if fully set forth

3  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

4  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

5  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

6  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

7  outside of the United States; (5) it is vague and ambiguous; and (6) it fails to "describe with

8  reasonable particularity the matters on which examination is requested."

9  **REQUEST FOR DEPOSITION SUBJECT NO. 8:**

10          All documents [sic] since March 24, 2004, that contain, constitute, reflect,

11  evidence, or refer to any communication between You and any other third party, whether on

12  behalf of Oracle, another client, or yourself, about Microsoft's compliance or alleged failure to

13  comply with European Community competition laws, including without limitation the 2004

14  Decision, the Article 24(1) Decision, or the SO.

15  **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 8:**

16          Daniel Harris hereby incorporates his General Objections as if fully set forth

17  herein. Daniel Harris further objects to this request for deposition category on the grounds that:

18  (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

19  appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

20  is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

21  outside of the United States; (5) it is vague and ambiguous; (6) it fails to "describe with

22  reasonable particularity the matters on which examination is requested"; and (7) it seeks

23  information that is protected by the attorney-client privilege, the attorney work product doctrine,

24  the common interest privilege and/or any other privilege recognized in either the United States or

25  the EC in violation of the express terms of Section 1782.

26  **REQUEST FOR DEPOSITION SUBJECT NO. 9:**

27          The authenticity of the documents produced pursuant to this subpoena and the

28  circumstances of their preparation.

1    **RESPONSE TO REQUEST FOR DEPOSITION SUBJECT NO. 9:**

2              Daniel Harris hereby incorporates his General Objections as if fully set forth

3    herein. Daniel Harris further objects to this request for deposition category on the grounds that:

4    (1) it constitutes an improper effort to circumvent the Commission's rulings regarding

5    appropriate file access and discovery; (2) the Commission opposes the requested discovery; (3) it

6    is overbroad and imposes an undue burden; (4) it seeks testimony from individuals residing

7    outside of the United States; (5) it is vague and ambiguous; (6) it fails to "describe with

8    reasonable particularity the matters on which examination is requested"; and (7) it seeks

9    information that is protected by the attorney-client privilege, the attorney work product doctrine,

10    the common interest privilege and/or any other privilege recognized in either the United States or

11    the EC in violation of the express terms of Section 1782.

12    Dated: March 13, 2006                              Respectfully submitted,

13                                                       LATHAM & WATKINS LLP
                                                         Daniel M. Wall
14                                                       Christopher S. Yates

15

16                                                       By _____
                                                         Christopher S. Yates
17                                                       Attorneys for Daniel Harris

18    SF\553022.1

19

20

21

22

23

24

25

26

27

28

**Exhibit 1**

OCT 07 '04  03:42PM GD&C LA 5353                                    P.1

FILED

2004 OCT -4 P 3: 45

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA. S.J.

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ADVANCED MICRO DEVICES, Inc., | NO. C 01-7033 MISC JW |
| Plaintiff, | **ORDER DENYING IN FULL AMD'S AMENDED APPLICATION PURSUANT TO 28 U.S.C. §1782(a)** |
| v. | |
| INTEL CORPORATION, | |
| Defendant. | |

## I. INTRODUCTION

Advanced Micro Devices, Inc. ("AMD") initiated this miscellaneous action to obtain discovery from Intel Corporation ("Intel") pursuant to 28 U.S.C. §1782(a). The Court referred the action to Magistrate Judge Lloyd, who issued an "Order Granting in Part AMD's Amended Application For Order Directing Intel To Produce Documents Pursuant To 28 U.S.C. §1782 And Denying Intel's Cross-Application." On September 27, 2004, the Court heard argument on Intel's Motion for de novo Determination of AMD's Amended Application and Intel's Cross-Application Pursuant to 28 U.S.C. §1782; Objections To Magistrate Judge's Recommended Decision. Having conducted a de novo review, and based upon all papers filed to date and the comments of counsel, the Court denies in full AMD's amended application for discovery.

## II. BACKGROUND

In October of 2000, AMD filed a complaint with he European Commission ("EC") against Intel for engaging in alleged anti-competitive behavior in violation of European laws. AMD describes the complaint as including the following three major charges:

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1        (1) that Intel uses "Intel Inside" and other "market development fund" programs as

2        loyalty rebates to secure the agreement of PC manufacturers and retailers to deal

3        exclusively in Intel-based PCs,

4        (2) that Intel withholds product allocations, roadmap information, or technology to

5        coerce PC manufacturers and retailers to deal exclusively with Intel, and

6        (3) that Intel forms private, standard-setting cartels that establish interfaces between

7        microprocessors and other components of the PC system, and by excluding AMD and

8        other disfavored firms from access to this critical information Intel promotes its

9        monopoly on microprocessors.

10  In pursuit of that complaint, AMD filed an application in this Court for an order directing Intel to

11  produce documents pursuant to 28 U.S.C. §1782. Section 1782(a) provides that a federal district

12  court "may order" a person "resid[ing]" or "found" in the district to give testimony or produce

13  documents "for use in a proceeding in a foreign or international tribunal. . . upon application of any

14  interested person." In its present form, AMD's application consists of seventy (70) document

15  requests, sixty-seven (67) of which essentially seek Intel documents produced to Intergraph

16  Corporation in an action between the parties in the Northern District of Alabama, Intergraph

17  Corporation v. Intel Corporation, CV 97-N-3023-NE (the "Intergraph case"). Intel produced

18  approximately 500,00 pages of confidential business information in the course of the Intergraph case.

19       The Intergraph case included allegations of patent infringement, state law violations, and

20  antitrust claims. Intergraph's antitrust claims were reportedly based upon assertions that Intel's

21  decision not to supply Intergraph with the patented Intel sample and pre-release microprocessors

22  constituted monopolization of the microprocessor market; that Intel violated Section 2 of the

23  Sherman Act by using its monopoly microprocessors to leverage a competitive advantage in the

24  downstream markets of workstations, graphics accelerators and chipsets; and that Intel conspired

25  with Intergraph workstation competitors to hinder Intergraph's sale of workstations to selected

26  digital animation customers. Intergraph's antitrust claims were rejected on summary judgment.

27  Intergraph Corp. v. Intel Corp., 88 F.Supp.2d 1288 (N.D. Ala. 2000), aff'd 253 F.3d 695 (Fed. Cir.

28  2001).

2

III. DISCUSSION

This Court has the benefit of the Supreme Court's determination that Section 1782(a) authorizes, but does not require a federal district court to authorize the discovery sought in this case. Intel Corp. v. Advanced Micro Devices, Inc., 124 S.Ct. 2466 (2004).[1] To guide this Court on remand, the Supreme Court delineated four main factors that "bear consideration" in ruling on a §1782 request. First, the Supreme Court found that "when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for §1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." Id. at 2483. The Supreme Court reasoned as follows:

> A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. . . . In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent §1782(a) aid.

Id. Second, the Supreme Court found that the district court faced with a §1782(a) request "may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." Id. Third, the Supreme Court also stated that "a district court could consider whether the §1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." Id. Fourth, the Supreme Court instructed that "unduly intrusive or burdensome requests may be rejected or trimmed." Id.

Having considered the factors set forth by the Supreme Court, this Court, in its discretion, holds that AMD's application for discovery should be denied in full. First, the Supreme Court has

---

[1] In reaching this conclusion, the Supreme Court resolved three key issues. First, it held that Section 1782 does not contain a "foreign-discoverability" requirement. Id. at 2476. Thus, AMD is not required in this case to make a threshold showing that the discovery it seeks would have been discoverable in the European Commission investigation had those documents been located within the Union. Second, the Supreme Court held that Section 1782(a) makes discovery available to complainants, such as AMD, who do not have the status of private "litigants" and are not sovereign agents. Id. Third, the Supreme Court held that a "proceeding" before a foreign "tribunal" need not be "pending" nor "imminent" for an applicant to invoke §1782(a). Id. Instead, "§1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation." Id. at 2480.

3

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  already determined that Intel is a participant in the EC proceedings, and that participant-status is

2  significant because the EC has jurisdiction over Intel, and therefore could simply ask Intel to produce

3  any or all of the discovery AMD now seeks. The EC, however, has not sought the documents AMD

4  now seeks. Therefore, the first factor weighs against granting AMD's application.

5       Second, the EC is not receptive to judicial assistance in this case. On this issue, it is

6  significant to this Court that the Supreme Court cited to the EC's two amicus curiae briefs to support

7  the finding that the EC "does not need or want" this Court's assistance in obtaining the documents

8  AMD seeks. See European Commission Amicus Curiae 11-16; Brief for European Commission as

9  Amicus Curiae in Support of Pet. for Cert. 4-8. The EC also stated that it "does not consider it

10 necessary to request or even subsequently to review the documents sought" by AMD in this case.

11 Brief for European Commission as Amicus Curiae in Support of Pet. for Cert. 4. Moreover, the EC

12 has stated that granting AMD's §1782(a) request would jeopardize "vital Commission interests."

13 See European Commission Amicus Curiae 15.

14      Third, AMD's §1782(a) application appears to be an attempt to circumvent the EC decision

15 not to pursue such discovery. See European Commission Amicus Curiae 6.

16      Because three out of the four factors discussed above clearly weigh against granting AMD's

17 application, the Court finds it largely unnecessary and purely academic to address the final factor,

18 namely whether the requests are unduly intrusive or burdensome. Nevertheless, for the sake of

19 completeness, the Court finds that the documents sought in AMD's application are unduly intrusive

20 and burdensome. AMD has made no attempt to tailor its application to the subject matter of the EC

21 complaint. For example, AMD's document requests do not contain the words "Europe" or

22 "European," the name of any European country, or the name or description of any European OEM or

23 retailer. Instead, it appears that AMD intentionally kept the requests broad, essentially lifting 67 out

24 of its 70 document requests verbatim from requests served on Intel by Intergraph. The breadth of

25 AMD's application, when considered in light of the EC's determination that the requested

26 documents are unwanted and unlikely to be reviewed, weighs against granting any portion of AMD's

27 application.

28

4

OCT 07 '04  03:44PM GD&C LA 5353                                          P.5

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.  CONCLUSION

For the reasons set forth above, AMD's amended application for discovery is denied in full. Intel's cross-application is denied as moot.

Dated: October 4, 2004

01onion7033

JAMES WARE
United States District Judge

5

OCT 07 '04  03:44PM GD&C LA 5353                                    P.6

1 | THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN MAILED TO:

2

3 | Patrick Lynch
    David Hurwitz
4 | O'MELVENY & MYERS
    400 South Hope Street
    Los Angeles, CA  90071-2899
5

6 | Robert Cooper
    GIBSON, DUNN & CRUTCHER
    333 South Grand Ave.
7 | Los Angeles, CA  90071-3197

8 | James Murray
    Intel Corp.
9 | 2200 Mission College Blvd., SC4-202
    Santa Clara, CA  95052-8119
10

11 | Dated: October 7, 2004

12

13

14

                                    Richard W. Wieking, Clerk

                                    By: _____
                                        Ronald L. Davis
                                        Courtroom Deputy

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

**Exhibit 2**



**EUROPEAN COMMISSION**
Competition DG

The Director-General

Brussels,
COMP/C-3/TK/vb  D(2006)*D197

Clifford Chance
Att. Mr. Thomas Vinje
avenue Louise 65
B - 1050 Bruxelles

**Subject:**   **Case COMP/C-3/37.792 Microsoft - Microsoft's discovery requests with US courts**

Dear Mr. Vinje,

By letter of 10 March 2006 you informed us of discovery requests filed with the US District Court for the Northern District of California by Microsoft Corporation addressed to your client Oracle, Clifford Chance and Mr. Ronald Alepin. You also informed us of an *ex parte* order issued by the said court on 3 March 2006 and the related subpoenas served on Oracle, Clifford Chance and Mr. Alepin by Microsoft.

Following your request and in view of the fact that DG Competition considers that the discovery requests in this case raise issues of considerable importance in relation to the Commission's rules on access to file, I am sending you herewith observations (in annex) that have been prepared by DG Competition with regard to these requests.

I should like to point out that the annexed document reflects the views of DG Competition, which is a service of the European Commission. Should this be deemed necessary and appropriate, the European Commission would like to be able to seek leave to intervene as *amicus curiae*. I should be grateful therefore if you would keep us informed in a timely way of developments in this proceeding.

As specified in the attached statement, the present observations do not seek to support, intervene in favour of or otherwise assist any of the parties involved in the proceeding.

Yours sincerely,

Philip Lowe

Annex

European Commission, B-1049 Brussels – Belgium - Telephone: (32-2) 299.11.11
Office: J-70 4/136 – Telephone: direct line (32-2) 296.87.16 – Fax (32-2) 296.01.28
Email: Comp-Greffe-Antitrust@cec.eu.int

 **EUROPEAN COMMISSION**
DG Competition

## Annex to the letter of 13 March 2006 addressed to Clifford Chance

**Subject:** Discovery requests *in re* Microsoft Corporation before the United States District Court for the Northern District of California

## 1.    INTRODUCTION

### 1.1.    The pending litigation before the US District Court for the Northern District of California

1.    The Directorate-General for Competition ("DG COMP") of the European Commission ("Commission") has been informed that Microsoft Corporation on 3 March 2006 has made an application for discovery pursuant to 28 U.S.C § 1782 with the US District Court for the Northern District of California and asked for the authorisation to serve subpoenas on Oracle, Clifford Chance and Mr. Ronald Alepin. The Commission has also been informed that an *ex parte* order has been issued on 3 March 2006 by the said court ordering Oracle, Clifford Chance and Mr. Alepin to essentially produce:

a.    *All documents that contain, constitute, reflect, evidence, or refer to any communication or correspondence between Oracle, Clifford Chance or Mr. Alepin and the Commission, the Monitoring Trustee or OTR relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.[1]*

b.    *All documents that contain, constitute, reflect, evidence, or refer to any communication between Oracle, Clifford Chance or Mr. Alepin and any other third party, relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.[2]*

c.    *All documents that contain, constitute, reflect, evidence, or refer to any communication between Oracle, Clifford Chance or Mr. Alepin and the Commission, the Monitoring Trustee or OTR about Microsoft's compliance or alleged failure to comply*

---

[1]    Points 1, 2 and 3 of Microsoft's request.

[2]    Point 4 of Microsoft's request.

Commission Européenne - Europese Commissie, B-1049 Brussels – Belgium
COMP GREFFE Antitrust J-70 04/138  - Telephone: (32-2) 299.11.11 · Telefax: (32-2) 295.01.28

with European Community competition laws, including without limitation the 2004 Decision, the Article 24(a)(1) Decision, or the SO.[3]

    d.    *All documents that contain, constitute, reflect, evidence, or refer to any communication between Oracle, Clifford Chance or Mr. Alepin and any other third party about Microsoft's compliance or alleged failure to comply with European Community competition laws, including without limitation the 2004 Decision, the Article 24(a)(1) Decision, or the SO.*[4]

2.    Given the importance of the policy issues that this matter raises, the Directorate-General for Competition of the European Commission wishes to state its position on these issues. The Commission may seek leave from the Court to intervene at a later date by filing an *amicus curiae* brief, should this be deemed necessary and appropriate, after following its decision making procedures.

3.    DG COMP wishes to underline that it does not intend to support or otherwise assist any of the parties to the pending litigation.

### 1.2.    The framework within which the Commission carries out its antitrust investigations

4.    The Commission is the institution entrusted within the European Union with the enforcement of the competition provisions of the Treaty establishing the European Community ("the EC Treaty"), notably Articles 81 ("agreements in restraint of trade") and 82 ("abuse of dominance")[5]. The Commission's powers of competition enforcement are stated in Council Regulation 1/2003 (previously in Council Regulation No. 17/62) which provides for specific means for investigating infringements of European antitrust rules, notably issuing formal requests for information, taking oral statements and conducting on-site inspections. Commission Regulation No. 773/2004 provides for more precise rules governing Commission procedures.

5.    As the European Court of Justice points out in its Hoffman-La Roche judgment the *"observance of the right to be heard is in all proceedings in which sanctions, in particular fines or penalty payments, may be imposed a fundamental principle of Community law which must be respected [...]"*.[6]

---

[3]    Points 5, 6 and 7 of Microsoft's request.

[4]    Point 8 of Microsoft's request.

[5]    Articles 81 and 82 provide for provisions comparable to those of Sections (1) and (2) of the Sherman Act.

[6]    Judgment of the Court of 13 February 1979 in Case 85/76, Hoffmann-La Roche & Co. AG v Commission [1979] ECR 461.

2

6.      In line with this judgment the Commission has established a number of procedural rules which are intended to guarantee the application of the principle of equality of arms and the protection of the rights of defence in proceedings before the Commission. In particular, the rules on access to file are intended to enable the effective exercise of the rights of defence by defendants in a Commission proceeding.

7.      The "Commission file" in a competition investigation (hereinafter also referred to as "the file") consists of all documents, which have been obtained, produced and/or assembled by DG COMP, during the investigation.[7] Access to file is granted to defendants in proceedings before the Commission to all documents making up the Commission file with the exception of internal documents, business secrets of other undertakings, or other confidential information after a Statement of Objections has been addressed to them.[8]

8.      Access is obviously only granted to those documents of the administrative procedure which relate to the objections raised by the Commission. The European Court of Justice confirmed that "the Commission is allowed to preclude from the administrative procedure evidence which has no relation to the allegations of fact and of law in the Statement of Objections and which therefore has no relevance to the investigation".[9]

9.      In case a defendant believes that the Commission services have erroneously withheld documents which are necessary for its defence it can make a request for a decision of the Hearing Officer, who is responsible for safeguarding the rights of defence in Commission proceedings.[10]

10.     A decision by the Hearing Officer not to disclose certain documents to a defendant can be reviewed by the European Court of First Instance ("CFI"). Similarly, an undertaking which deems that certain of its business secrets on the Commission file should not be disclosed to the defendant pursuant to a decision by the Hearing Officer can appeal to the CFI.[11]

---

[7]    See Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation(EC) No 139/2004, OJ 2005/C 325/07 of 22/12/2005 ("Notice on access to file"), at paragraph 7. This notice replaces an earlier but similar Commission Notice of 1997 on access to file, OJ C 23 of 23.01.1997.

[8]    Notice on access to file, at paragraph 10.

[9]    Judgment of the Court of 7 January 2004 in Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P, Aalborg Portland, not yet reported, at paragraph 126.

[10]   See Articles 1 and 8 of the Commission Decision of 23 May 2001 on the terms of reference of hearing officers in certain competition proceedings, OJ 2001 L 162/21 of 19.6.2001.

[11]   See Article 9 of the Commission Decision of 23 May 2001 on the terms of reference of hearing officers in certain competition proceedings.

3

11.    Documents obtained through access to file may only be used for the purpose of the Commission's proceedings. This is underlined in Article 15 of Regulation 773/2004, which stipulates that documents obtained through access to file may only be used "[...] *for the purposes of judicial and administrative procedures for the application of Articles 81 and 82 of the Treaty*". Furthermore, the Notice on access to file states "*Should the information be used for a different purpose, at any point in time, with the involvement of an outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action*".[12] Lastly, the Commission makes that obligation clear in a standard letter to the parties when addressing to them a Statement of Objections and providing access to file.

### 1.3.    The proceedings against Microsoft pursuant to Article 24 of Regulation 1/2003

12.    On 24 March 2004, the Commission adopted a decision in Case COMP/C-3/37.792 – Microsoft ("the Decision") in which it concluded that Microsoft had abused its dominant position in PC operating systems by (i) refusing to provide interoperability information necessary for competitors to be able to effectively compete in the work group server operating system market and (ii) tying its Windows Media Player with the Windows PC operating system. The Commission imposed a €497,196,304 fine on Microsoft and ordered it to bring the above-mentioned infringements of Article 82 EC to an end (Article 4 of the Decision).

13.    In particular, the Commission ordered Microsoft to supply interoperability information to interested undertakings on reasonable and non-discriminatory terms ("the interoperability remedy", Article 5 of the Decision) and to offer a full-functioning version of its Windows PC operating system which does not incorporate Windows Media Player ("the tying remedy", Article 6 of the Decision). The Decision also provided for the establishment of a monitoring mechanism, including a Monitoring Trustee, whose role is to provide expert advice to the Commission on Microsoft's compliance with the Decision. Microsoft was granted a deadline of 120 days to implement the interoperability remedy and a deadline of 90 days to implement the tying remedy. The obligations imposed by the Decision were suspended pending the Court of First Instance's consideration of Microsoft's request for interim measures. This application for interim measures was dismissed by the President of the Court of First Instance on 22 December 2004.[13]

14.    On 28 July 2005, the Commission adopted a decision on the monitoring mechanism foreseen in Article 7 of the Decision.[14] This decision sets out *inter alia* the

---

[12]    Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53,54 and 57 of the EEA Agreement and Council Regulation (EC) No139/2004, in OJ 2005/C 325/07 of 22/12/2005.

[13]    Order of the President of the Court of First Instance of 22 December 2004 in Case T-201/04 R, Microsoft, not yet reported.

[14]    C(2005) 2988 final.

4.

framework under which the Monitoring Trustee, whose role is to provide expert advice to the Commission on Microsoft's compliance with the Decision, will work. Subsequently, the Commission invited Microsoft to put forward candidates for the position of Monitoring Trustee. After a selection procedure, on 4 October 2005, on the basis of a shortlist of candidates submitted by Microsoft, the Commission appointed as Monitoring Trustee Professor Neil Barrett, a British computer science expert.

15.     Article 24 of Regulation 1/2003 grants the Commission the power to impose on undertakings daily penalty payments not exceeding 5% of the average daily turnover in the preceding business year in order to compel them to put an end to an infringement of Article 81 or 82 EC, in accordance with a prohibition decision taken pursuant to Article 7 of Regulation 1/2003 (Article 24(1)(a)).

16.     On the basis of an opinion from its outside technical experts OTR on the Technical Documentation, the Commission decided to open proceedings against Microsoft in order to compel it to comply with its obligations stemming from the Decision. Consequently, on 10 November 2005, the Commission adopted a decision pursuant to Article 24(1) of Regulation 1/2003 ("the Art 24(1) Decision"). This decision is the first step in a procedure pursuant to Article 24 of Regulation 1/2003. By means of this decision, a periodic penalty payment of €2 million per day was imposed on Microsoft as from 15 December 2005 in the event that it were not to comply with Article 5(a) and (c) of the Decision, i.e. its obligations to (i) supply complete and accurate interoperability information; and (ii) to make that information available on reasonable terms.

17.     In the light of the Monitoring Trustee's reports on the state of the Technical Documentation provided to the Commission by Microsoft in response to the Art 24(1) Decision, the Commission, on 21 December 2005, adopted a Statement of Objections in which it took the preliminary view that Microsoft had not yet complied with its obligation to supply complete and accurate interoperability information. A hearing on the objections raised by the Commission is scheduled for 30-31 March 2006.

**2.     DG COMP's POSITION WITH REGARD TO MICROSOFT'S REQUEST FOR DISCOVERY**

**2.1.  Microsoft's request to obtain all documents exchanged between the Commission, the Monitoring Trustee, OTR and third parties relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information"**

18.     After the issuance of the Statement of Objections Microsoft has requested access to the documents identified in the annex to the Statement of Objections, including to all documents exchanged between the Commission services and the Trustee and all documents exchanged between the Commission services and OTR in relation to all matters covered by the Statement of Objections.[15] By letter of 30 January 2006 Microsoft

---

[15]     E-mail from Jean-Yves Art, Microsoft's Director of Competition EMEA, of 23 December 2005.

5

requested access to documents on the Commission's file pertaining to the correspondence between the Commission on the one hand and third parties such as Sun, Oracle, IBM and Novell on the other as well as access to documents reflecting discussions that have taken place between third parties, in particularly Sun, IBM and OTR and the Trustee.[16]

19.    Following Microsoft's request the Hearing Officer took the position that the correspondence between the Commission services and the Trustee constitutes internal documents which are inaccessible to Microsoft whilst, after confidentiality waivers had been provided by third parties, Microsoft was given access to the communication between the Commission and third parties that relates to the issues raised in the Statement of Objections of 21 December 2005.[17]

20.    The Commission has therefore given Microsoft access to all third party documents in its possession. However, by letter of 2 March 2006 Microsoft specifically requested to have access to *"any material submitted by its adversaries to the Trustee and OTR"*.[18]

21.    This request is currently under scrutiny by the Hearing Officer. In order to verify whether Microsoft's request is well founded the Commission has asked OTR and the Trustee to disclose and transmit to the Commission any documents they have directly, without the Commission's knowledge, received from third parties or Microsoft in carrying out their duties as well as any minutes they have taken as regards communications with third parties or Microsoft.

22. It came as a surprise to DG COMP that Microsoft decided to turn to a US court for assistance under 28 U.S.C §1782 in order to gain access to documents which it had one day before sought to obtain from the Commission and on the disclosure of which a proceeding is currently pending before the Commission's Hearing Officer.

23. DG COMP takes the position the Microsoft's rights of defence in relation to the objections raised in the Statement of Objections of 21 December 2005 are adequately protected by the European rules on access to file. Therefore an application by Microsoft on the basis 28 U.S.C §1782 is not objectively necessary but rather an attempt to circumvent the established rules on access to file in proceedings before the Commission.

---

[16]    Letter from Microsoft's counsel Ian Forrester to the Hearing Officer of 30 January 2005.

[17]    Letter from the Hearing Officer to Ian Forrester of 8 February 2006.

[18]    Letter from Georg Berrisch, Microsoft's counsel, of 2 March 2006.

6

**2.2 Microsoft's request to obtain all documents exchanged between the Commission, the Monitoring Trustee or OTR and third parties about Microsoft's compliance or alleged failure to comply with European Community competition laws, including without limitation the 2004 Decision, the Article 24(1)(a) Decision**

24.    With regard to Microsoft's request to get access to documents which are not related to the Statement of Objections of 21 December 2005 the DG COMP would like to stress that such documents are not necessary for Microsoft to defend itself as the Commission has not a this stage raised any objections vis-à-vis Microsoft on these other issues. Microsoft will be given proper access to file once and if the Commission issues a Statement of Objections related to these matters.

25.    Microsoft's request to get access to such documents before a Statement of Objections has been issued is therefore unduly intrusive and totally at odds with the European rules on access to file which such a request would circumvent and undermine.

26.    The European Court of First Instance has indeed recognised that *"there is no right under Community law to be informed of the state of the administrative procedure before the statement of objections is formally issued"* and that, if there were *"a right to be informed of an investigation in circumstances where suspicions exist in respect of an undertaking"*, this would *"seriously hamper the work of the Commission"*.[19]

27.    Therefore a premature request by Microsoft for disclosure under 28 U.S.C § 1782 in order to find out if a company has filed a document pertaining to Microsoft's compliance or alleged failure to comply with European Community competition laws, or more specifically on an issue where a Statement of Objections has not yet been adopted is apt to seriously harm the Commission's investigation process and circumvent the European rules on access to file.

3.    CONCLUSION

28.    In sum, DG COMP is of the opinion that the described European access to file rules properly protect Microsoft's rights of defence and that the discovery requests presented by Microsoft are an attempt to circumvent these well established rules. DG COMP therefore sees no necessity for Microsoft to avail itself of the assistance of US courts pursuant to 28 U.S.C § 1782.

*Brussels, 10 March 2006*

---

[19]    Judgment of the Court of First Instance of 8 July 2004 in Case T-50/00 Dalmine v. Commission, not yet reported, paragraphs 83 and 110.

7

Prof. Neil Barrett

Monitoring Trustee

3, Bolt Court

London EC4A 3DQ UK

15th December 2005

Mr Cecilio Madero

European Commission, Competition

## Re: Competition Case COMP/C-3/37792

Herewith the second report on my findings following review of the WSPP documentation set provided to me by Microsoft at various dates in November 2005. This second report covers the question of whether or not the supplied WSPP documentation adequately addresses the requirements of any programmer or programming team seeking to use the documentation for the development of a interoperable system. This analysis has been described by us as the 'Sufficiency Test'.

To carry out this analysis, my technical advisor and I have each approached the documentation with a view to designing a part of a 'replacement' system – that is, a non-Windows server which is capable of providing the equivalent functionality as a Windows server to the Windows clients and/or the other Windows servers which might form a part of an organisation's network.

Two design tasks were undertaken:

1. An attempt to develop the necessary functions to perform the 'add new user' services; and

2. An attempt to develop the necessary functions to propagate a password change throughout a network by means of the replication services.

In each case, a contemporaneous record was maintained of the design questions that were being asked of the documentation. That is, a record of information discovered, technical details required and the ease (or otherwise) with which the documentation set can be navigated. Each of these are crucially important concerns for the successful use by a developer. To summarise the conclusions of this report – described more fully in what follows – in my judgement as Monitoring Trustee, the documentation set has failed the sufficiency test.

During both of these design exercises substantial problems were encountered with the documentation – not simply in terms of its 'ease of use' but also in the absence of vital information within the documentation. Functionality is not described; important data structures are not defined or explained; the basis of returned error codes and the required activities are not described; the sequencing of activities and the inter-functional dependencies are not explained or justified. Any programmer or programming team seeking to use the documentation for a real development exercise would be wholly and completely unable to proceed on the basis of the documentation. Although the replication aspect is not yet complete, the preliminary conclusion –

based on the number of unexplained aspects already encountered – is that this too is unable to proceed on the foundation of the documentation set.

The unsuccessful work on the 'add new user' functionality took the following time:

- 12 hours on 8th December;
- 10 hours on 10th December;
- 8 hours on 11th December; and
- 12 hours on 13th December.

Incidental and occasional hours were also spent on the exercise during the intervening days. It appears that the documentation is deficient if this simple design task on a small part of the documentation cannot be accomplished in reasonable amount of time. The design work for the replication – a significantly more complex exercise – still proceeds.

On that basis, the conclusion that the documentation set has failed the sufficiency test is unavoidable. Considerable additional work would be necessary on the part of Microsoft engineers and technical authors if the documentation set is to be considered appropriate for the purposes for which it is provided.

I turn now to a second point, that of the question of 'Innovation' exhibited within the WSPP documentation. I understand that the claim of innovation is an important one for the basis of the remuneration that Microsoft would propose to levy for access to some of the WSPP protocols. At present, however, it remains the case that I have not been presented with anything within the WSPP documentation that I would feel confident in describing as 'innovative'. On that basis, and until a more complete justification for any claim of innovation is presented to me, I do not consider WSPP or any part of WSPP to be innovative.

I trust that this meets with your requirements and remain,

Yours sincerely,

Prof. Neil Barrett

Monitoring Trustee

# WSPP Documentation Review

## Second Report – 15th December 2005

## I. Preliminary Remarks

The aim of this report is to give a second assessment on the completeness and accuracy of the new set of Technical Documentation provided by Microsoft on 11 November 2005 and on 23 November 2005 in order to comply with the March 2004 Decision of the European Commission.

For reference purposes, the Technical Documentation provided by Microsoft at the beginning of 2005 will be called "version 1" and the new set of Technical Documentation provided in November 2005 will be called "version 2".

## II. Methodology

This second review of the Technical Documentation follows a preliminary report, dated 30th November 2005, which determined that the major discrepancies of version 1 had not been rectified in version 2 of the Technical Documentation.

The main failings of version 2 that were identified in the previous report are as follows:
- The Technical Documentation is extremely difficult to use due to the absence of the ability to print, of hyperlinks, of a search facility, the absence of general structure and inconsistencies in the references contained within the documentation;
- it is incomplete: no general overview is provided and it lacks explanatory memoranda, illustrations, explanations of concepts and server rules, or examples
- it is inaccurate, as, in particular, explanations on behaviours and dependencies – where provided – are obviously insufficient

The current review exercise has been conducted by the Trustee and Mr Andrew Winfer (an engineer employed by the "Monitoring Trustee" company). The main purpose was to establish whether the documentation in its current form contains sufficient information to allow a developer or a team of developers to implement a server capable of interacting with Microsoft servers (and clients) in a functionally-equivalent manner.

## III. Findings

The findings made in the previous report have been corroborated during this review.

Moreover, it further appears that any programmer or programming team seeking to use the Technical Documentation for a real development exercise would be wholly and completely unable to proceed on the basis of the documentation.

1

20/12/2005   16:35   CECANS910625--04 → 50128                                          NO.285    P005
Case 5:06-mc-80038-JF   Document 20-6   Filed 03/15/2006   Page 36 of 45   PAGE  04/13

20/12/2005  14:08   +44-02073538850

The Technical Documentation is therefore totally unfit at this stage for its intended purpose.

# 1. The Technical Documentation is extremely difficult to use

From a presentation point of view, the following restrictions (on top of the ones identified in the previous report) render the use of the Technical Documentation extremely difficult, time-consuming and cumbersome:

— *Inconsistencies in the titles of the headings:*
The names of some of the files are totally inconsistent with their content.  To begin with, given the names of the two files contained in the technical documentation ("WSPP file and print server protocols.pdf" and "WSPP Active Directory Technical Spec PR.pdf"), it is rather surprising that the task of adding a new user that should most likely fall under the 'active directory' element rather than under 'file and print', the first document surprisingly covers both 'file and print' *and* authentication services, whilst the second one contains only introductory material on Active Directory

— *No adequate search facility:*
As no complete index is provided, thousands of manual searches through the document have to be conducted when trying to specify the design of programs intended to implement a function, based on the information contained in the documents. This is extremely time-consuming and cumbersome.

— *Useless links:*
Some of the links that are provided in the Technical Documentation appear to be totally useless, not least because of the lack of context given.
For example, for the 'ntstatus.h' file, two hyperlink references are provided. One is to a section called 'interpreting RPC-based interface documentation', the other is to a web link in which the details of 'on the wire' data are provided by the Open Group web site. The first link provides details of how the packets are to be formed, which is absolutely useless without any information on the expected or required field values in the Microsoft environment. The second link is a document dated from 1997, and accesses the index page of the document, but the referenced topic provides details of the structure of the packets, again totally useless without any information on what to put in the fields within the packets.

# 2. The Technical Documentation is neither complete nor sufficient

The attempt to use the documentation in a relevant manner proved that the Technical Documentation was in fact a lot more incomplete even than identified in the previous report, and was in fact totally unusable.
The following omissions go so far as to render most of the Technical Documentation totally useless:

— *Definitions of terms is missing*
     A large number of apparently technical terms are used in the Technical Documentation, but these are unclear even to a person knowledgeable in the art and no definition can be found in whatever place in the Documentation.

2

20/12/2005   16:35   CECONS010625--04 → 50128                              NO.285   D006
Case 5:06-mc-80038-JF   Document 20-6   Filed 03/15/2006   Page 37 of 45

20/12/2005  14:08   +44-02073538850                                                 PAGE  05/13

For example, the introductory material (headed 'Purpose') for the Active Directory documentation states that it describes the 'protocols, network objects, and state changes required for Active Directory domain controller interoperation' and that the directory service 'provides a data store for network objects'. But it is by no means obvious what a 'network object' might be, and whether or not the data representing a user's name and password might be considered as such. A search in the documentation for the term 'network object' for a definition or explanation results in the discovery that the term appears only in the introductory section on page 1 of the document and is never repeated, let alone explained.

Similarly, the description of the 'samr' function tells me that the interface uses 'context handles to maintain client state information'. The text goes on to say that the interface uses 'context handles to maintain client state information'. But, I have no idea what might constitute 'client state information'. It appears that this client state is somehow related to a context handle, and so a search is performed to see whether the term 'context handle' is anywhere defined in the document. The term appears 87 times but is nowhere actually defined; I am none the wiser. A detailed read through the 87 references to 'context handle' appears to indicate that it might be used for communication between a client and server. However, another part of the document implies that it is used for holding state information. So, the 'context handle' might be some communication *or* some storage mechanism? I have no way of knowing.

– *The Technical Documentation is unusable without more information*

Due to the lack of definitions and explanation, the Technical Documentation cannot be used in its current form. In order to obtain any information, it is necessary to perform repeated search queries on the documentation. For example, page 4,962 contains the comment that for the context handle, 'implementation is server specific, and so exact size and composition fall outside the scope of these documents'. As explained in the above section on the missing definition, I have no idea what a 'context handle' might be, let alone what its 'exact size and composition' should be in my implementation. In developing a conformant system, in order to discover the fundamental piece information of how big the 'context handle' should be, I would then be forced – if I am to proceed at all – to search external material outside of the documentation itself in order to discover what a context handle is and how I might choose to implement such a thing.

Similarly and as mentioned, the introductory text mentions a file 'ntstatus.h' but with no hyperlink to where the reader might find information on that file. Searching for the file in the whole Technical Documentation does not yield an explanation of the contents of the file, but only the file itself, evidently cut-and-pasted into the document. It starts on page 2,247 and runs to page 2,449 – i.e., the text includes 202 pages of a simple file without any explanation. Worse, for many of the 'explanatory text' lines, these run off the end of the page – and there is no explanation as to where (for example, a web link to MSDN) I might go to actually obtain this file itself rather than embedded text in a document from which it cannot be copied. This is all the more unsatisfactory because not only is there insufficient explanation associated with the included file, but the file cannot be used in its current state. There is no explanation as to where I might find this file, there is no description as to the circumstances in which the different return values might arise, nor is there any indication as to how my program might recognise the different types of status so as to prompt those return values.

– *Missing behaviours and dependencies*

As a general rule, no explanation is provided as to the events or reasons which might cause a particular event to be triggered.

20/12/2005   16:35   CFGQN5010625   04   3  50138     NO.285   P007
Case 5:06-mc-80038-JF   Document 20-6   Filed 03/15/2006   Page 38 of 45   PAGE 06/15

20/12/2005   14:00   +44-02073538050

For example, the Technical Documentation contains several hundred pages on error handling, but the contents of error definitions are simply listed with no explanation. A description of errors should indicate why or how such errors are generated, what functions need to do if an error is to be handled correctly, and whether or not the error is "fatal" or recoverable. None of that detail is present in the Technical Documentation.

The explanation of the 'samr' function lists a number of ways in which the function can be called. One of these is 'SamrCreateUserInDomain' with the associated comment, 'Adds a new user to the account database'. It is reasonable to assume that this is the particular activity required, and from the text it would appear that this is operation number 12. I can assume at this point that I must create a function that performs the operations carried out by 'samr' when it receives this particular request. The type of access which I believe a system would request of the samr function in order to add a new user is the ability to 'connect with the intention of writing'. So, I look through the list for a reference to 'connect' and a reference to 'write' (or perhaps, 'create' or some other similar phrase). But there is no listing of such an entry nor anything similar which might be considered analogous. Perhaps this is because the connection is implicit in the particular operation itself and therefore does not need to be specified explicitly. It can only be hoped so, because the information in this section is of no assistance as regards connection behaviour.

— *No description of the arguments of the functions*
There are a large number of functions for which there is no complete description of what the arguments should be.

For example, the 'Netlogon Authenticator' is described as a pointer to a structure containing the 'client credentials plus the current time of day, encrypted with the session key'. But, this raises a number of questions. The 'session key' does not appear to have been specified, meaning that I don't know where to find its value (or even how many bits it contains), what produces it, or what algorithm is used for its production. The 'encrypted with' raises the question: with what algorithm? Again, this is not obviously set out in this part of the document. The 'current time of day' raises the question: in what format is this held and presented? And the 'client credentials' raises the question: in what format is this held and presented? This description is therefore totally inadequate and unusable.

— *Hidden definition of data structure*
The use of mechanisms to render the data structure opaque is particularly striking.

For example, the SAMPR_HANDLE is defined by the line:
typedef void* SAMPR_HANDLE;
That is, the actual structure is explicitly hidden from view by use of the 'void*' mechanism whose purpose is to render used data structures opaque. The structure is therefore one which is not defined anywhere in the documentation but is rather deliberately hidden — despite the fact that it is self-evidently a fundamental requirement given the operation of the 'samr' and related functions.

— *Insufficient description*
The explanations provided in the Technical Documentation are often insufficient or limited in scope.

For example, the text related to the connection exercise seems to provide insufficient information for me to be able to implement the function itself. However, it *does* provide some additional information of relevance. It has a section headed 'requirements' — where the required client and the required server is listed. It states that the client must be running one of three versions of Windows XP. This seems fair enough. However, it goes on to state that the

4

server must also be running (one of three versions of) Windows. The purpose of this exercise is to permit replacing the Windows servers with an alternative, and therefore a more comprehensive list of the features that the client expects the server to provide is necessary (for example, an API called 'samr' capable of performing the required operations and returning the expected values; an account database structured with certain expected fields, and so on).

The documentation accordingly fails in any way to meet the Documentation standard required by the March 2004 Decision.

## IV. Conclusion

The documentation in its current form is not fit for use by developers. It is totally insufficient and inaccurate for the purpose for which it is intended, namely developing work group server operating system products able to viably compete with Microsoft's own products.

The analysis conducted illustrates that the documentation is unable to answer some of the simplest questions that would necessarily be raised in such an exercise. Terms are not defined, links are not provided, structures are explicitly left undeclared.
It is important to note that these are not trivial points, though the examples used to discover these problems *were* trivial ones.
The documentation appears to be fundamentally flawed in its conception, and in its level of explanation and detail. Entire error code files are included verbatim; but the definitions of vital structures are left blank. Function arguments are named but not explained. Function calls are described but the sequence must be guessed at.
Overall, the process of *using* the documentation is an absolutely frustrating, time-consuming and ultimately fruitless task. The documentation needs quite drastic overhaul before it could be considered workable.

For these reasons, the WSPP documentation set has failed not only the preliminary objective of 'closing the gaps' contained in version 1, but also the test of now being sufficiently usable by a programmer or team of programmers. Substantial further work on the documentation set would be required – at the level of explanatory detail – before I could be satisfied as to its usability.

Prof. Neil Barrett
Monitoring Trustee
London, 15th December 2005

5

20/12/2005   16:35   CECNS010625—04 → 50128                        NO.285   P009
Case 5:06-mc-80038-JF   Document 20-6   Filed 03/15/2006   Page 40 of 45   PAGE  08/13

20/12/2005  14:08    +44-02073538850

## Annex: Methodology used for the implementation of an "adding a user" functionality

The purpose of this further review was to establish whether, despite these deficiencies, version 2 contains sufficiently detailed information to allow a developer or team of developers to create software for a conformant system – which means to implement a server capable of interacting with Microsoft servers (and clients) in a functionally-equivalent manner.

The best way to establish the sufficiency of the documentation for a developer is to attempt to use the documentation in the expected manner: to specify the design of programs intended to implement the equivalent functions, based on the information contained in the documents. The outline method is to:

1. Identify a collection of expected activities that such a server would be required to support;
2. Provide an outline description of the ways in which such activities can be expected to operate;
3. Review the documentation to determine whether it is possible to establish the ways in which such activities are described;
4. Follow the documented descriptions and locate the appropriate application program interfaces, function arguments and data structures as specified;
5. From the documentation, determine whether sufficient information is provided in a usable format capable of acting as instructions to a programmer; and
6. Create high-level specifications – perhaps in the form of pseudo-code – to describe the activities and their implementation details.

The objective is to assess the state of the current documentation; the objective is *not* to attempt to create a fully operational system – but rather, to do enough to act as a suitable test of sufficiency.

In this first review, I have taken as the objective one of the simplest possible operations in a distributed system environment: to receive and process a request to add a new user. A second task was undertaken in parallel by my technical advisor, Mr Andrew Winfer: to implement the directory replication services so as to propagate a password change throughout the network.

We can expect a function to add a new user to carry out a limited set of operations:

- Receive a request to add a new user;
- Establish whether that user already has an account;
- Add an entry in some database corresponding to that user;
- Add a password for that user;
- Assign certain access rights for that user; and
- Confirm to the requesting system that the operations have been performed either successfully or unsuccessfully.

The function can therefore be expected to be relatively simple. It can be expected to return an indication of whether it was successful or not – and if not, some indication as to the reason for its failure. It can be expected to take certain simple input information – such as the name of the user and their access rights, and perhaps also their chosen or assigned initial password. We can therefore imagine a function, perhaps called 'AddNewUser' which returns an error code indicating success (common practice, success is indicated by an error code of zero) or some indicative code value corresponding to the type of error arising (a duplicate user name,

6

for example). This function will then be responsible for making the necessary changes to the stored data about the collection of users so as to allow the user to have appropriate access in the future. I sought to implement this particular function.

20/12/2005   16:35   CECONS010625--04 → 50128                    NO.285   D011
Case 5:06-mc-80038-JF   Document 20-6   Filed 03/15/2006   Page 42 of 45   PAGE  10/13

20/12/2005   14:08   +44-02073538850

Prof. Neil Barrett

Monitoring Trustee

3, Bolt Court

London EC4A 3DQ UK

16th December 2005

Mr Cecilio Madero

European Commission, Competition

### Re: Competition Case COMP/C-3/37792

I refer to the communication received by me from Microsoft on 15th December entitled 'Microsoft Response to Trustee Report' and provided as Annex 2 in the company's response to the Section 24 communication from the Commission.

This document presents Microsoft's initial response to my own preliminary report on the completeness and accuracy of the WSPP documentation set in which, you will recall, I raised my concerns as to the set's fitness for purpose. I wish to draw to your attention my reaction to this response.

In the concluding paragraph of the Microsoft Response it is stated that "the documentation [...] is fit for use by developers". It remains my position that this is not the case – and in fact, following further analysis work recently completed and communicated to you, my position if anything has hardened further.

If I can summarise the nature of the Response, it would be as follows. Microsoft state that all the concerns that I raised about the usability of the documentation set – in terms of references, search facilities, readability, presentation and so forth – have been addressed in the 'release of 15 December'. And all the concerns I raised about the technical completeness of the documentation appear to have been dismissed, with a statement that the descriptions are in fact complete.

It may well transpire that, when the 'release of 15 December' is communicated to me on or after 23rd December 2005, the usability concerns have indeed been addressed and resolved. I would not wish to prejudge the characteristics of a release not yet available to me for review. However, I am very concerned that my legitimate concerns regarding the technical content appear to have been dismissed. On that basis, I cannot bring myself to believe that the conclusion that the documentation set is insufficient will have been addressed.

It remains my view that, whilst there may well be data structures which are defined, there are other vitally important data structures for which this is not the case, and that the way in which the 'server rules' are described is not sufficient.

The Microsoft Response dismisses my concern over the use of 'void*' declarations on the basis that these are "valid expressions" in the programming language used. That is not and has never been disputed. Whether the purpose of using the expression is or is not one of obfuscation, the result is nonetheless obfuscation – in an element of the documentation set whose purpose is to explicate. A program

language expression declaring a structure as being a 'void*' means that the contents of the structure are hidden. To implement the structure – essential if the function using the structure is to be implemented – one needs to know the contents of the structure.

The Microsoft Response states that "the server rules [...] define not only the format, value and meaning of data structure fields and directory objects required for interoperation, but also the programming logic". Close inspection of the server rules shows that the data structure fields are defined in terms of other structures, themselves often defined in terms of yet other structures, and that in places those structures are subsequently not defined. As a result, the detail is not all usable.

Regarding the 'programming logic', this too is not adequately described in the documentation set. Data is described as having been encrypted, for example, but with no explanation of the encryption algorithm used; values are described as being 'resolved' with other values, with no explanation as to the meaning or mechanism. Source code fragments are unstructured, poorly or not commented, and therefore not explanatory; and the 'pseudo-code' descriptions are not in a standard or standardised format, making them equally non-explanatory.

In summary, whilst it may well be the case that the 'release of 15 December' will, on 23rd December 2005, address the usability concerns I remain anxious as to the technical content of the documentation set.

In the attached Annex, I address point-by-point the substantive issues raised by Microsoft in their Response, ignoring for the moment those elements where the Response indicates that a resolution is expected within the next revision of the documentation set.

I trust that this meets with your requirements and remain,

Yours sincerely,

Prof. Neil Barrett
Monitoring Trustee

20/12/2005  16:35  CECANS010625-04 → 50128                    NO.285  P013
Case 5:06-mc-80038-JF   Document 20-6   Filed 03/15/2006   Page 44 of 45
PAGE  12/13

20/12/2005  14:08  +44-02073538850

# Annex

I take the several important points raised in the Microsoft Response, summarise them and provide a point by response to each.

1. "Microsoft continues to believe that the Technical Documentation as provided is complete and accurate as required under the Decision" (Page 3)

   *From the preliminary and subsequent examination, it is apparent to me that the documentation is not complete, with apparently important detail missing and difficulty in 'asking a question' of the documentation.*

2. "The format, meaning and purpose of the data structures and objects required for interoperation is explained in technical detail in the reference section of each protocol, and in architectural detail and again as a conceptual overview in the Further Explanatory Materials section for the protocol" (Page 4)

   *There are details missing on the definition of certain important structures that appear to be of importance. As such, this cannot be accepted.*

3. "The server rules disclosed in the Technical Documentation define not only the format, value, and meaning of data structure fields and directory objects required for interoperation, but also the programming logic" (Page 4)

   *As for the previous comment, because elements are missing this cannot be accepted.*

4. "Illustrations are rarely used to present this material because of the volume of technical reference material" (Page 5)

   *Simple inspection of available textbooks covering many of the aspects of system operation and interoperation show that illustrations are widely used by technical authors to augment textual presentation. So again, this cannot be accepted.*

5. "A Licensee [...] has the conceptual understanding necessary to implement a work group server operating system product" (Page 5)

   *In places, it would seem that the programmer would need to be knowledgeable in Microsoft server details and this I believe should not be an assumption within documentation intended for use by non-Microsoft programmers.*

6. Examples for the most complex server rules are given in pseudocode notation and are found in the Server Rules section of the technical specification for a protocol" (Page 5)

   *The pseudocode used does not appear to be of a standard (or indeed, standardised) format and – along with the examples of source code – are not always usable. Moreover, where source code is presented (and incidentally, I comment that source code was never asked for nor indeed welcomed as a part of an explanatory document) as an alternative to pseudocode, the presentational problems of poor formatting and missing comments make this less than useful.*

7. "This logic is not part of a the (sic) communication protocol and it is disclosed most frequently in the specification as pseudocode, a common notation used where precision is required in describing an operation involving multiple data structures and objects" (Page 5)

> *In fact, pseudocode is used most obviously in describing algorithms which are themselves complex, rather than necessarily those involving multiple data structures and objects. Where such data structures and objects are manipulated, it is more common for the data structures to be defined in the way in which they are used within a program (i.e., 'declared') so that the structure can be understood.*

8. "All protocol specifications in the WSPP documentation discloses (sic) the implementation of all data structures used in the protocol for interoperation, including the field length, field format, and any required values of the component fields of the data structure" (Page 5)

> *From my reading of the documentation, there are elements of the necessary data structures which are not defined in the detail that would be necessary to allow a programmer confidently to implement them.*

9. "Microsoft strongly disagrees with the Trustee's comment that it has engaged in 'explicit obfuscation'" (Page 5)

> *The effect of the use of the 'void*' mechanism is obfuscation: since this is within elements of the documentation intended, one must presume, to provide an explication of detail – and that there is no justification given for the use of the 'void*' – it must be assumed to have been a deliberate inclusion in the documentation. The effect is therefore to obfuscate.*

10. "The Trustee cited error definitions as an example" (Page 7)

> *It is indeed true that error definitions are provided in great detail, but the nature of the presentation of these error definitions is such as to mitigate against their correct use. The bulk inclusion of a file, in a format that does not allow it to be copied, without an explanation of where it comes from, and with the explanatory lines running off the end of the page, is not useful.*

11. "Accordingly we believe the documentation offered clearly meets the requirements of the Decision in this matter and that appropriate programs are in place to address questions or issues as they arise through the use of the documentation itself" (Page 7)

> *In my view, the documentation set should be considered as a free-standing and complete description of the necessary data structures and behaviour required to implement a similar behaviour in a functionally-equivalent manner. It does not, at present, satisfy this and so I cannot but disagree with this statement.*