**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a <u>disclaimer and a copyright notice.</u>

JUDGMENT OF THE COURT OF FIRST INSTANCE (Second Chamber)
8 July 2004 (1)

(Cartels – Market in seamless steel tubes and pipes – EFTA – Powers of the Commission – Infringement – Fines)

In Joined Cases T-67/00, T-68/00, T-71/00 and T-78/00,

**JFE Engineering Corp.,** formerly NKK Corp., established in Tokyo (Japan), represented initially by M. Smith and C. Maguire, solicitors, and subsequently by A. Vandencasteele and V. Dehin, lawyers, and A.-L. Marmagioli, solicitor, with an address for service in Luxembourg,

applicant in Case T-67/00,

**Nippon Steel Corp.,** established in Tokyo, represented by J.-F. Bellis and K. Van Hove, lawyers, with an address for service in Luxembourg,

applicant in Case T-68/00,

**JFE Steel Corp.,** formerly Kawasaki Steel Corp., established in Tokyo, represented by A. Vandencasteele, lawyer, with an address for service in Luxembourg,

applicant in Case T-71/00,

**Sumitomo Metal Industries Ltd,** established in Tokyo, represented by C. Vajda QC, G. Sproul and F. Weitzman, solicitors, with an address for service in Luxembourg,

applicant in Case T-78/00,

v

**Commission of the European Communities,** represented by M. Erhart and A. Whelan, acting as Agents, and N. Khan, barrister, with an address for service in Luxembourg,

defendant,

supported by

**EFTA Surveillance Authority,** represented by D. Sif Tynes and P. Bjørgan, acting as Agents,

intervener in cases T-68/00, T-71/00 and T-78/00,

APPLICATION for the annulment of Commission Decision 2003/382/EC of 8 December 1999 relating to a proceeding under Article 81 of the EC Treaty (Case IV/E-1/35.860-B seamless steel tubes) (OJ 2003 L 140, p. 1) or, in the alternative, for reduction of the fines imposed on the applicants,

THE COURT OF FIRST INSTANCE OF THE EUROPEAN COMMUNITIES (Second Chamber),

composed of: N.J. Forwood, President, J. Pirrung and A.W.H. Meij, Judges,

Registrar: J. Plingers, Administrator,

having regard to the written procedure and further to the hearing on 19, 20 and 21 March 2003,

gives the following

# Judgment

### Facts and procedure

1    The present case concerns Commission Decision 2003/382/EC of 8 December 1999 relating to a proceeding under Article 81 of the EC Treaty (Case IV/E-1/35.860-B seamless steel tubes) (OJ 2003 L 140, p. 1; 'the contested decision').

2    The Commission addressed the contested decision to eight undertakings producing seamless steel tubes ('the addressees of the contested decision'). These undertakings included four European companies ('the European producers' or 'the Community producers'): Mannesmannröhren-Werke AG ('Mannesmann'), Vallourec SA, Corus UK Ltd (formerly British Steel plc, then British Steel Ltd; hereinafter 'Corus') and Dalmine SpA. The other four addressees of the contested decision are Japanese companies ('the Japanese producers' or 'the Japanese applicants'): NKK Corp., Nippon Steel Corp. ('Nippon'), Kawasaki Steel Corp. and Sumitomo Metal Industries Ltd ('Sumitomo').

*Administrative procedure*

3    By decision of 17 November 1994, the Surveillance Authority of the European Free Trade Association (EFTA), acting pursuant to Article 8(3) of Protocol 23 to the Agreement on the European Economic Area, approved by Decision 94/1/ECSC, EC of the Council and the Commission of 13 December 1993 on the conclusion of the Agreement on the European Economic Area between the European Communities, their Member States and the Republic of Austria, the Republic of Finland, the Republic of Iceland, the Principality of Liechtenstein, the Kingdom of Norway, the Kingdom of Sweden and the Swiss Confederation (OJ 1994 L 1, p. 1; 'the EEA Agreement', authorised the member responsible for competition matters to invite the Commission to carry out an investigation, within the Community, into possible anti-competitive practices concerning carbon-steel tubes used for drilling and transport operations in the Norwegian oil industry.

4    By decision of 25 November 1994 (Case IV/35.304; 'the decision of 25 November 1994'), unpublished, reproduced at page 3 of the Commission's file and adopted on the dual legal basis of Article 14(3) of Council Regulation No 17 of 6 February 1962: First Regulation implementing Articles [81] and [82] of the Treaty (OJ, English Special Edition 1959-1962, p. 87) and the decision of the EFTA Surveillance Authority of 17 November 1994, the Commission decided to initiate an investigation. This investigation was to examine the practices reported in the decision of the EFTA Surveillance Authority of 17 November 1994, in so far as they might constitute an infringement of not only Article 53 of the EEA Agreement but also Article 81 EC. The Commission sent a copy of its decision of 25 November 1994 to eight companies, including Mannesmann, Corus, Vallourec and a company within the Sumitomo group, Sumitomo Deutschland GmbH. Pursuant to that decision, Commission staff and representatives of the competition authorities of the Member States concerned carried out investigations at the premises of those undertakings on 1 and 2 December 1994.

5    By decision of 6 December 1995, the EFTA Surveillance Authority found that since trade between

Member States of the Community was being significantly affected by the case before it, it fell within the competence of the Commission by virtue of Article 56(1)(c) of the EEA Agreement. It therefore decided to transmit the case to the Commission, pursuant to Article 10(3) of Protocol 23 to the EEA Agreement, whereupon the Commission gave the case a new number (IV/E-1/35.860).

6      Between September 1996 and December 1997, the Commission carried out further investigations under Article 14(2) of Regulation No 17 at the premises of Vallourec, Dalmine and Mannesmann. In particular, it carried out an investigation at Vallourec's premises on 17 September 1996, when the head of Vallourec Oil & Gas, Mr Verluca, made the statement reproduced at page 6356 of the Commission's file (hereinafter 'Mr Verluca's statement of 17 December 1996'), on which the Commission relies in the contested decision. Subsequently, the Commission sent requests for information pursuant to Article 11 of Regulation No 17 to all the addressees of the contested decision, and also to certain other undertakings.

7      As Dalmine and the Argentinean companies Siderca SAIC ('Siderca') and Techint Group refused to supply some of the information requested, a Commission decision of 6 October 1997 (C(1997) 3036 IV/35.860 Steel tubes, unpublished), adopted under Article 11(5) of Regulation No 17, was addressed to them. Siderca and Dalmine brought actions before the Court of First Instance for annulment of that decision. Dalmine's action was declared manifestly inadmissible by order of the Court of First Instance of 24 June 1998 in Case T-596/97 Dalmine v Commission [1998] ECR II-2383, while Siderca's action for annulment was withdrawn and then removed from the list by order of 7 June 1998 in Case T-8/98 Siderca v Commission, not published in the ECR.

8      Mannesmann also refused to supply some of the information requested by the Commission. Although a decision requiring that it do so was adopted by the Commission on 15 May 1998 (C(1998) 1204, IV/35.860, Steel tubes, unpublished) pursuant to Article 11(5) of Regulation No 17, Mannesmann persisted in its refusal. Mannesmann also brought an action before the Court of First Instance against that decision. By judgment of 20 February 2001 in Case T-112/98 Mannesmannröhren-Werke v Commission [2001] ECR II-729, the Court of First Instance annulled the decision in part and dismissed the remainder of the application.

9      In January 1999, the Commission adopted two statements of objections concerning welded carbon steel tubes and seamless carbon steel tubes respectively. It thus divided the case into two: Case IV/E-1/35.860-A concerning welded steel tubes and Case IV/E-1/35.860-B concerning seamless steel tubes.

10      In the case relating to seamless carbon steel tubes the Commission sent its statement of objections to the eight addressees of the contested decision and also to Siderca and the Mexican company Tubos de Acero de México SA. Between 11 February and 22 April 1999 those undertakings were given access to the file which the Commission had compiled in the case. In addition, by letters of 11 May 1999, the Commission sent copies of the decisions of November 1994 relating to the investigations to the undertakings which were not addressees of those decisions and which, consequently, had not had sight of them.

11      After submitting their written observations, the addressees of the two statements of objections presented oral argument to the Commission on 9 June 1999 in the welded carbon steel tubes case and on 10 June 1999 in the seamless carbon steel tubes case. In July 1999, the Commission informed the addressees of the statement of objections in Case IV/E-1/35.860-A, concerning welded carbon steel tubes, that it had dropped the case relating to those products. However, it proceeded with Case IV/E-1/35.860-B.

12      It was in those circumstances that the Commission adopted the contested decision on 8 December 1999.

Relevant products

13      The relevant products in Case IV/E-1/35.860-B are seamless carbon steel tubes used by the oil and gas industry, consisting of two major categories.

14      The first category includes borehole pipes and tubes, commonly known as 'Oil Country Tubular Goods'

or 'OCTG'. These are sold either plain-ended ('plain ends') or threaded. Threading is designed to enable OCTG tubes to be joined together and may comply with American Petroleum Institute (API) standards (such tubes being referred to hereinafter as 'standard thread OCTG') or employ special techniques, which are usually patented. In the latter case, the threading, or 'joints', are known as 'premium quality' or 'premium' (tubes threaded according to this method being hereinafter referred to as 'premium-thread OCTG tubes').

15    The second category of products consists of oil and gas pipes ('line pipe') made of seamless carbon steel; these are divided into pipes made to standard specifications and those made to order for specific projects ('project line pipes').

*Infringements found by the Commission in the contested decision*

16    In the contested decision, the Commission considered, first, that the eight addressees of the decision had concluded an agreement with the object, inter alia, of respecting each other's domestic markets (recitals 62 to 67 to the contested decision). Under that agreement, each undertaking gave a commitment not to sell standard-thread OCTG tubes or project line pipe in the domestic market of any other party to the agreement. The agreement was concluded at meetings between Community and Japanese producers known as the 'the Europe-Japan Club'. The principle of respect for domestic markets was designated by the term 'Fundamental Rules' ('Fundamentals'). The Commission also found that the members of the club had in fact complied with the Fundamentals and that the agreement had therefore had anti-competitive effects in the common market (recital 68 to the contested decision).

17    The Commission concluded that the agreement fell within the prohibition laid down in Article 81(1) EC (recital 109 to the contested decision). Consequently, the Commission found in Article 1 of the contested decision that there had been an infringement of Article 81(1) EC and imposed fines on the eight undertakings concerned.

18    As regards the duration of the infringement, the Commission took the view that, although the Europe-Japan Club first met in 1977 (recital 55 to the contested decision), 1990 should be taken as the starting date of the infringement for the purpose of setting the fines because, between 1977 and 1990, agreements on the voluntary restraint of exports ('voluntary restraint agreements') had been concluded between the European Community and Japan (recital 108 to the contested decision). The Commission considered that the infringement ceased in 1995 (recitals 96 and 97 to the contested decision).

19    For the purpose of setting the amount of the fines imposed on the eight addressees of the contested decision, the Commission characterised the infringement as very serious on the ground that the agreement was intended to ensure respect for domestic markets and thus jeopardised the proper functioning of the single market (recitals 161 and 162 to the contested decision). On the other hand, it noted that sales of seamless carbon steel tubes in the four Member States in question by the undertakings concerned amounted to only around EUR 73 million a year. Consequently, it set the amount of the fine intended to reflect the gravity of the infringement at EUR 10 million for each of the eight undertakings. As they were all large undertakings, the Commission considered that there was no need to differentiate between the amounts adopted (recitals 162, 163 and 165 to the contested decision).

20    The Commission considered that the infringement was of medium duration and increased by 10% for each year of its participation in the infringement the amount of the fine established on the basis of gravity in order to set the basic amount of the fine imposed on each of the undertakings (recital 166 to the contested decision). However, taking into account the fact that the steel pipe and tube industry had been in crisis for a long time and that the situation in the sector had deteriorated since 1991, the Commission reduced the basic amounts by 10%, on the ground of attenuating circumstances (recitals 168 and 169 to the contested decision). Last, the Commission reduced Vallourec's fine by 40% and Dalmine's by 20% in accordance with point D.2 of Commission Notice 96/C 207/04 on the non-imposition or reduction of fines in cartel cases (OJ 1996 C 207, p. 4; 'the Leniency Notice'), in order to take account of the fact that both undertakings had cooperated with the Commission during the administrative procedure (recitals 170 to 173 to the contested decision).

21    The amount of the fine imposed on each of the undertakings concerned following the calculations described in the two preceding paragraphs is stated in Article 4 of the contested decision (see

paragraph 33 below).

22    Second, the Commission found in Article 2 of the contested decision that the contracts concluded
      between the Community producers in respect of sales of plain end tubes on the United Kingdom market
      constituted an infringement (recital 116 to the contested decision). However, it did not impose
      additional fines in respect of that infringement, on the ground that the contracts ultimately represented
      only a means of ensuring the application of the principle of respect for domestic markets decided upon
      within the framework of the Europe-Japan Club (recital 164 to the contested decision).

      *Essential facts established by the Commission in the contested decision*

23    The Europe-Japan Club met from 1977, approximately twice per year, until 1994 (recital 60 to the
      contested decision). In particular, the Commission found that, according to Mr Verluca's statement of
      17 September 1996, such meetings took place, in particular, on 14 April 1992 in Florence, on 23
      October 1992 in Tokyo, on 19 May 1993 in Paris, on 5 November 1993 in Tokyo and on 16 March 1994
      in Cannes. In addition, the Commission claimed that the note prepared by Vallourec entitled 'Some
      information on the occasion of the Europe-Japan Club' of 4 November 1991, reproduced at p. 4350 of
      its file, and that of 24 July 1990, reproduced at p. 15586 of its file, entitled 'Meeting of 24 July 1990
      with British Steel', (hereinafter 'the note on the meeting of 24 July 1990') state that meetings of the
      Europe-Japan Club also took place in 1989 and 1991.

24    The agreement reached within the Europe-Japan Club consisted of three parts: (a) the 'Fundamentals'
      on respect for domestic markets (described at paragraph 16 above), which constitute the infringement
      found in Article 1 of the contested decision; (b) setting prices for tenders and minimum prices for
      'special markets'; and (c) dividing up the rest of the world by means of 'sharing keys', Canada and the
      United States of America being excluded from the concerted action (recital 61 to the contested
      decision). The Commission bases its conclusion as to the existence of the 'Fundamentals' on a number
      of documents listed in recitals 62 to 67 to the contested decision and also on the table in recital 68,
      which in the Commission's contention shows that the share of the domestic producer in the deliveries of
      OCTG tubes and line pipe by the addressees of the contested decision in Japan and on the domestic
      market of each of the four Community producers was very high. The Commission infers that on the
      whole the domestic markets were in fact respected by the parties to the agreement. As regards the
      other two parts of the agreement, the Commission describes the relevant evidence in recitals 70 to 77
      to the contested decision.

25    When, in 1990, Corus envisaged closing down its plain-end pipe production activities, the Community
      producers were concerned as to whether the principle of respect for domestic markets in the context of
      the Fundamental Rules would continue to apply in the United Kingdom market. It was in those
      circumstances that Vallourec and Corus launched the idea of 'fundamentals improved', which sought to
      maintain the restrictions on access to the United Kingdom market by the Japanese producers
      notwithstanding Corus's withdrawal. In July 1990, when the licence agreement for the VAM threading
      technique was renewed, Vallourec and Corus agreed that the supply to Corus of seamless plain-end
      tubes should be divided between Vallourec, Mannesmann and Dalmine (recital 78 to the contested
      decision).

26    In April 1991, Corus closed its factory in Clydesdale (United Kingdom), where approximately 90% of its
      plain-end tubes were produced. Corus then concluded agreements for the supply of plain ends, for an
      initial period of five years and automatically renewable thereafter subject to 12 months' notice of
      termination, with Vallourec (24 July 1991), Dalmine (4 December 1991) and Mannesmann (9 August
      1993) (hereinafter 'the supply contracts'). Under those three contracts, which are reproduced at
      pp. 12867, 12910 and 12948 of the Commission's file, each of the beneficiary undertakings is allocated
      a supply quota fixed at 40%, 30% and 30% respectively of Corus's needs (recitals 79 to 82 to the
      contested decision), other than for small-diameter tubes.

27    In 1993 three factors led to a re-examination of the operating principles of the Europe-Japan Club.
      First, there was the restructuring of the European steel industry: in the United Kingdom, Corus was
      contemplating ceasing production of threaded seamless tubes; in Belgium, the company New
      Tubemeuse ('NTM'), whose principal activity was exporting to the Middle East and the Far East, was
      wound up on 31 December 1993. Second, Latin American producers were gaining access to the
      Community market, which threatened to disrupt the market shares agreed in the Europe-Japan Club.

Third and last, the share of welded tubes in the world market in tubes and pipes for oil and gas extraction and transportation had increased significantly, although significant regional disparities remained (recitals 83 and 84 to the contested decision).

28    It was in those circumstances that the members of the Europe-Japan Club met in Tokyo on 5 November 1993, in an attempt to reach a new market-sharing agreement with the Latin American producers. The terms of the agreement reached at that meeting are reflected in a document which was handed to the Commission on 12 November 1997 by an informer not involved in the proceedings and is reproduced at page 7320 of the Commission's file, and which contains, inter alia, a 'sharing key'. According to the informer, the document had been obtained from a commercial agent of one of the participants in the meeting. As regards, in particular, the consequences of the restructuring of the European industry, the closure of NTM had allowed the Community producers to obtain concessions from the Japanese and Latin-American producers, which were the principal beneficiaries of NTM's withdrawal from the export markets (recitals 85 to 89 to the contested decision).

29    Corus decided to put an end to its remaining production of seamless pipes and tubes. On 22 February 1994, Vallourec took control of Corus's tube threading and production facilities and for that purpose formed Tubular Industries Scotland Limited ('TISL'). On 31 March 1994, TISL took over the supply contracts for plain-end tubes which Corus had concluded with Dalmine and Mannesmann. On 24 April 1997, the contract thus concluded with Mannesmann was still in force. On 30 March 1999, Dalmine terminated its supply contract with TISL (recitals 90 to 92 to the contested decision).

30    The Commission took the view that, by means of those contracts, the Community producers had divided up amongst themselves the supply of the British market in plain-end tubes, which represents more than half of all Community OCTG consumption. The Commission therefore concluded that that amounted to a cartel prohibited by Article 81(1) EC (see paragraph 22 above).

*Operative part of the contested decision*

31    According to Article 1(1) of the contested decision, the eight undertakings to which the decision was addressed '… have infringed the provisions of Article 81(1) of the EC Treaty by participating … in an agreement providing, inter alia, for the observance of their respective domestic markets for seamless standard threaded OCTG pipes and tubes and project line pipe'.

32    Article 1(2) of the contested decision states that the infringement lasted from 1990 to 1995 in the case of Mannesmann, Vallourec, Dalmine, Sumitomo, Nippon, Kawasaki and NKK. In the case of Corus, the infringement is stated to have lasted from 1990 to February 1994.

33    The other relevant provisions of the operative part of the contested decision are worded as follows:

'*Article 2*

1.    [Mannesmann], Vallourec …, [Corus] and Dalmine … infringed Article 81(1) of the EC Treaty by concluding, in the context of the infringement mentioned in Article 1, contracts which resulted in a sharing of the supplies of plain and OCTG pipes and tubes to [Corus] (to Vallourec … from 1994).

2.    In the case of [Corus], the infringement lasted from 24 July 1991 to February 1994. In the case of [Vallourec], the infringement lasted from 24 July 1991 to 30 March 1999. In the case of [Dalmine], the infringement lasted from 4 December 1991 to 30 March 1999. In the case of [Mannesmann], the infringement lasted from 9 August 1993 to 24 April 1997.

…

*Article 4*

The following fines are imposed on the firms mentioned in Article 1 on account of the infringement established therein:

(1)   [Mannesmann] EUR 13 500 000

(2)   Vallourec … EUR 8 100 000

(3)   [Corus] EUR 12 600 000

(4)   Dalmine … EUR 10 800 000

(5)   Sumitomo … EUR 13 500 000

(6)   Nippon … EUR 13 500 000

(7)   Kawasaki … EUR 13 500 000

(8)   NKK Corp. … EUR 13 500 000

*A – Procedure before the Court of First Instance*

34   By seven applications lodged at the Registry of the Court of First Instance between 28 February and 3 April 2000, Mannesmann, Corus, Dalmine, NKK, Nippon, Kawasaki Steel Corp. and Sumitomo brought the present actions against the contested decision.

35   By three orders of 23 April 2002, the EFTA Surveillance Authority was granted leave to intervene in support of the form of order sought by the Commission, in accordance with Article 116(6) of the Rules of Procedure of the Court of First Instance, in Cases T-68/00, T-71/00 and T 78/00.

36   By order of 18 June 2002 the Court decided, after hearing the parties, to join the seven cases for the purposes of the oral procedure and also to join the four cases brought by the Japanese applicants (T-67/00, T-68/00, T-71/00 and T-78/00) for purposes of the judgment, in accordance with Article 50 of the Rules of Procedure. After the cases were joined, all the applicants in the seven cases were allowed to examine all the files relating to the present proceedings at the Court Registry. Measures of organisation of procedure were also adopted.

37   Upon hearing the report of the Judge-Rapporteur, the Court of First Instance (Second Chamber) decided to open the oral procedure. The parties, including the EFTA Surveillance Authority as intervener in Cases T-68/00, T-71/00 and T-78/00, presented oral argument and answered questions put to them by the Court at the hearing on 19, 20 and 21 March 2003.

**Forms of order sought**

38   In Case T-67/00, NKK claims that the Court should:

–      annul the contested decision in so far as it relates to it;

–      cancel the fine imposed on it;

–      in the alternative, in the event that the contested decision is upheld in whole or in part, reduce the fine imposed on it;

–      order the Commission to pay its costs;

–      grant such other order as may be necessary to give effect to the judgment of the Court.

39   In Case T-68/00, Nippon claims that the Court should:

–    annul the contested decision in so far as it concerns Nippon;

–    annul or, at least, reduce the amount of the fine imposed on it;

–    order the Commission to pay the costs.

40    In Case T-71/00, Kawasaki claims that the Court should:

–    annul the contested decision,

–    in the alternative, reduce the fine imposed on it;

–    order the Commission to pay the costs.

41    In Case T-78/00, Sumitomo claims that the Court should:

–    annul Articles 1 to 5 of the contested decision in so far as they concern Sumitomo;

–    in the alternative, annul Article 4 of the contested decision in so far as it imposes a fine of EUR 13.5 million on Sumitomo and fix a fine which is substantially lower;

–    order the Commission to pay the costs.

42    The Commission contends in each of the four cases that the Court should:

–    dismiss the action;

–    order the applicant to pay the costs.


**The impact of the concentration between Kawasaki and NKK**

43    By separate letters of 9 May 2003, NKK and Kawasaki informed the Court of First Instance, in connection with a concentration affecting the two groups to which they belonged, that they had changed name and were now called JFE Steel Corp. In the light of the documents annexed to their letters to evidence that change of name, the Registry of the Court asked those two applicants and the Commission to clarify the situation resulting from that concentration. Replies were received from each of the applicants in letters dated 11 September 2003 and from the Commission dated 22 September 2003.

44    It appears from those documents and replies that Kawasaki changed its name and became JFE Steel Corp. On the other hand, it must be noted that NKK changed its name and became JFE Engineering Corp. However, in their respective letters of 11 September 2003, those two applicants stated that the rights and obligations of the NKK undertaking had been transferred to JFE Steel Corp.

45    It must be observed, first, that the Community Courts can indeed take note of the change of name of a party to proceedings.

46    Moreover, it is recognised in the case-law that an action for annulment brought by the addressee of a measure can be pursued by the transferee of all the latter's business, particularly in the case of the death of a natural person or in the case of a legal person ceasing to exist when all its rights and obligations are vested in a new person (see to that effect Case 92/82 *Gutmann* v *Commission* [1983] ECR 3127, paragraph 2, and Case 294/83 *Les Verts* v *Parliament* [1986] ECR 1339, paragraphs 13 to 18). It must be observed that in such a situation the transferee of the entire business is necessarily substituted by operation of law for its predecessor as addressee of the contested measure.

47    On the other hand, the Community judicature has no power in the context of an action for annulment under Article 230 EC, not even in the exercise of its unlimited jurisdiction under Article 229 EC with regard to penalties in order to amend the decision of a Community institution by replacing the address thereof by another natural or legal person when that addressee still exists. That power belongs a priori only to the institution that adopted the measure concerned. Thus, once the competent institution has adopted a decision and, therefore, established the identity of the person to whom the decision is to be addressed, it is not for the Court to substitute another person for the latter.

48    It must then be considered that an application brought by a person in his capacity of addressee of a measure in order to give effect to his rights in the context of an action for annulment under Article 230 EC and/or of an application for amendment under Article 229 EC cannot be transferred to a third person who is not the addressee thereof. If such a transfer were to be allowed, there would be a discrepancy between the status by virtue of which the action was brought and the status by virtue of which it was purportedly pursued. Moreover, such a transfer would give rise to a discrepancy between the identity of the addressee of the European Communities and that of the person litigating as addressee.

49    It must be observed in that connection that a decision such as the contested decision, although drafted and published in the form of a single decision, must be seen as a set of individual decisions finding that each of the addressees is guilty of the infringement or infringements of which they are accused and imposing on them, where appropriate, a fine. That rule derives from a combined reading of the judgment of the Court of First Instance in Case T-227/95 *AssiDomän Kraft Products and Others* v *Commission* [1997] ECR II-1185, paragraph 56, and, on appeal, in Case C-310/97 P *Commission* v *AssiDomän Kraft Products and Others* [1999] ECR I-5363, paragraph 49. Thus, in this case, NKK was and remains the sole addressee of the decision that was addressed to it, Kawasaki being the addressee of a legally separate decision contained in the same measure.

50    Finally, it is true that the person who becomes responsible for the running of an undertaking may, at the stage of the administrative procedure before the Commission, assume, by making a declaration to that effect, responsibility for the matters alleged against the person actually responsible, even though it falls, in principle, to the legal or natural person managing the undertaking in question when the infringement was committed to answer for that infringement (see to that effect, even though an appeal is pending, the judgment of the Court of First Instance in Joined Cases T-45/98 and T-47/98 *Krupp Thyssen Stainless and Acciai speciali Terni* v *Commission* [2001] ECR II-3757, paragraphs 57 and 62). However, it is apparent from the considerations set out in paragraphs 46 to 49 above that such a declaration cannot have the effect of changing the identity of the addressee of a Commission decision once the decision has been adopted or that of the applicant in an action for the annulment of such a decision once the action has been brought.

51    In those circumstances, it is appropriate to take note of the change of name of Kawasaki to JFE Steel Corp. and of the fact that NKK is now called JFE Engineering Corp. However, it is not appropriate to replace JFE Engineering Corp. by JFE Steel Corp in Case T-67/00, whatever the effects may be under Japanese law of the merger agreement entered into by those two companies. Accordingly, JFE Steel Corp. (hereinafter 'JFE-Kawasaki') remains the applicant in Case T-71/00 and JFE Engineering Corp. (hereinafter 'JFE-NKK') remains the applicant in Case T-67/00.


**Law**

*A – The claims for annulment of the contested decision, in particular Article 1 thereof*

52    The Japanese applicants put forward 13 separate pleas in annulment, some of which are common to all of them or to several of them.

      1. *The first plea: the Commission did not establish to the requisite legal standard the existence of the infringement found in Article 1 of the contested decision*

53    The present plea is put forward by all four Japanese applicants.

      a) Arguments of the parties

54      The Japanese applicants make a number of preliminary observations concerning the taking of evidence of the alleged infringement of Article 81(1) EC. As regards the substance, this plea falls into three limbs.

55      First, the Japanese applicants argue that the absence of Japanese exports to the European onshore markets may be explained by objective commercial considerations and that the existence of the alleged cartel is inconsistent with the substantial deliveries of the relevant products by them in the market relating to the part of the continental shelf in the North Sea exploited by the United Kingdom (hereinafter 'the United Kingdom offshore market' or 'the British offshore market'), so that the infringement of which the Japanese applicants are accused could not have had any anti-competitive effects in any event. Secondly, the evidence gathered by the Commission fails to establish either the existence of the alleged cartel or, supposing there were such a cartel, the involvement of each of the Japanese applicants in it. Thirdly, the Commission's analysis of the objectives of the contracts for the supply of plain-end pipes concluded by the European Producers, which constitute the infringement complained of in Article 2 of the contested decision, is incoherent. That analysis also confirms that the Commission's argument regarding the participation of the Japanese applicants in the infringement established in Article 1 of the contested decision is unfounded.

Preliminary observations

56      Sumitomo and JFE-NKK argue that the burden of proof regarding all the elements making up an infringement lies on the Commission (Opinion of Advocate General Sir Gordon Slynn in Joined Cases 100/80 to 103/80 *Musique diffusion française* v *Commission* [1983] ECR 1825, 1914; Case C-185/95 P *Baustahlgewebe* v *Commission* [1998] ECR I-8417, paragraph 58, and Case C-49/92 P *Commission* v *Anic Partecipazioni* [1999] ECR I-4125, paragraph 86). Thus, where there is doubt, the benefit of that doubt must be given to the undertakings accused of the infringement (Joined Cases 40/73 to 48/73, 50/73, 54/73 to 56/73, 111/73, 113/73 and 114/73 *Suiker Unie and Others* v *Commission* [1975] ECR 1663, paragraphs 203, 304, 359 and 363, Case 27/76 *United Brands* v *Commission* [1978] ECR 207, paragraph 265, Opinion of Judge Vesterdorf, acting as Advocate General, in Case T-1/89 *Rhône-Poulenc* v *Commission* [1991] ECR II-867, at page II-954). Thus, the Commission is obliged to prove the facts which it alleges beyond all reasonable doubt (Opinion of Advocate General Darmon in Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 *Ahlström Osakeyhtiö and Others* v *Commission* ('*Woodpulp II*') [1993] ECR I-1307, at I-445, paragraph 195). Conversely, where an applicant is able to show that there is uncertainty as to the merits of the Commission's finding of an infringement, that will suffice to obtain the annulment of the decision containing the finding (Opinion of Advocate General Sir Gordon Slynn in *Musique diffusion française* v *Commission*, at page 1931).

57      Moreover, in order to prove an infringement, the Commission must, according to the Japanese applicants, produce sufficiently precise and consistent evidence to support the firm conviction that the alleged infringement took place (Joined Cases 29/83 and 30/83 *CRAM and Rheinzink* v *Commission* [1984] ECR 1679, paragraph 20, *Woodpulp II*, cited in paragraph 56 above, paragraph 127, Joined Cases T-68/89, T-77/89 and T-78/89 *SIV and Others* v *Commission* [1992] ECR II-1403, in particular, paragraphs 193 to 195, 198 to 202, 205 to 210, 220 to 232, 249, 250 and 322 to 328, Case T-62/98 *Volkswagen* v *Commission* [2000] ECR II-2707, paragraph 43 and 72). The evidence furnished must show, amongst other things, that the alleged infringements constitute an appreciable restriction of competition within the meaning of Article 81(1) EC. That requirement is not satisfied, in particular, where a plausible explanation can be given for the alleged infringement which rules out an infringement of the Community rules on competition (*CRAM and Rheinzink* v *Commission*, paragraph 16 et seq., Joined Cases T-185/96, T-189/96 and T-190/96 *Riviera Auto Service and Others* v *Commission* [1999] ECR II-93, paragraph 47, and *Volkswagen* v *Commission*).

58      Furthermore, the evidence put forward must satisfy the criteria of precision and consistency, mentioned earlier, in relation to all the elements of the infringement, in particular, the identity of the parties and their involvement in the infringement (*Woodpulp II*, cited in paragraph 56 above, paragraph 69, *Commission* v *Anic Partecipazioni*, cited in paragraph 56 above, paragraph 87, and Case T-295/94 *Buchmann* v *Commission* [1998] ECR II-813, paragraph 121), the products or services involved (*Suiker Unie and Others* v *Commission*, cited in paragraph 56 above, paragraphs 301 to 304, and *SIV and Others* v *Commission*, cited in paragraph 57 above, paragraphs 175 to 194 and 324), the restrictions agreed by the parties (Case T-337/94 *Enso-Gutzeit* v *Commission* [1998] ECR II-1571, paragraphs 102 to 150) and the duration of the infringement (Case T-43/92 *Dunlop Slazenger* v *Commission* [1994] ECR II-441, paragraph 79, and *Volkswagen* v *Commission*, cited in paragraph 57 above paragraph

188). As regards, more specifically, the duration of the infringement, the Commission must provide either direct evidence or evidence that is sufficiently recent, in other words contemporaneous evidence.

59    JFE-NKK argues, in particular, that, according to the judgment in Case T-348/94 *ENSO Española* v *Commission* [1998] ECR II-1875 (paragraphs 160 to 171), the Commission must rely on actual proof and not just assertions of the content and object of the meetings which the parties to the alleged agreement supposedly attended.

60    The Commission submits first of all that the fact that the Japanese applicants put forward arguments which place the facts established by the Commission in a different light cannot enable them to have the contested decision annulled. The arguments advanced by JFE-NKK on this point, based substantially on the judgment in *CRAM and Rheinzink* v *Commission*, cited in paragraph 57 above, and paragraphs 126 and 127 of the judgment in *Woodpulp II*, cited in paragraph 56 above, only apply where the Commission's decision is based on no more than a supposition that the facts established cannot be explained otherwise than by concertation between undertakings. That is not the case here.

61    As regards the argument that the Commission must prove the existence of the infringement beyond any reasonable doubt, the Commission states that there are no grounds for such a submission. It should be noted, in particular, that, in *Woodpulp II*, Advocate General Darmon's interpretation to that effect of the concept of sufficiently precise and coherent evidence was not adopted by the Court. Similarly, in Joined Cases T-305/94 to T-307/94, T-313/94 to T-316/94, T-318/94, T-325/94, T-328/94, T-329/94 and T-335/94 *Limburgse Vinyl Maatschaapij and Others* v *Commission* ('*PVC II*') [1999] ECR II-931, the Court's approach was to make a general assessment of whether the evidence was sufficient to establish the infringement in question. In relation, more specifically, to the duration of the infringement, the requirement of precision and coherence does not apply to establishment of the existence of the infringement but merely serves to determine the extent to which the fine should be commensurate with the duration of the infringement. In any event, the precise date on which the infringement began is irrelevant in the present case, provided that it was some time before 1990 because, in fixing the fines, the Commission took account of the infringement only from that date onwards.

First part: incompatibility of the existence of the alleged agreement with the situation existing in the British offshore market and the other European markets

62    The Japanese applicants submit in essence that the existence of barriers to trade provides a credible alternative explanation for the absence of Japanese sales on the European markets as far as the products referred to in Article 1 of the contested decision are concerned. Since the Commission's reasoning is based on the supposition that such absence can not be accounted for otherwise than by concertation between the parties to the offending agreement, Article 1 of the contested decision must be annulled, in line with the approach taken in the judgments in *CRAMandRheinzink* v *Commission*, cited in paragraph 57 above, paragraph 16, *Woodpulp II*, cited in paragraph 56 above, paragraphs 126 and 127, and *PVC II*, cited in paragraph 61 above, paragraph 725.

63    The applicants argue that there is a fundamental contradiction between the allegation that the Japanese applicants were parties to an agreement in which they undertook to refrain from supplying the European markets and their actual activity in that market. In fact, contrary to the Commission's claim, an examination of the patterns of trade between Japan and Europe demonstrates that the Japanese producers vigorously competed with the European producers in the offshore markets, in particular those of the United Kingdom and Norway, which, together, were the only markets of significance for the Japanese producers, for objective commercial reasons. Moreover, demand in the United Kingdom offshore market was primarily for premium thread OCTG rather than the standard thread OCTG mentioned in the contested decision. At the very least, the Commission erred in its assessment and classification of the facts by finding, in Article 1 of the contested decision, that there had been an infringement in both the offshore and onshore European markets.

64    In that connection, Nippon raises the question whether it is conceivable that the Japanese producers were parties to an agreement with the European producers not to sell their products in the European markets, given the circumstances described in the previous paragraph. JFE-Kawasaki and Sumitomo point out that, according to the table reproduced in recital 68 to the contested decision, no domestic producer has a 100% share of its national market in OCTG and transport pipes. In the United Kingdom

market, in particular, imports of those products fluctuated between 16% and 22%. In response to the Commission's argument that that fact may be explained by the particular status of the United Kingdom market, which is regarded as being 'semi-protected' (enjoying limited protection) by the 'Fundamentals', JFE-NKK replies that the French market, which did not have the same status, was less protected in 1991 and similarly protected in 1994, as is apparent from the table. Since the Japanese producers failed to sell any of the products referred to in the contested decision in certain European markets in some years of the period of the infringement established by the Commission, JFE-NKK considers that that fact may be explained by fluctuations in sales of those products, consumption being heavily dependent on activity in the oil and gas sectors.

65    Sumitomo expressly acknowledges that its arguments regarding the effects of the agreement are relevant to the present plea only if the Court of First Instance takes the view that the Commission failed to prove the existence of an infringement on the basis of the documents and statements relied on in the contested decision. Sumitomo observes in that connection that the Commission relied principally on the purpose of the agreement and only to a limited extent on its effects.

66    As regards the Commission's argument, based on paragraph 1088 of the judgment in Joined Cases T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95, T-42/95 to T-46/95, T-48/95, T-50/95 to T-65/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/94 *Cimenteries CBR and Others* v *Commission* ('*Cement*') [2000] ECR II-491, that an infringement is particularly serious if it consists in an agreement to eliminate competition in a market in which there is already little competition, JFE-Kawasaki points out that the circumstances of the present case are very different from those of that judgment. In the present case, there was strong competition within Europe, at least structurally, given the presence of four major Community producers and thus any potential Japanese competition would have been negligible. In the *Cement* case there was, by contrast, a series of closed geographical monopolies.

67    JFE-Kawasaki argues that, according to recitals 61 to 77 to the contested decision itself, the 'Fundamentals' did not apply to the United Kingdom offshore market or to the other Community offshore markets. In particular, it is clear from recital 62 to the contested decision that the 'Fundamental Rules' governed the situation in the domestic markets, the United Kingdom offshore market benefiting from the special status of being 'semi-protected' or enjoying 'limited protection'. The statement in recital 102 to the contested decision that the parties to the agreement were obliged to refrain from supplying the pipes in question in the domestic markets is inconsistent with the hybrid status attributed to the United Kingdom offshore market by recital 62.

68    Deliveries of seamless carbon-steel tubes from Japan to the UK offshore market are characterised by continuity and high volume. In that connection Nippon relies on the table reproduced in recital 68 to the contested decision, which shows that the Japanese applicants delivered significant quantities of seamless steel tubes to the United Kingdom market. The fact that the figures are for all steel tubes, not only those contemplated by the contested decision, does not affect their relevance and is simply the result of the fact that the producers supplied various types of tubes – standard thread OCTG, line pipe and premium thread OCTG – to the United Kingdom Continental shelf. Nippon also relies on export figures produced by Japanese customs authorities for the years 1988 to 1996 and on statistics for 1977 to 1987 issued by the Japanese Iron & Steel Exporters Association, which confirm that there was competition. Sumitomo also contends that its sales of tubes to the European Community market, and in particular to the United Kingdom continental shelf, were significant and it puts forward evidence in support of that submission. In particular, it disputes the figure of 230 000 tonnes put forward by the Commission for average annual sales of line pipe by the members of the Europe-Japan Club in the European Community markets in question. Total sales achieved by all members of that club amounted to 71 000 tonnes of line pipe per annum. JFE-NKK, for its part, refers to detailed figures which it supplied in response to a request for information from the Commission and which show that it certainly did not refrain from selling tubes on the European markets during the period determined as the duration of the infringement. JFE-Kawasaki argues that, although its sales in all the European markets remained minimal, it had made significant efforts to achieve sales, particularly with regard to the United Kingdom offshore market.

69    Moreover, the vigorous competition of the Japanese producers, in the UK market in particular, is expressly demonstrated by documentary evidence obtained by the Commission during its investigation into the European producers. In particular, the document reproduced at page 4902 of the Commission's file, headed 'Paper for Presidents' records 'the current [Japanese] aggression on OCTG' and the five

notes prepared by Vallourec (the note of 23 March 1990, reproduced at page 15622 of the Commission's file, headed 'Réflexions concernant le renouvellement du contrat VAM', the note of 2 May 1990, reproduced at page 15610 of the file, headed 'Réflexions stratégiques concernant les relations de VLR', the note of 1 June 1990, reproduced at page 15591 of the file, headed 'Renouvellement du contrat VAM BSC', the note on the meeting of 24 July 1990 and, lastly, the note of a meeting with Corus, set out at page 15596 of the file, undated, headed 'Entretien BSC') all confirm that Vallourec regarded sales by the Japanese producers in the UK offshore market as being of serious concern. Similarly, a fax from Mannesmann dated 16 August 1993, reproduced at page 2493 of the Commission's file, records that Japanese price competition was making it pointless for Mannesmann to submit tenders in certain cases.

70      Moreover, it is evident from a letter dated 6 June 1994 from the Liaison Committee of the European Community Steel Tube Industry to the Commission, reproduced at page 5243 of the Commission's file (hereinafter 'the Liaison Committee's letter of 6 June 1994') and from the minutes of the Liaison Committee's meeting of 24 August 1994, reproduced at page 5103 of the file, that the European producers regarded the Japanese firms as aggressive competitors and that their substantial market presence posed a threat to their position in the offshore markets of the Member States of the Community. The minutes of the Liasion Committee's meeting of 24 August 1994 also show that the Japanese producers achieved a 25% share of the Community and Faeroe offshore markets in OCTG (all types of steel) and a 34% share of the Community and Norwegian offshore market in carbon-steel OCTG. In support of its claim that Japanese imports were significant in volume, Sumitomo also refers to a fax from the European Steel Tube Association (formerly Liaison Committee of the Community Steel Tube Industry) dated 5 October 1994 (reproduced at page 4725 of the Commission's file) and an undated draft letter addressed to Mr Large of the Commission (page 4725 of the file). Similarly, statements by the European producers – and especially Dalmine's replies of 29 May 1997 to the questions put to it by the Commission pursuant to Article 11 of Regulation No 17 (reproduced at page 15162 of the Commission's file, hereinafter 'Dalmine's replies of 29 May 1997') and Corus's replies of 13 August 1997 (page 11916 of the file, hereinafter 'the Corus reply') confirm that view. In particular, Corus's replies say that the Japanese producers were targeting the United Kingdom offshore market. Nippon emphasises that, according to a document headed '(g) Japanese', reproduced at page 4909 of the Commission file and prepared by one of the European firms, 'Nippon Steel in particular are becoming ever more aggressive in the [United Kingdom continental shelf]'.

71      According to the Japanese producers, the fact that they sold significant quantities of steel tubes, and in particular premium thread OCTG and project line pipe, in the United Kingdom offshore market, without, however, selling significant quantities of those products in the onshore markets of the Member States of the Community, was – contrary to the Commission's view – perfectly logical and consistent with the absence of the alleged agreement. In particular, the products in question, where they are intended for offshore use, are of high quality and are very expensive. Moreover, it is easier for foreign producers, generally speaking, to compete with local producers as regards special products, such as premium thread OCTG, rather than standard products, such as standard thread OCTG.

72      Furthermore, the North Sea continental shelf and, in particular, the United Kingdom offshore market, represent the lion's share of the European market in steel tubes, as is evidenced by the '(g) Japanese' document. The onshore markets for those products are thus relatively limited and not seen as very profitable. In addition, the competitive conditions in the British offshore market are very different from those in the Community onshore market. Japanese sales in this latter market, in fact, have suffered as a result of the cumulative effect of a number of trade barriers most of which do not exist in the British offshore market. The Commission has not taken those differences into account and has failed to distinguish, in the contested decision, between offshore and onshore markets. Nippon, however, argues that those trade barriers, taken as a whole, practically closed the onshore markets to the Japanese producers because of those obstacles, at least when considered as a whole. That fact is confirmed, according to Sumitomo, in so far as concerns standard thread OCTG, by a letter from a company which purchases that type of product in which it stated that the Japanese producers had made offers to sell, but that the prices were uncompetitive and the delivery times were longer than those offered by the European producers. According to Sumitomo, the mention of Japanese suppliers on the internet site of the company just mentioned – on which the Commission relies – relates to premium thread OCTG, not to standard thread OCTG.

73      As regards barriers of imports of Japanese tubes into the European Community, the Japanese applicants take the view, first, that the traditional trade policy of the European Community, which

sought to protect European markets by means, in particular, of voluntary restrictions agreed between the Commission and the Japanese Government, represents such an obstacle. The aim of the policy was essentially to preserve existing trade patterns. In this case, the Japanese applicants state that, when those voluntary restraint agreements were in force, they were not exporting seamless tubes to the Community onshore market, or were doing so only on a very small scale, and that, consequently, the policy dissuaded them from exporting their products to those markets.

74    In practice, the first voluntary restrain agreement relating to steel tubes was entered into in March 1978. The last agreement renewing voluntary restraint arrangements, dated December 1989, remained in force until the end of 1990. The Commission itself asserted, in recital 134 to the contested decision, that those arrangements had dissuaded Japanese producers from exporting their steel tubes to Europe until 1990. That being so, during the period of voluntary restraint, the Japanese applicants simply could not have had, to a sufficient extent, common intentions of the kind referred to in Case T-141/94 *Thyssen Stahl* v *Commission* [1999] ECR II-347, at paragraph 262, or in *Cement*, cited in paragraph 66 above, at paragraph 917. JFE-NKK adds that it was the Commission itself that encouraged the Japanese producers to adopt the trade policy of which it now complains, despite its failure to prove exactly when the voluntary restraint agreement came to an end. Broadly speaking, the Japanese applicants rely on the extension of the voluntary restraint agreements in seeking a reduction in the amount of the fines (see paragraphs 136 et seq. and 511 to 513 below).

75    Second, Japanese steel tube producers were dissuaded from exporting to the Community carbon-steel seamless tube onshore markets because they faced significant customs duties under the Common Customs Tariff. From 1977 to 1994 customs duties imposed on imports of seamless steel tubes into the onshore Community markets were never less than 9%. The Commission's statement, in recital 138 to the contested decision, to the effect that it took that factor into account in no way explains why the Commission did not consider this to be a hindrance to Japanese sales. Sumitomo maintains in that connection that Latin American producers were subject to lower levels of import duty under the General System of Preferences. Likewise, over the period of the infringement determined by the Commission, several free-trade agreements with Central and Eastern European countries removed customs duties on steel products imported from those countries. This made imports from those countries more viable than imports from Japan.

76    Third, transport costs, and, in the case of tubes intended for onshore applications, the costs of loading, unloading at the port of arrival in the Community, and delivery by sea or road to the final destination added to the competitive disadvantage of the Japanese steel tube producers, by comparison with the Community producers, in the Community's onshore markets. Also, because the quantities of tubes ordered in the European onshore markets are small, transport costs per tonne delivered are correspondingly higher. Moreover, transport costs are particularly high, as a percentage of invoice value, in the case of the standard thread OCTG referred to in the contested decision, because of that product's relatively low cost. In that regard, the Japanese applicants put forward various sets of figures which they say are based on real prices obtained for supplies of seamless tubes to Europe. The Commission's assertion that consignments may be bulked together to reduce transport costs does not undermine their argument since it must be recognised that the level of costs would remain dissuasive none the less. The fact that transport costs are high for the Japanese producers is also confirmed by the Liaison Committee's letter of 6 June 1994, even though the purpose of that letter was to draw the Commission's attention to the threat posed by Japanese tube imports. It is further confirmed, albeit indirectly, by the Commission's decision-making practice, in particular Decision 93/247/EEC of 12 November 1992 declaring a concentration to be compatible with the common market (Case No IV/M.222 – Mannesmann/ Hoesch), recital 102 (OJ 1993 L 114, p. 34). Similarly, it is clear from the Commission's decision of 26 February 1998 declaring a concentration to be compatible with the common market (Case No IV/M.1014 – British Steel/Europipe (OJ 1998 C 181, p. 3) that distance constitutes a significant disadvantage for producers outside the Community wishing to sell small quantities of relatively low specification products.

77    On this point, JFE-Kawasaki adds that the Japanese producers were at a disadvantage in relation not only to European producers, but also to other producers in non-member countries. For example, the costs of shipment from Japan to either Italy or the United Kingdom are between 40 and 50% higher than from Argentina. As regards the Commission's argument that annex 5 to the contested decision shows that the Italian market was protected against Japanese imports but not against imports from other non-member countries, Sumitomo points out that the annex refers to all OCTG and all line pipe and is thus of no value in assessing the specific case of the products covered by Article 1 of the

contested decision.

78    JFE-Kawasaki and JFE-NKK dispute the argument put forward by the Commission in recital 137 to the
      contested decision to the effect that, given the structural overcapacity in the steel tubes sector, any
      sale at a price above the variable cost is worth making and that such sales help to cover fixed costs.
      First, transport costs are higher for steel tubes – which are particularly bulky – than for other steel
      products. Second, the Commission's assessment fails to take account of the fact that the Japanese
      producers have a finite steel production capacity and that they therefore seek to maximise profits by
      selling as many products as possible on which they can obtain the highest profit margin. The fact that
      the variable costs may be covered by sales of a particular product does not therefore imply that it is in
      the commercial interests of producers to make such sales.

79    As regards the Commission's view that production capacities for steel products are specific to the
      various products and that it is therefore not possible to concentrate capacity on products with the
      highest profit margin, Kawasaki replies that the first stage of the production process is the same for all
      steel products. That is the stage in which its production capacities are limited. Sumitomo also states
      that overcapacity affected the European producers just as much as the Japanese. The consequences
      were thus the same for both sides and the other disadvantages would still have remained even if the
      Japanese producers had wished to sell at prices just below variable costs.

80    Fourth, the Japanese producers are at a disadvantage by comparison with their European competitors
      as regards delivery times. It takes between four and six weeks to ship steel tubes manufactured in
      Japan to Europe. Whilst the Commission argues, in recital 137 to the contested decision, that the
      undertakings in question do not think delivery times present an obstacle to Japanese exports of
      premium thread OCTG, which are used, inter alia, on the United Kingdom continental shelf in pre-
      defined projects, that observation does not apply to standard thread OCTG. It would, in fact, be
      expensive for a buyer of premium thread OCTG to change the type of premium joint once he had opted
      for one or other type offered by a given producer. The impact of delivery times is thus less significant in
      such a case. In the market for standard thread OCTG, on the other hand, the ability to achieve short
      delivery times presents a significant advantage. As regards project line pipe, the treatment those pipes
      require means that the supplier must work to a very tight schedule, so that delivery times become even
      more significant. Lastly, because OCTG and project line pipe are sold directly to users, it would be
      impossible to overcome this obstacle by making indirect sales through the intermediary of stockholders.

81    Fifth, the domestic market in each of the four Member States of the Community where the largest
      onshore sales could be made, that is to say France, Germany, Italy and the United Kingdom, was
      dominated by one national producer. That situation was not necessarily the result of a market-sharing
      agreement because certain objective factors, economic and otherwise, tend to favour national
      production. The position of national producers was strengthened, in particular, by the purchasing policy
      of their main customers in that market, that is to say the national gas transportation and distribution
      companies, which are often public undertakings. The Commission acknowledged the existence of such a
      situation in its Decision 93/247.

82    By way of example, Corus (formerly British Steel) enjoyed privileged relations at the relevant time with
      the companies British Gas and BP (formerly British Petroleum), as is evidenced, in BP's case, by a
      document headed 'Minutes of technical liaison meeting by BP engineering / British Steel', reproduced at
      page 681 of the Commission's file. Similarly, statements made by employees of Dalmine, reproduced at
      page 8820 b 4 of the Commission's file (hereinafter 'the Dalmine employees' statements'), attest to the
      fact that they offered bribes to employees of Agip, which was Italy's largest oil and gas company, to
      ensure that Agip's orders for seamless steel tubes would not be awarded to other manufacturers and
      that Agip would generally seek to give preference to Italian manufacturers. In similar fashion, a
      document headed 'Meeting with Distrigaz', reproduced at page 2298 of the Commission's file, evidences
      Distrigaz's desire not to purchase from non-Community producers. More generally, the 11th and 12th
      recitals in the preamble to Council Directive 90/531/EEC of 17 September 1990 on the procurement
      procedures of entities operating in the water, energy, transport and telecommunications sectors (OJ
      1990 L 297, p. 1) confirm that the public markets relating to the extraction, transportation and
      distribution of oil and gas were closed before the directive came into force. In addition, Article 29 of the
      directive, which governs the future position of producers in non-member countries, does not grant such
      producers equal access to the European public markets, contrary to what appears to be implied in the
      contested decision. According to JFE-NKK, the Japanese producers did not benefit in full from the rules
      laid down by Directive 90/531 because the international agreement relating to public markets (annexed

to Council Decision 81/271/EEC of 10 December 1979 concerning the conclusion of the Multilateral Agreements resulting from the 1973 to 1979 trade negotiations (OJ 1980 L 71, p. 1) does not apply to the exploration, extraction or transportation of oil and gas.

83    Sixth, the European firms lodged antidumping complaints with the Commission with the aim of keeping non-Community producers out of the Community market. Between 1977 and 1998 seven actions were brought against non-Community producers of seamless steel tubes, only one of which was concluded without an undertaking being given or a duty imposed. Whilst none of those anti-dumping actions related to imports from Japan, there was nothing strange about that as regards the United Kingdom offshore market because the Community anti-dumping rules in force at the material time did not apply to the part of the continental shelf belonging to the Member States. On the other hand, the possibility of antidumping proceedings being brought against them had a significant dissuasive effect on Japanese exporters as regards the onshore markets, contrary to the Commission's submission in recital 137 to the contested decision. The very fact of antidumping proceedings being commenced against them would in itself represent a substantial burden for Japanese producers because of the investigative measures which would be adopted by the Commission. The truth of that argument is confirmed by the fact that the Paper for Presidents indicates that European firms were considering threatening the Japanese with anti-dumping complaints. The European producers were also exerting pressure on the Commission to extend the Community customs territory to the offshore markets of the Member States, as is evidenced in particular by the Liaison Committee's letter of 6 June 1994.

84    Seventh, the cost of constant compliance with various national standards in the Member States of the Community and widely differing licensing requirements constituted another significant trade barrier. Essentially, the 'API' standard is only a basic specification and it is thus also necessary to comply with national standards and even to meet additional standards imposed by certain individual customers. According to Nippon, in Germany, for example, a certificate was required for the production process as well as for the product testing equipment and employees' qualifications. To obtain those certificates it was necessary, every two or three years, to submit voluminous documents in German and pay a fee of up to DEM 45 000. In Decision 93/247, the Commission acknowledged that those national standards constituted a significant barrier to intra-Community trade in steel tubes. That finding is particularly pertinent to imports from Japan. The objective assessment made in Decision 93/247 cannot be dismissed in the present case for the reason voiced by the Commission that it was unaware of the present infringement when it adopted that decision. As regards the individual requirements of particular oil companies, JFE-Kawasaki points out that Total, the French company, and Agip, the Italian company, require an 'off-line' inspection of all steel tubes delivered to them. Compliance with that obligation occasions costs of over USD 100 per thousand tonnes

85    Eighth, JFE-NKK, Nippon and JFE-Kawasaki argue, in their respective replies, that Corus benefited from a policy of the United Kingdom Government to promote sales by British suppliers to the United Kingdom continental shelf. The United Kingdom Government implemented that policy by setting up an Offshore Supplies Office ('the OSO'). The OSO managed, by exerting pressure on operators active on the continental shelf, to increase the market share of British suppliers from between 25% and 30% in 1972 (according to a report published by the Department of Trade and Industry in 1997, a copy of which is included in annex 4 to the reply in Case T-67/00, hereinafter 'the DTI report') to 75% in 1984 and 87% in 1987 (according to the *Bulletin of the European Communities*, Supplement No 6-1998, paragraph 115). It was hardly necessary for Corus, therefore, to enter into an agreement with the Japanese producers to obtain protection in the offshore market given that it was already benefiting from the OSO's intervention. The very concept of 'Fundamental Rules', and especially of 'Fundamentals Improved' is tied up with the privileged status of Corus in the United Kingdom offshore market, as a result of that policy of national preference, a situation which also benefited other European producers to the extent that they supplied plain-end pipes to Corus after the closure of its Clydesdale plant. In any event, the contested decision is vitiated by a manifest error on this point because the Commission failed to take account of the role played by the OSO in the United Kingdom offshore market. That system of British national preference prevailed until July 1993 when it was replaced by the system of Community preference laid down by Directive 90/531. JFE-NKK maintains that it was unaware of those facts and obtained the documents annexed to its reply, which evidence the facts, only after it had lodged its application in Case T-67/00.

86    Those three applicants also submit that, in confirmation of their allegations on this point, some of the evidence on which the Commission relies mentions the policy implemented by the OSO. They point out, first, that the note headed 'Renouvellement du contrat VAM BSC' contains the statement: 'il ne faut pas

ouvrir la porte aux [Japonais] en les favorisant d'un british content' and that, according to the author of the note on the meeting of 24 July 1990, '[i]t cannot be excluded that in [19]93, OSO will grant the 3% preference to the European producers which it is currently granting to the UK producers'. The references in that note to the reinforcement of the European Community and the possible extension of the 3% preference to the European producers relate to the entry into force of Directive 90/531, which provides for a Community preference provided that the prices of the Community producers are not more than 3% higher than those of non-member countries.

87    The fact that virtually none of the European producers delivered seamless steel tubes to Japan, as demonstrated by the table set out in recital 68 to the contested decision, is also attributable to reasons of commercial policy. There would thus have been no commercial justification for entering into an agreement for sharing that market.

88    Moreover, the Liaison Committee's letter of 6 June 1994 makes it clear that the Japanese public markets in the steel tube sector were completely closed to European producers, that the Japanese tube market was dominated by huge consortia closely linked to the tube producers, that transportation and sales costs to Japan were very high for European producers and that the oil and gas exploration and production industry, and thus the OCTG sector, were in any event very limited. It also appears from a fax dated 16 November 1994 and sent to the Commission by the European Steel Tube Association, that non-Japanese steel tube producers wishing to sell in Japan were required to complete a very detailed questionnaire in order to comply with Japanese standards.

89    The Commission submits, first, that it based the contested decision essentially on the restrictive purpose of the agreement. It was therefore under no obligation also to prove actual effects in the Community markets in order to establish the existence of the infringement found in Article 1. Even if the trade barriers listed by the Japanese applicants could explain why they had not sold the products referred to in the contested decision in the Community markets, the fact nevertheless remains that the Commission furnished proof of an agreement the purpose of which was to restrict competition. In any event, to the extent to which the facts relied on by the applicants are relevant, their effect would be to increase the gravity of the infringement, rather than lessen it, as the applicants seem to suggest. In that connection the Commission refers to *Cement*, cited in paragraph 66 above, in which it was held that an economic analysis which tends to demonstrate the existence of objective trade barriers cannot override the inescapable reality of documentary evidence. Moreover, according to dicta of the Court of First Instance, if the economic analysis proposed by the applicants proves to be accurate, that would actually increase the gravity of the infringement because, by concluding the agreement in question, the undertakings attempted to eliminate what little real competition remained on the market (paragraphs 1087 and 1088 of *Cement*).

90    In response to JFE-Kawasaki's argument that the contested decision did not treat the United Kingdom offshore market as being covered by the market-sharing agreement, the Commission replies that recital 62 to the contested decision very clearly indicates that that market was in fact covered by the agreement, in so far as it was 'semi-protected'.

91    Secondly, the Commission takes the view that it has in any case demonstrated to the requisite legal standard that the agreement referred to in Article 1 of the contested decision had real effects on the Community markets. In particular, the table set out in recital 68 to the contested decision confirms that the agreement was in fact applied, to a great extent, in the European markets. The fact that the Japanese producers competed to some extent on the United Kingdom offshore market cannot negate the infringement established in the contested decision in so far as that market was only semi-protected.

92    As regards the argument that some of the documents used by the Commission, and especially the Paper for Presidents and the note of the meeting with Corus ('Entretien BSC'), indicate that the European producers were in fear of Japanese competition in the United Kingdom offshore market, the Commission submits that any such fear was attributable to the fact that the semi-protected status of that market was a source of particular tension within the cartel. Consequently, that argument does not raise any doubts as to the existence of the cartel.

93    The Commission also submits that the argument concerning the existence of a system of British preference for products used by the oil industry on the United Kingdom continental shelf, which JFE-NKK, Nippon and JFE-Kawasaki raise for the first time in their reply, is a new plea. It is inadmissible

under Article 48(2) of the Rules of Procedure. In the alternative, that argument is based on evidence annexed to the reply, which is inadmissible under Article 48(1) of the Rules of Procedure because neither Nippon nor JFE-Kawasaki has sought to justify the fact that it was submitted late. As regards JFE-NKK, which merely asserts that it was unaware of that evidence when it lodged its application, the Commission considers that that contention is hardly plausible

94    The Commission also submits, with regard to JFE-NKK, that the new plea is inadmissible also under Article 44(1)(c) of the Rules of Procedure.

95    In any event, the Commission considers that the new argument is unfounded.

96    Furthermore, the Commission submits that none of the trade barriers alleged by the Japanese applicants ever constituted an absolute obstacle to the import of Japanese tubes into the Community. In that regard, the Commission observes that none of the alleged obstacles to trade invoked by the Japanese applicants prevented other producers in third countries, and especially producers in Latin America, from exporting the products covered by the contested decision to the onshore markets of the Community.

97    Finally, the alleged absence of deliveries of seamless steel tubes by Community producers to Japan is not central to the contested decision, which is not directly concerned with restrictions on exports to Japan. The Commission notes that the Liaison Committee's letter of 6 June 1994 and the fax dated 16 November 1994 sent by the European Steel Tube Association, which, according to the Japanese applicants, indicate the closed nature of the Japanese market, relate to a period when it was unaware of the illegal agreement. The Commission deduces from that that the explanations given in those documents by the European producers served largely to hide the fact of the infringement found in Article 1 of the contested decision. In any event, the motives for which the parties entered into the agreement are irrelevant to establishing its existence.

      The second part of the first plea: evidence allegedly lacking probative value

98    The Japanese applicants argue that the documents on which the Commission relies fail to show any concurrence of wills capable of constituting the unlawful agreement penalised in Article 1 of the contested decision and in any event that they fail to establish the participation of the Japanese producers in that infringement. The Japanese applicants point out that almost none of the documents mention them and the Commission ought not, therefore, seek to use them against them. Article 1 of the contested decision should therefore be annulled on the ground that it relies upon an analysis that does not meet the requisite legal standard and thus infringes Article 81(1) EC. JFE-NKK and Nippon allege a manifest error of assessment in that regard.

99    According to the Japanese applicants, in the documents relied on by the Commission, their European competitors merely refer to the situation resulting from the fact that trade barriers were preventing Japanese producers from exporting their products to the European market. They also say that the evidence concerning project line pipe is very limited and that the contested decision should be annulled, at least in so far as concerns those products. JFE-NKK notes, in addition, that the reorganisation of the alleged Europe-Japan Club, which gave rise to the 'Fundamentals Improved' after a meeting held in Tokyo on 5 November 1993 (recitals 83 to 94 to the contested decision), is not mentioned in any of the documents produced by the Commission. It refers in particular to the Paper for Presidents, to the '(g) Japanese' document and to the sharing key document.

100   JFE-NKK argues that, in any event, the Commission erred in its analysis of the documents which refer to the Fundamental Rules and to 'Fundamentals Improved', particularly those emanating from Dalmine. In fact, the evidence in the Commission's file might equally well suggest that those concepts relate to the necessary rationalisation of the Community industry, rather than to any unlawful agreement. JFE-NKK makes particular reference to Dalmine's document of May-August 1993 headed 'Seamless Steel Tube System in Europe and Market Evolution' (hereinafter 'the system-for-steel-tubes document') reproduced at page 2051 of the Commission's file, which states: '... a useful solution of the [Corus] problem for everybody can only be found in a European context which implies acquisitions and closures of plants according to an outline for rationalisation. We see this process developing according to fundamental steps ...'. Contrary to the Commission's contention, the meeting of 6 October 1992 mentioned in the market evolution document, reproduced at page 15178 of the Commission's file,

related not only to the Central and Eastern European markets, but also, in part, to the rationalisation of the Community industry. Moreover, the Commission supported that rationalisation policy. JFE-NKK thus argues that it is unreasonable for the Commission now to complain of the conduct of firms which were merely following its advice. JFE-NKK also maintains that none of the documents relied on by the Commission establishes any link whatsoever between the closure of the Belgian firm NTM, to which reference is made in recitals 88 and 89 to the contested decision, and the situation of the Japanese producers.

101   In addition, JFE-NKK maintains that the evidence produced by the Commission does not support the definition of the market which it uses to establish the infringement found in Article 1 of the contested decision. The correct definition of the relevant market is of essential significance to the correct assessment of the effects of a particular agreement on competition in that market (see, in particular, *SIV and Others* v *Commission*, cited in paragraph 57 above) and thus that lack of evidence is enough to warrant annulment of the contested decision.

102   According to the Japanese applicants, Mr Verluca's statement of 17 September 1996 is very vague and does not prove the existence of the agreement alleged by the Commission. That statement, which is extremely succinct, in essence confirms that the domestic markets were protected, without explaining the nature and precise scope of that protection. Contrary to the Commission's assertions in the contested decision, Mr Verluca's statement of 17 September 1996 does not confirm that the term 'Fundamentals' refers to respect for domestic markets, in the sense of prohibiting all foreign producers from selling their steel tubes in the national markets of those of their competitors who were parties to the agreement. JFE-Kawasaki maintains in that connection that, in his statement, Mr Verluca commented on only one document, the note headed 'Quelques informations', which fails to provide any elucidation as to how the agreement operated.

103   Moreover, Mr Verluca's statement of 17 September 1996 does not confirm that the United Kingdom was one of the domestic markets where tenders were limited by the fact that other producers party to the agreement refrained from supplying tubes to those markets. The statement treats the United Kingdom market as 'semi-protected', meaning that a competitor had to contact the local producer of oilfields pipes and tubes before making a bid, and says that that rule was more or less observed. Nippon expressly denies that it ever contacted Corus before making a bid in the market in question and argues that the Commission has failed to produce evidence to the contrary. In any event, the Japanese applicants submit that the Commission's argument that the semi-protected status of the British offshore market is consistent with the fact of Japanese sales in that market does not satisfactorily explain what undertakings were supposed to have been given by the Japanese with regard to that market.

104   As regards the Commission's argument that Mr Verluca's statement of 17 September 1996 offers particularly compelling evidence and might, if need be, be sufficient in itself to prove the infringement, Sumitomo and JFE-NKK point out that paragraph 1838 of *Cement*, cited in paragraph 66 above, to which the Commission refers, relates solely to contemporaneous evidence. In addition, it is clear from the judgment in *Enso-Gutzeit*, cited in paragraph 58 above, that, first, an admission by one undertaking cannot constitute evidence that can be used against another undertaking unless such an admission is supported by other evidence (paragraph 91), and second, where such an admission is based on the belief of the maker of the statement, the basis of that belief must be stated, otherwise the Commission will be unable to use the statement against a third party (paragraph 131). Lastly, the Commission's argument that it is not appropriate to examine each piece of evidence separately is inconsistent with the approach adopted by the Court of First Instance in *Enso-Gutzeit* (particularly in paragraphs 102 and 151 to 153).

105   Moreover, Mr Verluca's statement of 17 September 1996 is not corroborated by the other evidence mentioned in the contested decision, particularly the evidence concerning the range of products mentioned in Article 1, the meaning and scope of the 'Fundamentals' and the duration of the infringement.

106   The products to which the contested decision and Mr Verluca's statement of 17 September 1996 relate, namely only standard thread OCTG and project pipe line, are not the same as those mentioned in the other documents relied on by the Commission to corroborate Mr Verluca's statement, particularly the documents emanating from Vallourec, Mr Verluca's employer at the material time. That being so, those other documents have no probative value as regards the infringement found in Article 1 of the

contested decision.

107   In particular, the notes headed 'Réflexions concernant le renouvellement du contrat VAM' and
      'Renouvellement du contrat VAM BSC', the note on the meeting of 24 July 1990, and the note headed
      'Entretien BSC' all relate to premium thread tubes of the VAM type and not to standard thread OCTG.

108   Moreover, the fact that the note headed 'Réflexions stratégiques concernant les relations de VLR' refers
      to 'Market P', that is to say the premium thread OCTG market, and the fact that Mr Verluca expressly
      states that his analysis does not concern standard 'Buttress' threading (page 15619 of the
      Commission's file) confirms the argument of the Japanese applicants. Similarly, the references in the
      note headed 'Entretien BSC' to the company Hunting and the reference to 'other' joints relate to
      premium thread OCTG tubes, not standard tubes, as the Commission suggests. The author of the note
      mentions the need to 'neutralise Fox', which is a premium joint patented by JFE-Kawasaki. The note
      headed 'Réflexions concernant le renouvellement du contrat VAM' relates to plain-end pipes and
      premium thread OCTG finished locally, especially 'Fox' tubes. The note on the meeting of 24 July 1990
      concerns stainless steel products, which are expressly excluded from the scope of the contested
      decision by recital 28 thereto, irrespective of their threading.

109   In short, none of those notes relates to line pipe. In any event, they contain mere reflections and
      personal speculation on the part of Vallourec's employees and refer to the 'Fundamentals' without
      making clear what they are. They do not, therefore establish the existence of a concurrence of views as
      between the addressees of the contested decision and likewise do not corroborate Mr Verluca's
      statement of 17 September 1996.

110   The Commission also refers to an internal Vallourec note dated 27 January 1994, reproduced at page
      4822 of its file, headed 'Compte rendu de l'entretien avec JF à Bruxelles le 25/1'. That document is
      irrelevant since it concerns only trapezoidal threading and VLR tubes with NTM threading and not the
      products covered by the contested decision.

111   The Commission also relies on the Paper for Presidents and the '(g) Japanese' document, even though it
      is impossible to determine accurately the range of products to which they relate. Those pieces of
      evidence contain references to products other than those contemplated by the contested decision and
      by Mr Verluca's statement of 17 September 1996, such as stainless steel OCTG and welded tubes, as
      well as references which suggest a range of products some of which are covered by the contested
      decision and some of which are not. The clear implication is that the analysis contained in these
      documents relates essentially to the premium thread OCTG market rather than to the market for the
      products covered by the contested decision. The argument which the Commission sets out in paragraph
      10 of its defence in Case T-68/00, which is that the Paper for Presidents was drafted on the premiss
      that standard thread OCTG, rather than premium thread OCTG, were the subject of the agreements in
      force when that document was drawn up, confirms that the 'Japanese aggression' mentioned in the
      document necessarily related to standard thread OCTG.

112   The sharing key document covers a range of products which is significantly more limited than that
      contemplated by Mr Verluca's statement of 17 September 1996. That document mentions in particular
      an open tender for seamless API standard tubes ('SMLS API OPEN TENDER'). It therefore relates solely
      to the market for standard thread OCTG in which open tenders are made. The Japanese applicants note
      in that connection that, according to Mr Verluca's statement of 17 September 1996, no large-scale
      tenders were made in Europe for the products to which he referred. The market to which the sharing
      key document relates is therefore non-existent. The Japanese applicants confirm that that assertion
      corresponds to the situation in the European market at the time and deduce from that that the sharing
      key proposed had no meaning as far as Europe was concerned because it related to a non-existent
      market. Sumitomo takes the view that the author of the sharing key document must have made an
      error, as there is no coherent and rational explanation for it. Moreover, no public invitations to tender
      for OCTG were issued to Japan during the period of the infringement as alleged in the contested
      decision.

113   Contrary to the Commission's assertion, the sharing key document clearly did not relate to line pipe. In
      recital 27 to the contested decision the Commission indicated that the abbreviation 'API' related to
      standard thread OCTG and it cannot now alter that interpretation at the litigation stage. Furthermore,
      the acronyms 'C/S' and 'T/B' used in the sharing key document itself confirm that conclusion. Lastly,

there are, in reality, API standards for all OCTG and line pipe, and the necessary conclusion is that the document also relates to products not covered by the contested decision.

114    As regards the probative value of the documentary evidence regarding the existence of an infringement, the Japanese applicants point out, first, that, in the note headed 'Réflexions stratégiques concernant les relations de VLR', Mr Verluca recommended a solution consisting in granting priority to the 'VAM' group whereby the Japanese producers would continue to compete freely against 'VAM' tubes in the United Kingdom market. That note dates back to a time when the voluntary restraint agreements were in force and when market-sharing agreements were not unlawful. It follows, according to Sumitomo, that if the Court of First Instance were to accept the Japanese applicants' arguments concerning the duration of the voluntary restraint agreements (see paragraph 139 et seq. below), that would reduce the evidential value of all the documentary evidence bearing a date in 1990, in particular some of the notes produced by Vallourec. Those documents could no longer be regarded as anything more than preparatory documents anticipating an agreement, and not as documents evidencing an agreement which existed when they were drawn up. Moreover, the reference to the 'present system' in the note headed 'Entretien BSC' explicitly refers to the Far East, South America and the Middle East and the reference in the same document to 'a fixed-price policy for North Sea business', to which the Japanese agreed to adhere at that time on a case-by-case basis, is inconsistent with a prohibition on Japanese producers selling the products described in Mr Verluca's statement of 17 September 1996. JFE-NKK points out that it was Mr Verluca himself that drafted the note headed 'Entretien BSC'.

115    Furthermore, the note headed 'Réflexions concernant le renouvellement du contrat VAM' mentions the possibility of persuading 'the Japanese not to intervene on the UK market and [allowing] the problem [to] be settled among Europeans', which clearly demonstrates that there was no agreement relating to the United Kingdom market in March 1990. Similarly, since the note on the meeting of 24 July 1990 used the conditional mood to refer to the possibility of adopting the 'Fundamentals Improved', 'qui interdiraient aux japonais l'accès du UK ...' ('which would deny the Japanese access to the UK ...'), it follows that no agreement was yet in place in July 1990.

116    The '(g) Japanese' document and the Paper for Presidents are merely preparatory documents, most likely drafted by an employee of Corus with a view to a meeting between the European producers taking place before the Europe-Japan Club meeting in Tokyo scheduled for 5 November 1993. Those documents therefore provide no evidence of the attitude of Japanese producers and still less of their participation in the agreement found by the Commission in Article 1 of the contested decision. On the contrary, they show that the Japanese producers were aggressive competitors in the United Kingdom offshore market and that, at most, the Community producers were merely endeavouring to reach an agreement – whose content is not clearly described – with the Japanese producers. Nippon emphasises that the '(g) Japan' document expressly refers to its aggressive conduct in the United Kingdom offshore market.

117    Moreover, the system of limiting Japanese sales allegedly provided for in the Paper for Presidents and the '(g) Japan' document is inconsistent with the interpretation of the 'Fundamentals' given by Mr Verluca in his statement of 17 September 1996, according to which the Japanese producers were under an obligation to contact Corus before supplying their products in the United Kingdom market. JFE-NKK points out that the description of the 'Fundamentals' given in the contested decision does not square with the other pieces of evidence submitted by the Commission or with its interpretation of the 'Fundamentals' in its defence in Case T-67/00. A contradiction of that kind must, in accordance with the case-law, necessarily entail the annulment of the contested decision (in particular, *SIV and Others* v *Commission*, cited in paragraph 57 above).

118    In addition, the Paper for Presidents mentions an obligation upon the Japanese producers to limit 'certaines de leurs livraisons' ('some of their deliveries') to the United Kingdom continental shelf, whereas recitals 101 and 102 to the contested decision mention market sharing, without making any distinction. Here again, the inconsistency is in itself sufficient, according to JFE-NKK, to warrant annulment of the contested decision. The '(g) Japan' document shows that the Japanese producers took the view, in any event, that sales under contracts were excluded from any agreement, which, moreover, would reduce the probative value of the sharing key document, which relates solely to the contractual sector of the European markets. Furthermore, the Commission's argument that those documents are based on the premiss that there was already an agreement requiring the Japanese producers to refrain from selling the products covered by the contested decision in the Community onshore markets fails to prove the existence of any such agreement, or at least fails to prove it with the

degree of precision and certainty required by case-law.

119    As regards the note headed 'Licence VAM à Siderca' dated 20 June 1994, reproduced at page 15809 of
       the Commission's file, which shows, amongst other things, that Mannesmann was required generally to
       stay out of the United Kingdom market, it does not, according to the Japanese applicants, confirm that
       they too agreed not to sell their tubes in the European markets.

120    JFE-Kawasaki argues that the sharing key document is inadmissible as evidence because it is undated
       and because the Commission has failed to reveal the identity of its author or that of the party who sent
       it to the Commission, with the result that the applicants are unable to discover the context in which it
       was drafted or the reasons for which it was disclosed to the Commission. It would be the first time that
       the Commission had found an undertaking guilty of an infringement on the basis of an unidentified
       document. The argument which the Commission sets out in recitals 121 and 122 to the contested
       decision that the sharing key document is admissible and reliable because it is corroborated by other
       pieces of evidence is unfounded: the document is, in fact, contradicted by other pieces of evidence in
       the file, particularly on essential points of fact, as the Commission itself notes in recital 86 to the
       contested decision with regard to the role of the Latin American producers. In that connection, JFE-
       Kawasaki refers to paragraph 72 of the judgment in *Volkswagen* v *Commission*, cited in paragraph 57
       above, in accordance with which the Commission must establish the existence of an agreement or
       concerted practice in a sufficiently precise and coherent manner.

121    JFE-Kawasaki in any event agrees with the other Japanese applicants in saying that, even if it is
       admissible, the sharing key document is not a reliable piece of evidence against it because it has not
       been sufficiently well identified. The fact that the document is not the only piece of evidence on which
       the Commission relied in reaching its finding of an infringement does not mean that there is no need to
       establish its credibility. Moreover, the sharing key document contradicts Mr Verluca's assertion in the
       document headed 'Verification auprès de Vallourec' (dated 18 December 1997 and reproduced at page
       7317 of the Commission's file, point 1.3) concerning the question whether the Latin American producers
       had responded favourably to the approaches made by the European producers at the end of 1993, and
       that calls in question the reliability of those two items of evidence. Furthermore, according to the
       answer given by the head of Mannesmann, Mr Becher, on 22 April 1997 (reproduced at page 10989A of
       the Commission's file) to a question concerning the nature of the 'Fundamentals' raised during an
       inquiry carried out at Mannesmann's premises on 21 April 1997 (hereinafter 'Mr Becher's answer'),
       sharing keys concerned non-Member State markets only. That is confirmed by recitals 101 and 103 to
       the contested decision.

122    In addition, the sharing key document is not the reflection of any firm agreement: Vallourec indicated in
       the document headed 'Verification auprès de Vallourec' ('Investigation carried out at Vallourec') that it
       was merely an attempt to alter the sharing keys, the document itself anticipating that a further meeting
       would be held between European producers in order to examine the way in which the sharing key
       proposed in the document might be applied.

123    The sharing key document also shows that the Japanese producers had expressed reservations about
       that proposal, finding that the scope of application of the key needed to be broadened to include 'ERW
       OCTG', which are welded steel tubes. In light of that document, the Commission ought, therefore, to
       have treated the Japanese producers in the same way as it treated the Latin American producers,
       against which it withdrew its complaint on the ground that they too had expressed reservations about
       the key proposed, to the extent to which it concerned the European market, and had sold steel tubes in
       Europe. The Commission cannot assert that the difference in treatment may be explained by the
       volume of sales made by the Latin American producers in the European markets because it has failed to
       provide any figures by which to make a valid comparison of the sales concerned. The difference in
       treatment is therefore unjustified and the fact that the Commission withdrew its complaint against the
       Latin American producers undermines its finding of an infringement in Article 1 of the contested
       decision in so far as concerns the Japanese applicants.

124    The fact that the Japanese producers sold some tubes in certain European markets ought a fortiori to
       suffice to show that the sharing key document does not reflect the existence of any agreement signed
       by them. Under the terms of that document, in fact, they would have been unreservedly prohibited
       from selling tubes in the European market, without that prohibition being subject to any reservation. In
       addition, the reservation expressed by the Latin American producers deprived the sharing key

document of any economic value from the point of view of the European producers and it would seem irrational, and is thus unlikely, that the document was later adopted, given those circumstances.

125    The Japanese applicants argue that Mr Verluca's statement of 14 October 1996, reproduced at page 6354 of the Commission's file (hereinafter 'Mr Verluca's statement of 14 October 1996') does not prove their participation in the agreement alleged by the Commission. The relevant part of the statement merely confirms that the Japanese applicants customarily attended meetings of the Europe-Japan Club and, according to Mr Verluca's statement of 17 September 1996, those meetings concerned markets other than the domestic markets of the European and Japanese producers. According to the Japanese applicants, the meetings only concerned sales in the markets of third countries such as China and Russia. Nor is there any proof that those meetings resulted in the illegal agreement alleged by the Commission. In its reply, Sumitomo argues that the document headed 'Verification auprès de Vallourec', which contains a statement made by Mr Verluca on 18 December 1997, and the statement by Mr Jachia of Dalmine made to the Public Prosecutor of Bergamo on 5 June 1995 (reproduced at page 8220 c 6 of the Commission's file, hereinafter 'Mr Jachia's statement'), exclude project line pipe from the scope of the agreement, referring instead to 'produits standard' ('standard products'). There is thus a contradiction between Mr Verluca's statement of 17 September 1996 and the assertions he makes in the document headed 'Verification auprès de Vallourec' as regards the products covered by the 'Fundamentals'.

126    JFE-Kawasaki also points out that, in the document 'Verification auprès de Vallourec', Mr Verluca stated that 'as a general rule, the other offshore markets [that is, other than the United Kingdom offshore markets] were not considered as domestic markets'. Thus it has not been established that there was any infringement so far as concerns those offshore markets.

127    The deposition made by Mr Biasizzo, a former Dalmine employee, to the Public Prosecutor of Bergamo on 1 June 1995, reproduced at page 8220 b 10 of the Commission's file, does not imply either that the Japanese applicants entered into the agreement alleged by the Commission in Article 1 of the contested decision. Although he did mention a non-binding agreement (a 'gentleman's agreement') under which foreign producers were asked, when making a tender, to suggest prices 8% to 10% higher than those offered by the national producer, he also described, in a later deposition headed 'Commento alle mie deposizioni' ('remarks concerning my statement') (reproduced at page 8220 b 14 of the Commission's file) all the objective economic advantages which a local steel tube producer enjoyed in its national market over foreign producers and did not again mention any international agreement (annex 15 to the SO, page 8220 b 16). In addition, that reference to tenders stands at odds with Mr Verluca's statement of 17 September 1996 in which he said that there were no significant tenders in the European markets.

128    There is clearly an important discrepancy between Mr Biasizzo's deposition and his comments on that deposition. In any event, those two pieces of evidence fail to indicate precisely what products were covered by the agreement referred to, or the duration of that agreement. It is unlikely, however, that the deposition and comments thereon relate to the products covered by the contested decision because the Italian steel tube market was focused at the time primarily on other products, namely premium thread OCTG and trade line pipe. Moreover, Mr Biasizzo's observations as regards maintaining the equilibrium of existing market shares relate to markets not covered by the contested decision. In any event, the deposition and the comments thereon are unreliable. Since they were made under pressure in a context in which their author had an interest in explaining the reasons, apart from the dishonest practices covered by the investigation opened against it, for which Dalmine had obtained all of Agip's procurement contracts. Contrary to the Commission's assertions, from the beginning of 1992 to the end of the first half of 1993, Mr Biasizzo was solely responsible for sales of OCTG, not for the sale of line pipe.

129    In any event, Nippon and JFE-Kawasaki submit that the definition of the 'Fundamental Rules' given in the contested decision, and in particular in recitals 61 and 101, which is that the parties to the agreement were strictly forbidden from selling their products in the markets of their competitors, is inconsistent with Mr Biasizzo's statement, according to which the parties were allowed to offer their products at higher prices than those of the national producer.

130    As regards the answer given by Dalmine on 4 April 1997 (reproduced at page 15099 of the Commission's file) to a question asked by officials of the Commission during an inquiry carried out at its premises (hereinafter 'Dalmine's answer of 4 April 1997'), although Dalmine mentioned contracts

entered into with Japanese industry, those contracts related to markets outside the European Community, such as the Russian market. Moreover, the answer asserted that the notion of 'Fundamentals' could reflect the position of the Community seamless steel pipes industry from 1986/1987 onwards and also mentioned uncontrolled imports of pipes from other geographical areas during the same period. In any event, it is apparent from the document that Dalmine's management at the time of that statement had no knowledge of what happened prior to February 1996 and that the company had no evidence in its files of meetings with the Japanese and European producers. Dalmine confirmed those facts in its answer of 29 May 1997 to a letter which the Commission addressed to it pursuant to Article 11 of Regulation No 17, reproduced at page 15162 of the Commission's file (hereinafter 'Dalmine's answer of 29 May 1997'). Dalmine's answer of 29 May 1997 contradicts Mr Biasizzo's statement and his comments thereon inasmuch as the latter indicate that only non-Community markets were discussed within the Europe-Japan Club and that exports of tubes to the European Community were limited, but not forbidden. In that connection, Sumitomo points out that Dalmine's answer of 29 May 1997 is based on the recollections of a certain Mr R., who gave as the source of his recollections certain conversations which he had had with Mr Biasizzo, who had also attended the meetings in question.

131   The Japanese applicants contend that, according to the steel-tube-system document, which is included in the Commission's file but is not mentioned in the contested decision, the 'Fundamental Rules' governed relations between the European producers. Contrary to the Commission's assertions, the document did not confine itself to examining the consequences of the withdrawal of Corus from the seamless tube market.

132   As far as Mr Becher's answer is concerned, the Japanese applicants point out that, according to his own statement, Mr Becher had no personal knowledge of the facts upon which he was commenting, something which the Commission omitted to mention when citing the statement in recital 63 to the contested decision. His evidence is therefore not of great probative value and, according to JFE-NKK, is inadmissible (judgment in *Rhône-Poulenc* v *Commission*, cited in paragraph 56 above, and the Opinion of Judge Vesterdorf, acting as Advocate General in that case, pp. 955 to 957). Moreover, the Commission cannot regard Mr Becher's answer as reliable evidence of the existence of an agreement between the European and Japanese producers whilst at the same time disregarding his assertion that there was no agreement between the European producers to stay out of each others' domestic markets. In so far as Mr Becher's statement denies the existence of a market-sharing agreement between the European producers, it is contradicted by the steel-tube-system document, which Mr Becher regards as erroneous. It is also inconsistent with Mr Verluca's statement of 17 September 1996 and with Dalmine's answer of 29 May 1997.

133   As regards Corus's reply of 31 October 1997 to a request for information from the Commission (reproduced at page 11932 of the Commission's file, hereinafter 'Corus's reply'), according to which the domestic markets were reserved to the local producers, the Japanese applicants submit that, in its letter of 30 March 1999 to the Commission (annex C.5 to the application in Case T-68/00, hereinafter 'the letter of 30 March 1999'), Corus clearly indicated that none of its statements should be understood as implying the existence of an agreement between European and Japanese producers. In response to the Commission's argument that the letter of 30 March 1999 is concerned with the procedure for welded tubes, the Japanese applicants point out that the statement which is clarified in that letter had been made by Corus in precisely the same terms in the context of the procedure relating to seamless tubes. As regards the Commission's argument that Corus's position is paradoxical, Nippon argues that, on the contrary, it is the Commission which is seeking to rely on an interpretation of Corus's assertions which Corus has denied. JFE-Kawasaki and Sumitomo point out that, in any event, the supposed admission on the part of Corus is vague and ambiguous. Sumitomo also emphasises that the only products mentioned in Corus's reply are OCTG. It argues, as does JFE-NKK, that Corus's answer related to non-Community markets only.

134   According to the Japanese applicants, the European producers had an interest in ensuring 'damage limitation', inter alia by admitting to an agreement with the Japanese producers in the hope of diverting the Commission's attention from the real import of the 'Fundamentals', which were designed to share the European markets between the European producers an infringement far more serious than the one found in Article 1 of the contested decision, the admission of which would have attracted far higher fines for those European producers. That theory finds confirmation in Vallourec's actions, its strategy being to inform the Commission of the existence of an agreement with the Japanese producers so that it would obtain a 40% reduction in the fine that would have been imposed on it had it not cooperated

and avoid the imposition of a further fine by the Commission in respect of the infringement concerning plain-end pipes found in Article 2 of the contested decision. Similarly, Dalmine received a 20% reduction in the fine imposed on it. The evidence put forward by the Commission in the contested decision – and especially the statements made by Mr Verluca – should be considered in light of those circumstances. Account should also be taken of the fact that Vallourec has not brought an action against the contested decision and that Dalmine has not disputed the facts on which the decision is based. Sumitomo points out that all the statements on which the Commission relies, in particular those of Mr Verluca, Mr Becher and Mr Biasizzo, were made after the event, adding that, where there is inconsistency, greater weight should be given to the evidence contained in contemporaneous documents, particularly the sharing key document than to the evidence contained in those statements.

135    Nippon claims that, contrary to the assertion in recital 131 to the contested decision, it responded in express terms, both in its written reply to the SO and at the hearing before the Commission, to the allegation that the documents referred to in recitals 62 to 67 and 100 to the contested decision reveal the existence and content of the agreement alleged in Article 1. It questions the probative value of the documents cited. Moreover, Nippon disputes the assertion, in recital 131 to the contested decision, that the Japanese firms acknowledged that they were unable to provide clarification regarding the meetings of the Europe-Japan Club: it had stated, in reply to a question raised at the hearing, that there had been meetings between European and Japanese producers but that their purpose was the coordination of sales in the Russian and Chinese export markets.

136    As regards the duration of the infringement, the dates mentioned in Mr Verluca's statement of 17 September 1996 are imprecise. The Commission has therefore failed to prove to the requisite legal standard the duration of the alleged infringement.

137    As regards identifying 1997 as the year in which, according to Mr Verluca, the 'échanges' began, the Japanese applicants raise two main objections.

138    First, they say that the French word 'échanges' is rather vague and has been translated in footnote 10 of the contested decision by the English word 'trade'. That is inconsistent with the Commission's contention in recital 108 to the effect that what was involved was 'meetings' between the parties to an unlawful agreement.

139    Secondly, the Japanese applicants argue that, as regards the period before 1990, the Commission acknowledges that the voluntary restraint agreement prevented the Japanese producers from selling their products in the markets of the European Community. However, there is no indication in Mr Verluca's statement of 17 September 1996 that an unlawful agreement between Japanese and European producers had replaced the voluntary restraint agreement at governmental level in 1990 or 1991. The Japanese applicants deduce that Mr Verluca's statement of 17 September 1996 fails to corroborate the Commission's claim regarding the date on which the infringement began. The Commission has therefore failed to acquit itself of its duty to produce sufficiently precise and coherent evidence of the duration of the infringement (*CRAM and Rheinzink* v *Commission*, cited in paragraph 57 above, paragraph 20).

140    Furthermore, even if it were established, to the requisite legal standard, that 'échanges' allegedly constituting an infringement actually took place as from 1977, the Commission nevertheless erred in calculating the duration of the infringement since the EC-Japan voluntary restraint agreements expired on 31 December 1990, not 31 December 1989. That fact is corroborated by the evidence annexed to the applications of the Japanese applicants, in particular by an extract from a white paper on international trade published by the Japanese Ministry of International Trade and Industry ('the MITI') on 25 June 1991, which shows that the voluntary restraint agreements remained in force in 1990. Under Japanese legislation, the MITI was given powers to force Japanese steel tube producers to comply with the conditions of the voluntary restraint agreements. Exercising those powers, the MITI called upon six Japanese firms, including the Japanese applicants, to enter into export restraint agreements, which the MITI subsequently ratified. In support of their contention, the Japanese producers have produced the documentation drawn up in Japan relating to the extension of the agreement for the year 1990, that is to say, the extension agreement approved by the MITI on 28 December 1989 and the letter of notification to the MITI explaining the reasons for which the agreement needed to be extended. Nippon has also produced a draft resolution issued by its management committee, and a copy of the committee's approval of the extension of the agreement

between Japanese producers until 31 December 1990.

141    In their replies, Nippon and JFE-Kawasaki express surprise that the Commission failed clearly to indicate in its defence the date on which the voluntary restraint agreements lapsed, even though it was itself a party to the intergovernmental agreement underlying it. That being so, it is not credible that the Commission was ignorant of the agreement entered into by the Japanese producers. Nippon requests the Court to ask the Commission to state precisely the date on which the voluntary restraint agreements finally came to an end. Furthermore, the two abovementioned applicants and Nippon and JFE-Kawasaki, together with JFE-NKK, argue that a change as significant as the expiry of the voluntary restraint agreement with Japan would have been mentioned by the Commission in its *XXIVth General Report on the Activities of the European Communities –1990* if it had occurred in that year. On the contrary, that report states that the rules governing imports of steel products remained unchanged as compared with 1989 (paragraph 840 of the report).

142    In those circumstances, it is clear that the Commission would not have concluded that there was an infringement in 1990 if it had not committed the factual error alleged by the applicants.

143    As regards the date of the end of the alleged infringement, the Japanese applicants note that the Commission's finding that it ended in 1995 is based solely on a vague assertion contained in Mr Verluca's statement of 17 September 1996 that 'les échanges se sont achevés il y a un peu plus d'un an' ('the 'échanges' ended just over a year ago'). The sharing key document refers to a period ending in March 1994 and there is no evidence of any meeting of the Europe-Japan Club after that date. The infringement must therefore be regarded as having ended by no later than the first half of 1994. Sumitomo and Nippon maintain in that connection that, at most, the sharing key document could only establish an infringement of one year's duration, lasting from 1993 to March 1994. The reference to the alleged agreement having been in existence before 1 April 1995, which appears in Mr Becher's statement, the document relied on by the Commission to establish the duration of the infringement is not relevant since that date was simply the one on which the author of that statement became general manager of Mannesmann. The finding in Article 1 of the contested decision that the infringement continued during 1995 is inconsistent with the evidence relied on. It is therefore necessary, at the very least, to annul the contested decision in so far as it finds an infringement during periods for which the evidence produced is unsatisfactory.

144    The Commission argues, first of all, that the tactic of the Japanese applicants, consisting in divorcing each individual piece of evidence from its context and subjecting it to elaborate forensic analysis, is inappropriate for the purposes of examining the body of material evidence, which, when viewed in context, does establish the infringement (see, for example, Case T-334/94 *Sarrió* v *Commission* [1998] ECR II-1439, paragraph 103). The Commission points out that, in *Cement*, cited in paragraph 66 above, the Court of First Instance held that, in order to assess the evidential value of a document, first, regard should be had to the credibility of the account it contains and to the person from whom the document originates, the circumstances in which it came into being and the person to whom it was addressed and, second, account must be taken of whether, on its face, the document appears sound and reliable (paragraph 1838 of the judgment).

145    In the present case, the argument that the 'Fundamentals' to which the various pieces of evidence relate describe a state of affairs rather than a market-sharing agreement is implausible. Nor does the documentary evidence support the submission that the 'Fundamentals' merely governed relations between the European producers. The Commission goes on to say that, in the contested decision, it did not neglect the intra-Community aspect of the alleged agreement and that its description of the infringement set out in the preamble to the decision and in Article 1 thereof means that, not only were the Japanese producers prohibited from selling their products in Europe, but also that none of the European producers was entitled to sell its products in the domestic markets of the other European producers.

146    In particular, the Commission disputes JFE-NKK's argument that the concept of 'Fundamentals' and 'Fundamentals Improved' relate to the necessary rationalisation of the Community steel industry, rather than to some unlawful agreement. The steel-tube-system document and, especially, the meeting of 6 October 1992 mentioned therein were concerned with a process of rationalisation financed by State aid which the Commission approved under Article 87 EC.

147   As regards Mr Verluca's statement of 17 September 1996, the Commission considers that considerable weight should be attached to it, given that its author was the head of Vallourec Oil & Gas and had direct knowledge of the activities of the Europe-Japan Club. He had attended a number of the club's six-monthly meetings, as he mentions in his statement (see paragraph 23 above). The Commission relies on the general principle that, in terms of taking evidence, statements which go against the interests of the person making the statement must be regarded as probative. It argues that, in the present case, Mr Verluca's statement of 17 September 1996 went against the interests of Vallourec, which company Mr Verluca represented, given that the Commission had initiated an investigation against that company.

148   As regards the argument that Mr Verluca's statement of 17 September 1996 is not corroborated by any other piece of evidence in so far as concerns all of the specific aspects of the infringement, and particularly in relation to the definition of the 'Fundamental Rules', the Commission points out that, according to paragraph 1838 of the judgment in *Cement*, cited in paragraph 66 above, there is no principle of Community law which precludes the Commission from relying on a single piece of evidence in order to conclude that Article 81 EC has been infringed.

149   In any event, Mr Verluca's statement of 17 September 1996 is corroborated by other pieces of evidence in the file, and in particular by the documents mentioned in the contested decision (see paragraph 161 et seq. below). Although most of that evidence does not define the 'Fundamentals' as such or delimit their scope, that is because the meaning to be attributed to those rules was clearly known both to the authors of those documents and to the addressees thereof.

150   More specifically, the Commission disputes that the word 'échanges' appearing in Mr Verluca's statement of 17 September 1996 does not refer to meetings and contends that the translation of the word in footnote 10 of the English version of the contested decision is wrong.

151   As regards the admissibility in evidence of the sharing key document, the Commission argues that, according to case-law, the concept of inadmissibility of evidence is, in Community law, only of very limited application. As Judge Vesterdorf stated in his Opinion in *Rhône-Poulenc* v *Commission*, cited in paragraph 56 above, the fundamental principle is that the evaluation of evidence is unfettered.

152   As regards the scope of the sharing key document, it should be borne in mind in particular that the term 'API' can relate equally to standard thread OCTG tubes and to line pipe since there are API standards for both those products (see the annex to the defence in Case T-78/00). In response to the argument that, according to Mr Verluca's statement of 17 September 1996, the market covered by the sharing key document was non-existent, the Commission contends that, if that were the case, there would be no reason to include Europe in the proposed sharing key, but that was in fact done.

153   As regards the Paper for Presidents, the Commission states that it was drafted by Corus but that it was Mannesmann that was to present it to the heads of the steel companies, as is confirmed by the manuscript note on the first page to the effect that it would be presented by 'HN' (that is to say, Hans Nolte of Mannesmann) and that Vallourec had approved its content. The document thus reflects the collective view of those three European producers.

154   In response to the argument that Latin American producers were treated more favourably, the Commission says that there is direct evidence that the Japanese producers were implicated in the infringement, in addition to the sharing key document, being contained, inter alia, in Mr Verluca's statements of 17 September and 14 October 1996. That is not the case for the Latin American producers.

155   As regards Mr Biasizzo's statement, the Commission disputes the Japanese applicants' submission that, in his remarks on his statement, Mr Biasizzo retracts what he had earlier said about the existence of an international market-sharing agreement and it cites in particular extracts from the later document in which Mr Biasizzo referred to the need to act in close cooperation with all the other producers and to come up with new rules and new modes of conduct.

156   The Commission takes the view that Dalmine's reply of 4 April 1997 contains certain revelations concerning the agreement in question but that, leaving these aside, it is merely an attempt at damage limitation and is therefore incapable of countering the clear and explicit statements of former

employees of that company. As regards the steel-tube-system document, the fact that it refers solely to the European markets, in contrast to the other pieces of evidence, and particularly the statements of Mr Verluca and Mr Biasizzo, is explained by the fact that, as its title indicates, the document is intended to describe only the position of the European producers.

157    Lastly, as regards the information in Mr Verluca's statement of 17 September 1996 concerning the duration of the agreement, the Commission argues that its precise duration is relevant only in so far as it influences the amount of the fine. For the purpose of setting the fines the Commission in fact took no account of the period from 1977 to the beginning of 1990, but it is clear from Mr Verluca's statement that the agreement was in force throughout that period.

158    The Commission states, regarding the date on which the infringement alleged in the contested decision started, that it did not acknowledge that there was no infringement between 1977 and 1989 because of the voluntary restraint agreements. On the contrary, it simply stated that the infringement between 1977 and the end of 1989 would not be taken into account.

159    In response to the argument based on the fact that, according to the *XXIVth General Report on the Activities of the European Communities – 1990*, the rules governing imports of steel products remained unchanged as compared with 1989, the Commission states, amongst other things, that although the XXVth report for 1991 makes the same statement the applicants do not claim that the voluntary restraint agreements remained in force during 1991.

160    Furthermore, the applications of the Japanese applicants and the documents annexed to them merely indicate that the applicants had entered into an agreement with the Japanese authorities to limit their exports until the end of 1990. The Japanese applicants have in no way shown that that agreement reflected any extension of the voluntary restraint agreements concluded by the European Commission and the Japanese Government at international level. The Commission has searched its archives but has found no trace of the alleged extension until 1990 of the voluntary restraint agreement.

161    In any event, the Japanese applicants' arguments concerning the date on which the infringement started are based on the premiss that the voluntary restraint agreements prohibited them from exporting their tubes to the Community. The Commission disputes that premiss on the ground that the agreement provided for a number of quotas for the Japanese producers.

162    As regards the date on which the infringement came to an end, the Commission points out that Mr Verluca asserted in his statement of 17 September 1996 that the agreement had ceased to operate 'il y a un peu plus d'un an' ('just over a year ago'). The statement contained in Mr Becher's statement to the effect that the agreement was in place 'before 1 April 1995' is consistent with that assertion. The part of the fine attributable to the duration of the agreement having been calculated on the basis of the finding that the agreement was in force from 1990 to 1994 inclusive, the information given by Mr Verluca is more than sufficient to establish the duration of the alleged infringement. The fact that the sharing key document only indicated further meetings of the Europe-Japan Club up to March 1994 certainly does not prove that the agreement did indeed end at that time.

The third part of the first plea: incorrect assessment of the scope of the infringement found in Article 2 of the contested decision

163    According to the Japanese applicants, the theory which the Commission sets out in recital 164 to the contested decision, on which it bases its view that the purpose of the infringement found in Article 2 was to preserve the protected status accorded to the British market by the 'Fundamental Rules', by means of the 'Fundamentals Improved', is intrinsically implausible. They say that Corus was not going to withdraw from the United Kingdom market for standard thread OCTG and project line pipe just because it was ceasing production of plain-end pipes at Clydesdale. It would thus remain active in that market, on which it was still selling products, even if it had not concluded any supply contracts for plain-end pipes with Vallourec, Dalmine or Mannesmann. In any event, the Japanese applicants reiterate their argument that Corus's presence in the British threaded OCTG and line pipe market never prevented them from putting up vigorous competition in the offshore part of that market. JFE-NKK maintains that, according to the Commission's view, it would have been necessary to find a British producer that manufactured its own plain-end pipes and then threaded them in order to replace Corus in the United Kingdom market, and that was not the case. Thus, the infringement found in Article 1 of

the contested decision could not have continued after 1990 because Corus ceased production of seamless tubes during the course of that year.

164    Sumitomo also argues that it would be wrong to say that the second infringement, found in Article 2 of the contested decision, was merely a means of implementing the one found in Article 1, in which the Japanese applicants are supposed to have been involved, unless the commission of that second infringement was the inevitable and necessary consequence of the first. The evidence advanced by the Commission does not, however, warrant such a conclusion, nor does it show that the Japanese producers were aware of that autonomous agreement. Contrary to the Commission's assertion in recital 94 to the contested decision, the sharing key document has no probative value concerning the restructuring of the European industry. Moreover, since it is clear from the Vallourec notes, analysed above, and in particular from its note 'Réflexions stratégiques', that the agreements between the European producers concerning plain-end pipes were conceived by Vallourec in the context of its premium threading technology, VAM, the Commission cannot claim that those agreements relate to standard thread OCTG and project line pipe.

165    In their replies, Nippon, JFE-Kawasaki and JFE-NKK allege that the reference in the note on the meeting of 24 July 1990 to 'reinforcement of the EEC', which was to lead to the 'Fundamentals Improved', related to the entry into force in 1990 of Council Directive 90/531. In the case of the British market, that directive was to have the effect of replacing the system of national preference implemented by the OSO with a system of Community preference enabling Community producers to corner the markets provided that their prices did not exceed those of non-Community producers by more than 3%, hence the allusion in the note on the meeting of 24 July 1990 to the possibility that the OSO might, in 1993, 'accorde aux producteurs européens la préférence de 3% qu'elle accorde aujourd'hui aux producteurs UK' ('grant European producers the 3% preference which it currently grants to UK producers'). In order to continue to benefit from the now Community preference, Corus thus found it necessary, after closing its plant at Clydesdale, to obtain supplies of plain-end pipes from European producers. That alone explains why it chose that supply source for plain-end pipes. Similarly, Vallourec, which organised Corus's new supply system, had every interest in maintaining Corus's position in the United Kingdom offshore market for premium thread OCTG tubes since it held a licence for the VAM technology used by Corus.

166    In that connection, it is clear from the note 'Réflexions stratégiques' that Vallourec contemplated threatening Corus with the withdrawal of the VAM licence so that it would not purchase plain-end pipes from Nippon and JFE-Kawasaki. The bilateral supply contracts for plain-end pipes between Vallourec and the other producers of plain-end pipes on the one hand and Corus on the other were thus the result of the commercial interest of the European producers in increasing their own sales of plain-end pipes. According to the Japanese applicants, there is no reason to suppose that that sharing of the market in plain-end pipes between European producers needed reinforcement by means of an agreement with the Japanese producers.

167    In any event, the contracts which Corus entered into with the three other European producers for the supply of plain-end pipes, which ended between 1997 and 1999, can hardly be regarded as implementing the infringement established in Article 1 of the contested decision, because that infringement continued until 1995 at the latest.

168    Of relevance also in that regard is the Japanese applicants' argument set out above that the Commission's analysis of the documents which refer to the 'Fundamental Rules' and, particularly in the present context, the 'Fundamentals Improved' is defective.

169    Lastly, the Japanese applicants insist that they do indeed have a legal interest in challenging the approach adopted by the Commission in recital 164 to the contested decision since one consequence of that approach is that the Commission imposed the same fine on both the European and the Japanese producers even though the former were implicated in two infringements and the latter in only one.

170    The Commission submits that it is clear from the note on the meeting of 24 July 1990 that the European producers felt they had to take measures to ensure that the closure of the Clydesdale plant would not result in the British market ceasing to be protected within the meaning of the 'Fundamental Rules'. The Commission's reasoning in recital 164 to the contested decision is therefore that the purpose of the infringement alleged in Article 2 of the decision was to ensure that Corus remained a

'domestic' producer for the purposes of the agreement, as explained in recital 102 to the contested decision.

171    The Commission considers that the Japanese applicants have no legal interest in contesting the findings in relation to the infringement attributed to parties other than themselves in Article 2. It is not necessary that they should have been a party to that infringement for it to have served to reinforce, in the manner described in recital 164 to the contested decision, the infringement alleged against them in Article 1 thereof. It is therefore immaterial whether Sumitomo could have been unaware of the agreement referred to in Article 2 of the contested decision, as it alleges, or indeed whether that infringement came to an end later than the one established in Article 1.

172    Lastly, even if the Japanese applicants can justly dispute the Commission's arguments concerning the transition from the 'Fundamental Rules' to the 'Fundamentals Improved', that in no way calls in question the Commission's main finding, namely the existence of the 'Fundamental Rules'. The argument that the reference to the 'Fundamentals Improved' relates to the entry into force of Directive 90/531 has little credibility in light of the body of documentary evidence relied on in the contested decision, and in particular the note on the meeting of 24 July 1990.

        b) Findings of the Court

        Preliminary observations

173    First, as far as the taking of evidence in respect of an infringement of Article 81(1) EC is concerned, it must be borne in mind that it is incumbent on the Commission to prove the infringements found by it and to adduce evidence capable of demonstrating to the requisite legal standard the existence of the circumstances constituting an infringement (*Baustahlgewebe* v *Commission*, cited in paragraph 56 above, paragraph 58, and *Commission* v *Anic Partecipazioni*, cited in paragraph 56 above, paragraph 86).

174    Moreover, in proceedings for annulment brought under Article 230 EC, all that is required of the Community judicature is to verify the legality of the contested measure.

175    Thus, the role of a Court hearing an application for annulment brought against a Commission decision finding the existence of an infringement of the competition rules and imposing fines on the addressees consists in assessing whether the evidence and other information relied on by the Commission in its decision are sufficient to establish the existence of the alleged infringement (see, to that effect, *PVC II*, cited in paragraph 61 above, paragraph 891).

176    It follows that the Commission cannot, in support of the contested decision, produce new inculpatory evidence not contained in the decision. Nevertheless, in so far as the applicants seek to establish, on the basis of documents other than those produced by them to the Court, that the Commission's assertion is incorrect in law, the Commission is entitled to respond to their arguments by referring to the documents in question.

177    Where there is doubt, the benefit of that doubt must be given to the undertakings accused of the infringement (see, to that effect, *United Brands* v *Commission*, cited in paragraph 56 above, paragraph 265). The Court cannot therefore conclude that the Commission has established the existence of the infringement at issue to the requisite legal standard if it still entertains doubts on that point, in particular in proceedings for the annulment of a decision imposing a fine.

178    In the latter situation, it is necessary to take account of the principle of the presumption of innocence resulting in particular from Article 6(2) of the European Convention for the Protection of Human Rights (ECHR), which is one of the fundamental rights which, according to the case-law of the Court of Justice and as reaffirmed in the preamble to the Single European Act, by Article 6(2) of the Treaty on European Union and by Article 47 of the Charter of Fundamental Rights of the European Union proclaimed on 7 December 2000 in Nice (OJ 2000 C 364, p 1), are protected in the Community legal order. Given the nature of the infringements in question and the nature and degree of severity of the ensuing penalties, the principle of the presumption of innocence applies in particular to the procedures relating to infringements of the competition rules applicable to undertakings that may result in the imposition of

fines or periodic penalty payments (see, to that effect, in particular the judgments of the European Court of Human Rights of 21 February 1984 in *Öztürk*, Series A No 73, and of 25 August 1987 in *Lutz*, Series A No 123-A, and of the Court of Justice in Case C-199/92 P *Hüls* v *Commission* [1999] ECR I-4287, paragraphs 149 and 150, and Case C-235/92 P *Montecatini* v *Commission* [1999] ECR I-4539, paragraphs 175 and 176).

179   As the Japanese applicants correctly observe, the Commission must produce sufficiently precise and consistent evidence to support the firm conviction that the alleged infringement took place (see, to that effect, *CRAM and Rheinzink* v *Commission*, cited in paragraph 20 above, paragraph 20; *Woodpulp II*, cited in paragraph 56 above, paragraph 157; *SIV and Others* v *Commission*, cited in paragraph 57 above, paragraphs 193 to 195, 198 to 202, 205 to 210, 220 to 232, 249, 250 and 322 to 328; and *Volkswagen* v *Commission*, cited in paragraph 57 above, paragraphs 43 and 72).

180   However, it is important to emphasise that it is not necessary for every item of evidence produced by the Commission to satisfy those criteria in relation to every aspect of the infringement. It is sufficient if the body of evidence relied on by the institution, viewed as a whole, meets that requirement (see, to that effect, *PVC II*, cited in paragraph 61 above, paragraphs 768 to 778, and in particular paragraph 777, confirmed on the relevant point by the Court of Justice, on appeal, in its judgment in Joined Cases C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P *Limburgse Vinyl Maatschaapij and Others* v *Commission* [2002] ECR I-8375, paragraphs 513 to 523).

181   It must also be borne in mind that, according to settled case-law, it follows from the actual text of Article 81(1) EC that agreements between undertakings are prohibited, regardless of their effect, where they have an anti-competitive object (see, in particular, *Commission* v *Anic Partecipazioni*, cited in paragraph 56 above, paragraph 123). In this case, the Commission relied primarily on the fact that the object of the agreement penalised in Article 1 of the contested decision was to restrict competition. Moreover it referred, in particular in recitals 62 to 67 thereto, to numerous items of documentary evidence which, in its view, demonstrate both the existence of that agreement and its restrictive object.

182   That situation potentially has important consequences regarding the first part of the present plea, which in essence alleges that the infringement penalised in Article 1 of the contested decision has no anti-competitive effects (see the first sentence of paragraph 55 above).

183   First, it must be pointed out that the Japanese applicants' arguments concerning the absence of effects of the agreement at issue, even if well founded, could not in principle by themselves lead to the annulment of Article 1 of the contested decision (see, to that effect, Case C-277/87 *Sandoz Prodotti Farmaceutici* v *Commission* [1990] ECR I-45, paragraph 30, and Case T-143/89 *Ferriere Nord* v *Commission* [1995] ECR II-917, paragraph 30).

184   As regards the specific case of agreements which, like those which the Commission found to exist in the present case, involve respecting domestic markets, the Court of First Instance held, in its *Cement* judgment, cited in paragraph 66 above (paragraphs 1085 to 1088), first, that, in themselves, they pursue the object of restricting competition and fall within a category of agreements expressly prohibited by Article 81(1) EC and, second, that the object whose reality was incontestably established, in the case in question, by documentary evidence cannot be justified by an analysis of the economic context of the anti-competitive conduct concerned.

185   It must be observed, in that regard, that, as far as the existence of the infringement is concerned, it would not matter whether or not the conclusion of the agreement with an anti-competitive purpose referred to by the Commission in Article 1 of the contested decision was in the commercial interests of the Japanese applicants if it were established, on the basis of evidence contained in the Commission's file, that they in fact concluded that agreement.

186   Second, it must be observed that the argument to the effect that the Japanese applicants proved the existence of circumstances which cast the facts established by the Commission in a different light and thus allow another, plausible explanation of those facts to be substituted for the one adopted by the Commission in concluding that the Community competition rules had been infringed (*CRAM and Rheinzink* v *Commission*, cited in paragraph 57 above, paragraph 16; *Woodpulp II*, cited in paragraph 56 above, paragraphs 126 and 127, and *PVC II*, cited in paragraph 61 above, paragraph 725) is irrelevant in this case. It must be pointed out that the case-law on which that argument is based relates

to circumstances in which the Commission relies solely on the conduct of the undertakings in question on the market for its view that an infringement has been committed (see, to that effect, *PVC II*, cited in paragraph 61 above, paragraphs 727 and 728).

187    As just observed, the Commission relied on documentary evidence in support of its finding of the existence of an anti-competitive agreement. It follows that the case-law relied on by the Japanese applicants cannot be relevant here unless the Commission has failed to establish the existence of the infringement on the basis of the documentary evidence adduced by it. In those circumstances, the burden is on the applicants seeking the annulment of Article 1 of the contested decision not only to put forward a plausible alternative to the Commission's view but also to allege that the evidence relied on in the contested decision to establish the existence of the infringement is insufficient (see, to that effect, *PVC II*, cited in paragraph 61 above, paragraph 728).

188    In the light of the foregoing considerations, it is appropriate to consider together the first two parts of the present plea, the first part being subsidiary to the second part concerning the probative force of the documentary evidence. Thereafter, the third part of the plea will be examined separately.

The second part of the plea: the absence of probative force of the evidence and, subsidiarily, the first part, alleging that the existence of the alleged agreement is inconsistent with the situation prevailing on the United Kingdom offshore market and the other markets

– Mr Verluca's statements

189    It must be observed, first, that the Commission relies to a very considerable extent, both in the contested decision (see, in particular, recital 131) and in its pleadings in the present cases, on the statement made by Mr Verluca on 17 September 1996, as supplemented by his statement of 14 October 1996 and by the document entitled 'Vérification auprès de Vallourec' (hereinafter together referred to as 'Mr Verluca's statements'). The importance of Mr Verluca's statements is said to lie in the fact that they constitute the only evidence that establishes all the aspects of the infringement, in particular its duration and the products involved.

190    According to Mr Verluca's statement of 17 September 1996, the domestic markets of the parties to the agreement, which was referred to as the 'Fundamentals', were 'protected', with the exception of the United Kingdom offshore market, which was 'semi-protected' in so far as 'a competitor had to contact the local producer of oilfield pipes and tubes [Corus] before making [its] bid' (see recitals 53 and 62 to the contested decision). The products covered by that agreement were, according to the statement of 17 September 1996, 'standard thread pipes (Premium thread pipes not being included) and [seamless project line pipe]' (see recital 56 to the contested decision). The duration of the agreement is also specified, in so far as Mr Verluca states that 'this trade began after the 1997 fall in the market' (recital 55 to the contested decision) and that it 'ended a little more than a year ago' (recital 96 to the contested decision). As regards the practical arrangements under the agreement, Mr Verluca describes a system of meetings held in principle twice yearly (recital 60 to the contested decision).

191    The Commission points out, in recital 57 to the contested decision, that Mr Verluca stated in his statement of 14 October 1996 that the 'usual participants' at the meetings were, for Europe '[Corus] (until it ended its OCTG business), Dalmine, Mannesmann and Vallourec ... [and] the Japanese ones were [JFE-NKK], [JFE-]Kawasaki, [Nippon] and [Sumitomo]'. Moreover, as the Commission observes in recital 60 to the contested decision, Mr Verluca provided, not in his statement of 17 September 1996, as the Commission affirms, but in annex 2 to his statement of 14 October 1996, a list of five meetings of the Europe-Japan Club held on 14 April 1992 in Florence, on 23 October 1992 in Tokyo, on 19 May 1993 in Paris, on 5 November 1993 in Tokyo and on 16 March 1994 in Cannes.

192    In that connection, no provision or any general principle of Community law prohibits the Commission from relying, as against an undertaking, on statements made by other incriminated undertakings (*PVC II*, cited in paragraph 61 above, paragraphs 109 and 512). If that were not the case, the burden of proving conduct contrary to Article 81 EC and Article 82 EC, which is borne by the Commission, would be unsustainable and incompatible with the task of supervising the proper application of those provisions which is entrusted it by the EC Treaty (*PVC II*, cited in paragraph 61 above, paragraph 512).

193    In the present case, it is necessary at the outset to clarify the meaning of the term 'échanges' used in Mr Verluca's statement of 17 September 1996. As the Commission observes, it is clear that the translation of that word by the English word "trade" in the footnote on page 10 of the English version of the contested decision is incorrect and that in reality that term indicates that there were contacts between the Japanese and European producers of steel tubes. It was thus correct for the Commission to refer to the phrase in which that term appears, cited in paragraph 190 above, in describing the agreement for which the Japanese and European producers are criticised.

194    Next, it must be pointed out that the Japanese applicants do not deny that meetings were held between the representatives of Japanese and European producers of seamless steel tubes (see recital 131 to the contested decision). Moreover, JFE-NKK, JFE-Kawasaki and Sumitomo do not deny having participated in those meetings but state that the only information they have regarding them derives from the recollections of their employees, and that those recollections are not very reliable in view of the time which has elapsed since those meetings.

195    As regards Nippon, its states that, as far as it knows, none of its present employees attended such meetings, but it states that it cannot rule out the possibility that certain former employees attended. However, a detail given in Nippon's reply of 4 December 1997 to the supplementary questions put to it by the Commission, namely the fact that Mr [X], who was in charge of steel tube exports, went to Cannes on a trip from 14 to 17 March 1994, supports the Commission's view regarding Nippon's participation in the meetings in question, since one of the meetings of the Europe-Japan Club to which Mr Verluca referred was held in Cannes on 16 March 1994 (recital 60 to the contested decision). In the same reply, Nippon states that it is not in a position to explain the purpose of that trip or that of other trips made by its employees to Florence, even though it had no customers in those two cities.

196    In those circumstances, the Commission was right to conclude that the Japanese applicants named by Mr Verluca in his statement of 14 October 1996 (see paragraph 191 above), including Nippon, did in fact participate in the meetings of the Europe-Japan Club described by him.

197    However, the four Japanese applicants deny that any agreement for the sharing of the Japanese and European markets was concluded at those meetings. In particular, JFE-NKK, JFE-Kawasaki and Sumitomo contend that those meetings related essentially to general matters or issues relating to third-country markets such as those of Russia and China.

198    At this stage, the difference of views between the Commission and the Japanese applicants concerns the question whether an illegal agreement providing for mutual respect of domestic markets in relation to the two products mentioned in Article 1 of the contested decision, namely standard thread OCTG pipes and tubes and project line pipe, was concluded by the Japanese and European producers at those meetings.

199    In that connection, the Japanese applicants contend that Mr Verluca's statements are too vague to constitute evidence, even weak evidence, of the existence of the market-sharing agreement alleged by the Commission. In particular, they observe that the description given by Mr Verluca of the system of partial protection of the United Kingdom offshore market, according to which '[t]he United Kingdom (off-shore) was regarded as semi-protected: a competitor had to contact the local producer of oilfield pipes and tubes before making a bid' and that that rule was more or less respected, is imprecise and does not reflect reality, not being corroborated by any of the other documents relied on by the Commission. Moreover, according to the Japanese applicants, there is a contradiction between the Commission's position in recital 62 to the contested decision, based on Mr Verluca's statement of 17 September 1996, according to which the United Kingdom offshore market was only semi-protected, and recitals 101 and 102 to the contested decision, which describe an outright system of market sharing.

200    It need merely be stated, with regard to the latter complaint, that the said recitals 101 and 102 describe the anti-competitive object of the Fundamental Rules in general terms, in the context of the Commission's legal assessment of the infringement found in Article 1 of the contested decision, and must be read in the light of recital 62, in which, in the context of a detailed description of the operation of the Fundamental Rules in the light of the documentary evidence gathered, it had already been stated that the United Kingdom offshore market had a special status. Accordingly, the Japanese applicants' argument in that regard must be rejected.

201   As regards the argument that the meetings of the Europe-Japan Club never related to the Community markets, it must be observed that, if, according to Mr Verluca, the 'important events affecting the petroleum products market (American VRA, political upsets in the USSR, development in China)' were discussed during those meetings, that does not prevent the 'application of the Fundamental Rules referred to above' from also being 'established' there. Thus, it is clear from Mr Verluca's statement of 17 September 1996 that the application of the Fundamental Rules, involving in particular respect of the four domestic markets of the Community producers by the Japanese applicants, is one of the subjects which was discussed at those meetings.

202   It must be borne in mind in that connection that the task of the Commission is to penalise infringements of Article 81(1) EC and that agreements which 'share markets or sources of supply' are expressly mentioned in Article 81(1)(c) EC as being prohibited by that provision. It is therefore sufficient for the Commission to establish that an agreement between undertakings capable of affecting trade between Member States had the object or effect of sharing the Community markets in one or more products between them for that agreement to constitute an infringement.

203   It must also be pointed out that, in practice, the Commission is often obliged to prove the existence of an infringement under conditions which are hardly conducive to that task, in that several years may have elapsed since the time of the events constituting the infringement and a number of the undertakings covered by the investigation have not actively cooperated therein. Whilst it is necessarily incumbent upon the Commission to establish that an illegal market-sharing agreement was concluded (see paragraphs 177 and 178 above), it would be excessive also to require it to produce evidence of the specific mechanism by which that object was attained (see, by analogy, Case T-310/94 *Gruber + Weber* v *Commission* [1998] ECR II-1043, paragraph 214). Indeed, it would be too easy for an undertaking guilty of an infringement to escape any penalty if it was entitled to base its argument on the vagueness of the information produced regarding the operation of an illegal agreement in circumstances in which the existence and anti-competitive purpose of the agreement had nevertheless been sufficiently established. Undertakings are able properly to defend themselves in such circumstances provided that they have an opportunity to comment on all the evidence relied on against them by the Commission.

204   Moreover, the Commission refers to the *Cement* judgment, cited in paragraph 66 above (paragraph 1838), in support of its view that it is entitled, where necessary, to rely on a single document to establish the existence of an infringement, provided that the probative force thereof is not in any doubt and provided that it clearly evidences the existence of the infringement. In its view, it is possible to apply that rule to Mr Verluca's statements in the circumstances of the present case.

205   In that connection, the appropriate view, contrary to the Japanese applicants' contention, is that Mr Verluca's statements are not only reliable but are of particularly great probative value since they were made on behalf of Vallourec. Answers given on behalf of an undertaking as such carry more weight than that of an employee of the undertaking, whatever his individual experience or opinion (see, although an appeal is pending, Case T-23/99 *LR AF 1998* v *Commission* [2002] ECR II-1705, paragraph 45).

206   Similarly, the deliberate nature and seriousness of Mr Verluca's statements is strengthened by the fact that, as chairman of Vallourec Oil & Gas, he was under a professional obligation to act in the interests of that company. He could not therefore lightly confess to the existence of an infringement without weighing the consequences of so doing, and there is nothing in the file to support the view that he might have failed to fulfil that obligation.

207   In any event, Mr Verluca was a direct witness of the circumstances which he described. The Commission stated, in particular in paragraph 28 of its defence in Case T-67/00, without being contradicted in that regard, that Mr Verluca, as chairman of Vallourec Oil & Gas, had himself taken part in the Europe-Japan Club meetings.

208   Furthermore, it must be observed that Mr Verluca responded in writing to the questions put to him orally during the investigation of 17 September 1996 by Commission staff who had asked him to comment on documents drawn up for the most part by him personally and previously seized by the Commission during the investigation carried out on 1 and 2 December 1994. Mr Verluca subsequently confirmed and supplemented the information already given in his statement of 14 October 1996 and also, once again in writing, during a further investigation carried out on 18 December 1997. His

statement of 14 October 1996 was given in response to a request for information which he states he received on 30 September 1996, and it was sent to the Commission with a copy to a lawyer, Mr Winckler of the firm Cleary, Gotlieb, Steen & Hamilton.

209   In addition, Mr Verluca had known for more than 18 months, at the time of the investigation of 17 September 1996, that the Commission had in its possession documents drawn up by it concerning contacts with competitors, in particular Corus. He had therefore had an opportunity to reflect on the reply he would give in the event of the Commission putting questions to him regarding those matters. As regards his statement of 14 October 1996, Mr Verluca had a period of two weeks in which to prepare it.

210   It follows from all those circumstances that Mr Verluca made his statements deliberately and after mature reflection. That fact makes them particularly credible.

211   In addition, the Commission correctly points out that statements which run counter to the interests of the declarant must in principle be regarded as particularly reliable evidence. In this case, Mr Verluca's statements clearly ran counter to the interests of Vallourec, which he represented, given that the Commission had opened an investigation into that company.

212   In particular, it must be concluded that where a person who has been asked to comment on documents, as Mr Verluca was requested to do by Commission staff, admits that he committed an infringement and thus admitted the existence of facts going beyond those whose existence could be directly inferred from the documents in question, that fact implies, a priori, in the absence of special circumstances indicating otherwise, that that person had resolved to tell the truth.

213   The Japanese applicants object to that logic, contending, in particular, that, in the present case, the employees of the European producers who made statements as representatives thereof had every interest in ensuring 'damage limitation', particularly by admitting the existence of an agreement with the Japanese producers with a view to distracting the Commission's attention from the true significance of the Fundamental Rules, which sought to share the European markets between European producers, a much more serious infringement.

214   However, the fact that the European producers admitted the existence of a market-sharing agreement with Japanese producers did not necessarily serve to conceal the existence of an agreement for the sharing of the European markets between them. Moreover, it is not feasible that Vallourec would, through Mr Verluca, have admitted the existence of an infringement whilst at the same time concealing the existence of a similar infringement, and one which, moreover, which was based on some of the facts admitted by it, but differing in geographical terms from the one which it had actually admitted. It must be observed that a person who acted thus would run a serious risk, in the event of the Commission establishing the real facts, of having helped the Commission to establish that he himself had committed an infringement, but without being granted any substantial reduction of his fine for having cooperated.

215   Consequently, the view put forward in that connection by the Japanese applicants is not convincing and cannot detract from the reliability of Mr Verluca's statements. As regards JFE-Kawasaki's argument to the effect that Mr Verluca confined himself to commenting on one document in his statement of 17 September 1996, namely the 'Quelques informations' memorandum, it need merely be pointed out that that statement, which, moreover, does not refer to that memorandum, explicitly mentions the existence of a generalised market-sharing agreement for two types of specific products. In those circumstances, there is no reason to consider that Mr Verluca confined himself in his statement to commenting on that one document alone and, thus, understated its significance.

216   As far as the 'Vérification auprès de Vallourec' document is concerned, JFE-Kawasaki contends that Mr Verluca stated in it that the other offshore markets referred to in the contested decision, namely the markets other than those of the United Kingdom, were not regarded as domestic markets within the meaning of the Fundamental Rules. It need merely be observed in that regard that Mr Verluca made the statement at issue in reply to the following question put to it by the Commission: 'What was the status of the various offshore markets (Netherlands, Denmark, UK, Norway, China) [?]'. In those circumstances, it is clear that that statement means only that the Netherlands, Danish, Norwegian and Chinese markets were not domestic markets and that it is entirely irrelevant as far as the status of the

offshore German, French and Italian markets are concerned.

217    As regards Sumitomo's argument based on the reference in the 'Vérification auprès de Vallourec' document to the fact that the sharing key arrangement applied 'only to standard products', so that line pipe, not being a standard product, was not affected by it, it should be noted that, in making that statement, Mr Verluca was replying specifically to a question which related to the report of the meeting with JF. It is clear from a reading of that report that it relates exclusively to OCTG tubes and not to line pipe, allowing the inference that Mr Verluca's explanations related only to OCTG tubes.

218    In any event, even if it were accepted that that statement by Mr Verluca concerned not only OCTG tubes, in respect of which he had already made clear in his statement of 17 September 1996 that only standard products were involved in the infringement, but also line pipe, it is clear from the terms of that statement that the respect of the domestic markets of the members of the Europe-Japan Club and the sharing key applicable to the third-country markets were two separate aspects of the Fundamental Rules. Consequently, that clarification, which relates solely to the third-country markets, does not undermine the Commission's essential thesis that not only standard thread OCTG tubes but also project line pipe was covered by the sharing of the domestic markets of the Europe-Japan Club. Moreover, it must be emphasised that Mr Verluca has not at any stage retracted his statement that the line pipe was covered by the illegal agreement.

219    Moreover, it must be borne in mind that, according to the case-law of the Court of First Instance, an admission by one undertaking accused of having participated in a cartel, the accuracy of which is contested by several other undertakings similarly accused, cannot be regarded as constituting adequate proof of an infringement committed by the latter unless it is supported by other evidence (see, to that effect, *Enso-Gutzeit*, cited in paragraph of 58 above, paragraph 91). Therefore, it must be concluded that, despite their reliability, Mr Verluca's statements must be corroborated by other evidence to establish the existence of the infringement penalised in Article 1 of the contested decision.

220    Nevertheless, the degree of corroboration required in this case is lesser, in terms both of precision and of depth, in view of the reliability of Mr Verluca's statements, than would be the case if the latter were not particularly credible. Thus, it must be concluded that, if it were to be held that a body of consistent evidence was such as to corroborate the existence and certain specific aspects of the market-sharing agreement referred to by Mr Verluca and referred to in Article 1 of the contested decision, Mr Verluca's statements might be sufficient in themselves, in such a case, to constitute evidence of other aspects of the contested decision, in accordance with the rule deriving from the *Cement* judgment, cited in paragraph 66 above (paragraph 1838) and relied on by the Commission (see paragraph 204 above). Moreover, provided that a document does not manifestly contradict Mr Verluca's statements as to the existence or the essential content of the market-sharing agreement, the fact that it provides evidence of significant elements of the agreement which he described is sufficient to endow it with corroborative value in the context of the body of inculpatory evidence (see paragraph 180 above and the case-law cited).

221    In the light of the foregoing considerations, it is appropriate to evaluate successively the other items of evidence relied on by the Commission in the contested decision, notably in recitals 62 to 67 and 100 thereto, and also certain other documents in the Commission's file to the extent to which they have been commented on by the parties before the Court in the context of their observations on the reliability of the information expressly relied on in the contested decision.

       – The Vallourec notes

222    In recital 67 to the contested decision, the Commission refers to the 'Entretien BSC' note, which is not dated but goes back to June 1990, and refers to two other notes, namely the note on the meeting of 24 July 1990 signed by Mr Verluca and that of 1 June 1990, entitled 'Renouvellement du contrat VAM BSC'. The Commission cites, in recital 67 to the contested decision, the following passage from the Entretien BSC note:

       '[Vallourec]'s view is that we should not open the door to the Japs by allowing them a British content. We must play the Fundamentals for all [they're] worth, the first step being to write via the Pt of the Club to the Jap Presidents drawing attention to the presence of the shoshas in the UK. It seems ambitious to imagine that [Corus] can organise a sharing key in Japanese PJ when SMI has got

nowhere on this point for many months.'

223    The following passage from the note on the meeting of 24 July 1990 appears in recital 78 to the contested decision, dealing with the infringement found in Article 2 thereof,

'[Mannesmann] is the only European producer who frightens the Japanese and who can therefore enforce the "Fundamentals Improved". It would be in [Mannesmann]'s interest for the "Fundamentals" to be defended in the UK since it would supply some of the plain-end pipes after the closure of Clydesdale.'

224    According to another passage from the same note, cited in the same recital:

'[Corus] and [Vallourec] agree that this strengthening of the EEC is viable and must result in "Fundamentals Improved" which would stop the Japanese from having access to the UK even after Clydesdale had been closed. [Philip Varley of Corus] added that 100% respect for the 'Fundamentals' in the UK was impossible but that if the exceptions did not exceed 15 000 tonnes a year, the situation would be tolerable. [Corus] mentioned, however, the possibility of buying plain ends from UTM, SIDERCA and TAMSA [Latin American producers] to avoid cut-throat competition on their part.'

225    In the grounds of the contested decision that relate to the existence of the infringement found in Article 2 of the contested decision (recital 80), the Commission also cited the following passage from the note entitled 'Réflexions sur le contrat VAM':

'... if ... we can persuade the Japanese not to intervene on the UK market and that the problem should be settled among Europeans. In that case, plain ends would effectively be shared between [Mannesmann], [Vallourec] and Dalmine. In this second scenario, it would probably be in our interest to link Vallourec's sales to both the price and the volume of VAM sold by [Corus]'.

226    In the same recital, the Commission also cites a sentence from the note 'Refléxions stratégiques' which sets out the conditions envisaged in the context of the scenario referred to in the foregoing citation:

'[Mannesmann]/DALMINE/[Vallourec] are getting [Corus] to buy its plain ends as a matter of priority from the Europeans, who share out this supply in accordance with strict rules.'

227    Moreover, according to another passage from the note 'Refléxions stratégiques' cited by the Commission in the part of the contested decision devoted to the aspects of the Fundamental Rules affecting the markets of third countries (recital 73), 'in order to ensure that the Japanese do not touch the UK, it is feared that the Europeans may have to give something in exchange (Far East, Middle East, revision of the world percentage ...)'.

228    Those passages from the Vallourec notes clearly and unequivocally corroborate the testimony contained in Mr Verluca's statements as the existence of the Fundamental Rules ('Fundamentals'). As the Commission observes in its pleadings, it is clear from those notes that the rules were well established, they being understandable by the Vallourec employees, who drew them up, and by the addressees, without any further details.

229    Furthermore, although the Vallourec notes do not explicitly describe the nature of the Fundamental Rules, it is clear from them that the Japanese producers were to 'respect' those rules and that 'the fear' inspired by Mannesmann was a possible means of ensuring that 'respect', in particular 'in the UK'. That finding is confirmed by the fact that, according to the notes of the meeting of 24 July 1990, the new version of the Fundamental Rules envisaged by Vallourec and Corus, styled 'Fundamentals Improved', 'would stop the Japanese from having access to the UK even after [the Corus factory] at Clydesdale had been closed'.

230    In those circumstances, it must be considered that those notes corroborate the description of the Fundamental Rules contained in Mr Verluca's statements, according to which those rules involved, in principle, protection, vis-à-vis the Japanese producers, of the domestic markets of the four European producers concerned. They also support Mr Verluca's statements regarding the fact that the United

Kingdom offshore market was covered by those protection rules but that the latter enjoyed a special status. It is apparent from those notes that the European producers were anxious to maintain that protection of the United Kingdom offshore market by reinforcing it to the maximum, despite the fact that Corus, a domestic producer in that market, was no longer going to produce plain-end pipes, confining itself to threading tubes purchased from other producers.

231     The Japanese applicants correctly observe that the Vallourec notes contain only considerations internal to that company and, in the case of some of them, observations concerning the discussions held between that company and Corus. Whilst that fact inevitably detracts from the probative value of those notes vis-à-vis the Japanese applicants, it cannot prevent the Commission from relying on them as inculpatory evidence corroborating the explicit statements of Mr Verluca, above all in the context of more wide-ranging consistent evidence. The fact that Vallourec employees believed that the Fundamental Rules were effective in protecting the European domestic markets against Japanese producers in itself constitutes an indication that such protection actually existed.

232     The Japanese applicants put forward a specific argument regarding the 'Refléxions stratégiques' and the 'Refléxions sur le contrat VAM'. They observe that the strengthening of the aspect of the Fundamental Rules concerning respect for European domestic markets by the Japanese producers is not the scenario among the three considered for which Mr Verluca, who was the author of both notes, opted in the conclusions thereof.

233     However, it can be clearly inferred from the wording of those two notes that their author preferred that solution and rejected it only reluctantly, on the ground that it was not achievable. In particular, according to the 'Refléxions stratégiques' note, the 'most advantageous solution for [Vallourec]' lay in the possibility of 'the Europeans persuading the Japanese to respect the UK as regards Buttress and Premium'. Mr Verluca rejects that solution in that note only on the ground that he 'does not unfortunately believe that that solution … could work'. Thus, given that that solution, which consisted in keeping in force the Fundamental Rules and possibly strengthening them, was implemented, Mr Verluca's provisional rejection of them in those notes is much less significant than the fact that he preferred it to the other solutions envisaged.

234     The accuracy of that analysis is further confirmed by the fact that the sharing between Vallourec, Mannesmann and Dalmine of the supplies of plain-end tubes to Corus envisaged by Mr Verluca in those two notes, in the context of the scenario in question (see paragraph 226 above), was subsequently achieved, at least as from 9 August 1993, by virtue of the subsequent signature of the three supply contracts mentioned in recital 79 to the contested decision (see paragraph 26 above). Furthermore, the proposal made by Mr Verluca (see paragraph 225 above and recital 80 to the contested decision) consisting in linking the sales of plain-end tubes to Corus by Vallourec to the price and volume of the OCTG premium tubes, threaded by the VAM method, sold by Corus, in fact corresponds to the terms of the contracts concluded subsequently, which have been produced to the court, in particular in Case T-44/00, and on which the Japanese applicants were therefore able to give their views at the joint hearing (see also recitals 79, 81 and 111 to the contested decision).

235     According to the Japanese applicants, all the considerations set out in the Vallourec notes cited by the Commission relate almost exclusively to the situation existing in the United Kingdom offshore market in premium thread OCTG tubes. However, the products involved in the infringement found in Article 1 of the contested decision are standard ('API') OCTG tubes and project line pipe, and not premium thread OCTG tubes. Similarly, the note on the meeting of 24 July 1990 refers to stainless steel products.

236     As regards the standard thread OCTG tubes, it is common ground that they are sometimes referred to as 'Buttress' in the steel and petroleum industries. It should thus be noted that the reference in the 'Refléxions stratégiques' note to respect by Japanese producers of the United Kingdom offshore market regarding 'Buttress' necessarily relates to those products (see paragraph 233 above). Moreover, the note entitled 'Refléxions sur le contrat VAM BSC' refers to the fact that Corus 'will do better to keep its share in VAM than in Buttress'.

237     The circumstance, noted by the Japanese applicants, that the Vallourec notes also include numerous references to premium thread OCTG does not undermine the analysis made in this case by the Commission regarding standard thread OCTG. First, the references to premium thread OCTG provides no basis whatsoever for concluding that the contracts between Vallourec and Corus related exclusively

to premium thread OCTG. Second, the fact that the Commission found an infringement relating to two specific products cannot be criticised on the ground that certain evidence in its possession indicates that other products were also covered by the penalised agreement.

238    In any event, although the absence of a precise and consistent definition of the products covered by the Fundamental Rules in the Vallourec notes necessarily reduces their probative value, the possibility cannot be excluded that, in so far as they reinforce certain essential statements made by Mr Verluca, the Commission was entitled to rely on them to corroborate his statements. The fact that a document refers only to some of the facts referred to in other evidence is not sufficient to require the Commission to exclude that document from the body of inculpatory evidence (see paragraphs 180 and 220 above).

239    The Japanese applicants also contend that the Community markets other than the United Kingdom offshore market are not referred to at all in the Vallourec notes. In that regard, it must be observed that the notes in question focus on problems which might have arisen on the United Kingdom market as a result of the cessation of production of plain-end tubes by the British producer Corus, which explains the absence of specific references to other markets which were not directly affected by that anticipated event.

240    The Japanese applicants also contend that, according to the 'Refléxions sur le contrat VAM' notes and the note on the meeting of 24 July 1990, the exclusion of the Japanese producers from the United Kingdom market was a measure proposed for the future, from which it follows that no agreement with the Japanese producers existed when they were drawn up, that is to say in 1990 (see paragraph 115 above). However, it is clear from the Vallourec notes, read together, and in particular from the passage of the 'Entretien BSC' note cited in recital 67 to the contested decision, that the Fundamental Rules were already understood by the employees of Vallourec in 1990 and that the 'problem' mentioned in the note 'Refléxions sur le contrat VAM' which was to be settled 'between Europeans' was that of maintaining the domestic status of the United Kingdom market in the context of the Fundamental Rules following the cessation of production of plain-end tubes by Corus (see paragraph 283 below). Thus, in those circumstances, an improved version of the Fundamental Rules would 'stop the Japanese from having access to the UK', as observed in the note on the meeting of 24 July 1990, in the future as in the past (see paragraphs 223 and 229 above).

241    Finally, with regard to the mode of operation of the system for protecting the United Kingdom offshore market, the Japanese applicants contend that the description given in that regard by Mr Verluca, in his statement of 17 September 1996, to the effect that a competitor was to contact Corus before offering the products covered by the Fundamental Rules on that market, is not consistent either with the evidence put forward by the Commission in the contested decision or with reality. In contrast, the Commission contends, in recital 62 to the contested decision, that the 'Entretien BSC' note confirms the correctness of that description.

242    It must be observed in that connection that, in the 'Entretien BSC' note, a Vallourec employee, probably Mr Verluca, states as follows: 'our friends at BSC [Corus] ... are relying on the Kyoto and Marbella discussions and consider that although the [Japanese] are today prepared to observe a pricing policy for the [North Sea business] on a case-by-case basis, tomorrow when Clydesdale [factory] has stopped, they will let loose'. It must be recognised that that citation does not corroborate the description given by Mr Verluca, in so far as it does not confirm the existence of contacts between Corus and the other members of the Europe-Japan Club concerning specific deliveries on the United Kingdom offshore market. However, that citation unequivocally shows that, when the said note was drawn up in 1990, the Japanese producers had accepted restrictions of competition on the United Kingdom offshore market. Moreover, the expression 'case-by-case' may be interpreted as meaning that those contacts actually took place in relation to specific transactions, so that the 'Entretien BSC' note is certainly not inconsistent with Mr Verluca's statement of 17 September 1996.

243    In any event, it must be borne in mind that it is sufficient for the Commission to establish that an agreement with an anti-competitive object has been entered into for it to be entitled to conclude that there has been an infringement of Article 81(1) EC (see paragraph 203 above). Consequently, the fact that the evidence put forward in this case is supplemented in order to demonstrate the existence of arrangements restricting the competition engaged in by the Japanese producers on the United Kingdom offshore market is sufficient support for the Commission's thesis regarding that market, even if those documents do not enable the mode of operation of that aspect of the Fundamental Rules to be

understood with certainty and precision.

244    Thus, it must be concluded that the Vallourec notes, taken together, are such as to corroborate Mr Verluca's statements and, therefore, to confirm the truth of them.

– The 1993 documents in English

245    The Commission also refers, in recital 84 to the contested decision, to two documents which date back to 1993, namely the 'Paper for Presidents' and the '(g) Japanese' document (together hereinafter referred to as 'the 1993 documents in English'). The Commission does not cite passages from those documents in that recital to the contested decision, but their content is summarised briefly in recital 83, with regard to certain factors which allegedly upset the operation of the Fundamental Rules, and in recital 84, with regard to the solutions put forward to remedy the situation. The Commission therefore relies on those documents, in the contested decision, to confirm the existence and the scope of the Fundamental Rules and, in particular, to explain the evolution of those rules, in 1993, into 'Fundamentals Improved' at the time when Corus was making preparations for its definitive withdrawal from the threaded OCTG market.

246    The Japanese applicants contest the relevance of those documents. They observe, in particular, that those documents refer to Japanese aggression and Nippon emphasises that the '(g) Japanese' document refers in that connection to itself in particular. That aggression and the description at the beginning of the Paper for Presidents of an obligation of moderate scope attaching to the Japanese producers to eliminate 'certain of their sales' are incompatible with the system of respect for domestic markets described in recitals 101 and 102 to the contested decision.

247    First, the following should be noted from the Paper for Presidents:

'The current agreements are unsatisfactory for the EC offshore areas because, although only the Japanese have agreed to limit some of their deliveries to those areas (at levels which have never been satisfactory to the Europeans and which only cover half of the customers) their current aggression on OCTG (seamless and welded) and welded line pipe means lower prices and reduced share for the Europeans.'

248    Moreover, according to the same document:

'Although the Japanese have agreed not to request changes in our agreements if the EC seamless industry were to restructure, there is no guarantee that they would follow this precept if [Corus] were to exit tubemaking or finishing in the UK.'

249    Moreover, according to the '(g) Japanese' document, 'the fundamental position on the UKCS is not "firm"' and its author, a Corus employee, raises questions concerning the most suitable tactics to 'attack the Japanese', probably on the Chinese market, 'with the prime objective of forcing them out of Europe'.

250    Those two documents, in particular the passages cited above, support several essential assertions made by Mr Verluca in his statement, so that in principle it may be concluded that the Commission was right to rely on them to confirm the existence of the Fundamental Rules and the 'Fundamentals Improved'.

251    In particular, it is apparent from those two documents that agreements described by the term 'Fundamental[s]' concluded between the European and Japanese producers existed as early as 1993 and that those agreements were unsatisfactory from the European producers' point of view regarding the United Kingdom offshore sector, in particular in so far as they served only to limit certain Japanese sales on that market. It can also be inferred from those documents that the agreements referred to were constituted by the Fundamental Rules described by Mr Verluca in his statements and that the European producers were more satisfied with them regarding the onshore sectors than regarding the United Kingdom offshore sector. Thus, it follows indirectly from those documents that the onshore sectors of the European markets concerned had to be protected adequately.

252    Moreover, in so far as the author of those documents complains of the existence of significant Japanese sales on the United Kingdom offshore market and proposes solutions designed to limit those sales in the future, those items of evidence are consistent with the presentation of the Fundamental Rules contained in Mr Verluca's statements. They confirm not only that the purpose of the Fundamental Rules was to share the markets concerned, but also that the United Kingdom offshore sector was protected in a less effective manner than the other sectors covered by that sharing arrangement.

253    However, given that the Japanese applicants put forward several objections challenging the probative value of those two documents and even infer from them evidence in their own favour, it is appropriate to consider those objections in order to assess whether in fact they undermine the probative value of those documents.

254    In that connection, first, the Japanese applicants' arguments concerning references to their 'aggression' and to the limited nature of their obligations on the United Kingdom offshore market must be rejected. Those references were made in a context in which the author of those two documents was complaining about Japanese sales, in particular those on the United Kingdom offshore market, and described the inadequacy of the limitations applicable to Japanese sales on that market. Thus, it must be considered that, within the general scheme of those documents, the references to the 'aggression' of the Japanese producers establish the overstepping, in practice, of the limits agreed between the members of the Europe-Japan Club for the United Kingdom offshore market, which was only partially protected, rather than free and vigorous competition on the part of the Japanese producers on that market. Those references do not therefore in any way detract from the Commission's thesis regarding the existence of the agreement penalised in Article 1 of the contested decision.

255    Next, the Japanese applicants contend that the Paper for Presidents and the '(g) Japanese' document cannot establish the existence of an infringement in their case, since they only contained the thoughts of Corus employees on internal matters. However, it must be observed that, in so far as the author of those documents, a Corus employee, is describing the situation on the European markets and their probable evolution, there is no reason to suppose that his analysis does not reflect reality as perceived by him at the material time. It follows from the detailed nature and the content of those documents that their author was necessarily involved in conceiving a commercial strategy for steel tubes within Corus.

256    Thus, the description given in those two documents, analysed above, of an agreement concluded between the European and Japanese producers with a view to limiting the latter's sales on the European markets is reliable, notwithstanding the internal nature of those documents.

257    It must also be observed that, before the Court, the Commission contended, without being contradicted by the Japanese and European applicants, that the Paper for Presidents was drawn up by Corus, but that Mannesmann was to present it to the Presidents of the European producers, as evidenced by the handwritten words on the first page thereof to the effect that it would be included in the presentation by 'HN' (Hans Nolte of Mannesmann). It follows that that document contains the collective analysis of at least two of the European producers rather than only one, which means that it constitutes particularly probative evidence.

258    Finally, according to the Japanese applicants, it is impossible to define the products specifically referred to in the 1993 documents in English.

259    It is true that the passages from the '(g) Japanese' document which refer to the '13% chrome' tubes and 'stainless' tubes, like those from the 'Entretien BSC' note and the note on the meeting of 24 July 1990, which use those terms, are not relevant here, in so far as the contested decision relates solely to carbon steel tubes and pipes (recital 28 to the contested decision). However, it must be observed that those passages do not exclusively define the scope of the market-sharing agreement and are not therefore incompatible with the existence of the infringement found in Article 1 of the contested decision.

260    Moreover, the Paper for Presidents and the '(g) Japanese' document contain several references to OCTG in general and it is logical to consider that those references embrace not only the standard thread OCTG referred to in the contested decision but also premium threaded OCTG. The Paper for Presidents suggests limitations on deliveries of 'seamless and welded OCTG and line pipe' and the '(g) Japanese'

document refers to the fact that '[o]n OCTG in general J's have agreed to limit their sales to the UKCS to 15% of the non-contract business'. Moreover, the reference in the Paper for Presidents to Japanese aggression regarding the 'OCTG [seamless and welded] and welded line pipe' (see paragraph 247 above) necessarily relates to standard thread OCTG and not to premium thread OCTG since, in the following sentence, the author regrets the absence of control, in particular, of the quantities of premium thread OCTG delivered.

261    In so far as certain passages from those documents, and likewise certain Vallourec notes (see paragraph 237 above and the reference to the 'Entretien BSC' note in paragraph 259 above), imply that the market-sharing agreement penalised in Article 1 of the contested decision affected, or was capable of affecting, a wider range of products including premium thread OCTG, that fact does not in any way prevent them from confirming the existence of the more limited infringement that was penalised. The fact that the status of premium thread OCTG under the Fundamental Rules is not clearly and unequivocally apparent from those documents is irrelevant, since those products are not involved in the infringement found in Article 1 of the contested decision.

262    As regards seamless line pipe, on the other hand, the 1993 documents in English are more ambiguous. The first passage, which refers to deliveries of 'OCTG and seamless and welded line pipe', implies that seamless line pipe was to be covered by the Fundamental Rules, whereas the other citation in the same recital, which refers to '[seamless and welded] OCTG and welded line pipe' might possibly be interpreted as meaning that those products were excluded from the illegal agreements. It must be concluded that those two documents are ambiguous and therefore neutral as regards the question whether project seamless line pipe was covered by the Fundamental Rules. The 1993 documents in English cannot therefore corroborate Mr Verluca's statements regarding that specific aspect of the infringement, but nevertheless do not constitute exculpatory evidence regarding those products.

263    Accordingly, whilst the lack of clarity of the two documents at issue concerning the products involved in the infringement found in Article 1 of the contested decision incontestably reduces their force as evidence, that is no reason for rejecting them entirely. It must be borne in mind, again, as in the case of the Vallourec notes (see paragraph 238 above), that the fact that a document refers only to certain of the facts mentioned in other items of evidence does not mean that the Commission cannot rely on it to corroborate other evidence.

264    It follows that the 1993 documents in English corroborate Mr Verluca's statements in several respects and properly form part of the body of consistent evidence relied on by the Commission in the contested decision.

– The steel tube system document

265    That document was not expressly referred to by the Commission in the contested decision, but, in so far as the Japanese applicants refer to it as exculpatory evidence, it is appropriate to respond to their arguments.

266    It must first be observed that the idea that the European seamless stainless steel tube manufacturing industry was, at the material time, in the process of restructuring and that the European producers were acting in concert in order to control that restructuring is not in any way incompatible with the Commission's thesis. Recitals 87 to 94 to the contested decision indicate that the Commission in fact took account of the impact of the restructuring of the European steel industry.

267    Moreover, it is clear from the contested decision and from the Vallourec notes examined above that the European producers examined the restructuring of the European industry in the specific context of the Fundamentals, having regard in particular to the repercussions which that restructuring might have for their relations with the Japanese producers. In particular, the European producers feared that the United Kingdom market, in particular its substantial offshore sector, would no longer be respected as a domestic market by the Japanese producers following the closure of the Corus plant at Clydesdale (see paragraphs 170, 223 and 242 above). Moreover, in the Paper for Presidents and in the '(g) Japanese' document, it was proposed that the European producers should take account of the possible closure of NTM in the context of their negotiations with the Japanese producers.

268    In those circumstances, the fact that the steel tube system document uses the English term
       'Fundamentals' in the context of the discussions concerning rationalisation of the Community industry
       certainly does not mean that the concept of the Fundamental Rules concerned that process and not the
       market-sharing agreement penalised in Article 1 of the contested decision. Similarly, it does not follow
       from that document – which states that relations between the European producers are governed by the
       Fundamental Rules, without mentioning the Japanese producers – that the Fundamental Rules
       concerned only Europe. That omission is accounted for by the fact that the document in question, read
       as a whole, was clearly intended to examine relations between the Community producers. It cannot
       therefore be inferred from it that, contrary to what was said by Mr Verluca in his statement of 17
       September 1996, as corroborated by other evidence, the Fundamental Rules were the subject only of
       intra-European discussions.

269    In the light of the foregoing, the stainless steel tube system document cannot be regarded as
       constituting exculpatory evidence with respect to the infringement of Article 81(1) EC for which the
       Japanese applicants are criticised.

       – Sharing key document

270    In recitals 85 and 86 to the contested decision, the Commission relies on a document which was passed
       to it on 12 November 1997 by a person unconnected with these proceedings in order inter alia to
       support its description of the development of relations within the Europe-Japan Club from the end of
       1993 onwards. The source of that document, according to the informant, is a commercial agent of one
       of the participants in that club. According to the Commission, that document shows that the contacts
       established with the Latin American producers were partially successful and the table in it shows how
       the markets mentioned were shared between the European, Japanese and Latin American producers. In
       particular, that document provides for a market share of 100% for the European producers in Europe
       and a market share of 100% for the Japanese producers in Japan. As far as the other markets are
       concerned, the European producers have, in particular, a share of 0% in the Far East, 20% in the
       Middle East and 0% in Latin America

271    JFE-Kawasaki contends that that document is inadmissible as evidence since it is not dated and the
       Commission has divulged neither the identity of its author nor that of the person who disclosed it to it,
       so that it is impossible for the applicants to ascertain in what context it was drawn up and the reasons
       for which it was disclosed to the Commission. This is the first time that the Commission has established
       the existence of an infringement by undertakings on the basis of an unidentified document.

272    That argument must be rejected.

273    The prevailing principle in Community law is that of unfettered evaluation of evidence and the only
       relevant criterion for assessing evidence produced lies in the reliability thereof (Opinion of Judge
       Vesterdorf, acting as Advocate General, in *Rhône-Poulenc* v *Commission*, cited in paragraph 56 above).
       Moreover, it may be necessary for the Commission to protect the anonymity of informers (see, to that
       effect, Case 145/83 *Adams* v *Commission* [1985] ECR 3539, paragraph 34) and that fact does not
       suffice to compel the Commission to set aside evidence in its possession. Accordingly, whilst
       JFE-Kawasaki's arguments are relevant as regards assessment of the credibility of the sharing key
       document, there are no grounds for treating that document as constituting inadmissible evidence.

274    In that regard, JFE-Kawasaki agrees with the other Japanese applicants in stating that, even if it is
       admissible as evidence, the sharing key document does not constitute reliable inculpatory evidence,
       since it has not been properly identified. It must be held, indeed, that the credibility of that document is
       undeniably reduced by the fact that the context in which it was drawn up is largely unknown and the
       Commission's statement in that regard cannot be verified (see paragraph 270 above).

275    However, in so far as the sharing key document contains specific information corresponding to that
       contained in other documents, it must be considered that those items of evidence reinforce each other.

276    It must be observed, in that connection, that Mr Verluca's statement of 17 September 1996 refers to an
       'initial' sharing key applicable to 'international tenders' and covering contracts concluded between the
       Japanese and European producers, so that the existence of such sharing in the framework of the

Europe-Japan Club is sufficiently established. Moreover, it is clear from the report of the meeting with JF that Vallourec was required, in order to remain 'within the framework of the system … to keep out of the Far East and South America, and limit operations in the Middle East to the point of sharing 20% of the market of 3'. When the Commission asked Mr Verluca to comment on those two documents, he indicated that they related to an attempt in 1993 to adapt the applicable sharing keys to take account of the sales of the Latin American producers and of the 'positions acquired' on the various markets.

277    The Japanese applicants put forward several additional arguments against the Commission's use of the sharing key document. First, it relates to a considerably narrower range of products than those covered by Mr Verluca's statement of 17 September 1996. That document is concerned only with the part of the standard seamless OCTG market covered by general calls for tenders. The Japanese applicants observe in that regard that the scope of the sharing key referred to in that document is limited by the reference to 'SMLS API OPEN TENDER', whereas, according to Mr Verluca's statement of 17 September 1996, there were no important calls for tenders ('no large-scale tenders') in Europe for the products to which it referred. The market covered by that sharing key is therefore, according to Mr Verluca, non-existent.

278    In that connection, it must be observed first that, contrary to the Commission's assertion, the sharing key document relates only to seamless OCTG and not to line pipe. As the Japanese applicants observed at the hearing, without being contradicted on that point by the Commission, the abbreviations 'C/S' and 'T/B' used twice in that document, which relate, respectively to tubes used for casing and tubing used for the production column, relate to two essential elements of an OCTG pipe, in accordance with the description of that product contained in recital 29 to the contested decision, and therefore refer necessarily and solely to that product.

279    As regards the expression 'SMLS API OPEN TENDER' in the sharing key document, it must be observed that the assertion, in Mr Verluca's statement of 17 September 1996, to the effect that there were no important calls for tenders in Europe appears in section '1.4 Other markets', whereas the domestic markets of the Europe-Japan Club are covered in section '1.1 Domestic markets', the 'UK offshore' market being expressly mentioned there. That fact implies a priori that the term 'Europe' appearing in that section 1.4 relates to European markets other than the four domestic markets covered by the infringement found in Article 1 of the contested decision, namely the German, French, Italian and United Kingdom markets.

280    However, it must be recognised that that reference to Europe is vague and therefore ambiguous and that, if it were intended to cover those four markets, in contrast to the interpretation set out in the foregoing paragraph, it would have to be concluded that the sharing key document cannot directly support Mr Verluca's statement of 17 September 1996 in relation to the situation existing on those four markets. Indeed, if there were no open calls for tenders in those markets, it must be concluded that the sharing key document could not relate to them, since it relates to API seamless tubes covered by such calls for tenders. Consequently, that ambiguity, which it is not possible to resolve in the light of information in the file and of the applicants' arguments on that subject, reduces the probative value of the sharing key document as regards corroboration of Mr Verluca's statements.

281    Moreover, according to the Japanese applicants, the sharing key document contradicts Mr Verluca's statement, set out in the 'Verification auprès de Vallourec' document (in paragraph 1.3), as to whether the Latin America producers responded favourably to the approaches from the European producers at the end of 1993, which in their view detracts from the reliability of those two items of evidence. The Commission stated in recital 86 to the contested decision, on the basis of the sharing key document, that 'the approaches made to the Latin Americans were partly successful' and itself recognises that that statement contradicts Mr Verluca's assertion, set out in the Vallourec investigation document, to the effect that:

'The Europe-Japan Club did not include the South American producers … exploratory approaches were made in late 1993 in order to achieve a balance reflecting the positions acquired (about 20% in the Middle East for the Europeans). It very soon became clear that those attempts could not work.'

282    It must nevertheless be observed that, according to the sharing key document, the Latin American producers accepted the proposed sharing key 'except for the European market', on the basis of which the markets were to be examined 'case by case' in a spirit of cooperation. The Commission therefore concluded, in recital 94 to the contested decision, that the Latin American producers had not accepted

that the European market should be reserved to the European producers.

283    It is apparent from the various Vallourec notes and from the Paper for Presidents and the '(g) Japanese' document, examined above, that, from the European producers' point of view, the essential purpose of their contacts with the Japanese producers was protection of their domestic markets, in particular maintenance of the domestic status of the United Kingdom market after Corus's closure of its Clydesdale plant. Although the contradiction noted in paragraph 281 above certainly weakens the probative value of the sharing key document and also, to some extent, that of Mr Verluca's statements, its significance is minimised by the fact referred to at the beginning of this paragraph. Even if the Latin American producers agreed to apply a sharing key on markets other than the European market, it must be observed that the negotiations with those producers substantially failed from the European point of view, so that Mr Verluca's negative assessment of their outcome actually corresponds to the sharing key document on that crucial point.

284    It must be concluded that the contradiction between Mr Verluca's assertions in one of those statements and the sharing key document, referred to by the Commission in recital 86 to the contested decision, does not substantially detract from the credibility of those two items of evidence.

285    Finally, the Japanese producers contend that, in the sharing key document, they expressed a reservation regarding that proposal, considering that the scope of the key should be extended to cover 'ERW OCTG' tubes, they being welded steel tubes. The Commission should therefore have treated the Japanese producers in the same way as the Latin American producers, vis-à-vis which it withdrew its objections on the ground that they had also expressed a reservation regarding the proposed key, in so far as the latter related to the European market, and they had made significant sales of steel tubes in Europe. This is therefore a case of unjustified unequal treatment and the withdrawal of the objections against the Latin American producers therefore undermines the Commission's thesis regarding the existence of the infringement found in Article 1 of the contested decision with regard to the Japanese applicants.

286    It need merely be borne in mind in that connection that, in the Vallourec investigation document, Mr Verluca stated that the 'Europe-Japan Club did not include the South American producers'. Since the Commission relied mainly on Mr Verluca's statements in the contested decision to establish the participation of the Japanese producers in an infringement, it had no choice but to exclude the Latin American producers from the scope of Article 1 of that decision in the light of that categorical assertion. It follows from that circumstance that the Japanese and Latin American producers were certainly not in a comparable situation as regards the evidence against them.

287    In any event, it must be observed that the 'reservation' expressed by the Japanese producers according to the sharing key document is not of the same nature as that expressed by the Latin American producers. According to the sharing key document, the latter refused automatic application of the sharing key to the European market, whereas the Japanese producers proposed including the 'ERW' tubes, that is to say welded tubes, in the sharing key adopted in order 'to avoid grey area'. It must be pointed out that, whilst the reservations expressed by the Latin American producers deprive the sharing key document of much of its probative force as against them concerning the existence of an infringement on the Community market, the position is certainly not the same in the case of the Japanese producers. Thus, the situation of the Japanese producers was objectively different from that of the Latin American producers.

288    In the light of the foregoing, it must be concluded that the sharing key document retains some probative value such as to corroborate, in the context of a body of consistent evidence used by the Commission, certain of the essential assertions contained in Mr Verluca's statements in relation to the existence of a market-sharing agreement covering seamless OCTG. It is clear from that item of evidence that the Japanese producers, on the one hand, and the European producers, on the other, accepted the principle that they should not sell certain seamless steel tubes on the domestic markets of other producers in the context of 'open' calls for tenders. That document also confirms the existence of a market-sharing key in various regions of the world and therefore reinforces the credibility of Mr Verluca's statements in so far as they also refer to that concept.

       – Replies of the European producers

289    The Commission uses as inculpatory evidence, in the contested decision, the replies to its requests for information given by Mannesmann, Dalmine and Corus, in recitals 63, 65 and 66 thereto respectively.

290    In particular, according to the reply of 22 April 1997 given by Mr Becher, an employee of Mannesmann, the Fundamental Rules concerned OCTG and project line pipe and meant that 'the Japanese producers were not supposed to penetrate European markets [in europäische Märkte] in those sectors, while European producers were not to deliver to Japan'. Corus indicated in its reply of 31 October 1997, reproduced at page 11932 of the Commission's file, in relation to the Europe-Japan Club, that Japanese and European producers of seamless OCTG were members thereof and that 'in practice, domestic markets were reserved to the local producers in the first instance'. In its reply of 4 April 1997, Dalmine admitted that there were contacts between the European and Japanese producers, stating that they 'related to exports of pipes (particularly those intended for the oil industry) to zones other than the EC (Russia and China) and they were also intended to limit pipe exports to the EC after closure of [Corus]'s mills and, consequently, to protect the Community seamless pipe and tube industry'.

291    It must also be observed that Mannesmann's reply of 22 April 1997 is also cited in recital 74 to the contested decision in connection with the description of the markets of third countries. The relevant passage is worded as follows:

'For the other markets where there were worldwide calls for tenders, the respective deliveries of the Japanese and the Europeans were determined in advance. At that time, that procedure was described by the term "sharing key". Apparently, the idea was to maintain the historical market shares of the various producers.'

292    According to the Japanese applicants, the European producers had an interest in ensuring 'damage limitation' in relation to the Commission investigation, in particular by admitting the existence of an agreement with the Japanese producers with a view to distracting the Commission's attention from the real significance of the Fundamental Rules, which pursued the aim of sharing the European markets between European producers, a much more serious infringement from that found in Article 1 of the contested decision and which, if found to exist, would have given rise to heavier fines for them. Thus, in so far as some of their replies to the Commission's questions refer to Japanese participation in the infringement found in Article 1 of the contested decision, they are not reliable.

293    In that connection, it must be borne in mind that the fact that the European producers admitted the existence of a market-sharing agreement with the Japanese producers did not necessarily serve to dissimulate the existence of an agreement for the sharing of the European markets between them (see paragraph 214 above). It is unlikely that the European producers would have invented unlawful agreements with the Japanese producers in order to dissimulate the existence of an intra-European cartel, for the reasons set out in paragraph 214 above. In any event, it must be observed in that regard that, in its reply of 29 May 1997, reproduced at page 15162 of the Commission file, which supplements the information provided in its reply of 4 April 1997, Dalmine refers both to contacts with the Japanese producers and to meetings between the European producers alone. For its part, Corus did not confine its statement regarding protection of markets solely to relations between Japanese and European producers (see paragraph 290 above).

294    As regards the reply given by Mannesmann, the Japanese applicants observe that its author, Mr Becher, did not have any personal knowledge, on his own admission, of the circumstances on which he was commenting, since he did not become a Mannesmann executive until April 1995. His evidence is not therefore of great probative value and, according to JFE-NKK, is even inadmissible.

295    In that connection, it must first be observed from the factual point of view that, although Mr Becher did not become a Mannesmann executive until April 1995, the representative of that company stated, at the hearing, that he held other posts within that company before that date.

296    Next, regard must be had to the case-law cited in paragraph 205 above, according to which replies given on behalf of the company as such carry more weight than that of an employee of the undertaking, whatever his individual experience or opinion (*LR AF 1998* v *Commission*, cited in paragraph 205 above, paragraph 45). It is clear from paragraph 45 of the *LR AF 1998* v *Commission* judgment that the probative value as inculpatory evidence of the reply at issue in that case, against a third company, was not in any way affected by the fact that the person who signed it on behalf of the

company concerned had not been present at the meeting concerned, and was likewise not its employee at that time.

297    Where, as in the present case as far as Mannesmann is concerned, a person not having direct knowledge of the relevant circumstances makes a statement as a representative of a company, admitting the existence of an infringement by it and by other undertakings, that person thoroughly relies on information provided by his company and, in particular, by employees thereof with direct knowledge of the practices in question. As was pointed out in paragraph 211 above, statements running counter to the author's own interests must, in principle, be regarded as probative and it is therefore appropriate to give considerable weight to Mr Becher's statement in this case.

298    The argument which JFE-NKK bases on the *Rhône-Poulenc* v *Commission* case and, more particularly, the Opinion of Mr Vesterdorf, acting as Advocate General in that case, cited in paragraph 56 above, must be rejected. In his Opinion, Judge Vesterdorf observed that evidence of persons having knowledge of the facts is, in principle, of particularly great probative value ([1989] ECR II-956 and II-957).

299    It is inappropriate to infer therefrom that the statement made on behalf of a company by an executive thereof, against it and against other undertakings, is of limited probative value because he did not have direct knowledge of the facts. A fortiori, there is no reason to reject such an item of evidence as inadmissible.

300    In this case, as in *LR AF 1998* v *Commission*, cited in paragraph 205 above, the statement in question constitutes an admission of an infringement by the company represented by the maker of the statement.

301    Moreover, the Japanese applicants contend that the Commission cannot treat Mannesmann's reply as reliable evidence in so far as it confirms the existence of an agreement between the European and Japanese producers when it does not treat the same reply as reliable to the extent to which it denies the existence of an agreement concerning respect for the national market of each European producer by the other European producers.

302    It is true that the fact that Mr Becher denied the existence of an intra-European component of the Fundamental Rules in the form of an obligation for mutual respect of domestic markets as between European producers weakens his statement, in some degree, as evidence capable of corroborating Mr Verluca's statements. However, it must be observed that Mr Becher confirmed the existence of a market-sharing agreement between the European and Japanese producers for OCTG and project line pipe unequivocally (see paragraph 290 above). Thus, his statement corroborates those of Mr Verluca as regards that aspect of the infringement and, therefore, regarding the fact that the Japanese applicants were parties to a market-sharing agreement under which they agreed not to market standard thread OCTG and project line pipe on Community markets. The fact that the Mannesmann statement does not exclude premium thread OCTG from the agreement which it describes is irrelevant for the reasons set out in paragraph 261 above. Finally, the probative value of Mannesmann's statement is, in this case, further reinforced by the fact that it also corroborates those of Mr Verluca regarding the existence of a sharing key for awards in international tendering procedures on the markets of third countries (see paragraph 291 above).

303    The applicants observe that Dalmine, in its replies to the Commission of 4 April and 29 May 1997, stated that its discussions with the Japanese producers had related essentially to third-country markets, such as the Russian and Chinese markets. It must be observed at the outset that, according to the terms of the passage of the reply of 4 April 1997 cited above, those discussions also related to the protection of Community markets (see paragraph 290 above). In any event, it must be considered that the statements relied on in that connection by the Japanese applicants carry very little weight specifically for the reason put forward by the Japanese applicants themselves (see paragraph 292 above), namely that Dalmine sought 'damage limitation'. Considering that it was unable to deny that it had had contacts with the Japanese producers and with the other European producers, Dalmine sought to present those contacts in such a way that their illegality under Community law was ruled out or minimised as far as possible.

304    Thus, Dalmine's two replies, in particular the passage from that of 4 April 1997 cited in recital 65 to the contested decision (see paragraph 290 above), corroborate Mr Verluca's statements regarding the

reality of contacts between the European and Japanese producers with a view to sharing certain geographical markets between them, and in particular to prohibiting Japanese sales of tubes on the Community markets.

305    As regards the reply given by Corus on 31 October 1997, the Japanese applicants observe that, in a letter of 30 March 1999, Corus clearly indicated that none of its statements should be interpreted as meaning that it implied the existence of an agreement between European and Japanese producers. In response to the Commission's argument that the letter of 30 March 1999 is concerned with the procedure for welded tubes, the Japanese applicants observe that the statement, thus clarified, had been made by Corus in exactly the same terms as that made in connection with the procedure relating to seamless tubes.

306    It is true that the absence, in the procedure relating to seamless tubes (Case IV/E-1/35.860-B), of a letter similar to that sent in connection with the procedure relating to welded tubes (Case IV/E-1/35.860-A) is bizarre, which may give the impression that there was an omission rather than the taking of an intentionally different position in one case as compared with the other.

307    However, the statements contained in the letter of 30 March 1999, according to which the reply of 31 October 1997 does not refer to the existence of an agreement and is not regarded as open to being interpreted as an admission in that connection, are not sufficient, in any event, to explain the meaning of that reply. In the absence of a very convincing explanation of the meaning to be given to the terms 'in practice, domestic markets were reserved to the local producers in the first instance' and in view of the fact that those terms appear in a paragraph which relates to the purpose of the meetings of the Europe-Japan Club, that statement constitutes a very relevant item of evidence.

308    Thus, the fact, if assumed to be correct, that Corus wished, in a letter sent to the Commission more than one year later, to limit the scope of its statement concerning market sharing hardly reduces the probative value of the latter. It must therefore be considered that Corus's reply also corroborates Mr Verluca's statements as regards the existence of a market-sharing agreement for OCTG tubes in the framework of the Europe-Japan Club.

    – Mr Biasizzo's deposition

309    The Commission also refers, in recital 64 to the contested decision, to a deposition of 1 June 1995 made by a former employee of Dalmine, Mr Biasizzo, to the Public Prosecutor, Bergamo, Italy, in connection with a corruption investigation. It is clear from that deposition that 'producers' clubs (cartels)' existed, which met twice yearly: once in Europe and once in Japan. According to Mr Biasizzo, each producer was entitled to win all tenders on its domestic market and it was agreed that the other producers would always tender prices which were 8-10% higher than those of the local producer, a rule that was rigorously applied.

310    According to the Japanese applicants, Mr Biasizzo's deposition is not credible, having been made under constraint in a context in which the deponent had an interest in explaining why Dalmine was successful in relation to all Agip public contracts by referring to something other than the dishonest practices for which he was under investigation.

311    It must be observed that, in his deposition, Mr Biasizzo stated that it was he himself who had suggested the practice of extending improper payments to Agip employees. Moreover, the role of those payments, according to Mr Biasizzo, was to facilitate the later phases of implementation of the contract, once Dalmine had been awarded it, under the unlawful agreement. In those circumstances, it must be observed that the terms of Mr Biasizzo's deposition are incompatible with the explanation that he sought to conceal his participation in illegal practices by attributing Dalmine's strength on the Italian market to a non-existent agreement. The Japanese applicants' argument in that connection must therefore be rejected.

312    Moreover, the fact that those statements were made to the Bergamo Public Prosecutor in connection with a judicial inquiry reinforces, rather than detracts from, their probative value, contrary to the Japanese applicants' contention. Although, admittedly, a statement made before a public prosecutor does not have the same value as evidence given under oath in a court, it must be considered that the

compulsion deriving from the investigative powers enjoyed by a public prosecutor, and the adverse consequences which might arise under criminal law for a person who perjured himself in an inquiry, are circumstances which render such a deposition more reliable than a mere statement.

313    According to the Japanese applicants, the reference made to tenders on the Italian market, in Mr Biasizzo's deposition, is incompatible with the assertion contained in Mr Verluca's statement of 17 September 1996 that there were no significant calls for tenders on the European markets.

314    In that connection, it must be borne in mind that the assertion, in Mr Verluca's statement of 17 September 1996, that there were no important calls for tenders in Europe appears in section 1.4 thereof entitled 'Other markets' ('OPEN TENDERS') and under the heading 'Open calls for tenders for API seamless tubes', whereas the domestic markets of the members of the Europe-Japan Club are covered in section 1.1 entitled 'Domestic markets', which implies a priori that the term 'Europe' used in the said section 1.4 refers to European markets other than the four domestic markets covered by the infringement found in Article 1 of the contested decision (see paragraphs 279 and 280 above).

315    Furthermore, Mr Biasizzo was describing a situation existing only in the Italian market and it is therefore possible to distinguish between important international calls for tenders ('large-scale tenders') which did not concern the European markets according to Mr Verluca, including, where appropriate, the domestic markets of the four European producers, and those organised by Agip on the Italian market. The first sentence of section 1.4 of Mr Verluca's statement of 17 September 1996, in the terms of which 'the big deals under international calls for tenders ("OPEN TENDERS") were shared on the basis of a sharing key', also supports that thesis in so far as it highlights the largeness and the international nature of the tendering procedures covered by that section of the statement.

316    Admittedly, the reference to calls for tenders on the Italian market to some extent reduces the probative value of Mr Biasizzo's deposition as regards corroborating Mr Verluca's statements. It must be observed that, at best, Mr Biasizzo's description of the method of sharing contracts on the Italian market is not reflected in those statements and that, at worst, it contradicts them.

317    However, it must be borne in mind again that the Commission was not required to prove by what specific mechanism market sharing took place provided that the anti-competitive nature of the illegal agreement was adequately established (see paragraph 203 above). Thus, in this case, the less than total concordance between Mr Verluca's statement and Mr Biasizzo's deposition regarding the method of application of the Fundamental Rules in the domestic markets of the members of the Europe-Japan Club only reduces, to a limited extent, the probative value of that evidence, in so far as Mr Biasizzo's deposition corroborates Mr Verluca's statements regarding other significant aspects of the censured agreement (see also paragraph 334 below).

318    Moreover, the Japanese applicants observe that, in a later deposition entitled 'Comments on my depositions', Mr Biasizzo enumerated all the objective economic advantages accruing to a local producer of steel tubes in its domestic market vis-à-vis foreign producers and he made no reference to any international agreement.

319    It must be observed in that connection that, according to settled case-law, it follows from the actual text of Article 81(1) EC that agreements between undertakings are prohibited regardless of their effect where they have an anti-competitive object (see paragraph 181 above and the case-law there cited). It follows that the fact that Mr Biasizzo enumerated the objective economic advantages accruing to a local producer of steel tubes in its national market does not constitute exculpatory evidence in the circumstances of the present case and does not therefore detract from the probative value of his initial deposition.

320    As regards the alleged absence of a new explicit reference in the document 'Comments on my depositions' to the existence of an international agreement, it must be observed that that fact is also irrelevant since Mr Biasizzo has never retracted what he said on that subject in his initial deposition. On the contrary, Mr Biasizzo refers again to the existence of such an agreement in the document 'Comments on my depositions', in that he confirmed that Dalmine's strong position in the Italian market derived, inter alia, from the 'influence brought to bear by each producer, within its own markets, on the other producers' ('l'influenza che ogni produttore ha, per le sue aree di mercato, nei confronti degli altri produttori'). Mr Biasizzo even referred, in that connection, to the description given in his initial

deposition, stating that '[t]he system as a whole [was] based on observance of a balance based on the historical market shares ... as [he had] already stated several times in [his statement]' ('Tutto il sistema è basato sul rispetto di equilibri consolidati da quote storiche ... come già ho detto più volte nel corso del mio memoriale').

321   Moreover, given that the Japanese applicants challenged the reliability of Mr Biasizzo's deposition, it must be observed that it is corroborated by other depositions made by colleagues of his contained in the Commission's file and referred to by the Commission before the Court, but which are not cited in the contested decision. In particular, it is apparent from Mr Jachia's deposition of 5 June 1995, reproduced at page 8220 *ter* 6 of the Commission's file, that there was an agreement 'to respect the areas belonging to the various operators' and from that of Mr Ciocca of 8 June 1995, reproduced at page 8220 *ter* 3 of the Commission's file, that an 'understanding between tube manufacturers operates worldwide'. Similarly, it is clear from Dalmine's reply of 29 May 1997 that Mr Biasizzo attended at least one meeting with the Japanese producers in Japan, so that he had direct knowledge of the existence and terms of the agreement penalised in Article 1 of the contested decision.

322   Finally, according to the Japanese applicants, the two statements by Mr Biasizzo do not make clear what products were covered by the agreement to which it refers.

323   It must again be noted, in that connection, that it is not necessary for each item of evidence produced by the Commission to reflect precisely and concordantly the statements by Mr Verluca in relation to each element of the infringement (see paragraph 180 above). It is sufficient for a document to evidence significant elements of the agreement described by Mr Verluca to have some corroborative value in the context of the body of inculpatory evidence (see paragraph 220 above). In any event, without there being any need to deal with the difference of views between the parties as to precisely how long Mr Biasizzo was in charge of sales of the two types of product covered by the contested decision, it is common ground in this case that he was responsible for Dalmine's sales of OCTG for a substantial part of the ascertained duration of the infringement and for sales of line pipe for at least several months within that period, so that he had direct knowledge of the facts which he described.

324   It must be concluded, in that regard, that Mr Biasizzo's deposition corroborates Mr Verluca's statements regarding the existence of the agreement for sharing of the domestic markets described by the latter. More specifically, that item of evidence confirms that each producer's domestic markets were to be respected by the other members of the club and that that principle was laid down at the meetings held twice yearly, once in Europe and once in Japan, to which the Japanese applicants sent representatives (see paragraphs 192 to 196 above).

325   It must also be observed that, in its reply of 7 November 1997 to a request for information, set out on page 14451 of the Commission's file, mentioned in footnote 41 of the contested decision, JFE-NKK recognises that the European producers asked it to respect their domestic markets at the meetings of the Europe-Japan Club ('We recall that other (European) mills requested that JFE respect their home markets'). However, JFE-NKK denies having acceded to that request ('However we were neither bound by nor did we respect such requests').

326   It must be pointed out, first, that that reply from JFE-NKK confirms that the discussions held at the Europe-Japan Club meetings related not only to third-country markets but also to Community markets, as they were described in Mr Verluca's statements.

327   It must also be borne in mind that, according to settled case-law, where an undertaking participates, even if not actively, in meetings between undertakings with an anti-competitive object and does not publicly distance itself from what occurred at them, thus giving the impression to the other participants that it subscribes to the results of the meeting and will act in conformity with them, it may be concluded that it is participating in the cartel in question (Case T-7/89 *Hercules Chemicals* v *Commission* [1991] ECR II-1711, paragraph 232; Case T-12/89 *Solvay* v *Commission* [1992] ECR II-907, paragraph 98; Case T-141/89 *Tréfileurope* v *Commission* [1995] ECR II-791, paragraphs 85 and 86; and *Cement*, cited in paragraph 66 above, paragraph 1353).

328   The case-law mentioned in paragraph 327 above is not directly applicable to the situation of JFE-NKK since, in the cases cited, the existence of an infringement committed by other undertakings had been established and the only outstanding issue was that of the participation of the passive undertaking in

that infringement.

329   However, the principle that an undertaking which participates in meetings with an anti-competitive purpose gives the impression to the other participants that it is participating in the resultant agreement and that it will comply with it, if it does not distance itself publicly from the subject-matter of the meetings, and thereby participates in an infringement, is capable of applying to this case. JFE-NKK's participation in those meetings is particularly well established in this case since it admits that a specific request to respect the Community markets was addressed to it at those meetings. Thus, JFE-NKK's reply constitutes particularly probative evidence such as to corroborate Mr Verluca's statements regarding the fact that that company participated in a cartel with the four European producers.

330   It must also be observed that the other three Japanese producers took part in the same Europe-Japan Club meetings as JFE-NKK. It is inconceivable, having regard to the way in which the Europe-Japan Club operates and to its objectives, as evidenced by the documents examined above, that the European producers would have confined themselves to asking JFE-NKK, and not the other Japanese producers who were members of the club, to respect their home markets. In those circumstances, it must be considered that JFE-NKK's answer also confirms the participation of the other three Japanese producers in the infringement found in Article 1 of the contested decision.

331   It follows from all the foregoing that the body of evidence relied on by the Commission is amply sufficient to corroborate Mr Verluca's statements in relation to the fact that the Japanese and European producers actually concluded, in the context of the Europe-Japan Club described by him, a market-sharing agreement covering certain seamless steel tubes, under which each producer was, in particular, required to refrain from selling the products concerned on the home market of each of the other members of the club.

332   It is not clearly apparent from most of the information making up the said body of evidence which seamless steel tubes were covered by the sharing arrangement, but there is no doubt that the products covered included standard thread OCTG. The specific references to those products in the 'Réflexions stratégiques' and 'Refléxions sur le contrat VAM' notes, in the sharing key document and in the Mannesmann reply, and the unqualified references to OCTG in general in other documents relied on by the Commission adequately and clearly corroborate Mr Verluca's statement relating to the fact that the Fundamental Rules concerned those products.

333   As regards project line pipe, a single item of evidence, Mannesmann's reply made by Mr Becher, unequivocally supports Mr Verluca's statement that the illegal agreement also covered project line pipe. However, given the particularly probative nature of that reply, as described in paragraphs 294 to 302 above, it must be considered as being sufficient to corroborate Mr Verluca's statements, which were in themselves already very reliable (see paragraphs 205 to 207 above) in relation to those products.

334   In any event, it has already been held that, if the body of consistent evidence relied on by the Commission makes it possible to establish the existence of, and certain specific aspects of, the market-sharing agreement mentioned by Mr Verluca and referred to in Article 1 of the contested decision, the latter's statements could in themselves be sufficient, in that case, to evidence other aspects of the contested decision, in accordance with the rule deriving from the *Cement* judgment, cited in paragraph 66 above (paragraph 1838), and relied on by the Commission (see paragraphs 204 and 220 above). It has already been held, in paragraphs 330 and 332 above, that the body of evidence relied on by the Commission is sufficient to corroborate Mr Verluca's statements in several respects, and in particular with regard to standard thread OCTG.

335   In those circumstances, it must be considered that Mr Verluca clearly told the truth in his statements and, therefore, that those statements constitute sufficient evidence to establish that the agreement on sharing of the home markets of the Europe-Japan Club members covered not only standard thread OCTG, as shown by several other items of evidence, but also the project line pipe. There is no reason to suppose that Mr Verluca, who had direct knowledge of the facts, might have made incorrect statements regarding line pipe, when other evidence corroborates his statements concerning the existence of the agreement and its application to standard thread OCTG.

336   Finally, even if it is assumed that the Japanese applicants may have raised a doubt as to the specific products covered by the agreement penalised in Article 1 of the contested decision – which has not

been demonstrated – it must be observed that if the decision, taken as a whole, shows that the infringement found related to a particular kind of product and mentions the evidence on which that conclusion is based, the fact that the decision does not contain a precise and exhaustive list of all the types of product covered by the infringement is not sufficient in itself to justify annulment thereof (see, by analogy, in the context of a plea alleging an inadequate statement of reasons, *Gruber + Weber* v *Commission*, cited in paragraph 203 above, paragraph 214). If that were not the case, an undertaking could escape any penalty despite the fact that the Commission had established with certainty that it had committed an infringement in circumstances in which the identity of the specific products, included in a range of similar products marketed by the undertaking in question, had not been established.

337    In that connection, the case-law on adequate definition of the market, relied on by JFE-NKK (see paragraph 101 above, and *SIV and Other*s v *Commission*, cited in paragraph 57 above) is not relevant since it relates to a situation in which the Commission finds an infringement on the basis of the anti-competitive effects of the conduct of the undertakings involved, whereas in this case the anti-competitive purpose of the illegal agreement has been established on the base of documentary evidence.

        – Duration of the infringement

338    As regards the duration of the infringement, it must first be observed that the Commission found, in recital 108 to the contested decision, that it could have set the start-date of the infringement as 1977 but chose not to do so because of the existence of voluntary restraint agreements. Thus, in Article 1 of the contested decision, it found an infringement only from 1990 onwards.

339    It follows that the Japanese applicants are mistaken in maintaining that, in the contested decision, the Commission decided that there was an infringement only as from 1990 because it considered that the existence of voluntary restraint agreements prevented the Japanese applicants from exporting their steel tubes to the Community. However, the Commission's position in this case, namely that it found an infringement as from 1977 but took account of it only as from 1990 for the purpose of setting the amount of the fine, likewise does not correspond to the terms of the contested decision, in particular Article 1 thereof.

340    It must be observed, in that connection, that, in the present cases, the Commission has not asked the Court to determine the existence of an infringement before 1990. Moreover, whilst the Commission observes in its pleadings that the fact that it did not make a finding of an infringement for the period when the voluntary restraint agreements were in force constitutes a concession to the addressees of the contested decision which it was not obliged to make, it does not contend before the Court that it is appropriate to call that concession in question in the context of the present proceedings.

341    It follows that the Court's examination must not relate to the legality or appropriateness of that concession, but only to the question whether the Commission, having expressly made it in the grounds of the contested decision, correctly applied it in this case. It must be borne in mind, in that connection, that the Commission must produce precise and consistent evidence to support the firm conviction that the infringement took place, since the burden of proof concerning the existence of the infringement and, therefore, its duration, falls upon it (see paragraphs 177 to 179 above and the case-law cited).

342    Thus, given that the agreements at issue were concluded at international level between the Japanese Government, represented by the Ministry of International Trade and Industry (MITI), and the Community, represented by the Commission, it must be stated that the latter should have retained the documentation confirming the date on which those agreements came to an end, in accordance with the principle of sound administration. Therefore, it should have been in a position to produce that documentation to the Court. However, the Commission has informed the Court that it searched its archives but was unable to produce documents recording the date of cessation of those agreements.

343    Although, in general, an applicant cannot transfer the burden of proof to the defendant by invoking circumstances which it is not in a position to establish, the concept of burden of proof cannot be applied for the benefit of the Commission in this case with regard to the date of cessation of the international agreements concluded by it. The Commission's inexplicable inability to produce evidence relating to a circumstance which concerns it directly makes it impossible for the Court to give a ruling in full knowledge of the facts concerning the date of cessation of those agreements. It would be contrary to

the principle of sound administration of justice to cause the consequences of that inability on the part of the Commission to be borne by the addressees of the contested decision which, in contrast to the defendant institution, were not in a position to produce the missing evidence.

344    In those circumstances, it must be considered, by way of exception, that it was incumbent on the Commission to produce evidence of that cessation. However, the Commission did not produce evidence of the date on which the voluntary restraint agreements came to an end, either in the contested decision or before the Court.

345    In any event, although the Japanese applicants have not produced evidence that the voluntary restraint agreements continued to exist at international level, they have all produced very relevant evidence relating to the Japanese perception of the status of the voluntary restraint agreements during 1990. That evidence includes in particular a request made on 22 December 1989 by six Japanese steel tube producers, including the four Japanese applicants, seeking authorisation to extend until 31 December 1990 the internal agreement limiting their exports to the European Community and, finally, the decision of the MITI of 28 December 1989 approving that extension. Those documents enable it to be concluded with certainty that the Japanese applicants, and also the competent Japanese authorities, considered that the international voluntary restraint agreement concluded with the European Communities remained applicable in 1990.

346    In those circumstances, it is appropriate to conclude, for the purposes of these proceedings, on the basis of the evidence produced to the Court and having regard to the burden of proof falling upon the Commission regarding the existence of an infringement, that the voluntary restraint agreements concluded between the Commission and the Japanese authorities remained in force during 1990. In view of that finding of fact and of the concession made by the Commission itself in the contested decision, the duration of the infringement found in Article 1 of the contested decision must be reduced by one year.

347    As regards the date on which the infringement came to an end, the Commission relies in recitals 96 and 108 to the contested decision on Mr Verluca's statement of 17 September 1996 to the effect that trade came to an end 'a little more than one year earlier' for its view that the infringement lasted until 1995. However, it is apparent from recital 166 to the contested decision, concerning calculation of the fines, that the infringement was ascertained only for a period of five years for the four Japanese applicants, so that it must have come to an end on 1 January 1995. The Commission confirmed at the hearing that that interpretation of the contested decision is the one that should be adopted.

348    The Japanese applicants observe that the only one of the other documents relied on by the Commission which contains evidence concerning the duration of the infringement, namely the sharing key document, refers to a period which expired in March 1994. Moreover, they observe that there is no evidence of Europe-Japan Club meetings after that date.

349    It must be observed first that, although Mr Verluca's statements are particularly reliable, the phrase on which the Commission relies for its conclusion that the infringement lasted until the beginning of 1995 is very vague. Accordingly, it must be considered that the evidence corroborating Mr Verluca's statements on other points is not sufficient to enable the Commission to rely exclusively on that statement in the present context. Indeed, whilst the veracity of what Mr Verluca said in relation to the duration of the infringement is not in doubt, it is apparent from the vagueness of what he says concerning the end of the infringement that his statement is not alone sufficient to establish the latter date to the requisite legal standard.

350    Moreover, according to the description of the Europe-Japan Club meetings contained in Mr Verluca's statements, they were held 'twice yearly, once in Europe and once in Japan (generally in March or April in Europe and in October or November in Japan)' (Mr Verluca's statement of 14 October 1996). It follows that if the infringement lasted until the beginning of 1995, as the Commission assumes, a new meeting of the club should have taken place, in the normal course of events, in autumn 1994. However, although the March 1994 meeting is confirmed by several items of evidence, in particular the sharing key document, there is no trace in the file of any meeting in autumn 1994. In those circumstances, it cannot be concluded with sufficient certainty that the infringement lasted beyond the first half of 1994.

351    Consequently, it must be considered that the infringement found in Article 1 of the contested decision

ended on 1 July 1994 and, accordingly, the duration of the infringement must be reduced by six months in so far as concerns the four Japanese applicants, in addition to the reduction indicated in paragraph 346 above.

352    It follows from all the foregoing that the Commission has established the existence of the infringement found in Article 1 of the contested decision against the Japanese applicants on the basis of evidence referred to in the grounds thereof, in accordance with the rules concerning the administration of evidence set out in paragraphs 173 to 180 above, but only for a period of three-and-a-half years, namely from 1 January 1991 to 1 July 1994. Thus, the second part of the first plea must be rejected in other respects, save as regards the said reduction of the duration of the infringement. Since the existence of the infringement found in Article 1 of the contested decision was established to the requisite legal standard, it must be held that the specific arguments put forward by the applicants and not expressly rejected by the Court are not material.

353    Moreover, the rejection of the second part of the plea, on the ground that it has been established that the Japanese applicants actually concluded the agreement with an anti-competitive object which was penalised, entails the consequence that the first part of the plea must also be rejected. Neither the possible existence of barriers preventing Japanese imports nor the possible existence of Japanese sales of the products covered by that agreement on the United Kingdom offshore market can detract from the conclusion, based on documentary evidence, that, for the reasons set out in paragraphs 181 to 186 above, that agreement existed.

       The third part of the plea: the Commission's allegedly misconceived view of the significance of the infringement found in Article 2 of the contested decision

354    According to the Japanese applicants, the view expressed by the Commission in recital 164 to the contested decision, namely that the infringement referred to in Article 2 pursued the aim of preserving the status of 'national market' of the United Kingdom under the Fundamental Rules, by means of the 'Fundamentals Improved', is intrinsically untenable. They submit, in particular, that Corus did not withdraw from the United Kingdom market in standard thread OCTG and project line pipe merely because it had stopped production of plain end pipes at Clydesdale, but continued to manufacture and sell those products on its home market, even if it did not conclude supply contracts for plain end pipes with Vallourec, Dalmine and Mannesmann.

355    With regard to the present part of the first plea, it is only necessary for the Court to consider whether the Commission was authorised to rely on the existence of the infringement found in Article 2 of the contested decision to bolster its thesis as to the existence of the infringement found in Article 1 of the contested decision.

356    It must be observed first that, since the existence of the infringement found in Article 1 of the contested decision was established on the basis of documentary evidence relied on by the Commission in the contested decision, it is not strictly necessary to analyse the impact of the finding of the second infringement on that issue. However, it is appropriate, in this case, to consider the arguments put forward by the Japanese applicants, for the sake of completeness, since their arguments on that point have an impact on other pleas advanced by them, particularly the plea alleging unequal treatment concerning their requests for reduction of the amount of the fines.

357    It is apparent from the evidence relied on by the Commission in the contested decision that the European producers feared that Corus's continuing tube-threading activity would not be sufficient to ensure that the Japanese producers continued to respect the United Kingdom market as a home market, under the Fundamental Rules. In particular, it must be emphasised that the Paper for Presidents contains the following appraisal, cited in recital 90 to the contested decision:

       'Although the Japanese have agreed not to request changes in our agreements if the EC seamless industry were to restructure, there is no guarantee that they would follow this precept if [Corus] were to exit tubemaking or finishing in the UK.'

358    That statement is corroborated by the Vallourec notes, in particular the note on the meeting of 24 July 1990, by the 'Refléxions sur le contrat VAM BSC', cited in recitals 78 and 80 to the contested decision,

and by the 'Entretien BSC' note, which refer to the risk that the Japanese producers might seek to increase their market share significantly following Corus's closure of its Clydesdale mill, and conclude that it is necessary to protect the United Kingdom market. The logic underlying the Commission's analysis consists in considering that the Japanese producers would no longer necessarily agree to treat the United Kingdom market as a domestic market under the Fundamental Rules if Corus ceased its production of plain end pipes and purchased its plain end pipes for threading from producers established in third countries, a possibility expressly referred to by Vallourec in the 'Refléxions stratégiques' and the 'Renouvellement du contrat VAM BSC' note. On the other hand, the authors of the Vallourec notes were more optimistic regarding the possibility of ensuring compliance with the Fundamental Rules by the Japanese producers in the event of Corus agreeing to obtain supplies of plain end pipes only from Community sources, above all if Mannesmann, regarded as the 'only European producer who frightens the Japanese', according to the note of 24 July 1990, was among the producers signing supply contracts.

359    It must be observed in that regard that the Commission was not required to prove that the thesis set out in the Vallourec notes and in the Paper for Presidents was correct, in that it reflected an interpretation of the Fundamental Rules which was accepted by the Japanese producers. It was logically sufficient for it, in the present context, to demonstrate that the European producers believed in the effectiveness of that strategy to maintain the Fundamental Rules, so that they actually shared supplies of plain end pipes to Corus between Vallourec, Mannesmann and Dalmine to attain that objective. The existence of such a strategy is meaningful only if a market-sharing agreement between the European and Japanese producers already actually existed and it follows that the evidence of that first fact also confirms the existence of that agreement.

360    As to the arguments put forward by the Japanese applicants concerning the OSO preference policy and Directive 90/531, in particular the significance of the references to the 3% preference, they are not sufficient to negate the value of clear evidence. Although those considerations do make it possible better to understand those references and to consider whether there was another reason for Corus to obtain supplies of plain end pipes from intra-Community sources, namely the fact that the United Kingdom preference was on the point of being replaced by a Community preference, it is clear from the documents examined in paragraphs 357 and 358 above that, notwithstanding the existence of such preferences, the European producers feared that their Japanese counterparts would start selling tubes on the United Kingdom market.

361    The Japanese applicants' arguments concerning the difference of the dates of signature on each of the supply contracts must also be rejected. The reasoning set out in paragraphs 356 to 359 above remains valid, regardless of the precise date on which each of the European producers became a party to the agreement constituting the infringement found in Article 2 of the contested decision. The important aspect of that infringement is the fact, noted above, that its existence, whether from 1991 or from 1993, confirms that of the infringement found in Article 1 of the contested decision.

362    Nevertheless, it must be observed that the Japanese applicants' arguments have a certain value, in so far as it is clear from recitals 110 to 116 to the contested decision itself, in particular recital 111, that the second infringement had, in particular, the object and effect of a strict sharing between Vallourec, Mannesmann and Dalmine of supplies of plain end pipes to Corus. Accordingly, whilst it is clear from the documentary evidence examined above, in particular in paragraphs 357 and 358, that one of the purposes of the second infringement was in fact safeguarding the United Kingdom market, it must be held that, according to the contested decision itself, that agreement also had an object and effects which were anti-competitive regarding the United Kingdom plain end pipes market.

363    Furthermore, in so far as the supply contracts for plain end pipes were renewed after the end of the first half of 1994, after which date the existence of the Europe-Japan Club has not been established, it is difficult to view them, thus renewed, as a means of implementing an infringement which had already come to an end. Each of the contracts was concluded for an initial period of five years, each party being entitled to terminate it on expiry of that term upon giving 12 months' notice to the other party. In particular, in so far as Vallourec and Dalmine kept the contract of 4 December 1991 (Vallourec having succeeded to the rights of Corus through TISL in1994 – see recital 92 to the contested decision) in force after 4 December 1996, until 30 March 1999, it is not possible to establish a link between that commercial conduct and the infringement found in Article 1 of the contested decision. In any event, the parties to the supply contracts could have terminated them consensually at any time after the cessation of the infringement found in Article 1 of the contested decision. There is every reason to suppose that

they would have done so no later than 1995 if the only commercial interest presented by those agreements had been the one referred to by the Commission in recital 164 to the contested decision.

364   In the light of the foregoing, it must be pointed out that the Commission's statement, in the first sentence of recital 164 to the contested decision, to the effect that the supply contracts which constituted the infringement found in Article 2 represented only a means of perpetrating the infringement found in Article 1 thereof is excessive, since that conduct merely represented one objective of the second infringement among several objectives and effects of an anti-competitive nature which were linked but separate. Any impact of that circumstance on the calculation of the fines imposed on the Japanese applicants will be examined in paragraphs 567 to 574 below.

365   However, it is clear that the Commission was right to consider that the second infringement pursued among other objects that of reinforcing or, to employ the expression used in recital 164 to the contested decision, of ensuring the application of the market-sharing agreement penalised in Article 1 of the contested decision, and the Commission was correct to rely on the existence of the second infringement to confirm the existence of that found in Article 1 (see paragraph 359 above). That fact is a sufficient basis for rejecting the present part of the first plea.

366   It follows that the first plea must be rejected in its entirety.

      2. *The second plea: the infringement found in Article 1 should in fact be seen as comprising two separate infringements*

      a) Arguments of the parties

367   JFE-Kawasaki and Sumitomo argue, in the alternative, that, even if the Japanese producers had participated in an agreement prohibiting them from selling the steel tubes referred to in the contested decision in the Community markets, that would not entitle the Commission to reach the conclusion that, in so doing, they participated in any agreement with the European producers under the terms of which each of the European producers desisted from selling tubes not only on the Japanese market but also in the national markets of the other European producers. Given it has not been shown that the involvement of the Japanese producers was necessary in order for the European producers to enter into an agreement between themselves, the Commission should have regarded these two aspects of the 'Fundamental Rules' as constituting two separate infringements. In that connection, it should be remembered that the table in the sharing key document merely provides that the Japanese producers must respect the European markets. The other items of evidence at most allude to an alleged obligation on the part of the Japanese producers not to sell their products in Europe.

368   In addition, JFE-Kawasaki observes that, given that the infringement found in Article 2 of the contested decision is regarded as being no more than a means of carrying out the infringement found in Article 1, it would be absurd to conclude that the Japanese producers had any involvement in that separate aspect of the latter infringement.

369   The Commission maintains that the market-sharing agreement must be viewed as a set of rules and that it is thus artificial to subdivide it into two. In its view, the effectiveness of the cartel depended on the participation of as many manufacturers as possible, as is evidenced by the efforts made to persuade the Latin American producers to join. Had the Japanese producers not entered into the agreement, it is by no means certain that the European producers would have created a cartel amongst themselves alone.

      b) Findings of the Court

370   It must first be borne in mind that, as the Commission correctly points out, an undertaking may be held responsible for an overall cartel even though it is shown to have participated directly only in one or some of its constituent elements if it is shown that it knew, or must have known, that the collusion in which it participated, especially by means of regular meetings organised over several years, was part of an overall plan intended to distort competition and that the overall plan included all the constituent elements of the cartel (*PVC II*, cited in paragraph 61 above, paragraph 773). Similarly, the fact that different undertakings have played different roles in the pursuit of a common objective does not mean

that there was no identity of anti-competitive object and, therefore, of infringement, provided that each undertaking has contributed, at its own level, to the pursuit of the common object (see, to that effect, *Cement*, cited in paragraph 66 above, paragraph 4123).

371   In this case, it is clear from the evidence examined above, in particular Mr Verluca's statement of 17 September 1996, that one of the essential principles of the Fundamental Rules was mutual respect of the domestic markets of the Europe-Japan Club members. Thus, the agreement for respect of markets described by the Commission related, at Community level, only to the home markets of the four European producers and not the other Community markets. Although the exclusion of the European producers from the Japanese market logically constituted the feature of that aspect of the Fundamental Rules which was of interest to the Japanese producers, the latter knew, or ought necessarily to have understood that that principle was applicable as much at intra-Community level as at inter-continental level.

372   It must also be borne in mind that the European producers were convinced that the cessation of production of plain end pipes by Corus in Clydesdale was likely to mean that the Japanese producers would undermine the domestic status of the United Kingdom market (see paragraphs 354 to 365 above). It necessarily follows that the presence of a national producer that was a member of the Europe-Japan Club manufacturing and marketing standard thread OCTG and project line pipe on the national market of a State was perceived as a precondition for respect of a market by the other members of the club.

373   Furthermore, the Japanese applicants' argument that the Community markets were treated as a single market in the context of the Europe-Japan Club is undermined by the fact that the United Kingdom offshore market enjoyed a special, 'semi-protected' status under the market-sharing agreement. The Japanese applicants themselves state that they sold seamless steel tubes on that market even though they did not sell them on the other Community markets.

374   It is clear from the foregoing that it was not appropriate, in this case, for the Commission to treat the infringement found in Article 1 of the contested decision as comprising two separate infringements, the first relating to relations between the European and Japanese producers and the second to intra-Community relations. Consequently, the present plea must be rejected.

   3. *The third plea: the agreement should not be regarded as having had an appreciable effect on competition*

   a) Arguments of the parties

375   JFE-Kawasaki and NKK refer to the trade barriers described in paragraphs 73 to 88 above, which hindered Japanese exports of steel tubes to the European markets, and in particular to the onshore markets of the Member States of the Community, in support of their argument that the agreement between Japanese and European producers found in the contested decision did not necessarily have the effect of restricting the supply of such products in those markets to any appreciable extent.

376   Thus, in the present case the Japanese producers had no economic interest in selling steel tubes in the domestic markets of the European producers. They would not have done so in any event, whether the agreement alleged against them existed or not. The Commission has thus failed to show in the contested decision that the condition regarding an appreciable effect on competition is satisfied in the case of the Japanese pipe and tube producers.

377   In support of that argument, JFE-Kawasaki cites paragraph 16 of the judgment of the Court of Justice in Case 22/71 *Béguelin Import* [1971] ECR 949, which, it says, shows that the *de minimis* rule applies whatever the nature of the agreement in issue. Paragraphs 1087 and 1088 of the judgment in *Cement*, cited in paragraph 66 above, cannot suppress application of the *de minimis* rule in certain cases.

378   JFE-NKK considers that the Commission is under an obligation to prove that the Japanese applicants would have conducted themselves differently in the absence of the alleged agreements, which it has not done in this case, and refers in that connection to paragraph 196 of the judgment in *Suiker Unie and Others* v *Commission*, cited in paragraph 56 above.

379     Sumitomo simply states that the Commission has not proved that the Japanese producers would have sold steel tubes in the European markets in the absence of the infringement, but it does not make that a specific plea.

380     The Commission states that, pursuant to its Notice on agreements of minor importance which do not fall within the meaning of Article [81](1) of the Treaty establishing the European Community (OJ 1997 C 372, p. 13), the application of Article 81(1) EC cannot be ruled out in cases of horizontal agreements which have as their object, amongst other things, the sharing of markets or sources of supply, even if the market share of the undertaking concerned is minimal. Indeed, reducing the market share of some of them to a minimum is precisely the goal of such agreements.

381     The Commission maintains that the presence of trade barriers to which the Japanese applicants refer is irrelevant in this context, even if it could be proved, and it has not been proved in this case.

        b) Findings of the Court

382     It must be borne in mind that the Commission is not obliged to demonstrate that there was an adverse effect on competition to establish an infringement of Article 81 EC (see *Ferriere Nord* v *Commission*, cited in paragraph 183 above, paragraph 30 et seq., and *Thyssen Stahl* v *Commission*, cited in paragraph 74 above, paragraph 277; see also paragraph 181 above).

383     In the contested decision, the Commission relied primarily on the anti-competitive object of the agreement concluded within the Europe-Japan Club and the Court has held that the contested decision is well founded in that regard (see paragraph 189 et seq. above). Accordingly, the supposed lack of anti-competitive effects of the illegal agreement alleged by the Japanese applicants, even if it were to be established, is irrelevant as regards the existence of the infringement.

384     It must be added that undertakings which conclude an agreement whose object is to restrict competition cannot, in principle, exonerate themselves by claiming that their agreement was not intended to have any appreciable effect on competition. In this case, the agreement penalised in Article 1 of the contested decision provided for sharing of the markets between the members of the Europe-Japan Club and it is therefore clear that its purpose was to restrict competition in an appreciable manner.

385     Consequently, the present plea must be rejected.

        4. *The fourth plea: the agreement had no impact on trade between Member States*

        a) Arguments of the parties

386     JFE-Kawasaki and JFE-NKK maintain that the agreement found in the contested decision between Japanese producers and European producers cannot be regarded as having had any effect on trade between Member States, or at least not any appreciable effect, as is required by case-law (Case 28/77 *Tepea* v *Commission* [1978] ECR 1391, paragraph 47). JFE-NKK again states that it is for the Commission to show that the applicants would have conducted themselves differently in the absence of agreements. It refers on that point to paragraph 196 of the judgment in *Suiker Unie and Others* v *Commission*, cited in paragraph 56 above. According to JFE-Kawasaki and JFE-NKK, the Japanese producers sell the tubes referred to in the contested decision, which are all finished products, solely to end consumers, that is to say oil companies. Those products are therefore never resold within the Community market. JFE-NKK argues that such sales are usually made through the intermediary of a Japanese trading house, under a long-term supply contract or a framework agreement. In particular, project line pipe is not a standard product; it is made to order in accordance with specifications laid down by the client, as the Commission noted in recital 34 to the contested decision. It is not amenable therefore to resale. Moreover, the infringement found in Article 1 of the contested decision had no effect on trade between Member States during the currency of the voluntary restraint agreements.

387     JFE-Kawasaki argues that the fact that products could not be resold distinguishes the present case from all the cases to which the Commission refers in footnote 35 of the contested decision to justify its conclusion that the agreement found in Article 1 did have an effect upon trade between Member States:

Case 51/75 *EMI Records* [1976] ECR 811 and the cases which led to Commission Decision 74/634/EEC of 29 November 1974 relating to proceedings under Article [81 EC] (Case IV/27.095 – Franco-Japanese ball-bearings agreement) (OJ 1975 L 343, p. 19), Commission Decision 75/77/EEC of 8 January 1975 relating to a proceeding under Article [81 EC] (Case IV/27.039 – preserved mushrooms) (OJ 1975 L 29, p. 26), and Commission Decision 75/497/EEC of 15 July 1975 relating to a proceeding under Article [81 EC] (Case IV/27.000 – IFTRA rules for producers of virgin aluminium) (OJ 1975 L 228, p. 3). In all of those cases there was at least the possibility that the products the importation of which from non-party countries was prohibited by unlawful agreements might be resold within the Community. Commission Decision 73/109/EEC of 2 January 1973 relating to proceedings under Articles [81 and 82 EC] (Case IV/26.918 – European sugar industry) (OJ 1973 L 140, p. 17) mentioned in footnote 36 to the contested decision related to a concerted practice rather than to any unlawful agreement and is thus also irrelevant in the present case.

388  In response to the Commission's argument that the infringement found in Article 1 of the contested decision arises from a single comprehensive agreement affecting trade between Member States, JFE-Kawasaki reiterates its view that that infringement is in fact attributable to two separate agreements, one governing dealings between Japanese producers on the one side and European producers on the other, the second governing relations between European producers. Even if the Commission were right to take the view that there was only one agreement, it should have examined separately the two distinct aspects mentioned above in assessing the lawfulness of the conduct of the undertakings concerned under Community competition law.

389  JFE-Kawasaki observes in that connection that, in recital 103 to the contested decision, the Commission left aside two distinct aspects of the agreement which it suspected existed, relating to the sharing of other markets and concerted price-fixing on those markets, because it had insufficient evidence of them, whilst at the same time focusing on other aspects of the agreement. The Commission cannot therefore claim that it is impossible to analyse each individual aspect of an agreement separately.

390  The Commission refers first to its argument that it is illogical to evaluate the impact of the Japanese applicants' involvement in the infringement found in Article 1 of the contested decision in isolation from the impact of the involvement of the European producers. However, even if the Court were to regard it as appropriate to assess separately the effect upon trade between Member States of the conduct of each of the undertakings fined, the Commission points out, by way of example, that, pursuant to the multilateral agreement, JFE-Kawasaki had agreed with Vallourec in particular that neither of them would export its tubes to the German market and that, indisputably, eliminated a source of trade between Member States. According to the Commission, the fact that tubes are normally sold directly to end users is of no account since the agreement influenced the conduct of all suppliers who were parties to it in all markets other than their own domestic market.

391  The Commission points out that, according to case-law, it is sufficient that the agreement in question may have an influence, direct or indirect, actual or potential, on the pattern of intra-Community trade in order for the condition laid down in Article 81(1) EC concerning effects on trade between Member States to be satisfied (*Cement*, cited in paragraph 66 above, paragraph 1986). In the judgment in Case C-306/96 *Javico* [1998] ECR I-1983 (paragraph 17), the Court of Justice held that an agreement imposing absolute territorial protection may escape the prohibition laid down in Article 81(1) EC if it affects the market only insignificantly. In this case, that is clearly not the position. Finally, the judgment in *Tapea* v *Commission*, cited in paragraph 386 above, should be seen in context and is not relevant to the present case.

b) Findings of the Court

392  According to settled case-law, for an agreement, decision or concerted practice to be capable of affecting trade between Member States, it must be possible to foresee with a sufficient degree of probability on the basis of objective factors of law or fact that it may have an influence, direct or indirect, actual or potential, on the pattern of trade between Member States (see, in particular, Case T-395/94 *Atlantic Container Line and Others* v *Commission* [2002] ECR II-875, paragraphs 79 and 90). It follows that the Commission was not required to demonstrate the actual existence of such an effect on trade, a potential effect being sufficient (see, to that effect, *Atlantic Container Line and Others* v *Commission*, paragraph 90). However, as the applicants correctly point out, it is important that that actual or potential influence should not be insignificant (Case C-475/99 *Ambulanz Glöckner* [2001] ECR

I-8089, paragraph 48).

393    In this case, it has already been held in paragraph 374 above that it was not appropriate, in this case, for the Commission to treat the infringement found in Article 1 of the contested decision as two separate infringements. Thus, since that infringement had to be treated as a single infringement, it is clear that the intra-Community aspect of the illegal agreement penalised by the decision at least potentially impeded trade between Member States, so that the condition concerning the impact of the agreement on trade between Member States is satisfied in this case.

394    In any event, the circumstance, noted above (see in particular paragraphs 357 to 359 and 372), that the European producers were convinced that the cessation of seamless tube production by Corus in Clydesdale carried with it the risk that the Japanese producers might undermine the domestic status of the United Kingdom market is sufficient to establish the existence of a potential impact on intra-Community trade resulting from the conduct of the Japanese producers in the context of the Europe-Japan agreement. It follows from this finding that the mutual respect of domestic markets within the Community, as illustrated by the defending of the domestic status of the United Kingdom market, formed part of the Fundamental Rules and constituted an obstacle to intra-Community trade.

395    In the light of the foregoing, the present plea must be rejected.

       5. *The fifth plea: insufficient reasoning to support the Commission's conclusions concerning the significance of the infringement found in Article 2 of the contested decision*

       a) Arguments of the parties

396    Sumitomo and JFE-NKK argue that, contrary to Article 253 EC, the Commission failed to give the reasons for its conclusion, set out in Article 2 of the contested decision, that the agreements constituting the infringement found in that article were concluded as part of the infringement mentioned in Article 1 of that decision, on the grounds set out in paragraph 163 et seq. above. That part of Article 2 of the contested decision should therefore be annulled in any event.

397    The Commission maintains that it gave, at recitals 90 to 94 to the contested decision, a sufficient statement of the reasons for its view that the infringement found in Article 2 of the decision is part of that found in Article 1. It is clear that the purpose of the agreements between the Community producers governing Corus's purchases of plain-end pipes was to enable Corus to remain the national producer in the United Kingdom and thus ensure continued compliance with the 'Fundamentals' in the OCTG and line pipe market of that Member State.

       b) Findings of the Court

398    According to settled case-law, the statement of the reasons on which a decision adversely affecting a person is based must be such as to enable the Community judicature to exercise its power of review as to the legality of the decision and to enable the person concerned to ascertain the matters justifying the measure adopted, so that he can defend his rights and verify whether the decision is well founded (see *Buchmann* v *Commission*, cited in paragraph 58 above, paragraph 44, and the case-law cited).

399    It follows that the lack of, or an inadequate, statement of reasons constitutes a plea of infringement of an essential procedural requirement, which, as such, is different from a plea that the grounds of the decision are inaccurate, the latter plea being a matter to be reviewed by the Court when it examines the substance of that decision (*Buchmann* v *Commission*, paragraph 45).

400    In this case, it must be borne in mind, as has been held in paragraph 364 above, that the reasoning set out in recitals 90 to 94 to the contested decision does not constitute a proper basis for the Commission to consider, in recital 164 thereto, that the supply contracts were in fact merely a means of implementing the Europe-Japan agreement. The Commission itself subsequently expressed the view, in the recitals setting out its legal assessment of the supply contracts, that they should be classified, in view of their characteristics, as an infringement of Article 81(1) EC (recital 110 et seq. to the contested decision).

401    However, the fact that the conclusion reached by the Commission in recital 164 to the contested decision is incorrect in law, although capable of giving rise to a substantive defect in the contested decision, does not constitute an incorrect statement of reasons.

402    Recitals 90 to 94 to the contested decision, read in the light in particular of recital 110 and the first sentence of recital 111, to the effect that 'the object of these contracts was the supply of plain ends to the "leader" of the North Sea OCTG market, and their purpose was to maintain a domestic producer in the United Kingdom with a view to securing respect for the Fundamentals in the Europe-Japan Club', made it possible to see why the Commission reached the conclusion appearing in recital 164. It is apparent from the contested decision, read as a whole, that the Commission, having considered that the primary purpose of the supply contracts was to implement the Europe-Japan agreement, inferred that in reality they were solely a means of implementing that agreement.

403    Thus, in the circumstances of this case, the grounds of the decision enabled the Community judicature to exercise its review of the legality and the interested party to learn the explanations given for the measure adopted, to enable it to defend its interests and verify whether or not the decision was well founded.

404    Accordingly, the present plea must be rejected.

       6. *The sixth plea: insufficient reasoning concerning the status of the Community offshore markets and the United Kingdom offshore market in particular*

       a) Arguments of the parties

405    JFE-Kawasaki argues that, in the contested decision, the Commission failed to analyse the system of 'semi-protection' supposedly governing the United Kingdom offshore market for the products covered by the decision. Nor did it give reasons for its conclusion that an infringement existed also in the German, French and Italian offshore markets.

406    The Commission states that recital 62 to the contested decision clearly indicates that the United Kingdom offshore market was covered by the unlawful agreement in so far as it was 'semi-protected'. It states in its defence that Corus maintained its 'semi-protected' status by operating a system of price directives, control over which the European producers feared they might lose after the closure of Clydesdale plant.

       b) Findings of the Court

407    It must be observed that it is clear from recital 62 to the contested decision that the Commission took the view, on the basis of two items of evidence, namely Mr Verluca's statement of 17 September 1996 and the BSC interview note, that the United Kingdom offshore market was targeted by the penalised agreement, but enjoyed a form of limited protection whereby a competitor wishing to submit a tender within that market was required to consult Corus.

408    That information is sufficient in this case to show clearly and unequivocally the Commission's reasoning concerning that market. Accordingly, that statement of grounds enables the Community judicature to exercise its power of review and the persons concerned to know the grounds on which the measure was adopted, in accordance with the requirements of the case-law (see, in particular, Case T-266/97 *Vlaamse Televisie Maatschappij* v *Commission* [1999] ECR II-2329, paragraph 143).

409    As regards the offshore sector of the other Community markets concerned by the infringement found in Article 1 of the contested decision, it need merely be pointed out that the Commission has never drawn a distinction between the offshore and onshore sectors of those markets, either in the contested decision or before the Court. Accordingly, the lack of a specific statement of reasons relating to that sector of those markets in the contested decision does not in any way amount to insufficient reasoning.

410    Accordingly, the present plea must be rejected.

*7. The seventh and eighth pleas: insufficient statement of the reasons for the Commission's decision to penalise the Japanese producers and not the Latin American producers, and unequal treatment in that respect*

a) Arguments of the parties

411    JFE-Kawasaki states that the Commission ought to have set out the reasons for which it decided not to fine Latin American producers, as it did the Japanese, despite the fact that there was evidence, specifically, in the sharing key document, that they too agreed to apply a system of partial protection as regards Europe. In that connection, JFE-Kawasaki refers to the judgment in Case T-241/97 *Stork Amsterdam* v *Commission* [2000] ECR II-309 in which the Court of First Instance held that the Commission has a special obligation to give reasons for its decisions in cases where it decides to adopt a second, different decision on the basis of the same facts.

412    The Commission states that its decision to treat the two groups differently is justified by, amongst other things, the considerable difference in the evidence available to it concerning the Japanese and Latin American producers. The documents obtained by the Commission in the course of the investigation contain little evidence of Latin American participation in an illegal agreement, whereas there was much which pointed to the existence of an agreement with the Japanese.

b) Findings of the Court

413    It must be observed, first, that a decision such as the contested decision, although drafted and published in the form of a single decision, must be seen as a bundle of individual decisions finding, against each of the addressee undertakings, the infringement or infringements established against them and imposing on each, where appropriate, a fine. That rule derives from a reading, in conjunction with each other, of the judgments in Case T-227/95 *AssiDomän Kraft Products and Others* v *Commission* [1997] ECR II-1185, paragraph 56, and, on appeal, Case C-310/97 P *Commission* v *AssiDomän Kraft Products and Others* [1999] ECR I-5363, paragraph 49.

414    Accordingly, it need merely be pointed out that the Commission was not under any obligation to set out, in the contested decision, the reasons for which the Latin American producers were not amongst its addressees. The obligation to state the reasons on which a measure is based cannot embody an obligation for the institution from which it emanates to give reasons for the fact that it did not adopt other measures of a similar kind addressed to third parties.

415    Even if the arguments put forward in the context of the present pleas were to be understood as also alleging unequal treatment adversely affecting the Japanese applicants, they would still have to be rejected. Whilst certain evidence contained in the Commission file implies that the Latin American producers may also have participated in an infringement, it must be pointed out that that file contains clearly more solid evidence regarding the participation of the Japanese producers in an infringement. In particular, the witness evidence of Mr Verluca refers only to an attempt to reach an agreement with the Latin American producers, which, in his view, failed. Moreover, as the Commission points out in recital 86 to the contested decision, it is clear from the sharing key document that the Latin American producers, although appearing to have accepted certain restrictions on competition, formulated an express reservation concerning respect of the European market.

416    In those circumstances, the seventh and eighth pleas must be rejected.

*8. The ninth plea: flawed reasoning on the part of the Commission concerning sales at prices above variable cost*

a) Arguments of the parties

417    JFE-NKK states that the view given by the Commission in recital 137 to the contested decision to the effect that any sale at a price above variable cost would be worth making for the Japanese producers is not supported by reasoning to the requisite legal standard. In particular, JFE-NKK says that the Commission failed to gather sufficient information on that point.

418    The Commission did not reply expressly to this plea.

       b) Findings of the Court

419    It must be observed that the arguments put forward in support of this plea do not relate to defective reasoning. The statement criticised by JFE-NKK makes an assertion of an economic nature which is understandable in itself. Even if it were assumed to be correct, either generally or in the light of the circumstances of this case, it would have to be concluded that the Commission made an error of assessment and not that it failed adequately to state the reasons for its decision.

420    It must also be borne in mind in that connection that the allegation that the Commission failed to gather adequate information cannot constitute a failure to state reasons and is, rather, a substantive issue (see, to that effect, Case C-367/95 P *Commission* v *Sytraval and Brink's France* [1998] ECR I-1719, paragraph 72).

421    As regards the correctness of the assertion from the substantive point of view, it must be observed that, in any event, the issue is connected with one of the obstacles to Japanese imports alleged by the Japanese applicants. The argument alleging the existence of such barriers to trade has already been rejected from the substantive point of view in paragraph 353 above, on the ground that it relates solely to the anti-competitive effects of the infringement found in Article 1 of the contested decision which the Commission took into account on a subsidiary basis in the contested decision. The existence of the infringement, pursuing an anti-competitive purpose, found in Article 1 of the contested decision was established on the basis of the documentary evidence referred to in the contested decision and therefore the alleged non-existence of anti-competitive effects is irrelevant as regards the finding as to the existence of an infringement.

422    It follows that the present plea must be rejected.

       9. *The 10th plea: breach of the rights of the defence arising from inconsistencies between the statement of objections and the contested decision in relation to the geographical market referred to in Article 1 of that decision*

       a) Arguments of the parties

423    JFE-NKK and JFE-Kawasaki argue, in their reply, that the Commission infringed their rights of defence in that, by contrast with the contested decision, the SO did not deal with European offshore markets, or at least not in a sufficiently explicit manner, as is required by the requirements laid down, inter alia, in *Cement*, cited in paragraph 66 (in paragraph 504). JFE-Kawasaki observes in particular that it stated in its reply to the SO that, according to its reading of the SO, the Commission had excluded all offshore markets from the scope of its inquiry and that the Commission did not at any point inform it that it disputed that interpretation.

424    The Commission replies that JFE-Kawasaki raised this plea for the first time in its reply and that, since it is a new plea and not merely an argument, it is, pursuant to Article 48(2) of the Rules of Procedure, inadmissible in so far as Kawasaki is concerned. In any event, point 56 of the SO is, in essence, identical to recital 62 to the contested decision. In particular, both clearly indicate that the United Kingdom offshore market was indeed covered by the unlawful agreement.

       b) Findings of the Court

425    As regards the admissibility of this plea in Case T-71/00, it must be borne in mind that a breach of the rights of the defence, which by its nature is subjective, does not fall within the scope of an infringement of essential procedural requirements and, therefore, must not be raised on a party's own initiative (see, to that effect, *Musique diffusion française and Others* v *Commission*, cited in paragraph 56 above, paragraph 30; Case 107/82 *AEG* v *Commission* [1983] ECR 3151, paragraph 30; Case T-352/94 *Mo och Domsjö* v *Commission* [1998] ECR II-1989, paragraph 74). Consequently, this plea must be rejected as inadmissible, under Article 48(2) of the Rules of Procedure, and cannot be examined in Case T-71/00 since JFE-Kawasaki raised it for the first time in its reply.

426     In the context of Case T-67/00, the present plea must be rejected from the substantive point of view. As the Commission correctly points out, paragraph 56 of the SO is substantially identical, as regards the definition of the markets concerned, to recital 62 to the contested decision and there can therefore be no breach of the rights of the defence in that connection. As regards the absence of explicit references to the offshore sector of Community markets other than the United Kingdom, it is accounted for by the fact that the Commission never drew a distinction between the onshore and offshore sectors regarding those markets (see paragraph 409 above).

        10. *The 11th plea: breach of the rights of the defence arising from inconsistencies between the statement of objections and the contested decision as regards the products concerned*

        a) Arguments of the parties

427     JFE-NKK alleges that the Commission's definition of the market in its SO is broader than that given in Article 1 of the contested decision, the former relating to all OCTG (in addition to project line pipe), the latter being restricted to standard thread OCTG. JFE-NKK takes the view that that change distorts the definition of the relevant market in the contested decision and amounts to an infringement of its rights of defence and thus also of Article 2(2) of Commission Regulation (EC) No 2842/98 of 22 December 1998 on the hearing of parties in certain proceedings under Articles [81 and 82 EC] (OJ 1998 L 354, p. 18). The two definitions vary substantially, altering the scope of the infringement alleged against JFE-NKK. JFE-NKK also maintains that, in accordance with *Cement*, cited in paragraph 66 above (paragraphs 2212 to 2225), the fact that the Commission's definition of the product scope of the alleged agreement was wider in the SO than in the final decision was sufficient for the decision in that case to be annulled.

428     The Commission observes that the paragraphs of the *Cement* judgment on which JFE-NKK relies address the question whether or not the agreements alleged in that case extended to a certain geographical region. That question is of no relevance in the present case. On the other hand, it is clear from paragraphs 852 to 860 of the judgment in *Cement* that, where there is a discrepancy between an SO and a final decision, the rights of the defence are only infringed where the final decision contains a complaint which was not set out in the SO in sufficient detail to enable the addressees of the decision to defend themselves. Since JFE-NKK makes no allegation to that effect as regards the definition of the products covered by the contested decision, the present plea should be rejected. If, as is clear from the SO, the Commission had had in its possession sufficient evidence in relation to a wider market than that to which the contested decision finally relates, then a fortiori it had sufficient evidence in relation to the products covered by the contested decision.

        b) Findings of the Court

429     It must be observed at the outset that the rights of the defence are not breached by an inconsistency between the SO and the final decision unless a criticism contained in the latter had not been set out in the former sufficiently clearly to enable the addressees to defend themselves (see, to that effect, *Ciment*, cited in paragraph 66 above, paragraphs 852 to 860).

430     In principle, the Commission cannot be criticised for making the scope of a final decision narrower than that of the preceding SO, in so far as the Commission must hear the views of the addressees and, if appropriate, take account of the observations submitted by them in response to the objections made, specifically in order to observe their rights of defence.

431     It must be pointed out that in this case the Commission's action in finding the existence of an infringement of narrower scope than that originally outlined in the SO was logical, or indeed necessary, in the circumstances of this case, in view of the fact, in particular, that Mr Verluca's statements relate only to standard thread OCTG tubes and project line pipes. There is no reason, in this case, to suppose that the fact that the Commission limited the scope of the contested decision to two of the products mentioned in the SO prevented JFE-NKK from properly defending itself at the stage of the administrative procedure with regard to those two products. Moreover, JFE-NKK has not explained to the Court how the presentation of its arguments purporting to exonerate it might have been different if the scope of the SO had been more limited.

432    Accordingly, the present plea must be rejected.

       11. *The 12th plea: breach of the rights of the defence deriving from the lack of an adequate analysis of the voluntary restraint agreements in the statement of objections and from inconsistencies between the statement of objections and the contested decision regarding the scope of those agreements*

       a) Arguments of the parties

433    JFE-NKK argues that, in the contested decision, the Commission departed radically from the position it had adopted earlier during the administrative procedure with regard to the voluntary restraint agreements. According to JFE-NKK, the Commission must, in the SO, present an analysis of the effect of the agreements in question on its provisional assessment of the infringement which it alleges, and it failed to do so. In the absence of such an analysis, it was impossible for the addressees of the SO to make known their point of view on that matter before the Commission adopted its definitive position, set out in recitals 108 and 166 to the contested decision (*Musique diffusion française* v *Commission*, cited in paragraph 56 above, paragraph 14). JFE-NKK was thus not alerted, at the time of lodging its reply to the SO, to the need to furnish evidence of the extension of the voluntary restraint agreements, and consequently its rights of defence were infringed.

434    The Commission did not expressly respond to this plea.

       b) Findings of the Court

435    It must be borne in mind that the Commission took account of the existence of the voluntary restraint agreements in the contested decision solely in forming the view that it was not appropriate to take into account, particularly for the purpose of determining the amount of the fines, the existence of an infringement for the period during which those agreements were in force (recitals 108 and 164 to the contested decision). Thus, the difference between the SO and the contested decision alleged by JFE-NKK is favourable to the latter and cannot therefore, in principle, harm its interests.

436    However, it has been held in paragraphs 342 to 346 above, in accordance with the arguments to that effect put forward by the Japanese applicants, that the Commission misapplied, in the contested decision, its own approach of finding the existence of an infringement only from the time when the voluntary restraint agreements ceased to be in force.

437    It follows that, if the Japanese applicants had been informed, before the adoption of the contested decision, that the Commission envisaged taking that approach regarding the duration of the infringement, they might perhaps have produced evidence at the stage of the administrative procedure to show that the voluntary restraint agreements remained in force until 31 December 1990.

438    Nevertheless, it must be observed that JFE-NKK had an opportunity to make known its observations on the SO, including the details thereof relating to the duration of the infringement. It must be observed, more specifically, that, according to the SO, the infringement had commenced in 1977. In those circumstances, JFE-NKK could have realised the relevance of the voluntary restraint agreements in that connection and informed the Commission that the infringement found in Article 1 of the contested decision had thus not commenced, or should not have been taken into account, until after the expiry of the voluntary restraint agreements at the end of 1990 at the earliest. In fact, JFE-NKK did not refer to the existence of the voluntary restraint agreements in its reply to the SO nor did it supply the Commission with the evidence later produced to the Court (see paragraph 345 above).

439    It must also be remembered that, according to the Commission, its approach to this issue in itself constitutes a concession to the Japanese producers (see paragraph 338 et seq. above).

440    Thus, in this case, it would be contrary to the logic inherent in the concept of rights of the defence to consider that the Commission was required, before applying what it regarded as a concession in such a way as to limit the duration of the infringement in the contested decision, to ask the addressees of the SO to give their views again regarding the relevance and scope of that concession.

441    Regardless of whether or not that concession was classified correctly, it must be observed that the impact of the voluntary restraint agreements does not in any way constitute an additional objection and did not in any way adversely affect the interests of the Japanese applicants, since, on the contrary, it gave rise to a reduction of the duration of the infringement.

442    Whilst it is true that the error on the part of the Commission justifies a reduction of the duration of the infringement in the context of these proceedings, there is no reason to conclude that the Commission breached the rights of the defence of JFE-NKK in that regard.

443    Finally, it must be observed that the Court has drawn the appropriate inferences, as regards the amount of the fines, from the error observed above in connection with the issue of the duration of the infringement to which the present plea relates (see paragraphs 574, 588 and 590 below).

444    In the light of the foregoing, the present plea must be rejected.

       12. *The 13th plea: breach of the rights of the defence deriving from inconsistencies between the statement of objections and the contested decision regarding the scope attributed to the infringement found in Article 2 of the decision*

       a) Arguments of the parties

445    JFE-NKK and Sumitomo both advance this plea. JFE-NKK observes, at the outset, that respect for the rights of the defence is a fundamental right and forms part of the broader right to a fair hearing, which is enshrined in Article 6 of the ECHR and, as such, is one of the general principles the observance of which the Community Courts must ensure (Case 11/70 *Internationale Handelsgesellschaft* [1970] ECR 1125).

446    However, in the SO, the Commission merely asserted, at paragraph 63, that the purpose of the agreement for sharing between Vallourec, Dalmine and Mannesmann the supply of plain-end pipes to Corus was to keep a national producer in the United Kingdom, with a view to ensuring compliance with the Fundamental Rules in the market of that State by retaining the national status of that market within the meaning of the rules. According to Sumitomo and JFE-NKK, the Commission made no suggestion, when dealing with this point, that it regarded the agreement simply as a means of implementing the principle of protection of national markets underlying the arrangements for sharing the Japanese and European OCTG and line pipe markets (recital 164 to the contested decision).

447    Sumitomo maintains that, had the SO contained such an allegation, it would have replied to it in express terms and that it was thus deprived of the opportunity to make known effectively its view on the correctness and relevance of the alleged facts, as is required by Articles 2 and 3 of Regulation No 2842/98 and the fundamental Community law principle of the right to a fair hearing.

448    In support of that claim, Sumitomo and JFE-NKK submit that, according to settled case-law, the Commission must state its case fully so that the addressee of an SO is in a position to make known effectively, during the administrative procedure, its views on the correctness and relevance of the facts and circumstances alleged (Case 17/74 *Transocean Marine Paint Association* v *Commission* [1974] ECR 1063, paragraph 15; Opinion of Advocate General Warner in Case 113/77 *NTN Toyo Bearing* v *Council* [1979] ECR 1185, pp. 1212 and 1261; Case 264/82 *Timex* v *Council and Commission* [1985] ECR 849, paragraphs 24 to 30, Case C-49/88 *Al-Jubail Fertilizer* v *Commission* [1991] ECR I-3187, paragraphs 15 to 17, *Mo och Domsjö* v *Commission*, cited in paragraph 425 above, paragraph 63, and *Cement*, cited in paragraph 66 above, paragraphs 106 and 476). It is also established case-law that an SO must set out the conclusions that the Commission intends to draw from the facts, documents and legal considerations of the case, which it failed properly to do in the present case (Case C-62/86 *AKZO* v *Commission* [1991] ECR I-3359, paragraph 29, *Mo och Domsjö*, cited above, paragraph 63; and Case T-9/89 *Hüls* v *Commission* [1992] ECR II-499, paragraph 39). Finally, the principle of protection of the rights of the defence prohibits the Commission from deviating from the facts reported in the SO when it prepares its final decision (Case 85/76 *Hoffmann-La Roche* v *Commission* [1979] ECR 461, paragraph 11).

449    The Commission replies, first of all, that it set out in recital 164 to the contested decision the reasons

for which it decided not to impose an additional fine on the Community producers in respect of the infringement found in Article 2 of the decision. The Commission reiterates that it avails the Japanese applicants nothing to contest that recital because the fine imposed on them reflects the infringement of Article 81 EC set out in Article 1 of the contested decision.

450    In any event, the legal analysis given in the SO clearly explains the link between the two infringements: the purpose of the agreements between Community producers which governed Corus's purchase of plain-end pipes was to keep Corus as a domestic producer in the United Kingdom in order to ensure compliance with the Fundamental Rules in the finished products market of that Member State (see, in particular, point 144 of the SO). Recital 164 to the contested decision is merely a synthesis of the points made in the SO. It does not represent an incursion upon the applicant's rights of defence inasmuch as Sumitomo and JFE-NKK had an opportunity to formulate any observations they wished to make on the subject of the agreements between European producers with full knowledge of the facts.

       b) Findings of the Court

451    First, as regards the criticism concerning the existence of the infringement found in Article 2 of the contested decision, the Commission's argument that the Japanese applicants have no legal interest in attacking the Commission's assessment as set out in recital 164 to the contested decision regarding the non-existent relationship between the two infringements found therein must be rejected. Whilst those applicants are not directly affected by the finding of the second infringement, they are nevertheless entitled to contend, as they have done in support of their claim for reduction of the fine, that, in so far as no fine was imposed on the European producers for the second infringement, they have suffered unequal treatment. The fact that the Commission considered that the supply contracts, which gave rise to the second infringement, were simply a means of committing the first infringement found in particular against the Japanese applicants implies that the latter have an interest in challenging the finding of that link, since the second infringement is relied on as a basis for the first, of which they are accused.

452    Nevertheless, this plea must be rejected.

453    The Commission's obligation at the SO stage is limited to setting out its objections and describing clearly the facts on which it relied and the classification attributed to them, so that its addressees can properly defend themselves (see, to that effect, the judgments cited by the applicants, *AKZO* v *Commission*, cited in paragraph 448 above, paragraph 29, and *Mo och Domsjö* v *Commission*, cited in paragraph 425 above, paragraph 63). The Commission is not obliged to set out the conclusions which it draws from facts, documents and legal arguments.

454    It must also be observed that the judgment in *Hüls* v *Commission*, cited in paragraph 448 above, specifically relied on by the applicants (end of paragraph 39) relates to identification of the circumstances in which the Commission may rely, in its final decision, on documents which, although annexed to the SO, were not expressly mentioned in it.

455    In this case, the only relevant difference between the SO paragraph at issue, namely paragraph 144, and recital 164 to the contested decision consists in the fact that, in the latter, the Commission considered that the contracts making up the second infringement 'represented only a means of ensuring the application' of the first infringement, whereas the SO confined itself to stating that the 'purpose' of the supply contracts was to maintain the domestic status of the United Kingdom market under the Fundamental Rules.

456    It has been held, in paragraph 364 above, that the view expressed by the Commission in the contested decision is incorrect in so far as the contracts constituting the second infringement pursued more than one purpose. However, even if it is assumed that a difference of analysis can be perceived between the SO and the contested decision in that respect, it is clear that the addressees of the SO had an opportunity to submit their observations on the key concept underlying the Commission's approach, namely the idea that the European producers concluded contracts constituting the second infringement in order to strengthen the application of the Fundamental Rules in the United Kingdom offshore market.

457    In those circumstances, there was no breach of the rights of the defence in that respect.

458    Finally, it must be observed that the Court has drawn the appropriate inferences, as regards the
       amounts of the fines, from the analytical error with which the present plea is concerned in the context
       of the plea alleging unequal treatment (see paragraphs 574, 588 and 590 below).

       13. *The 14th plea: the illegality of the Commission decision of 25 November 1994 to authorise the
       investigations of 1 and 2 December 1994*

       a) Arguments of the parties

459    According to the four Japanese applicants, the decision of 25 November 1994, on the basis of which the
       Commission carried out its investigations of 1 and 2 December 1994, is vitiated by illegality because it
       empowered Commission officials to carry out their own investigation under Article 81 EC whilst at the
       same time recognising that the EFTA Surveillance Authority had exclusive competence in this matter,
       under Article 56 of the EEA Agreement (hereinafter 'Article 56 EEA'). Adopting the decision of 25
       November 1994 on this dual legal basis was unlawful.

460    The Commission's decision of 25 November 1994 was adopted pursuant to a request made of it by a
       member of the EFTA Surveillance Authority with responsibility for competition matters so that checks
       could be made within the Community in accordance with Article 8(3) of Protocol 23 to the EEA
       Agreement ('Protocol 23') as part of an investigation the surveillance authority was itself carrying out.
       That step was authorised by decision of the surveillance authority of 17 November 1994. The
       Commission expressly acknowledged, in point 1 of its SO, that in conducting the inquiries of 1 and 2
       December 1994 it was acting as agent of the EFTA Surveillance Authority. That analysis is confirmed by
       the wording of Article 8(3) of Protocol 23 to the EEA Agreement, which enables the competent
       surveillance authority, as defined in Article 56 of the EEA Agreement, to request another surveillance
       authority to undertake investigations within its territory. The Japanese applicants also observe that,
       according to Article 8(5) of Protocol 23, every authority is under an obligation, when acting on behalf of
       another authority, to send its principal all the information obtained immediately on completion of its
       investigation.

461    The applicants observe that Article 56 EEA, to which Article 8(3) of Protocol 23 makes express
       reference, provides for a strict division of powers between the two surveillance authorities in the
       handling of individual competition cases. They say that Article 56 EEA thus provides for a 'one-stop-
       shop' approach whereby the processing of all possible individual cases that could arise under Article 53
       EEA is divided between the Commission and the EFTA Surveillance Authority on the basis of specific
       criteria which rule out any sharing of powers in the same matter. Contrary to the Commission's claim,
       the Court of Justice stated in Opinion 1/92 of 10 April 1992 ([1992] ECR I-2821) that that strict division
       of powers is not inconsistent with the division of jurisdiction in the Community and is thus compatible
       with the EC Treaty.

462    It follows that, by adopting its decision of 25 November 1994 acceding to the request for administrative
       assistance within the territory of the Community made in the name of the EFTA Surveillance Authority,
       the Commission necessarily recognised that the surveillance authority had exclusive competence to deal
       with the matter at the time. The Japanese applicants argue that, according to the wording of Article 56
       EEA, infringements which affect trade between Member States of the European Community and which
       therefore infringe Article 81 EC fall within the exclusive competence of the Commission. Had the
       Commission thought, when adopting its decision of 25 November 1994, that it was competent to
       investigate the matter under Article 81 EC, it should have taken issue with the request for assistance
       from the EFTA Surveillance Authority, asked the surveillance authority to close its file and commenced
       its own investigation. In that connection, Nippon observes that the decision of the EFTA Surveillance
       Authority of 17 November 1994 confirms, in both its preamble and its operative part, that it was
       concerned solely with practices in the Norwegian offshore market. It is therefore clear that the EFTA
       Surveillance Authority and the Commission both took the view, at that point, that the surveillance
       authority was the 'competent authority' for the purposes of inquiring into the practices in issue.

463    By deciding, on 25 November 1994, to carry out its own contemporaneous inquiry with a view to
       establishing whether Article 81 EC and/or Article 53 EEA had been infringed, whilst the EFTA
       Surveillance Authority was competent at that stage to inquire into that matter, the Commission
       infringed Article 56(1) EEA. Indeed, as the Commission noted in its SO, it was not until 6 December
       1995 that the EFTA Surveillance Authority forwarded its file to the Commission, on the ground that the

practices under investigation were having an effect on intra-Community trade. That step would make no sense had the Commission already had competence to investigate the matter. The Commission in fact initiated a new inquiry procedure following communication of the file.

464    The Commission's claim that Article 56 EEA relates solely to the question of competence to adopt decisions recording infringements is undermined by Article 55 of the same agreement which provides that '[t]he competent surveillance authority, as provided for in Article 56, shall investigate cases of suspected infringement'. Similarly, Article 109 of the EEA Agreement ('Article 109 EEA'), which the Court held in Opinion 1/92, cited in paragraph 461 above, to be relevant to assessing the compatibility of Article 56 EEA with the EC Treaty, confirms that exclusive competence applies also to the investigation phase. Indeed, Article 109(4) EEA provides that the Commission and the EFTA Surveillance Authority must each examine the complaints falling within their competence and must, as appropriate, pass to the other body any complaints which fall within the competence of that body. Under Article 109(5) EEA, in case of disagreement between the two bodies with regard to the action to be taken in relation to a complaint or with regard to the result of an investigation, either of the bodies may refer the matter to the EEA Joint Committee. It makes no sense to argue that the strict division of competence would apply in the investigatory phase in cases involving complaints while it would not in cases involving *ex officio* investigations.

465    Taking all of those factors into account, Protocol 23, and in particular Article 10(3), on which the Commission relies, should be interpreted in the light of Article 109 EEA. Consequently, any information obtained during the course of an investigation carried out by, or on behalf of, the EFTA Surveillance Authority and included in the file sent to the Commission by the authority pursuant to Article 10(3) of Protocol 23 can be used by the Commission only for the purpose of applying the provisions of the EEA Agreement. Contrary to the Commission's assertion, that interpretation does not render Article 10(3) of the protocol nugatory. In any event, the wording and general structure of Article 10 of Protocol 23 confirm that only one authority can be competent to carry out an investigation at any one time.

466    Given that the Commission's decision of 25 November 1994 to carry out the investigations which took place on 1 and 2 December 1994 was unlawful, according to the Japanese applicants, all documentary evidence obtained in the course of those investigations should be removed from the file in accordance with the case-law of the Court of Justice and the Court of First Instance (order of the President of the Court of Justice of 26 March 1987 in Case 46/87 R *Hoechst* v *Commission* [1987] ECR 1549, paragraph 34, and the judgment in *PVC II*, cited in paragraph 61 above, paragraph 395). The Commission ought to have sought information from the firms concerned, as it did in *PVC II* (paragraphs 474 to 476).

467    The documentary evidence obtained by the Commission on behalf of the EFTA Surveillance Authority should be removed from the file in the current proceedings not only because the Commission investigation decision of 25 November 1994 was unlawful, but also because the purpose of the present proceedings is different from that of the EFTA Surveillance Authority's investigation.

468    Article 9(1) of Protocol 23 provides that information acquired pursuant to the protocol may only be used for the purposes of the procedures provided for in Articles 53 and 54 of the EEA Agreement, in much the same way as, under Article 20 of Regulation No 17, information may only be used for the purpose for which it was obtained. As regards this latter provision, it is settled case-law that the right to professional secrecy and the rights of defence of a company are violated when the Commission, or a national authority as the case may be, relies on evidence against that company which was obtained during an investigation carried out for a different purpose (Case 85/87 *Dow Benelux* v *Commission* [1989] ECR 3137, paragraph 18, Case C-67/91 *Asociación Española de Banca Privada and Others* ('*Spanish Banks*') [1992] ECR I-4785, paragraph 35 et seq., Case C-60/92 *Otto* [1993] ECR I-5683, paragraph 20, and *PVC II*, paragraph 472).

469    In the *Spanish Banks* case, in particular, the Court of Justice held that information obtained by the Commission in the course of an investigation carried out pursuant to Article 81 EC could not be used by national competition authorities, even where it is the responsibility of those authorities to apply the same provision of Community law (paragraph 32 of the judgment). Similarly, in *Otto*, the Court of Justice held that information obtained in the course of national proceedings may not be used by the Commission to establish an infringement of the Community competition rules (paragraph 20 of the judgment). Lastly, JFE-Kawasaki points out that, in *PVC II*, the Court of First Instance relied on the fact that the Commission had requested anew the production of documents which it had already obtained in

an investigation conducted for a different purpose in finding that there had not been a violation of the rights of the defence in that case (see the last part of paragraph 466 above).

470     According to the Japanese applicants, the documents obtained in the course of the investigation carried out by the EFTA Surveillance Authority ought in this case, for the same reasons, also to be removed from the file in this case. The purpose of that investigation was markedly different from that of the investigation subsequently launched by the Commission. The Commission issued an SO relating to an alleged agreement governed exclusively by Article 81 EC, whereas it is clear from the decision of the Surveillance Authority of 17 November 1994 that the authority's investigation was conducted under Article 53 EEA and related solely to practices in the Norwegian offshore market.

471     The two investigations, according to the Japanese applicants, thus have different legal bases. By analogy with the judgments in *Spanish Banks* and *Otto*, cited in paragraph 468 above, and taking into account the wording of Article 9(1) of Protocol 23, the proper view is therefore that the probative value of information obtained in the context of an EFTA Surveillance Authority investigation is defined exclusively by EEA law and use of the information is confined exclusively to proceedings governed by the internal rules of the authority, that is to say Protocol 4 to the agreement between the EFTA States on the institution of a surveillance authority and a Court of Justice.

472     In view of the procedural error described above, it is necessary to remove from the file, in particular, the note 'Quelques informations', Vallourec's note headed 'RB à M. Patrier' appended to a letter dated 15 May 1991, the facsimile letter sent by Mannesmann on 16 January 1991 headed 'Vancouver List', reproduced at page 4782 of the Commission's file, the facsimile sent by Sumitomo on 19 February 1991 headed 'Price List', reproduced at page 4789 of the Commission's file, the Paper for Presidents, the '(g) Japanese' document, the note on the meeting of 24 July 1990, Mannesmann's document of 27 January 1986 headed 'Stahlröhrmarkt 1970-1985' ('Steel tube market 1970-1985'), reproduced at page 2128 of the Commission's file and Dalmine's market evolution document.

473     The Court should also take no account of statements made by undertakings under investigation in response to requests for information and questions put by the Commission relating to, or based upon, documents which should have been removed from the file for the reasons set out above. Using such statements would be unlawful in the same way as would be use of the documents themselves because, without the documents, the Commission would not have been in a position to ask the specific questions it did ask or to obtain the additional information contained in the statements. It is therefore necessary to remove from the file in the present case Mr Verluca's statements of 17 September 1996 and 14 October 1996, Mr Becher's reply, Corus's replies, Nippon's replies of 17 November and 4 December 1997 set out at pages 13544 and 14157 of the Commission's file, Sumitomo's replies of 31 October and 16 December 1997 set out at pages 14168 and 14430 of the Commission's file, JFE-NKK's replies of 7 November and 15 December 1997, set out at pages 14451 and 14491 of the Commission's file, JFE-Kawasaki's replies of 3 November and 18 December 1997, set out at pages 14519 and 14615 of the Commission's file and, probably, the document 'Verification auprès de Vallourec'.

474     According to Nippon, it is also necessary to remove from the file certain other documents on the ground that they relate to a period prior to the investigations of 1 and 2 December 1994, namely Sumitomo's facsimile to Vallourec of 9 October 1987, reproduced at page 4283 of the Commission's file, the minutes of the meeting with JF, the document 'Parts de marché estimés par SMI' of 19 September 1991, reproduced at page 4848 of the Commission's file, the document headed 'Japan Exports of Seamless Pipe (Jan-Sep 95)', reproduced at page 8514 of the Commission's file, the document headed 'OCTG Seamless pipe supply record 1993 (Jan-Sep)', reproduced at page 8692 of the Commission's file, the note 'Renouvellement du contrat VAM BSC', the note 'Entretien BSC', the note 'Réflexions stratégiques', the note 'Réflexions sur le contrat VAM', Vallourec's note headed 'Relations avec JFE-Kawasaki' of 29 August 1991, reproduced at page 15802 of the Commission's file, and Vallourec's note headed 'Licence VAM à Siderca' of 20 June 1994, reproduced at page 15809 of the Commission's file.

475     Given that the documentary evidence and statements just mentioned were unlawfully obtained, the contested decision itself is vitiated by illegality in particular because the rights of defence of the firms concerned have been infringed. According to JFE-Kawasaki, that fact alone should entail the annulment of the contested decision. The Japanese applicants are in any event agreed that all evidence obtained on the basis of an unlawful decision should be removed from the file, otherwise the contested decision should be annulled to the extent to which it is based on such evidence (order in *Hoechst* v *Commission*,

cited in paragraph 466 above, paragraph 34).

476   The Commission states that it did not infringe Article 53 EEA by authorising its officials and agents to inquire into possible infringements of Article 81 EC, notably by means of its decision of 25 November 1994, whilst at the same time authorising them to inquire, on the basis of the same factual evidence, into possible infringement of Article 53 EEA on behalf of the EFTA Surveillance Authority, as it was asked to do. The EFTA Surveillance Authority did not, in fact, have exclusive competence to conduct an inquiry at the time when that decision was taken. According to the Commission, Article 53 EEA contains no provision which would render Article 81 EC inapplicable where the criteria for application of both Article 81 EC and Article 53 EEA are satisfied. That interpretation of Article 53 EEA is confirmed by the Court of Justice in Opinion 1/91 of 14 December 1991 (ECR I-6079) and Opinion 1/92, cited in paragraph 461 above.

477   Thus, according to the Commission, such an investigation by the EFTA Surveillance Authority could not impinge upon the powers of the Community within its field of competence. The Commission remained free to inquire into infringements of Article 81 EC. Indeed, it was the competent surveillance authority to do so under Article 55 of the EEA Agreement

478   The Commission observes that in any event it must still have had the right to conduct an inquiry, at least for the purpose of establishing whether or not it was the competent authority in the case at hand because of the presence of effects on trade between Member States.

479   In response to the Japanese applicants' arguments based on case-law, the Commission states that the fact that the arrangements put in place by the EEA Agreement include a mechanism for transferring cases from one authority to another distinguishes the present case from that which gave rise to the judgment in *Spanish Banks* (paragraph 468 above) because the Community system does not include any similar mechanism for transferring cases between the Commission and the national competition authorities. Moreover, the judgment in *PVC II* (paragraph 61 above) is irrelevant to the present case because in that case the subject-matter of the two proceedings in which the same information was obtained was different.

480   Furthermore, the evidence gathered by the Commission was not gathered solely for the purpose of a proceeding different from the one which led to the contested decision but was gathered pursuant to investigation decisions which expressly cited possible infringements of Article 81 EC and were conducted on a dual legal basis. Because of that dual legal basis, the decision of 25 November 1994 is lawful in any event.

481   At the hearing, the EFTA Surveillance Authority submitted observations only on the present plea. In essence it aligned itself with the arguments put forward by the Commission.

      b) Findings of the Court

482   It must be borne in mind first of all that, in its Opinion 1/92, cited in paragraph 461 above, the Court declared that the provisions of the EEA Agreement referred to it, in particular Article 56 thereof on the division of competences concerning competition between the EFTA Surveillance Authority and the Commission, were compatible with the EC Treaty.

483   In arriving at that conclusion regarding that article, the Court observed, in particular, in paragraphs 40 and 41 of that opinion that the competence of the Community to conclude international agreements in the area of competition necessarily carries with it the possibility, for the Community, of accepting rules of agreements concerning the sharing of competences as between contracting parties in the field of competition, provided that those rules do not change the nature of the powers of the Community and of its institutions as conceived in the Treaty.

484   It follows therefore from Opinion 1/92 that Article 56 EEA does not undermine the competences of the Community as provided for by the EC Treaty in the field of competition.

485   In that connection, it is clear both from a reading of Article 56 EEA itself and from the detailed description of that provision contained in the introductory part of Opinion 1/92, in the part entitled

'Summary of the Commission's request' that all cases falling within Community competence in the field of competition before the entry into force of the EEA agreement remain subject to the exclusive competence of the Commission after its entry into force. All the cases in which trade between Member States of the European Community is affected continue to fall within the Commission's competence, regardless of whether or not there is also an impact on trade between the Community and the EFTA States and/or between the EFTA States themselves.

486    In the light of the foregoing considerations, it must be held that the provisions of the EEA Agreement cannot be interpreted in such a way as to deprive the Commission, even temporarily, of its competence to apply Article 81 EC to an anti-competitive agreement affecting trade between Member States of the Community.

487    It must be observed in this case that the Commission, in its decision of 25 November 1994 opening an investigation in the steel tube sector, relied in particular on Article 81 EC and Regulation No 17 as a legal basis. In the context of the investigation, it exercised the powers vested in it by Regulation No 17 in order to gather the evidence used in the contested decision and, finally, penalised the offending agreements solely on the basis of Article 81 EC in Articles 1 and 2 of that decision.

488    Accordingly, it is appropriate to reply expressly to the specific arguments of the Japanese applicants concerning the illegality of the dual legal basis used by the Commission in its decision of 25 November 1994, namely not only Article 81 EC and Regulation No 17 but also Article 53 EEA and the decision of the EFTA Surveillance Authority of 17 November 1994 giving authority for a request for assistance to be sent to the Commission.

489    It must be observed that, in this case, the Commission could not have reasonably known with certainty at the time of adoption of its decision of 25 November 1994 what the correct legal basis was, since the answer to that question depended on the geographical scope of the possible infringement and, more specifically, on the question whether the infringement affected trade between Member States of the Community. The Japanese applicants correctly observe that the EEA Agreement, in particular Articles 56 and 109 thereof, establishes a 'one-stop-shop' for the application of the competition rules, a system which is applicable as from the investigation stage, so that each of the two authorities is under an obligation to cease handling the matter and to transfer its file to the other authority if it determines that the other authority is the competent authority.

490    However, that 'one-stop' concept cannot apply from the start of the investigation if it is not possible at that stage to determine which authority is competent, otherwise, in the event of the EFTA Surveillance Authority being seised of the case but the Commission ultimately proving to be the competent authority, there would be a breach of the principle, described above, whereby the provisions of the EEA Agreement cannot deprive the Commission of its power to investigate anti-competitive conduct affecting trade between Member States of the Community.

491    It must also be observed in that connection that the mere fact that a Community institution relies for a measure both on a correct legal basis and on one or more other legal bases which subsequently prove to have been inappropriate cannot in itself entail the result that the measure in question is vitiated (see, to that effect, Case T-213/00 *CMA CGM and Others* v *Commission* [2003] ECR II-913, paragraphs 79 to 103, in particular paragraph 94).

492    It follows that the Commission was competent, at all times, to conduct inquiries concerning the anti-competitive agreements ultimately penalised in the contested decision despite the fact that the EFTA Surveillance Authority had already launched an investigation concerning possible practices of a similar nature in the Norwegian market. Consequently, the other arguments put forward by the Japanese applicants, in particular the argument based on the *Spanish Banks* judgment (see paragraphs 468 and 469 above), are not relevant to this case.

493    In those circumstances, the present plea must be rejected.

B – *The pleas concerning reduction of the fines*

1. *The first and second pleas: defective statement of reasons concerning the failure to apply to JFE-NKK*

*the Leniency Notice and an error in that regard*

a) Arguments of the parties

494    JFE-NKK argues that the Commission failed in recital 175 to the contested decision to give reasons for its refusal properly to apply in its favour the provisions of its Leniency Notice.

495    JFE-NKK maintains that it responded in detail to the four requests for information addressed to it by the Commission. That warrants a reduction of 10% of the fine imposed on it in accordance with the judgment of the Court of Justice in Case 48/69 *ICI* v *Commission* [1972] ECR 619. Moreover, it was the only producer to provide the Commission with the exact dates, names of participants at and locations of the meetings between the European and Japanese producers. That, according to the same case-law, warrants a 20% reduction in the fine.

496    The Commission says that JFE-NKK's argument is unfounded: recital 175 to the contested decision states that there was no effective cooperation in its case. According to the Leniency Notice, the party concerned would have at least to inform the Commission that it did not substantially contest the materiality of the facts set out in the SO, and JFE-NKK did not do so.

b) Findings of the Court

497    It need merely be stated that recital 175 to the contested decision states that there was 'no effective cooperation' on the part of JFE-NKK in the context of the investigation conducted in this case. Whether or not that finding is correct, it must be pointed out that it constitutes a sufficient statement of the reasons for which the Commission refused to grant a reduction of the fine imposed on JFE-NKK in respect of cooperation.

498    Even if it could be assumed that the present pleas could be regarded as alleging misapplication of the Leniency Notice, they must be rejected.

499    It must be borne in mind that, in order to justify reduction of the fine for cooperation, an undertaking's conduct must facilitate the Commission's task of identifying and penalising infringements of the Community competition rules (see Case T-347/94 *Mayr-Meinhof* v *Commission* [1998] ECR II-1751, paragraph 309, and the case-law cited therein).

500    In this case, it must be observed that, although the answers given to the questions by JFE-NKK, in particular the indications given in its reply of 7 November 1997 concerning the dates and places of several meetings of the Europe-Japan Club, were of some use to the Commission, they merely confirmed certain items of information already given by Mr Verluca in the statements he made on behalf of Vallourec in 1996. Accordingly, it is not correct that JFE-NKK was the only undertaking to supply such information.

501    Admittedly, in so far as undertakings supply the Commission, at the same stage of the administrative procedure and in similar circumstances, with similar information concerning the matters regarding which they are accused, the degrees of cooperation afforded by them must be regarded as comparable (see, by analogy, *Krupp Thyssen Stainless and Acciai Speciali Terni* v *Commission*, cited in paragraph 50 above, paragraphs 243 to 245).

502    However, in this case, Vallourec explicitly recognised, through Mr Verluca's statements, that the meetings in question were held in the context of a market-sharing agreement concerning in particular the national markets of the four European producers. Mr Verluca observed that each member of the Europe-Japan Club was required to respect the national markets of each of the other members of that club, and made it clear that the United Kingdom offshore market had a special status, being 'semi-protected'. He also specified the duration and the method of operation of the market-sharing agreement. In contrast, JFE-NKK contended, in its reply of 7 November 1997, that although the European producers asked it to respect their national markets, it never responded favourably to those requests.

503    It must be observed that Mr Verluca did not confine himself to answering the questions asked by the
       Commission during the first investigation carried out at Vallourec in September 1996. It is clear from Mr
       Verluca's statements, taken as a whole, that he genuinely wished to recognise the existence of an
       infringement and to cooperate effectively in the investigation being conducted by the Commission. JFE-
       NKK, on the other hand, merely provided the factual information which the Commission asked it to
       provide, whilst at the same time rejecting any interpretation thereof which was capable of establishing
       the existence of an infringement on its part.

504    It must be considered that the usefulness of the information provided by JFE-NKK derives solely from
       the fact that it corroborates, to some extent, the statements by Mr Verluca which were already in the
       Commission's possession. Consequently, the disclosure of that information did not significantly facilitate
       the Commission's task and, therefore, was not sufficient to justify a reduction, in respect of
       cooperation, of the fine imposed.

505    For the rest, the Commission correctly found that JFE-NKK did not inform it at any time that it admitted
       the materiality of the facts during the administrative procedure. Moreover, it has continued to contest
       them before the Court.

506    In those circumstances, it must be held that JFE-NKK's arguments do not justify application of the
       Leniency Notice with a view to reducing the fine imposed on that undertaking.

       2. *The third plea: defective statement of reasons concerning the method of calculating the fines*

       a) Arguments of the parties

507    JFE-NKK argues that the Commission's explanation of its method of calculating the fines is insufficiently
       detailed to satisfy the requirements laid down in case-law (Case T-148/99 *Tréfilunion* v *Commission*
       [1995] ECR II-1063, paragraph 142). In fixing the fines, it failed to examine in particular the turnover
       figures or to assess the actual involvement of each of the addressees of the contested decision which
       were parties to the infringement. According to JFE-NKK, that omission is a defect in its reasoning.

508    The Commission points out that it gave an adequate explanation of its method of calculating the fines in
       the contested decision, in particular in recital 162.

       b) Findings of the Court

509    It need merely be stated, in that connection, that the Commission clearly and coherently indicated in
       recitals 156 to 175 to the contested decision the factors of which it took account in determining the
       amount of the fines. The *Tréfilunion* v *Commission* judgment, cited in paragraph 507 above, does not
       avail JFE-NKK since it merely indicates in that regard that the Commission must set out the method of
       calculating the fines. The separate question of whether the Commission made errors of assessment
       regarding calculation of the amount of the fines will be considered in paragraph 515 et seq. below.

510    Accordingly, the present plea must be rejected.

       3. *The fourth plea: incorrect assessment of the duration of the infringement*

       a) Arguments of the parties

511    In paragraph 136 et seq. above a summary is given of the Japanese applicants' arguments to the effect
       that the Commission should, at least, have ascertained an infringement of a shorter duration than that
       determined in Article 1 of the contested decision

512    Since the Commission applied an increase of 10% per year of the amount of the fine determined by
       reference to the gravity of the infringement and since the infringement lasted for, at most, four
       complete years (from 1991 to 1994) rather than five, the overall increase of 50% adopted in the
       contested decision for all the Japanese applicants on account of duration should become a maximum of
       40%. Nippon states, in its reply, that the Commission's argument that the voluntary restraint

agreements did not prevent the Japanese producers from selling seamless tubes in the Community is at odds with the position which it adopted in the contested decision with regard to the period 1977 to 1989. Sumitomo states in that connection that Commission officials cannot act as if they were Members of the Commission by arguing that it was right to impose a fine in respect of 1990 even if it were assumed that the voluntary restraint agreements had been in force during that year.

513    The Commission's arguments concerning the duration of the infringement found in Article 1 of the contested decision are summarised in paragraph 157 et seq. above. Essentially, since the duration of the infringement was established to a sufficient legal standard, it is inappropriate, in the Commission's view, to reduce the amount of the fines.

b) Findings of the Court

514    The parties' arguments concerning the duration of the infringement have been examined in paragraphs 338 to 352 above and it is therefore sufficient, for the purposes of the present plea, to repeat that that duration must be reduced, as regards each of the Japanese applicants, from five years to three years and six months, namely the period from 1 January 1991 to 1 July 1994. That new duration will be taken into account below in paragraphs 588 and 590 concerning determination of the amount of the fines imposed on the Japanese applicants.

4. *The fifth plea: incorrect assessment of the documents relied on to prove the existence of the infringement found in Article 1 of contested decision*

a) Arguments of the parties

515    The Japanese applicants refer to the arguments put forward by them in seeking the annulment of Article 1 of the contested decision, which are based on inconsistency between the products mentioned in the various items of documentary evidence on which the Commission relied in the contested decision and those finally stated to be involved in the infringement (see paragraph 105 et seq. above). If the Court were to reject some of the documentary evidence relied upon by the Commission but none the less upheld the contested decision, the fine should be reduced to reflect the definition of the products and the duration of the infringement inferred from the documentary evidence which it does admit. Account should also be taken in this context of the fact that certain items of evidence, notably the sharing key document, relate to a more limited range of products.

516    JFE-Kawasaki and Sumitomo also argue that, at very least, the Commission ought, in deciding the degree of gravity of the infringement and, thus, fixing the fines to be imposed on the addressees of the decision, to have taken account of a more restricted market. Specifically, from the geographical point of view, the Commission failed to establish to the requisite legal standard that the alleged infringement concerned the United Kingdom offshore market.

517    The Commission replies that, in so far as the documentary evidence shows that the scope of the agreement varied, it would seem to be indicative of a broader scope than that determined in the contested decision. As regards the allegation that it failed properly to identify the relevant geographical market, the Commission replies that, in assessing the gravity of the infringement, it referred to the accurate market definition contained in recitals 160 and 161 to the contested decision, which was established on the basis of evidence obtained during its inquiry (see also paragraph 155 et seq. above).

b) Findings of the Court

518    It is sufficient, in order to reject this plea, to refer to the fact that, as held in paragraph 352 above, the infringement found in Article 1 of contested decision was established to a sufficient legal standard in all respects except as regards its duration, and the repercussions thereof for the amount of the fines are indicated in paragraph 514 above.

5. *The fifth and sixth pleas: breach of the principle of proportionality and of the Guidelines for calculating fines, and inadequate statement of reasons*

a) Arguments of the parties

519    The Japanese applicants submit that, in fixing the amount of the fines imposed on them, account should have been taken of the fact that no effects were felt in the European market as a result of the infringement (Joined Cases 6/73 and 7/73 *Istituto Chemioterapico Italiano and Commercial Solvents* v *Commission* [1974] ECR 223, paragraph 51 et seq., *Suiker and Others* v *Commission*, cited in paragraph 56 above, paragraph 614 et seq.; *Thyssen Stahl* v *Commission*, cited in paragraph 74 above, paragraph 672). In that connection Nippon and Sumitomo refer back to the points they made concerning trade barriers the existence of which prevented the Japanese producers from selling their products in the Community markets, so that the effects on the common market of the infringement would, in any event, have been practically non-existent. In that context, JFE-NKK refers to section 3 of the Guidelines on the method of setting fines imposed pursuant to Article 15(2) of Regulation No 17 and Article 65(5) of the ECSC Treaty (OJ 1998 C 9, p. 3, hereinafter 'the Guidelines'), which provides that non-implementation of offending agreements or practices is to be regarded as a mitigating factor. Kawasaki argues in that connection that the fines, including those imposed on the Japanese applicants, seem to take account of the infringement found in Article 2 of the contested decision, which would be unlawful given that the second infringement concerns only the Community producers.

520    Furthermore, the range of products described in Article 1 of the contested decision is considerably smaller than that described in the SO. Essentially, the range is so small that the fine of EUR 99 million in total is disproportionate to the average cumulative turnover of all the addressees of the contested decision for those products, which is EUR 73 million per annum (recital 162 to the contested decision). In that connection Sumitomo refers to the judgments of the Court of First Instance in Case T-77/92 *Parker Pen* v *Commission* [1994] ECR II-549, paragraph 580, and Case T-319/94 *Fiskeby Board* v *Commission* [1998] ECR II-1331, paragraph 40. The Commission has never in any of its earlier decisions imposed a fine of almost the same amount as the annual turnover achieved in the market concerned in a decision recording an infringement. In addition, JFE-Kawasaki observes that this figure of EUR 73 million seems to include sales in the offshore markets of the Community, which ought not to have been taken into account for the reasons summarised in paragraph 405 above.

521    Nippon states in that connection that, according to the judgment in *PVC II*, cited in paragraph 61 above, the Commission must take into account all the circumstances of the infringement in deciding what amount of fine is proportionate. Those circumstances include the number and value of goods involved in the infringement (*Musique diffusion française* v *Commission*, cited in paragraph 56 above, paragraph 120). Moreover, according to the Guidelines, the actual impact of an infringement in the market concerned ought to be taken into account and the amount of the fine adjusted to reflect the actual impact in the market, and thus the gravity of the infringing conduct of each of the undertakings concerned (see also Case C-51/92 P *Hercules* v *Commission* [1999] ECR I-4235, paragraph 110, and *Cement*, cited in paragraph 66 above, paragraph 4949). JFE-Kawasaki adds that the Commission ought to have taken account of the fact that the Japanese applicants did not comply with the unlawful agreement: they in fact continued to sell the products in question in the only market that interested them, that is to say the United Kingdom offshore market (*Buchmann* v *Commission*, cited in paragraph 58 above, paragraph 121). In that connection, the Commission's assertion at recital 161 to the contested decision that the four States of origin of the European producers concerned by the contested decision make up a broad geographical market is at odds with its observations in recitals 106 and 145 to the decision, where it talks of four national markets.

522    The argument which the Commission draws from the case-law relating to its discretion in fixing the amount of fines is irrelevant because the Commission nevertheless remains obliged to comply with Article 15 of Regulation No 17. Moreover, its argument that the Guidelines provide, in principle, for a basic fine of EUR 20 million for 'very serious' infringements cannot prevail over the principle of proportionality when fines are calculated.

523    Sumitomo takes the view that the existence of the voluntary restraint agreements prior to 1991 is a mitigating factor which the Commission ought to have taken into consideration as regards the subsequent period, despite the fact that application of Article 81 EC was no longer precluded at the time when the agreement expired. Sumitomo invites the Court to apply by analogy paragraphs 619 and 620 of the judgment in *Suiker and Others* v *Commission*, cited in paragraph 56 above. The Commission's argument, set out in its defence in Case T-78/00, that the existence of the voluntary restraint agreements prior to 1991 is an aggravating, rather than a mitigating, factor is inconsistent with the approach it adopted in the contested decision and thus constitutes a breach of its duty to state reasons,

as provided for in Article 253 EC.

524    The Commission denies that the fine is disproportionate and contends that the Japanese applicants have based their argument on the false premiss that the fine must be set by reference to the size of the market concerned. The Commission says that it must be proportional to the infringement appraised as a whole and not merely to the turnover of the addressees of the contested decision. In recital 162 to the contested decision, the Commission stated that the market-sharing agreement was a 'very serious' infringement of Article 81 EC because its purpose was to ring-fence national markets which account for most of the Community's consumption of the products concerned by the contested decision. The infringement thus clearly affected the functioning of and competition within the common market.

525    The approach taken in recital 162 to the contested decision conforms to the Guidelines, which state that, subject to the ceiling of 10% of turnover, fines are to be determined by taking a basic amount reflecting the seriousness of the infringement as a starting point. The turnover of the addressees of a decision recording an infringement is relevant only in relation to that 10% limit (*Cement*, cited in paragraph 66 above, paragraphs 5005 to 5025). The Guidelines give EUR 20 million as the basic amount for very serious infringements and since the Commission has already reduced that figure to EUR 10 million to reflect the size of the market (recital 163 to the decision), there is no reason to reduce it further. The Commission also points out that, according to the Guidelines, the impact of an infringement on the market is a factor to be taken into account only 'where this can be measured' and that the individual turnover figures of each of the firms guilty of an infringement of the same kind are only taken into account where there is significant variance between them. That is not so in the present case.

526    The approach taken in the contested decision is consistent with case-law, in which it has been acknowledged that the Commission may exercise discretion in setting the amount of fines (*Mo och Domsjö*, cited in paragraph 425 above, paragraph 268). In paragraph 358 of that judgment, which was confirmed on appeal by the Court of Justice in Case C-283/98 P *Mo och Domsjö* v *Commission* [2000] ECR I-9855, paragraph 62, the Court of First Instance held that, where the object of the infringement is in itself serious, an effect on the market may be presumed or, at least, becomes irrelevant to any assessment of its gravity.

527    In response to JFE-Kawasaki's argument that the fine imposed on the Japanese producers includes an amount on account of the infringement found in Article 2, the Commission maintains that that view is incorrect: no fine was imposed, nor was the original fine increased in respect of that infringement.

528    The Commission points out that its decision not to impose a fine in respect of the period during which the voluntary restraint agreement was in force was already a concession to the Japanese producers, particularly in the light of the Commission's Notice concerning imports into the Community of Japanese products (OJ 1972 C 111, p. 13), which stated that no comfort could be drawn from voluntary restraint agreements as regards the application of competition law. Thus, the existence of voluntary restraint agreements prior to 1990 is in no way a mitigating factor for the purpose of fixing the fine in respect of the period 1990 onwards, contrary to Sumitomo's argument to that effect.

529    In response to Sumitomo's argument that the Commission is not entitled to raise for the first time before the Court the allegedly aggravating nature of the voluntary restraint agreements prior to 1990, the Commission states that Sumitomo is asking the Court, in the exercise of its unlimited jurisdiction, to reduce the fine. In this context, the Commission considers that it is appropriate to draw to the Court's attention all factors relevant to the Commission's exercise of its discretion.

530    In that connection, it is appropriate to point out that Sumitomo appears to be attempting to introduce a new plea relating to its claim that the fine should be reduced by raising, in its reply, the issue of reasoning, even though its application contains no plea alleging inadequacy of the statement of reasons concerning the calculation of that amount. That plea is inadmissible pursuant to Article 48(2) of the Rules of Procedure.

b) Findings of the Court

531    It is important to note first of all that, under Article 15(2) of Regulation No 17, the Commission may

impose fines from a minimum of EUR 1 000 to a maximum of EUR 1 000 000, and the latter amount may be increased to 10% of the turnover achieved during the previous financial year by each of the undertakings which participated in the infringement. To determine the amount of the fine within those limits, that provision requires account to be taken of the gravity and of the duration of the infringement.

532    However, neither Regulation No 17, nor the case-law nor the Guidelines provide that the amount of the fines must be fixed directly by reference to the size of the market concerned, that factor being only one of several. Under Regulation No 17, as interpreted by the case-law, the amount of the fine imposed on an undertaking in respect of an infringement of competition law must be proportional to the infringement, seen as a whole, having regard, in particular, to the gravity thereof (see, to that effect, Case T-83/91 *Tetra Pak* v *Commission* [1994] ECR II-755, paragraph 240, and, by analogy, Case T-229/94 *Deutsche Bahn* v *Commission* [1997] ECR II-1689, paragraph 127). As the Court held in paragraph 120 of its judgment in *Music diffusion française and Others* v *Commission*, cited in paragraph 56 above, it is necessary in assessing the gravity of an infringement to take account of numerous elements whose nature and importance varies according to the type of infringement concerned and the special circumstances surrounding it (see also, by analogy, *Deutsche Bahn* v *Commission*, paragraph 127).

533    It must also be noted in that connection that the only express reference to the turnover of the undertaking concerned, namely the limit of 10% of the turnover relied on for the purpose of determining fines in Article 15(2) of Regulation No 17, relates to the overall worldwide turnover of the undertaking (see to that effect *Music diffusion française and Others* v *Commission*, paragraph 119) and not the turnover achieved by it on the market affected by the anti-competitive conduct penalised. It is clear from the same paragraph of that judgment that that limit is designed to ensure that the fines are not disproportionate to the size of the undertaking as a whole.

534    However, it must be emphasised that that reference to worldwide turnover is relevant only to the calculation of the upper limit of the fine which may be imposed by the Commission (see paragraph 1 of the Guidelines) and certainly does not mean that there must be a strictly proportional relationship between the size of each undertaking and the fine imposed on it.

535    In so far as it is not alleged in this case that the amount of the fines exceeds 10% of the total turnover of the Japanese applicants, those fines are not open to criticism merely because, when added to those imposed on the European producers, they exceed the turnover achieved on the relevant market, namely EUR 73 million. It must, admittedly, be observed that the Court of Justice, in its judgment in Case C-248/98 P *KNP BT* v *Commission* [2000] ECR I-9641, paragraph 61, emphasised incidentally that 'Article 15(2) of Regulation No 17 … aims to ensure that the penalty is proportionate to the undertaking's size on the product market in respect of which the infringement was committed'. However, apart from the fact that, in paragraph 61 of that judgment, the Court of Justice mentions expressly, by way of reference, paragraph 119 of the *Music diffusion française* judgment, it must be emphasised that the wording in question, which was not taken up in the subsequent case-law, forms part of the special context of the *KNP BT* v *Commission* case. In that case, the applicant criticised the Commission for having taken into account the value of sales within the group for the purpose of determining its market shares, an approach which was nevertheless held to be valid by the Court of Justice for the reason given above. It cannot therefore be inferred that the penalties imposed on the Japanese applicants in this case are disproportionate.

536    Moreover, it must be observed that, although the Commission did not expressly refer to the Guidelines in the contested decision, it nevertheless determined the amount of the fines imposed on the Japanese applicants by applying the calculation method laid down by the Guidelines.

537    However, whilst the Commission enjoys a discretion in fixing the amount of fines (Case T-150/89 *Martinelli* v *Commission* [1995] ECR II-1165, paragraph 59, and, by analogy, *Deutsche Bahn* v *Commission*, cited in paragraph 532 above, paragraph 127), it must be pointed out that the Commission cannot depart from the rules which it has set for itself (see *Hercules Chemicals* v *Commission*, cited in paragraph 327 above, paragraph 53, confirmed on appeal by the judgment of 8 July 1999 in *Hercules Chemicals* v *Commission*, cited in paragraph 521 above, and the case-law cited therein). Thus, the Commission must in fact take account of the Guidelines when determining fines, in particular the elements which are mandatory under the Guidelines.

538    However, the discretion enjoyed by the Commission and the limits which it has imposed in that regard
       do not in any event prejudge the exercise by the Community judicature of its unlimited jurisdiction.

539    It must be observed that, according to point 1 A of the Guidelines for calculating fines, '[i]n assessing
       the gravity of the infringement, account must be taken of its nature, its actual impact on the market,
       where this can be measured, and the size of the relevant geographic market'. However, in recital 159 to
       the contested decision, the Commission states that it took account of those same three criteria in
       determining the gravity of the infringement.

540    However, the Commission relied, in recital 161 to the contested decision, essentially on the nature of
       the offending conduct of all the undertakings as a basis for its conclusion that the infringement found in
       Article 1 of the contested decision is 'very serious'. In that regard, it referred to the seriously anti-
       competitive nature of the market-sharing agreement penalised and the way it jeopardised the proper
       functioning of the single market, the intentional nature of the illegal conduct and the secret and
       institutionalised nature of the system established in order to restrict competition. The Commission also
       took into account in the same recital 161 the fact that 'the four Member States in question account for
       most of the consumption of seamless OCTG and line pipe in the Community and therefore constitute an
       extended geographic market'.

541    On the other hand, the Commission found in recital 160 to the contested decision that 'the specific
       impact of the infringement on the market has been limited', because the two specific products covered
       by it, namely standard thread OCTG and project line pipe, account for only 19% of Community
       consumption of OCTG and seamless line pipe and welded tubes can now cater for part of the demand
       for seamless tubes as a result of technological progress.

542    Thus, in recital 162 to the contested decision, the Commission, after describing the infringement as
       'very serious' on the basis of the factors listed in recital 161, took account of the relatively low level of
       sales of the products in question by the addressees of the contested decision in the four Member States
       concerned (EUR 73 million a year). That reference to the size of the market affected relates to the
       assessment of the limited impact of the infringement on the market in recital 160 to the contested
       decision. The Commission therefore decided to set the amount reflecting the gravity of the infringement
       as EUR 10 million. The Guidelines provide, in principle, for a fine 'above [EUR] 20 million' for an
       infringement categorised as very serious.

543    It must be concluded that that reduction of the amount determined by reference to the gravity of the
       infringement to 50 % of the minimum sum usually adopted in the case of a 'very serious' infringement
       adequately takes account of the limited impact of the infringement on the market in this case. In that
       connection, it must also be remembered that the purpose of fines is to have a deterrent effect in
       matters of competition (see, in that connection, the fourth paragraph of point 1 A of the Guidelines).
       Thus, in view of the large size of the addressees of the contested decision, mentioned in recital 165 to
       the contested decision (see also paragraph 552 below), a substantially greater reduction of the amount
       determined in respect of gravity of the infringement could have deprived the fines of their deterrent
       effect.

544    As regards the arguments relating to the existence of obstacles to exports to onshore Community
       markets, it must be observed that the Commission did not take account of those factors in the
       contested decision for the purpose of fixing the amount of the fines, because it contests them from the
       factual point of view. Since the classification of the infringement as 'very serious' in this case is based
       on the nature of the infringement and its purpose, rather than on its effects, those arguments of the
       Japanese applicants have no impact on that analysis as such.

545    Moreover, it must be borne in mind, once again, in that connection that the Commission applied a very
       significant reduction, as compared with the amount usually imposed for an infringement of that
       seriousness, in order to take account of the limited economic effects of the agreement.

546    It must be also pointed out that, since the existence of the infringement found in Article 1 of the
       contested decision was established on the basis of documentary evidence, the participation of the
       Japanese applicants in the anti-competitive agreement thereby penalised is one of the main reasons for
       which the Commission was not required to assess in any event the reality and size of the obstacles to
       trade referred to by the Japanese applicants. An undertaking which agrees, under a wider agreement,

to decline to sell a particular product on a given market when it had no intention of doing so in any case makes it practically impossible, by virtue of its own attitude, to determine how it would have behaved in relation to the sale of that product on the market in question in the absence of that agreement.

547    Point 1 of the Guidelines states that the impact of an infringement on the market must be taken into account 'where this can be measured' (see paragraph 539 above). It must be stated that, in the circumstances of this case, it was precisely the offending conduct of the Japanese applicants themselves which made it almost impossible to measure the extent of the alleged obstacles to trade and, therefore, to take account of those obstacles in assessing the impact of the infringement on the market.

548    In those circumstances, even if it were assumed that the applicants' allegations as to the existence and extent of the barriers to trade were well founded, the Court considers, in the exercise of its unlimited jurisdiction that, in determining the amount of the fines in respect of gravity of the infringement, the Commission did not in any way breach the principle of proportionality in this case and there is therefore no justification for further reducing that amount by reference to those circumstances. Consequently, it is unnecessary to give a decision on the merits or otherwise of that argument in this case.

549    The Japanese applicants' arguments concerning their alleged non-compliance with the penalised agreement regarding the United Kingdom offshore market on which they claim to have sold substantial quantities of the products referred to in Article 1 of the contested decision must also be rejected. Like the arguments considered in the foregoing paragraphs, that argument, even if it were assumed to be well founded, merely places in context the practical effects of the agreement penalised in Article 1 of the contested decision. However, the Commission has already established and correctly taken account of the fact that the infringement had a limited impact on the markets concerned (see paragraphs 542 and 543 above).

550    In any event, the impact of such 'non-compliance' with the agreement regarding the United Kingdom offshore market is limited by the fact that that market was only 'semi-protected', in the terms of the contested decision, so that the Commission was already aware of that factor when setting the fines (see recital 62 to the contested decision).

551    The Japanese applicants observe that the sixth paragraph of point 1 A of the Guidelines provides that it is possible 'in some cases to apply weightings to the amounts determined within each of the three categories [of infringement] in order to take account of the specific weight and, therefore, the real impact of the offending conduct of each undertaking on competition'. According to that paragraph, that approach is appropriate 'particularly where there is considerable disparity between the sizes of the undertakings committing infringements of the same type'.

552    In this case, the Commission found, in recital 165 to the contested decision, that all the addressees of the contested decision were large undertakings, so that it was not appropriate for that reason to differentiate the amounts of the fines imposed. In that connection, none of the Japanese applicants has challenged its classification as a large undertaking as such, their arguments in that connection being merely of a comparative nature.

553    Moreover, it is clear from the use of the expression 'in some cases' and the term 'in particular' in the Guidelines that weighting according to the individual size of undertakings is not a systematic stage in the calculation which the Commission has imposed on itself but falls within the scope of the flexibility which it has granted itself in cases where it is called for. It is appropriate in this context to refer to the case-law according to which the Commission enjoys a discretion enabling it to take account or not take account of certain factors when determining the amount of the fines which it intends imposing, having regard in particular to the circumstances of the case (see, to that effect, the order of the Court of Justice of 25 March 1996 in Case C-137/95 P *SPO and Others* v *Commission* [1996] ECR I-1611, paragraph 54, Case C-219/95 P *Ferriere Nord* v *Commission* [1997] ECR I-4411, paragraphs 32 and 33, and *Limburgse Vinyl Maatschappij and Others* v *Commission*, cited in paragraph 180 above, paragraph 465; see also, to that effect, Case T-309/94 *KNP BT* v *Commission* [1998] ECR II-1007, paragraph 68). In view of the terms of the sixth paragraph of point 1 A of the Guidelines, referred to above, it must be considered that the Commission retains a degree of discretion concerning the appropriateness of weighting fines according to the size of each undertaking.

554     Since the Commission found in the contested decision that all the Japanese applicants were large undertakings (see paragraph 552 above) and since it took account of the relatively limited impact of the infringement on the markets generally (see paragraphs 542 and 543 above), the Japanese applicants' argument is not sufficient to show that the Commission exceeded its discretion in this case by not applying the sixth paragraph of point 1 A of the Guidelines.

555     Moreover, Sumitomo alleges that the existence of voluntary restraint agreements before 1991 is an attenuating factor which the Commission should have taken into account for the period subsequent to those agreements. It need merely be stated in that connection that, while the status of the voluntary restraint agreements was a matter of contention between the Japanese applicants and the Commission in the present proceedings, it is common ground that those agreements were no longer in force, either nationally or internationally, as from 1 January 1991. It must be stated that, as soon as the voluntary restraint agreements ceased to be operative, they should no longer have affected the commercial conduct of the Japanese producers and cannot therefore be invoked as an attenuating circumstance in the present context.

556     In that connection, since the voluntary restraint agreements were not taken to be an aggravating circumstance in the contested decision, there can be no question of any inadequacy of the statement of reasons regarding that classification.

557     Finally, as regards JFE-Kawasaki's argument concerning the taking into account of the infringement found in Article 2 of the contested decision, it is clear from recital 164 to the contested decision and from the absence of references to the supply contracts constituting that second infringement in recitals 159 to 163 and 165 to 175 that the Commission decided not to take account thereof for the purpose of determining the amount of the fines. That fact is sufficient to render JFE-Kawasaki's argument entirely irrelevant for the purposes of the present plea.

558     It follows that the present plea must be rejected in its entirety.

        6. *The sixth plea: breach of the principle of equal treatment*

        a) Arguments of the parties

559     JFE-Kawasaki and Sumitomo argue that the level of the fine imposed on the Japanese producers for supposedly agreeing to refrain from selling the products mentioned in Article 1 of the contested decision in Europe is disproportionate by comparison with the level of the fines imposed on the European producers. The latter in fact are alleged to have committed two infringements the purpose of which was to ring-fence European markets, conferring on their infringement an intra-Community aspect absent from the infringement alleged against the Japanese producers. The Commission thus breached the principle of non-discrimination, which precludes different situations being treated in the same way without objective justification (Case C-342/93 *Gillespie* [1996] ECR I-475, paragraph 16, and the Guidelines). Sumitomo states that it is unfair to draw inferences from the fact that the infringement found in Article 2 of the contested decision supposedly forms part of the infringement found in Article 1 because the Commission does not allege that the agreement between the European and Japanese producers required the European producers to commit that further infringement. Moreover, it follows that the Japanese applicants indeed had an interest in disputing the Commission's reasoning in recital 164 to the contested decision according to which no additional fine should be imposed on the European producers.

560     In that connection JFE-Kawasaki reiterates its argument that the relations between the European and Japanese producers and the relations between the European producers themselves should be treated as two separate infringements. Sumitomo maintains that, in any event, if one infringement the object of which was sharing the Community markets between the European producers may be described as very serious because it is likely to lead to ring-fencing of the markets of the Member States, that does not apply to any undertaking given by producers in a non-Member country to refrain from selling their products in the Community market.

561     According to Sumitomo, the Commission also breached the principle of non-discrimination by failing to take account of the longer duration of the infringement found in Article 2 of the contested decision in

fixing the fines imposed on the European producers. Sumitomo also points out that the Article 2 infringement does not relate to the same products as the Article 1 infringement. It relates to plain-ended steel tubes.

562    Nippon also submits that the voluntary restraint agreements should not be taken into account for the purposes of calculating the fine imposed on the European producers because they had no bearing on that intra-Community aspect of the infringements. Moreover, according to JFE-Kawasaki, the fine imposed in respect of the infringement found in Article 1 of the contested decision includes the fine that ought to have been imposed in respect of the infringement found in Article 2, in which the Japanese producers had absolutely no part. In view of those arguments, the fines imposed on the Japanese producers should be reduced in order to re-establish equilibrium between them and the European producers.

563    In that connection, JFE-NKK submits that, by concluding that each producer was responsible for implementation of the alleged cartel as a whole, the Commission applied the principle of collective liability and in so doing infringed the general principle that penalties should be based upon individual responsibility.

564    According to the Commission, the Japanese applicants have not been discriminated against, the same fine on account of the seriousness of the infringement having been imposed on each of the European and Japanese producers implicated in the infringement found in Article 1 of the contested decision.

565    It is of no interest to the Japanese applicants to dispute the conclusion set out in recital 164 to the contested decision because the Commission's decision to impose no additional fine in respect of the second infringement causes them no harm. The fact that the Article 2 infringement went on for longer than the principal infringement which it helped implement and that it related to the market for plain-end pipes is irrelevant to the level of fine imposed in Article 1 of the contested decision.

    b) Findings of the Court

566    As regards the argument that the infringement found in Article 1 of the contested decision in fact comprises two infringements, namely an intra-Community infringement and an inter-continental infringement, it need merely be borne in mind that, for the reasons set out in paragraphs 370 to 374 above, that infringement constitutes a single infringement. Thus, the fact of considering that all the parties participated in it to the same extent does not, in that regard, in any way infringe the general principle of equal treatment, or the principle of proportionality.

567    As regards the criticism concerning the existence of the infringement found in Article 2 of the contested decision against the European producers, it has been held in paragraph 557 above that the Commission did not take account of it for the purpose of calculating the fines in the contested decision.

568    However, it has also been held, in paragraph 451 above, that, contrary to the Commission's assertion, the Japanese applicants did indeed have a legal interest in challenging the Commission's assessment, set out in recital 164 to the contested decision, concerning the relationship existing between the two infringements established in the decision.

569    It must be remembered that the Commission itself considered in recital 111 to the contested decision, after examining their specific characteristics, that the supply contracts constituted in themselves an infringement of Article 81(1) EC and that their competition-restricting objects and effects went beyond a mere contribution to the continuation of the Europe-Japan agreement (see paragraphs 362 to 364 above). In particular, the Commission considered that that infringement had had an impact not only on the upstream market in standard thread OCTG tubes, but also, directly and clearly, on the downstream market in seamless tubes.

570    It must be stated that the Commission was required to draw certain inferences from those findings of fact and legal classifications for the purpose of setting the amount of the fines, and that it did not do so.

571    As has been held in paragraph 364 above, the first sentence of recital 164 to the contested decision is vitiated by errors of assessment in that the Commission considered that the contracts constituting the

second infringement were merely a 'means of ensuring the application' of the first infringement. Consequently, the second sentence of recital 164, in which the Commission announces its intention not to impose an additional fine in respect of the second infringement, is deprived of its logical basis.

572    The Commission enjoys a degree of latitude in determining fines and, in so far as its Guidelines do not require it to take account systematically of any given circumstance (see paragraphs 537 and 553 above, and the case-law cited), it can determine which factors can be taken into account for that purpose, which enables it to adapt its assessment to specific cases. Its assessment must, however, be carried out in compliance with Community law, which includes not only the provisions of the Treaty but also the general principles of law (see, by analogy, Case C-50/00 P *Unión de Pequeños Agricultores* v *Council* [2002] ECR I-6677, paragraph 38).

573    By thus omitting to take account of the infringement found in Article 2 of the contested decision in determining the fine imposed on the European producers, the Commission treated different situations in the same way but without relying on objective reasons capable of justifying that approach. It follows that it infringed the general Community law principle of equal treatment (see, to that effect, Case T-311/94 *BPB de Eendracht* v *Commission* [1998] ECR II-1129, paragraph 309, and the case-law cited).

574    Consequently, the present plea alleging breach of the principle of equal treatment must be upheld. Accordingly, it is appropriate for the Court to exercise its unlimited jurisdiction, deriving from Article 229 EC and Article 17 of Regulation No 17, to adjust the amount of the fines imposed by Article 4 of the contested decision.

575    In that connection, the Commission observed at the hearing that the possible existence of unequal treatment referred to above should logically lead to an increase in the fines imposed on the European producers, rather than a reduction of the amount of the fines imposed on the Japanese producers. It must be observed, in that context, that, contrary to the views put forward by JFE-Kawasaki in this case in connection with another plea (see paragraph 512 above), Commission representatives may, subject to any express instructions to the contrary from their superiors, lawfully plead that the Community judicature should exercise its unlimited jurisdiction to increase the amount of a fine set by the Members of the Commission. The mere fact that a Commission representative asks the Community judicature to exercise a power available to it and puts forward arguments which might justify such a course of action cannot mean that the representative is acting in the stead of the Members of the Commission.

576    It must be considered that, in the circumstances of this case, the most appropriate way of restoring a fair balance between the addressees of the contested decision would be to increase the amount of the fine imposed on each of the European producers which brought an action calling upon the Court to change the amount of its fine and therefore to reassess the amount of the fine, rather than to reduce the amount of the fines imposed on the Japanese applicants. The abovementioned unequal treatment does not relate to the proportionally over-severe fine imposed on the Japanese producers, the method of calculation adopted by the Commission in setting their fines having been held to be perfectly lawful in itself (see paragraphs 531 to 558 above), but, on the contrary, relates to the fact that the gravity of the offending conduct of the European producers, appraised as a whole, was under-evaluated by comparison with the unlawful conduct of the Japanese producers.

577    Moreover, the applicants in Cases T-44/00, T-48/00, and T-50/00, namely Mannesmann, Corus and Dalmine, each asked the Court in their applications to exercise in that connection its unlimited jurisdiction to change the amount of the fine imposed. It must be recognised that, where the exercise of that jurisdiction is requested by an applicant, including in connection with an application for reduction of a fine, the Court is therefore empowered to amend the contested measure, even if it does not annul it, having regard to all the factual circumstances, in order to amend the amount of the fine imposed (see, to that effect, *Limburgse Vinyl Maatschappij and Others* v *Commission*, cited in paragraph 180 above, paragraph 692). Moreover, the unlimited jurisdiction conferred on the Community judicature by Article 17 of Regulation No 17 in accordance with Article 229 CE, expressly includes the power to increase the fine imposed, if appropriate.

578    However, the Commission has not pleaded in its defence in Cases T-44/00, T-48/00 and T-50/00, which have been joined to the present cases for the purposes of the hearing (see judgments delivered today, *Mannesmannröhren-Werke* v *Commission*, paragraph 38, *Corus* v *Commission*, paragraph 38, and

*Dalmine* v *Commission*, paragraphs 38 and 245 to 247), or even belatedly at the hearing, even though it did refer to that possibility, that the Court should revise upwards the amount of the fines imposed on the applicants in these cases. In that connection, the Court has not asked those applicants to submit observations on that point. Accordingly, the applicants in the three cases mentioned above have not had an opportunity to give their views on the appropriateness of increasing their fines, or on the factors which might possibly influence the amount thereof. In those circumstances, the fines imposed on the applicants in the three cases mentioned above have not been increased (see the operative parts of the judgments in *Mannesmannröhren-Werke* v *Commission*, *Corus* v *Commission* and *Dalmine* v *Commission*, cited above).

579    It follows that the most suitable way of remedying the unequal treatment observed in this case is, for the purpose of determining the amount of the fine imposed on each of the Japanese applicants, to reduce the amount decided on by the Commission in respect of the gravity of the infringement, in recital 163 to the contested decision. In the exercise of its unlimited jurisdiction, the Court considers, having regard to all the circumstances of this case, that the fine should be reduced from EUR 10 million to EUR 9 million for each of the Japanese applicants.

580    That new amount is taken into account in paragraphs 588 and 590 below in order to fix the amount of the fines imposed on the Japanese applicants.

581    Finally, as regards Nippon's argument that the voluntary restraint agreements should not be taken into account for the purpose of calculating the fine imposed on the European producers because they had no impact on the intra-Community aspect of the infringements, it must be stated, first, that it has already been held that there was no reason in this case to treat the infringement found in Article 1 of the contested decision as two separate infringements, the first relating to relations between the European-Japanese producers and the second to intra-Community relations (see paragraph 584 below).

582    It must next be observed that the choice made by the Commission not to find that an infringement existed before 1990, because of the existence of the voluntary restraint agreements, necessarily constitutes a concession made by the Commission both to the Japanese producers and to the European producers for reasons relating to the commercial policy followed in the steel industry. According to the Commission opinion on the import of Japanese products into the Community, the existence of the voluntary restraint agreements would not have assisted the Japanese producers in any way in terms of the application of competition law.

583    In that connection, it is clear from recital 27 to the contested decision that the voluntary restraint agreements were included as from the 1970s 'as part of the anti-crisis trade measures' adopted by the Commission to cope with the difficult situation prevailing in the Community steel industry. The Japanese applicants have not challenged that statement in the present procedure and it must be borne in mind, in that regard, that the Commission granted a reduction of the fines imposed on all the addressees of the contested decision in respect of attenuating circumstances to take account of the fact that 'the steel pipe and tube industry has been in crisis for a long time' (recital 168 to the contested decision).

584    In view of those circumstances, it must be concluded that the commercial policy reasons underlying the concession mentioned in recital 108 to the contested decision for the period corresponding to the lifetime of the voluntary restraint agreements relate not only to the relations between the Community and the Japanese authorities but also to the existence of the crisis which affected the Japanese steel tube manufacturers in the same way as their Community counterparts during that same period.

585    Moreover, the Commission observed in recital 27 to the contested decision and before the Court, without being contradicted by the Japanese applicants on that point, that the voluntary restraint agreements were simply quota agreements and limited rather than prohibited the marketing of steel tubes from Japan into the European Community. The difference of circumstances invoked by Nippon is therefore relative and not absolute. Those agreements are not therefore sufficient to account for the passive conduct of the Japanese applicants in the Community markets.

586    In those circumstances, the Court considers that the unequal treatment alleged by Nippon does not exist.

587    Furthermore, in view of the context described in paragraphs 583 to 585 above, particularly the political nature of the concession granted by the Commission, the legality of which has not been contested, it would not in any event be appropriate for the Community Court to change the amount of the fines imposed on the Japanese applicants, since it is clear from the contested decision that, for the Commission, that concession was justified on a political level.

*7. Calculation of the fines*

588    It follows from the foregoing that the fine imposed on each of the Japanese applicants must be reduced to take account, first, of the reduction of the amount relating to the gravity of the infringement from EUR 10 to EUR 9 million and, second, that the duration of the infringement is established in the present cases as three-and-a-half years rather than five years.

589    The method of calculating the amount of the fines adopted in the Guidelines and employed by the Commission in this case has not been criticised in itself, for which reason it is appropriate for the Court, in the exercise of its unlimited jurisdiction, to apply that method in the light of the conclusion reached in the foregoing paragraph.

590    Thus, the basic amount for each Japanese producer shall be EUR 9 million, plus 10% for each year of the duration of the infringement, that is to say 35% in all, which gives a figure of EUR 12.15 million. That amount must then be reduced by 10% to reflect the attenuating circumstances referred to in recitals 168 and 169 to the contested decision, giving a final amount for each of the Japanese applicants of EUR 10.935 million instead of EUR 13.5 million.

**Costs**

591    Under Article 87(3) of the Rules of Procedure, the Court may order that the costs be shared or that each party bear its own costs if the parties succeed on some and fail on other heads of claim. Since each party has failed on one or more heads in this case, it is appropriate to order each of the Japanese applicants and the Commission to bear their own costs.

592    Under the second subparagraph of Article 87(4) of the Rules of Procedure, the EFTA Surveillance Authority must bear its own costs if it intervenes in proceedings.

On those grounds,

THE COURT OF FIRST INSTANCE (Second Chamber)

hereby:

**1.      Annuls Article 1(2) of Commission Decision 2003/382/EC of 8 December 1999 relating to a proceeding under Article 81 of the EC Treaty (Case IV/E-1/35.860-B seamless steel tubes) in so far as it establishes the existence of the infringement found in that article against the four applicants in Cases T-67/00, T-68/00, T-71/00 and T-78/00 as pre-dating 1 January 1991 and extending beyond 30 June 1994;**

**2.      Sets the fine imposed on each of the four applicants by Article 4 of Decision 2003/382 at EUR 10 935 000;**

**3.      Dismisses the remainder of the four applications;**

**4.      Orders the four applicants and the Commission to bear their own costs;**

**Orders the EFTA Surveillance Authority to bear its own costs.**

Forwood                              Pirrung                                    Mei

Delivered in open court in Luxembourg on 8 July 2004.

H. Jung                                                                    J. Pirrung

Registrar                                                                  President

## Table of contents

| | |
|---|---|
| Facts and procedure | II – 3 |
| Administrative procedure | II – 3 |
| Relevant products | II – 5 |
| Infringements found by the Commission in the contested decision | II – 5 |
| Essential facts established by the Commission in the contested decision | II – 7 |
| Operative part of the contested decision | II – 9 |
| A – Procedure before the Court of First Instance | II – 10 |
| Forms of order sought | II – 11 |
| The impact of the concentration between Kawasaki and NKK | II – 12 |
| Law | II – 14 |
| A – The claims for annulment of the contested decision, in particular Article 1 thereof | II – 14 |
| 1. The first plea: the Commission did not establish to the requisite legal standard the existence of the infringement found in Article 1 of the contested decision | II – 14 |
| a) Arguments of the parties | II – 14 |
| Preliminary observations | II – 14 |
| First part: incompatibility of the existence of the alleged agreement with the situation existing in the British offshore market and the other European markets | II – 16 |
| The second part of the first plea: evidence allegedly lacking probative value | II – 28 |
| The third part of the first plea: incorrect assessment of the scope of the infringement found in Article 2 of the contested decision | II – 44 |
| b) Findings of the Court | II – 47 |
| Preliminary observations | II – 47 |
| The second part of the plea: the absence of probative force of the evidence and, subsidiarily, the first part, alleging that the existence of the alleged agreement is inconsistent with the situation prevailing on the United Kingdom offshore market and the other markets | II – 50 |
| – Mr Verluca's statements | II – 50 |
| – The Vallourec notes | II – 57 |
| – The 1993 documents in English | II – 62 |
| – The steel tube system document | II – 66 |
| – Sharing key document | II – 67 |
| – Replies of the European producers | II – 71 |
| – Mr Biasizzo's deposition | II – 75 |
| – Duration of the infringement | II – 81 |
| The third part of the plea: the Commission's allegedly misconceived view of the significance of the infringement found in Article 2 of the contested decision | II – 84 |
| 2. The second plea: the infringement found in Article 1 should in fact be seen as comprising two separate infringements | II – 88 |
| a) Arguments of the parties | II – 88 |
| b) Findings of the Court | II – 88 |
| 3. The third plea: the agreement should not be regarded as having had an appreciable effect on competition | II – 89 |
| a) Arguments of the parties | II – 89 |
| b) Findings of the Court | II – 90 |

4.  The fourth plea: the agreement had no impact on trade between Member
States                                                                    II – 91
   a)  Arguments of the parties                            II – 91
   b)  Findings of the Court                                II – 93
5.  The fifth plea: insufficient reasoning to support the Commission's conclusions
concerning the significance of the infringement found in Article 2 of the contested    II – 94
decision
   a)  Arguments of the parties                            II – 94
   b)  Findings of the Court                                II – 94
6.  The sixth plea: insufficient reasoning concerning the status of the Community
offshore markets and the United Kingdom offshore market in particular     II – 95
   a)  Arguments of the parties                            II – 95
   b)  Findings of the Court                                II – 96
7.  The seventh and eighth pleas: insufficient statement of the reasons for the
Commission's decision to penalise the Japanese producers and not the Latin     II – 96
American producers, and unequal treatment in that respect
   a)  Arguments of the parties                            II – 96
   b)  Findings of the Court                                II – 97
8.  The ninth plea: flawed reasoning on the part of the Commission concerning
sales at prices above variable cost                                       II – 97
   a)  Arguments of the parties                            II – 97
   b)  Findings of the Court                                II – 98
9.  The 10th plea: breach of the rights of the defence arising from inconsistencies
between the statement of objections and the contested decision in relation to the     II – 98
geographical market referred to in Article 1 of that decision
   a)  Arguments of the parties                            II – 98
   b)  Findings of the Court                                II – 99
10.  The 11th plea: breach of the rights of the defence arising from inconsistencies
between the statement of objections and the contested decision as regards the     II – 99
products concerned
   a)  Arguments of the parties                            II – 99
   b)  Findings of the Court                                II – 100
11.  The 12th plea: breach of the rights of the defence deriving from the lack of an
adequate analysis of the voluntary restraint agreements in the statement of
objections and from inconsistencies between the statement of objections and the     II – 101
contested decision regarding the scope of those agreements
   a)  Arguments of the parties                            II – 101
   b)  Findings of the Court                                II – 101
12.  The 13th plea: breach of the rights of the defence deriving from
inconsistencies between the statement of objections and the contested decision
regarding the scope attributed to the infringement found in Article 2 of the     II – 103
decision
   a)  Arguments of the parties                            II – 103
   b)  Findings of the Court                                II – 104
13.  The 14th plea: the illegality of the Commission decision of 25 November 1994
to authorise the investigations of 1 and 2 December 1994                  II – 105
   a)  Arguments of the parties                            II – 105
   b)  Findings of the Court                                II – 111
B –  The pleas concerning reduction of the fines                          II – 113
1.  The first and second pleas: defective statement of reasons concerning the
failure to apply to JFE-NKK the Leniency Notice and an error in that regard     II – 113
   a)  Arguments of the parties                            II – 113
   b)  Findings of the Court                                II – 114
2.  The third plea: defective statement of reasons concerning the method of
calculating the fines                                                     II – 115
   a)  Arguments of the parties                            II – 115
   b)  Findings of the Court                                II – 116
3.  The fourth plea: incorrect assessment of the duration of the infringement     II – 116
   a)  Arguments of the parties                            II – 116
   b)  Findings of the Court                                II – 116
4.  The fifth plea: incorrect assessment of the documents relied on to prove the
existence of the infringement found in Article 1 of contested decision     II – 117

|  | |
|---|---|
| a) Arguments of the parties | II – 117 |
| b) Findings of the Court | II – 117 |
| 5. The fifth and sixth pleas: breach of the principle of proportionality and of the Guidelines for calculating fines, and inadequate statement of reasons | II – 118 |
| a) Arguments of the parties | II – 118 |
| b) Findings of the Court | II – 121 |
| 6. The sixth plea: breach of the principle of equal treatment | II – 126 |
| a) Arguments of the parties | II – 126 |
| b) Findings of the Court | II – 128 |
| 7. Calculation of the fines | II – 132 |
| Costs | II – 132 |

----

<u>1</u> –    Language of the case: English.