# EXHIBIT C

Dockets.Justia.com

 Celex is no longer updated since 1 January 2005.
Please use the new EUR-Lex website (http://europa.eu.int/eur-lex/lex)

**61976J0085**
Judgment of the Court of 13 February 1979.
Hoffmann-La Roche & Co. AG v Commission of the European Communities.
Dominant position.
Case 85/76.
*European Court reports 1979 Page 00461*
*Greek special edition 1979:I Page 00215*
*Portuguese special edition 1979:I Page 00217*
*Swedish special edition IV Page 00315*
*Finnish special edition IV Page 00341*
*Spanish special edition 1979 Page 00225*


**Dates:**

of document:   13/02/1979
of application:        27/08/1976

**Type of procedure:** Application for annulment - unfounded ; Appeal against penalty - successful
**Judge-Rapporteur:** Mertens de Wilmars
**Notes relating to the decision:**
*Baden Fuller, C.W.: European Law Review 1979 p.423-441*
*Alexander, W.: Ars aequi 1979 p.545-548*
*Bennett, T.J.: European Law Review 1979 p.210-220*
*Barents, R.: S.E.W. ; Sociaal-economische wetgeving 1979 p.530-534*
*Dhaeyer, Bernard: Journal des tribunaux 1979 p.401-406*
*Elsener, Ferdinand: Revue suisse de droit international de la concurrence 1979 nº 7 p.45-57*
*Krsjak, Peter: La vie judiciaire 1979 nº 1727 p.1 p.5-6*
*Maitland-Walker, Julian: European Intellectual Property Review 1979 p.357-361*
*Meier, G.: Neue juristische Wochenschrift 1979 p.2461*
*Pardolesi, R.: Il Foro italiano 1979 IV Col.380-381*
*Pesce, Angelo: Il Foro padano 1979 IV Col.45-46*
*Fernández-Novoa, Carlos: Actas de derecho industrial 1979-80 Tomo VI p.247-272*
*Garner, Scott S.: Journal of International Law and Economics 1980 Vol.14 p.485-508*
*Laurent, Philippe: Gazette du Palais 1980 III Doct. p.64-66*
*Piselli, Pierluigi: Rivista di diritto industriale 1980 II p.207-260*
*White, Eric L.: The Law Society's Gazette 1980 p.246-247*
*Zanon, Lucio: Journal of World Trade Law 1981 nº 4 p.305-322*
*Cicala, Curzio: La funzione amministrativa 1989 p.430-462*
*Barents, R.: Annotaties Hof van Justitie EG (Ed. W.E.J. Tjeenk Willink - Zwolle) 1995 p.326-330*


**Authentic language:** German

**Subject matter:** *Competition ; Rules applying to undertakings ; Dominant position ; Exclusive agreements*

**Instruments cited in case law:**
157E002 : N 125
157E003-LF : N 38 125 132
157E037-P1 : N 132
157E040-P3L2 : N 132
157E085-P1 : N 129
157E085-P3 : N 90 116 120
157E085 : N 14 116 125 132

157E086-L2LB : N 134
157E086-L2LC : N 90 122 134
157E086-L2LD : N 111 134
157E086 : N 21 - 30 38 - 41 48 49 70 89 90 107
157E086 : N 123 - 126 131 - 134
157E087 : N 129
157E090 : N 132
359X0301-A69P3 : N 142
362R0017-A02 : N 129 134 139
362R0017-A03 : N 7
362R0017-A15 : N 7 137 139
362R0017-A15P2 : N 129
362R0017-A17 : N 141
362R0017-A18 : N 3
362R0017-A19 : N 9 13
362R0017-A19P1 : N 9
362R0017-A20 : N 14
362R0017-A20P2 : N 13 14
362R0017-A21 : N 13
363R0099-A04 : N 9
368X0313 : N 3
369D0477 : N 135
669J0045 : N 10
376D0642-A01 : N 1
376D0642-A02 : N 1
376D0642-A03 : N 1
376D0642 : N 1 - 141
676J0027 : N 70
**Case affecting:**
Confirms 376D0642-A01
Amends 376D0642-A03

----------

**Keywords:**
*1 . COMMUNITIY LAW - OBSERVANCE OF THE RIGHT TO BE HEARD - FUNDAMENTAL
PRINCIPLE - FIELD OF APPLICATION - COMPETITION - ADMINISTRATIVE PROCEEDINGS -
SCOPE OF THE PRINCIPLE
( COUNCIL REGULATION NO 17 , ART . 19 ( 1 ); REGULATION OF THE COMMISSION NO
99/63 , ART . 4 )
2 . COMPETITION - ADMINISTRATIVE PROCEEDINGS - COMMISSION ' S POWERS OF
INVESTIGATION - INFORMATION COVERED BY PROFESSIONAL SECRECY - USE AGAINST
AN UNDERTAKING OF THE OBLIGATION TO OBSERVE PROFESSIONAL SECRECY -
CONDITION - OBSERVANCE OF THE RIGHT TO BE HEARD
( COUNCIL REGULATION NO 17 , ART . 20 ( 2 ))
3 . COMPETITION - DOMINANT POSITION - RELEVANT MARKET - DELIMITATION - PRODUCT
USABLE FOR DIFFERENT PURPOSES
( EEC TREATY , ART . 86 )
4 . COMPETITION - DOMINANT POSITION - CONCEPT
( EEC TREATY , ART . 86 )
5 . COMPETITION - DOMINANT POSITION - EXISTENCE - MARKET SHARE - OTHER
CRITERIA
( EEC TREATY , ART . 86 )
6 . COMPETITION - DOMINANT POSITION - ABUSE - CONCEPT
( EEC TREATY , ART . 86 )*

*7 . COMPETITION - DOMINANT POSITION - ABUSE - AGREEMENT TO OBTAIN SUPPLIES EXCLUSIVELY FROM ONE SUPPLIER - FIDELITY REBATES - ' ' ENGLISH ' ' CLAUSE ( EEC TREATY , ART . 86 )*
*8 . COMPETITION - DOMINANT POSITION - ABUSE - FIDELITY REBATES - APPLICATION OF DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS ( EEC TREATY , ART 86 ( C ))*

**Summary**
*1 . OBSERVANCE OF THE RIGHT TO BE HEARD IS IN ALL PROCEEDINGS IN WHICH SANCTIONS , IN PARTICULAR FINES OR PENALTY PAYMENTS , MAY BE IMPOSED A FUNDAMENTAL PRINCIPLE OF COMMUNITY LAW WHICH MUST BE RESPECTED EVEN IF THE PROCEEDINGS IN QUESTION ARE ADMINISTRATIVE PROCEEDINGS .*

*IN THE MATTER OF COMPETITION AND IN THE CONTEXT OF PROCEEDINGS FOR A FINDING OF INFRINGEMENTS OF ARTICLES 85 OR 86 OF THE TREATY , OBSERVANCE OF THE RIGHT TO BE HEARD REQUIRES THAT THE UNDERTAKINGS CONCERNED MUST HAVE BEEN AFFORDED THE OPPORTUNITY TO MAKE KNOWN THEIR VIEWS ON THE TRUTH AND RELEVANCE OF THE FACTS AND CIRCUMSTANCES ALLEGED AND ON THE DOCUMENTS USED BY THE COMMISSION IN SUPPORT OF ITS CLAIM THAT THERE HAS BEEN AN INFRINGEMENT .*

*2 . THE OBLIGATION ON THE COMMISSION UNDER ARTICLE 20 ( 2 ) OF REGULATION NO 17 TO OBSERVE PROFESSIONAL SECRECY MUST BE RECONCILED WITH THE RIGHT TO BE HEARD . BY PROVIDING UNDERTAKINGS FROM WHOM INFORMATION HAS BEEN OBTAINED WITH A GUARANTEE THAT THEIR INTERESTS , WHICH ARE CLOSELY CONNECTED WITH OBSERVANCE OF PROFESSIONAL SECRECY , ARE NOT JEOPARDIZED , THAT PROVISION ENABLES THE COMMISSION TO COLLECT ON THE WIDEST POSSIBLE SCALE THE REQUISITE DATA FOR THE FULFILMENT OF ITS TASK OF SUPERVISION WITHOUT THE UNDERTAKINGS BEING ABLE TO PREVENT IT FROM DOING SO ; THE COMMISSION MAY NOT HOWEVER USE , TO THE DETRIMENT OF AN UNDERTAKING IN PROCEEDINGS FOR A FINDING OF AN INFRINGEMENT OF THE RULES ON COMPETITION , FACTS OR DOCUMENTS WHICH IT CANNOT IN ITS VIEW DISCLOSE IF SUCH A REFUSAL OF DISCLOSURE ADVERSELY AFFECTS THAT UNDERTAKING ' S OPPORTUNITY TO MAKE KNOWN EFFECTIVELY ITS VIEWS ON THE TRUTH OR IMPLICATIONS OF THOSE FACTS OR DOCUMENTS OR AGAIN ON THE CONCLUSIONS DRAWN BY THE COMMISSION FROM THEM .*

*3 . IF A PRODUCT COULD BE USED FOR DIFFERENT PURPOSES AND IF THESE DIFFERENT USES ARE IN ACCORDANCE WITH ECONOMIC NEEDS , WHICH ARE THEMSELVES ALSO DIFFERENT , THERE ARE GOOD GROUNDS FOR ACCEPTING THAT THIS PRODUCT MAY , ACCORDING TO THE CIRCUMSTANCES , BELONG TO SEPARATE MARKETS WHICH MAY PRESENT SPECIFIC FEATURES WHICH DIFFER FROM THE STANDPOINT BOTH OF THE STRUCTURE AND OF THE CONDITIONS OF COMPETITION . HOWEVER THIS FINDING DOES NOT JUSTIFY THE CONCLUSION THAT SUCH A PRODUCT TOGETHER WITH ALL THE OTHER PRODUCTS WHICH CAN REPLACE IT AS FAR AS CONCERNS THE VARIOUS USES TO WHICH IT MAY BE PUT AND WITH WHICH IT MAY COMPETE , FORMS ONE SINGLE MARKET . THE CONCEPT OF THE RELEVANT MARKET IN FACT IMPLIES THAT THERE CAN BE EFFECTIVE COMPETITION BETWEEN THE PRODUCTS WHICH FORM PART OF IT AND THIS PRESUPPOSES THAT THERE IS A SUFFICIENT DEGREE OF INTERCHANGEABILITY BETWEEN ALL THE PRODUCTS FORMING PART OF THE SAME MARKET IN SO FAR AS A SPECIFIC USE OF SUCH PRODUCTS IS CONCERNED .*

*4 . THE DOMINANT POSITION REFERRED TO IN ARTICLE 86 OF THE TREATY RELATES TO A POSITION OF ECONOMIC STRENGTH ENJOYED BY AN UNDERTAKING WHICH ENABLES IT TO PREVENT EFFECTIVE COMPETITION BEING MAINTAINED ON THE RELEVANT MARKET BY AFFORDING IT THE POWER TO BEHAVE TO AN APPRECIABLE EXTENT INDEPENDENTLY OF ITS COMPETITORS , ITS CUSTOMERS AND ULTIMATELY OF THE CONSUMERS . SUCH A*

POSITION DOES NOT PRECLUDE SOME COMPETITION , WHICH IT DOES WHERE THERE IS A MONOPOLY OR A QUASIMONOPOLY , BUT ENABLES THE UNDERTAKING WHICH PROFITS BY IT , IF NOT TO DETERMINE , AT LEAST TO HAVE AN APPRECIABLE INFLUENCE ON THE CONDITIONS UNDER WHICH THAT COMPETITION WILL DEVELOP , AND IN ANY CASE TO ACT LARGELY IN DISREGARD OF IT SO LONG AS SUCH CONDUCT DOES NOT OPERATE TO ITS DETRIMENT .

5 . VERY LARGE MARKET SHARES ARE HIGHLY SIGNIFICANT EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION . OTHER RELEVANT FACTORS ARE THE RELATIONSHIP BETWEEN THE MARKET SHARES OF THE UNDERTAKING CONCERNED AND OF ITS COMPETITORS , ESPECIALLY THOSE OF THE NEXT LARGEST , THE TECHNOLOGICAL LEAD OF THE UNDERTAKING OVER ITS COMPETITORS , THE EXISTENCE OF A HIGHLY DEVELOPED SALES NETWORK AND THE ABSENCE OF POTENTIAL COMPETITION .

6 . THE CONCEPT OF ABUSE IS AN OBJECTIVE CONCEPT RELATING TO THE BEHAVIOUR OF AN UNDERTAKING IN A DOMINANT POSITION WHICH IS SUCH AS TO INFLUENCE THE STRUCTURE OF A MARKET WHERE , AS A RESULT OF THE VERY PRESENCE OF THE UNDERTAKING IN QUESTION , THE DEGREE OF COMPETITION IS WEAKENED AND WHICH , THROUGH RECOURSE TO METHODS DIFFERENT FROM THOSE WHICH CONDITION NORMAL COMPETITION IN PRODUCTS OR SERVICES ON THE BASIS OF THE TRANSACTIONS OF COMMERCIAL OPERATORS , HAS THE EFFECT OF HINDERING THE MAINTENANCE OF THE DEGREE OF COMPETITION STILL EXISTING IN THE MARKET OR THE GROWTH OF THAT COMPETITION .

7 . AN UNDERTAKING WHICH IS IN A DOMINANT POSITION ON A MARKET AND TIES PURCHASERS - EVEN IF IT DOES SO AT THEIR REQUEST - BY AN OBLIGATION OR PROMISE ON THEIR PART TO OBTAIN ALL OR MOST OF THEIR REQUIREMENTS EXCLUSIVELY FROM THE SAID UNDERTAKING ABUSES ITS DOMINANT POSITION WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , WHETHER THE OBLIGATION IN QUESTION IS STIPULATED WITHOUT FURTHER QUALIFICATION OR WHETHER IT IS UNDERTAKEN IN CONSIDERATION OF THE GRANT OF A REBATE . THE SAME APPLIES IF THE SAID UNDERTAKING , WITHOUT TYING THE PURCHASERS BY A FORMAL OBLIGATION , APPLIES , EITHER UNDER THE TERMS OF AGREEMENTS CONCLUDED WITH THESE PURCHASERS OR UNILATERALLY , A SYSTEM OF FIDELITY REBATES , THAT IS TO SAY DISCOUNTS CONDITIONAL ON THE CUSTOMER ' S OBTAINING ALL OR MOST OF ITS REQUIREMENTS FROM THE UNDERTAKING IN A DOMINANT POSITION .

OBLIGATIONS OF THIS KIND TO OBTAIN SUPPLIES EXCLUSIVELY FROM A PARTICULAR UNDERTAKING , WHETHER OR NOT THEY ARE IN CONSIDERATION OF REBATES OR OF THE GRANTING OF FIDELITY REBATES INTENDED TO GIVE THE PURCHASER AN INCENTIVE TO OBTAIN HIS SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION , ARE INCOMPATIBLE WITH THE OBJECTIVE OF UNDISTORTED COMPETITION WITHIN THE COMMON MARKET , BECAUSE THEY ARE NOT BASED ON AN ECONOMIC TRANSACTION WHICH JUSTIFIES THIS BURDEN OR BENEFIT BUT ARE DESIGNED TO DEPRIVE THE PURCHASER OF OR RESTRICT HIS POSSIBLE CHOICES OF SOURCES OF SUPPLY AND TO DENY OTHER PRODUCERS ACCESS TO THE MARKET .

THE ABUSE OF A DOMINANT POSITION AND THE RESTRICTION OF COMPETITION AS ATTRIBUTES OF THE CONTRACTS IN QUESTION ARE NOT AVOIDED BY THE SO-CALLED ' ' ENGLISH ' ' CLAUSE CONTAINED IN THEM WHEREBY THE PURCHASERS UNDERTAKE TO NOTIFY THE UNDERTAKING IN A DOMINANT POSITION OF ANY MORE FAVOURABLE OFFER MADE TO THEM BY COMPETITORS AND ARE FREE , IF THAT UNDERTAKING DOES NOT ADJUST ITS PRICES TO THE SAID OFFER , TO OBTAIN THEIR SUPPLIES FROM COMPETITORS . IN THESE CIRCUMSTANCES A CLAUSE OF THIS KIND IS SUCH AS TO ENABLE THE UNDERTAKING IN A DOMINANT POSITION TO REALIZE AN ABUSE OF THAT DOMINANT POSITION .

*8 . THE EFFECT OF FIDELITY REBATES IS TO APPLY DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS WITH OTHER TRADING PARTIES IN THAT TWO PURCHASERS PAY A DIFFERENT PRICE FOR THE SAME QUANTITY OF THE SAME PRODUCT DEPENDING ON WHETHER THEY OBTAIN THEIR SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION OR HAVE SEVERAL SOURCES OF SUPPLY .*

**Parties**
IN CASE 85/76
HOFFMANN-LA ROCHE & CO . AG , BASLE , REPRESENTED BY MESSRS . A . DERINGER AND J . SEDEMUND , ADVOCATES AT THE COLOGNE BAR , WITH AN ADDRESS FOR SERVICE IN LUXEMBOURG AT THE CHAMBERS OF E . ARENDT , P.O . BOX 39 ,
APPLICANT ,
V
COMMISSION OF THE EUROPEAN COMMUNITIES IN BRUSSELS , REPRESENTED BY E . ZIMMERMANN , LEGAL ADVISER , WITH AN ADDRESS FOR SERVICE IN LUXEMBOURG AT THE OFFICE OF MARIO CERVINO , JEAN MONNET BUILDING , KIRCHBERG , DEFENDANT ,

**Subject of the case**
APPLICATION FOR THE ANNULMENT OF COMMISSION DECISION OF 9 JUNE 1976 RELATING TO A PROCEEDING UNDER ARTICLE 86 OF THE EEC TREATY ( IV/29.020 - VITAMINS ),

**Grounds**
1THE PRINCIPAL CLAIM IN THE APPLICATION LODGED ON 27 AUGUST 1976 BY THE SWISS COMPANY HOFFMANN-LA ROCHE & COMPANY AG ( HEREINAFTER REFERRED TO AS ' ' ROCHE ' ' ), WHOSE PRINCIPAL PLACE OF BUSINESS IS AT BASLE , IS THE ANNULMENT OF COMMISSION DECISION OF 9 JUNE 1976 ( IV/29.020 - VITAMINS ) RELATING TO A PROCEEDING UNDER ARTICLE 86 OF THE EEC TREATY , WHICH WAS SERVED UPON THE APPLICANT ON 14 JUNE 1976 AND PUBLISHED IN THE OFFICIAL JOURNAL OF THE EUROPEAN COMMUNITIES L 223 OF 16 AUGUST 1976 , AND THE ALTERNATIVE CLAIM IS THE ANNULMENT OF ARTICLE 3 OF THAT DECISION WHICH IMPOSES UPON THE APPLICANT A FINE OF 300 000 UNITS OF ACCOUNT , BEING 1 098 000 DEUTSCHMARKS .

2IN THAT DECISION THE COMMISSION FINDS THAT ROCHE HAS A DOMINANT POSITION WITHIN THE COMMON MARKET , WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , ON THE MARKETS IN VITAMINS A , B2 , B3(PANTOTHENIC ACID ), B6 , C , E AND H ( BIOTIN ) AND THAT IT HAS ABUSED THAT POSITION AND THEREBY INFRINGED THE SAID ARTICLE , BY CONCLUDING , FROM 1964 ONWARDS AND IN PARTICULAR DURING THE YEARS 1970 TO 1974 INCLUSIVE , WITH 22 PURCHASERS OF THESE VITAMINS AGREEMENTS WHICH CONTAIN AN OBLIGATION UPON PURCHASERS , OR BY THE GRANT OF FIDELITY REBATES OFFER THEM AN INCENTIVE , TO BUY ALL OR MOST OF THEIR REQUIREMENTS OF VITAMINS EXCLUSIVELY OR IN PREFERENCE FROM ROCHE ( ARTICLE 1 OF THE DECISION ). THAT DECISION ENJOINS ROCHE TO TERMINATE THE INFRINGEMENT FORTHWITH ( ARTICLE 2 ) AND ORDERS IT TO PAY THE ABOVE-MENTIONED FINE ( ARTICLE 3 ).

3IN SUPPORT OF ITS APPLICATION THE APPLICANT MAKES THE FOLLOWING SUBMISSIONS :
- FIRST SUBMISSION : THE CONTESTED DECISION INFRINGES THE FUNDAMENTAL PRINCIPLE THAT RULES RELATING TO PENALTIES MUST BE CERTAIN AND FORESEEABLE .

- SECOND SUBMISSION : THE CONTESTED DECISION , AS A RESULT OF IRREGULARITIES IN THE ADMINISTRATIVE PROCEDURE UPON THE CONCLUSION WHEREOF IT WAS ADOPTED , HAS SEVERAL FORMAL DEFECTS .

- THIRD SUBMISSION : THE CONTESTED DECISION INFRINGES ARTICLE 86 OF THE

TREATY IN THAT THE COMMISSION INCORRECTLY INTERPRETED AND IN ANY CASE INACCURATELY APPLIED THE CONCEPTS OF A DOMINANT POSITION AND OF THE ABUSE OF A DOMINANT POSITION WHICH MAY AFFECT TRADE BETWEEN MEMBER STATES BY FINDING THAT ROCHE WAS IN SUCH A POSITION AND BY TREATING THE AGREEMENTS IN QUESTION AS CONSTITUTING SUCH AN ABUSE .

- FOURTH SUBMISSION : THE CONTESTED DECISION , BY IMPOSING A FINE UPON ROCHE , HAS INFRINGED ARTICLE 15 ( 2 ) OF REGULATION NO 17 OF THE COUNCIL OF 6 FEBRUARY 1962 ( OFFICIAL JOURNAL , ENGLISH SPECIAL EDITION 1959-1962 , P . 87 ), THE ALLEGED INFRINGEMENTS , IN SO FAR AS THEY MAY BE FOUND TO EXIST , WERE NOT COMMITTED EITHER INTENTIONALLY OR NEGLIGENTLY .

THE APPLICANT HAS ALSO RELIED IN ITS APPLICATION ON THE INFRINGEMENT OF ARTICLE 18 OF REGULATION NO 17 OF THE COUNCIL OF 6 FEBRUARY 1962 AND OF FINANCIAL REGULATION NO 68/313 OF 30 JULY 1968 ( JOURNAL OFFICIEL L 199 , P . 1 ) IN THAT THE FINE HAD BEEN CONVERTED INTO DEUTSCHMARKS , BUT , DURING THE PROCEEDINGS , IT WITHDREW THIS SUBMISSION SO THAT ONLY THE ABOVEMENTIONED FOUR SUBMISSIONS HAVE TO BE EXAMINED .

FIRST SUBMISSION : INFRINGEMENT OF THE PRINCIPLE THAT RULES RELATING TO PENALTIES MUST BE CERTAIN AND FORESEEABLE
4 ACCORDING TO THE APPLICANT THE CONCEPTS OF DOMINANT POSITION AND ABUSE OF SUCH A POSITION IN ARTICLE 86 ARE AMONG THE MOST INDETERMINATE AND VAGUE CONCEPTS BOTH IN COMMUNITY LAW AND IN THE NATIONAL LAW OF THE MEMBER STATES AND CONSEQUENTLY , BY APPLYING A FUNDAMENTAL LEGAL PRINCIPLE WHICH SHOULD BE DEDUCED FROM THE LEGAL MAXIM NULLUM CRIMEN , NULLA POENA SINE LEGE , THE COMMISSION MAY NOT IMPOSE THE PENALTIES PROVIDED FOR IN THE CASE OF INFRINGEMENT OF THAT ARTICLE UNTIL THOSE CONCEPTS HAVE BEEN GIVEN A SUFFICIENTLY SPECIFIC MEANING EITHER BY ADMINISTRATIVE PRACTICE OR BY CASE-LAW TO ENABLE UNDERTAKINGS TO KNOW WHERE THEY STAND .

5NEVERTHELESS THE APPLICANT DOES NOT DENY THAT THE COMMISSION IS ENTITLED TO INTERPRET AND GIVE A SPECIFIC MEANING TO THESE CONCEPTS IN THE DECISIONS WHICH IT ADOPTS IN RESPECT OF UNDERTAKINGS BUT ONLY DISPUTES ITS POWER TO IMPOSE PENALTIES AS LONG AS THESE CONCEPTS HAVE REMAINED UNDEFINED , WHICH IS WHAT HAS HAPPENED IN THIS CASE .

6CONSEQUENTLY THIS SUBMISSION IS ONLY CONCERNED WITH THE FINE IMPOSED AND IT WILL BE NECESSARY TO EXAMINE IT LATER ON AT THE SAME TIME AS THE OTHER OBJECTIONS TO THE IMPOSITION OF THIS FINE .

SECOND SUBMISSION : IRREGULARITIES IN THE ADMINISTRATIVE PROCEDURE
7ON THIS POINT THE APPLICANT IN THE FIRST PLACE SUBMITTED IN ITS APPLICATION THAT THE PROCEDURE INITIATED BY THE COMMISSION ITS OWN INITIATIVE AGAINST IT PURSUANT TO ARTICLES 3 AND 15 OF REGULATION NO 17 OF THE COUNCIL WAS IRREGULAR HAVING REGARD TO THE FACT THAT DOCUMENTS FOR INTERNAL USE BY ITS DEPARTMENTS CAME UNLAWFULLY INTO THE POSSESSION OF THE COMMISSION .

HOWEVER DURING THE WRITTEN AND ORAL PROCEDURE BEFORE THE COURT IT STATED THAT IT WITHDREW THIS SUBMISSION AND ITSELF PRODUCED FOR THE COURT ' S FILE WITH OTHER DOCUMENTS THE DOCUMENTS THE USE OF WHICH BY THE COMMISSION IT HAD PREVIOUSLY REGARDED AS BEING UNLAWFUL .

IN THESE CIRCUMSTANCES THIS SUBMISSION MAY BE REJECTED WITHOUT ANY FURTHER EXAMINATION SINCE THE COURT IS OF THE OPINIONS THAT IT NEED NOT EXAMINE IT OF ITS OWN MOTION .

8THE APPLICANT SUBMITS IN THE SECOND PLACE THAT IN THE DISPUTED DECISION DOCUMENTS , PARTICULARS WHEREOF WERE NOT GIVEN DURING THE ADMINISTRATIVE PROCEDURE , AND OTHER EVIDENCE WHICH THE COMMISSION REFUSED TO LET IT INSPECT BECAUSE OF THE DUTY TO RESPECT PROFESSIONAL SECRECY WERE TAKEN INTO ACCOUNT .

THUS THE APPLICANT FIRST OF ALL REFERS TO THE DOCUMENTS MENTIONED IN RECITAL 12 TO THE CONTESTED DECISION , NAMELY FOUR INTERNAL CIRCULARS ISSUED BY ROCHE , WHICH ACCORDING TO THE DECISION WERE DATED SEPTEMBER 1970 ( ACTUALLY 8 SEPTEMBER 1972 ), DECEMBER 1970 , MAY 1971 ( ACTUALLY MID-AUGUST 1971 ) AND AUGUST 1971 AND ALSO TO THE MINUTES OF THE EUROPEAN BULK MANAGERS MEETING ON 12 AND 13 OCTOBER 1971 ( ACTUALLY ON 12 AND 13 OCTOBER 1972 ).

IT REFERS IN THE SECOND PLACE TO THE EVIDENCE WHICH THE COMMISSION OBTAINED FROM OTHER VITAMIN MANUFACTURERS AND WITH THE HELP OF WHICH IT CALCULATED THE MARKET SHARES WHICH IT CLAIMS ROCHE HAS , AND ALSO TO THE INFORMATION REQUESTED AND OBTAINED FROM THE APPLICANT ' S CUSTOMERS FOR THE PURPOSE OF DETERMINING WHETHER OR NOT THE CONTRACTS , THE CONCLUSION WHEREOF IS REGARDED BY THE COMMISSION AS AN ABUSE OF A DOMINANT POSITION HAD AS THEIR EFFECT THE RESTRICTION OF COMPETITION AND OF TRADE BETWEEN MEMBER STATES .

9OBSERVANCE OF THE RIGHT TO BE HEARD IS IN ALL PROCEEDINGS IN WHICH SANCTIONS , IN PARTICULAR FINES OR PENALTY PAYMENTS , MAY BE IMPOSED A FUNDAMENTAL PRINCIPLE OF COMMUNITY LAW WHICH MUST BE RESPECTED EVEN IF THE PROCEEDINGS IN QUESTION ARE ADMINISTRATIVE PROCEEDINGS .

ARTICLE 19 ( 1 ) OF COUNCIL REGULATION NO 17 OBLIGES THE COMMISSION , BEFORE TAKING A DECISION IN CONNEXION WITH FINES , TO GIVE THE PERSONS CONCERNED THE OPPORTUNITY OF PUTTING FORWARD THEIR POINT OF VIEW WITH REGARD TO THE COMPLAINTS MADE AGAINST THEM .

SIMILARLY ARTICLE 4 OF REGULATION NO 99/63 OF THE COMMISSION OF 25 JULY 1963 ( OFFICIAL JOURNAL , ENGLISH SPECIAL EDITION 1963 , P . 47 ) ON THE HEARING PROVIDED FOR ARTICLE 19 OF REGULATION NO 17 PROVIDES THAT THE COMMISSION SHALL IN ITS DECISIONS DEAL ONLY WITH THOSE OBJECTIONS RAISED AGAINST UNDERTAKINGS AND ASSOCIATIONS OF UNDERTAKINGS IN RESPECT OF WHICH THEY HAVE BEEN AFFORDED THE OPPORTUNITY OF MAKING KNOWN THEIR VIEWS .

10ALTHOUGH THE COURT IN ITS JUDGMENT OF 15 JULY 1970 IN CASE 45/69 ( BOEHRINGER MANNHEIM GMBH V COMMISSION OF THE EUROPEAN COMMUNITIES ( 1970 ) ECR 769 ) HELD THAT THESE REQUIREMENTS ARE SATISFIED AS FAR AS CONCERNS THE NOTIFICATION OF COMPLAINTS - THE FIRST STAGE OF THE ADMINISTRATIVE PROCEDURE - IF THE NOTIFICATION SETS FORTH CLEARLY , ALBEIT SUCCINCTLY , THE ESSENTIAL FACTS UPON WHICH THE COMMISSION RELIES , THIS RULING IS SUBJECT TO THE PROVISO THAT ' ' IN THE COURSE OF THE ADMINISTRATIVE PROCEDURE IT SUPPLIES THE DETAILS NECESSARY TO THE DEFENCE . ' '
11THUS IT EMERGES FROM THE PROVISIONS QUOTED ABOVE AND ALSO FROM THE GENERAL PRINCIPLE TO WHICH THEY GIVE EFFECT THAT IN ORDER TO RESPECT THE PRINCIPLE OF THE RIGHT TO BE HEARD THE UNDERTAKINGS CONCERNED MUST HAVE BEEN AFFORDED THE OPPORTUNITY DURING THE ADMINISTRATIVE PROCEDURE TO MAKE KNOWN THEIR VIEWS ON THE TRUTH AND RELEVANCE OF THE FACTS AND CIRCUMSTANCES ALLEGED AND ON THE DOCUMENTS USED BY THE COMMISSION TO SUPPORT ITS CLAIM THAT THERE HAS BEEN AN INFRINGEMENT OF ARTICLE 86 OF THE TREATY .

12THE COMMISSION DOES NOT DENY THAT , SINCE IT TOOK THE VIEW THAT IT WAS

BOUND TO OBSERVE PROFESSIONAL SECRECY , IT REFUSED TO PASS ON THE DATA THAT IT HAD OBTAINED FROM COMPETITORS OR CUSTOMERS OF ROCHE WHICH FORMED THE BASIS , TOGETHER WITH OTHER DATA , OF ITS ASSESSMENT OF THE MARKET SHARES AND OF THE VIEW THAT THE DISPUTED CONTRACTS RESTRICT COMPETITION .

13ALTHOUGH ARTICLE 20 ( 2 ) OF REGULATION NO 17 PROVIDES THAT ' ' WITHOUT PREJUDICE TO THE PROVISIONS OF ARTICLES 19 AND 21 , THE COMMISSION AND THE COMPETENT AUTHORITIES OF THE MEMBER STATES , THEIR OFFICIALS AND OTHER SERVANTS SHALL NOT DISCLOSE INFORMATION ACQUIRED BY THEM AS A RESULT OF THE APPLICATION OF THIS REGULATION AND OF THE KIND COVERED BY PROFESSIONAL SECRECY ' ' , THIS RULE MUST , AS THE EXPRESS REFERENCE TO ARTICLE 19 CONFIRMS , BE RECONCILED WITH THE RIGHT TO BE HEARD .

14THE SAID ARTICLE 20 BY PROVIDING UNDERTAKINGS FROM WHOM INFORMATION HAS BEEN OBTAINED WITH A GUARANTEE THAT THEIR INTERESTS WHICH ARE CLOSELY CONNECTED WITH OBSERVANCE OF PROFESSIONAL SECRECY , ARE NOT JEOPARDIZED , ENABLES THE COMMISSION TO COLLECT ON THE WIDEST POSSIBLE SCALE THE REQUISITE DATA FOR THE FULFILMENT OF THE TASK CONFERRED UPON IT BY ARTICLES 85 AND 86 OF THE TREATY WITHOUT THE UNDERTAKINGS BEING ABLE TO PREVENT IT FROM DOING SO , BUT IT DOES NOT NEVERTHELESS ALLOW IT TO USE , TO THE DETRIMENT OF THE UNDERTAKINGS INVOLVED IN A PROCEEDING REFERRED TO IN REGULATION NO 17 , FACTS , CIRCUMSTANCES OR DOCUMENTS WHICH IT CANNOT IN ITS VIEW DISCLOSE IF SUCH A REFUSAL OF DISCLOSURE ADVERSELY AFFECTS THAT UNDERTAKING ' S OPPORTUNITY TO MAKE KNOWN EFFECTIVELY ITS VIEWS ON THE TRUTH OR IMPLICATIONS OF THOSE CIRCUMSTANCES , ON THOSE DOCUMENTS OR AGAIN ON THE CONCLUSIONS DRAWN BY THE COMMISSION FROM THEM .

15HOWEVER IF SUCH IRREGULARITIES HAVE IN FACT BEEN PUT RIGHT DURING THE PROCEEDINGS BEFORE THE COURT THEY DO NOT NECESSARILY LEAD TO THE ANNULMENT OF THE CONTESTED DECISION IN SO FAR AS REMEDYING THEM AT A LATER STAGE HAS NOT AFFECTED THE RIGHT TO BE HEARD .

16THE DOCUMENTS TO WHICH THE APPLICANT HAS REFERRED ARE , ON THE ONE HAND , THOSE MENTIONED IN RECITAL 12 TO THE CONTESTED DECISION , THAT IS TO SAY THE SAME DOCUMENTS AS THOSE IN THE CASE OF WHICH IT HAD CRITICIZED THE MANNER OF THEIR COMING INTO THE POSSESSION OF THE COMMISSION , ALTHOUGH IT LATER PRODUCED THEM FOR THE COURT ' S FILE SO THAT BOTH PARTIES COULD AND DID MAKE THEIR SUBMISSIONS CONCERNING THEM .

ON THE OTHER HAND AS FAR AS CONCERNS THE DATA ON THE BASIS OF WHICH THE COMMISSION HAS CALCULATED THE MARKET SHARES AND ITS ANALYSES OF THE EFFECTS OF THE DISPUTED CONTRACTS THE PARTIES , DURING THE WRITTEN PROCEDURE AT THE REQUEST OF THE COURT PRODUCED , FOLLOWING AN EXCHANGE OF INFORMATION , AN AGREED DOCUMENT WHICH SHOWS THAT THE COMMISSION IN THE CASE OF ALL THE VITAMINS IN QUESTION HAS DISCLOSED THE BASES OF ITS CALCULATION OF THE MARKET SHARES ACCORDING TO THEIR VALUE FOR 1972 , 1973 AND 1974 WITH THE RESULT THAT ROCHE WAS IN A POSITION TO ESTIMATE ITS MARKET SHARES ACCORDING TO THE QUANTITIES SOLD ON THE BASIS OF THE SALES ATTRIBUTED TO CERTAIN COMPETITORS IN THE DOCUMENTS PRODUCED BY THE COMMISSION .

17THUS THE PARTIES HAVE BEEN ABLE TO AGREE ON AN ESTIMATE OF THE MARKET SHARES ACCORDING TO QUANTITY AND VALUE - ALTHOUGH THEY HAVE REMAINED IN DESAGREEMENT AS TO WHICH OF THE TWO CRITERIA IS DETERMINATIVE - AS FAR AS CONCERNS VITAMINS A , B3 AND H AND ALSO VITAMINS C AND E SUBJECT IN THE CASE OF THE LATTER TO AN EXAMINATION OF THE MARKET TO BE TAKEN INTO CONSIDERATION FROM THE STANDPOINT OF THE INTERCHANGEABILITY FOR CERTAIN USES OF THESE TWO

VITAMINS WITH OTHER PRODUCTS , ONLY THE MARKET SHARES OF VITAMINS B2 AND B6 REMAINING UNAGREED .

18FINALLY THE COMMISSION ALSO PRODUCED DURING THE WRITTEN PROCEDURE AT THE REQUEST OF THE COURT THE MINUTES OF THE MEETING BETWEEN UNILEVER AND ROCHE MENTIONED IN RECITAL 3 TO THE CONTESTED DECISION AS WELL AS THE REPORTS OF THE INQUIRIES CARRIED OUT BY ITS OFFICIALS WITH SOME OF ROCHE ' S CUSTOMERS , WHO ENTERED INTO THE DISPUTED CONTRACTS , OR , IN THE CASE OF THOSE UNDERTAKINGS WHICH WISHED TO REMAIN ANONYMOUS , A NOTE SUMMARIZING THE SAID REPORTS .

19IN THESE CIRCUMSTANCES THE SUBMISSION BASED ON THE ALLEGED BREACH OF THE PRINCIPLE OF THE RIGHT TO BE HEARD CANNOT BE UPHELD .

THIRD SUBMISSION : INFRINGEMENT OF ARTICLE 86 OF THE TREATY
20IN THE APPLICANT ' S VIEW THE COMMISSION HAS INFRINGED ARTICLE 86 OF THE TREATY IN THE FOLLOWING RESPECTS :
I THE CONTESTED DECISION WRONGLY ASSUMES THAT THE APPLICANT HAS A DOMINANT POSITION , INTERPRETS THIS CONCEPT INCORRECTLY AND WRONGLY APPLIES THAT INTERPRETATION TO THE CASE IN POINT , ESPECIALLY AS FAR AS CONCERNS THE ASSESSMENT AND RELEVANCE BOTH OF THE MARKET SHARES AND ALSO OF THE OTHER FACTORS USED TO ESTABLISH THE EXISTENCE OF THE ALLEGED DOMINANT POSITION .

IITHE CONTESTED DECISION ASSUMES , IN ANY CASE INCORRECTLY , THAT THE APPLICANT HAS ABUSED SUCH A POSITION , SINCE THE COMMISSION HAS MADE A WRONG ANALYSIS OF THE CONTRACTS THE CONCLUSION WHEREOF IS SUPPOSED , ACCORDING TO IT TO CONSTITUTE AN ABUSE AND OF THE RESTRICTIVE EFFECTS ON COMPETITION OF THE SAID CONTRACTS .

IIITHE CONTESTED DECISION WRONGLY ASSUMES THAT THE APPLICANT ' S CONDUCT WAS SUCH AS TO HAVE AN APPRECIABLE EFFECT ON INTRA-COMMUNITY TRADE .

I - THE EXISTENCE OF A DOMINANT POSITION
SECTION 1 : THE DELIMITATION OF THE RELEVANT MARKETS
21IN ORDER TO DETERMINE WHETHER ROCHE HAS THE DOMINANT POSITION AS ALLEGED , IT IS NECESSARY TO DELIMIT THE RELEVANT MARKETS BOTH FROM THE GEOGRAPHICAL STANDPOINT AND FROM THE STANDPOINT OF THE PRODUCT .

22RECITALS 3 AND 6 TO THE CONTESTED DECISION SHOW THAT THE GEOGRAPHICAL MARKET TO BE CONSIDERED COMPRISES THE WHOLE OF THE COMMON MARKET , THAT IS TO SAY THE SIX MEMBER STATES UP TO 31 DECEMBER 1972 AND THE NINE MEMBER STATES THEREAFTER .

23THE CONTESTED DECISION REFERS TO BULK VITAMINS BELONGING TO 13 GROUPS , OF WHICH ROCHE MANUFACTURES AND MARKETS EIGHT ( A , B1 , B2 , B3 ( PANTOTHENIC ACID ), B6 , C , E AND H ( BIOTIN ) AND FIVE PURCHASED BY ROCHE FROM THE PRODUCERS AND RESOLD BY IT , B12 , D , PP , K AND M ).

THE COMMISSION FOUND THAT THERE WAS A DOMINANT POSITION IN THE CASE OF SEVEN OF THE EIGHT GROUPS OF VITAMINS MANUFACTURED BY ROCHE , NAMELY A , B2 , B3 , B6 , C , E AND H .
THE PARTIES ARE AGREED , ON THE ONE HAND , THAT EACH OF THESE GROUPS HAS SPECIFIC METABOLIZING FUNCTIONS AND FOR THIS REASON IS NOT INTERCHANGEABLE WITH THE OTHERS AND , ON THE OTHER HAND , THAT IN THE CASE OF THE POSSIBLE USES WHICH THESE THREE GROUPS HAVE IN COMMON , NAMELY FOR FOOD , ANIMAL FEED AND FOR PHARMACEUTICAL PURPOSES , THE VITAMINS IN QUESTION DO NOT ENCOUNTER THE COMPETITION OF OTHER PRODUCTS .

24THE COMMISSION AFTER TAKING THESE FACTORS INTO ACOUNT CONSIDERED ( RECITAL 20 TO THE CONTESTED DECISION ) THAT EACH GROUP OF VITAMINS CONSTITUTES A SEPARATE MARKET AND ROCHE , AFTER HAVING FIRST OF ALL SUGGESTED THAT SEVERAL GROUPS MIGHT TOGETHER FORM A SINGLE MARKET , ACCEPTED THIS POINT OF VIEW WITH THE RESERVATION THAT IN ITS OPINION THE C AND E GROUPS OF VITAMINS , AS FAR AS EACH OF THEM IS CONCERNED , TOGETHER WITH OTHER PRODUCTS FORM PART OF A WIDER MARKET .

THEREFORE THE QUESTION WHETHER THE COMMISSION HAS CORRECTLY DELIMITED THE MARKETS TO WHICH THE C AND E GROUPS OF VITAMINS BELONG MUST BE EXAMINED .

25IT IS AN ESTABLISHED FACT THAT VITAMINS C AND E APART FROM THEIR USES IN THE PHARMACEUTICAL INDUSTRY AND IN FOOD AND ANIMAL FEED - CALLED BIO-NUTRITIVE USES - ARE ALSO SOLD , INTER ALIA , AS ANTIOXIDANTS , FERMENTATION AGENTS AND ADDITIVES - USES COVERED BY THE WORD ' ' TECHNOLOGICAL ' ' AND , TO THE EXTENT TO WHICH THERE IS ANY DEMAND FOR THESE VITAMINS FOR THE PURPOSE OF THE SAID TECHNOLOGICAL USES , THEY ARE EXPOSED TO THE COMPETITION OF OTHER PRODUCTS SUITABLE FOR THE SAME USES .

26ACCORDING TO ROCHE THE CONCLUSION TO BE DRAWN FROM THIS IS THAT THE C AND E GROUPS OF VITAMINS ARE PART OF A MUCH LARGER MARKET COMPRISING THESE OTHER PRODUCTS AND THAT THE COMMISSION HAS EXAGGERATED ROCHE ' S SHARE OF THE SAID MARKETS , BY FAILING TO INCLUDE THE LATTER .

27THE COMMISSION ON THE OTHER HAND TAKES THE VIEW THAT THE PRODUCTS WHICH CAN BE SUBSTITUTED FOR VITAMINS C AND E FOR TECHNOLOGICAL USES CANNOT BE INCLUDED IN THE SAME MARKETS AS THESE VITAMINS BECAUSE THE TWO POSSIBLE USES OF THE LATTER MEAN THAT THE DEGREE OF INTERCHANGEABILITY OF THE SAID PRODUCTS WITH THE VITAMINS IN QUESTION IS NOT SUFFICIENT .

NEITHER CAN THE VITAMINS USED IN THE END FOR BIO-NUTRITIVE PURPOSES AND THOSE USED FOR TECHNOLOGICAL PURPOSES BE DIVIDED INTO TWO SEPARATE MARKETS , BECAUSE , BY REASON OF THE TWO USES TO WHICH THESE PRODUCTS LEND THEMSELVES , THE MANUFACTURERS AND PURCHASERS ARE ENTIRELY FREE , ESPECIALLY ON AN EXPANDING MARKET , TO USE THEM FOR THE PURPOSE WHICH THEY REGARD AS THE MOST PROFITABLE .

HOWEVER ASSUMING THAT THE VITAMINS SOLD BY ROCHE FOR TECHNOLOGICAL PURPOSES HAD TO BE EXCLUDED FROM THE MARKETS IN QUESTION THE SAME WOULD HAVE TO BE DONE IN THE CASE OF ITS COMPETITORS WITH THE RESULT THAT THE MARKET SHARES WOULD REMAIN UNCHANGED .

28IF A PRODUCT COULD BE USED FOR DIFFERENT PURPOSES AND IF THESE DIFFERENT USES ARE IN ACCORDANCE WITH ECONOMIC NEEDS , WHICH ARE THEMSELVES ALSO DIFFERENT , THERE ARE GOOD GROUNDS FOR ACCEPTING THAT THIS PRODUCT MAY , ACCORDING TO THE CIRCUMSTANCES , BELONG TO SEPARATE MARKETS WHICH MAY PRESENT SPECIFIC FEATURES WHICH DIFFER FROM THE STANDPOINT BOTH OF THE STRUCTURE AND OF THE CONDITIONS OF COMPETITION .

HOWEVER THIS FINDING DOES NOT JUSTIFY THE CONCLUSION THAT SUCH A PRODUCT TOGETHER WITH ALL THE OTHER PRODUCTS WHICH CAN REPLACE IT AS FAR AS CONCERNS THE VARIOUS USES TO WHICH IT MAY BE PUT AND WITH WHICH IT MAY COMPETE , FORMS ONE SINGLE MARKET .

THE CONCEPT OF THE RELEVANT MARKET IN FACT IMPLIES THAT THERE CAN BE EFFECTIVE COMPETITION BETWEEN THE PRODUCTS WHICH FORM PART OF IT AND THIS

PRESUPPOSES THAT THERE IS A SUFFICIENT DEGREE OF INTERCHANGEABILITY BETWEEN ALL THE PRODUCTS FORMING PART OF THE SAME MARKET IN SO FAR AS A SPECIFIC USE OF SUCH PRODUCTS IS CONCERNED .

THERE WAS NO SUCH INTERCHANGEABILITY , AT ANY RATE DURING THE PERIOD UNDER CONSIDERATION , BETWEEN ALL THE VITAMINS OF EACH OF THE GROUPS C AND E AND ALL THE PRODUCTS WHICH , ACCORDING TO THE CIRCUMSTANCES , MAY BE SUBSTITUTED FOR ONE OR OTHER OF THESE GROUPS OF VITAMINS FOR TECHNOLOGICAL USES WHICH ARE THEMSELVES EXTREMELY VARIED .

29ON THE OTHER HAND THERE MAY BE SOME DOUBT WHETHER , FOR THE PURPOSE OF DELIMITING THE RESPECTIVE MARKETS OF THE C AND E GROUPS OF VITAMINS , IT IS NECESSARY TO INCLUDE ALL THE VITAMINS OF EACH OF THESE GROUPS IN A MARKET CORRESPONDING TO THAT GROUP , OR WHETHER , ON THE CONTRARY , EACH OF THESE GROUPS MUST BE PLACED IN A SEPARATE MARKET , ONE COMPRISING VITAMINS FOR BIO-NUTRITIVE USE AND THE OTHER VITAMINS FOR TECHNOLOGICAL PURPOSES .

30HOWEVER IN ORDER TO CALCULATE THE MARKET SHARES OF ROCHE AND OF ITS COMPETITORS CORRECTLY THIS QUESTION DID NOT HAVE TO BE ANSWERED BECAUSE , AS THE COMMISSION HAS RIGHTLY POINTED OUT , IF IT HAD BEEN NECESSARY TO DRAW THIS DISTINCTION , IT WOULD HAVE HAD TO BE DRAWN FOR ROCHE ' S COMPETITORS AS WELL AS FOR ROCHE ITSELF , AND - IN THE ABSENCE OF ANY INDICATION TO THE CONTRARY BY THE APPLICANT - IN SIMILAR PROPORTIONS WITH THE RESULT THAT THE MARKET SHARES IN PERCENTAGES WOULD REMAIN UNCHANGED .

FINALLY ROCHE , IN ANSWER TO A QUESTION PUT TO IT BY THE COURT , HAS STATED THAT ALL THE VITAMINS OF EACH GROUP , IRRESPECTIVE OF THE ULTIMATE INTENDED USE OF THE PRODUCT , WERE SUBJECT TO THE SAME PRICE SYSTEM SO THAT THEY COULD NOT BE SPLIT UP INTO SPECIFIC MARKETS .

IT FOLLOWS FROM THE FOREGOING THAT THE COMMISSION HAS CORRECTLY DELIMITED THE RELEVANT MARKETS IN ITS CONTESTED DECISION .

SECTION 2 : THE STRUCTURE OF THE RELEVANT MARKETS
31ALTHOUGH EACH GROUP OF VITAMINS CONSTITUTES A MARKET OF ITS OWN , THESE SEPARATE MARKETS NEVERTHELESS , AS FAR AS CONCERNS PRODUCTION AND MARKETING STRUCTURES , HAVE COMMON FEATURES WHICH MUST BE BROUGHT OUT .

32IN THE FIRST PLACE THE PARTIES AGREE THAT THE MARKETS OF ALL THE GROUPS OF VITAMINS EXPANDED VERY CONSIDERABLY BETWEEN 1950 AND 1974 - ALTHOUGH ON A DIFFERENT SCALE - WITH PRODUCTION INCREASING ALL THE TIME .

33IN PARTICULAR AS FAR AS CONCERNS PRODUCTION THE PARTIES ALSO AGREE THAT , ALTHOUGH THE SYNTHESIS OF VITAMINS , ABOVE ALL AFTER THE EXPIRATION OF THE PATENTS , A NOT INCONSIDERABLE NUMBER OF WHICH WAS HELD BY ROCHE , DOES NOT RAISE ANY ESPECIALLY DIFFICULT TECHNICAL PROBLEMS , PRODUCTION NEVERTHELESS PRESUPPOSES LARGE CAPITAL INVESTMENT AND NECESSITATES SPECIAL EQUIPMENT , WHICH IS TO A VERY GREAT EXTENT PECULIAR TO EACH GROUP OF VITAMINS , WITH THE RESULT THAT THE CAPACITY OF THE FACTORIES DURING THE ABOVE-MENTIONED PERIOD WAS GEARED TO THE ESTIMATED GROWTH IN DEMAND OVER A PERIOD OF TEN YEARS .

IN SPITE OF THE VIGOROUS GROWTH MENTIONED ABOVE THIS MARKET STRUCTURE IN THE CASE OF MOST OF THE GROUPS OF VITAMINS BROUGHT IN ITS WAKE A SURPLUS PRODUCTION CAPACITY THROUGHOUT THE WORLD .

THIS SITUATION IS ILLUSTRATED IN A STRIKING MANNER BY THE OBSERVATION RECORDED IN THE MINUTES OF THE MEETING BETWEEN UNILEVER AND ROCHE ON 11

DECEMBER 1972 THAT ROCHE ' S CAPACITY AS A WHOLE WAS ALONE SUFFICIENT TO
MEET WORLD DEMAND AND THAT ROCHE AT THAT TIME WAS ONLY OPERATING AT 50%
OF THIS CAPACITY .

34AS FAR AS PRODUCERS OPERATING WITHIN THE COMMON MARKET ARE CONCERNED
THIS PRODUCTION CAPACITY WAS CONCENTRATED DURING THE PERIOD TAKEN INTO
CONSIDERATION BY THE COMMISSION IN THE HANDS OF A LIMITED NUMBER OF
UNDERTAKINGS - NINE ALTOGETHER ACCORDING TO THE TABLE IN RECITAL 4 TO THE
CONTESTED DECISION - THE NUMBER OF MANUFACTURERS IN EACH GROUP BEING EVEN
SMALLER NAMELY , FOUR IN THE CASE OF VITAMIN A , THREE IN THE CASE OF VITAMIN
B2 , THREE IN THE CASE OF VITAMIN B3 , FOUR IN THE CASE OF VITAMIN B6 , FIVE IN
THE CASE OF VITAMIN C , FOUR IN THE CASE OF VITAMIN E AND TWO IN THE CASE OF
VITAMIN H .
SOME OF THESE PRODUCERS WERE MOREOVER PURCHASERS AND RESELLERS OF
VITAMINS WHICH THEY DID NOT PRODUCE THEMSELVES , WHILE UNSPECIFIED
QUANTITIES OF VITAMINS WERE MARKETED BY LARGE COMMERCIAL FIRMS WHICH
OBTAINED THEIR SUPPLIES FROM SOURCES OTHER THAN THE NINE PRODUCERS
MENTIONED IN THE DECISION .

35AS FAR AS CONCERNS THE DEMAND FOR BULK VITAMINS THE SPECIAL FEATURE OF THE
SITUATION WITH THE COMMON MARKET IS THE PRESENCE OF A RELATIVELY LARGE
NUMBER OF PURCHASERS - ABOUT 5 000 WHO BUY FROM ROCHE - BUT A CONSIDERABLE
PROPORTION OF THIS DEMAND , WHICH IN THE CASE OF ROCHE MAY BE ESTIMATED AT
APPROXIMATELY 25% OF ITS SALES WITHIN THE COMMON MARKET , WAS AT THE PERIOD
UNDER CONSIDERATION CONCENTRATED IN THE HANDS OF 22 LARGE FIRMS , OF WHICH
SEVEN BELONGED TO THE PHARMACEUTICAL INDUSTRY , FIVE TO THE FOOD INDUSTRY
AND 10 TO THE ANIMAL FEED INDUSTRY .

ALL THESE CUSTOMERS , IRRESPECTIVE OF THE SECTOR OF THE ECONOMY TO WHICH
THEY BELONGED , WERE BUYERS OF A GOOD DEAL , IF NOT ALL OF THE VITAMINS IN
QUESTION , THE ONLY APPARENT EXCEPTION IN THIS CONNEXION , AT ALL EVENTS AS
FAR AS CONCERNS ITS RELATIONS WITH ROCHE , BEING UNILEVER WHICH ONLY
PURCHASED VITAMINS IN GROUP A .
SECTION 3 : THE RELEVANCE OF THE FACTORS USED BY THE COMMISSION TO ESTABLISH
THE EXISTENCE OF A DOMINANT POSITION
36THE COMMISSION IS OF THE OPINION THAT ROCHE HAS A DOMINANT POSITION ON
THE SEVEN MARKETS ( A , B2 , B3 , B6 , C , E , H ) AND BASES THIS VIEW ON THE ONE
HAND , ON THE RELATIONSHIP BETWEEN THE APPLICANT ' S MARKET SHARES AND THOSE
OF ITS COMPETITORS AND , ON THE OTHER HAND , ON THE EXISTENCE OF A NUMBER OF
FACTORS WHICH , IF THE MARKET SHARE IS NOT IN ITSELF THE DETERMINATIVE
CRITERION , NEVERTHELESS SECURE ROCHE A MARKED ASCENDANCY ON THE RELEVANT
MARKETS .

THE COMMISSION DRAWS THE FOLLOWING CONCLUSION FROM THIS ( RECITAL 21 TO
THE DECISION ): ' ' ROCHE ENJOYS SUCH COMPLETE FREEDOM OF ACTION ON THE
RELEVANT MARKETS ENABLING IT TO IMPEDE EFFECTIVE COMPETITION WITHIN THE
COMMON MARKET THAT IT HAS A DOMINANT POSITION ON SUCH MARKETS ' ' .

37ROCHE CHALLENGES THE ASSESSMENT OF ITS MARKET SHARES AND ALSO THE TRUTH
AND RELEVANCE OF THE OTHER FACTORS USED IN THE CONTESTED DECISION .

IT ALSO BLAMES THE COMMISSION FOR HAVING OMITTED TO EXAMINE AND TAKE INTO
CONSIDERATION ROCHE ' S CONDUCT ON THE RELEVANT MARKETS AND IN PARTICULAR
THE CONTINUAL LARGE FALLS IN THE PRICES OF VITAMINS WHICH PROVE THAT THERE
WAS EFFECTIVE COMPETITION AND THAT ROCHE HAD TO YIELD TO ITS PRESSURE .

38ARTICLE 86 IS AN APPLICATION OF THE GENERAL OBJECTIVE OF THE ACTIVITIES OF

THE COMMUNITY LAID DOWN BY ARTICLE 3 ( F ) OF THE TREATY NAMELY , THE INSTITUTION OF A SYSTEM ENSURING THAT COMPETITION IN THE COMMON MARKET IS NOT DISTORTED .

ARTICLE 86 PROHIBITS ANY ABUSE BY AN UNDERTAKING OF A DOMINANT POSITION IN A SUBSTANTIAL PART OF THE COMMON MARKET IN SO FAR AS IT MAY AFFECT TRADE BETWEEN MEMBER STATES .

THE DOMINANT POSITION THUS REFERRED TO RELATES TO A POSITION OF ECONOMIC STRENGTH ENJOYED BY AN UNDERTAKING WHICH ENABLES IT TO PREVENT EFFECTIVE COMPETITION BEING MAINTAINED ON THE RELEVANT MARKET BY AFFORDING IT THE POWER TO BEHAVE TO AN APPRECIABLE EXTENT INDEPENDENTLY OF ITS COMPETITORS , ITS CUSTOMERS AND ULTIMATELY OF THE CONSUMERS .

39SUCH A POSITION DOES NOT PRECLUDE SOME COMPETITION , WHICH IT DOES WHERE THERE IS A MONOPOLY OR A QUASI-MONOPOLY , BUT ENABLES THE UNDERTAKING WHICH PROFITS BY IT , IF NOT TO DETERMINE , AT LEAST TO HAVE AN APPRECIABLE INFLUENCE ON THE CONDITIONS UNDER WHICH THAT COMPETITION WILL DEVELOP , AND IN ANY CASE TO ACT LARGELY IN DISREGARD OF IT SO LONG AS SUCH CONDUCT DOES NOT OPERATE TO ITS DETRIMENT .

A DOMINANT POSITION MUST ALSO BE DISTINGUISHED FROM PARALLEL COURSES OF CONDUCT WHICH ARE PECULIAR TO OLIGOPOLIES IN THAT IN AN OLIGOPOLY THE COURSES OF CONDUCT INTERACT , WHILE IN THE CASE OF AN UNDERTAKING OCCUPYING A DOMINANT POSITION THE CONDUCT OF THE UNDERTAKING WHICH DERIVES PROFITS FROM THAT POSITION IS TO A GREAT EXTENT DETERMINED UNILATERALLY .

THE EXISTENCE OF A DOMINANT POSITION MAY DERIVE FROM SEVERAL FACTORS WHICH , TAKEN SEPARATELY , ARE NOT NECESSARILY DETERMINATIVE BUT AMONG THESE FACTORS A HIGHLY IMPORTANT ONE IS THE EXISTENCE OF VERY LARGE MARKET SHARES .

40A SUBSTANTIAL MARKET SHARE AS EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION IS NOT A CONSTANT FACTOR AND ITS IMPORTANCE VARIES FROM MARKET TO MARKET ACCORDING TO THE STRUCTURE OF THESE MARKETS , ESPECIALLY AS FAR AS PRODUCTION , SUPPLY AND DEMAND ARE CONCERNED .

EVEN THOUGH EACH GROUP OF VITAMINS CONSTITUTES A SEPARATE MARKET , THESE DIFFERENT MARKETS , AS HAS EMERGED FROM THE EXAMINATION OF THEIR STRUCTURE , NEVERTHELESS HAVE A SUFFICIENT NUMBER OF FEATURES IN COMMON TO MAKE IT POSSIBLE FOR THE SAME CRITERIA TO BE APPLIED TO THEM AS FAR AS CONCERNS THE IMPORTANCE OF THE MARKET SHARES FOR THE PURPOSE OF DETERMINING WHETHER THERE IS A DOMINANT POSITION OR NOT .

41FURTHERMORE ALTHOUGH THE IMPORTANCE OF THE MARKET SHARES MAY VARY FROM ONE MARKET TO ANOTHER THE VIEW MAY LEGITIMATELY BE TAKEN THAT VERY LARGE SHARES ARE IN THEMSELVES , AND SAVE IN EXCEPTIONAL CIRCUMSTANCES , EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION .

AN UNDERTAKING WHICH HAS A VERY LARGE MARKET SHARE AND HOLDS IT FOR SOME TIME , BY MEANS OF THE VOLUME OF PRODUCTION AND THE SCALE OF THE SUPPLY WHICH IT STANDS FOR - WITHOUT THOSE HAVING MUCH SMALLER MARKET SHARES BEING ABLE TO MEET RAPIDLY THE DEMAND FROM THOSE WHO WOULD LIKE TO BREAK AWAY FROM THE UNDERTAKING WHICH HAS THE LARGEST MARKET SHARE - IS BY VIRTUE OF THAT SHARE IN A POSITION OF STRENGTH WHICH MAKES IT AN UNAVOIDABLE TRADING PARTNER AND WHICH , ALREADY BECAUSE OF THIS SECURES FOR IT , AT THE VERY LEAST DURING RELATIVELY LONG PERIODS , THAT FREEDOM OF ACTION WHICH IS

THE SPECIAL FEATURE OF A DOMINANT POSITION .

42THE CONTESTED DECISION HAS MENTIONED BESIDES THE MARKET SHARES A NUMBER OF OTHER FACTORS WHICH TOGETHER WITH ROCHE ' S MARKET SHARES WOULD SECURE FOR IT IN CERTAIN CIRCUMSTANCES , A DOMINANT POSITION .

THESE FACTORS WHICH THE DECISION CLASSIFIES AS ADDITIONAL CRITERIA ARE AS FOLLOWS :
( A ) ROCHE ' S MARKET SHARES ARE NOT ONLY LARGE BUT THERE IS ALSO A BIG DISPARITY BETWEEN ITS SHARES AND THOSE OF ITS NEXT LARGEST COMPETITORS ( RECITALS 5 AND 21 TO THE DECISION );

( B ) ROCHE PRODUCES A FAR WIDER RANGE OF VITAMINS THAN ITS COMPETITORS ( RECITAL 21 TO THE DECISION );

( C ) ROCHE IS THE WORLD ' S LARGEST VITAMIN MANUFACTURER WHOSE TURNOVER EXCEEDS THAT OF ALL THE OTHER PRODUCERS AND IS AT THE HEAD OF A MULTINATIONAL GROUP WHICH IN TERMS OF SALES IS THE WORLD ' S LEADING PHARMACEUTICALS PRODUCER ( RECITALS 5 , 6 AND 21 TO THE DECISION );

( D ) ALTHOUGH ROCHE ' S PATENTS FOR THE MANUFACTURE OF VITAMINS HAVE EXPIRED ROCHE , SINCE IT HAS PLAYED A LEADING ROLE IN THIS FIELD , STILL ENJOYS TECHNOLOGICAL ADVANTAGES OVER ITS COMPETITORS OF WHICH THE HIGHLY DEVELOPED CUSTOMER INFORMATION AND ASSISTANCE SERVICE WHICH IT HAS IS EVIDENCE ( RECITALS 7 AND 8 TO THE DECISION );

( E ) ROCHE HAS A VERY EXTENSIVE AND HIGHLY SPECIALIZED SALES NETWORK ( RECITAL 21 TO THE DICISION );

( F ) THERE IS NO POTENTIAL COMPETITION ( RECITAL 21 TO THE DECISION ).

FURTHERMORE DURING THE PROCEEDINGS BEFORE THE COURT THE COMMISSION ADDUCED AS A FACTOR ESTABLISHING ROCHE ' S DOMINANT POSITION THE LATTER ' S ABILITY , NOTWITHSTANDING LIVELY COMPETITION , TO MAINTAIN ITS MARKET SHARES SUBSTANTIALLY INTACT .

43BEFORE CONSIDERING WHETHER THE FACTORS TAKEN INTO ACCOUNT BY THE COMMISSION CAN IN FACT BE CONFIRMED IN ROCHE ' S CASE IT IS NECESSARY TO ASCERTAIN , SINCE THE APPLICANT CHALLENGES THEIR RELEVANCE , WHETHER THESE FACTORS , IN THE LIGHT OF THE SPECIAL FEATURES OF THE RELEVANT MARKETS AND OF THE MARKET SHARES , ARE OF SUCH A KIND AS TO DISCLOSE THE EXISTENCE OF A DOMINANT POSITION .

44IN THIS CONNEXION IT IS NECESSARY TO REJECT THE CRITERION BASED ON RETENTION OF MARKET SHARES , SINCE THIS MAY JUST AS WELL RESULT FROM EFFECTIVE COMPETITIVE BEHAVIOUR AS FROM A POSITION WHICH ENSURES THAT ROCHE CAN BEHAVE INDEPENDENTLY OF COMPETITORS , AND THE COMMISSION , WHILE ADMITTING THAT THERE IS COMPETITION , HAS NOT MENTIONED THE FACTORS WHICH MAY ACCOUNT FOR THE STABILITY OF MARKET SHARES WHERE IT HAS BEEN FOUND TO EXIST .

HOWEVER IF THERE IS A DOMINANT POSITION THEN RETENTION OF THE MARKET SHARES MAY BE A FACTOR DISCLOSING THAT THIS POSITION IS BEING MAINTAINED , AND , ON THE OTHER HAND , THE METHODS ADOPTED TO MAINTAIN A DOMINANT POSITION MAY BE AN ABUSE WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY .

45THE FACT THAT ROCHE PRODUCES A FAR WIDER RANGE OF VITAMINS THAN ITS

COMPETITORS MUST SIMILARLY BE REJECTED AS BEING IMMATERIAL .

THE COMMISSION REGARDS THIS AS A FACTOR ESTABLISHING A DOMINANT POSITION AND ASSERTS THAT ' ' SINCE THE REQUIREMENTS OF MANY USERS EXTEND TO SEVERAL GROUPS OF VITAMINS , ROCHE IS ABLE TO EMPLOY A SALES AND PRICING STRATEGY WHICH IS FAR LESS DEPENDENT THAN THAT OF THE OTHER MANUFACTURERS ON THE CONDITIONS OF COMPETITION IN EACH MARKET ' ' .

46HOWEVER THE COMMISSION HAS ITSELF FOUND THAT EACH GROUP OF VITAMINS CONSTITUTES A SPECIFIC MARKET AND IS NOT , OR AT LEAST NOT TO ANY SIGNIFICANT EXTENT , INTERCHANGEABLE WITH ANY OTHER GROUP OR WITH ANY OTHER PRODUCTS ( RECITAL 20 TO THE DECISION ) SO THAT THE VITAMINS BELONGING TO THE VARIOUS GROUPS ARE AS BETWEEN THEMSELVES PRODUCTS JUST AS DIFFERENT AS THE VITAMINS COMPARED WITH OTHER PRODUCTS OF THE PHARMACEUTICAL AND FOOD SECTOR .

MOREOVER IT IS NOT DISPUTED THAT ROCHE ' S COMPETITORS , IN PARTICULAR THOSE IN THE CHEMICAL INDUSTRY , MARKET BESIDES THE VITAMINS WHICH THEY MANUFACTURE THEMSELVES , OTHER PRODUCTS WHICH PURCHASERS OF VITAMINS ALSO WANT , SO THAT THE FACT THAT ROCHE IS IN A POSITION TO OFFER SEVERAL GROUPS OF VITAMINS DOES NOT IN ITSELF GIVE IT ANY ADVANTAGE OVER ITS COMPETITORS , WHO CAN OFFER , IN ADDITION A LESS OR MUCH LESS WIDE RANGE OF VITAMINS , OTHER PRODUCTS WHICH ARE ALSO REQUIRED BY THE PURCHASERS OF THESE VITAMINS .

47SIMILAR CONSIDERATIONS LEAD ALSO TO THE REJECTION AS A RELEVANT FACTOR OF THE CIRCUMSTANCE THAT ROCHE IS THE WORLD ' S LARGEST VITAMIN MANUFACTURER , THAT ITS TURNOVER EXCEEDS THAT OF ALL THE OTHER MANUFACTURERS AND THAT IT IS AT THE HEAD OF THE LARGEST PHARMACEUTICALS GROUP IN THE WORLD .

IN THE VIEW OF THE COMMISSION THESE THREE CONSIDERATIONS TOGETHER ARE A FACTOR SHOWING THAT THERE IS A DOMINANT POSITION , BECAUSE ' ' IT FOLLOWS THAT THE APPLICANT OCCUPIES A PREPONDERANT POSITION NOT ONLY WITHIN THE COMMON MARKET BUT ALSO ON THE WORLD MARKET ; IT THEREFORE ENJOYS VERY CONSIDERABLE FREEDOM OF ACTION , SINCE ITS POSITION ENABLES IT TO ADAPT ITSELF EASILY TO THE DEVELOPMENTS OF THE DIFFERENT REGIONAL MARKETS . AN UNDERTAKING OPERATING THROUGHOUT THE MARKETS OF THE WORLD AND HAVING A MARKET SHARE WHICH LEAVES ALL ITS COMPETITORS FAR BEHIND IT DOES NOT HAVE TO CONCERN ITSELF UNDULY ABOUT ANY COMPETITORS WITHIN THE COMMON MARKET ' ' .

SUCH REASONING BASED ON THE BENEFITS REAPED FROM ECONOMICS OF SCALE AND ON THE POSSIBILITY OF ADOPTING A STRATEGY WHICH VARIES ACCORDING TO THE DIFFERENT REGIONAL MARKETS IS NOT CONCLUSIVE , SEEING THAT IT IS ACCEPTED THAT EACH GROUP OF VITAMINS CONSTITUTES A GROUP OF SEPARATE PRODUCTS WHICH REQUIRE THEIR OWN PARTICULAR PLANT AND FORM A SEPARATE MARKET , IN THAT THE VOLUME OF THE OVERALL PRODUCTION OF PRODUCTS WHICH ARE DIFFERENT AS BETWEEN THEMSELVES DOES NOT GIVE ROCHE A COMPETITIVE ADVANTAGE OVER ITS COMPETITORS , ESPECIALLY OVER THOSE IN THE CHEMICAL INDUSTRY , WHO MANUFACTURE ON A WORLD SCALE OTHER PRODUCTS AS WELL AS VITAMINS AND HAVE IN PRINCIPLE THE SAME OPPORTUNITIES TO SET OFF ONE MARKET AGAINST THE OTHER AS ARE OFFERED BY A LARGE OVERALL PRODUCTION OF PRODUCTS WHICH DIFFER FROM EACH OTHER AS MUCH AS THE VARIOUS GROUPS OF VITAMINS DO .

48ON THE OTHER HAND THE RELATIONSHIP BETWEEN THE MARKET SHARES OF THE UNDERTAKING CONCERNED AND OF ITS COMPETITORS , ESPECIALLY THOSE OF THE NEXT LARGEST , THE TECHNOLOGICAL LEAD OF AN UNDERTAKING OVER ITS COMPETITORS ,

THE EXISTENCE OF A HIGHLY DEVELOPED SALES NETWORK AND THE ABSENCE OF POTENTIAL COMPETITION ARE RELEVANT FACTORS , THE FIRST BECAUSE IT ENABLES THE COMPETITIVE STRENGTH OF THE UNDERTAKING IN QUESTION TO BE ASSESSED , THE SECOND AND THIRD BECAUSE THEY REPRESENT IN THEMSELVES TECHNICAL AND COMMERCIAL ADVANTAGES AND THE FOURTH BECAUSE IT IS THE CONSEQUENCE OF THE EXISTENCE OF OBSTACLES PREVENTING NEW COMPETITORS FROM HAVING ACCESS TO THE MARKET .

AS FAR AS THE EXISTENCE OR NON-EXISTENCE OF POTENTIAL COMPETITION IS CONCERNED IT MUST HOWEVER BE OBSERVED THAT , ALTHOUGH IT IS TRUE - AND THIS APPLIES TO ALL THE GROUPS OF VITAMINS IN QUESTION - THAT BECAUSE OF THE AMOUNT OF CAPITAL INVESTMENT REQUIRED THE CAPACITY OF THE FACTORIES IS DETERMINED ACCORDING TO THE ANTICIPATED GROWTH OVER A LONG PERIOD SO THAT ACCESS TO THE MARKET BY NEW PRODUCERS IS NOT EASY , ACCOUNT MUST ALSO BE TAKEN OF THE FACT THAT THE EXISTENCE OF CONSIDERABLE UNUSED MANUFACTURING CAPACITY CREATES POTENTIAL COMPETITION BETWEEN ESTABLISHED MANUFACTURERS .

NEVERTHELESS ROCHE IS IN THIS RESPECT IN A PRIVILEGED POSITION BECAUSE , AS IT ADMITS ITSELF , ITS OWN MANUFACTURING CAPACITY WAS , DURING THE PERIOD COVERED BY THE CONTESTED DECISION , IN ITSELF SUFFICIENT TO MEET WORLD DEMAND WITHOUT THIS SURPLUS MANUFACTURING CAPACITY PLACING IT IN A DIFFICULT ECONOMIC OR FINANCIAL SITUATION .

49IT IS IN THE LIGHT OF THE PRECEDING CONSIDERATIONS THAT ROCHE ' S SHARES OF EACH OF THE RELEVANT MARKETS , COMPLEMENTED BY THOSE FACTORS WHICH IN CONJUNCTION WITH THE MARKET SHARES MAKE IT POSSIBLE TO SHOW THAT THERE MAY BE A DOMINANT POSITION , MUST BE EVALUATED .

FINALLY IT WILL ALSO BE NECESSARY TO CONSIDER WHETHER ROCHE ' S SUBMISSIONS RELATING TO THE IMPLICATION OF ITS CONDUCT ON THE MARKET , MAINLY AS FAR AS CONCERNS PRICES , ARE OF SUCH A KIND AS TO ALTER THE FINDINGS TO WHICH THE EXAMINATION OF THE MARKET SHARES AND THE OTHER FACTORS TAKEN INTO ACCOUNT MIGHT LEAD .

SECTION 4 : APPLICATION OF THE RELEVANT CRITERIA TO THE DIFFERENT GROUPS OF VITAMINS
( A ) THE VITAMIN A GROUP
50THE PARTIES BOTH CONCEDE THAT ROCHE ' S MARKET SHARE WITHIN THE COMMON MARKET MAY BE PUT AT 47 % BOTH AS TO VALUE AND QUANTITY .

ACCORDING TO THE DATA PRODUCED BY THE COMMISSION , WHICH ROCHE DOES NOT DISPUTE , THE SHARES OF THE OTHER PRODUCERS IN 1974 MAY BE PUT AT 27 % , 18 % , 7 % , AND 1 % .

51SINCE THE RELEVANT MARKET THUS HAS THE PARTICULAR FEATURES OF A NARROW OLIGOPOLISTIC MARKET IN WHICH THE DEGREE OF COMPETITION BY ITS VERY NATURE HAS ALREADY BEEN WEAKENED , ROCHE ' S SHARE , WHICH IS EQUAL TO THE AGGREGATE OF THE SHARES OF ITS TWO NEXT LARGEST COMPETITORS , PROVES THAT IT IS ENTIRELY FREE TO DECIDE WHAT ATTITUDE TO ADOPT WHEN CONFRONTED BY COMPETITION .

ROCHE ' S TECHNICAL LEAD OVER ITS COMPETITORS DUE TO THE FACT THAT IT IS THE PROPRIETOR OF SEVERAL PATENTS RELATING TO VITAMIN A , EVEN AFTER THE EXPIRATION OF THESE PATENTS , IS A FURTHER INDICATION THAT IT OCCUPIES A DOMINANT POSITION .

AS HAS BEEN INDICATED ABOVE THE SAME APPLIES TO THE ABSENCE OF POTENTIAL

COMPETITION FROM NEW MANUFACTURERS , WHEREAS THE COMPETITION DERIVED FROM THE SURPLUS MANUFACTURING CAPACITY OF EXISTING UNDERTAKINGS RATHER FAVOURS ROCHE AS IS APPARENT FROM AN EXTRACT FROM MANAGEMENT INFORMATION OF THE MIDDLE OF AUGUST 1971 WHICH READS ' ' ALTHOUGH BASF WILL CONTINUE TO INTENSIFY ITS ACTIVITIES , WE EXPECT TO ACHIEVE A FURTHER STEADY INCREASE OF OUR TURNOVER . HOWEVER , THE PRESENT OVERCAPACITY OF PRODUCTION IS SUCH THAT A FIXING OF PRICES CANNOT BE EXPECTED FOR THE NEXT FEW YEARS . SUCH A DEVELOPMENT WOULD , OF COURSE , BE ACCELERATED IF ONE OF OUR SMALLER COMPETITORS CEASED PRODUCTION ' ' .

52THEREFORE THE COMMISSION WAS RIGHT TO FIND THAT THE APPLICANT OCCUPIES A DOMINANT POSITION ON THE MARKET IN VITAMIN A .
THE FACT THAT ROCHE HAD TO OBTAIN ITS SUPPLIES OF RAW MATERIALS FOR THE MANUFACTURE OF VITAMINS OF GROUP A FROM AN UNDERTAKING OF THE CHEMICAL INDUSTRY WHICH ALSO MANUFACTURED VITAMIN A AND WHICH WAS CONSEQUENTLY ITS COMPETITOR IS NOT OF SUCH A KIND AS TO ALTER THE COMMISSION ' S CONCLUSIONS , SINCE ROCHE HAS NEVER CLAIMED THAT IT WAS IN ANY DIFFICULTIES AT ALL EITHER AS REGARDS THE FREQUENCY OF THE DELIVERIES OF ITS SUPPLIES OR AS REGARDS PRICES .

( B ) THE VITAMIN B GROUP
53THE COMMISSION IN ITS CONTESTED DECISION HAD EVALUATED ROCHE ' S MARKET SHARE AT 86 % .

IN THE DOCUMENT WHICH WAS JOINTLY PREPARED DURING THE WRITTEN PROCEDURE IT DISCLOSED THE BASES OF ITS CALCULATIONS OF ROCHE ' S MARKET SHARES BOTH IN VALUE AND IN QUANTITY , AND IT APPEARS FROM THE TABLES WHICH IT PRODUCED THAT ALL THE IMPORTS OF VITAMINS INTO THE COMMON MARKET FOR WHICH THERE ARE STATISTICS HAVE BEEN TAKEN INTO CONSIDERATION .

ON THE BASIS OF THESE DATA IT ARRIVES AT THE FOLLOWING FIGURES :
54ROCHE SIMPLY ASSERTS IN SUBSTANCE ' ' THAT SINCE , AS FAR AS CONCERNS COMPETITION , IT HAS TO RELY ON MERE ESTIMATES IT IS UNABLE TO ADDUCE ANY EVIDENCE TO THE CONTRARY ' ' , BUT IT ESTIMATES ITS SHARE OF THE WORLD MARKET AS BEING CONSIDERABLY LESS AND ITS SHARE OF THE COMMON MARKET AT NOT MORE THAN 50 % .

IN ORDER TO JUSTIFY THE DIFFERENCE BETWEEN THE LATTER ESTIMATE AND THE COMMISSION ' S IT REFERS TO THE FACT THAT ' ' IF THE FERMENTATION PRODUCTION CAPACITY , ESPECIALLY IN THE USA , OF 200 TO 300 TONNES PER ANNUM , WHICH WAS REDUCED TO A MINIMUM AT THE BEGINNING OF 1970 BUT WHICH MAY AT ANY MOMENT BE REACTIVATED , IS ADDED TO THESE FIGURES ITS SHARE IS ONLY ABOUT 50 % ' ' , THUS PLEADING - WITHOUT GIVING ANY OTHER PARTICULARS - EITHER THE EXISTENCE OF POTENTIAL COMPETITION OR A REDUCTION OF ITS OWN MANUFACTURING CAPACITY IN THE USA .
55IF THE FIRST ASSUMPTION PROVED TO BE CORRECT IT WOULD BE SUCH AS TO RAISE THE PRESUMPTION THAT AFTER 1970 SOME OF ROCHE ' S COMPETITORS WERE ELIMINATED FROM THE MARKET .

EVEN IF IT IS ASSUMED - THE POSITION IS NOT CLEAR - THAT THE REFERENCE IS TO THE CLOSING DOWN OF ROCHE ' S MANUFACTURING CAPACITY , THIS FACT CANNOT BE RELIED ON FOR THE PURPOSE OF CHALLENGING THE COMMISSION ' S CALCULATIONS AS LONG AS IT HAS NOT BEEN ESTABLISHED THAT COMPETITORS DID NOT ALSO CLOSE DOWN THEIR MANUFACTURING CAPACITY , AND THAT , IN ANY CASE , THE INEVITABLE OUTCOME OF THIS WAS A REDUCTION OF ROCHE ' S MARKET SHARES WITHIN THE COMMON MARKET RATHER THAN A RATIONALIZATION OF PRODUCTION .

FURTHERMORE ALTHOUGH THE EXISTENCE OF SURPLUS MANUFACTURING CAPACITY MAY IN CERTAIN CIRCUMSTANCES BE A CONSISTENT ELEMENT OF POTENTIAL COMPETITION LIKELY TO HAVE AN EFFECT ON THE QUESTION WHETHER THERE IS A DOMINANT POSITION - ALTHOUGH IT HAS ALREADY BEEN CONFIRMED ABOVE THAT THIS FACTOR DID NOT APPLY TO ROCHE DURING THE PERIOD UNDER CONSIDERATION - IT CANNOT AFFECT THE EVALUATION OF THE MARKET SHARES WHICH HAVE IN FACT BEEN ACQUIRED .

56IN THESE CIRCUMSTANCES THE COMMISSION ' S CALCULATIONS AS CORRECTED , WHICH MOREOVER ARE SUFFICIENTLY DEPENDABLE TO BE CAPABLE OF ACCEPTANCE , CANNOT BE CALLED IN QUESTION ON THE STRENGTH OF THE ABOVE-MENTIONED OBJECTIONS AND THE MARKET SHARES WHICH THEY DISCLOSE ARE SO LARGE THAT THEY ARE IN THEMSELVES EVIDENCE OF A DOMINANT POSITION .

( C ) THE VITAMIN B3 ( PANTOTHENIC ACID ) GROUP
57THE COMMISSION HAS ADMITTED THAT THE FIGURES USED IN THE CONTESTED DECISION HAD TO BE CORRECTED AND THE TWO PARTIES AGREE THE FOLLOWING EVALUATIONS OF THE MARKET SHARES :
58MARKET SHARES OF THIS SIZE EITHER IN VALUE OR IN QUANTITY , COMPLEMENTED BY THE STATEMENT IN THE DOCUMENT JOINTLY PREPARED BY THE PARTIES THAT THE FIGURES FOR 1971 WERE 6 % LOWER STILL THAN THOSE FOR 1972 DO NOT IN THEMSELVES CONSTITUTE A FACTOR SUFFICIENT TO ESTABLISH THE EXISTENCE OF A DOMINANT POSITION FOR MOST OF THE PERIOD CONSIDERED BY THE COMMISSION .

ON THE CONTRARY IT HAS BECOME APPARENT THAT THE RECTIFICATION WHICH THE LATTER HAD TO CARRY OUT WAS DUE TO ITS OMISSION TO TAKE ACCOUNT OF THE IMPORTS OF A JAPANESE COMPETITOR WHICH IN 1973 ACCOUNTED FOR 30 % OF THE MARKET .

ON THE OTHER HAND THE COMMISSION , IN THE CASE OF THIS PARTICULAR MARKET , HAS NOT INDICATED WHAT THE ADDITIONAL FACTORS WOULD BE , WHICH , TOGETHER WITH THE MARKET SHARE AS CORRECTED , NEVERTHELESS WOULD BE OF SUCH A KIND AS TO ADMIT OF THE EXISTENCE OF A DOMINANT POSITION .

THESE FINDINGS LEAD TO THE CONCLUSION THAT , AS FAR AS CONCERNS VITAMIN B3 , THERE IS INSUFFICIENT EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION HELD BY ROCHE FOR THE PERIOD UNDER CONSIDERATION .

( D ) THE VITAMIN B6 GROUP
59THE COMMISSION HAD EVALUATED ROCHE ' S MARKET SHARE AT 95 % WHEREAS ROCHE , WHICH HAS NOT SUPPLIED ANY PARTICULARS RELATING TO THE COMMON MARKET , ADMITS THAT IT HAS A MARKET SHARE OF ABOUT 60 TO 70 % OF THE WORLD MARKET .

AFTER THE PARTIES HAD COMPARED THEIR FIGURES ( ANNEXES 1 ( E ) AND 2 ( G ) TO THE DOCUMENT RELATING TO MATTERS AGREED BY THE PARTIES ) THEY WERE UNABLE TO AGREE A JOINT EVALUATION AND THE COMMISSION PRODUCED THE FOLLOWING FIGURES AFTER HAVING CORRECTED ITS OWN EVALUATION :
60IT MUST BE NOTED THAT , ALTHOUGH THE MARKET SHARES COVER THE TWO GROUPS B6 AND H , AT LEAST IN TERMS OF VALUE , BECAUSE THE VITAMINS OF GROUPS B6 AND H FALL WITHIN THE SAME CUSTOMS HEADING , ROCHE HAS NEVERTHELESS NOT CONTENDED THAT THIS FACT IS NOT OF SUCH A KIND AS TO ALTER THE RESULTING ORDERS OF MAGNITUDE .

ROCHE MAINTAINS , WITHOUT GOING INTO A MORE DETAILED EXPLANATION , THAT THIS ESTIMATE MUST BE REDUCED BY AT LEAST 20 % , BUT EVEN IF THIS VIEW WERE TO BE ACCEPTED WITHOUT QUALIFICATION , ROCHE ' S MARKET SHARES ARE NEVERTHELESS SO LARGE THAT THEY PROVE THE EXISTENCE OF A DOMINANT POSITION .

THIS IS ALL THE MORE TRUE BECAUSE AT THE RELEVANT TIME THE MARKET SHARE OF NONE OF ROCHE ' S FOUR NEXT LARGEST COMPETITORS REACHED 10 % AND THE SHARES OF SOME OF THEM WERE PROBABLY LESS THAN 5 % .

( E ) THE VITAMIN C GROUP
61THE COMMISSION IN THE CONTESTED DECISION HAD ESTIMATED ROCHE ' S MARKET SHARE AT 68 % , WHEREAS ROCHE DURING THE PROCEEDINGS PUT FORWARD THE FIGURE OF 50% .

THE PARTIES , AFTER HAVING COMPARED THEIR VIEWS , AGREED ON THE FOLLOWING ESTIMATES OF THE MARKET SHARES ON THE ASSUMPTION THAT ONLY THE MARKET IN VITAMINS IS TAKEN INTO CONSIDERATION :
62ROCHE TAKES THE VIEW THAT THIS ESTIMATE SHOULD BE CORRECTED BY ALLOWING FOR THE FACT THAT THE MARKET IN QUESTION SHOULD ALSO INCLUDE PRODUCTS COMPETING WITH THE TECHNOLOGICAL USES OF VITAMIN C AND IT ASSERTS THAT IN THOSE CIRCUMSTANCES ITS MARKET SHARE WOULD NOT EXCEED 47% .

63SINCE THE CONSIDERATIONS SET OUT ABOVE RELATING TO THE DELIMITATION OF THE RELEVANT MARKET FOR VITAMINS INTENDED BOTH FOR BIONUTRITIVE AND TECHNOLOGICAL USES HAVE LED TO THE ARGUMENT DEVELOPED BY ROCHE BEING REJECTED , THE MARKET SHARES WHICH THE PARTIES HAVE AGREED OF THE VITAMIN C MARKET AS SUCH MUST BE ACCEPTED . THEY ARE EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION .

AS FAR AS CONCERNS THIS MARKET TOO - ON WHICH MOREOVER THERE WAS A SHORTAGE IN 1971 - THE GAP BETWEEN ROCHE ' S SHARES ( 64.8% ) AND THOSE OF ITS NEXT LARGEST COMPETITORS ( 14.8% AND 6.3% ) WAS SUCH AS TO CONFIRM THE CONCLUSION WHICH THE COMMISSION REACHED .

( F ) THE VITAMIN E GROUP
64THE COMMISSION IN ITS CONTESTED DECISION HAD EVALUATED ROCHE ' S SHARE OF THE VITAMIN E MARKET AT 70% , WHEREAS ROCHE DURING THE PROCEEDINGS PUT FORWARD THE FIGURE OF 40% .

THE PARTIES , AFTER HAVING COMPARED THEIR VIEWS , JOINTLY AGREED TO EVALUATE THE MARKET SHARES , ON THE ASSUMPTION THAT ONLY THE VITAMIN E MARKET HAS TO BE TAKEN INTO CONSIDERATION , AS FOLLOWS :
MOREOVER ROCHE ESTIMATES THAT ITS SHARE FOR 1970 AND 1971 IS 7% LOWER STILL THAN THAT FOR 1972 .
65ROCHE TAKES THE VIEW , FOR THE SAME REASONS WHICH IT PUT FORWARD IN RELATION TO VITAMIN C , THAT THE RELEVANT MARKET SHOULD ALSO INCLUDE PRODUCTS COMPETING WITH THE TECHNOLOGICAL USES OF VITAMIN E AND IT ASSERTS THAT IN THOSE CIRCUMSTANCES ITS MARKET SHARE FOR 1974 WOULD NOT EXCEED 40% .

66SINCE ROCHE ' S ARGUMENT AS FAR AS CONCERNS THE DELIMITATION OF THE RELEVANT MARKET HAS BEEN REJECTED FOR THE REASONS MENTIONED ABOVE IT IS NECESSARY TO TAKE INTO CONSIDERATION THE MARKET SHARES WHICH THE PARTIES HAVE AGREED .

THE SIZE OF THESE SHARES , WHICH IS IN ITSELF SIGNIFICANT , IS MADE THE MORE SO BY THE FACT THAT THE SHARES OF ROCHE ' S COMPETITORS MUST BE ESTIMATED , AFTER THE BEFORE-MENTIONED RECTIFICATION , FOR 1974 , ACCORDING TO VALUE , AT 16% , 6% AND 1% IN THE CASE OF THE OTHER PRODUCERS AND AT 19% FOR ONE OR MORE IMPORTERS WHO WERE IN GENERAL FIRMS OPERATING FROM NON-MEMBER STATES .

SUCH A POSITION AS THE ONE WHICH HAS BEEN ESTABLISHED CONFORMS EVEN MORE TYPICALLY THAN THE ONE ESTABLISHED IN THE CASE OF VITAMIN A TO THE PATTERN OF A NARROW OLIGOPOLISTIC MARKET IN WHICH ROCHE ' S SHARE IS MUCH LARGER THAN THE COMBINED SHARES OF THE TWO NEXT LARGEST COMPETITORS .

THEREFORE THE COMMISSION WAS RIGHT TO FIND THAT THERE WAS A DOMINANT POSITION ON THIS MARKET .

( G ) THE VITAMIN H GROUP
67THE APPLICANT HAS ADMITTED THAT IT HAD A 100% SHARE OF THIS MARKET AND THAT DURING THE PERIOD UNDER CONSIDERATION ITS SHARE AMOUNTED TO 93% WITH THE RESULT THAT IT IN FACT HAS A MONOPOLY .

( H ) SUMMARY
68IT FOLLOWS FROM THE FOREGOING THAT , AS FAR AS CONCERNS THE GROUPS OF VITAMINS A , B2 , B6 , C , E AND H , ALL THE CONSTITUENT ELEMENTS OF A DOMINANT POSITION WERE PRESENT WHEREAS THE EXISTENCE OF SUCH A POSITION IN THE CASE OF VITAMIN B3 HAS NOT BEEN ESTABLISHED .

SECTION 5 : THE APPLICANT ' S CONDUCT ON THE MARKET
69IT IS HOWEVER NECESSARY TO CONSIDER WHETHER THE PRECEDING CONCLUSIONS ARE BELIED BY THE APPLICANT ' S BEHAVIOUR ON THE RELEVANT MARKETS , WHICH IN ITS VIEW SHOWS THAT THERE WAS NOT ONLY LIVELY COMPETITION BUT ALSO THAT SUCH COMPETITION BROUGHT PRESSURE TO BEAR ON IT .

ON THIS POINT IT PLACES SPECIAL RELIANCE ON THE FACT THAT THE PRICES OF THE VARIOUS GROUPS OF VITAMINS CONTINUALLY FELL AND ALSO THAT IN CERTAIN MEMBER STATES ITS MARKET SHARES DECREASED .

IT ALSO REFERS TO THE INFORMATION CONTAINED IN VARIOUS INTERNAL DOCUMENTS AND ESPECIALLY IN ' ' MANAGEMENT INFORMATION ' ' AND ' ' MARKETING NEWS ' ' WHICH IT CIRCULATED REGULARLY AND WHICH CONTAIN AN ANALYSIS OF THE MARKET SITUATION OF EACH GROUP OF VITAMINS AND ALSO TO THE INFORMATION RELATING TO THE EUROPEAN BULK MANAGERS MEETING ORGANIZED BY ROCHE IN BASLE IN OCTOBER 1972 .
70THE COURT HAS ALREADY HELD INTER ALIA IN ITS JUDGEMENT OF 14 FEBRUARY 1978 IN CASE 27/76 UNITED BRANDS COMPANY AND UNITED BRANDS CONTINENTAAL B.V . V COMMISSION OF THE EUROPEAN COMMUNITIES ( 1978 ) ECR 207 THAT EVEN THE EXISTENCE OF LIVELY COMPETITION ON A PARTICULAR MARKET DOES NOT RULE OUT THE POSSIBILITY THAT IS A DOMINANT POSITION ON THIS MARKET SINCE THE PREDOMINANT FEATURE OF SUCH A POSITION IS THE ABILITY OF THE UNDERTAKING CONCERNED TO ACT WITHOUT HAVING TO TAKE ACCOUNT OF THIS COMPETITION IN ITS MARKET STRATEGY AND WITHOUT FOR THAT REASON SUFFERING ANY DETRIMENTAL EFFECTS FROM SUCH BEHAVIOUR .

71HOWEVER , THE FACT THAT AN UNDERTAKING IS COMPELLED BY THE PRESSURE OF ITS COMPETITORS ' PRICE REDUCTIONS TO LOWER ITS OWN PRICES IS IN GENERAL INCOMPATIBLE WITH THAT INDEPENDENT CONDUCT WHICH IS THE HALLMARK OF A DOMINANT POSITION .

THE APPLICANT HAS PRODUCED IN THE ANNEXES TO ITS APPLICATION A NUMBER OF GRAPHS WITH TWO DIFFERENT CURVES , THE ONE FOR MEASURING FALLS IN PRICES AND THE OTHER FOR MEASURING INCREASES IN PRODUCTION OF ROCHE ' S DIFFERENT GROUPS OF VITAMINS ON THE WORLD MARKET DURING A PERIOD WHICH COVERS , AS THE CASE MAY BE , THE YEARS FROM 1940 TO 1954 UP TO THE END OF 1974 .
72IT MUST HOWEVER BE NOTED THAT THESE GRAPHS RELATE TO THE WORLD MARKET

AND THAT ROCHE , WHICH HAS SEVERAL TIMES STRESSED THE DISPARITIES BETWEEN THE PRICE FLUCTUATIONS FROM ONE MEMBER STATE TO ANOTHER , CANNOT THEREFORE MAINTAIN THAT THE VARIATIONS ON THE WORLD MARKET ARE NECESSARILY REPRESENTATIVE OF PRICE TRENDS IN THE COMMUNITY .

EVEN IF IT IS ASSUMED THAT THE RECORDED WORLD PRICE TRENDS MAY BE REGARDED AS REFLECTING THE GENERAL TREND OF PRICES WITHIN THE COMMON MARKET , AN EXAMINATION OF THE GRAPHS HOWEVER MAKES IT CLEAR THAT , TO A VERY GREAT EXTENT , THE PRICES OF DIFFERENT GROUPS OF VITAMINS FELL CONSIDERABLY SO LONG AS PRODUCTION ONLY INCREASED SLOWLY , BUT THAT THESE FALLS WERE GREATLY REDUCED AND EVEN GRADUALLY SUPERSEDED BY A VERY HIGH DEGREE OF STABILITY AS FROM THE TIME WHEN THERE WAS A BIG INCREASE IN THE PRODUCTION OF EACH SPECIFIC GROUP OF VITAMINS , NAMELY : FROM 1964 IN THE CASE OF VITAMIN A , FROM 1956 IN THE CASE OF VITAMIN B2 ; FROM 1966 IN THE CASE OF VITAMIN B6 ; FROM 1958 IN THE CASE OF VITAMIN C ; FROM 1950 IN THE CASE OF VITAMIN B3 ; FROM 1965 IN THE CASE OF VITAMIN E , WHILE IN THE CASE OF VITAMIN H ( BIOTIN ), THE PRICE CURVE , WHICH HAD BEEN STABLE UP TO 1970 , AS FROM THAT TIME FALLS SLIGHTLY WHILE AT THE SAME TIME PRODUCTION EXPANDS .

THESE DATA SHOW THAT THERE IS A CORRELATION BETWEEN PRICES ON THE ONE HAND , AND THE VOLUME OF PRODUCTION AND COSTS ON THE OTHER , RATHER THAN BETWEEN PRICES AND THE PRESSURE OF COMPETITION .

73 ROCHE , IN ANSWER TO QUESTIONS PUT BY THE COURT , PRODUCED A NUMBER OF TABLES ( ANNEX 4 ( A-I ) OF THE DOCUMENT RELATING TO MATTERS AGREED BY THE PARTIES ) SETTING OUT THOSE VARIATIONS IN THE PRICES OF VITAMINS CONSIDERED BY ROCHE TO BE THE MOST REPRESENTATIVE IN EACH GROUP BETWEEN 1970 AND 1976 FOR EACH MEMBER STATE AS WELL AS THE AVERAGE PRICES BASED ON NATIONAL PRICES THROUGHOUT THE COMMUNITY .

74THESE TABLES IN FACT SHOW THAT THE PRICE RISES AND FALLS VARIED CONSIDERABLY .

HOWEVER , THE PRICE VARIATIONS OF THE SAME PRODUCT DURING THE SAME PERIOD DIFFER MARKEDLY IN THE VARIOUS MEMBER STATES AND THIS DISCLOSES A PARTITIONING OF THE MARKETS AND WOULD BE LIKELY TO RAISE THE PRESUMPTION OF A CORRESPONDING PRICE STRATEGY .

IT IS NOTEWORTHY THAT IN THE CASE OF VITAMIN H ( BIOTIN ), IN RESPECT OF WHICH ROCHE ADMITS THAT ITS MARKET SHARE WAS 100% IN 1970 AND 93% IN 1974 , ANNEX 4 TO THE DOCUMENT RELATING TO MATTERS AGREED BY THE PARTIES SHOWS THAT THERE WERE ALSO CONSIDERABLE PRICE REDUCTIONS , WHICH , EXPRESSED IN SWISS FRANCS AND TAKING AVERAGE FIGURES , RECORD FALLS THROUGHOUT THE WHOLE OF THE COMMON MARKET FROM 40.54 SWISS FRANCS IN 1970 TO 30.72 SWISS FRANCS IN 1973 AND TO 29.85 SWISS FRANCS IN 1974 . SUCH FALLS IN PRICES CANNOT IN THE CASE OF AN UNDERTAKING HAVING A MARKET SHARE OF BETWEEN 93% AND 100% BE ATTRIBUTED TO THE PRESSURE OF COMPETITION BUT ARE DETERMINED RATHER BY A PRICE POLICY INTENTIONALLY AND FREELY ADOPTED AND ARE NOT IN ANY CASE INCONSISTENT WITH THE EXISTENCE OF A DOMINANT POSITION .

75THIS FINDING IS SUBSTANTIALLY CONFIRMED BY THE INTERNAL DOCUMENTS MENTIONED ABOVE .

AS FAR AS CONCERNS IN PARTICULAR VITAMIN H ( BIOTIN ), MANAGEMENT INFORMATION OF 8 SEPTEMBER 1972 DISCLOSES THAT , ALTHOUGH A COMPETITOR - THE SUMITOMI UNDERTAKING - FIRST BEGAN TO MANUFACTURE BIOTIN AT THE END OF 1971 , IT PREFERRED TO SELL PART OF ITS PRODUCTION TO ROCHE AND THE REST IN THE

UNITED STATES AND THAT ROCHE , ANTICIPATING THE APPEARANCE OF ANOTHER PRODUCER DURING 1973 , DECIDED TO STRIKE FIRST AND DROP ITS ' ' INFLEXIBLE PRICE POLICY AT ONCE ' ' .

IT IS IN FACT IN THE YEAR 1973 THAT A SIGNIFICANT FALL IN THE PRICE OF VITAMIN H HAS BEEN RECORDED .

76THESE FACTORS SHOW THAT ROCHE IS CERTAINLY NOT SUBJECTED TO ANY COMPETITIVE PRESSURE BUT BY MEANS OF ITS POSITION IS ABLE TO ADOPT A PRICE POLICY DESIGNED TO FORESTALL SUCH PRESSURE .

FURTHERMORE THE SAME NUMBER OF MANAGEMENT INFORMATION RECOMMENDS AMONG OTHER PRECAUTIONS TO BE TAKEN THE USE OF FIDELITY CONTRACTS .

77AS FAR AS CONCERNS VITAMIN C , OF WHICH ROCHE ' S MARKET SHARE BETWEEN 1972 AND 1974 MAY BE ESTIMATED AT ABOUT 65% , MARKETING NEWS OF 6 DECEMBER 1971 STATES THAT , IN VIEW OF THE SHORTAGE OF THIS PRODUCT , THE REPRESENTATIVES AND SUBSIDIARIES OF ROCHE , HAVING REGARD TO THE LONG-TERM MARKET STRATEGY , ARE ADVISED ' ' TO GIVE PREFERENCE TO THE FOOD INDUSTRY , BOTH IN RESPECT OF SUPPLIES AND PRICE ADVANTAGES ' ' AS OPPOSED TO THE PHARMACEUTICAL INDUSTRY WHICH WILL HAVE TO OBTAIN PART OF ITS SUPPLIES FROM THE BROKERS .

78ALTHOUGH THE FIGURES AND DOCUMENTS PRODUCED SHOW THAT PRICE VARIATIONS , WHICH WERE SOMETIMES CONSIDERABLE , MAY BE RECORDED ON THE MARKETS FOR ALL THE DIFFERENT VITAMINS , THESE VARIATIONS APPEAR IN CERTAIN CASES TO BEAR NO RELATION TO THE EXISTENCE OF COMPETITION , WHILE IN OTHER CASES IT IS USUALLY ROCHE WHICH AT LEAST PLAYS THE PART OF THE PRICE LEADER .

FURTHERMORE THE DOCUMENTS PRODUCED TAKEN AS A WHOLE DISCLOSE THE EXISTENCE OF A FIRST-RATE COMMERCIAL AND MARKETING ORGANIZATION , THROUGH WHICH IT IS POSSIBLE NOT ONLY TO CARRY OUT A SYSTEMATIC SURVEY OF THE MARKETS BUT ALSO TO DETECT THE SLIGHTEST INTENTION ON THE PART OF ANY POSSIBLE COMPETITOR TO ENTER THE MARKET FOR ONE OR OTHER OF THE PRODUCTS , AND WHICH IS CAPABLE NOT ONLY OF REACTING INSTANTANEOUSLY BUT ALSO OF FORESTALLING SUCH ENDEAVOURS BY TAKING APPROPRIATE STEPS .

ALL THESE CONSIDERATIONS SHOW THAT THE PRICE VARIATIONS ALLEGED AND IN FACT CONFIRMED DO NOT PROVE THAT THERE WAS ANY COMPETITIVE PRESSURE WHICH WAS LIKELY TO JEOPARDIZE THE MARKED DEGREE OF INDEPENDENCE ENJOYED BY ROCHE AS FAR AS CONCERNS ITS MARKET STRATEGY AND THAT SUCH VARIATIONS ARE NOT OF SUCH A KIND AS TO INVALIDATE THE FINDINGS THAT THERE IS A DOMINANT POSITION BASED , IN THE CASE OF EACH GROUP OF VITAMINS , ON THE COMBINATION OF THE MARKET SHARES AND THE OTHER FACTORS USED .

79CONSEQUENTLY THE COMMISSION WAS RIGHT TO FIND IN THE CONTESTED DECISION THAT THERE WAS SUCH A POSITION AS FAR AS CONCERNS THE MARKETS IN VITAMINS A , B2 , B6 , C , E AND H .
ON THE OTHER HAND IT WAS WRONG TO FIND THAT THERE WAS SUCH A POSITION ON THE VITAMIN B3 MARKET .

II - THE EXISTENCE OF AN ABUSE OF A DOMINANT POSITION
SECTION 1 : PRELIMINARY OBSERVATIONS
80ACCORDING TO THE CONTESTED DECISION THE APPLICANT HAS ABUSED ITS DOMINANT POSITION BY CONCLUDING WITH 22 LARGE PURCHASERS OF VITAMINS CONTRACTS OF SALE - ABOUT 30 ( SOME OF THEM MOREOVER WERE RENEWALS WITH OR WITHOUT AMENDMENTS OF A PREVIOUS CONTRACT ) - UNDER WHICH THESE

PURCHASERS UNDERTOOK TO OBTAIN ALL OR MOST OF THEIR REQUIREMENTS OF VITAMINS OR CERTAIN VITAMINS EXPRESSLY MENTIONED THEREIN EXCLUSIVELY FROM ROCHE OR WHICH GAVE THEM AN INCENTIVE TO DO SO BY INCLUDING A PROMISE OF A DISCOUNT WHICH THE COMMISSION CLASSIFIES AS A FIDELITY REBATE .

ACCORDING TO THE COMMISSION ( RECITALS 22 TO 24 OF THE CONTESTED DECISION ) THE EXCLUSIVITY AGREEMENTS AND THE FIDELITY REBATES COMPLAINED OF ARE AN ABUSE WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , ON THE ONE HAND , BECAUSE THEY DISTORT COMPETITION BETWEEN PRODUCERS BY DEPRIVING CUSTOMERS OF THE UNDERTAKING IN A DOMINANT POSITION OF THE OPPORTUNITY TO CHOOSE THEIR SOURCES OF SUPPLY AND , ON THE OTHER HAND , BECAUSE THEIR EFFECT WAS TO APPLY DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS WITH OTHER TRADING PARTNERS , THEREBY PLACING THEM AT A COMPETITIVE DISADVANTAGE , IN THAT ROCHE OFFERS TWO PURCHASERS TWO DIFFERENT PRICES FOR AN IDENTICAL QUANTITY OF THE SAME PRODUCT DEPENDING ON WHETHER THESE TWO BUYERS AGREE OR NOT TO FOREGO OBTAINING THEIR SUPPLIES FROM ROCHE ' S COMPETITORS .

81THE CONTRACTS AT ISSUE ARE FOR THE SALE OF VITAMINS WHICH BELONG TO ONE OR MORE OF THE GROUPS IN RESPECT OF WHICH A DOMINANT POSITION HAS BEEN FOUND TO EXIST TO PURCHASERS OWNING WITHIN THE COMMON MARKET UNDERTAKINGS FOR WHICH PART OR ALL OF THESE VITAMINS ARE INTENDED .

THESE CONTRACTS MAY BE CATALOGUED AS FOLLOWS AND WILL BE REFERRED TO LATER BY THE NAME OF THE PURCHASER :
1 . AFICO/NESTLE : ONE CONTRACT FOR ONE YEAR COMMENCING ON 1 JANUARY 1968 RENEWABLE BY TACIT AGREEMENT .

2 . AMERICAN CYANAMID : ONE CONTRACT FOR ONE YEAR COMMENCING ON 1 JANUARY 1971 RENEWABLE BY TACIT AGREEMENT .

3 . ANIMEDICA . TWO CONTRACTS , ONE A MULTI-NATIONAL CONTRACT OF 12 JANUARY 1973 , THE OTHER FOR SUPPLIES TO THE FEDERAL REPUBLIC OF GERMANY OF 9 MAY 1972 , EACH OF THEM FOR ONE YEAR RENEWABLE BY TACIT AGREEMENT .

4 . BEECHAM : THREE SUCCESSIVE AGREEMENTS DATED 1 APRIL 1972 , 1 APRIL 1973 AND 31 DECEMBER 1973 COVERING THE PERIODS 1 APRIL 1972 TO 31 MARCH 1973 ; 1 APRIL 1973 TO 31 DECEMBER 1973 RESPECTIVELY AND THE YEAR 1974 .
5 . CAPSUGEL/PARKE DAVIS : ONE CONTRACT OF 22 MARCH 1967 WHICH TOOK EFFECT AS FROM 15 MARCH 1967 .
6 . DAWE ' S : ONE CONTRACT WHICH TOOK EFFECT FROM 1 AUGUST 1971 WITHOUT ANY STIPULATION AS TO ITS DURATION .

7 . GUYOMARC ' H : ONE CONTRACT WHICH TOOK EFFECT AS FROM 1 MAY 1972 FOR A PERIOD OF ONE YEAR AND RENEWABLE BY TACIT AGREEMENT .

8 . ISAAC SPENCER : TWO CONTRACTS , THE FIRST COVERING THE PERIOD FROM 1 JULY 1973 TO 31 DECEMBER 1973 , THE SECOND COVERING THE YEAR 1974 .
9 . MERCK : THREE CONTRACTS , THE FIRST DATED 3 MARCH 1972 , RELATING TO VITAMIN A , FOR A PERIOD OF FIVE YEARS , RENEWABLE BY TACIT AGREEMENT FOR FURTHER PERIODS OF TWO YEARS ; THE SECOND OF 3 MARCH 1972 , RELATING TO VITAMIN E AND CONTAINING A CLAUSE CONCERNING ITS DURATION ALMOST IDENTICAL TO THAT IN THE PRECEDING CONTRACT ; THE THIRD , DATED 5 JULY 1971 , RELATING TO VITAMIN B6 FOR A PERIOD UP TO 31 DECEMBER 1966 , THEN RENEWABLE BY TACIT AGREEMENT FOR SUCCESSIVE PERIODS OF TWO YEARS .

10 . NITROVIT/IMPERIAL FOODS : TWO CONTRACTS , ONE OF 22 DECEMBER 1972 , THE OTHER OF 11 JANUARY 1974 , EACH FOR A PERIOD OF ONE YEAR .

11 . ORGANON : ONE CONTRACT OF 15 APRIL 1970 , AMENDED ON 10 OCTOBER 1974 , FOR PERIODS OF ONE YEAR RENEWABLE BY TACIT AGREEMENT .

12 . PAULS AND WHITES : THREE CONTRACTS DATED 2 MARCH 1972 , 16 JULY 1973 AND 22 JANUARY 1974 FOR THE PERIODS 1 APRIL 1972 TO 31 MARCH 1973 , 1 APRIL 1973 TO 31 DECEMBER 1973 AND FOR 1974 RESPECTIVELY .

13 . PROTECTOR : ONE CONTRACT WHICH TOOK EFFECT AS FROM 1 JULY 1968 FOR THE YEAR 1968 , WHICH WAS IN FACT RENEWED EACH YEAR AND IN ANY CASE UNTIL THE END OF 1972 .
14 . PROVIMA : ONE CONTRACT OF 30 SEPTEMBER 1972 , AMENDED ON 27 NOVEMBER 1974 , WITH NO STIPULATION AS TO DURATION .

15 . RADAR : ONE CONTRACT OF 23 FEBRUARY 1971 , FOR THE YEAR 1971 WHICH REFERS TO A SIMILAR AGREEMENT ENTERED INTO PREVIOUSLY FOR 1970 .
16 . RALSTON PURINA : ONE CONTRACT OF 19 JANUARY 1970 , FOR THE YEAR 1970 , RENEWED AT LEAST UNTIL THE END OF 1974 .
17 . RAMIKAL : ONE CONTRACT OF 22 AUGUST 1972 , WHICH TOOK EFFECT AS FROM 1 JANUARY 1972 FOR AN INDEFINITE PERIOD AND REPLACED A CONTRACT GOING BACK TO 1964 .
18 . SANDOZ : ONE CONTRACT WHICH TOOK EFFECT IN 1965 FOR A CALENDAR YEAR RENEWABLE BY TACIT AGREEMENT FROM YEAR TO YEAR .

19 . TROUW : ONE CONTRACT OF 1 JULY 1971 , WHICH TOOK EFFECT AS FROM 1 JANUARY 1971 AND WAS AMENDED ON 27 NOVEMBER 1972 .
20 . UNILEVER : THREE CONTRACTS OF 9 JANUARY 1974 , THE FIRST TWO RELATING TO SUPPLIES OF VITAMINS TO THE UNITED KINGDOM , VITAMIN A , TYPE B IN THE CASE OF THE FIRST CONTRACT , OTHER TYPES OF VITAMIN A IN THE CASE OF THE SECOND CONTRACT , WHILE THE THIRD COVERS SUPPLIES OF VITAMIN A ON THE CONTINENT , IN THE CASE OF ALL THREE CONTRACTS FOR THE YEARS 1974 AND 1975 .
21 . UPJOHN : ONE CONTRACT WHICH TOOK EFFECT ON 1 NOVEMBER 1967 WITHOUT ANY STIPULATION AS TO DURATION .

22 . WYETH : ONE CONTRACT WHICH COMMENCED ON 1 JANUARY 1964 WITHOUT ANY STIPULATION AS TO DURATION .

SECTION 2 : ANALYSIS OF THE CONTRACTS AT ISSUE
82ALTHOUGH THESE CONTRACTS WERE DRAWN UP AT DIFFERENT TIMES AND IN TERMS WHICH ARE NOT ALWAYS IDENTICAL , THEY MAY BE DIVIDED INTO THREE CATEGORIES AS FAR AS CONCERNS THE SCOPE OF THE UNDERTAKING BY THE PURCHASER TO OBTAIN ITS SUPPLIES .

83SOME OF THEM CONTAINED A SPECIFIC UNDERTAKING BY THE PURCHASER TO OBTAIN EXCLUSIVELY FROM ROCHE EITHER :
( A ) ALL OR ALMOST ALL OF ITS REQUIREMENTS OF BULK VITAMINS MANUFACTURED BY ROCHE : AFICO/NESTLE , DAWE ' S , ORGANON , PROVIMI ( EXCEPT FOR 10% THEREOF FOR THE PURPOSE OF COMPARISON ), RALSTON , PURINA , UPJOHN ( ALL VITAMINS EXCEPT FOUR SPECIAL VITAMIN A PRODUCTS INTENDED FOR ANIMAL FEED IN RESPECT OF WHICH ROCHE HAS GRANTED UPJOHN A LICENCE UNDER ITS TRADEMARK INJACOM );

( B ) ON ALL ITS REQUIREMENTS OF CERTAIN VITAMINS THEREIN EXPRESSLY MENTIONED : MERCK ( VITAMIN A , VITAMIN B6 OVER AND ABOVE THE 200 TONNES MANUFACTURED BY MERCK ITSELF , AND VITAMIN E );

( C ) ON A PERCENTAGE STIPULATED IN THE CONTRACT OF ITS TOTAL REQUIREMENTS ( AMERICAN CYANAMID , ANIMEDICA ALLEMAGNE AND ANIMEDICA INTERNATIONAL : 80% )

OR OF ITS REQUIREMENTS OF CERTAIN SPECIFIED VITAMINS ( GUYOMARC ' H : 75% OF ITS REQUIREMENTS OF VITAMINS A , B , C , E );

( D ) ON ' ' THE MAJOR PART ' ' ( ' ' LA MAJEURE PARTIE ' ' , ' ' UBERWIEGENDER TEIL ' ' ) OF ITS REQUIREMENTS OF VITAMINS OR OF CERTAIN VITAMINS ( BEECHAM , ISAAC SPENCER , NITROVIT , PAULS AND WHITES , RAMIKAL , TROUW ).

GROUNDS CONTINUED UNDER DOC.NUM : 676J0085.184IN SOME OF THE CONTRACTS THE PURCHASER UNDERTOOK TO ' ' GIVE PREFERENCE TO ROCHE ' ' ( WYETH ) OR EXPRESSED ITS ' ' INTENTION ' ' TO OBTAIN ITS SUPPLIES EXCLUSIVELY FROM ROCHE ( CAPSUGEL/PARKE DAVIS ) OR AGREED TO RECOMMEND ITS SUBSIDIARIES TO DO THE SAME ( SANDOZ ), EITHER IN RESPECT OF ALL THEIR VITAMIN REQUIREMENTS OR OF CERTAIN VITAMINS THEREIN SPECIFIED ( CAPSUGEL/PARKE DAVIS : A , B1 , B2 , B6 , C , E , H ) OR AGAIN IN RELATION TO A FIXED PERCENTAGE OF THEIR TOTAL REQUIREMENTS ( PROTECTOR : 80% ).

85FINALLY THE CONTRACTS CONCLUDED WITH MERCK AND UNILEVER RESPECTIVELY HAD SPECIAL FEATURES WHICH MAKES IT DESIRABLE TO EXAMINE SEPARATELY THE UNDERTAKINGS WHICH THEY CONTAINED .

86THE DURATION OF MOST OF THE CONTRACTS WAS FOR AN INDEFINITE PERIOD , EITHER ACCORDING TO THE TERMS THEREOF OR BECAUSE OF THE OPERATION OF A CLAUSE PROVIDING FOR RENEWAL BY TACIT AGREEMENT , AND THEY WERE CLEARLY DESIGNED TO ESTABLISH TRADING RELATIONS FOR SEVERAL YEARS .

MOST OF THE CONTRACTS WERE ENTERED INTO AS FAR BACK AS 1970 AND WERE IN FORCE DURING THE WHOLE OR PART OF THE PERIOD 1970 TO 1974 .
87ALL THE ABOVE-MENTIONED CONTRACTS WITH THE EXCEPTION OF THOSE ENTERED INTO WITH UNILEVER PROVIDED FOR THE GRANT , UNDER VARIOUS NAMES , OF DISCOUNTS OR REBATES CALCULATED ON THE TOTAL PURCHASES OF VITAMINS , WHATEVER GROUP THE LATTER BELONG TO , DURING A GIVEN PERIOD USUALLY OF A YEAR OR SIX MONTHS .

IT WAS A SPECIAL FEATURE OF THE CONTRACTS WITH BEECHAM , ISAAC SPENCER , NITROVIT , PAULS AND WHITES , SANDOZ AND WYETH THAT THE PERCENTAGE OF THE REBATES PROVIDED FOR WAS NOT FIXED BUT INCREASED - IN GENERAL FROM 1% TO 3% - ACCORDING TO THE AMOUNTS PURCHASED EVERY YEAR .

EXCEPT IN THE CASE OF ANIMEDICA INTERNATIONAL , GUYOMARC ' H , MERCK B6 , PROTECTOR AND UPJOHN , THE CONTRACTS CONTAINED A CLAUSE , CALLED THE ENGLISH CLAUSE , UNDER THE TERMS OF WHICH THE CUSTOMERS COULD - BY ADOPTING VARIOUS METHODS WHICH WILL BE EXAMINED LATER ON - BRING TO ROCHE ' S NOTICE BY WAY OF COMPARISON MORE FAVOURABLE OFFERS FROM COMPETITORS WITH THE RESULT THAT , IF ROCHE DID NOT ADJUST ITS PRICES , THE CUSTOMER AFFECTED WAS RELEASED , AS FAR AS THAT PURCHASE WAS CONCERNED , FROM ITS OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE , OR , IF NO SUCH SPECIFIC OBLIGATION HAD BEEN STIPULATED , COULD PURCHASE FROM THE SAID COMPETITORS WITHOUT THEREBY LOSING IN EITHER CASE , AS FAR AS CONCERNS PAST OR FUTURE PURCHASES , THE BENEFIT OF THE ABOVE-MENTIONED REBATE .

88IT IS IN THE LIGHT OF THESE SPECIAL FEATURES THAT IT IS NECESSARY TO CONSIDER WHETHER THE DISPUTED CONTRACTS WERE AN ABUSE BY ROCHE OF ITS DOMINANT POSITION .

SECTION 3 : THE DETERMINATION , IN THE LIGHT OF ARTICLE 86 OF THE TREATY , OF THE LEGAL NATURE OF THE UNDERTAKINGS TO OBTAIN SUPPLIES EXCLUSIVELY FROM

ROCHE AND OF THE SYSTEM OF REBATES

89AN UNDERTAKING WHICH IS IN A DOMINANT POSITION ON A MARKET AND TIES PURCHASERS - EVEN IF IT DOES SO AT THEIR REQUEST - BY AN OBLIGATION OR PROMISE ON THEIR PART TO OBTAIN ALL OR MOST OF THEIR REQUIREMENTS EXCLUSIVELY FROM THE SAID UNDERTAKING ABUSES ITS DOMINANT POSITION WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , WHETHER THE OBLIGATION IN QUESTION IS STIPULATED WITHOUT FURTHER QUALIFICATION OR WHETHER IT IS UNDERTAKEN IN CONSIDERATION OF THE GRANT OF A REBATE .

THE SAME APPLIES IF THE SAID UNDERTAKING , WITHOUT TYING THE PURCHASERS BY A FORMAL OBLIGATION , APPLIES , EITHER UNDER THE TERMS OF AGREEMENTS CONCLUDED WITH THESE PURCHASERS OR UNILATERALLY , A SYSTEM OF FIDELITY REBATES , THAT IS TO SAY DISCOUNTS CONDITIONAL ON THE CUSTOMER ' S OBTAINING ALL OR MOST OF ITS REQUIREMENTS - WHETHER THE QUANTITY OF ITS PURCHASES BE LARGE OR SMALL - FROM THE UNDERTAKING IN A DOMINANT POSITION .

90OBLIGATIONS OF THIS KIND TO OBTAIN SUPPLIES EXCLUSIVELY FROM A PARTICULAR UNDERTAKING , WHETHER OR NOT THEY ARE IN CONSIDERATION OF REBATES OR OF THE GRANTING OF FIDELITY REBATES INTENDED TO GIVE THE PURCHASER AN INCENTIVE TO OBTAIN HIS SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION , ARE INCOMPATIBLE WITH THE OBJECTIVE OF UNDISTORTED COMPETITION WITHIN THE COMMON MARKET , BECAUSE - UNLESS THERE ARE EXCEPTIONAL CIRCUMSTANCES WHICH MAY MAKE AN AGREEMENT BETWEEN UNDERTAKINGS IN THE CONTEXT OF ARTICLE 85 AND IN PARTICULAR OF PARAGRAPH ( 3 ) OF THAT ARTICLE , PERMISSIBLE - THEY ARE NOT BASED ON AN ECONOMIC TRANSACTION WHICH JUSTIFIES THIS BURDEN OR BENEFIT BUT ARE DESIGNED TO DEPRIVE THE PURCHASER OF OR RESTRICT HIS POSSIBLE CHOICES OF SOURCES OF SUPPLY AND TO DENY OTHER PRODUCERS ACCESS TO THE MARKET .

THE FIDELITY REBATE , UNLIKE QUANTITY REBATES EXCLUSIVELY LINKED WITH THE VOLUME OF PURCHASES FROM THE PRODUCER CONCERNED , IS DESIGNED THROUGH THE GRANT OF A FINANCIAL ADVANTAGE TO PREVENT CUSTOMERS FROM OBTAINING THEIR SUPPLIES FROM COMPETING PRODUCERS .

FURTHERMORE THE EFFECT OF FIDELITY REBATES IS TO APPLY DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS WITH OTHER TRADING PARTIES IN THAT TWO PURCHASERS PAY A DIFFERENT PRICE FOR THE SAME QUANTITY OF THE SAME PRODUCT DEPENDING ON WHETHER THEY OBTAIN THEIR SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION OR HAVE SEVERAL SOURCES OF SUPPLY .

FINALLY THESE PRACTICES BY AN UNDERTAKING IN A DOMINANT POSITION AND ESPECIALLY ON AN EXPANDING MARKET TEND TO CONSOLIDATE THIS POSITION BY MEANS OF A FORM OF COMPETITION WHICH IS NOT BASED ON THE TRANSACTIONS EFFECTED AND IS THEREFORE DISTORTED .

91FOR THE PURPOSE OF REJECTING THE FINDING THAT THERE HAS BEEN AN ABUSE OF A DOMINANT POSITION THE INTERPRETATION SUGGESTED BY THE APPLICANT THAT AN ABUSE IMPLIES THAT THE USE OF THE ECONOMIC POWER BESTOWED BY A DOMINANT POSITION IS THE MEANS WHEREBY THE ABUSE HAS BEEN BROUGHT ABOUT CANNOT BE ACCEPTED .

THE CONCEPT OF ABUSE IS AN OBJECTIVE CONCEPT RELATING TO THE BEHAVIOUR OF AN UNDERTAKING IN A DOMINANT POSITION WHICH IS SUCH AS TO INFLUENCE THE STRUCTURE OF A MARKET WHERE , AS A RESULT OF THE VERY PRESENCE OF THE UNDERTAKING IN QUESTION , THE DEGREE OF COMPETITION IS WEAKENED AND WHICH , THROUGH RECOURSE TO METHODS DIFFERENT FROM THOSE WHICH CONDITION NORMAL COMPETITION IN PRODUCTS OR SERVICES ON THE BASIS OF THE TRANSACTIONS OF

COMMERCIAL OPERATORS , HAS THE EFFECT OF HINDERING THE MAINTENANCE OF THE DEGREE OF COMPETITION STILL EXISTING IN THE MARKET OR THE GROWTH OF THAT COMPETITION .

SECTION 4 : THE NATURE OF THE REBATES AT ISSUE
92THE APPLICANT NEVERTHELESS SUBMITS THAT THE AGREED REBATES ARE QUANTITY AND NOT FIDELITY REBATES OR THAT THEY CORRESPOND TO AN ECONOMIC TRANSACTION WITH THE CUSTOMER JUSTIFYING CONSIDERATION OF THIS KIND .

93IN CONSIDERING THIS SUBMISSION IT IS NECESSARY TO DISTINGHUISH BETWEEN THOSE CONTRACTS WHICH PROVIDE FOR REBATES AT A FIXED RATE AND THOSE IN WHICH REBATES AT PROGRESSIVE RATES ARE PROVIDED FOR .

( A ) CONTRACTS WHICH PROVIDE FOR REBATES AT A FIXED RATE
94FIRST THE APPLICANT ' S ARGUMENT CANNOT BE ACCEPTED IN THE CASE OF THOSE CONTRACTS WHICH PROVIDE FOR A REBATE AT A FIXED RATE .

95IN FACT - AND WITHOUT PREJUDICE TO THE OBSERVATION THAT WHERE EXCLUSIVITY HAS BEEN FORMALLY ACCEPTED THE GRANTING OR NOT OF A REBATE IS IN THE FINAL ANALYSIS IRRELEVANT - NONE OF THE SAID CONTRACTS INCLUDES ANY UNDERTAKING RELATING TO FIXED OR ONLY ESTIMATED QUANTITIES OR LINKED TO THE VOLUME OF PURCHASES BUT THEY ALL REFER TO ' ' REQUIREMENTS ' ' OR A PROPORTION OF THE SAID REQUIREMENTS .

MOREOVER IN MOST OF THEM THE PARTIES HAVE THEMSELVES DESCRIBED THE CLAUSE AS A FIDELITY REBATE CLAUSE ( AMERICAN CYANAMID , ORGANON , PROVIMI , RALSTON PURINA , TROUW ) OR USED TERMS WHICH STRONGLY UNDERLINE THE LINK BETWEEN THE EXCLUSIVITY AND THE REBATES ALLOWED .

96THE DAWE ' S CONTRACT STIPULATES THAT THE REBATE IS GRANTED ' ' IN RETURN ' ' FOR THE EXCLUSIVITY WHICH HAS BEEN ACCEPTED ; THE RAMIKAL CONTRACT PROVIDES FOR A CONFIDENTIAL ANNUAL BONUS ( VERTRAULICHER JAHRESBONUS ), ' ' WHICH IS A GENUINE BONUS FOR YOUR PURCHASES FROM ROCHE ' ' ( EINE ECHTE VERGUTUNG AUF IHRE BEZUGE VON ROCHE ) AND IS INDEPENDENT OF THE QUANTITY REBATES TO WHICH RAMIKAL REMAINS ENTITLED .

IT IS TRUE THAT IN FOUR OF THE CONTRACTS , NAMELY THE AFICO/NESTLE , CAPSUGEL/PARKE DAVIS , PROVIMI ( AS FROM 1974 ) AND UPJOHN CONTRACTS , THE REASON WHY THE REBATE IS ALLOWED ON ALL PURCHASES , ACCORDING TO THE TERMS OF THE SAID CONTRACTS , IS THAT THESE CUSTOMERS GUARANTEE TO ROCHE PAYMENT OF THE BILLS RESULTING FROM ORDERS PLACED DIRECTLY BY SUBSIDIARIES OF THOSE CUSTOMERS .

IT IS NEVERTHELESS DIFFICULT TO ACCEPT THAT REBATES CALCULATED IN ALL RESPECTS ON THE SAME BASIS AS THOSE WHICH IN THE OTHER CONTRACTS ARE ACKNOWLEDGED TO BE FIDELITY REBATES , CAN BE CONSIDERATION FOR AN UNDERTAKING BY INTERNATIONAL COMPANIES SUCH AS NESTLE , PARKE DAVIS AND UPJOHN DESIGNED TO REASSURE ROCHE THAT THEIR SUBSIDIARIES ARE SOLVENT .

NOR IS IT POSSIBLE TO ACCEPT ROCHE ' S ARGUMENT THAT , AT LEAST IN THE CASE OF CERTAIN VITAMINS SUCH AS BIOTIN ( VITAMIN H ), THE REBATE WAS AN INTRODUCTORY REBATE , SINCE THE CONTRACTS NEITHER DISTINGUISH BETWEEN THE DIFFERENT REBATES ACCORDING TO THEIR FUNCTION FIXED IN A GENERAL AND UNIFORM WAY FOR ALL OR A LARGE PROPORTION OF EACH CUSTOMER ' S REQUIREMENTS NOR ALLOW ANY SUCH DISTINCTION TO BE DRAWN .

( B ) CONTRACTS WHICH PROVIDE FOR REBATES AT PROGRESSIVE RATES

97A NUMBER OF THE CONTRACTS AT ISSUE , NAMELY BEECHAM ( 1972 , 1973 , 1974 ), ISAAC SPENCER ( 1973 , 1974 ), NITROVIT ( 1973 , 1974 ), PAULS AND WHITES ( 1972 , 1973 , 1974 ) CONTAIN , ON THE ONE HAND , AN UNDERTAKING RELATING TO ' ' THE MAJOR PART ' ' OF THE PURCHASER ' S REQUIREMENTS AND , ON THE OTHER HAND , A REBATE CLAUSE PROVIDING FOR A DISCOUNT , THE PERCENTAGE WHEREOF INCREASES - IN GENERAL FROM 1% TO 2% , AND THEN TO 3% - DEPENDING ON WHETHER DURING THE PERIOD OF ONE YEAR A GREATER OR LESSER PERCENTAGE OF THE PURCHASER ' S ESTIMATED REQUIREMENTS HAS BEEN MET , EACH OF THE CONTRACTS CONTAINING A VALUE ESTIMATE ( IN POUNDS STERLING ) OF THE TOTAL REQUIREMENTS AND , IN ADDITION , IN THE CASE OF TWO OF THE CONTRACTS ( PAULS AND WHITES 1972 , BEECHAM 1972 ) A QUANTITATIVE ESTIMATE OF EACH OF THE TYPES OF VITAMINS REFERRED TO IN THE CONTRACT .

BY WAY OF EXAMPLE REFERENCE MAY BE MADE TO THE BEECHAM CONTRACT ( 1 APRIL 1972 TO 31 MARCH 1973 ) WHEREBY , SINCE THE ANNUAL REQUIREMENTS WERE ESTIMATED AT A MAXIMUM OF POUNDS 300 000 , THE REBATE PROVIDED FOR WAS 1% IF THE TURNOVER REACHED 60% , NAMELY POUNDS 180 000 , 1.5% IF IT REACHED 70% , NAMELY POUNDS 210 000 , AND 2% IF IT REACHED 80% , NAMELY POUNDS 240 000 . THERE ARE SIMILAR FORMULAE IN THE OTHER CONTRACTS , THE ESTIMATE OF REQUIREMENTS DIFFERING FROM CONTRACT TO CONTRACT AND FROM YEAR TO YEAR , OBVIOUSLY TO ALLOW FOR THE CUSTOMER ' S CAPACITY OF ABSORPTION .

98ALTHOUGH THE CONTRACTS AT ISSUE CONTAIN ELEMENTS WHICH APPEAR AT FIRST SIGHT TO BE OF A QUANTITATIVE NATURE AS FAR AS CONCERNS THEIR CONNEXION WITH THE GRANTING OF A REBATE ON AGGREGATE PURCHASES , AN EXAMINATION OF THEM HOWEVER SHOWS THAT THEY ARE IN FACT A SPECIALLY WORKED OUT FORM OF FIDELITY REBATE .

99IN THE FIRST PLACE IT IS NOTICEABLE THAT THIS PARTICULAR FORM OF REBATE IS INCORPORATED IN THOSE VERY CONTRACTS IN WHICH THE UNDERTAKING BY THE PURCHASER TO OBTAIN SUPPLIES WAS DRAWN UP IN THE FORM WHICH PLACED HIM UNDER THE LEAST CONSTRAINT , NAMELY THAT THE PURCHASER WAS TO OBTAIN ' ' MOST OF HIS REQUIREMENTS ' ' , SO THAT THE PURCHASER CONCERNED WAS LEFT WITH CONSIDERABLE FREEDOM OF ACTION .

THE INDETERMINATE NATURE OF THE UNDERTAKING THUS WORDED IS TO A GREAT EXTENT OFFSET BY AN ESTIMATE OF ANNUAL REQUIREMENTS AND BY THE GRANTING OF A REBATE INCREASING IN ACCORDANCE WITH THE PERCENTAGE OF THE REQUIREMENTS WHICH ARE MET AND THIS PROGRESSIVE RATE IS CLEARLY A POWERFUL INCENTIVE TO OBTAIN THE MAXIMUM PERCENTAGE OF THE SAID REQUIREMENTS FROM ROCHE .

100THIS METHOD OF CALCULATING THE REBATES DIFFERS FROM THE GRANTING OF QUANTITATIVE REBATES , LINKED SOLELY TO THE VOLUME OF PURCHASES FROM THE PRODUCERS CONCERNED IN THAT THE REBATES AT ISSUE ARE NOT DEPENDENT ON QUANTITIES FIXED OBJECTIVELY AND APPLICABLE TO ALL POSSIBLE PURCHASERS BUT ON ESTIMATES MADE , FROM CASE TO CASE , FOR EACH CUSTOMER ACCORDING TO THE LATTER ' S PRESUMED CAPACITY OF ABSORPTION , THE OBJECTIVE WHICH IT IS SOUGHT TO ATTAIN BEING NOT THE MAXIMUM QUANTITY BUT THE MAXIMUM REQUIREMENTS .

101CONSEQUENTLY THE COMMISSION WAS ALSO RIGHT TO REGARD THE SAID CONTRACTS CONTAINING FIDELITY REBATES AS AN ABUSE OF A DOMINANT POSITION .

SECTION 5 : THE ENGLISH CLAUSE
102ALL THE CONTRACTS IN QUESTION EXCEPT FIVE ( THE ANIMEDICA INTERNATIONAL , GUYOMARC ' H , MERCK B6 , PROTECTOR AND UPJOHN CONTRACTS ) CONTAIN A CLAUSE , CALLED THE ENGLISH CLAUSE , UNDER WHICH THE CUSTOMER , IF HE OBTAINS FROM COMPETITORS OFFERS AT PRICES WHICH ARE MORE FAVOURABLE THAN THOSE UNDER

THE CONTRACTS AT ISSUE MAY ASK ROCHE TO ADJUST ITS PRICES TO THE SAID OFFERS ; IF ROCHE DOES NOT COMPLY WITH THIS REQUEST , THE CUSTOMER , IN DEROGATION FROM HIS UNDERTAKING TO OBTAIN HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE , IS ENTITLED TO GET HIS SUPPLIES FROM THE SAID COMPETITOR WITHOUT FOR THAT REASON LOSING THE BENEFIT OF THE FIDELITY REBATES PROVIDED FOR IN THE CONTRACTS IN RESPECT OF THE OTHER PURCHASES ALREADY EFFECTED OR STILL TO BE EFFECTED BY HIM FROM ROCHE .

103IN THE APPLICANT ' S VIEW THIS CLAUSE DESTROYS THE RESTRICTIVE EFFECT ON COMPETITION BOTH OF THE EXCLUSIVITY AGREEMENTS AND OF THE FIDELITY REBATES .

IN PARTICULAR IN THE CASE OF THOSE CONTRACTS WHICH DO NOT CONTAIN AN EXPRESS UNDERTAKING BY THE PURCHASER TO OBTAIN HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE THE ENGLISH CLAUSE ELIMINATES ' ' THE ATTRACTIVE EFFECT ' ' OF THE REBATES AT ISSUE SINCE THE CUSTOMER DOES NOT HAVE TO CHOOSE BETWEEN ACCEPTANCE OF ROCHE ' S LESS ATTRACTIVE OFFERS OR LOSING THE BENEFIT OF THE FIDELITY REBATES ON ALL PURCHASES WHICH HE HAS ALREADY EFFECTED FROM ROCHE .

104THERE IS NO DOUBT WHATEVER THAT THIS CLAUSE MAKES IT POSSIBLE TO REMEDY SOME OF THE UNFAIR CONSEQUENCES WHICH UNDERTAKINGS BY PURCHASERS TO OBTAIN THEIR REQUIREMENTS EXCLUSIVELY FROM ROCHE OR THE PROVISION FOR FIDELITY REBATES ON ALL PURCHASES ACCEPTED FOR RELATIVELY LONG PERIODS , MIGHT HAVE IN SO FAR AS THOSE PURCHASERS ARE CONCERNED .

NEVERTHELESS IT IS NECESSARY TO POINT OUT THAT THE PURCHASER ' S OPPORTUNITIES FOR EXPLOITING COMPETITION FOR HIS OWN BENEFIT ARE MORE RESTRICTED THAN APPEARS AT FIRST SIGHT .

105APART FROM THE FACT THAT THE ENGLISH CLAUSE IS NOT IN THE GUYOMARC ' H , MERCK B6 , ANIMEDICA INTERNATIONAL , PROTECTOR AND UPJOHN CONTRACTS IT IS SUBJECT TO CONDITIONS WHICH LIMIT ITS SCOPE AND IN FACT LEAVE ROCHE WITH A WIDE DISCRETION AS TO THE POSSIBILITY OF THE CUSTOMER ' S INVOKING IT .

A NUMBER OF CONTRACTS STIPULATE NOT ONLY THAT THE OFFER MUST COME FROM IMPORTANT COMPETITORS BUT ALSO FROM LARGE COMPETITORS OPERATING ON THE SAME SCALE AS ROCHE OR AGAIN PROVIDE THAT THE OFFERS MUST NOT ONLY BE COMPARABLE AS TO THE QUALITY OF THE PRODUCT BUT ALSO AS TO THEIR CONTINUITY AND SUCH A CONDITION , BY ELIMINATING A MORE FAVOURABLE BUT OCCASIONAL METHOD OF OBTAINING SUPPLIES , STRENGTHENS THE EXCLUSIVITY .

OTHER CONTRACTS STIPULATE THAT THE OFFER MUST COME FROM PRODUCERS TO THE EXCLUSION OF BROKERS OR COMMERCIAL AGENTS AND SUCH A CONDITION IN FACT ELIMINATES NON-EUROPEAN COMPETITORS WHO OPERATE ON THE MARKET THROUGH COMMERCIAL FIRMS AS WAS FOUND WHEN THE PARTIES AT THE REQUEST OF THE COURT SEPARATELY UNDERTOOK AN INVESTIGATION OF THE MARKET SHARES .

IN SOME CONTRACTS THE ENGLISH CLAUSE IS LINKED DIRECTLY WITH ROCHE ' S PLEDGE TO GUARANTEE THE BEST PRICES ' ' ON THE LOCAL MARKET ' ' AND IT ONLY OPERATES WITHIN THESE LIMITS , AND THIS NOT ONLY RESTRICTS ITS SCOPE BUT BRINGS ABOUT A PARTITIONING OF THE MARKETS WHICH IS INCOMPATIBLE WITH THE COMMON MARKET .

106FURTHERMORE THE ENGLISH CLAUSE DOES NOT REMOVE THE DISCRIMINATION RESULTING FROM THE FIDELITY REBATES BETWEEN PURCHASERS IN SIMILAR CIRCUMSTANCES DEPENDING ON WHETHER OR NOT THEY RESERVE THEIR FREEDOM TO CHOOSE THEIR SUPPLIERS .

107IT IS PARTICULARLY NECESSARY TO STRESS THAT , EVEN IN THE MOST FAVOURABLE CIRCUMSTANCES , THE ENGLISH CLAUSE DOES NOT IN FACT REMEDY TO A GREAT EXTENT THE DISTORTION OF COMPETITION CAUSED BY THE CLAUSES OBLIGING PURCHASERS TO OBTAIN THEIR REQUIREMENTS EXCLUSIVELY FROM ROCHE AND BY THE FIDELITY REBATES ON A MARKET WHERE AN UNDERTAKING IN A DOMINANT POSITION IS OPERATING AND WHERE FOR THIS REASON THE STRUCTURE OF COMPETITION HAS ALREADY BEEN WEAKENED .

IN FACT THE ENGLISH CLAUSE UNDER WHICH ROCHE ' S CUSTOMERS ARE OBLIGED TO INFORM IT OF MORE FAVOURABLE OFFERS MADE BY COMPETITORS TOGETHER WITH THE PARTICULARS ABOVE MENTIONED - SO THAT IT WILL BE EASY FOR ROCHE TO IDENTIFY THE COMPETITOR - OWING TO ITS VERY NATURE , PLACES AT THE DISPOSAL OF THE APPLICANT INFORMATION ABOUT MARKET CONDITIONS AND ALSO ABOUT THE ALTERNATIVES OPEN TO , AND THE ACTIONS OF , ITS COMPETITORS WHICH IS OF GREAT VALUE FOR THE CARRYING OUT OF ITS MARKET STRATEGY .

THE FACT THAT AN UNTERTAKING IN A DOMINANT POSITION REQUIRES ITS CUSTOMERS OR OBTAINS THEIR AGREEMENT UNDER CONTRACT TO NOTIFY IT OF ITS COMPETITOR ' S OFFERS , WHILST THE SAID CUSTOMERS MAY HAVE AN OBVIOUS COMMERCIAL INTEREST IN NOT DISCLOSING THEM , IS OF SUCH A KIND AS TO AGGRAVATE THE EXPLOITATION OF THE DOMINANT POSITION IN AN ABUSIVE WAY .

FINALLLY BY VIRTUE OF THE MACHINERY OF THE ENGLISH CLAUSE IT IS FOR ROCHE ITSELF TO DECIDE WHETHER , BY ADJUSTING ITS PRICES OR NOT , IT WILL PERMIT COMPETITION .

108IT IS ABLE IN THIS WAY , OWING TO THE INFORMATION WHICH ITS OWN CUSTOMERS SUPPLY , TO VARY ITS MARKET STRATEGY IN SO FAR AS IT AFFECTS THEM AND ITS COMPETITORS .

IT FOLLOWS FROM ALL THESE FACTORS THAT THE COMMISSION ' S VIEW THAT THE ENGLISH CLAUSES INCORPORATED IN THE CONTRACTS AT ISSUE WERE NOT OF SUCH A KIND AS TO TAKE THEM OUT OF THE CATEGORY OF ABUSE OF A DOMINANT POSITION HAS BEEN ARRIVED AT BY MEANS OF A PROPER CONSTRUCTION AND APPLICATION OF ARTICLE 86 OF THE TREATY .

SECTION 6 : APPLICATION OF THE CRITERIA ADOPTED IN THE CONTRACTS AT ISSUE ( OTHER THAN UNILEVER AND MERCK )
109THE CONTRACTS WHICH CONTAIN AN EXPRESS OBLIGATION BY PURCHASERS TO OBTAIN FROM ROCHE ALL ( AFICO , DAWE ' S , ORGANON , PROVIMI , RALSTON , PURINA , UPJOHN ) OR A VERY LARGE PERCENTAGE ( ANIMEDICA ALLEMAGNE , ANIMEDICA INTERNATIONAL , AMERICAN CYANAMID , GUYOMARC ' H ) OF THEIR REQUIREMENTS OF VITAMINS OR OF THEIR REQUIREMENTS OF CERTAIN GROUPS OF VITAMINS DESIGNATED IN THE CONTRACTS , SATISFY THE CONDITIONS AMOUNTING TO CONDUCT RESTRICTING COMPETITION AS SET OUT ABOVE AND REPRESENT AN ABUSE OF A DOMINANT POSITION .

THE SAME APPLIES TO CONTRACTS WHEREBY THE PURCHASER UNDERTAKES TO RESERVE TO ROCHE THE SUPPLYING OF THE ' ' MAJOR PART ' ' ( ' ' MAJEURE PARTIE ' ' , ' ' UBERWIEGENDER TEIL ' ' ) OF ITS REQUIREMENTS ( BEECHAM , PAULS AND WHITES , NITROVIT , ISAAC SPENCER , RAMIKAL AND TROUW ) ESPECIALLY AS THE LESS RESTRICTIVE NATURE OF THE WORDING USED IS OFFSET , AS HAS BEEN SHOWN ABOVE , BY THE GRANTING OF REBATES WHICH ARE SPECIALLY DESIGNED TO HAVE SUCH A CORRECTIVE EFFECT .

110THE SAME FINDINGS HAVE TO BE RECORDED IN RESPECT OF THE CONTRACTS WHICH , ALTHOUGH IT MAY BE DOUBTFUL WHETHER THEY CONTAIN A FIRM UNDERTAKING BY

THE PRODUCERS TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE , OFFER , BY MEANS OF THE GRANTING OF THE REBATES ANALYSED ABOVE , A STRONG INCENTIVE TO PURCHASERS TO LET ROCHE ALONE SUPPLY THE WHOLE OR PART OF THEIR REQUIREMENTS OF VITAMINS OR OF CERTAIN GROUPS OF VITAMINS .

THE COMMISSION WAS JUSTIFIED IN POINTING OUT ( RECITALS 11 AND 24 TO CONTESTED DECISION ) THAT THIS INCENTIVE IS MADE MORE ATTRACTIVE BY THE FACT THAT THE REBATE IS GRANTED ON ALL PURCHASES OF THE DIFFERENT GROUPS OF VITAMINS SO THAT IF THE PURCHASER WANTED TO APPROACH - IN CIRCUMSTANCES OTHER THAN THOSE TO WHICH THE ENGLISH CLAUSE , THE SCOPE OF WHICH HAS BEEN EXAMINED ABOVE , APPLIES - A COMPETING PRODUCER FOR A PARTICULAR VITAMIN HE WILL HOWEVER BE PREVENTED FROM DOING SO BECAUSE HE WOULD THEREBY LOSE THE BENEFIT OF THE REBATE ON ALL THE OTHER VITAMINS WHICH HE CONTINUES TO BUY FROM ROCHE .

111HAVING REGARD TO THE FACT , WHICH BOTH THE APPLICANT AND THE COMMISSION ADMIT , THAT THE VARIOUS GROUPS OF VITAMINS ARE PRODUCTS WHICH ARE NOT INTERCHANGEABLE AND REPRESENT SEPARATE MARKETS , THIS SYSTEM OF REBATES ON OVERALL PURCHASES IS FURTHERMORE AN ABUSE WITHIN THE MEANING OF SUBPARAGRAPH ( D ) OF THE SECOND PARAGRAPH OF ARTICLE 86 OF THE TREATY IN THAT IT AIMS AT ' ' MAKING THE CONCLUSION OF CONTRACTS SUBJECT TO ACCEPTANCE BY THE OTHER PARTIES OF SUPPLEMENTARY OBLIGATIONS WHICH , BY THEIR NATURE OR ACCORDING TO COMMERCIAL USAGE , HAVE NO CONNEXION WITH THE SUBJECT OF SUCH CONTRACTS ' ' .

FINALLY IT MUST BE BORNE IN MIND THAT , EVEN IF , AS ROCHE SUBMITS , THE PURCHASER ' S NON-COMPLIANCE WITH HIS UNDERTAKING TO OBTAIN HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE DID NOT MAKE HIM LIABLE TO BE SUED FOR BREACH OF CONTRACT BUT ONLY CAUSED HIM TO LOSE THE BENEFIT OF THE PROMISED REBATES , SUCH CONTRACTS NEVERTHELESS CONTAIN A SUFFICIENT INCENTIVE TO RESERVE TO ROCHE THE SOLE RIGHT TO SUPPLY THE PURCHASER FOR THEM TO BE , FOR THIS REASON ALONE , AN ABUSE OF A DOMINANT POSITION .

SECTION 7 : APPLICATION OF THE CRITERIA ADOPTED IN THE MERCK AND UNILEVER CONTRACTS
( A ) THE MERCK CONTRACTS
112ROCHE HAS ENTERED INTO THREE CONTRACTS WITH MERCK , THE FIRST DATED 5 JULY 1971 FOR SUPPLYING MERCK WITH VITAMIN B6 , THE SECOND DATED 3 MARCH 1972 FOR SUPPLYING IT WITH VITAMIN A AND THE THIRD OF THE SAME DATE FOR SUPPLYING IT WITH VITAMIN E .
113THE RECITALS TO THE FIRST CONTRACT , RELATING TO A PRODUCT IN RESPECT OF WHICH THE APPLICANT ' S MARKET SHARE IS APPROXIMATELY 80 % , STATE THAT ' ' ROCHE IS SHORTLY GOING TO DOUBLE THE MANUFACTURING CAPACITY OF ITS PLANT WHICH AT THE PRESENT TIME IS ABOUT 500 TONNES PER ANNUM AND THEREFORE HAS AN INTEREST IN MEETING PART OF MERCK ' S REQUIREMENTS ' ' AND THAT ' ' MERCK IS WILLING TO COVER THESE REQUIREMENTS FROM ROCHE UPON THE FOLLOWING TERMS AND CONDITIONS IN SO FAR AS THEY EXCEED ITS PRESENT MANUFACTURING CAPACITY OF ABOUT 200 TONNES PER ANNUM ' ' .

UNDER CLAUSES 6 AND 7 OF THIS CONTRACT THE DELIVERY PRICE PAYABLE BY MERCK IS THE AVERAGE SELLING PRICE OF THE SAME PRODUCT TO THIRD PARTIES LESS A REBATE OF 20 % , IT BEING UNDERSTOOD THAT ROCHE ' ' WILL IN ANY CASE APPLY TO MERCK THE MOST FAVOURABLE PRICES AND/OR CONDITIONS ' ' .

UNDER CLAUSE 12 THEREOF MERCK IS FORBIDDEN TO RESELL THE SAID VITAMINS TO ROCHE ' S COMPETITORS WITHOUT ROCHE ' S CONSENT .

UNDER CLAUSE 14 ROCHE AGREES TO OBTAIN ALL ITS SUPPLIES OF ' ' PHOSPHORIC
ESTER OF PYRODOXINE 5 ' ' FROM MERCK AND MERCK AGREES TO SUPPLY THE LATTER
THEREWITH UPON THE SAME CONDITIONS AS THOSE STIPULATED FOR SUPPLYING MERCK
WITH VITAMIN B6 .
CLAUSE 13 OF THE CONTRACT PROVIDES THAT THE CONTRACT SHALL BE FOR A PERIOD
OF FIVE YEARS AND THEREAFTER RENEWABLE BY TACIT AGREEMENT FOR PERIODS OF
TWO YEARS .

THE CONTRACT DOES NOT CONTAIN AN ENGLISH CLAUSE .

114THE OTHER TWO CONTRACTS DATED 3 MARCH 1972 FOR SUPPLYING MERCK WITH
VITAMINS A AND E ARE IN GENERAL IN THE SAME FORM AS THE CONTRACT ANALYSED
ABOVE .

THE DIFFERENCE BETWEEN THESE TWO CONTRACTS IS THAT IN THE ONE RELATING TO
VITAMIN E THE RECITALS RESTATE THAT ' ' ROCHE IS SHORTLY TO INCREASE
SUBSTANTIALLY ITS PRODUCTION CAPACITY FOR VITAMIN E ' ' AND ' ' WOULD THEREFORE
LIKE TO BE A REGULAR SUPPLIER OF MERCK ' ' , WHEREAS THE CONTRACT RELATING TO
VITAMIN A DOES NOT CONTAIN SUCH A RECITAL .

THE TWO CONTRACTS DATED 3 MARCH 1972 - UNLIKE THE ONE DATED 5 JULY 1971 - DO
NOT PROVIDE FOR THE PARTIES SUPPLYING EACH OTHER EXCLUSIVELY ON A RECIPROCAL
BASIS BUT CONTAIN A CLAUSE TO THE EFFECT THAT MERCK IS RELEASED FROM ITS
OBLIGATION TO PURCHASE ITS REQUIREMENTS EXCLUSIVELY FROM ROCHE IF IT
RECEIVES A MORE FAVOURABLE OFFER AND ROCHE DOES NOT ADJUST ITS PRICES .

FINALLY , THESE TWO CONTRACTS FORBID MERCK TO RESELL THE SAID VITAMINS WHICH
ARE THE SUBJECT-MATTER THEREOF TO ROCHE ' S COMPETITORS WITHOUT ROCHE ' S
CONSENT .

115THE SPECIAL FACTORS SET OUT ABOVE INDICATE THAT THE PURPOSE OF MERCK ' S
UNDERTAKING TO OBTAIN ITS REQUIREMENTS EXCLUSIVELY FROM ROCHE WAS , AS FAR
AS CONCERNS VITAMINS B6 AND E , TO SECURE ROCHE IN ADVANCE A STABLE MARKET
FOR THE INCREASED PRODUCTION WHICH WAS PLANNED AND TO REMOVE AT THE VERY
LEAST A NOT INCONSIDERABLE PART OF THIS ADDITIONAL PRODUCTION FROM THE
RISKS OF COMPETITION .

SUCH AN OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FOR SUCH A PERIOD OF TIME
FROM AN UNDERTAKING IN A DOMINANT POSITION , FOR THE LATTER ' S BENEFIT , IS AN
ABUSE BY THAT UNDERTAKING OF ITS DOMINANT POSITION WITHIN THE MEANING OF
ARTICLE 86 OF THE TREATY .

ALTHOUGH THE SAME PURPOSE HAS NOT BEEN EXPRESSED AS FAR AS VITAMIN A IS
CONCERNED AND ALTHOUGH THE POSSIBILITY CANNOT BE RULED OUT THAT THIS
CONTRACT - AS SEVERAL PRECISE , TECHNICAL DEFINITIONS INCORPORATED IN THE
TEXT LEAD ONE TO SUPPOSE - MEETS MERCK ' S WISH TO SECURE REGULAR AND
CONTINUOUS SUPPLIES OF A PRODUCT OF WHICH IT ONLY MANUFACTURES SMALL
QUANTITIES ITSELF , THIS FACT DOES NOT REMOVE THE PROHIBITION ON AN
UNDERTAKING IN A DOMINANT POSITION FROM TYING ITS PURCHASERS BY OBLIGATIONS
TO OBTAIN THEIR SUPPLIES EXCLUSIVELY FROM IT , ESPECIALLY FOR PERIODS AS LONG
AS THOSE PROVIDED FOR IN THE SAID CONTRACT .

THE OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE TOGETHER WITH THE
GRANTING OF VERY LARGE REBATES , ACCORDING TO THE CIRCUMSTANCES , OF 12.5 %
TO 20 % ( VITAMIN A ), 15 % TO 20 % ( VITAMIN E ) AND 20 % ( VITAMIN B6 ), AND THE
BAN ON RESALE TO PRODUCERS OF VITAMINS PROVES THE INTENTION TO RESTRICT
COMPETITION .

116IT IS NECESSARY TO POINT OUT THAT IN CIRCUMSTANCES SUCH AS THOSE IN THIS CASE , AND ESPECIALLY WITH REFERENCE TO THE CONTRACT OF 5 JULY 1971 , IN WHICH THE PARTIES UNDERTAKE TO SUPPLY EACH OTHER EXCLUSIVELY ON A RECIPROCAL BASIS , THE QUESTION MIGHT BE ASKED WHETHER THE CONDUCT IN QUESTION DOES NOT FALL WITHIN ARTICLE 85 OF THE TREATY AND POSSIBLY WITHIN PARAGRAPH ( 3 ) THEREOF .

HOWEVER , THE FACT THAT AGREEMENTS OF THIS KIND MIGHT FALL WITHIN ARTICLE 85 AND IN PARTICULAR WITHIN PARAGRAPH ( 3 ) THEREOF DOES NOT PRECLUDE THE APPLICATION OF ARTICLE 86 , SINCE THIS LATTER ARTICLE IS EXPRESSLY AIMED IN FACT AT SITUATIONS WHICH CLEARLY ORIGINATE IN CONTRACTUAL RELATIONS SO THAT IN SUCH CASES THE COMMISSION IS ENTITLED , TAKING INTO ACCOUNT THE NATURE OF THE RECIPROCAL UNDERTAKINGS ENTERED INTO AND TO THE COMPETITIVE POSITION OF THE VARIOUS CONTRACTING PARTIES ON THE MARKET OR MARKETS IN WHICH THEY OPERATE TO PROCEED ON THE BASIS OF ARTICLE 85 OR ARTICLE 86 .
( B ) THE UNILEVER CONTRACTS
117ROCHE ENTERED INTO THREE CONTRACTS WITH UNILEVER ON 9 JANUARY 1974 .
118THE FIRST , EXECUTED BY FOOD INDUSTRIES LTD ., ACTING AS UNILEVER ' S AGENT , WITH ROCHE ' S UK SUBSIDIARY , CONTAINS FIRST OF ALL AN ESTIMATE OF THE PURCHASER ' S REQUIREMENTS OF SYNTHETIC VITAMIN A , TYPE B , ASSESSED AT 130-134 THOUSAND MILLIARD ( M.M .) INTERNATIONAL UNITS FOR 1974 .
THE CONTRACT ALSO PROVIDES THAT IT SHALL CONTINUE DURING 1975 AND THAT THE PURCHASER SHALL GIVE AN ESTIMATE OF ITS REQUIREMENTS DURING DECEMBER 1974 AT THE LATEST .

THE SECOND , EXECUTED BY THE SAME PARTIES , COVERS DELIVERIES OF VITAMIN A , OTHER THAN TYPE B , AND AS FAR AS CONCERNS THE REST OF THE AGREEMENT CONTAINS THE SAME TERMS AND CONDITIONS AS THE FIRST .

THE THIRD CONTRACT IS CONCLUDED DIRECTLY BETWEEN ROCHE , BASLE , AND UNILEVER INKOOP MIJ , ROTTERDAM , AND PROVIDES THAT ROCHE HAS ' ' AGREED TO SUPPLY THE REQUIREMENTS OF YOUR GROUP ( CONTINENT ONLY ) FOR THE FOLLOWING PRODUCTS : VITAMIN A FOR MARGARINE ABOUT 30 M.M . IN 1974 , BETWEEN 27 AND 33 M.M . IN 1975 ; BETA-CAROTENE ( ALL FORMS ) ABOUT 6 000 KG IN 1974 , BETWEEN 5 400 KG AND 6 600 KG IN 1975 ' ' .

119THE THREE CONTRACTS STATE THE PRICES WHICH HAVE BEEN AGREED , SUBJECT MOREOVER IN THE CASE OF THE CONTRACTS WITH FOOD INDUSTRIES LTD . TO A CLAUSE DEALING WITH EXCHANGE RATES .

THESE THREE CONTRACTS DO NOT PROVIDE FOR ANY REBATES BUT IN ITS TWO CONTRACTS WITH FOOD INDUSTRIES LTD . ROCHE GIVES AN ASSURANCE THAT IT WILL CHARGE UNILEVER ANY MORE-FAVOURABLE PRICE WHICH IT CHARGES THIRD PARTIES , WHEREAS THE CONTRACT FOR THE CONTINENT ONLY PROVIDES THAT IF UNILEVER RECEIVES MORE-FAVOURABLE OFFERS FROM COMPETITORS ROCHE WILL ADJUST ITS PRICES OR PERMIT THE PURCHASER TO BUY THE QUANTITY CONCERNED FROM COMPETITORS .

120THE TERMS OF THE CONTRACTS MAKE IT ABSOLUTELY CLEAR THAT THEIR PURPOSE IS THE SUPPLY BY ROCHE OF ALL UNILEVER ' S REQUIREMENTS OF THE VITAMIN IN QUESTION FOR A PERIOD COVERING THE YEARS 1974 AND 1975 .
SINCE THE CONTRACTS IN QUESTION CONTAIN A FORMAL UNDERTAKING TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE THE QUESTION WHETHER OR NOT THEY ALSO CONTAIN A PROVISION GRANTING A REBATE IS NOT DETERMINATIVE WHEN DECIDING WHETHER THEY ARE CAUGHT BY ARTICLE 86 OF THE TREATY .

THE FACT THAT ROCHE ' S CONTRACTING PARTNER IS ITSELF A POWERFUL UNDERTAKING

AND THAT THE CONTRACT IS CLEARLY NOT THE OUTCOME OF PRESSURE BROUGHT TO BEAR BY ROCHE ON ITS PARTNER DOES NOT PRECLUDE THE EXISTENCE OF AN ABUSE OF A DOMINANT POSITION , SUCH AN ABUSE CONSISTING IN THIS CASE OF THE ADDITIONAL INTERFERENCE , DUE TO THE OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE , WITH THE STRUCTURE OF COMPETITION IN A MARKET IN WHICH IN CONSEQUENCE OF THE PRESENCE THERE OF AN UNDERTAKING OCCUPYING A DOMINANT POSITION THE DEGREE OF COMPETITION HAS ALREADY BEEN WEAKENED .

SUCH AGREEMENTS COULD ONLY POSSIBLY BE ADMISSIBLE IN THE CONTEXT OF , AND SUBJECT TO THE CONDITIONS LAID DOWN IN , ARTICLE 85 ( 3 ) OF THE TREATY BUT NONE OF THE CONTRACTING PARTIES HAS THOUGHT IT NECESSARY TO AVAIL ITSELF OF THIS POSSIBILITY .

121THE EXAMINATION OF THE CONTRACTS AT ISSUE CONCLUDED BOTH WITH MERCK AND UNILEVER DOES NOT DISCLOSE ANY SPECIAL FEATURES WHICH WOULD PREVENT THEM FROM FALLING WITHIN THE CONCEPT OF AN ABUSE WHICH IN PRINCIPLE INCLUDES ANY OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FROM AN UNDERTAKING IN A DOMINANT POSITION WHICH BENEFITS THAT UNDERTAKING .

III - THE EFFECT ON COMPETITION AND TRADE BETWEEN MEMBER STATES
122THE APPLICANT DENIES THAT THE DIFFERENCE BETWEEN THE PRICES WHICH BY MEANS OF THE FIDELITY REBATES IT ALLOWS ITS VARIOUS CUSTOMERS TO PAY AND WHICH VARY ACCORDING TO WHETHER THOSE CUSTOMERS AGREE TO OBTAIN ALL THEIR REQUIREMENTS EXCLUSIVELY FROM IT OR NOT , IS OF SUCH A KIND AS TO PLACE THEM AT A COMPETITIVE DISADVANTAGE WITHIN THE MEANING OF SUBPARAGRAPH ( C ) OF THE SECOND PARAGRAPH OF ARTICLE 86 OF THE TREATY , SINCE THIS DIFFERENCE CANNOT HAVE AN APPRECIABLE EFFECT ON THE COMPETITION INTER SE OF ROCHE ' S PURCHASERS .

FURTHERMORE IN ITS REPLY IT SEEMS TO BE MAINTAINING THAT THE CONDUCT FOR WHICH IT IS CENSURED IS NOT OF SUCH A KIND AS TO HINDER TRADE BETWEEN MEMBER STATES .

123AS FAR AS THE FIRST POINT IS CONCERNED THE TERMS OF THE CONTRACTS AT ISSUE AS WELL AS THE CONSIDERATIONS SET OUT IN MANAGEMENT INFORMATION AND IN THE MINUTES OF THE MEETING BETWEEN UNILEVER AND ROCHE IN LONDON ON 11 DECEMBER 1972 SHOW CLEARLY THE IMPORTANCE WHICH ROCHE ITSELF ATTACHES TO THE REBATES WHICH IT GRANTS .

IN THESE CIRCUMSTANCES IT CANNOT BE ACCEPTED THAT THESE REBATES ARE NOT OF IMPORTANCE TO THE CUSTOMERS .

MOREOVER SINCE THE COURSE OF CONDUCT UNDER CONSIDERATION IS THAT OF AN UNDERTAKING OCCUPYING A DOMINANT POSITION ON A MARKET WHERE FOR THIS REASON THE STRUCTURE OF COMPETITION HAS ALREADY BEEN WEAKENED , WITHIN THE FIELD OF APPLICATION OF ARTICLE 86 ANY FURTHER WEAKENING OF THE STRUCTURE OF COMPETITION MAY CONSTITUTE AN ABUSE OF A DOMINANT POSITION .

124AS FAR AS CONCERNS THE QUESTION WHETHER TRADE BETWEEN MEMBER STATES HAS BEEN AFFECTED IT IS IN THE FIRST PLACE AN ESTABLISHED FACT THAT THE MARKET FOR EACH OF THE VITAMINS CONSIDERED COMPRISES THE WHOLE OF COMMUNITY TERRITORY WHICH COVERED , TO BEGIN WITH , SIX AND THEN NINE MEMBER STATES .

125THE PROHIBITIONS CONTAINED IN ARTICLES 85 AND 86 MUST BE INTERPRETED AND APPLIED IN THE LIGHT OF ARTICLE 3 ( F ) OF THE TREATY WHICH PROVIDES THAT THE ACTIVITIES OF THE COMMUNITY SHALL INCLUDE THE ' ' INSTITUTION OF A SYSTEM ENSURING THAT COMPETITION IN THE COMMON MARKET IS NOT DISTORTED ' ' AND

ARTICLE 2 OF THE TREATY WHICH GIVES THE COMMUNITY THE TASK OF PROMOTING ' ' THROUGHOUT THE COMMUNITY A HARMONIOUS DEVELOPMENT OF ECONOMIC ACTIVITIES ' ' .

BY PROHIBITING THE ABUSE OF A DOMINANT POSITION WITHIN THE MARKET IN SO FAR AS IT MAY AFFECT TRADE BETWEEN MEMBER STATES , ARTICLE 86 THEREFORE COVERS NOT ONLY ABUSE WHICH MAY DIRECTLY PREJUDICE CONSUMERS BUT ALSO ABUSE WHICH INDIRECTLY PREJUDICES THEM BY IMPAIRING THE EFFECTIVE COMPETITIVE STRUCTURE AS ENVISAGED BY ARTICLE 3 ( F ) OF THE TREATY .

126FURTHERMORE THE ACTUAL WORDING OF A NUMBER OF THE ENGLISH CLAUSES IMPLIED THAT THE PARTITIONING OF THE MARKETS WOULD BE MAINTAINED MAKING IT POSSIBLE IN PARTICULAR TO CHARGE DIFFERENT PRICES FROM ONE MEMBER STATE TO ANOTHER , AND THIS FINDING IS CONFIRMED BY THE FACT , TO WHICH ATTENTION HAS ALREADY BEEN DRAWN ABOVE , THAT THE PRICE VARIATIONS FOR A PARTICULAR VITAMIN AT A PARTICULAR TIME DIFFERED MARKEDLY FROM ONE MEMBER STATE TO ANOTHER .

127THE FOREGOING SHOWS THAT THE COURSE OF CONDUCT AT ISSUE WAS CAPABLE OF BOTH AFFECTING COMPETITION AND AFFECTING TRADE BETWEEN MEMBER STATES .

FOURTH SUBMISSION : THE FINE
( A ) THE IMPRECISION OF THE RULES CONTAINING PENALTIES
128THE APPLICANT SUBMITS THAT BECAUSE OF THE GENERAL NATURE AND IMPRECISION OF THE CONCEPTS ' ' DOMINANT POSITION ' ' AND ' ' ABUSE ' ' OF SUCH A POSITION , WHICH ARE SET OUT IN ARTICLE 86 OF THE TREATY , THE COMMISSION COULD ONLY HAVE IMPOSED FINES UPON IT FOR INFRINGING THIS ARTICLE AFTER THESE CONCEPTS HAD BEEN GIVEN A SPECIFIC MEANING EITHER BY ADMINISTRATIVE PRACTICE OR BY CASE-LAW SO THAT THOSE PERSONS LIABLE TO BE FINED KNOW WHERE THEY STAND .

129BY VIRTUE OF ARTICLE 87 OF THE TREATY THE COUNCIL HAD TO ADOPT THE NECESSARY REGULATIONS OR DIRECTIVES ESPECIALLY WITH A VIEW TO ENSURING ' ' COMPLIANCE WITH THE PROHIBITIONS LAID DOWN IN ARTICLE 85 ( 1 ) AND IN ARTICLE 86 BY MAKING PROVISION FOR FINES AND PERIODIC PENALTY PAYMENTS ' ' .

IN PURSUANCE OF THIS PROVISION IT ADOPTED REGULATION NO 17 OF 6 FEBRUARY 1962 ARTICLE 15 ( 2 ) WHEREOF PROVIDES THAT THE COMMISSION MAY BY DECISION IMPOSE ON UNDERTAKINGS OR ASSOCIATIONS OF UNDERTAKINGS FINES UP TO A MAXIMUM FIXED BY THAT ARTICLE IF THEY EITHER INTENTIONALLY OR NEGLIGENTLY INFRINGE ARTICLE 85 ( 1 ) OR ARTICLE 86 OF THE TREATY .

ON THE OTHER HAND UNDER ARTICLE 2 OF THE SAME REGULATION : ' ' UPON APPLICATION BY THE UNDERTAKINGS OR ASSOCIATIONS OF UNDERTAKINGS CONCERNED , THE COMMISSION MAY CERTIFY THAT , ON THE BASIS OF THE FACTS IN ITS POSSESSION , THERE ARE NO GROUNDS UNDER ARTICLE 85 ( 1 ) OR ARTICLE 86 OF THE TREATY FOR ACTION ON ITS PART IN RESPECT OF AN AGREEMENT , DECISION OR PRACTICE ' ' .

130THUS FROM 1962 ONWARDS UNDERTAKINGS KNEW , ON THE ONE HAND , THAT IF THEY IGNORED THE PROHIBITIONS OF ARTICLE 86 THEY WOULD RENDER THEMSELVES LIABLE TO FINES AND , ON THE OTHER HAND , THAT BY MEANS OF A SPECIALLY ARRANGED PROCEDURE THEY WERE IN A POSITION TO OBTAIN CLARIFICATION OF THE APPLICATION OF THE SAID PROHIBITIONS TO THEIR PARTICULAR CASE .

MOREOVER THE NATURE OF THESE PROHIBITIONS AND THE CONDITIONS WHICH MUST BE FULFILLED FOR THEM TO APPLY , IN SPITE OF ARTICLE 86 BEING INEVITABLY COUCHED IN GENERAL TERMS , ARE NOT IMPRECISE AND IMPOSSIBLE TO FORESEE AS ROCHE CLAIMS .

131THE WAY IN WHICH ARTICLE 86 HAD BEEN APPLIED BEFORE PROVIDED ROCHE DURING THE PERIOD 1970 TO 1974 , WHICH THE COMMISSION CONSIDERED FOR THE PURPOSE OF FIXING THE FINE , WITH A DEGREE OF ANTICIPATION WHICH WAS AMPLY SUFFICIENT TO ENABLE ROCHE TO TAKE ACCOUNT OF THIS TO ITS ADVANTAGE WHEN DECIDING HOW TO ACT IN RELATION BOTH TO ITS DOMINANT POSITION AND TO THE PRACTICES FOR WHICH IT IS BLAMED .

132WHEN ARTICLE 86 REFERS TO THE EXISTENCE OF A DOMINANT POSITION AND FORBIDS ANY ABUSE OF IT , THAT ARTICLE HAS TO BE CONSIDERED IN THE LIGHT OF A COMPREHENSIVE SYSTEM OF PROVISIONS - SUCH AS ARTICLE 3 ( F ) , ARTICLE 37 ( 1 ) , THE SECOND SUBPARAGRAPH OF ARTICLE 40 ( 3 ) , ARTICLE 85 AND ARTICLE 90 OF THE TREATY - ALL OF WHICH ARE DESIGNED TO ESTABLISH ON A MARKET HAVING THE PARTICULAR FEATURES OF A SINGLE MARKET COMPETITION WHICH IS EFFECTIVE AND NOT DISTORTED .

MOREOVER WHERE ARTICLE 86 USES THE EXPRESSIONS ' ' DOMINANT POSITION ' ' AND ' ' ABUSE ' ' IT REFERS TO CONCEPTS WHICH ARE NOT NEW , BUT WHICH HAVE IN ESSENCE BEEN GIVEN A SPECIFIC MEANING AS A RESULT OF THE PRACTICE OF THE AUTHORITIES RESPONSIBLE IN MOST OF THE MEMBER STATES FOR EXAMINING AND CURBING CONDUCT WHICH RESTRICTS COMPETITION .

133AS FAR AS CONCERNS IN PARTICULAR THE CONCEPT OF A DOMINANT POSITION A PRUDENT COMMERCIAL OPERATOR IS IN NO DOUBT THAT , ALTHOUGH POSSESSION OF LARGE MARKET SHARES IS NOT NECESSARILY AND IN EVERY CASE THE ONLY FACTOR ESTABLISHING THE EXISTENCE OF A DOMINANT POSITION , IT HAS HOWEVER IN THIS CONNEXION A CONSIDERABLE SIGNIFICANCE WHICH MUST OF NECESSITY BE TAKEN INTO CONSIDERATION IN RELATION TO HIS POSSIBLE CONDUCT ON THE MARKET .

SUCH AN EVALUATION OF THE SCOPE OF ARTICLE 86 DID NOT MEAN THAT IN ROCHE ' S CASE , AT ALL EVENTS ON MOST OF THE MARKETS AT ISSUE , THERE WAS ANY FACTOR WHICH IT WAS IMPOSSIBLE TO FORESEE OR WHICH GAVE RISE TO UNREASONABLE DOUBT .

134AS FAR AS CONCERNS THE COMPATIBILITY OF FIDELITY REBATES WITH THE PROHIBITIONS OF ARTICLE 86 THE APPLICATION OF THIS ARTICLE TO A SYSTEM OF OBTAINING SUPPLIES EXCLUSIVELY FROM THE APPLICANT AND OF REBATES OF THE KIND IT HAS WORKED OUT WAS NOT IMPOSSIBLE TO FORESEE AND THIS IS SHOWN NOT ONLY BY THE EXPERIENCE WHICH EVERY UNDERTAKING OF THE SIZE OF THE APPLICANT OPERATING THROUGHOUT THE COMMON MARKET OUGHT TO HAVE OF THE PRACTICE OF THE AUTHORITIES RESPONSIBLE IN THE MEMBER STATES FOR APPLYING COMPETITION LAW BUT ALSO BY THE PRECISE WORDING OF SUBPARAGRAPH ( B ) OF THE SECOND PARAGRAPH OF ARTICLE 86 DIRECTED AGAINST LIMITING MARKETS , OF SUBPARAGRAPH ( D ) OF THE SECOND PARAGRAPH OF ARTICLE 86 WHICH PROHIBITS MAKING THE CONCLUSION OF CONTRACTS SUBJECT TO ACCEPTANCE BY THE OTHER PARTIES OF SUPPLEMENTARY OBLIGATIONS WHICH HAVE NO CONNEXION WITH THE SUBJECT OF SUCH CONTRACTS AND , IN PARTICULAR , OF SUBPARAGRAPH ( C ) OF THE SECOND PARAGRAPH OF ARTICLE 86 WHICH IS DIRECTED AGAINST APPLYING DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS .

THERE IS EVEN LESS REASON TO ACCEPT ROCHE ' S CLAIM THAT IT WAS IMPOSSIBLE TO FORESEE THE RESULT OF ITS ACTIONS BECAUSE AT THE VERY LEAST THE POSSIBILITY , IF NOT THE PROBABILITY , OF THIS APPLICATION OF THE LAW HAD TO BE TAKEN INTO CONSIDERATION BY A VIGILANT COMMERCIAL OPERATOR AND BECAUSE ARTICLE 2 OF REGULATION NO 17 ALLOWED A PRECAUTIONARY MEASURE TO BE TAKEN FOR A RULING ON THE APPLICATION OF ARTICLE 86 TO DOUBTFUL CASES . THE APPLICANT DID NOT HOWEVER CONSIDER THAT IT SHOULD AVAIL ITSELF OF THIS OPPORTUNITY IN ORDER TO

OBTAIN THAT LEGAL CERTAINTY OF WHICH IT CLAIMS IT HAS BEEN DEPRIVED .

135FINALLY , THE APPLICANT QUOTES THE COMMISSION ' S DECISION OF 5 DECEMBER 1969 ( JOURNAL OFFICIEL L 323 , P . 21 ) RELATING TO A PROCEEDING UNDER ARTICLE 85 OF THE EEC TREATY ( IV-24 , 470-1 , PIRELLI/DUNLOP ) .

IN ITS VIEW THAT DECISION INDICATES THAT AGREEMENTS UNDER WHICH THE PARTIES SUPPLY EACH OTHER ON A RECIPROCAL BASIS ARE ADMISSIBLE AS SOON AS THEY INCLUDE AN ENGLISH CLAUSE .

136THE DECISION WHICH THE APPLICANT HAS QUOTED WAS CONCERNED WITH AN AGREEMENT ENTERED INTO BY TWO UNDERTAKINGS , WHICH DID NOT OCCUPY A DOMINANT POSITION ON THE MARKET , RELATING TO THE MANUFACTURE ON RECIPROCAL ACCOUNT OF TYRES AND WHICH WAS INTENDED TO MAKE IT EASIER FOR EACH OF THE TWO PARTIES TO PENETRATE THE MARKET OF THE OTHER .

FURTHERMORE THE CLAUSE PROVIDING FOR ADJUSTMENT OF PRICES IN THE DUNLOP/PIRELLI AGREEMENT WAS NOT SUBJECT TO THE MANY RESTRICTIONS AND CONDITIONS WHICH ARE FOUND IN THE CONTRACTS AT ISSUE AND WHICH MARKEDLY RESTRICT THE SCOPE OF THAT CLAUSE .

AN UNDERTAKING IN A DOMINANT POSITION CANNOT REASONABLY BELIEVE THAT A NEGATIVE CLEARANCE ISSUED IN SUCH CIRCUMSTANCES WOULD SERVE AS A PRECEDENT FOR JUSTIFYING ITS OWN BEHAVIOUR IN THE CONTEXT OF ARTICLE 86 . 137IT FOLLOWS FROM THE FOREGOING CONSIDERATIONS THAT THE SUBMISSION BASED ON THE IMPRECISE NATURE OF THE CONCEPTS IN ARTICLE 86 MUST BE REJECTED .

( B ) THE APPLICATION OF ARTICLE 15 ( 2 ) OF REGULATION NO 17
138THE APPLICANT ALSO SUBMITS THAT IT WOULD APPEAR FROM THE CONTENTS AS A WHOLE OF THE FILE AND FROM ITS OWN CONDUCT THAT IT COULD NOT BE REGARDED AS HAVING ACTED EITHER INTENTIONALLY OR NEGLIGENTLY IF IT WAS OF THE OPINION , ON THE ONE HAND , THAT IT DID NOT OCCUPY A DOMINANT POSITION ON THE MARKETS IN QUESTION AND , ON THE OTHER HAND , THAT THE CONTRACTS AT ISSUE WERE COMPATIBLE WITH ARTICLE 86 OF THE TREATY .

139THE SUGGESTIONS AND INSTRUCTIONS CONTAINED IN MANAGEMENT INFORMATION AND THE OTHER INTERNAL DOCUMENTS RELATING TO THE IMPORTANCE AND THE ANTICIPATED EFFECTS OF ENTERING INTO CONTRACTS , WHICH PROVIDE FOR THE PURCHASER OBTAINING HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE AND FOR A SYSTEM OF FIDELITY REBATES , IN RELATION TO THE RETENTION BY ROCHE OF ITS MARKET SHARES PROVE THAT THE APPLICANT INTENTIONALLY PURSUED A COMMERCIAL POLICY DESIGNED TO BAR THE ACCESS TO THE MARKET OF NEW COMPETITORS .

THE INCREASE FROM 1970 ONWARDS OF CONTRACTS UNDER WHICH THE PURCHASER OBTAINS HIS SUPPLIES EXCLUSIVELY FROM ROCHE OR IS INDUCED TO SO CONFIRMS THIS INTENTION .

ON THE OTHER HAND THE SIZE OF THE APPLICANT ' S MARKET SHARES , IN ANY EVENT IN THE CASE OF MOST OF THE GROUPS OF VITAMINS , IMPLIES THAT ITS CONVICTION IT DID NOT OCCUPY A DOMINANT POSITION COULD ONLY BE THE OUTCOME OF AN INADEQUATE STUDY OF THE STRUCTURES OF THE MARKETS ON WHICH IT OPERATES OR OF A REFUSAL TO TAKE THESE STRUCTURES INTO CONSIDERATION .

THE CONDITIONS FOR THE APPLICATION OF ARTICLE 15 OF REGULATION NO 17 WERE THEREFORE FULFILLED .

( C ) THE AMOUNT OF THE FINE

140HOWEVER , THE PREPARATORY INQUIRIES IN THIS CASE HAVE DISCLOSED THAT THE COMMISSION HAS MADE SOME MISTAKES IN ITS EVALUATION OF THE APPLICANT ' S DOMINANT POSITION ON THE MARKET FOR VITAMINS IN GROUP B3 .
FURTHERMORE AS FAR AS CONCERNS THE MARKET SHARES WHICH ARE EVIDENCE OF A DOMINANT POSITION THE COMMISSION ONLY SUPPLIED PARTICULARS FOR THE YEARS 1972 , 1973 , 1974 AND TO A CERTAIN EXTENT FOR 1971 , SO THAT THE DURATION OF THE INFRINGEMENT TO WHICH REGARD IS TO BE HAD IN FIXING THE AMOUNT OF THE FINE MUST BE REDUCED TO A PERIOD WHICH IS ONLY A LITTLE OVER THREE YEARS AND SO LESS THAN THE FIVE YEARS WHICH THE COMMISSION TOOK INTO CONSIDERATION .

FINALLY IT IS AN ESTABLISHED FACT THAT AS FAR BACK AS THE STAGE OF THE ADMINISTRATIVE PROCEDURE ROCHE STATED THAT IT WAS READY TO AMEND THE CONTRACTS AT ISSUE AND IN FACT AMENDED THEM IN CONJUNCTION WITH THE COMMISSION ' S DEPARTMENTS .

141IN VIEW OF THE FOREGOING IT IS APPROPRIATE TO REDUCE THE AMOUNT OF THE FINE AND IT APPEARS JUSTIFIABLE TO FIX IT AT 200 000 UNITS OF ACCOUNT , BEING DM 732 000 , THE REMAINDER OF THE APPLICATION BEING DISMISSED .

**Decision on costs**
COSTS
142UNDER ARTICLE 69 ( 2 ) OF THE RULES OF PROCEDURE THE UNSUCCESSFUL PARTY SHALL BE ORDERED TO PAY THE COSTS IF THEY HAVE BEEN ASKED FOR IN THE SUCCESSFUL PARTY ' S PLEADING .

UNDER PARAGRAPH ( 3 ) OF THAT ARTICLE , WHEN EACH PARTY SUCCEEDS ON SOME AND FAILS ON OTHER HEADS , OR WHERE THE CIRCUMSTANCES ARE EXCEPTIONAL , THE COURT MAY ORDER THAT THE PARTIES BEAR THEIR OWN COSTS IN WHOLE OR IN PART .

EACH PARTY HAS FAILED ON SOME HEADS AND MUST THEREFORE BEAR ITS OWN COSTS .

**Operative part**
ON THOSE GROUNDS
THE COURT
HEREBY
1 . REDUCES THE AMOUNT OF THE FINE IMPOSED ON HOFFMANN-LA ROCHE AG , FIXED UNDER ARTICLE 3 ( 1 ) OF COMMISSION DECISION OF 9 JUNE 1976 ( IV/29.020 ) AT 300 000 UNITS OF ACCOUNT , BEING DM 1 098 000 TO 200 000 UNITS OF ACCOUNT , BEING DM 732 000 ;

2 . DISMISSES THE REMAINDER OF THE APPLICATION ;

3 . ORDERS EACH PARTY TO BEAR ITS OWN COSTS .

© European Communities, 2004. All rights reserved