# EXHIBIT E

Dockets.Justia.com

**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a <u>disclaimer and a copyright notice.</u>

JUDGMENT OF THE COURT (Fifth Chamber)

7 January 2004 <u>(1)</u>

(Appeal - Competition - Cement market - Article 85(1) of the EC Treaty (now Article 81(1) EC) - Jurisdiction of the Court of First Instance - Rights of the defence - Access to the file - Single and continuous infringement - Liability for an infringement - Evidence of participation in the general agreement and measures of implementation - Fine - Determination of the amount)

In Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P,

**Aalborg Portland A/S**, established in Aalborg (Denmark), represented by K. Dyekjær-Hansen and K. Høegh, advokaterne (C-204/00 P),

**Irish Cement Ltd**, established in Dublin (Ireland), represented by P. Sreenan SC, instructed by J. Glackin, Solicitor, with an address for service in Luxembourg (C-205/00 P),

**Ciments français SA**, established in Paris (France), represented by A. Winckler, avocat, with an address for service in Luxembourg (C-211/00 P),

**Italcementi - Fabbriche Riunite Cemento SpA**, established in Bergamo (Italy), represented by A. Predieri, M. Siragusa, M. Beretta, C. Lanciani and F. Moretti, avvocati, with an address for service in Luxembourg (C-213/00 P),

**Buzzi Unicem SpA**, formerly Unicem SpA, established in Casale Monferrato (Italy), represented by C. Osti and A. Prastaro, avvocati, with an address for service in Luxembourg (C-217/00 P),

and

**Cementir - Cementerie del Tirreno SpA**, established in Rome (Italy), represented by G.M. Roberti and P. Criscuolo Gaito, avvocati (C-219/00 P),

appellants,

APPEAL against the judgment of the Court of First Instance of the European Communities in Joined Cases T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95, T-42/95 to T-46/95, T-48/95, T-50/95 to T-65/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95 *Cimenteries CBR and Others* v *Commission* [2000] ECR II-491, seeking to have that judgment set aside in part,

the other party to the proceedings being:

**Commission of the European Communities,** represented in Case C-204/00 P by R. Lyal and by H.P. Hartvig, acting as Agents, and in the other cases by R. Lyal, and also by N. Coutrelis, avocat (C-211/00 P) and by A. Dal Ferro, avvocato (C-213/00 P, C-217/00 P and C-219/00 P), with an address for service in Luxembourg,

defendant at first instance,

THE COURT (Fifth Chamber),

composed of: P. Jann, acting for the President of the Fifth Chamber, D.A.O. Edward (Rapporteur) and A. La Pergola, Judges,

Advocate General: D. Ruiz-Jarabo Colomer,

Registrars: H. von Holstein, Deputy Registrar, and H.A. Rühl, Principal Administrator,

having regard to the Report for the Hearing,

after hearing oral argument from the parties at the hearing on 4 July 2002, when Aalborg Portland A/S was represented by K. Dyekjær-Hansen, Irish Cement Ltd by P. Sreenan SC, Ciments français SA by A. Winckler and by F. Brunet, avocat, Italcementi - Fabbriche Riunite Cemento SpA by M. Siragusa, C. Lanciani and F.M. Moretti, Buzzi Unicem SpA by C. Osti, Cementir - Cementerie del Tirreno SpA by G.M. Roberti and by G. Bellitti, avvocato, and the Commission, in Case C-204/00 P, by R. Lyal and H.P. Hartvig and, in the other cases, by R. Lyal, and also by N. Coutrelis (C-211/00 P) and by A. Dal Ferro (C-213/00 P, C-217/00 P C-219/00 P)

after hearing the Opinion of the Advocate General at the sitting on 11 February 2003,

gives the following

## Judgment

1.

> By applications lodged at the Court Registry between 24 and 31 May 2000, Aalborg Portland A/S (Aalborg), Irish Cement Ltd (Irish Cement), Ciments français SA (Ciments français), Italcementi - Fabbriche Riunite Cemento SpA (Italcementi), Buzzi Unicem SpA (Buzzi Unicem), which, resulting from the merger between Fratelli Buzzi SpA and Unicem SpA (Unicem), is relying in the present proceedings only on the interests of Unicem, and Cementir - Cementerie del Tirreno SpA (Cementir) each brought an appeal under Article 49 of the EC Statute of the Court of Justice against the judgment of the Court of First Instance of 15 March 2000 in Joined Cases T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95, T-42/95 to T-46/95, T-48/95, T-50/95 to T-65/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95 *Cimenteries CBR and Others* v *Commission* [2000] ECR II-491 (the judgment under appeal), whereby the Court of First Instance, inter alia, confirmed most of the infringements found against them in Commission Decision 94/815/EC of 30 November 1994 relating to a proceeding under Article 85 of the EC Treaty (Cases IV/33.126 and 33.322 - Cement) (OJ 1994 L 343, p. 1, hereinafter the Cement Decision), but over a shorter period than that determined in that decision.

### I - Facts

2.

> From April 1989 to July 1990, the Commission carried out investigations into European cement producers and trade associations in the sector pursuant to Article 14 of Regulation No 17 of the Council of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-62, p. 87).

*The Statement of Objections*

3.

On 25 November 1991, the Commission sent to the 76 undertakings and associations of undertakings concerned a Statement of Objections (SO) pursuant to Article 2(1) of Regulation No 99/63/EEC of the Commission of 25 July 1963 on the hearings provided for in Article 19(1) and (2) of Council Regulation No 17 (OJ, English Special Edition 1963-64, p. 47).

4.

The SO draws a basic distinction between two types of objectionable practices, namely practices at international level and practices at national level in certain Member States. However, the full text of the SO, which is contained in a single document, was not sent to each of the undertakings and associations involved in the proceeding. Each received only the part of the SO setting out the infringements established against it. The chapters relating to practices engaged in at international level were sent to only 61 undertakings and associations, while the chapters relating to conduct at national level were only sent to the undertakings and associations established in the Member State in question.

5.

The Commission did not append to the SO the documents supporting its conclusions or the other documents which it considered relevant. In view of the large number of documents in question, it prepared a box of documents (the Box), which was made available to each addressee of the SO when it inspected the file at the end of 1991.

6.

The Commission drew up a list of all the documents itemised under file numbers IV/33.126, IV/33.322 and IV/27.997 specifying which documents were accessible to each addressee of the SO (the List). As regards access to the file relating to the administrative procedure (the investigation file), each undertaking or association had access to the documents which the Commission had obtained from that undertaking or association together with the documents relating to the chapters of the SO which had been sent to it. The addressees had access only to the national file of the Member State on whose territory they were established.

7.

As the Commission refused to accede to the addressees' requests that it send them the chapters of the SO which they had not received and to grant them access to all the documents in the investigation file, except for internal or confidential documents, certain undertakings and associations brought actions before the Court of First Instance seeking annulment of the Commission's refusal to send the documents requested and, in proceedings for interim measures, sought the suspension of the procedure initiated against them by the Commission (Joined Cases T-10/92 R, T-11/92 R, T-12/92 R, T-14/92 R and T-15/92 R *Cimenteries CBR and Others* v *Commission* [1992] ECR II-1571).

8.

By 31 March 1992 all the applicants in the present proceedings had submitted observations on the SO sent to them by the Commission. They were heard between 1 March and 1 April 1993. The hearings were divided into three series of sessions: one on the cement market, which all the undertakings and associations of undertakings were able to attend; one on the international part of the SO, which only those undertakings and associations of undertakings which received that part of the SO were able to attend; and one on each of the national chapters, which the undertakings and associations of undertakings of the relevant Member State were able to attend separately.

9.

Following the written replies to the SO and the oral explanations provided at the hearings, the Commission decided on 23 September 1993 to drop the objections relating to the national agreements (the decision to drop the national objections). It also decided to drop the objections relating to the international part of the SO as against 12 German undertakings and also six Spanish undertakings and, consequently, to discontinue the proceeding against them.

10.

On 5 October and 23 November 1994, the Commission consulted the Advisory Committee on Restrictive Practices and Dominant Positions.

*The Cement Decision*

11.

At the close of the administrative procedure, on 30 November 1994, the Commission adopted the Cement Decision, whereby it imposed fines on 42 undertakings and associations active in the grey cement market. The amounts of the fines imposed varied between ECU 40 000 and ECU 32 492 000 and came to a total of ECU 242 420 000. The Cement Decision also ordered six undertakings active in the white cement market to pay fines of between ECU 554 000 and ECU 1 088 000 and coming to a total of ECU 5 546 000.

12.

As regards the grey cement market, Article 1 of the Cement Decision found the existence of a general agreement designed to ensure non-transhipment to home markets and to regulate cement transfers from one country to another, in breach of Article 85(1) of the Treaty. In the case of the six appellants, the Commission found that the infringement had begun on 14 January 1983, the date on which a meeting took place of the Head Delegates of European cement producers who were members of Cembureau - European Cement Association (Cembureau). Apart from Ciments français, all the appellants were members of that association.

13.

The Cembureau Agreement was considered by the Commission to be a single and continuous agreement in that it was implemented in the framework of bilateral or multilateral agreements and concerted practices, the existence of which is found in Articles 2 to 6 of the Cement Decision (the implementing measures). Essentially, according to that decision, those measures consisted of:

- agreements between Cembureau and its members on the exchange of price information in order to facilitate the implementation of the Cembureau Agreement (Article 2(1) of the Cement Decision);

- concerted practices between Cembureau and its members on the circulation of information on prices designed to facilitate the implementation of the Cembureau Agreement (Article 2(2) of the Cement Decision);

- concerted practices between French undertakings and an Italian undertaking (Article 3(1) of the Cement Decision); an agreement concerning the Spanish and Portuguese markets (Article 3(2) of the Cement Decision); agreements and concerted practices concerning the French and German markets (Article 3(3) of the Cement Decision);

- collusion between a number of European producers in reaction to imports of Greek cement and clinker into the Member States in the mid-1980s. That collusion led to the setting-up of the European Task Force (the ETF) (Article 4(1) of the Cement

Decision), the setting-up of Interciment SA (Interciment), having as its purpose the carrying-out of the persuasive and dissuasive measures against those threatening the stability of the markets (Article 4(2) of the Cement Decision) and participation in agreements and concerted practices on the adoption of measures to prevent and/or reduce imports of Greek cement and clinker into the Member States, in particular on the Italian market (Article 4(3) and (4) of the Cement Decision); and

- concerted practices within the framework of two committees, the European Cement Export Committee (ECEC) (Article 5 of the Cement Decision) and the European Export Policy Committee (EPC), relating in particular to the exchange of information on prices and to the supply and demand situation in the importing non-member countries and on the home markets and designed to prevent incursions by competitors on respective national markets in the Community.

14.

As regards the white cement market, Article 7 of the Cement Decision finds that six undertakings participated in agreements and concerted practices within the framework of the White Cement Committee, relating in particular to non-transhipment to home markets.

15.

According to the operative part of the Cement Decision, the appellants in the present proceedings all participated, either directly or indirectly, in the Cembureau Agreement in the grey cement market sector. More particularly, that decision describes their participation in the implementing measures as follows:

- all the appellants in the present proceedings, with the exception of Ciments français, participated in the exchanges of information referred to in Article 2 of that decision;

- Ciments français participated in the concerted practices referred to in Article 3(1)(b) and (3)(a) of that decision;

- all the appellants in the present proceedings participated in the setting-up of the ETF referred to in Article 4(1) of that decision;

- Ciments français, Italcementi, Unicem and Cementir participated in the setting-up of Interciment, referred to in Article 4(2) of that decision;

- all the appellants in the present appeals participated in the concerted practices designed to withdraw Calcestruzzi SpA (Calcestruzzi) as a customer from the Greek producers referred to in Article 4(3)(a) of that decision, but only Italcementi, Unicem and Cementir participated in an agreement relating to the contracts having as their aim the prevention of imports of Greek cement by Calcestruzzi, as referred to in Article 4(3)(b) of that decision;

- all the appellants, with the exception of Ciments français, participated in the concerted practices within the framework of the ECEC, referred to in Article 5 of that decision; and

- Ciments français participated in the concerted practices within the framework of the EPC referred to in Article 6 of that decision.

16.

The Cement Decision set an aggregate fine on each undertaking, taking into account the role played by each of them in concluding the Cembureau Agreement or in adopting implementing measures, and also the duration of the infringements.

17.

Article 9 of the Cement Decision imposes on the appellants, in respect of the infringement found in Article 1, which was put into effect, in particular, by the conduct set out in Articles 2-6, in the grey cement market sector, fines of the following amounts:

- for Aalborg, ECU 4 008 000,

- for Irish Cement, ECU 3 524 000;

- for Ciments français, ECU 24 716 000;

- for Italcementi, ECU 32 492 000;

- for Unicem, ECU 11 652 000;

- for Cementir, ECU 8 248 000.

18.

As regards the white cement market sector, Ciments français and Italcementi were fined ECU 1 052 000 and ECU 1 088 000 respectively for their participation in the agreements referred to in Article 7 of the Cement Decision.

**II - Procedure before the Court of First Instance and the judgment under appeal**

19.

By applications lodged at the Registry of the Court of First Instance between 14 February and 12 April 1995, 41 of the undertakings and associations concerned by the Cement Decision, including the present appellants, brought proceedings before the Court of First Instance.

20.

They claimed, inter alia, that the Cement Decision should be annulled in whole or in part and, in the alternative, that the fines imposed on them by that decision should be annulled or reduced.

21.

Between 1996 and 1997, the Court of First Instance, following complaints alleging infringements of essential procedural requirements during the administrative procedure, ordered various measures of organisation of procedure (measures of organisation of procedure) in order to enable the applicants at first instance to identify the passages of the SO and the relevant documents which had not been sent to them during the administrative procedure.

22.

More particularly, the Court of First Instance requested:

- the Commission to produce various documents, including the SO as notified to each undertaking or association concerned, the minutes of the hearing of that party, the List, the Box and the correspondence exchanged during the administrative procedure between the Commission and the undertaking or association concerned during the administrative procedure (the measures of 19 January to 2 February 1996);

- the Commission to authorise the applicants at first instance in question to consult the national chapters of the SO at its premises and, in regard to each of the national

agreements and concerted practices, to give them access to the same national file as that sent during the administrative procedure to the addressees of the SO established in the Member State concerned (the measure of 2 October 1996);

- the applicants at first instance to identify the passages of the SO and the relevant documents which had not been sent to them during the administrative procedure and to explain in what respect the outcome of the administrative procedure might have been different if those items had been made available to them during that procedure;

- the Commission (by decision notified on 27 February 1997) to specify exactly which documents were rendered accessible to the applicants at first instance following the adoption of the measure of 2 October 1996 and to identify them on the List. It follows in that regard from the Commission's reply of 8 and 17 April 1997 that it gave them access, however, to only around a quarter of files IV/33.126 and IV/33.322 as a whole;

- the Commission, by decisions notified on 18 and 19 June 1997, to lodge at the Registry, by 30 September 1997 at the latest, the originals of all documents itemised on the List in files IV/33.126 and IV/33.322 except for documents containing business secrets or other confidential information and the Commission's internal documents. The Commission was requested to specify the nature of each internal document on the List. It was also requested to replace the confidential documents in the investigation file with non-confidential versions or non-confidential summaries;

- the 39 applicants at first instance concerned to consult, at the Registry of the Court of First Instance, the original, non-confidential versions of the documents lodged by the Commission. They were allowed to lodge a pleading specifying any document to which they had not had access during the administrative procedure which could have affected their defence and explain briefly why the outcome of the administrative procedure might have been different if the document in question had been made available to them. The Commission was allowed to lodge a response in those cases.

23.

The hearings took place before the Court of First Instance on 16, 18, 23, 25 and 30 September 1998 and on 2, 7, 9, 14, 16 and 21 October 1998.

24.

On 15 March 2000, the Court of First Instance delivered the judgment under appeal, joining for the purposes of the judgment all the cases relating to the Cement Decision.

25.

In Case T-39/95 *Ciments français* v *Commission*, the Court of First Instance, at paragraph 12 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 17 February 1989 and in so far as it [found] that the applicant [had] implemented the Cembureau agreement by participating in the infringement referred to in Article 3(1)(b);

- annul[led] Article 3(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in an agreement on the sharing of the Saarland market and in so far as it [found] that the applicant [had] participated in an infringement of Article 85(1) of the Treaty after 12 August 1987;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 31 May 1987;

- annul[led] Article 4(2) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 7 November 1988;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it concern[ed] the applicant;

- annul[led] Article 6 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 18 November 1983;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 12 519 000;

- fixe[d] the amount of the fine imposed on the applicant by Article 10 of Decision 94/815 at EUR 1 051 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

26.

In Case T-44/95 *Aalborg Portland* v *Commission* the Court of First Instance, at paragraph 15 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 31 December 1988;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement after 19 March 1984;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 31 May 1987;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 2 349 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

27.

In Case T-50/95 *Unicem* v *Commission*, the Court of First Instance, at paragraph 19 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 3 April 1992;

- annul[led] Article 2(1) of Decision 94/815 in so far as it concern[ed] the applicant;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer and in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 31 May 1987;

- annul[led] Article 4(2) of Decision 94/815 in so far as it concern[ed] the applicant;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 6 399 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

28.

In Case T-60/95 *Irish Cement* v *Commission*, the Court of First Instance, at paragraph 29 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 31 December 1988;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement after 19 March 1984;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for

supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 31 May 1987;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 2 065 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

29.

In Case T-65/95 *Italcementi - Fabbriche Riunite Cemento* v *Commission*, the Court of First Instance, at paragraph 34 of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 19 March 1984 and after 3 April 1992;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement before 19 March 1984 and after that date;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer, and in so far as it [found] that the applicant [had] participated in the infringement before 19 March 1984;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 31 May 1987;

- annul[led] Article 4(2) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 7 November 1988;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 25 701 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

30.     In Case T-87/95 *Cementir - Cementerie del Tirreno* v *Commission*, the Court of First Instance, at paragraph 39 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 3 April 1992;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement after 14 January 1983;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer;

- annul[led] Article 4(1) and (2) of Decision 94/815 in so far as they concern[ed] the applicant;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 7 471 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

**III - Forms of order sought in the appeals**

31.     Aalborg claims that the Court should:

- primarily, set aside the judgment under appeal in so far is it concerns Aalborg, in so far as it upholds the Cement Decision in regard to it, and refer the case back to the Court of First Instance for a fresh adjudication;

- in the alternative, set aside the judgment under appeal in part in so far as it concerns Aalborg, in so far as it confirms the Cement Decision in regard to it, and refer the case back to the Court of First Instance for a fresh adjudication;

- primarily, annul the fine in its entirety and, in the alternative, annul it in part; and

- order the Commission to pay the costs incurred in the present case by Aalborg before the Court of First Instance and the Court of Justice.

32.

Irish Cement claims that the Court should:

- set aside the judgment under appeal in whole or in part in so far as it confirms the Cement Decision in regard to Irish Cement;

- in the alternative, declare the Cement Decision void and/or reduce the fine imposed on Irish Cement; and

- order the Commission to pay the costs.

33.

Ciments français claims that the Court should:

- set aside the judgment under appeal in part, on the basis of Article 225 EC and Article 54 of the EC Statute of the Court of Justice;

- annul the Cement Decision on the basis of Article 230 EC;

- in the alternative, reduce the fine imposed on Ciments français on the basis of Article 229 EC and Article 17 of Regulation No 17; and

- order the Commission to pay the costs.

34.

Italcementi claims that the Court should:

- primarily, set aside the judgment under appeal in its entirety;

- in the alternative, set that judgment aside in part;

- annul the Cement Decision in part, in so far as the Court should allow the appeal against that judgment;

- reduce the fine to such amount as the Court should deem appropriate;

- refer the case back to the Court of First Instance should the Court consider that the state of the matter does not allow it, in whole or in part, to give final judgment in the matter; and

- order the Commission to pay the costs incurred before the Court of First Instance and the Court of Justice.

35.

Buzzi Unicem claims that the Court should:

- primarily, set aside the judgment under appeal and annul the Cement Decision and order the Commission to pay the costs;

- in the alternative, should the Court decide not to set aside the judgment under appeal, reduce the penalty imposed on Unicem; and

- in any event, adopt such other provision as may be necessary or as the Court may consider appropriate or just.

36.

Cementir claims that the Court should:

- primarily, set aside the judgment under appeal in whole or in part and, consequently, annul the Cement Decision in whole or in part and annul, or at least reduce, the fine imposed on Cementir;

- in the alternative, set aside the judgment under appeal in whole or in part and refer the case back to the Court of First Instance for an adjudication on the substance in the light of the guidance which the Court will provide to it; and

- order the Commission to pay the costs incurred before the Court of First Instance and the Court of Justice.

37.

The Commission contends that the Court should:

- as regards the appeal introduced by Ciments français, declare the application for annulment of the Cement Decision inadmissible and dismiss the remainder of the action as unfounded; and, in the alternative, dismiss the action as unfounded in its entirety;

- as regards the other appeals, dismiss them as inadmissible in so far as the pleas put forward cannot be examined in an appeal and, for the remainder, dismiss them as unfounded; and

- order all the appellants to pay the costs incurred by the Commission in connection with these appeals.

**IV - Procedure before the Court of Justice and pleas in law**

38.

By reasoned orders of 5 June 2002, the Court dismissed at the outset as manifestly inadmissible and/or manifestly unfounded, under Article 119 of the Rules of Procedure, a number of the pleas in law and arguments put forward by the appellants.

39.

The pleas in law put forward by Aalborg which were not dismissed at the outset by the order of 5 June 2002 in Case C-204/00 P *Aalborg Portland* v *Commission*, not published in the ECR, allege:

- breach of the rights of defence owing to the lack of access to documents liable to contain exculpatory evidence;

- incorrect imputation of liability for the infringements of Article 85 of the Treaty;

- breach of the basic principles applicable to the setting of fines;

- infringement of Regulation (EEC) No 2988/74 of the Council of 26 November 1974 concerning limitation periods in proceedings and the enforcement of sanctions under the rules of the European Economic Community relating to transport and competition (OJ 1974 L 319, p. 1).

40.

The pleas in law put forward by Irish Cement which were not dismissed entirely at the outset by the order of 5 June 2002 in Case C-205/00 P *Irish Cement* v *Commission*, not published in the ECR, relate to:

- lack of competence of the Court of First Instance;

- a procedural defect;

- infringement of Community law and manifest errors of assessment as regards the procedural rules protecting the rights of the defence and the relevance of certain documentary evidence;

- a failure to state reasons and a failure to respond to the appellant's arguments.

41.

The only pleas in law put forward by Ciments français which were not dismissed at the outset by the order of 5 June 2002 in Case C-211/00 P *Ciments français* v *Commission*, not published in the ECR, concerned:

- an error of assessment in respect of the turnover used in calculating the amount of the fine imposed on Ciments français;

- breach of the principle of proportionality in relation to the amount of that fine.

42.

The pleas in law put forward by Italcementi that were not dismissed at the outset by the order of 5 June 2002 in Case C-213/00 P *Italcementi - Fabbriche Riunite Cemento* v *Commission*, not published in the ECR, allege:

- breach of the rights of the defence owing to incomplete access to the documents in the investigation file;

- breach of the rights of the defence, insufficient reasoning and inconsistency with an earlier decision in respect of the dropping of the national complaints;

- incorrect application of Community law and a contradiction in the reasoning as regards the assessment of the unlawful nature of the agreement relating to the agreements signed with Calcestruzzi in 1987;

- breach of the principles of fairness, proportionality and non-discrimination as regards the intangibility of the fine;

- breach of Article 15(2) of Regulation No 17 and inadequate reasoning as regards the assessment of the gravity of the infringement found in Italcementi's case;

- breach of that provision as regards the assessment of the duration of the infringement found in Italcementi's case.

43.

The pleas in law put forward by Buzzi Unicem that were not entirely dismissed at the outset by the order of 5 June 2002 in Case C-217/00 P *Buzzi Unicem* v *Commission*, not published in the ECR, concern:

- breach of the rights of the defence, misapplication of the legal provisions and incorrect and contradictory reasoning in respect of:

- the refusal to authorise access to the SO and to the documents in the investigation file;

- the dropping of the national objections;

- the contracts concluded between Calcestruzzi and the Italian producers;

- Unicem's participation in the ETF;

- the link between the ETF and the Cembureau Agreement.

- an alleged breach of the principle *ne bis in idem* and of the principle of equal treatment;

- an alleged breach of the right of non-self-incrimination;

- a manifest error in assessing probative documents;

- an error of law and insufficient reasoning concerning the designation of Unicem as a direct member of Cembureau;

- an alleged infringement of Article 190 of the EC Treaty (now Article 253 EC), of Article 15(2) of Regulation No 17, of the principle of equal treatment and of the principle of proportionality as regards:

- the imposition of a single fine for all the infringements established on the market for grey cement;

- the assessment of liability in the infringement relating to participation in the Cembureau Agreement;

- the calculation of the duration of the infringement.

44.

The pleas in law put forward by Cementir that were not wholly dismissed at the outset by the order of 5 June 2002 in Case C-219/00 P *Cementir - Cementerie del Tirreno* v *Commission*, not published in the ECR, concern:

- breach of the rights of the defence as regards access to the investigation file;

- error of law, defective reasoning and breach of the rights of the defence as regards:

- the existence of the Cembureau agreement;

- the exchanges of price information;

- the measures referred to in Article 4(3) and (4) of the Cement Decision;

- an error of law and defective reasoning as regards the concept of a single and continuous agreement;

- an error of law and an incorrect assessment of the criteria for the calculation of the penalty imposed on Cementir.

45.

On account of the connection between them, the present cases should be joined for the purposes of the final judgment, in accordance with Article 43 of the Rules of Procedure.

**V - The review exercised by the Court in the present appeals**

46.

It is appropriate to make a number of preliminary observations concerning the judicial review carried out in an appeal and also the legal and factual context in which anti-competitive conduct is investigated and sanctions imposed. The purpose of these

observations is to shed light on the legal framework within which the Court will examine the present appeals.

*The role of the Court in an appeal*

47.

In an appeal, the Court's task is limited to examining whether, in exercising its power of review, the Court of First Instance made an error of law. Under Article 225 EC and Article 51, first paragraph, of the EC Statute of the Court of Justice, an appeal must be limited to points of law and must lie on grounds of lack of competence of the Court of First Instance, a breach of procedure before it which adversely affects the interests of the applicant or infringement of Community law by the Court of First Instance.

48.

An appeal may therefore be based only on grounds relating to the infringement of rules of law, to the exclusion of any appraisal of the facts. The Court of First Instance has exclusive jurisdiction, first, to establish the facts except where the substantive inaccuracy of its findings is apparent from the documents submitted to it and, second, to assess those facts (see, *inter alia*, Case C-284/98 P *Parliament* v *Bieber* [2000] ECR I-1527, paragraph 31.

49.

It follows that the appraisal of the facts by the Court of First Instance does not constitute, save where the clear sense of the evidence produced before it is distorted, a question of law which is subject, as such, to review by the Court of Justice (see, *inter alia*, Joined Cases C-280/99 P to C-282/99 P *Moccia Irme and Others* v *Commission* [2001] ECR I-4717, paragraph 78).

50.

Article 225 EC, Article 51, first paragraph, of the EC Statute of the Court of Justice and Article 112(1)(c) of the Rules of Procedure of the Court of Justice provide, in particular, that where the appellant alleges distortion of the evidence by the Court of First Instance, he must indicate precisely the evidence alleged to have been distorted by that Court and show the errors of appraisal which, in his view, led to that distortion.

51.

The requirements resulting from those provisions are not satisfied by an appeal which, without even including an argument specifically identifying the error of law allegedly vitiating the judgment of the Court of First Instance, simply repeats or reproduces verbatim the pleas in law and arguments already put forward before that Court, including those which were based on facts expressly rejected by that Court. Such an appeal amounts in reality to no more than a request for re-examination of the application submitted to the Court of First Instance, which the Court of Justice does not have jurisdiction to undertake (see, inter alia, the order in Case C-317/97 P *Smanor and Others* v *Commission* [1998] ECR I-4269, paragraph 21, and the judgment in Case C-352/98 P *Bergaderm and Goupil* v *Commission* [2000] ECR I-5291, paragraph 35).

52.

It is on the basis of those considerations, in particular, that the Court rejected at the outset as manifestly inadmissible certain of the pleas in law and arguments put forward by the appellants (see paragraph 38 of this judgment).

*The legal and factual context of the review of anti-competitive practices and agreements*

53.

Participation by an undertaking in anti-competitive practices and agreements constitutes an economic infringement designed to maximise its profits, generally by an intentional limitation of supply, an artificial division of the market and an artificial increase in prices. The effect of such agreements or of such practices is to restrict free competition and to prevent the attainment of the common market, in particular by hindering intra-Community trade. Such harmful effects are passed directly on to consumers in terms of increased prices and reduced diversity of supply. Where an anti-competitive practice or agreement is adopted in the cement sector, the entire construction and housing sector, and the real-estate market, suffer such effects.

54.

The aim of the powers given to the Commission by Regulation No 17 is to enable it to carry out its duty under Article 89 of the EC Treaty (now, after amendment, Article 85 EC) of ensuring that the rules on competition are applied in the common market. As may be seen from the preceding paragraph, it is consistent with the general interest to avoid anti-competitive practices and agreements, to discover them and to impose sanctions.

55.

Since the prohibition on participating in anti-competitive agreements and the penalties which offenders may incur are well known, it is normal for the activities which those practices and those agreements entail to take place in a clandestine fashion, for meetings to be held in secret, most frequently in a non-member country, and for the associated documentation to be reduced to a minimum.

56.

Even if the Commission discovers evidence explicitly showing unlawful contact between traders, such as the minutes of a meeting, it will normally be only fragmentary and sparse, so that it is often necessary to reconstitute certain details by deduction.

57.

In most cases, the existence of an anti-competitive practice or agreement must be inferred from a number of coincidences and indicia which, taken together, may, in the absence of another plausible explanation, constitute evidence of an infringement of the competition rules.

58.

Furthermore, the Commission may be faced with difficulties inherent in the complex structures of certain operators, with restructuring and with changes in the legal personality of undertakings.

59.

It is appropriate, in that context, to observe that Article 85 of the Treaty refers to the activities of undertakings. For that provision to apply, a change in the legal form and name of an undertaking does not necessarily have the effect of creating a new undertaking free of liability for the anti-competitive behaviour of its predecessor when, from an economic point of view, the two are identical (see, to that effect, Joined Cases 29/83 and 30/83 *CRAM and Rheinzink v Commission* [1984] ECR 1679, paragraph 9).

60.

However, the statement of objections must specify unequivocally the legal person on whom fines may be imposed and be addressed to that person (Case C-176/99 P *ARBED v Commission* [2003] ECR I-0000, paragraph 21).

61.

In order to ensure the effectiveness of the investigative power conferred on it by Article 11(1) and (5) of Regulation No 17, the Commission is entitled to compel an undertaking, if necessary by adopting a decision, to provide all necessary information concerning such facts as may be known to it and to disclose to it, if necessary, such documents relating thereto as are in that undertaking's possession, even if the latter may be used to establish, against it or another undertaking, the existence of anti-competitive conduct.

62.

Regulation No 17 places the undertaking being investigated under a duty of active cooperation, which means that it must be prepared to make any information relating to the object of the inquiry available to the Commission (Case 374/87 *Orkem* v *Commission* [1989] ECR 3283, paragraph 27).

63.

In carrying out its task, the Commission must however ensure that the rights of the defence are not impaired during preliminary inquiry procedures, which may be decisive in providing evidence of the unlawful nature of conduct engaged in by undertakings for which they may be liable (Joined Cases 46/87 and 227/88 *Hoechst* v *Commission* [1989] ECR 2859, paragraph 15).

64.

The rights of the defence are fundamental rights forming an integral part of the general principles of law, whose observance the Court ensures (see, to that effect, Case C-7/98 *Krombach* [2000] ECR I-1935, paragraphs 25 and 26), drawing inspiration for that purpose from the constitutional traditions common to the Member States and from the guidelines supplied by international treaties for the protection of human rights on which the Member States have collaborated or to which they are signatories, such as the European Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome on 4 November 1950 (the ECHR) (see Case C-274/99 P *Connolly* v *Commission* [2001] ECR I-1611, paragraphs 37 and 38).

65.

Thus, when requesting information, the Commission may not compel an undertaking to provide it with answers which might involve an admission on its part of the existence of an infringement which it is incumbent upon the Commission to prove (see *Orkem* v *Commission*, cited above, paragraph 35).

66.

Equally, respect for the rights of the defence requires that the undertaking concerned must have been afforded the opportunity, during the administrative procedure, to make known its views on the truth and relevance of the facts and circumstances alleged and on the documents used by the Commission to support its claim that there has been an infringement of the Treaty (see Joined Cases 100/80 to 103/80 *Musique Diffusion française and Others* v *Commission* [1983] ECR 1825, paragraph 10, and Case C-310/93 P *BPB Industries and British Gypsum* v *Commission* [1995] ECR I-865, paragraph 21).

67.

In that sense, Regulation No 17 provides that the parties are to be sent a statement of objections which must set forth clearly all the essential facts upon which the Commission is relying at that stage of the procedure. However, that may be done summarily and the decision is not necessarily required to be a replica of the Commission's statement of objections (*Musique Diffusion française and Others* v *Commission*, cited above, paragraph 14), since the statement of objections is a preparatory document containing assessments of fact and of law which are purely

provisional in nature (see, to that effect, Joined Cases 142/84 and 156/84 *BAT and Reynolds* v *Commission* [1987] ECR 4487, paragraph 70). For that reason, the Commission may, and even must, take into account the factors emerging from the administrative procedure in order, inter alia, to abandon such objections as have been shown to be unfounded (*Musique Diffusion française and Others* v *Commission*, cited above, paragraph 14).

*The right of access to the file*

68.

A corollary of the principle of respect for the rights of the defence, the right of access to the file means that the Commission must give the undertaking concerned the opportunity to examine all the documents in the investigation file which may be relevant for its defence (see, to that effect, Case T-30/91 *Solvay* v *Commission* [1995] ECR II-1775, paragraph 81, and Case C-199/99 P *Corus UK* v *Commission* [2003] ECR I-0000, paragraphs 125 to 128). Those documents include both incriminating evidence and exculpatory evidence, save where the business secrets of other undertakings, the internal documents of the Commission or other confidential information are involved (see Case 85/76 *Hoffmann-La Roche* v *Commission* [1979] ECR 461, paragraphs 9 and 11; Case C-51/92 P *Hercules Chemicals* v *Commission* [1999] ECR I-4235, paragraph 75; and Joined Cases C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P *Limburgse Vinyl Maatschappij and Others* v *Commission* [2002] ECR I-8375, paragraph 315).

69.

It may be that the undertaking draws the Commission's attention to documents capable of providing a different economic explanation for the overall economic assessment carried out by the Commission, in particular those describing the relevant market and the importance and the conduct of the undertakings acting on that market (see, to that effect, *Solvay* v *Commission*, cited above, paragraphs 76 and 77).

70.

The European Court of Human Rights has none the less held that, just like observance of the other procedural safeguards enshrined in Article 6(1) of the ECHR, compliance with the adversarial principle relates only to judicial proceedings before a tribunal and that there is no general, abstract principle that the parties must in all instances have the opportunity to attend the interviews carried out or to receive copies of all the documents taken into account in the case of other persons (see, to that effect, Euro. Court H.R., the *Kerojärvi* v *Finland* judgment of 19 July 1995, Series A No 322, § 42, and the *Mantovanelli* v *France* judgment of 18 March 1997, *Reports of Judgments and Decisions* 1997-II, § 33).

71.

The failure to communicate a document constitutes a breach of the rights of the defence only if the undertaking concerned shows, first, that the Commission relied on that document to support its objection concerning the existence of an infringement (see, to that effect, Case 322/81 *Michelin* v *Commission* [1983] ECR 3461, paragraphs 7 and 9) and, second, that the objection could be proved only by reference to that document (see Case 107/82 *AEG* v *Commission* [1983] ECR 3151, paragraphs 24 to 30, and *Solvay* v *Commission*, cited above, paragraph 58).

72.

If there were other documentary evidence of which the parties were aware during the administrative procedure that specifically supported the Commission's findings, the fact that an incriminating document not communicated to the person concerned was inadmissible as evidence would not affect the validity of the objections upheld in the

contested decision (see, to that effect, *Musique Diffusion française and Others* v *Commission*, cited above, paragraph 30, and *Solvay* v *Commission*, cited above, paragraph 58).

73.

It is thus for the undertaking concerned to show that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence.

74.

On the other hand, where an exculpatory document has not been communicated, the undertaking concerned must only establish that its non-disclosure was able to influence, to its disadvantage, the course of the proceedings and the content of the decision of the Commission (see *Solvay* v *Commission*, paragraph 68).

75.

It is sufficient for the undertaking to show that it would have been able to use the exculpatory documents in its defence (see *Hercules Chemicals* v *Commission*. paragraph 81, and *Limburgse Vinyl Maatschappij and Others* v *Commission*, paragraph 318), in the sense that, had it been able to rely on them during the administrative procedure, it would have been able to put forward evidence which did not agree with the findings made by the Commission at that stage and would therefore have been able to have some influence on the Commission's assessment in any decision it adopted, at least as regards the gravity and duration of the conduct of which it was accused and, accordingly, the level of the fine (see, to that effect, *Solvay* v *Commission*, paragraph 98).

76.

The possibility that a document which was not disclosed might have influenced the course of the proceedings and the content of the Commission's decision can be established only if a provisional examination of certain evidence shows that the documents not disclosed might - in the light of that evidence - have had a significance which ought not to have been disregarded (see *Solvay* v *Commission*, paragraph 68).

77.

In the context of that provisional analysis, it is for the Court of First Instance alone to assess the value which should be attached to the evidence produced to it (see order of 17 September 1996 in Case C-19/95 P *San Marco* v *Commission* [1996] ECR I-4435, paragraph 40). As stated at paragraph 49 of this judgment, its assessment of the facts does not, provided the evidence is not distorted, constitute a question of law which is subject, as such, to review by the Court of Justice.

*Establishment of the liability of the undertakings*

78.

As the Council very recently stated in the fifth recital of Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ 2003 L 1, p. 1), it should be for the party or the authority alleging an infringement of the competition rules to prove the existence thereof and it should be for the undertaking or association of undertakings invoking the benefit of a defence against a finding of an infringement to demonstrate that the conditions for applying such defence are satisfied, so that the authority will then have to resort to other evidence.

79.

Although according to those principles the legal burden of proof is borne either by the Commission or by the undertaking or association concerned, the factual evidence on

which a party relies may be of such a kind as to require the other party to provide an explanation or justification, failing which it is permissible to conclude that the burden of proof has been discharged.

80.

In the Cement Decision, the Commission concluded that there was a cartel in the cement sector in which, it claimed, 42 undertakings and associations, including the present appellants, had participated. That decision was essentially upheld by the Court of First Instance, which, in the exercise of its power to review the Commission's findings as to the degree of the undertakings' involvement and participation in the cartel, amended the fines. Apart from alleging errors of law and in the reasoning in the judgment under appeal, the appellants essentially dispute the Court of First Instance's findings concerning their participation in the cartel and the degree or duration of that participation.

81.

According to settled case-law, it is sufficient for the Commission to show that the undertaking concerned participated in meetings at which anti-competitive agreements were concluded, without manifestly opposing them, to prove to the requisite standard that the undertaking participated in the cartel. Where participation in such meetings has been established, it is for that undertaking to put forward evidence to establish that its participation in those meetings was without any anti-competitive intention by demonstrating that it had indicated to its competitors that it was participating in those meetings in a spirit that was different from theirs (see Case C-199/92 P *Hüls* v *Commission* [1999] ECR I-4287, paragraph 155, and Case C-49/92 P *Commission* v *Anic* [1999] ECR I-4125, paragraph 96).

82.

The reason underlying that principle of law is that, having participated in the meeting without publicly distancing itself from what was discussed, the undertaking has given the other participants to believe that it subscribed to what was decided there and would comply with it.

83.

The principles established in the case-law cited at paragraph 81 of this judgment also apply to participation in the implementation of a single agreement. In order to establish that an undertaking has participated in such an agreement, the Commission must show that the undertaking intended to contribute by its own conduct to the common objectives pursued by all the participants and that it was aware of the actual conduct planned or put into effect by other undertakings in pursuit of the same objectives or that it could reasonably have foreseen it and that it was prepared to take the risk (*Commission* v *Anic*, paragraph 87).

84.

In that regard, a party which tacitly approves of an unlawful initiative, without publicly distancing itself from its content or reporting it to the administrative authorities, effectively encourages the continuation of the infringement and compromises its discovery. That complicity constitutes a passive mode of participation in the infringement which is therefore capable of rendering the undertaking liable in the context of a single agreement.

85.

Nor is the fact that an undertaking does not act on the outcome of a meeting having an anti-competitive purpose such as to relieve it of responsibility for the fact of its participation in a cartel, unless it has publicly distanced itself from what was agreed in

the meeting (see Case C-291/98 P *Sarrió* v *Commission* [2000] ECR I-9991, paragraph 50).

86.

Neither is the fact that an undertaking has not taken part in all aspects of an anti-competitive scheme or that it played only a minor role in the aspects in which it did participate material to the establishment of the existence of an infringement on its part. Those factors must be taken into consideration only when the gravity of the infringement is assessed and if and when it comes to determining the fine (see, to that effect, *Commission* v *Anic*, paragraph 90).

87.

Where the liability of undertakings for anti-competitive conduct results, according to the Commission, from their participation in meetings having such conduct as their purpose, it is for the Court of First Instance to ascertain whether those undertakings had the opportunity, both during the administrative procedure and before that Court, to rebut the findings thus made and, where appropriate, to prove circumstances which cast the facts established by the Commission in a different light and thus allow another explanation of the facts to be substituted for the one adopted by the Commission.

88.

In an appeal, it is for the Court to ascertain that the Court of First Instance did not make any errors of law or in its reasoning or distort the evidence.

*The criteria material to the setting of the fine*

89.

Article 15(2) of Regulation No 17 lays down the conditions which must be fulfilled to enable the Commission to impose fines for anti-competitive conduct. The infringement must thus have been committed intentionally or negligently. Furthermore, the amount of the fine is set according to the gravity of the infringement and, where appropriate, to its duration (see Case C-219/95 P *Ferriere Nord* v *Commission* [1997] ECR I-4411, paragraph 32).

90.

As regards the gravity of the infringement, the Court has held that it has to be determined by reference to criteria such as the particular circumstances of the case, its context and the dissuasive effect of the fines (see *Ferriere Nord* v *Commission*, paragraph 33).

91.

Objective factors such as the content and duration of the anti-competitive conduct, the number of incidents and their intensity, the extent of the market affected and the damage to the economic public order must be taken into account. The analysis must also take into consideration the relative importance and market share of the undertakings responsible and also any repeated infringements.

92.

Where an infringement has been committed by a number of persons, the relative gravity of the participation of each of them will be examined (see Joined cases 40/73 to 48/73, 50/73, 54/73 to 56/73, 111/73, 113/73 and 114/73 *Suiker Unie and Others* v *Commission* [1975] ECR 1663, paragraphs 622 and 623).

**VI - Pleas in law**

A - *Pleas alleging procedural defects and breach of the rights of the defence*

1. Pleas concerning the role of the Court of First Instance in the organisation of the procedure

Arguments of the parties

93.

Aalborg, Irish Cement, Italcementi, Buzzi Unicem and Cementir claim that the Court of First Instance infringed procedural or substantive rules by not automatically annulling the Cement Decision even though it expressly acknowledged at paragraph 152 of the judgment under appeal that the Commission had not given proper access to the investigation file, since it had denied access to approximately three quarters of the documents therein.

94.

Italcementi and Buzzi Unicem refer to the judgment in *Hercules Chemicals* v *Commission*, cited above, and claim that the parties' right to peruse the documents in the investigation file is the essential corollary of the right of defence, which is closely linked to the right to be heard, to the presumption of innocence, to the need to respect the principle audi alteram partem during the procedure and to the fundamental principle of equality of arms between the Commission and the undertakings concerned. The right of access to those documents should be regarded as a fundamental right for the purposes of Article F of the Treaty on European Union (now, after amendment, Article 6 EU) and also under Article 6 of the ECHR and Article 42 of the Charter of Fundamental Rights of the European Union proclaimed in Nice on 7 December 2000 (OJ 2000 C 364, p. 1).

95.

The right of access to the file must therefore be effective in the context of the administrative procedure, which takes place before the Commission, and not in the context of a subsequent stage. It cannot be accepted that the Commission, in its double role of notifying authority and authority which determines whether the alleged infringements did in fact exist, should be authorised to decide unilaterally whether the documents in its possession are useful and to prevent the undertaking concerned from having knowledge of them in order to prepare its defence strategy in the adversarial proceedings in which it participates with the Commission services. That is *a fortiori* the case since the Court of First Instance has no jurisdiction to reserve to itself the right, in the judicial context, to make assessments of the relevance of documents, for the purposes of taking evidence, which should have been made at the level of the administrative investigation.

96.

Irish Cement, Italcementi, Buzzi Unicem and Cementir emphasise that a breach of the rights of the defence at the stage of the administrative procedure cannot be put right during the procedure before the Court of First Instance and accuse the Court of First Instance of having attempted, by adopting measures of organisation of procedure, to make good the Commission's failure to comply with procedural requirements. That approach is inconsistent with *Hercules Chemicals* v *Commission* and *Solvay* v *Commission* and with Case T-36/91 *ICI* v *Commission* [1995] ECR II-1847 and Case T-37/91 *ICI* v *Commission* [1995] ECR II-1901, and also with the Opinion of Advocate General Warner in Case 30/78 *Distillers Company* v *Commission* [1980] ECR 2229.

97.

That approach does not fall within the jurisdiction conferred on the Court of First Instance and therefore alters the balance of powers and of functions established by the Treaty.

98.

While the Commission recognises that the organisation of access to the investigation file was not as transparent as it should have been, it claims that the argument that non-disclosure of documents during the administrative procedure constitutes a procedural defect automatically entailing annulment of the decision taken at the close of that procedure is contrary both to the case-law referred to in the preceding paragraph and to the general principles of law.

99.

The Court of First Instance ascertained whether and to what extent a procedural irregularity of such a kind as to entail annulment of the Cement Decision had actually occurred. In ordering the measures of organisation of procedure referred to, it did not organise access to the file at a subsequent stage with the intention of making good any defects in the access granted by the Commission but sought to examine whether, by not making available to the parties documents which would have been of use in their defence, the Commission had indeed adversely affected the rights of the defence. Consequently, it did not exceed its jurisdiction.

Findings of the Court

100.

It is common ground that during the administrative procedure the Commission did not communicate the great majority of the documents in the investigation file and that it did not give the present appellants proper access to the investigation file, so that the administrative procedure was indeed irregular in that regard.

101.

However, as the Court of First Instance pointed out at paragraph 240 of the judgment under appeal, it could not annul the contested decision in whole or in part unless it was found that the lack of proper access to the investigation file given to the undertakings concerned during the administrative procedure had prevented them from perusing documents which were likely to be of use in their defence and had thus infringed their rights of defence.

102.

In the context of an action brought before the Court of First Instance against the decision closing an administrative procedure, it is open to that Court to order measures of organisation of procedure and to arrange full access to the file, in order to determine whether the Commission's refusal to disclose or communicate a document may be detrimental to the defence of the undertaking concerned.

103.

As that examination is limited to a judicial review of the pleas in law, it has neither the object nor the effect of replacing a full investigation of the case in the context of an administrative procedure (see *Solvay* v *Commission*, paragraphs 98 and 103). It is common ground that belated disclosure of documents in the file does not put the undertaking which has brought the action against the Commission decision back into the situation it would have been in if it had been able to rely on those documents in presenting its written and oral observations to the Commission (see *Hercules Chemicals* v *Commission*, paragraph 79).

104.

Nor can it be denied that an infringement of the rights of the defence at the stage of the administrative procedure cannot be remedied by the mere fact that access was made possible at a later stage, in particular during the judicial proceedings relating to an action in which annulment of the contested decision is sought (see *Hercules Chemicals* v *Commission*, paragraph 78, and *Limburgse Vinyl Maatschappij and Others* v *Commission*, paragraph 318).

105.

In the present case, contrary to what the appellants maintain, the Court of First Instance did not in any way attempt to replace the Commission in its investigative role or to remedy the procedural defects attributable to the Commission when it ordered the measures of organisation of procedure. In that regard, it merely carried out, within the framework of the tasks assigned to it, a provisional examination of the evidence in order to ascertain whether there had been an infringement of the rights of the defence.

106.

As the Court of First Instance did not err in law in ordering the measures of organisation of procedure rather than in annulling the Cement Decision at the outset, the pleas concerning the role of the Court of First Instance in the organisation of the procedure are unfounded.

2. Pleas concerning the Court of First Instance's assessment of the usefulness of the documents in the defence of the undertakings concerned

Arguments of the parties

107.

The appellants put forward a number of arguments whereby they challenge the analytical framework set out by the Court of First Instance at paragraphs 241 to 248 of the judgment under appeal.

- The objective link criterion

108.

Italcementi and Cementir maintain that the requirement, as stated by the Court of First Instance, for an objective link between the documents which were not disclosed and an objection adopted against the undertaking concerned in the Cement Decision is wholly arbitrary and unfounded. Its application amounts essentially to depriving the fundamental right of access to the investigation file of all meaning.

109.

First, that requirement ignores the general nature of the right of access to the investigation file, which extends to all the documents in the file. Thus, it means that even such a serious restriction of the exercise of the rights of the defence during the investigation does not necessarily constitute a procedural defect capable of rendering the final decision invalid. Second, by excluding documents which, although having no direct link with the objections specifically adopted against the undertaking concerned, are such as to cast a different light on the context of the market and also on the undertaking's conduct and the degree of its participation in the facts in issue, the Court of First Instance failed to have regard to the principle that any infringement must be assessed in its economic and factual context.

110.

That is *a fortiori* the case when the documents might contain exonerating evidence and therefore assume essential importance for the merits of the objections adopted against a specific undertaking. By providing useful information about the market, they could influence the very meaning and probative force of documents considered to contain proof of the infringement.

111.

On the other hand, the Commission fully approves the condition of an objective link applied by the Court of First Instance in the judgment under appeal. A document having no link with objections raised in the Cement Decision cannot be associated with the infringement found in that decision and it is difficult to make out how a

document unrelated to the objections adopted against an undertaking might be of use in its defence.

- The criterion relating to the impact of the non-disclosure of documents

112.

Irish Cement, Italcementi, Buzzi Unicem and Cementir dispute the Court of First Instance's assertion, at paragraph 247 of the judgment under appeal, that the non-disclosure of a document could constitute an infringement of the rights of the defence only where, in the light of the evidence adduced by the Commission in support of the objections referred to in the contested decision, the document would have had any - even a small - chance of altering the outcome of the procedure.

113.

First of all, Italcementi criticises the application of that principle in the present case. It submits that there is a clear and arbitrary discrepancy between the theoretical examination to which the Court of First Instance expressly stated that it intended to limit its own checks and the practical examination of the usefulness of the various undisclosed documents which it actually carried out in the large part of the judgment under appeal.

114.

Italcementi and Cementir maintain that the Court of First Instance confused the assessment of the procedural pleas raised by the applicants at first instance with the substantive analysis of the actual usefulness of documents in order to assess the substance of the objections adopted by the Commission. It thus ultimately substituted its own assessment for the assessment which the Commission should have carried out during the administrative procedure. In so doing, the Court of First Instance acted as a court of last - and sole - instance and deprived the undertakings concerned of their right to have their situation examined first by the administrative authority and then by the judicial authority.

115.

Irish Cement claims that the Court of First Instance did not have jurisdiction to draw the conclusions which it reached because it was impossible for that Court effectively to place itself in the same situation, with the same degree of knowledge and understanding, as that in which the Commission had been in 1992 and 1993.

116.

Next, Irish Cement, Italcementi, Buzzi Unicem and Cementir claim that, in adopting that arbitrary criterion, the Court of First Instance erred in law and failed to apply the principles established in *Hercules Chemicals* v *Commission*, *Solvay* v *Commission* and Case T-36/91 *ICI* v *Commission*. Irish Cement maintains that the distinction on which the Court of First Instance rejected that case-law is based on circular reasoning which amounts to prejudging the outcome of the dispute.

117.

Both Italcementi and Buzzi Unicem put forward the fact that in *Hercules Chemicals* v *Commission* the Court of Justice held that it was not necessary for the undertakings to prove after the event that if they had had knowledge of the file during the administrative procedure the Commission would have been led to adopt a radically different decision from the one which it did in fact adopt. It is sufficient for them to prove that the documents that were not disclosed could have been of some use in their defence.

118.

That less restrictive rule of assessment could also preclude the Court of First Instance, in the context of its judicial review, from making an analytical assessment of the

significance and the implications of the various documents that remained inaccessible during the investigation stage.

119.

Last, Italcementi, Buzzi Unicem and Cementir maintain that, contrary to the principle that it is for the Commission to adduce evidence that an infringement has been committed, the approach adopted by the Court of First Instance has the consequence of reversing the roles, by placing on the undertakings concerned the burden of showing that the documents of which they had not thus far had knowledge are in themselves capable of rebutting the conclusions formulated in the Commission decision.

- The relevance of direct documentary evidence

120.

First of all, with reference to the weakness of the evidence which the Commission adduced in support of the existence of the Cembureau Agreement, both Irish Cement and Italcementi dispute the Court of First Instance's assertion at paragraph 260 of the judgment under appeal that the Commission based the finding of infringements in the SO and in the Cement Decision solely on [direct] documentary evidence. Cementir contends that that criterion - which led the Court of First Instance to carry out a kind of postponed inquiry into the meaning and the implications of the documents which were not communicated - has no basis in the Community case-law.

121.

Italcementi maintains that, in concluding that it had subscribed to the object of the Cembureau Agreement merely by participating in the meeting of Head Delegates of European cement producers belonging to Cembureau on 19 March 1984 (the meeting of 19 March 1984) without publicly manifesting its dissent, the Court of First Instance based itself on a wide interpretation of the concept of direct evidence and accepted a disproportionate use of presumptions, which provides a ground for setting aside the judgment under appeal.

122.

Next, Irish Cement, Italcementi and Cementir criticise the Court of First Instance for having misinterpreted the judgment in Case T-37/91 *ICI* v *Commission* by requiring the applicants at first instance to prove that the documents in the investigation file which remained inaccessible contradicted the tenor of the direct evidence used by the Commission. The Court of First Instance thus precluded at the outset the usefulness of documents which might have provided an alternative economic explanation for the cement producers' conduct on the market. That approach seriously limited their ability to defend themselves.

123.

Cementir further submits that in Case T-37/91 *ICI* v *Commission* the Court of First Instance clearly confined itself to an *ex ante* assessment and did not carry out an *ex post* assessment of the specific content and the evidential relevance of each document that had not been communicated.

124.

Last, Buzzi Unicem claims that the reasoning of the Court of First Instance is contradictory. It clearly stated at paragraph 264 of the Cement Decision, in a manner incompatible with the principles stated in the preceding paragraph of that judgment, that the submission of other economic explanations could not in any event have altered the outcome of the administrative procedure, precisely because the substance of the Commission's argument relied on direct documentary evidence.

Findings of the Court

125.

The question whether the Court of First Instance applied correct criteria in order to determine whether the Commission's exclusion of a specific document adversely affected an undertaking's rights of the defence is a question of law amenable to review by the Court of Justice. The same applies to the question whether a document must be qualified as an exculpatory document capable of being of use in an undertaking's defence (see, to that effect, *Corus UK* v *Commission*, paragraph 131).

126.

As regards, first, the criterion of an objective link, it cannot be for the Commission alone, who notifies any objections and adopts the decision imposing a penalty, to determine the documents of use in the defence of the undertaking concerned (see *Solvay* v *Commission*, paragraphs 81 and 83). However, the Commission is allowed to preclude from the administrative procedure evidence which has no relation to the allegations of fact and of law in the SO and which therefore has no relevance to the investigation. An applicant cannot properly put forward as a ground of annulment the fact that irrelevant documents were not communicated to it.

127.

In that regard, an infringement of the rights of the defence must be examined in relation to the specific circumstances of each particular case, since it depends essentially on the objections raised by the Commission in order to prove the infringement which the undertaking concerned is alleged to have committed (see *Solvay* v *Commission*, paragraph 60).

128.

Contrary to what Italcementi and Cementir maintain, the criterion of an objective link does not preclude documents containing exculpatory evidence or even indications of the context of the market or the conduct of the operators present on that market, provided that it relates objectively to any objections adopted against the undertaking concerned.

129.

The Court of First Instance therefore did not err in law in holding, at paragraph 241 of the judgment under appeal, that it was necessary to determine whether there was an objective link between the documents which were not made accessible during the administrative procedure and an objection adopted against the undertaking concerned in the Cement Decision.

130.

As regards, next, the assessment criteria which the Court of First Instance employed in the present case in order to ascertain whether the non-disclosure of a document could have harmed the defence of an undertaking during the administrative procedure, it is necessary to do as the Court of First Instance did at paragraphs 237 to 248 and 281 to 379 of the judgment under appeal and draw a distinction between access to documents which may exculpate the undertaking and access to documents establishing the existence of the infringement which it is alleged to have committed (see Case T-37/91 *ICI* v *Commission*, paragraph 60).

131.

The Court of First Instance did not err in law in holding, at paragraphs 241 and 247 of the judgment under appeal, that it must assess whether, in the light of the evidence adduced by the Commission in support of the objections formulated in the Cement Decision, disclosure of a document would have had even a small chance of altering the outcome of the administrative procedure if the undertaking concerned had been able to

rely on it during that procedure. It merely stated the condition that the undertaking must show that a document could have been useful in its defence.

132.

Such an examination necessarily implies that the Court of First Instance carries out a comparative and provisional analysis of the probative value of the documents that were not disclosed and also of the evidence that the Commission regards as sufficient to lead to the findings made in the Cement Decision. When the Commission establishes that the undertaking in question has participated in an anti-competitive measure, it is for that undertaking to provide, using not only the documents that were not disclosed but also all the means at its disposal, a different explanation for its conduct. It follows that the complaints alleging reversal of the burden of proof and breach of the presumption of innocence are unfounded.

133.

Last, the Court of First Instance did not err in law in holding at paragraphs 260 to 264 of the judgment under appeal that when, both in the SO and in the contested decision, the Commission relied solely on direct documentary evidence to show various infringements and the participation of undertakings in those infringements, the undertakings must prove that the evidence that was inaccessible to them during the administrative procedure was at variance with the thrust of that evidence. Contrary to Buzzi Unicem's contention, moreover, there is no inconsistency in those paragraphs.

134.

In the light of the foregoing, the pleas relating to the Court of First Instance's assessment of the usefulness of certain documents in the defence of the undertakings concerned must be rejected.

3. The various pleas relating to the application by the Court of First Instance to the facts of the present case of the criteria concerning the probative value of the documents that were not disclosed

Arguments of the parties

135.

Aalborg, Irish Cement and Cementir criticise the Court of First Instance for having applied too strictly in the present case the principles which it set out at paragraph 247 of the judgment under appeal concerning the evaluation of the documents that were not disclosed.

- The evidence relating to the existence of the Cembureau Agreement (the infringement referred to in Article 1 of the Cement Decision)

136.

First, Cementir criticises the Court of First Instance for having refused to reopen the oral procedure in spite of the fact that the Commission had expressly acknowledged at the hearing before that Court that undertakings concerned should have had access during the administrative procedure to Mr Toscano's note of 17 February 1983 (Mr Toscano's note), which concerned the meeting of the Head Delegates of the European cement producers who were members of Cembureau held on 14 January 1983 (the meeting of 14 January 1983) and which indicated that the problems of dumping were discussed at that meeting. Those statements are fundamental to a proper assessment of the relevance of Mr Toscano's note and thus of the consequences of the lack of access to that document during the administrative procedure.

137.

Second, Aalborg, Irish Cement and Cementir contend that the Court of First Instance's finding, at paragraphs 1122 to 1132 of the judgment under appeal, that the use of Mr Toscano's note in the context of their defence would not have had even a small chance of altering the outcome of the administrative procedure is manifestly incorrect.

138.

Irish Cement maintains that the Court of First Instance did not answer its argument that Mr Toscano's note invalidated the Commission's interpretation of the objective or the content of the meeting of 14 January 1983. Cementir claims that that note, which refers exclusively to discussions about dumped imports from other European countries, provides a different interpretation of the agenda of the meeting. The Court of First Instance should therefore have considered that the note was a document of use in the defence and that the failure to communicate it infringed the rights of the defence.

139.

In Aalborg's submission, Mr Toscano's note, which is an internal document providing a direct account of the meeting of 14 January 1983 without referring in any way to an anti-competitive agreement, could clearly have had a decisive influence on the outcome of the administrative procedure.

140.

Irish Cement accuses the Commission of having erred in ascribing greater importance to the preparatory documents for the meeting of 14 January 1983 on which the Commission relied than to an authentic minute of the actual meeting. The Court of First Instance gave no explanation for its reason for rejecting the argument that one passage in Mr Toscano's note confirmed that the participants in the meeting intended to comply with the Community competition rules.

141.

According to Irish Cement, the Court of First Instance was also mistaken to conclude that Mr Toscano's note did not appear to constitute an exhaustive account of the meeting. The Court of First Instance therefore fell into the trap of circular reasoning and effectively shifted the burden of proof from the Commission to the undertaking.

142.

Cementir further contends that the probative value of Mr Toscano's note is made stronger by two other documents referred to at paragraph 1131 of the judgment under appeal, which contain no trace of a discussion of the rule on non-transhipment to home markets. Consequently, there is a range of probative evidence that clearly refutes the Commission's argument that the theme of intra-Community trade dealt with during the meeting of 14 January 1983 necessarily implied that the participants in that meeting intended to conclude an anti-competitive agreement.

143.

Aalborg criticises the Court of First Instance for having incorrectly concluded, at paragraphs 1209 to 1213 of the judgment under appeal, that several documents relating to dumping and a basing point system were not of such a nature as to shed a different light on the various items of direct documentary evidence referred to in the SO and in the Cement Decision.

144.

First, Aalborg claims that it would have been able to refer, during the administrative procedure, to the notification files lodged by the United Kingdom Cement Makers' Federation (the CMF) and also to contacts between the European cement industry and the Commission concerning the introduction of a basing point system (the BPS) in order to show that Mr Van Hove's presentation at the meeting of 14 January 1983

related to a lawful parity point system and that the object of the discussions was the introduction at bilateral or European level, without infringing Community competition law, of a price formation system comparable to the BPS.

145.

Second, Aalborg contends that it could have relied on various other documents (including Mr Van Hove's letter of 18 February 1983 and document 33.126/6162, referring to the rules of the game) to support its argument that dumping was the topic to which the meetings held in 1983 and 1984 were really devoted.

146.

The Court of First Instance therefore applied a stricter test than that laid down in the Community case-law. The error of law thus made should, in Aalborg's submission, lead to the judgment under appeal being set aside in its entirety.

- The evidence relating to the price information exchanges (the infringements referred to in Article 2 of the Cement Decision)

147.

Cementir criticises the Court of First Instance for having refused to take into account certain documents which confirmed that the prices charged by a company vary significantly according to a number of factors. Those documents, it maintains, were of objective use for the purposes of the defence, since they showed that the exchanges of price information could not in any way contribute to the implementation of the alleged Cembureau Agreement. They are therefore of such a kind as to cast a different perspective on the evidence taken into account by the Commission.

- The evidence relating to the meeting at which the ETF was set up (the infringement referred to in Article 4(1) of the Cement Decision)

148.

Aalborg maintains that several documents containing exculpatory evidence, including the minutes of the meetings of the CMF, an internal memorandum of Blue Circle Industries plc (Blue Circle) and other documents relating to lobbying initiatives, could have supported its argument that its presence at the meeting of the European cement producers belonging to Cembureau in Baden-Baden (Germany) on 9 September 1986 (the meeting of 9 September 1986), at which the ETF was set up, was not a sign of its participation in the unlawful ETF agreement. Aalborg participated only in a meeting to prepare, in the context of lobbying activities, for an action, to take place the following day in Strasbourg (France), to raise the awareness of members of the European Parliament to the problem of unlawful subsidies granted by the Hellenic Republic to its cement industry.

149.

More particularly, Aalborg emphasises the importance of those documents as exculpatory evidence in that they show that it remained passive during a brief meeting where the other participants were aware that it was there for a different, lawful purpose. Those documents should therefore have influenced the degree of its liability for the ETF and the amount of the fine imposed.

150.

Aalborg criticises the Court of First Instance for having wrongly concluded at paragraphs 2888 to 2898 of the judgment under appeal that none of its observations would have had even a small chance of altering the outcome of the administrative procedure. In its submission, the Court of First Instance did not apply in practice the criterion which it described at paragraph 241 of the judgment under appeal. Its approach requires the undertaking concerned to prove beyond doubt that a different

decision, based on an assessment of different evidence, would have been taken if the documents concerned had been disclosed. In reality, the Court of First Instance gave to that criterion a scope so limited that no case remains in which even very serious breaches of the right of access to the file and, accordingly, of the rights of defence of the undertakings could have any consequences.

151.

The Court of First Instance therefore made an error of law in applying the criterion of the usefulness of the documents for the defence as established in the Community case-law, with the effect that the judgment under appeal must be set aside in its entirety or, in any event, in part, in so far as it confirms the infringements relating to the ETF.

- The evidence relating to the agreements with Calcestruzzi (the infringement referred to in Article 4(3) of the Cement Decision)

152.

Cementir criticises the Court of First Instance for having failed to explain its reason for not taking into account the following documents, which, it claims, confirm that its participation in the agreements with Calcestruzzi was based on purely commercial considerations:

- the minutes of the meeting of 23 July 1986 of the board of directors of Heracles General Cement Company (Heracles) (documents 33.126/19878 to 19880), which, according to Cementir, show that Heracles and Titan Cement company SA (Titan) had concluded agreements between them in order to be able to make joint supplies in Italy and confirm the substance of its argument that, in the light of the significant volume of Calcestruzzi's demand, Cementir had to participate in an agreement involving other producers and signed solely for commercial reasons;

- documents 33.126/2945 to 2951, 2934, 2935, 3065 to 3068 and 2954 to 2966, which, according to Cementir, show that certain Italian producers had taken local measures to protect their market against imports from Greece, but which had nothing to do with the Cembureau agreement;

- documents 33.126/19369 to 19377, 19387, 19389 and 19412 and also 20275 to 20282, 20294, 19889, 19781, 20124 to 20137, 20140 to 20156, 19433, 20001, 19401 and 19410, which, according to Cementir, support its argument that the agreements with Calcestruzzi had no damaging effect on the trade in cement between Italy and Greece, thus showing the great extent to which Greek imports had penetrated the Italian market.

153.

Cementir reiterates that there was no direct evidence that its adherence to the agreements with Calcestruzzi was linked to discussions within the ETF and maintains that the Court of First Instance did not properly assess the relevance of the documents in question in order to ensure the full exercise of the rights of the defence and that, in particular, it overlooked evidence of definite importance which cast a completely different light on Cementir's commercial conduct.

- The evidence relating to the agreement between Italian cement producers (the infringement referred to in Article 4(3)(b) of the Cement Decision)

154.

Italcementi maintains that the Court of First Instance made an error of interpretation when it considered, at paragraph 118 of the Cement Decision, that the inseparable link between the national agreements and concerted practices and the international

agreements and concerted practices existed only in one direction, since the Cembureau agreement and the measures for implementing it at international level in no way depended on the existence of the national agreements and concerted practices.

155.

Italcementi criticises the Court of First Instance for having held, on the basis of that false reasoning, that the evidence of the existence of unlawful agreements at national level was of no interest and had no impact on intra-Community relations. The Court of First Instance therefore failed, in breach of the rights of the defence, to examine the documents which Italcementi had produced in support of its complex and detailed analysis of the relations between cement producers at national level, which was carried out after it consulted the administrative file.

Findings of the Court

- The evidence relating to the existence of the Cembureau Agreement

156.

As regards the Court of First Instance's refusal to accede to Cementir's request that it reopen the oral procedure, that Court correctly recognised, at paragraph 1123 of the judgment under appeal, that Mr Toscano's note was relevant to the defence in that it related directly to the objections formulated by the Commission and that, accordingly, that document in the investigation file should have been communicated to the undertakings under investigation.

157.

However, the non-disclosure of that note does not automatically mean that there was a breach of the rights of the defence. The sole purpose of what the Commission said at the hearings before the Court of First Instance was to reiterate that position and what it said therefore does not in any way constitute an admission. Nor did its declarations have any decisive impact on the course of the procedure.

158.

As regards the Court of First Instance's assessment of whether or not Mr Toscano's note was of use in the defence of the undertakings concerned as an exculpatory document, the Court of First Instance never denied that that note proved that the problem of imports of dumped cement had been discussed at the meeting of 14 January 1983 (see paragraph 1130 of the judgment under appeal). However, according to the Court of First Instance's assessment, when read in the light of the other evidence, the note could not be considered an accurate and exhaustive account of the discussions which took place at that meeting and was not of such a nature as to shed a different light on the direct documentary evidence on which the Commission had relied (see paragraphs 1129 and 1130 of the judgment under appeal).

159.

The appellants have not stated precisely what evidence was distorted by the Court of First Instance and have not demonstrated the errors that led to that distortion.

160.

Contrary to Irish Cement's contention, moreover, the Court of First Instance did not wrongly ascribe more importance to the preparatory documents for the meeting of 14 January 1983 on which the Commission relied than to the minutes of that meeting, but it considered that Mr Toscano's note lacked relevance by comparison with the evidence adduced by the Commission.

161.

Nor can the complaints which Irish Cement derives from the Court of First Instance's failure to respond to its arguments concerning Mr Toscano's note be accepted. The

Court of First Instance answered those arguments in detail at paragraphs 1126 to 1130 of the judgment under appeal and rejected them as unfounded; and Irish Cement cannot challenge the reasoning of the Court of First Instance on the sole ground that it preferred a different interpretation.

162.

According to the Court of First Instance, the various items of documentary evidence referred to at points 9 and 61 of the SO and also at recitals 18, 19 and 45 of the Cement Decision established to the requisite legal standard that at the meeting held on 14 January 1983 the Head Delegates agreed on the principle of non-transhipment to home markets. According to the Court of First Instance's assessment, the exculpatory documents on which the applicants at first instance relied proved, at the very most, that the problems of dumping and the BPS had also been discussed at that meeting. They were not capable of shedding a different light on the various items of direct documentary evidence on which the Commission had relied (see paragraphs 1183 and 1211 of the judgment under appeal).

163.

The Court of First Instance concluded that all of those documents were irrelevant by comparison with the evidence on which the Commission had relied.

164.

Aalborg merely reproduces word for word the arguments which it had already raised before the Court of First Instance, without stating precisely what evidence has been distorted by the Court of First Instance or showing the errors that might have led to that distortion. For the reasons set out at paragraphs 47 to 52 of this judgment, those arguments must therefore be rejected.

- The evidence relating to the price information exchanges

165.

Cementir's plea alleging infringement of the rights of the defence challenges the Court of First Instance's finding that the price information exchanges constituted a measure for the implementation of the Cembureau Agreement. Contrary to what Cementir contends, it is clear from paragraphs 1772 and 1773 of the judgment under appeal that the Court of First Instance found that those documents had been taken into account by the Commission during the administrative procedure but did not seem to it to be sufficiently convincing in the light of the other evidence at its disposal. The additional comments that Cementir would have been able to make at the material time in order to establish the variable nature of the information on price exchanges would therefore not have invalidated the assessments made by the Commission. It follows that there was no breach of the rights of the defence.

- The evidence relating to the meeting of 9 September 1986

166.

As regards the Court of First Instance's assessment of the evidence relating to the meeting of 9 September 1986, the Court of First Instance observed at paragraph 2890 of the judgment under appeal that the Commission had properly taken into account in the Cement Decision the political dimension and the economic background of the problem connected with imports from Greece. However, it found that the documents relied on by Aalborg could not have prevailed over the documents on the basis of which the Commission had found that, at the same time as the lobbying action, the appearance of the imports issue had given rise to the setting-up of the ETF for the purposes of considering dissuasive and persuasive measures capable of eliminating cheap imports of cement (principally those from Greece) into Western Europe.