167.

Contrary to Aalborg's contention, the Court of First Instance did not require Aalborg to demonstrate that the Cement Decision would have been different had Aalborg been able to rely on the exculpatory documents. In that particular case, the Court of First Instance heard Aalborg's arguments concerning the real reason why its representative, Mr Larsen, participated in the meeting of 9 September 1986 and the impact that the exculpatory documents could have had on the Commission's assessment of the gravity and the duration of its participation in the ETF.

168.

However, the Court of First Instance rejected those arguments in the light of the evidence adduced by the Commission. First, as the Court of First Instance held at paragraph 2891 of the judgment under appeal, the allegedly exculpatory documents could not have invalidated the Commission's finding that Mr Larsen had attended the meeting of 9 September 1986, at which the setting-up of the ETF, its anti-competitive purpose, its composition, the organisation of its tasks and the various measures which it was given to consider were in turn discussed.

169.

Second, as the Court of First Instance observed at the same paragraph of the judgment under appeal, any observations that Aalborg might have made during the administrative procedure on the basis of the allegedly exculpatory documents in order to show that it had taken part in that meeting solely for the purpose of political action could not have disguised the total lack of evidence to show that at the meeting of 9 September 1986 it had expressly informed the other participants that it was attending the meeting with quite different objects in mind.

170.

In reality, this complaint merely reproduces pleas already raised before the Court of First Instance and seeks to obtain a reconsideration of the application submitted to that Court.

- The evidence relating to the agreements with Calcestruzzi

171.

As regards the evidence relating to the agreements with Calcestruzzi, it clearly follows from paragraphs 3390 and 3391 of the judgment under appeal that Cementir is merely reiterating before the Court of Justice the complaints already formulated before the Court of First Instance and rejected by it as unfounded following a detailed statement of its reasons. In that regard, Cementir cannot accuse the Court of First Instance of any failure to state reasons.

172.

Contrary to Cementir's contention, the Court of First Instance accepted, at paragraph 3392 of the judgment under appeal, the probative force of the minutes of the meeting of the ETF held on 11 February 1987 (the meeting of 11 February 1987) and the meeting of 15 March 1987, at which the Italian representative presented a report on developments in the agreement between the Italian cement manufacturers and Calcestruzzi's parent company, Ferruzzi (see recital 27, paragraph 5, of the grounds of the Cement Decision). In addition, that evidence is given further weight by the fact that Cementir signed agreements and contracts with Calcestruzzi, Italcementi and Unicem on 3 and 15 April 1987 whereby they jointly undertook to meet all the cement requirements of the Calcestruzzi group and Cementir undertook to cooperate with the Italian cement producers (see recital 27, paragraph 6, of the grounds of the Cement Decision). Cementir also took an active part in the negotiations with Titan and the

other Italian producers in Luxembourg in May 1987 (the Luxembourg meeting, see recital 27, paragraphs 7 to 10, of the grounds of the Cement Decision).

173.

The Court of First Instance therefore considered that that bundle of evidence constituted convincing proof of an agreement between Italcementi, Unicem and Cementir, designed to avoid the threatened imports of cement from Greece by Calcestruzzi. It considered that the arguments put forward by Cementir in relation to its commercial motives and the economic context of the Italian market faced with heavy penetration by Greek exports were not capable of upsetting the conclusions to which the evidence relied on by the Commission led.

174.

As Cementir has confined itself to challenging the assessment of the evidence by the Court of First Instance, its complaints cannot be examined by the Court of Justice and must be rejected.

- The evidence relating to the agreements between Italian cement producers

175.

As regards the evidence relating to the agreements and concerted practices between Italian cement producers, the SO draws a clear distinction between the collusion at national level in Italy, namely the agreements with Calcestruzzi which led to the formation of the Società Italiana per le Promozioni ed Applicazioni del Calcestruzzo SpA (SIPAC) and the collusion between cement producers having effects at international level, namely the concerted practices between Italcementi, Unicem and Cementir intended to take away from the Greek producers a customer who was important to their penetration of the Italian market.

176.

It is clear that the collusion at international level did not in any way depend on the existence of the national collusion. The Court of First Instance's reasoning is therefore not contradictory in that regard.

177.

The objection in respect of the relevance of the documents concerning the relations between Italian cement producers at national level contains no reference from which it is possible to identify the arguments presented before the Court of First Instance, the documents relied on to support it or even the contested paragraphs of the Cement Decision. More particularly, by failing to provide that information, Italcementi has not demonstrated the errors which, in its submission, led the Court of First Instance to distort the evidence.

178.

In the light of the foregoing, the pleas relating to the application by the Court of First Instance to the circumstances of the case of the criteria relating to the probative force of documents which were not disclosed must be rejected.

4. Pleas alleging breach of the rights of defence as regards the decision to drop the national objections

Arguments of Italcementi

179.

Italcementi criticises the Court of First Instance, first, for having refused to censure the breach of the rights of the defence consisting in the failure to communicate beforehand the decision to drop the national objections and, second, for having ignored the contradiction between that decision and the Cement Decision.

180.

> If the decision to drop the national objections had been communicated to Italcementi before it was definitively adopted, it could at the very least have persuaded the Commission to confine its accusations to the effects of the conclusion of the agreement between the Italian cement producers which were directly bound by the Cembureau Agreement. In Italcementi's submission, there is not the slightest link between the purpose of the Cembureau Agreement and the execution of the supply contracts concluded between the Italian cement producers and Calcestruzzi.

181.

> Italcementi also claims that there is a contradiction between the Commission's decision to drop its objections at national level, as described in Chapters 3 to 9 and 13 to 19 of the SO, and Article 4(3)(b) of the Cement Decision, which confers international status on the infringement alleged to have been committed by the Italian producers by virtue of their participation in an agreement designed to prevent imports of Greek cement by Calcestruzzi.

182.

> According to Italcementi, the Court of First Instance incorrectly stated that that agreement was also referred to in the part of the SO devoted to the international objections, thus implying that there had been no contradiction between the decision to drop the national objections and the Cement Decision. Italcementi claims that, in Chapters 2 and 10 of the SO, devoted to the international objections, there is no reference to an agreement between Italian cement producers designed to block Greek imports. On the contrary, the relations between those producers were analysed in Chapter 13, point 70, of the SO, entitled Agreements and practices set out in Chapter 3 - Italy.

183.

> Italcementi states that the decision to drop the national objections does, however, expressly refer to Chapters 3 and 13 as forming part of those of which the object is abandoned. The Court of First Instance carried out a superficial analysis of the Cement Decision, in regard to the SO and the decision to drop the national objections, by failing to find that Article 4(3)(b) of the Cement Decision was illegal and to censure the conduct of the Commission on that point.

184.

> More specifically, it maintains that, had it had the opportunity to express its views on the Commission's intentions to drop the national complaints, it would have pointed out that anomaly and perhaps been able to persuade the Commission to change its attitude or to withdraw its accusations concerning the relations between the Italian cement producers and Calcestruzzi.

185.

> In that regard, Italcementi disputes the Court of First Instance's finding that the arguments that Italcementi might have been able to put forward in respect of the consequences of the dropping of the national objections would not have had even a small chance of inducing the Commission not to sanction the agreement between the Italian cement producers and Calcestruzzi as an expression of the Cembureau Agreement. Since the former agreement is the only aspect of the national objections not to have been dropped by the Commission, it is not logical to preclude the possibility that those arguments might have convinced the Commission.

> Findings of the Court

186.

As regards, first of all, the alleged contradiction between the decision to drop the national objections and the Cement Decision, it is true that the withdrawal of Chapters 3 and 13 of the SO, on Italy, had the effect of withdrawing the accusations relating to the setting-up, following agreements between Italcementi, Unicem, Cementir and Calcestruzzi, of the subsidiary, SIPAC, through which the three Italian cement producers cooperated in jointly meeting all the cement requirements of the Calcestruzzi group and in applying price reductions.

187.

Despite withdrawing those accusations, the Commission continued to examine the international effects of the agreement between Italcementi, Unicem and Cementir relating to those agreements with Calcestruzzi before finding them liable for the infringement referred to in Article 4(3)(a) of the Cement Decision.

188.

Contrary to Italcementi's contention, however, that examination and that finding by the Commission are in no way incompatible with the decision to drop the national objections. The Commission merely drew a distinction between the measures having purely national consequences and those having international effects.

189.

As regards, next, the alleged absence of any reference in the SO to an agreement between Italcementi, Unicem and Cementir, as the Court of First Instance stated at paragraph 443 of the judgment under appeal, it is clear from point 61(h)(iv) of the SO, which forms part of Chapter 10 of the part of the SO on the international objections and which is reproduced in recital 55, part (a), paragraph 1 of the Cement Decision, that [t]he pressure brought to bear on Calcestruzzi and the non-implementation of the contract on the purchase of cement from Titan are the result of agreements and/or concerted practices between the Italian producers Italcementi, Unicem and Cementir and between them and the other participants in the Cembureau Task Force ..., the aim being to take away from the Greek producers a customer who was important to their penetration of the Italian market.

190.

That extract from the SO draws a clear distinction between, on the one hand, the concerted practices between the Italian producers Italcementi, Unicem and Cementir (which form the subject-matter of the objections formulated in Article 4(3)(b) of the Cement Decision) and, on the other hand, the concerted practices between those Italian producers and the other participants in the ETF (which form the subject-matter of the objections formulated in Article 4(3)(a) of the Cement Decision).

191.

Consequently, Italcementi's argument that the Court of First Instance incorrectly failed to have regard to the absence of any reference in the part of the SO dealing with the international objections to an agreement between those Italian producers alone cannot be accepted.

192.

As regards, last, the need to afford Italcementi the opportunity to express its views on the dropping of the national objections, the Court of Justice has held that communication to the parties concerned of further objections is necessary only if the result of the investigations leads the Commission to take new facts into account against the undertakings or to alter materially the evidence for the contested infringements (see Case 53/69 *Sandoz* v *Commission* [1972] ECR 845, paragraph 14).

193.

In the present case, as the Court of First Instance rightly observed at paragraphs 439 and 440 of the judgment under appeal, the dropping of the national objections did not in any way change the legal and factual context of the objections raised against Italcementi. It was even in Italcementi's interest that they should be dropped. Accordingly, respect for the rights of the defence did not require that Italcementi should be allowed to submit its observations afterwards.

194.

Furthermore, Italcementi had already had the opportunity to attempt to persuade the Commission to restrict its accusations concerning the link between the conclusion of the agreement between the Italian cement producers and the Cembureau Agreement, first when it presented its comments on the SO (of which the part relating to the international objections referred to the concerted practices between the cement producers) and, second, when it was heard by the Commission between March and April 1993.

195.

Furthermore, since the part of the SO relating to the international objections was expressly aimed at the concerted practices between the Italian cement producers, the arguments disputing the Court of First Instance's finding, at paragraph 447 of the judgment under appeal, that the comments which Italcementi might have been able to make on the dropping of the national objections would clearly not have led the Commission to drop the international objection relating to the agreement between the Italian cement producers, are of no avail.

196.

In view of the foregoing, the pleas alleging breach of the rights of the defence in respect of the decision to drop the national complaints must be rejected.

5. The plea relating to the right to cross-examine the authors of the documents relied on by the Commission

Arguments of Irish Cement

197.

Irish Cement criticises the Court for having wrongly rejected, at paragraph 1399 of the judgment under appeal, its argument that the internal memoranda of Blue Circle (documents 33.126/11332 to 11337) and the statement of Mr Kalogeropoulos (documents 33.126/19875 to 19877) were inadmissible because it had not had an opportunity to cross-examine the authors of those documents.

198.

In its submission, the use against it of those documents, which did not originate within Irish Cement and whose authors it was unable to cross-examine, constitutes a breach of the fundamental principles of justice and fair procedures.

Findings of the Court

199.

As the Court of First Instance observed at paragraph 1399 of the judgment under appeal, the Blue Circle internal memoranda and the statement of Mr Kalogeropoulos did not constitute the sole or decisive basis of the finding made against Irish Cement, since other documents, which Irish Cement had the opportunity to consult and to comment on, showed that the Cembureau agreement was concluded at the Head Delegates meetings and that Irish Cement participated in those meetings.

200.

As the procedure before the Commission is purely an administrative procedure, the Commission is not required to afford the undertaking concerned the opportunity to cross-examine a particular witness and to analyse his statements at the investigation stage. As for the ECHR, it does not lay down the rules on evidence as such (see the *Mantovanelli* v *France* judgment, § 34).

201.

Accordingly, the Court of First Instance made no error of law when it rejected Irish Cement's arguments on the ground that Regulations No 17 and No 99/63 make no provision for the author of a document to be cross-examined by the undertaking against which it is used and held that there had been no breach of the rights of the defence in that regard.

202.

The plea must therefore be rejected as unfounded.

6. The plea alleging breach of the right not to give self-incriminating evidence

Arguments of Buzzi Unicem

203.

Buzzi Unicem criticises the Court of First Instance for having failed to apply the principle in *Orkem* v *Commission*, in that it refused to recognise that the Commission had breached Unicem's rights of defence by basing its arguments on declarations made by the parties during the procedure, contrary to the principle which precludes self-incriminating evidence.

204.

First, the Court of First Instance wrongly concluded at paragraph 733 of the judgment under appeal that the Commission was entitled to rely, as against Unicem, on the recognition of the existence of an infringement which emanated from parties other than Unicem. If such a declaration cannot be used against the party who made it, it necessarily follows that it cannot be adduced as evidence of the unlawful conduct of another undertaking, on pain of infringing the principle of equal treatment and the defence.

205.

Second, in Buzzi Unicem's submission, the reasoning at paragraph 735 of the judgment under appeal is incorrect. The Court of First Instance's assertion that the undertakings were not required to respond to a request for information pursuant to Article 11(1) of Regulation No 17 has no relevance for Unicem since the information which concerned it was provided on the basis of Article 14(2) of that regulation.

Findings of the Court

206.

Buzzi Unicem does not claim that the Commission questioned Unicem about particular practices or measures in such a way as to constrain it to admit infringements. The breach of the rights of the defence alleged by Buzzi Unicem was caused only by the answers given by Cembureau on the occasion of an investigation pursuant to Article 14(2) of Regulation No 17 and by the latter's replies in the wake the SO.

207.

In carrying out the task conferred on it by Article 89 of the Treaty, the Commission is entitled to question the undertaking under investigation about the conduct of all the other undertakings concerned. Furthermore, Regulation No 17 places the undertaking under an obligation to cooperate actively and the Commission may reduce the amount

of any fine imposed on that undertaking to reflect its cooperation in the investigation (see, to that effect, Case T-13/89 *ICI* v *Commission* [1992] ECR II-1021, paragraph 393).

208.

Those considerations also apply as regards the questioning of associations of undertakings concerning the individual conduct of their members. To acknowledge the existence of a right to silence, as defined by Buzzi Unicem, which would have the effect of protecting the members of an association of undertakings by preventing the association from giving evidence against its members, would go beyond what is necessary in order to preserve the rights of defence of undertakings, and would constitute an unjustified hindrance to the Commission's performance of its duty to ensure that the rules on competition within the common market are observed.

209.

It follows that the Court of First Instance did not err in law when it held, at paragraph 733 of the judgment under appeal, that the Commission had not infringed Unicem's right not to give evidence against itself on the ground that the replies in issue emanated from Cembureau and not from Unicem.

210.

The plea must therefore be rejected as unfounded.

211.

It follows from all of the foregoing that the pleas relating to alleged procedural defects and a breach of the rights of the defence must be rejected in their entirety.

B - *The substantive pleas*

212.

The appellants have put forward various pleas criticising the Court of First Instance for having made errors of law, errors in its reasoning and errors in its assessment of the probative documents when it confirmed their participation in the Cembureau Agreement and in the measures adopted to implement that agreement.

213.

The Commission claims that, by certain of those pleas, the appellants are, in essence, merely criticising the findings of fact made by the Court of First Instance or inviting the Court of Justice to establish the facts in different terms from those used by the Court of First Instance.

1. Pleas alleging errors of law, flawed reasoning and distortion of evidence as regards the existence of the Cembureau Agreement (the infringement referred to in Article 1 of the Cement Decision)

Arguments of the parties

- The legal characterisation of the evidence as [direct] documentary evidence

214.

Irish Cement, Italcementi, Buzzi Unicem and Cementir challenge the Court of First Instance's assertion at paragraph 260 of the judgment under appeal that the Commission relied solely on [direct] documentary evidence to establish the existence of the Cembureau Agreement in regard to them.

215.

More specifically, Italcementi emphasises the weakness of the only direct documentary evidence which the Commission adduced to support the existence of the Cembureau Agreement, namely the evidence relating to the characterisation of the

undertakings concerned as members of Cembureau, to the participation of certain of those undertakings in the meetings of 14 January 1983 and 19 March 1984 and also to the meeting of Head Delegates of the European cement producers belonging to Cembureau held on 7 November 1984 (the meeting of 7 November 1984), and likewise to the content of the agenda of those meetings. In its submission, the Court of First Instance considered that the mere fact that Italcementi had participated in the meeting of 19 March 1984, without having openly manifested its dissent, justified the conclusion that Italcementi had intended to subscribe to the object of the Cembureau Agreement. Such a conclusion is based not on direct evidence but on a presumption.

216.

Cementir further submits that the existence of consensus among certain undertakings as to the conclusion of the Cembureau Agreement must be established on the basis of firm and clear evidence which leaves no room for reasonable doubt. The conclusions formulated by the Court of First Instance, which confirm the Commission's findings concerning the meetings of Head Delegates within Cembureau and also the conclusion of the alleged Cembureau Agreement, have no basis in legal logic and result from the distortion of essential evidence. In arriving at the legal characterisation of Cementir's conduct, the Court of First Instance therefore infringed the principles of the burden of proof and of the presumption of innocence; and, furthermore, that characterisation is not properly reasoned.

217.

Buzzi Unicem observes that none of the documents relied on in that regard by the Commission mentions Unicem. It maintains that the Court of First Instance reached the conclusion that the Cembureau Agreement was unlawful by means of presumption and in a purely interpretative manner. The Court of First Instance made an error of reasoning by not commenting on the fact that Unicem was not mentioned in those documents. Buzzi Unicem maintains that the Court of First Instance's reasoning is confused, imprecise and contradictory on many points.

- The statement of Mr Kalogeropoulos

218.

Irish Cement, Buzzi Unicem and Cementir maintain that the Court of First Instance was manifestly mistaken in its assessment of the relevance of the statement of Mr Kalogeropoulos at paragraph 904 of the judgment under appeal. That statement, made in 1986, does not support the Commission's hypothesis that an agreement had been concluded at the meeting of 14 January 1983. Nor did the Court of First Instance reply to their submission that the statement of Mr Kalogeropoulos was a political statement intended to explain the problems of Heracles and also to attempt to justify and extend the State aid granted to that undertaking.

- The Blue Circle memoranda

219.

Irish Cement maintains that the Court of First Instance did not respond to the arguments disputing the probative value of the Blue Circle internal memoranda. Those memoranda do not show that the Cembureau Agreement or principle was that which had been accepted at the meeting of 14 January 1983.

220.

Buzzi Unicem maintains that the memoranda, which do not mention Unicem, do not constitute direct evidence of the completion of the Cembureau Agreement or of Unicem's participation in that agreement; and in any event, they do not demonstrate that the Cembureau Agreement applied to the whole of Europe.

221.

    Cementir states that it is not mentioned anywhere in the Blue Circle internal memoranda, which were drafted by a third party whom Cementir did not know. It further criticises the Court of First Instance's finding that the memoranda could not be interpreted as meaning that they related to dumped imports from non-member countries. In Cementir's submission, the memoranda cannot as such constitute such a definite indication - still less direct evidence - of its liability.

    - The admission by Cembureau

222.

    Buzzi Unicem maintains that the admission by Cembureau (documents 33.126/11525 and 13568 to 13573) contains no reference to Unicem's participation in the Cembureau Agreement and cannot therefore constitute direct evidence of its involvement in that agreement. The Court of First Instance made an error of reasoning by failing to adjudicate on that point.

    - The letters convening the meeting of 14 January 1983

223.

    Irish Cement, Buzzi Unicem and Cementir dispute the probative value ascribed by the Court of First Instance at paragraphs 934 to 940 of the judgment under appeal to the letters convening the meeting of 14 January 1983.

224.

    Irish Cement criticises the Court of First Instance for having failed to examine its argument that Mr Braz de Oliveira's letter was not a letter convening the Head Delegates meeting, since the author had acted not as an official representative of Cembureau but solely as a member if its Executive Committee. The sole purpose of the letter was to inform the other two members of that committee, namely the Danish and Irish representatives, that a meeting was to be held.

225.

    Buzzi Unicem criticises the Court of First Instance for having failed to note that the example of appropriate measures given in the letter convening the meeting related solely to transfers between Belgium and the Netherlands.

226.

    Cementir criticises the Court of First Instance's finding at paragraphs 935 and 936 of the judgment under appeal that the two versions of the letter convening the meeting (namely the letter signed by Mr Braz de Oliveira, which refers to transfers of cement between the countries of origin of the members of Cembureau and the official convocation to the meeting of 14 January 1983, which omits such a reference) were in no way inconsistent. Cementir maintains that the Court of First Instance reached that conclusion by deduction.

227.

    Cementir further maintains that the Court of First Instance's finding at paragraph 940 of the judgment under appeal that the so-called official convocation is relevant evidence against it is based on wholly irrelevant grounds. In that regard, it maintains that it never received the letter from Mr Braz de Oliveira which referred to transfers of cement. Nor did it participate in the meeting of the Cembureau Executive Committee of 5 November 1982 to which, according to the Court of First Instance, that letter referred and during which the need to protect the cement industry from serious problems by taking appropriate measures was supposed to have been discussed.

    - The Chairman's draft introductory statement for the meeting of 14 January 1983

228.

Cementir maintains that the Court of First Instance was wrong to conclude on the basis of the purely provisional text of the Chairman's introductory statement for the meeting of 14 January 1983 that the setting of rules of the game by economic operators constituted an anti-competitive agreement. Since the document merely expressed a wish that rules be set, it cannot provide definite and clear evidence of the fact that Cementir gave its consent to an anti-competitive agreement, lasting, moreover, for almost 10 years. The Court of First Instance's conclusion is therefore manifestly illogical and incorrectly reasoned. It is the consequence of a radical distortion of the document in question for the purposes of the legal characterisation of the conduct of that undertaking.

229.

Cementir further criticises the Court of First Instance for having wrongly confirmed that it was liable for the conclusion of the Cembureau Agreement by virtue of the fact that the Chairman of the meeting of 14 January 1983 had announced that no minutes of the meeting would be taken. The absence of minutes cannot constitute direct and positive evidence of the conclusion of the agreement. The fact that the participants in the meeting wished to keep any action secret is of no relevance in establishing Cementir's participation in the meeting.

- The meetings of 19 March and 7 November 1984

230.

Cementir disputes the Court of First Instance's assessment of the confirmatory nature of the meeting of 19 March 1984 and states that it was not present at that meeting.

231.

Cementir and Buzzi Unicem criticise the Court of First Instance's reasoning where it states that the fact that the Head Delegates declared themselves in favour of an agreement between Spanish and Greece producers (the Hispano-Greek agreement) supported the conclusion that at the meeting of 7 November 1984 the Head Delegates had manifested their intention to confirm their adherence to the alleged Cembureau Agreement. Such a declaration cannot be regarded as a firm and clear indication of the existence of the alleged Cembureau Agreement without infringing the principle of the presumption of innocence.

232.

Cementir maintains that the Court of First Instance erred in characterising the very nature of the evidence when it regarded as direct evidence an item of evidence which in reality was arrived at by logical deduction and therefore constitutes indirect evidence. That error also shows that the Court of First Instance's reasoning is inconsistent.

233.

Buzzi Unicem claims that the Court of First Instance was wrong to reject the argument whereby it disputed the Commission's interpretation of the document of 12 November 1984 summarising the discussions at the meeting of 7 November 1984 (the Summary Notes) on the ground that the expression achieve a firm undertaking between the major European exporters in that document does not prove that an agreement was concluded between the European producers. Nor can Unicem have formed part of the group of large cement exporters.

- Other exculpatory evidence

234.

In Cementir's submission, the Court of First Instance paid only scant attention to evidence such as the fact that between 1983 and 1985 there were two meetings of Head Delegates at which intra-Community trade was not discussed; the finding that Cementir participated in only two of the five meetings concerned, the second of which definitely did not deal with the topic of intra-Community trade; and the fact that Cementir participated in Cembureau's activities only to a very slight extent, since it concentrated its activities on local customers.

235.

Cementir maintains that the Court of First Instance's rejection of those items of evidence does not reflect a correct assessment of the conduct of the various undertakings. Faced with fragmentary, uncertain and equivocal evidence, which essentially focused on the nature of the discussions alleged to have taken place at the meeting of 14 January 1983, and given the confusion between direct and indirect evidence, the evidence referred to in the preceding paragraph could not be regarded as wholly lacking in probative value.

Findings of the Court

236.

Irish Cement, Italcementi, Buzzi Unicem and Cementir criticise the Court of First Instance for having ignored the fact that the documents on which the Commission had relied did not constitute irrebuttable evidence of the conclusion of the Cembureau Agreement and of their involvement in that agreement. Those complaints appear to be based on an incorrect interpretation of direct evidence.

237.

Contrary to what Italcementi and Cementir contend, the Court of First Instance did not improperly reverse the burden of proof or infringe the presumption of innocence. The Court of First Instance concluded, first, that the documents referred to in recital 18 of the Cement Decision, namely the Blue Circle internal memoranda, the statement of Mr Kalogeropoulos and the statements of Cembureau itself (documents 33.126/11525 and 13568 to 13573) expressly mentioned the existence of an agreement between European cement producers having as its object non-transhipment to internal markets and the regulation of sales from one country to another (see paragraph 920 of the judgment under appeal) and, second, that the documents referred to in recitals 19 and 45 of the Cement Decision indicated that an agreement within the meaning of Article 85(1) of the Treaty had been concluded at the meeting of 14 January 1983 (see paragraph 1003 of the judgment under appeal). The Court of First Instance was therefore correct, at paragraph 862 of the judgment under appeal, to characterise those documents as [direct] documentary evidence of the existence of the Cembureau Agreement.

238.

As the arguments relating to the relevance of the statement of Mr Kalogeropoulos are merely a word for word reproduction of the pleas already raised before the Court of First Instance and as they identify no error of law, they must be rejected in the context of the present appeals, in accordance with the principles set out at paragraph 51 of this judgment.

239.

As regards the complaint alleging a defect in the reasons for rejecting in the judgment under appeal the argument relating to the nature of that statement, it is sufficient to state that the Court of First Instance expressly referred to that argument at paragraph 902 of the judgment under appeal before rejecting it as not credible at paragraph 907 of that judgment on the ground that the statement contained no reference to State aid

to Heracles or any justification for the latter's earlier conduct. That detailed reasoning is not open to criticism.

240.

The reason for challenging the probative value of the Blue Circle internal memoranda on the ground that they did not mention either the Cembureau agreement or the parties to that agreement is based on the same error as that identified at paragraph 236 of the present judgment concerning the scope of [direct] evidence. As the Court of First Instance observed at paragraphs 876 to 878 of the judgment under appeal, first, those memoranda refer to an agreement, a principle or a policy of not transhipping to internal European markets which the memoranda link to Cembureau. Second, Blue Circle had an active role within Cembureau and Mr Reiss, the author of the memoranda and regional director in Blue Circle's export division, participated in various meetings of the EPC. Those factors are sufficient for both memoranda to be characterised as [direct] evidence of the existence of the Cembureau Agreement.

241.

The status of the memoranda as [direct] evidence is in no way undermined by the fact that they do not expressly refer to the undertakings concerned. On the contrary, the participation of those undertakings in the Cembureau Agreement is clear from their participation in the Head Delegates meetings or, in Unicem's case, from its participation in an implementing measure, namely the setting-up of the ETF, by the presence of its representative, Mr Albert, at the meeting of the subgroup stick actions on 17 March 1987 (the meeting of 17 March 1987).

242.

Cementir merely criticises the Court of First Instance's findings and does not demonstrate the errors which, it claims, led that Court to distort the evidence. Its criticism is merely an attempt to substitute its version of the events for the Court of First Instance's assessment.

243.

As regards Cembureau's statements, the Court of First Instance, after mentioning Cembureau's assertion that the references to the Cembureau Agreement in the Blue Circle internal memoranda were to established practices and ethics that have gradually evolved through contact with businesses and economic development in various countries, concluded at paragraph 917 of the judgment under appeal that Cembureau had not denied the existence of a concurrence of wills on its part and that of its members concerning good neighbour rules or established practices and ethics.

244.

Even though Cembureau's admission does not refer expressly to Unicem, it has probative force as regards the existence of the concurrence of wills necessary to found an agreement within the meaning of Article 85(1) of the Treaty. As its admission does not concern Unicem's participation in the agreement, the Court of First Instance did not err in its reasoning when it failed to adjudicate on the argument that Unicem was not mentioned in the admission.

245.

The arguments relating to the letters convening the meeting of 14 January 1983 merely criticise the merits of the Court of First Instance's findings of fact and merely reiterate a version of the facts which has already been rejected by the Court of First Instance. As regards the alleged failure to state reasons in assessing the status of the letter from Mr Braz de Oliveira, the Court of First Instance set out at paragraph 933 of the judgment under appeal Irish Cement's argument that the letter had been sent by its author, acting in his personal capacity, only to the Danish Head Delegate (Mr Larsen)

and his Irish counterpart (Mr Dempsey). However, it rejected that argument at paragraph 934 of the judgment under appeal, on the ground that the letter convening the meeting had been sent to Aalborg and to Irish Cement ... at the request of the Cembureau Chairman, Mr Jean Bailly. That clear and logical reasoning is not open to criticism.

246.

Buzzi Unicem's argument concerning transfers between Belgium and the Netherlands must be rejected, since it contains no elements of law.

247.

As regards the argument based on the consistency between Mr Braz de Oliveira's letter and the official convocation of the meeting of 14 January 1983, Cementir's complaints relate only to the interpretation of the evidence by the Court of First Instance and do not identify any distortion of evidence. Even though the letters convening that meeting to not mention Cementir by name, in the light of all the evidence they confirm the anti-competitive objective of the meeting of 14 January 1983, which Cementir attended.

248.

The arguments relating to the introductory statement of the Chairman of the meeting of 14 January 1983 are based on the same error as that identified at paragraph 235 of this judgment as regards the scope of the concept of [direct] evidence. Although the Chairman did not propose the adoption of a formal agreement within Cembureau, he expressed the desire that the participants in the meeting should agree on rules of the game. The fixing by economic operators of rules of the game applicable to their conduct on the market unquestionably constitutes, in the light of the Community case-law, an agreement for the purposes of Article 85(1) of the Treaty. No distortion of the evidence and no failure to state reasons can be established in that regard. As regards the criticism based on the probative value of the absence of minutes of that meeting, it merely reproduces the pleas already rejected by the Court of First Instance at paragraph 976 of the judgment under appeal.

249.

As regards the meeting of 19 March 1984, the Court of First Instance held at paragraph 1353 of the judgment under appeal that Cementir's responsibility for the conclusion of the Cembureau agreement derives from the fact that, by virtue of its presence at one or more meetings of Head Delegates at which a concurrence of wills emerged or was confirmed in respect of the principle of non-transhipment to home markets and the regulation of cement transfers from one country to another, it had subscribed to or at least given the impression to the other participants that it subscribed to the subject-matter of the Cembureau Agreement. The Court of First Instance did not err in law when it held, at paragraph 1376 of the judgment under appeal, that the mere presence of Cementir at one of the Head Delegates meetings at which the Cembureau Agreement was concluded or confirmed sufficed for a finding that it had participated in the concurrence of wills which had been reached. The Court of First Instance's assessment of the confirmatory nature of the meeting of 19 March 1984 is therefore in no way rendered invalid by the fact that Cementir was not present at that meeting.

250.

As regards the meeting of 7 November 1984, the Court of First Instance considered the various possible interpretations of the Summary Notes and rejected Unicem's and Cementir's arguments that, in particular, the sole purpose of the Hispano-Greek agreement referred to in the document was to stabilise prices of exports outside

Europe. According to the Court of First Instance, which has unlimited jurisdiction to assess the evidence adduced before it, the Head Delegates, by supporting that agreement, pursued a double objective, namely, first, to obtain better export prices and, second, to avoid the risk of a destabilisation in Europe. According to the Court of First Instance, non-transhipment to home markets and the channelling of exports went hand in hand (see paragraphs 1034 to 1036 of the judgment under appeal).

251.

The arguments which Buzzi Unicem and Cementir draw in that regard from an alleged incorrect characterisation of the evidence and of the inconsistent nature of the reasoning of the Court of First Instance in reality seek only to call in question findings of fact, which is not permissible in appeal. More specifically, the arguments alleging incorrect characterisation of the evidence are drawn from an incorrect interpretation of the concept of [direct] evidence.

252.

Since the support for the Hispano-Greek agreement manifested at the meeting of 7 November 1984 had precisely the same aim as the Cembureau Agreement, namely to prevent destabilisation of the European markets, the Court of First Instance correctly concluded at paragraph 1046 of the judgment under appeal that the Summary Notes were relevant evidence, in so far as they indicated that the concurrence of wills in regard to the principle of non-transhipment to home markets and the regulation of sales from one country to another had been reaffirmed at that meeting. The Court of First Instance therefore did not in any way distort the evidence or, moreover, employ illogical reasoning when, at paragraph 1037 of the judgment under appeal, it confirmed the correctness of the conclusion set out in recital 45, paragraph 2, second subparagraph, of the Cement Decision, that the content of the Cembureau Agreement had again been confirmed at the meeting of 7 November 1984.

253.

As regards the existence of other Head Delegates meetings between 1983 and 1985, moreover, at which intra-Community trade was not discussed, the Court of First Instance's assessment of the probative force of what was alleged to be exculpatory evidence adduced in rebuttal of the evidence presented by the Commission is not, as such, amenable to review by the Court of Justice and there is nothing in the arguments put forward by Cementir to justify calling that assessment in question in the present case. The Court of First Instance did not distort the evidence when it held, at paragraph 1049 of the judgment under appeal, that the documents showing that intra-Community trade was not discussed at the meetings held on 30 May 1983 and 10 June 1985 were not such as to shed a different light on the body of documentary evidence presented by the Commission and showing that an agreement not to tranship to home markets had been concluded, and then confirmed, at the meetings held on 14 January 1983, 19 March and 7 November 1984.

254.

The pleas relating to alleged errors of law, flawed reasoning and the distortion of evidence concerning the existence of the Cembureau Agreement must therefore be rejected as inadmissible and/or unfounded.

2. Pleas relating to alleged errors of law, flawed reasoning and distortion of evidence as regards the single and continuous nature of the Cembureau Agreement

Arguments of the parties

255.

Italcementi, Buzzi Unicem and Cementir criticise the Court of First Instance for having wrongly regarded the Cembureau Agreement and the implementing measures as a single agreement, since it considered that the object was the same in all cases and found that the parties were the same.

256.

According to Buzzi Unicem, the concept of single agreement presupposes conduct that is single, uninterrupted and continuous in time. It maintains that the actions examined during the administrative and judicial stages do not constitute such conduct. That, it submits, is proved by the long intervals between the Head Delegates meetings. The gap of 14 months between the meeting of 14 January 1983 and the meeting of 19 March 1984 means, in the light of the judgment in Case T-43/92 *Dunlop Slazenger* v *Commission* [1994] ECR II-441, that those meetings cannot be regarded as sufficiently close in time to support an inference of the continuation of a single conduct. The precise repetition of the conduct attributed to the undertakings referred to by the Cement Decision in the context of a single unlawful design, rather than in the context of a single agreement, could have led the Commission and the Court of First Instance to set the fine on the basis of the role played by each undertaking.

257.

Italcementi criticises the Court of First Instance for having incorrectly held that, once it was inferred that they adhered to the principle of the Cembureau Agreement, all the conduct of the undertakings concerned on the market could only constitute implementing measures confirming the actual application of the agreement. As those measures are alleged to be intended to implement an agreement the existence of which was deemed to have been established directly by documentary evidence, they are presumed to have been proved by direct documentary evidence.

Findings of the Court

258.

An infringement of Article 85(1) of the Treaty may result not only from an isolated act but also from a series of acts or from continuous conduct. That interpretation cannot be challenged on the ground that one or several elements of that series of acts or continuous conduct could also constitute in themselves and taken in isolation an infringement of that provision (see, to that effect, *Commission* v *Anic*, paragraph 81). When the different actions form part of an overall plan, because their identical object distorts competition within the common market, the Commission is entitled to impute responsibility for those actions on the basis of participation in the infringement considered as a whole.

259.

In the present case, contrary to Buzzi Unicem's contention, it is artificial to subdivide into a number of distinct actions the Cembureau Agreement, which is characterised by a series of efforts pursuing a single economic end, namely non-transhipment to home markets.

260.

Since each of those actions comes within the concept of infringement within the meaning of Article 85(1) of the Treaty, it is necessary to distinguish as manifestly irrelevant to the present case the judgment in *Dunlop Slazenger* v *Commission*, which dealt with legal certainty in relation to the burden of proof. In the context of an overall agreement extending over several years, a gap of several months between the manifestations of the agreement is immaterial. The fact that the various actions form part of an overall plan owing to their identical object, on the other hand, is decisive.

261.

Likewise, the distinction that Buzzi Unicem draws between a single agreement and a single criminal design is of no relevance. For the purposes of applying Article 85(1) of the Treaty, there is no need to take account of the actual effects of an agreement once it appears that its aim is to restrict, prevent or distort competition within the common market (see Case C-277/87 *Sandoz prodotti farmaceutici* v *Commission* [1990] ECR I-45).

262.

It follows that the Court of First Instance did not make an error of assessment when it confirmed the Commission's conclusion that the Cembureau Agreement was single and continuous and that it was constituted by the whole of the arrangements adopted within the framework of Cembureau and the bilateral and/or multilateral meetings and contacts (recital 46, paragraph 1 of the Cement Decision).

263.

The pleas relating to alleged errors of law, flawed reasoning and distortion of evidence as regards the single and continuous nature of the Cembureau Agreement must therefore be rejected as unfounded.

3. Pleas alleging errors of law, flawed reasoning and infringement of the rights of the defence as regards the exchanges of price information

Arguments of the parties

264.

Aalborg, Buzzi Unicem and Cementir raise a number of pleas criticising the Court of First Instance for having applied an incorrect legal characterisation, first, to the specific exchanges of information on prices during the Head Delegates meetings (referred to in Article 2(1) of the Cement Decision; the specific exchanges) and, second, to the periodic exchanges of information (referred to in Article 2(2)(b) of the Cement Decision; the periodic exchanges) when it regarded them as implementing measures. The Court of First Instance is also alleged to have exaggerated the duration of the Cembureau Agreement.

- The anti-competitive object of the exchanges of price information

265.

Aalborg, Buzzi Unicem and Cementir maintain that the periodic exchanges and also, in Cementir's submission, the specific exchanges were neutral from the aspect of competition, for the following reasons:

- the selling prices of cement were easily accessible to the public and, as regards the Danish market, they were even published;

- most frequently, prices were subject to public control measures, such as approval by the Danish Monopoltilsyn;

- the gathering of data on prices charged was traditionally part of the tasks of a trade association and, owing to its limited scope, had no significance from the point of view of competition; and

- information on prices had always been sent by Cembureau to its members after the prices communicated had become applicable at the time of an annual update.

266.

Aalborg maintains that although the Court of First Instance considered that the periodic exchanges had no impact from the point of view of competition, it incorrectly

extended the scope of the Cembureau Agreement to a lawful practice which had existed between the same parties long before that agreement had been concluded.

267.

Buzzi Unicem supports those arguments and claims that the findings of the Court of First Instance are inconsistent with the settled criteria consistently applied by the Community judicature in such matters, according to which an infringement of Article 85(1) of the Treaty presupposes that the information exchanged may be regarded as trade secrets.

268.

Aalborg and Buzzi Unicem contend that the reasoning used by the Court of First Instance at paragraphs 1651 and 1652 of the judgment under appeal to prove that the periodic exchanges facilitated the implementation of the Cembureau Agreement is unclear and illogical. To find that those exchanges are anti-competitive in nature because they have the same anti-competitive purpose as the Cembureau Agreement constitutes circular reasoning.

- The error in the Italian version of the judgment under appeal

269.

Buzzi Unicem criticises the Court of First Instance for having incorrectly stated, at paragraphs 1680 to 1682 of the judgment under appeal, its reasons for rejecting the plea that the exchanges of price information were lawful in any event since the market was not oligopolistic. In the Italian version of the judgment under appeal, the Court of First Instance appears to assert that Unicem maintained that the market was oligopolistic. Even if, as the Commission contends, this was merely a clerical error in the Italian version, which does not render the Court of First Instance's conclusion invalid, Buzzi Unicem claims that its rights of defence were affected, since it could not identify that error and was therefore unable to present its plea differently.

- The alleged unequal treatment

270.

Buzzi Unicem criticises the Court of First Instance's reasons for rejecting its plea alleging unequal treatment and infringement of its rights of defence owing to the fact that the objections relating to the exchange of information were not disputed in respect of the Associazione Italiana Tecnico Economica del Cemento (AITEC), which was in a situation comparable to Buzzi Unicem's. It claims that the requirement which the Court of First Instance imposed on it, namely that it demonstrate that the failure to dispute the same objection in respect of AITEC placed it in a less favourable situation, is a kind of *probatio diabolica*. Only if AITEC had also been involved in the procedure would Unicem have been able to adduce firm and conclusive evidence of what might have happened in that hypothesis.

271.

Buzzi Unicem contends that the Court of First Instance also erred in law in failing to take account of the consistent Community case-law which condemns the conduct of trade associations through which exchanges of information are implemented.

- The characterisation of the exchanges as an implementing measure

272.

Aalborg, Buzzi Unicem and Cementir criticise the Court of First Instance for having made an error of law, distorted evidence and made an error of reasoning in stating that the exchanges of price information formed an integral part of an alleged single and continuous agreement lasting several years. They maintain that the necessary temporal

link between those exchanges and the meetings of 14 January 1983 and 19 March and 7 November 1984 at which the Cembureau Agreement was deemed to have been concluded and confirmed was absent and that the exchanges cannot be deemed to be a measure implementing that agreement.

273.

First, Cementir submits that it cannot be inferred from any passage in the introductory statement of the Chairman of the meeting of 14 January 1983 that the data specifically exchanged in that context could facilitate the setting-up or the functioning of a collusive arrangement. The document in question is quite general and does not constitute the slightest basis for the conclusion as to the anti-competitive scope of the data distributed.

274.

Second, Cementir maintains that the two documents on which the Commission relies in respect of the meeting of 19 March 1984 cannot be used against it, since it was not present at that meeting. The Court of First Instance accepted that Cementir could not be held liable for the exchanges which took place on that occasion and, accordingly, the Court of First Instance's hypothesis that the data exchanged made it possible to compare the prices applied on the various national markets is unfounded.

275.

Third, as regards the periodic exchanges, Cementir criticises the Court of First Instance for having distorted evidence and for having vitiated its reasoning as regards the legal assessment of those exchanges, for the following reasons:

- the Court of First Instance made a logical error when it concluded that the references to national prices in the introductory statement of the Chairman of the meeting of 14 January 1983 should be compared with the exchange of data which took place at that meeting. That is not sufficient reason to regard as unlawful a system of data exchange which was set up well before that meeting.

- contrary to the Court of First Instance's assertion at paragraphs 1645 and 1646 of the judgment under appeal, the document relating to average national prices which, according to the Court of First Instance, illustrated the exchange of price information between the members of Cembureau was distributed at the meeting of 30 Mary 1983, in which Cementir did not participate, nor at the meeting of 14 January 1983. That document is therefore of no relevance for the purpose of establishing an infringement by Cementir.

276.

More specifically, Buzzi Unicem claims that paragraph 1698 of the judgment under appeal reveals circular reasoning in that it regards Unicem's participation in the exchange of information as proof of its involvement in the Cembureau Agreement and its participation in that agreement as proof of its participation in the information exchange.

277.

According to Buzzi Unicem, the Court of First Instance's inferences of the existence of a link between respect for the Cembureau Agreement and Unicem's participation in the periodic exchanges do not, in accordance with the Community case-law, constitute the only plausible explanation for that conduct, but represent mere supposition and hypotheses which most certainly have no more probative value than do the perfectly plausible reasons put forward by Unicem.

- The duration of the exchanges

278.

Aalborg maintains that the lawful nature of the exchanges of price information did not change after the conclusion of the Cembureau Agreement and submits that there is nothing in either the Community case-law or the exchanges themselves to justify extending the duration of the Cembureau Agreement until 31 December 1988. Accordingly, the facts in respect of which the Cement Decision imposed a fine are time-barred in Aalborg's case and the fine imposed on it must therefore be annulled or reduced.

Findings of the Court

279.

As regards the exchanges of price information, Aalborg, Buzzi Unicem and Cementir are essentially reproducing the same arguments as they had already raised in vain before the Court of First Instance. Examination by the Community judicature of the complex economic assessments made by the Commission must necessarily be confined to verifying whether the rules on procedure and on the statement of reasons have been complied with, whether the facts have been accurately stated and whether there has been any manifest error of appraisal or misuse of powers (see, inter alia, Case 42/84 *Remia and Others* v *Commission* [1985] ECR 2545, paragraph 34, and *BAT and Reynolds* v *Commission*, paragraph 62).

280.

As regards the periodic exchanges, at paragraphs 1628 to 1630 of the judgment under appeal, the Court of First Instance explicitly rejected as unfounded the arguments alleging the lawful nature of the price information exchanged, on the ground that the information was not as neutral as the undertakings concerned claimed.

281.

As the Court of First Instance stated at paragraphs 1510, 1511 and 1634 of the judgment under appeal, even though the information thus exchanged was in the public domain or related to historical and purely statistical prices, its exchange infringes Article 85(1) of the Treaty where it underpins another anti-competitive arrangement. That interpretation is based on the consideration that the circulation of price information limited to the members of an anti-competitive cartel has the effect of increasing transparency on a market where competition is already much reduced and of facilitating control of compliance with the cartel by its members.

282.

In the present case, it is irrelevant that the information on prices in question was provided two weeks before the meeting of 14 January 1983, since it served as the basis for discussion during that meeting. Aalborg's argument that the circulation of such information by a trade association such as Cembureau is lawful cannot be accepted either.

283.

Furthermore, at paragraphs 1648 to 1653 of the judgment under appeal, the Court of First Instance examined and rejected as irrelevant the fact that the Danish prices had been subject to supervision by the Danish competition authorities until 1989. When the Court of First Instance refused to examine whether the intrinsic characteristics of the information exchanged could or could not have rendered the exchanges unlawful, and concluded that both the specific and the periodic exchanges were intended to facilitate the implementation of the Cembureau Agreement and were therefore anti-competitive in nature, it did not err in law. The legal characterisation which the Court of First Instance ascribed to those exchanges is not open to challenge.

284.

As regards the missing negative before the word corresponding to oligopolistic at paragraph 1680 of the Italian version of the judgment under appeal, this is merely a clerical error which does not appear in the other language versions. As such, it is of no relevance, since in the light of the context and the other paragraphs of the judgment under appeal paragraph 1680 cannot be interpreted literally. Since paragraph 1681 of the judgment under appeal dispels any ambiguity on that point, the error is not such as to render the judgment under appeal marred by defective reasoning. As it was not capable of misleading Buzzi Unicem, the error did not in any event affect its rights of defence.

285.

The argument relating to the alleged unequal treatment of Unicem and AITEC was rejected by the Court of First Instance at paragraphs 1701 to 1703 of the judgment under appeal. Relying on Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 *Ahlström Osakeyhtiö and Others* v *Commission* [1993] ECR I-1307, paragraph 146, the Court of First Instance stated that the fact that AITEC was not charged with the infringement in question could not absolve Unicem from its liability. There was no breach of the rights of the defence, since Unicem was not prevented from obtaining access to documents which might have supported its defence during the course of the administrative procedure.

286.

As regards the implementation of the Cembureau Agreement by the exchanges of price information, the Court of First Instance ascertained that the Commission had adduced evidence apt to demonstrate to the requisite legal standard, first, that the various anti-competitive practices had, owing to their identical objective, contributed to the carrying-out of the infringement in its entirety and, second, that the undertakings involved had the necessary subjective intention.

287.

After carefully examining the evidence before it, the Court of First Instance found no error in the Commission's conclusion. It confirmed, first, that the purpose of the specific exchanges of price information at the meetings of 14 January 1983 and 19 March 1984 was to reinforce the general agreement on non-transhipment to home markets concluded and then confirmed at those meetings (see paragraph 1518 of the judgment under appeal) and, second, that one of the objectives assigned to the periodic exchanges of information had been to ensure the implementation of the agreement (see paragraph 1644 of the judgment under appeal).

288.

The Court of First Instance found that these exchanges were therefore intended to curb intra-Community imports of cement, or, in short, to facilitate the implementation of the Cembureau Agreement.

289.

In the present case, Cementir's arguments concerning the probative force of the draft introductory statement of the Chairman of the meeting of 14 January 1983 are irrelevant. Reference should be made to the finding of the Court of First Instance at paragraph 1521 of the judgment under appeal, in response to a similar argument put forward by Irish Cement, that one passage in the draft statement shows that the purpose of the meeting was to assess the risks entailed by an increase in certain imports coupled with a sharp reduction in certain prices. The Court of First Instance held that, [r]ead in their context ..., [the relevant passages] clearly signify that the purpose of the exchanges of information on prices in Cembureau member countries during that meeting was to point up the differences between various national price

levels, some of which had been sharply reduced, in order to identify possible solutions capable of modifying market developments before the phenomenon of an increase in imports and a sharp reduction in certain prices had time to spread in extent and gravity. The Court of First Instance therefore found no error in the Commission's conclusion that the exchange of information in question was intended to assist the implementation of the Cembureau Agreement concluded at that meeting. Those findings of fact cannot be overturned in an appeal.

290.

As regards the criticisms formulated by Cementir and Aalborg concerning the lack of a temporal link between the periodic exchanges and the meetings of 14 January 1983 and 19 March 1984, it is necessary, in that regard, only to determine whether the exchanges form part of an overall plan because they have the same objective, without taking their particular chronology into consideration. The Court of First Instance rightly held at paragraph 1644 of the judgment under appeal that the fact that the system of periodic exchanges had been in place well before the adoption of the Cembureau Agreement did not preclude the Commission from finding that, as from the conclusion of the Cembureau Agreement, that system had taken over and subsequently extended the anti-competitive object pursued by the discussions during the meetings of 14 January 1983 and 19 March 1984 and also by the specific exchanges of price information at those two meetings.

291.

As regards the evidence of subjective intent on the part of each of the undertakings involved, it was for the Court of First Instance to ascertain that the Commission had established that the undertaking concerned intended to contribute by its own conduct to the common objectives pursued by all the participants and that it was aware of the actual conduct planned or put into effect by other undertakings in pursuit of the same objectives or that it could reasonably have foreseen it and that it was prepared to take the risk (see *Commission v Anic*, paragraph 87).

292.

The fact that an undertaking has not taken part in all aspects of an anti-competitive scheme or that it played only a minor role in the aspects in which it did participate is of no relevance for the purpose of establishing the existence of the infringement. Such a factor must be taken into consideration only when the gravity of the infringement is assessed and if and when it comes to determining the fine (see, to that effect, *Commission v Anic*, paragraph 90).

293.

As Cementir expressly recognised that it had attended the meeting of 14 January 1983 at which price information was exchanged (see paragraph 1566 of the judgment under appeal), it is irrelevant, for the purpose of proving the existence of a global infringement, that it was not present at the meeting of 19 March 1984. The Court of First Instance therefore did not err when it held that the Commission was right to rely on the notes of the meeting and the document relating to national average prices associated with that meeting in order to establish the existence of the infringement and Cementir's participation therein.

294.

As regards Buzzi Unicem's allegations of illogical reasoning and distortion of the evidence of Unicem's participation in the periodic exchanges, it is common ground that as Unicem did not attend the meetings of 14 January 1983 and 19 March 1984, the Cement Decision contains no evidence capable of showing that Unicem had adhered to the Cembureau Agreement before 9 September 1986 by means of its participation in

the periodic exchanges (see paragraph 4246 of the judgment under appeal). However, the Court of First Instance found at paragraph 1698 of the judgment under appeal that, from 9 September 1986 (the date on which the ETF was set up), Unicem had participated in the periodic exchanges, motivated by a desire to see the Cembureau Agreement applied. Nowhere in the judgment under appeal did the Court of First Instance state that Unicem's participation in those exchanges testified to its adherence to the Cembureau Agreement. It was its adherence from the date of the setting-up of the ETF, 9 September 1986, that explained its participation in the exchanges of price information. The Court of First Instance's reasoning is therefore not illogical.

295.

As regards the duration of the periodic exchanges as a measure taken to implement the Cembureau Agreement, the Court of First Instance held at paragraph 1641 of the judgment under appeal that it was not disputed that those exchanges had continued after the Head Delegates meetings in 1983 and 1984, at least until the end of 1988.

296.

Since those exchanges underpinned the Cembureau Agreement, it is perfectly logical, in the absence of proof to the contrary, to consider that the agreement ended with the last of those exchanges. It follows that the Court of First Instance's findings or its reasoning in respect of the duration of the Cembureau Agreement cannot be called in question. By arguing generally that if the Court of First Instance had accepted Aalborg's arguments it would necessarily have reached a different conclusion, Aalborg is in reality merely challenging in general the findings of fact made by the Court of First Instance without putting forward any serious argument to support its allegation that that Court distorted the evidence or made an error of law. The arguments relating to the duration of the periodic exchanges are therefore inadmissible.

297.

The pleas alleging errors of law, flawed reasoning and a breach of the rights of the defence in respect of the exchanges of price information must therefore be rejected as inadmissible and/or unfounded.

4. Pleas alleging errors of law, flawed reasoning, distortion of evidence and breach of the rights of the defence as regards the activities within the framework of the ETF and the agreements and practices intended to protect the Italian market

Arguments of the parties

- Participation in the setting-up of the ETF

298.

Aalborg criticises the Court of First Instance for having wrongly held it liable for the setting-up of the ETF (the infringement referred to in Article 4(1) of the Cement Decision). The Court of First Instance relied solely on the passive presence of Mr Larsen during the very brief presentation of the ETF at the end of the meeting of 9 September 1986.

299.

Aalborg maintains that the Court of First Instance relied solely on the fact that it did not expressly distance itself during that presentation of the ETF. It claims that it was present at the meeting purely for lawful reasons, namely lobbying. Aalborg maintains that liability in that regard cannot be based on information provided in the margin at a meeting of which it had no knowledge and on which, *a fortiori*, it could have no influence.

300.

The Court of First Instance therefore erred in law by extending Aalborg's liability for not distancing itself far beyond what is permissible according to the criteria of a continuous agreement established in the Community case-law. The setting-up of the ETF and its continuation until May 1987, and also the activities of the principal actors of the ETF, cannot in Aalborg's submission be regarded as actions forming part of a global plan, to whose adoption it consented and which contained the constituent elements of a cartel.

301.

That is *a fortiori* so, as the Court of First Instance accepted that Aalborg had not taken part in any other meeting, had not been informed of subsequent initiatives and had not participated in the stick and carrot measures or in any other actions carried out by the ETF. It cannot therefore be held liable on the basis of its purely passive presence during the account of the ETF presented on 9 September 1986 or be established beyond that date.

- The characterisation of the setting-up of the ETF as a single agreement relating to the ETF and as a measure taken to implement the Cembureau Agreement

302.

Aalborg maintains that the temporal links between, on the one hand, the meeting of 9 September 1986 and, on the other, the meetings of 14 January 1983 and 19 March and 7 November 1984, at which, according to the Commission and the Court of First Instance, the Cembureau Agreement was concluded and confirmed, is not sufficient for the setting-up of the ETF to be regarded as a measure taken to implement that agreement so far as Aalborg is concerned.

303.

Buzzi Unicem contends that the Court of First Instance was wrong to base its assessment on the constituent elements of the ETF and on Mr Albert's proposition in order to conclude that Unicem was necessarily aware of the fact that the Cembureau Agreement and the concerted practices in which it had participated formed part of an overall strategy designed to eliminate imports.

- Duration of the infringement relating to the setting-up of the ETF

304.

Aalborg disputes the fact that its liability for the setting-up of the ETF was held to extend until 31 May 1987 on the ground that the active participants held meetings until that date. It submits that the Court of First Instance none the less accepted that Aalborg had not taken part in any meeting other than that held on 9 September 1986, had not been informed of subsequent initiatives and had not participated in the stick and carrot measures or in other actions carried out by the ETF. Its liability cannot therefore be established beyond the date of that meeting, which it attended in a strictly passive capacity.

- Participation in the infringement relating to the setting-up of the ETF

305.

Aalborg criticises the Court of First Instance for having wrongly held it liable, owing to its participation in the ETF, for the concerted practice designed to withdraw Calcestruzzi as a customer from the Greek cement producers, in particular Titan, in particular in so far as that infringement is imputed to it after 9 September 1986.

306.

In that regard, Aalborg submits the same arguments as those already relied on in order to dispute the infringement consisting in the setting-up of the ETF, namely that the

Court of First Instance relied solely on the passive presence of an Aalborg representative at the meeting of 9 September 1986 and on the fact that Aalborg did not expressly distance itself during the brief communication made on that occasion about the meetings between the Italian cement producers and Ferruzzi.

307.

That practice, it submits, was applied on the Italian market, which is a long way from Aalborg's natural local market having regard to the transport costs of cement and, it would appear, was applied essentially by Italian undertakings. Neither the Cement Decision nor the judgment under appeal contains the slightest explanation, still less a convincing explanation, of any knowledge, interest or influence which Aalborg might have had of or in that concerted practice.

308.

Cementir contends that none of the evidence on which the Court of First Instance relied in order to confirm the existence of a concerted practice at European level designed to ensure that Calcestruzzi would no longer be a customer of the Greek producers supports the argument that Cementir participated in that concerted practice:

- the minutes of the meeting of 9 September 1986 are of no relevance to Cementir, since it did not participate in that meeting;

- Titan's letter of 2 September 1988 to its lawyers in London (document 33.126/19196) does not in any way show that Cementir's conduct towards Calcestruzzi was linked with a concerted practice with other European producers within the framework of the ETF, a body to which Cementir did not belong, as the Court of First Instance acknowledged;

- neither the meeting of 11 February 1987 nor the meeting of 17 March 1987 concerned Cementir, since it did not participate in any meetings of the ETF;

- the two telexes sent to Titan confirming the suspension of deliveries of cement agreed between Titan and Calcestruzzi does not show that Cementir or any other companies concluded a trade agreement with Calcestruzzi in the context of the implementation of a definitive anti-competitive plan at European level.

309.

The findings of the Court of First Instance on that point are therefore not adequately reasoned. The Court of First Instance relied on a mere presumption which is not supported by either direct evidence or indirect evidence. Such a presumption also places on Cementir the burden of a *probatio diabolica*, consisting in proving the absence of a link, contrary to the principles governing the taking of evidence for the purpose of ensuring the presumption of innocence.

310.

Nor has Cementir ever disputed that fact that Calcestruzzi had been a customer since 1979 and that, owing to the large quantities supplied to that customer, it regarded it as a customer not to be lost. On that basis, Cementir's conduct should have been characterised, from the aspect of competition law, as wholly autonomous and competitive conduct and certainly not as collusive conduct extending over several years and deserving of such a heavy penalty.

- The characterisation of the agreements with Calcestruzzi as a single agreement relating to the ETF and as measures taken to implement the Cembureau Agreement

311.

Cementir claims that the Court of First Instance made a manifest error of characterisation in establishing a link between its adherence to the agreements with Calcestruzzi and any anti-competitive agreements which may have been concluded by other producers within the framework of the ETF. First, the judgment under appeal finds no direct evidence of such a link. Second, the Court of First Instance failed to ascertain whether or not there was indirect evidence of that link. In Cementir's submission, there was no such evidence, since Cementir participated in the agreements with Calcestruzzi solely for trade purposes unconnected with the initiatives of the ETF. It thus participated in the Luxembourg meeting with the sole aim of ensuring that its own agreement would continue to apply and not - as the judgment under appeal wrongly asserts - for the purposes of the agreement between Calcestruzzi and Titan. The Court of First Instance's analysis at paragraph 3359 of the judgment under appeal distorted its argument.

- The alleged error in the legal analysis of the unlawful nature of the agreements with Calcestruzzi

312.

In Italcementi's submission, the Court of First Instance erred in regarding as relevant and deserving of a sanction the implementation of the supply contracts between the Italian cement manufacturers and Calcestruzzi, because, first, those contracts were not open to challenge and, second, the purpose of protecting the Italian market was not attained by the breaking of the contract between Titan and Calcestruzzi.

313.

Italcementi is unable to see why the Court of First Instance concludes its analysis of the agreements with Calcestruzzi by finding that it, Unicem and Cementir infringed Article 85(1) of the Treaty between 3 April 1987 and 3 April 1992, since that means that the unlawful act also consisted in implementing the contracts with Calcestruzzi. In Italcementi's submission, that amounts to a profound contradiction and also to an error in legal analysis.

314.

Italcementi maintains that it is clear that since the horizontal agreement concluded between the three Italian cement manufacturers and the pressure brought to bear on Calcestruzzi had the consequence of interrupting deliveries between Calcestruzzi and Titan, they had also exhausted their anti-competitive effects attributable to the Cembureau Agreement. However, the Court of First Instance seems to have considered, without stating any reason for doing so, that the contracts concluded with Calcestruzzi also constituted an expression of that agreement.

315.

Italcementi claims to have shown, without being proved wrong by the Court of First Instance on that point, that imports of Greek cement into Italy had increased exponentially from 1986. Calcestruzzi represented only 5% of Italian demand for cement and the Greek cement could therefore easily have been supplied to other purchasers. Italcementi contends that Calcestruzzi could have obtained supplies elsewhere for a significant amount (20%) of its needs. Consequently, the agreement was not intended to stem the flow of Greek imports into Italy but was meant to ensure that such imports took place within the framework of a fixed-term contract between Calcestruzzi and Titan. The conclusion of the contracts with Calcestruzzi therefore marks the end, and not the beginning, of the unlawful act referred to in Article 4(3)(b) of the Cement Decision.

- The plea relating to the principle *ne bis in idem*

316.

Both Buzzi Unicem and Italcementi maintain that the imposition of a sanction in respect of their agreements with Calcestruzzi and the agreements between the three Italian cement producers is incompatible with the decision to drop the national objections and irreconcilable with the decision of the Italian competition authority. To reiterate the objections based on those agreements in Article 4(3) of the Cement Decision entailed in their regard a double imputation of liability, at Community level and at national level, for the same conduct, contrary to the principle *ne bis in idem*.

317.

Buzzi Unicem maintains that the decision to drop the national objections constituted a clear indication that any national agreements between the Italian cement manufacturers were not connected with the ETF or the Cembureau Agreement. However, the Commission regarded those agreements as proof of the cement producers' involvement in the Cembureau Agreement for the purpose of preventing any imports of Greek cement by Calcestruzzi.

318.

Buzzi Unicem contends that the reasons stated by the Court of First Instance at paragraph 3386 of the judgment under appeal for the double examination of the national conduct lacks conviction and appears to be complicated and fallacious. The Court of First Instance wrongly relied on a differentiation of the objects of the two procedures, national and Community, stating, first, that the examination by the Italian competition authority was designed to ascertain the lawfulness of the contracts concluded between Calcestruzzi and the Italian producers and, second, that the analysis made by the Commission and by the Court of First Instance concerned the agreement concluded between those producers which gave rise to those contracts and which had the objective of preventing Calcestruzzi from importing cement from Greece. In reality, however, it follows, in particular, from paragraphs 3356 and 3396 of the judgment under appeal that that analysis also concerned those contracts.

319.

Italcementi puts forward similar arguments. It maintains that, from the point of view of their content, the contracts concluded with Calcestruzzi governed exclusively national sales relationships, the anti-competitive elements of which had already been sanctioned by a decision of the Italian competition authority in March 1996. Their implementation therefore had no connection with the ETF or with the Cembureau Agreement.

- The alleged distortion of the evidence

320.

Buzzi Unicem criticises the Court of First Instance for having distorted the meaning of the minutes of the meetings of 17 June and 4 September 1987 and of having stated inadequate and contradictory reasons, at paragraph 2683 of the judgment under appeal, for its finding that Unicem had participated in the concerted practices. It maintains that the direct documentary evidence is not the irrebuttable evidence that the Court of First Instance considers it to be.

- The duration of the infringement referred to in Article 4(3)(b) of the Cement Decision

321.

Italcementi and Buzzi Unicem dispute the Court of First Instance's assessment of the duration of the infringement constituted by the Cembureau Agreement. The judgment under appeal alters the duration of that infringement and has the consequence that,

from 19 May 1989 to 3 April 1992, only the Italian cement manufacturers adhered to the Cembureau Agreement.

Findings of the Court

322.

Aalborg's arguments concerning its participation in the ETF reiterate in part its version of the events which took place at the meeting of 9 September 1986. Those arguments, which seek to demonstrate the lawful nature of the objects of that meeting, have already been rejected at paragraphs 2600, 2656 and 2891 of the judgment under appeal. Aalborg cannot challenge those findings of fact made by the Court of First Instance.

323.

It is an undisputed fact that Mr Larsen, from Aalborg, was present at the meeting of 9 September 1986, where both the objective of the ETF and the stick and carrot measures against incursions of low-priced cement into the European markets were initially described. As Aalborg had not proved that it had distanced itself from the discussions of the ETF, the Court of First Instance was entitled to confirm the Commission's conclusion that, by its unreserved presence at the meeting of 9 September 1986 at which the objective of the ETF had been put forward, Aalborg had participated in the concurrence of wills that led to the setting-up of the ETF. The Court of First Instance did not err when it rejected as irrelevant Aalborg's passive role at that meeting and also its failure to participate in the subsequent meetings and in the implementation of the initiatives referred to (paragraph 2891 of the judgment under appeal).

324.

As regards Buzzi Unicem's arguments relating to the setting-up of the ETF, the pleas alleging errors as regards Unicem's participation in the ETF have already been rejected by this Court as manifestly unfounded (see the order in *Buzzi Unicem* v *Commission*, cited above, paragraphs 133 to 165).

325.

As regards the characterisation of the setting-up of the ETF as a single agreement, the Court of First Instance held at paragraphs 2537, 2538 and 3701 of the judgment under appeal that the ETF was set up for the purpose of examining stick and carrot measures capable of eliminating imports into Western Europe, in particular those from Greece. The ETF was therefore driven by the same anti-competitive economic aim as the other agreements and concerted practices referred to in Article 4 of the Cement Decision. The Court of First Instance considered that that identity of purpose was confirmed by the fact that those various unlawful measures had been adopted, or at leased discussed, during the series of meetings of, or relating to, the ETF between 28 May 1986 and the end of May 1987 (see paragraph 3705 of the judgment under appeal).

326.

As regards the implementation of the Cembureau Agreement by the ETF, the Court of First Instance held at paragraphs 2560 and 3701 of the judgment under appeal that the ETF had a wider mission than that of preventing cheap imports from Greece, namely that of preventing any imports of cheap cement likely to destabilise European markets.

327.

As regards the duration of the infringements, it follows from paragraph 2795 of the judgment under appeal that the fate of the ETF was last discussed at the Luxembourg meeting at the end of May 1987. At paragraph 3309 of the judgment under appeal, the Court of First Instance clearly stated the reasons why 15 March 1987 was taken as the date of the end of the infringement relating to the defensive measures. That date

referred to the meeting of 17 March 1987 at which a report was given for the last time of the negotiations between the Italian cement producers and the Ferruzzi group.

328.

It is true that the Commission did not demonstrate that Aalborg had attended those meetings. However, according to the case-law of the Court of Justice, the fact that an undertaking has not taken part in all aspects of an anti-competitive scheme or that it played only a minor role in the aspects in which it did participate is of no relevance to the establishment of the existence of an infringement (see, to that effect, *Commission* v *Anic*, paragraph 90). Where it is established that an undertaking was aware of the offending conduct of the other participants or that it could reasonably have foreseen it and that it was prepared to take the risk, it is also regarded as responsible, throughout the entire period of its participation in that infringement, for conduct put into effect by other undertakings in the context of the same infringement (see *Commission* v *Anic*, paragraph 83). Aalborg has adduced no firm evidence capable of establishing that it withdrew its support from the ETF or from the defensive measures before they were last discussed.

329.

As regards Aalborg's responsibility for the measures for the protection of the Italian market, the Court of First Instance explained in detail at paragraphs 3200 to 3202 of the judgment under appeal that Aalborg had attended the meeting of 9 September 1986 at which the situation of imports of Greek cement by Ferruzzi had been examined and it had been mentioned that talks between the Italian cement producers and Ferruzzi might produce results. As may be seen from paragraph 3196 of the judgment under appeal, Aalborg has never disputed those facts.

330.

Nor, as may be seen from paragraph 3203 of the judgment under appeal, has Aalborg shown that at that meeting it had openly showed its disapproval of those unlawful practices or that it informed the other participants that it intended to take part in the meeting with different objects in mind.

331.

The Court of First Instance did not make an error in concluding, at the same paragraph, that the Commission had therefore been entitled to consider that Aalborg, among others, had acceded to those practices or at least that it had given that impression to the other participants in a spirit of solidarity when confronted with the decision of the Greek cement industry to export its surplus production to the markets of Western Europe, a decision perceived as a serious threat to the stability of all those markets.

332.

As regards the arguments whereby Cementir challenges the findings of the Court of First Instance in relation to certain evidence, it is common ground that, as the Court of First Instance observed at paragraph 2768 of the judgment under appeal, Cementir did not take part in any of the meetings of the ETF. However, the Court of First Instance accepted that the Cement Decision contained a number of indications showing that Cementir intended to contribute by its own conduct to the common objectives pursued by all the participants in the ETF (paragraphs 3153 to 3155 and 3284 to 3287 of the judgment under appeal).

333.

Cementir's arguments contain no firm indication that the Court of First Instance distorted that evidence. The fact that Cementir did not attend the meetings of the ETF is of minor significance when it is clear from the documents relating to those meetings

that it contributed by its own conduct to the common objectives pursued by all the participants. In that regard, according to the assessment made by the Court of First Instance at paragraph 3288 of the judgment under appeal, the bundle of documents showed that Cementir was one of the Italian cement producers which had intervened with the Ferruzzi group in order to induce Calcestruzzi to suspend performance of the supply contract that it had concluded with Titan.

334.

Furthermore, it follows from the findings of fact made by the Court of First Instance at paragraph 3155 of the judgment under appeal that the Italian cement producers, represented by Italcementi, asked their European colleagues to apprise their EEC representatives so that they [would] not oppose the request for application of the Italian law providing for the introduction of prior notification of all cement imports. Thus, those cement producers, including Cementir, were aware of the actual conduct contemplated or implemented by other undertakings in pursuit of anti-competitive objectives.

335.

Furthermore, the fact that commercial reasons led Cementir to participate in the anti-competitive agreement is irrelevant when the agreement had the effect of restricting competition. Since its participation in the agreement is demonstrated, there is no need to examine whether it had any interest in participating in it.

336.

As regards the characterisation of the agreements with Calcestruzzi, since Cementir lent its support to the actions and agreements relating to Calcestruzzi when faced with imports from Greece, the Court of First Instance's conclusion that Cementir was aware that it was participating in a general agreement on market-sharing cannot be regarded as arbitrary or incorrect.

337.

The Court of First Instance did not err when it concluded at paragraph 3289 of the judgment under appeal that the Commission was entitled to find in Article 4(3)(a) of the Cement Decision that Cementir had participated in the concerted practices designed to induce Calcestruzzi to cease to be a customer of the Greek producers, and of Titan in particular.

338.

As regards observance of the principle *ne bis in idem*, the application of that principle is subject to the threefold condition of identity of the facts, unity of offender and unity of the legal interest protected. Under that principle, therefore, the same person cannot be sanctioned more than once for a single unlawful course of conduct designed to protect the same legal asset.

339.

The Court of First Instance merely pointed out the difference in object between, on the one hand, the supply contracts and the cooperation agreements signed between Calcestruzzi and the three Italian cement producers and, on the other hand, the part of the agreement between those cement producers which sought to prevent imports of cement from Greece by Calcestruzzi. Participation in the Cembureau Agreement on non-transhipment to home markets constitutes the infringement sanctioned by the Cement Decision and the Court of First Instance considered that the Cement Decision had a different object from that pursued by the decision of the Italian competition authority in respect of the supply contracts and the cooperation agreements between Calcestruzzi and the Italian cement producers.

340.

As there was no identity in the facts, there was no breach of the principle *ne bis in idem*.

341.

As regards Buzzi Unicem's argument that the Court of First Instance distorted the meaning to be ascribed to the minutes of the meetings of 17 June and 4 September 1987, the Court of First Instance neither distorted the evidence nor stated contradictory reasons. Buzzi Unicem merely expressed its disagreement with the Court of First Instance's assessment of the relevant documents and reiterated its version of the facts, which has already been rejected by the Court of First Instance.

342.

As regards the duration of the infringement, it was fixed on the basis of the duration of the supply contracts and cooperation agreements between the Italian cement producers and Calcestruzzi. The fact that those cement producers complied with the Cembureau Agreement until 3 April 1992, whereas the other cement producers had ceased to apply it, means that they kept the agreement in force longer than those producers did. As regards the concerted practice aimed at withdrawing Calcestruzzi as a customer from the Greek producers, and from Titan in particular, it lasted until the final meeting held in that regard within the ETF (see paragraphs 3301 to 3310 of the judgment under appeal).

343.

The pleas alleging errors of law, flawed reasoning, distortion of evidence and a breach of the rights of the defence as regards the activities within the framework of the ETF and also the agreements and practices designed to protect the Italian market must therefore be rejected as inadmissible and/or unfounded.

C - *The attribution of responsibility*

344.

It transpires from the judgment under appeal that Aalborg was formed on 26 June 1990 and that it acquired, with retroactive effect to 1 January 1990, the cement plant of Aktieselskabet Aalborg Portland-Cement Fabrik. The latter company became a holding company, with it and Blue Circle each owning 50% of the shares in Aalborg.

Arguments of the parties

345.

Aalborg claims that the Court of First Instance was wrong, in the judgment under appeal, to approve the Commission's decision to hold it accountable for the infringements committed by Aktieselskabet Aalborg Portland-Cement Fabrik.

346.

Aalborg concludes that at paragraph 1336 of the judgment under appeal the Court of First Instance appears to hold Aalborg accountable on the basis that the facts referred to at paragraph 344 of this judgment constituted a reorganisation within one and the same legal entity. It maintains that it had stated during the hearings before the Court of First Instance that it was incorrect that its formation was part of a reorganisation of the group to which it belongs. In fact, a different legal entity, Blue Circle, acquired economic ownership of half of the activities formerly carried out by Aktieselskabet Aalborg Portland-Cement Fabrik.

347.

Aalborg claims that the case-law of the Court of Justice on the transfer of responsibility (*Suiker Unie and Others* v *Commission, CRAM and Rheinzink* v *Commission* and *Commission* v *Anic*) applies only to situations in which the undertaking responsible had ceased to exist and a different undertaking had taken over

its entire material and human resources. The Court of Justice stated that the economic continuity test can apply only where the legal person responsible for running the undertaking has ceased to exist in law after the infringement has been committed.

348.

In the present case, the legal person with responsibility for the infringements found in the Cement Decision, Aktieselskabet Aalborg Portland-Cement Fabrik, has not ceased to exist, a fact which, moreover, does not appear to have been disputed by the Commission. Consequently, that responsibility cannot, in Aalborg's submission, be imputed to Aalborg, as it was in the Cement Decision and in the judgment under appeal.

349.

Aalborg further contends that the flawed reasoning as regards the legal person accountable for the infringement requires that the judgment under appeal be set aside. The fact that Aalborg did not specifically mention during the administrative procedure any ambiguity as to the legal person responsible cannot have the consequence that the Commission is not required to designate precisely the person responsible and to state the reasons for its choice.

350.

In that regard, Aalborg states that it had no particular reason to correct the Commission's indication of the addressee of the SO, because the Commission was relying on a different hypothesis, that of a cartel which allegedly still existed.

351.

However, as that hypothesis was amended in the Cement Decision, the question of the identity of the addressee of the decision became of the essence. Aalborg could not be held accountable for the activities of a cartel during the period in the past to which the Cement Decision, unlike the SO, ascribes that infringement. Since Aalborg had not yet been formed when the meetings in question took place, its representatives were indisputably absent from the meetings regarded as fundamental to the cartel whose existence was established in the Cement Decision.

352.

The Commission contends that an economic entity remains the same when all the means of production used in the manufacture of cement are transferred from one undertaking to another, which continues that industrial activity. It claims that a capital injection by a new undertaking does not in any way alter the fact that production remains in the hands of the same economic entity.

353.

In the Commission's submission, the Court of First Instance was not guilty of procedural irregularity when it took into consideration the fact that Aalborg acknowledged at the hearings that it had not disputed in its reply to the SO the possibility that it might be held accountable for the acts of Aktieselskabet Aalborg Portland-Cement Fabrik.

Findings of the Court

354.

In the context of Aalborg's appeal, the Court must examine whether the Court of First Instance erred in considering that the Commission was entitled to proceed against that company and to treat it as accountable for the anti-competitive conduct of Aktieselskabet Aalborg Portland-Cement Fabrik prior to Aalborg's formation.

355.

More specifically, the Court must determine whether the fact that Aktieselskabet Aalborg Portland-Cement Fabrik still exists wholly and necessarily precludes the

Commission from proceeding against Aalborg as being, from an economic and organisational point of view, the author of the infringement.

356.

It is not disputed that the economic activities of Aktieselskabet Aalborg Portland-Cement Fabrik in the cement sector were transferred to Aalborg in 1990.

357.

When the Court of First Instance concluded, at paragraph 1335 of the judgment under appeal, that Aalborg and Aktieselskabet Aalborg Portland-Cement Fabrik constituted the same economic entity for the purposes of applying Article 85(1) of the Treaty, that finding must be taken to mean that the undertaking run by Aalborg from 1990 is the same as that previously run by Aktieselskabet Aalborg Portland-Cement Fabrik (see, in that regard, paragraph 59 of this judgment).

358.

The fact that Aktieselskabet Aalborg Portland-Cement Fabrik still exists as a legal entity does not invalidate that finding and did not therefore in itself constitute a ground for annulling the Cement Decision in respect of Aalborg.

359.

In that regard, it is true that in *Commission* v *Anic* (paragraph 145) the Court held that there can be economic continuity only where the legal person responsible for running the undertaking has ceased to exist in law after the infringement has been committed. However, that case concerned two existing and functioning undertakings one of which had simply transferred part of its activities to the other and where there was no structural link between them. As is apparent from paragraph 344 of this judgment, that is not the position in this case.

360.

As regards the allegedly flawed reasoning, the Court of First Instance was justified in considering at paragraph 1336 of the judgment under appeal that since Aalborg had not submitted before the Commission that it could not be held accountable for the activities of Aktieselskabet Aalborg Portland-Cement Fabrik, the Commission was not required to explain further in the Cement Decision why it held Aalborg accountable for those activities.

361.

This plea must therefore be rejected as unfounded.

D - *The fines*

1. The determination of the fines in the Cement Decision

362.

The Cement Decision distinguished two categories or groups of undertakings and associations: first, those that participated in the Cembureau Agreement and, second, those whose involvement was less decisive and of less gravity. The conduct described in Articles 2 to 4 of the Cement Decision was regarded by the Commission as more serious than that described in Articles 5 and 6 of that decision, which had less direct effects on the partitioning of home markets.

363.

The undertakings and associations in the first category, which all endeavoured to ensure non-transhipment to home markets with the same intensity and all brought direct influence to bear on the partitioning of those markets, were fined an amount corresponding to 4% of the turnover of each of them on the grey cement market in 1992. The amount of the fine imposed on those in the second category was 2.8% of their corresponding turnover.

364.

Assessing the proportionality of fines with regard to the gravity and duration of an infringement falls within the unlimited jurisdiction conferred on the Court of First Instance by Article 17 of Regulation No 17. In exercising its power of review, the Court of First Instance allowed in part the applications of the applicants at first instance. For the purpose of setting the amounts of the fines, the Commission had considered that the undertakings had participated in the agreement for 122 months whereas it had emerged in the proceedings before the Court of First Instance that the actual duration of their participation was shorter. The Court of First Instance therefore reduced the amounts of the fines in proportion.

365.

In the present appeals, the Court's analysis is limited to the question whether, by approving the criteria used by the Commission in setting the fines and by reviewing their application, and indeed by correcting that application, the Court of First Instance made a manifest error or failed to have regard to the principles of proportionality and equality which govern the imposition of fines.

366.

The pleas raised in the context of these appeals are grouped for the purpose of the present judgment according to the pleas put forward by each applicant.

2. Pleas relating to the criteria for setting the fines and also to the principles of equality and proportionality

Arguments of the parties

367.

All the appellants have submitted pleas seeking annulment of or a reduction in the fines imposed on them by the Cement Decision, and then reduced by the Court of First Instance. They refer, in particular, to the criteria used by the Commission in imposing the fines and also to alleged infringements of the principles of proportionality and equality in the calculation of the fines by the imposition of very high fines without reference to the degree to which each undertaking participated in the infringement. They also criticise the fact that the fines were not further reduced to reflect the finding that a number of the alleged infringements had not occurred and that the duration of others was shorter than claimed, so that undertakings whose involvement was less decisive and of less gravity received the same fine.

368.

Aalborg and Cementir submit more particularly that the principle of equality was infringed in so far as other undertakings classified with them in the subgroup of those whose responsibility was greatest had participated more intensively in the cartel. Buzzi Unicem also contends that the annulment by the Court of First Instance of certain parts of the Cement Decision on the ground that Unicem's contribution to the conduct described therein had not been demonstrated must be accompanied by a reduction in the fine.

369.

The Commission contends that the Court of First Instance's position is the direct consequence of its rejection of the argument that the fines should be proportionate to the measures to implement the Cembureau Agreement adopted by each of the undertakings. The Court of First Instance thus approved the Commission's analysis, at recital 65 of the Cement Decision, that it was necessary to sanction the overall participation in the implementation of that agreement. The decision not to reduce the amount of the fine on the ground that certain parts of Articles 3 and 4 of the Cement

Decision had been annulled is consistent with that analysis, since, as regards the grey cement market, the fine is based on Article 1 of the Cement Decision. In any event, the Court of First Instance, in accordance with Article 15(2) of Regulation No 17, amended the penalty in accordance with the gravity of the conduct of each undertaking and also with its duration and the role played by each of them in the cartel.

Findings of the Court

370.

In so far as the pleas relating to the criteria used in setting the fines and to the gravity of the appellants' participation relate to questions of fact or merely reproduce the arguments already put forward at first instance and which the Court of First Instance answered at paragraphs 4964 to 4969 of the judgment under appeal, they are inadmissible.

371.

As regards the alleged failure to state reasons in the judgment under appeal concerning the criteria used in setting the fines, although it is not precluded that the Court of First Instance did not expressly answer one or other isolated argument in a single integrated text, the judgment under appeal contains adequate reasoning. The Court of First Instance confirmed the Commission's decision to assess the overall responsibility of the undertakings and to sanction the infringement constituted by the Cembureau Agreement rather than the various constituent elements of that infringement. It explained that the number of individual infringements committed by a given undertaking did not constitute an appropriate criterion by which to assess its degree of responsibility in that agreement. It also approved the Commission's assessment that the measures aimed at directly protecting home markets were more serious than the measures to channel production surpluses to non-member countries (paragraphs 4965, 4966 to 4968 and 4975 of the judgment under appeal).

372.

Furthermore, the obligation to state reasons does not require the Court of First Instance to provide an account that follows exhaustively and one by one all the reasoning articulated by the parties to the case. The reasoning may therefore be implicit on condition that it enables the persons concerned to know why the measures in question were taken and provides the competent court with sufficient material for it to exercise its power of review (see, to that effect, Case C-120/99 *Italy* v *Council* [2001] ECR I-7997, paragraph 28).

373.

As regards the criteria for setting the fine and respect for the principles of proportionality and equality, the Court of First Instance approved the criteria adopted by the Commission. It thus declared that the Commission had been right to decide to sanction the participation in the Cembureau Agreement as such, irrespective of the isolated conduct and the number of implementing measures adopted by each undertaking. The Court of First Instance likewise considered that the distinction drawn by the Commission between direct participants (first category) and indirect participants (second category) was well founded and that the Commission was therefore not required to evaluate the specific role played by each of them in the various unlawful acts found. The Court of First Instance also held that the number of individual infringements committed by a given undertaking in the framework of the Cembureau Agreement did not constitute in the particular case an appropriate criterion by which to assess its degree of responsibility.

374.

The criteria used by the Court of First Instance, namely continuous adherence to the Cembureau Agreement by participation or collaboration in one or more of the measures implementing that agreement and the impact of the conduct on competition and on the partitioning of home markets, are consistent with the principles, set out at paragraphs 89 to 92 of the present judgment, that govern the imposition of fines.

375.

The pleas relating to the criteria for setting the fines and also to the principles of equality and proportionality must therefore be rejected as inadmissible and/or unfounded.

3. The part of Cementir's sixth plea concerning the calculation of turnover

Arguments of Cementir

376.

Cementir claims that there is an accounting error in the calculation of the turnover made by the Commission, in that the cost of transporting the cement or the cost of the sacks in which it is delivered was included in the selling price. Since the turnover of the other undertakings to which the Cement Decision was addressed did not include those cost items, Cementir claims to be the victim of unequal treatment.

Findings of the Court

377.

This part of Cementir's sixth plea is inadmissible, since Cementir is merely repeating arguments which it has already set out at first instance and which the Court of First Instance answered at paragraphs 5030 to 5032 of the judgment under appeal. As regards the part of the plea relating to the principle of equal treatment, it is sufficient to observe that Cementir has adduced no evidence on which it might be established that the judgment under appeal constitutes an infringement of that principle in regard to it.

378.

The part of Cementir's sixth plea concerning the calculation of the turnover must therefore be rejected as inadmissible in part and unfounded in part.

4. The second plea of Ciments français, concerning its Belgian subsidiary

Arguments of the parties

379.

In calculating the fines which it imposed on Cements français, the Commission included the turnover of its Spanish, Greek and Belgian subsidiaries. The Court of First Instance maintained in its own calculation the turnover of the Belgian subsidiary, on the ground that Ciments français had not disputed that it controlled that subsidiary at the time when the infringements had been committed. Ciments français contends that the judgment under appeal contains a manifest error of assessment in that regard, since it results from the file at first instance that Ciments français assumed control of the Compagnie des ciments belges SA (CCB) from October 1990. The Court of First Instance's assessment also contains an error of law in that it infringes the principle of non-discrimination, since that assessment induced the Court of First Instance to afford different treatment to undertakings in identical situations: the subsidiaries of Ciments français were punished more severely than the subsidiaries of other companies and its Belgian subsidiary was treated more severely than its Spanish and Greek subsidiaries. Ciments français therefore requests that the judgment under appeal be set aside in part

and that the amount of the fine imposed for the infringement committed on the market in grey cement be reduced from EUR 12.52 million to EUR 9.62 million.

380.

The Commission claims that the plea raises a question of pure fact and is therefore inadmissible. The Court of First Instance stated that a calculation of the amount of the fine on the basis of total group turnover does not mean that it is the subsidiaries that must pay the fine. The plea is unfounded, moreover, because, at first instance, Ciments français relied solely on its own letter of 28 February 1994, in which it did not mention the date on which it had assumed control of its Belgian subsidiary. The documents proving that date were not produced before the stage of the reply and the hearing before the Court of First Instance did not relate to the impact of the date on which control of that subsidiary was assumed for the calculation of the fine, so that any error committed in that regard by the Court of First Instance cannot be characterised as manifest. Nor, it alleges, is the Court of First Instance's position entirely consistent, since if the fine must be calculated according to the overall turnover of the undertaking responsible, it is also necessary to take into account the turnover of the subsidiaries which formed part of the group on the date taken for the purpose of determining that overall turnover. There is no reason to exclude the undertakings which were not part of the group at the time of the infringement.

Findings of the Court

381.

The administrative file, the Cement Decision itself (recital 5, paragraph 7(g), third indent, second subparagraph) and the file at first instance, including a letter of 22 September 1998 in reply to a question put by the Judge-Rapporteur, show that Ciments français had indicated on a number of occasions that it had not assumed control of CCB before October 1990.

382.

The Court of First Instance excluded from the calculation of the fines imposed on Ciments français the turnover of its Spanish and Greek subsidiaries because it had been established that Ciments français did not yet control them at the time when it became guilty of the conduct constituting the infringement. The Court of First Instance accepted, moreover, that in 1990 Ciments français had ceased any unlawful conduct.

383.

It follows from the Cement Decision itself that Ciments français had assumed control of CCB during 1990, or the same year as it had acquired control of its Spanish and Greek subsidiaries. Contrary to the Commission's contention, the Court of First Instance therefore made a manifest error which could be detected upon reading a document such as the Cement Decision, which was clearly at the centre of the discussion from the outset.

384.

The Court must therefore uphold Ciments français's second plea and ascribe to that error of the Court of First Instance the same legal consequence as that applied to its Spanish and Greek subsidiaries by removing CCB's turnover for 1992 from the basis for the calculation of the fines. The judgment under appeal is therefore set aside in so far as it set at EUR 12 519 000 the amount of the fine imposed in respect of the infringements committed by Ciments français on the grey cement market.

385.

Since the Court has before it all the necessary evidence to give final judgment itself in the matter, pursuant to the first paragraph of Article 61 of the Statute of the Court of Justice, the fine imposed on Ciments français by Article 9 of the Cement Decision is

reduced to EUR 9 620 000, calculated on the basis of the figures which Ciments français submitted before the Court of First Instance and then before the Court of Justice and which the Commission has not disputed.

5. Other pleas

386.

Italcementi claims that the Court of First Instance did not distinguish the periods during which its adherence to the Cembureau had been less robust than those during which it had been more involved. Italcementi criticises the Court of First Instance for not having reduced the amount of the fine in spite of having annulled Article 2(1) and (2) of the Cement Decision and of finding that the conduct described in Article 5 of the Cement Decision was not contrary to Article 85(1) of the Treaty.

387.

In that regard, the Court of First Instance made a proportional reduction of the amount of the fine according to the duration of Italcementi's participation in the Cembureau Agreement, so that the annulment of Article 2 in its case was reflected in the amount of the fine (see paragraph 4381 of the Cement Decision). As regards the annulment of Article 5, it does not reduce either the gravity or the duration of Italcementi's conduct and is therefore not capable of being reflected in the amount of the fine. The Court of First Instance did not breach the principle of proportionality when it considered that the number of particular infringements committed by an undertaking does not determine the evaluation of its degree of responsibility in an agreement. As regards the distinction between different periods according to the degree of Italcementi's involvement, that argument relates to the facts and cannot be examined in an appeal. Accordingly, that plea must be rejected as inadmissible in part and unfounded in part.

388.

Furthermore, Irish Cement claims that the Court of First Instance failed to respond to its argument that its conduct can have had no effect on the partitioning of home markets and that its participation in the facts complained of by the Commission was purely marginal.

389.

That plea must be rejected in so far as the Court of First Instance answered that argument by implication at paragraphs 4966 and 4975 of the judgment under appeal and in so far as it relates to the facts without raising any question of law.

**Costs**

390.

Under the first subparagraph of Article 69(2)of the Rules of Procedure, which applies to the appeal procedure by virtue of Article 118 of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. As the Commission has applied for costs and Aalborg, Irish Cement, Italcementi, Buzzi Unicem and Cementir have been unsuccessful, they must be ordered to pay the costs in Cases C-204/00 P, C-205/00 P, C-213/00 P, C-217/00 P and C-219/00 P respectively.

391.

Under the first paragraph of Article 122 of the Rules of Procedure, where the appeal is well founded and the Court of Justice itself gave final judgment in the case, the Court is to make a decision as to costs. Under the first subparagraph of Article 69(3) of the Rules of Procedure, which apply to appeal proceedings by virtue of Article 118 of the Rules of Procedure, where each party succeeds on some and fails on other heads, the Court may order that the parties bear their own costs. Since Ciments français and the

Commission have been unsuccessful in part in Case C-211/00 P, they must be ordered to bear their own costs in that case.

On those grounds,

THE COURT (Fifth Chamber),

hereby:

**1. Sets aside paragraph 12, seventh indent, of the operative part of the judgment of the Court of First Instance of the European Communities of 15 March 2000 in Cases T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95, T-42/95 to T-46/95, T-48/95, T-50/95 to T-66/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95;**

**2. Sets the amount of the fine imposed on Ciments français SA for the infringement found in Article 1 of Commission Decision 94/815/EC of 30 November 1994 relating to a proceeding under Article 85 of the EC Treaty (Cases IV/33.126 and 33.322 - Cement) at EUR 9 620 000;**

**3. Dismisses the appeals for the remainder;**

**4. Orders Aalborg Portland A/S, Irish Cement Ltd, Italcementi-Fabbriche Riunite Cemento SpA, Buzzi Unicem SpA and Cementir-Cementerie del Tirreno SpA to pay the costs in Cases C-204/00 P, C-205/00 P, C-213/00 P, C-217/00 P and C-219/00 P;**

**5. Orders Ciments français SA and the Commission of the European Communities to bear their own costs in Case C-211/00 P.**

Jann
  Edward
La Pergola

Delivered in open court in Luxembourg on 7 January 2004.

R. Grass

V. Skouris

Registrar

President

---

1: Languages of the case: Danish, English, French and Italian.