Exhibit A
to
**SUPPLEMENTAL DECLARATION OF JAMES N. PENROD IN SUPPORT OF RESPONSE TO
MICROSOFT CORPORATION'S OBJECTIONS TO MAGISTRATE'S ORDER**

# Exhibit A

# Part 2 of 3

Exhibit A
to
**SUPPLEMENTAL DECLARATION OF JAMES N. PENROD IN SUPPORT OF RESPONSE TO
MICROSOFT CORPORATION'S OBJECTIONS TO MAGISTRATE'S ORDER**

Dockets.Justia.com

POSITION DOES NOT PRECLUDE SOME COMPETITION , WHICH IT DOES WHERE THERE IS A MONOPOLY OR A QUASIMONOPOLY , BUT ENABLES THE UNDERTAKING WHICH PROFITS BY IT , IF NOT TO DETERMINE , AT LEAST TO HAVE AN APPRECIABLE INFLUENCE ON THE CONDITIONS UNDER WHICH THAT COMPETITION WILL DEVELOP , AND IN ANY CASE TO ACT LARGELY IN DISREGARD OF IT SO LONG AS SUCH CONDUCT DOES NOT OPERATE TO ITS DETRIMENT .

5 . VERY LARGE MARKET SHARES ARE HIGHLY SIGNIFICANT EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION . OTHER RELEVANT FACTORS ARE THE RELATIONSHIP BETWEEN THE MARKET SHARES OF THE UNDERTAKING CONCERNED AND OF ITS COMPETITORS , ESPECIALLY THOSE OF THE NEXT LARGEST , THE TECHNOLOGICAL LEAD OF THE UNDERTAKING OVER ITS COMPETITORS , THE EXISTENCE OF A HIGHLY DEVELOPED SALES NETWORK AND THE ABSENCE OF POTENTIAL COMPETITION .

6 . THE CONCEPT OF ABUSE IS AN OBJECTIVE CONCEPT RELATING TO THE BEHAVIOUR OF AN UNDERTAKING IN A DOMINANT POSITION WHICH IS SUCH AS TO INFLUENCE THE STRUCTURE OF A MARKET WHERE , AS A RESULT OF THE VERY PRESENCE OF THE UNDERTAKING IN QUESTION , THE DEGREE OF COMPETITION IS WEAKENED AND WHICH , THROUGH RECOURSE TO METHODS DIFFERENT FROM THOSE WHICH CONDITION NORMAL COMPETITION IN PRODUCTS OR SERVICES ON THE BASIS OF THE TRANSACTIONS OF COMMERCIAL OPERATORS , HAS THE EFFECT OF HINDERING THE MAINTENANCE OF THE DEGREE OF COMPETITION STILL EXISTING IN THE MARKET OR THE GROWTH OF THAT COMPETITION .

7 . AN UNDERTAKING WHICH IS IN A DOMINANT POSITION ON A MARKET AND TIES PURCHASERS - EVEN IF IT DOES SO AT THEIR REQUEST - BY AN OBLIGATION OR PROMISE ON THEIR PART TO OBTAIN ALL OR MOST OF THEIR REQUIREMENTS EXCLUSIVELY FROM THE SAID UNDERTAKING ABUSES ITS DOMINANT POSITION WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , WHETHER THE OBLIGATION IN QUESTION IS STIPULATED WITHOUT FURTHER QUALIFICATION OR WHETHER IT IS UNDERTAKEN IN CONSIDERATION OF THE GRANT OF A REBATE . THE SAME APPLIES IF THE SAID UNDERTAKING , WITHOUT TYING THE PURCHASERS BY A FORMAL OBLIGATION , APPLIES , EITHER UNDER THE TERMS OF AGREEMENTS CONCLUDED WITH THESE PURCHASERS OR UNILATERALLY , A SYSTEM OF FIDELITY REBATES , THAT IS TO SAY DISCOUNTS CONDITIONAL ON THE CUSTOMER ' S OBTAINING ALL OR MOST OF ITS REQUIREMENTS FROM THE UNDERTAKING IN A DOMINANT POSITION .

OBLIGATIONS OF THIS KIND TO OBTAIN SUPPLIES EXCLUSIVELY FROM A PARTICULAR UNDERTAKING , WHETHER OR NOT THEY ARE IN CONSIDERATION OF REBATES OR OF THE GRANTING OF FIDELITY REBATES INTENDED TO GIVE THE PURCHASER AN INCENTIVE TO OBTAIN HIS SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION , ARE INCOMPATIBLE WITH THE OBJECTIVE OF UNDISTORTED COMPETITION WITHIN THE COMMON MARKET , BECAUSE THEY ARE NOT BASED ON AN ECONOMIC TRANSACTION WHICH JUSTIFIES THIS BURDEN OR BENEFIT BUT ARE DESIGNED TO DEPRIVE THE PURCHASER OF OR RESTRICT HIS POSSIBLE CHOICES OF SOURCES OF SUPPLY AND TO DENY OTHER PRODUCERS ACCESS TO THE MARKET .

THE ABUSE OF A DOMINANT POSITION AND THE RESTRICTION OF COMPETITION AS ATTRIBUTES OF THE CONTRACTS IN QUESTION ARE NOT AVOIDED BY THE SO-CALLED ' ' ENGLISH ' ' CLAUSE CONTAINED IN THEM WHEREBY THE PURCHASERS UNDERTAKE TO NOTIFY THE UNDERTAKING IN A DOMINANT POSITION OF ANY MORE FAVOURABLE OFFER MADE TO THEM BY COMPETITORS AND ARE FREE , IF THAT UNDERTAKING DOES NOT ADJUST ITS PRICES TO THE SAID OFFER , TO OBTAIN THEIR SUPPLIES FROM COMPETITORS . IN THESE CIRCUMSTANCES A CLAUSE OF THIS KIND IS SUCH AS TO ENABLE THE UNDERTAKING IN A DOMINANT POSITION TO REALIZE AN ABUSE OF THAT DOMINANT POSITION .

*8 . THE EFFECT OF FIDELITY REBATES IS TO APPLY DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS WITH OTHER TRADING PARTIES IN THAT TWO PURCHASERS PAY A DIFFERENT PRICE FOR THE SAME QUANTITY OF THE SAME PRODUCT DEPENDING ON WHETHER THEY OBTAIN THEIR SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION OR HAVE SEVERAL SOURCES OF SUPPLY .*

**Parties**
IN CASE 85/76
HOFFMANN-LA ROCHE & CO . AG , BASLE , REPRESENTED BY MESSRS . A . DERINGER AND J . SEDEMUND , ADVOCATES AT THE COLOGNE BAR , WITH AN ADDRESS FOR SERVICE IN LUXEMBOURG AT THE CHAMBERS OF E . ARENDT , P.O . BOX 39 ,
APPLICANT ,
V
COMMISSION OF THE EUROPEAN COMMUNITIES IN BRUSSELS , REPRESENTED BY E . ZIMMERMANN , LEGAL ADVISER , WITH AN ADDRESS FOR SERVICE IN LUXEMBOURG AT THE OFFICE OF MARIO CERVINO , JEAN MONNET BUILDING , KIRCHBERG ,
DEFENDANT ,

**Subject of the case**
APPLICATION FOR THE ANNULMENT OF COMMISSION DECISION OF 9 JUNE 1976 RELATING TO A PROCEEDING UNDER ARTICLE 86 OF THE EEC TREATY ( IV/29.020 - VITAMINS ),

**Grounds**
1THE PRINCIPAL CLAIM IN THE APPLICATION LOOGED ON 27 AUGUST 1976 BY THE SWISS COMPANY HOFFMANN-LA ROCHE & COMPANY AG ( HEREINAFTER REFERRED TO AS ' ' ROCHE ' ' ), WHOSE PRINCIPAL PLACE OF BUSINESS IS AT BASLE , IS THE ANNULMENT OF COMMISSION DECISION OF 9 JUNE 1976 ( IV/29.020 - VITAMINS ) RELATING TO A PROCEEDING UNDER ARTICLE 86 OF THE EEC TREATY , WHICH WAS SERVED UPON THE APPLICANT ON 14 JUNE 1976 AND PUBLISHED IN THE OFFICIAL JOURNAL OF THE EUROPEAN COMMUNITIES L 223 OF 16 AUGUST 1976 , AND THE ALTERNATIVE CLAIM IS THE ANNULMENT OF ARTICLE 3 OF THAT DECISION WHICH IMPOSES UPON THE APPLICANT A FINE OF 300 000 UNITS OF ACCOUNT , BEING 1 098 000 DEUTSCHMARKS .

2IN THAT DECISION THE COMMISSION FINDS THAT ROCHE HAS A DOMINANT POSITION WITHIN THE COMMON MARKET , WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , ON THE MARKETS IN VITAMINS A , B2 , B3(PANTOTHENIC ACID ), B6 , C , E AND H ( BIOTIN ) AND THAT IT HAS ABUSED THAT POSITION AND THEREBY INFRINGED THE SAID ARTICLE , BY CONCLUDING , FROM 1964 ONWARDS AND IN PARTICULAR DURING THE YEARS 1970 TO 1974 INCLUSIVE , WITH 22 PURCHASERS OF THESE VITAMINS AGREEMENTS WHICH CONTAIN AN OBLIGATION UPON PURCHASERS , OR BY THE GRANT OF FIDELITY REBATES OFFER THEM AN INCENTIVE , TO BUY ALL OR MOST OF THEIR REQUIREMENTS OF VITAMINS EXCLUSIVELY OR IN PREFERENCE FROM ROCHE ( ARTICLE 1 OF THE DECISION ). THAT DECISION ENJOINS ROCHE TO TERMINATE THE INFRINGEMENT FORTHWITH ( ARTICLE 2 ) AND ORDERS IT TO PAY THE ABOVE-MENTIONED FINE ( ARTICLE 3 ).

3IN SUPPORT OF ITS APPLICATION THE APPLICANT MAKES THE FOLLOWING SUBMISSIONS :
- FIRST SUBMISSION : THE CONTESTED DECISION INFRINGES THE FUNDAMENTAL PRINCIPLE THAT RULES RELATING TO PENALTIES MUST BE CERTAIN AND FORESEEABLE .

- SECOND SUBMISSION : THE CONTESTED DECISION , AS A RESULT OF IRREGULARITIES IN THE ADMINISTRATIVE PROCEDURE UPON THE CONCLUSION WHEREOF IT WAS ADOPTED , HAS SEVERAL FORMAL DEFECTS .

- THIRD SUBMISSION : THE CONTESTED DECISION INFRINGES ARTICLE 86 OF THE

TREATY IN THAT THE COMMISSION INCORRECTLY INTERPRETED AND IN ANY CASE INACCURATELY APPLIED THE CONCEPTS OF A DOMINANT POSITION AND OF THE ABUSE OF A DOMINANT POSITION WHICH MAY AFFECT TRADE BETWEEN MEMBER STATES BY FINDING THAT ROCHE WAS IN SUCH A POSITION AND BY TREATING THE AGREEMENTS IN QUESTION AS CONSTITUTING SUCH AN ABUSE .

- FOURTH SUBMISSION : THE CONTESTED DECISION , BY IMPOSING A FINE UPON ROCHE , HAS INFRINGED ARTICLE 15 ( 2 ) OF REGULATION NO 17 OF THE COUNCIL OF 6 FEBRUARY 1962 ( OFFICIAL JOURNAL , ENGLISH SPECIAL EDITION 1959-1962 , P . 87 ), THE ALLEGED INFRINGEMENTS , IN SO FAR AS THEY MAY BE FOUND TO EXIST , WERE NOT COMMITTED EITHER INTENTIONALLY OR NEGLIGENTLY .

THE APPLICANT HAS ALSO RELIED IN ITS APPLICATION ON THE INFRINGEMENT OF ARTICLE 18 OF REGULATION NO 17 OF THE COUNCIL OF 6 FEBRUARY 1962 AND OF FINANCIAL REGULATION NO 68/313 OF 30 JULY 1968 ( JOURNAL OFFICIEL L 199 , P . 1 ) IN THAT THE FINE HAD BEEN CONVERTED INTO DEUTSCHMARKS , BUT , DURING THE PROCEEDINGS , IT WITHDREW THIS SUBMISSION SO THAT ONLY THE ABOVEMENTIONED FOUR SUBMISSIONS HAVE TO BE EXAMINED .

FIRST SUBMISSION : INFRINGEMENT OF THE PRINCIPLE THAT RULES RELATING TO PENALTIES MUST BE CERTAIN AND FORESEEABLE
4 ACCORDING TO THE APPLICANT THE CONCEPTS OF DOMINANT POSITION AND ABUSE OF SUCH A POSITION IN ARTICLE 86 ARE AMONG THE MOST INDETERMINATE AND VAGUE CONCEPTS BOTH IN COMMUNITY LAW AND IN THE NATIONAL LAW OF THE MEMBER STATES AND CONSEQUENTLY , BY APPLYING A FUNDAMENTAL LEGAL PRINCIPLE WHICH SHOULD BE DEDUCED FROM THE LEGAL MAXIM NULLUM CRIMEN , NULLA POENA SINE LEGE , THE COMMISSION MAY NOT IMPOSE THE PENALTIES PROVIDED FOR IN THE CASE OF INFRINGEMENT OF THAT ARTICLE UNTIL THOSE CONCEPTS HAVE BEEN GIVEN A SUFFICIENTLY SPECIFIC MEANING EITHER BY ADMINISTRATIVE PRACTICE OR BY CASE-LAW TO ENABLE UNDERTAKINGS TO KNOW WHERE THEY STAND .

5NEVERTHELESS THE APPLICANT DOES NOT DENY THAT THE COMMISSION IS ENTITLED TO INTERPRET AND GIVE A SPECIFIC MEANING TO THESE CONCEPTS IN THE DECISIONS WHICH IT ADOPTS IN RESPECT OF UNDERTAKINGS BUT ONLY DISPUTES ITS POWER TO IMPOSE PENALTIES AS LONG AS THESE CONCEPTS HAVE REMAINED UNDEFINED , WHICH IS WHAT HAS HAPPENED IN THIS CASE .

6CONSEQUENTLY THIS SUBMISSION IS ONLY CONCERNED WITH THE FINE IMPOSED AND IT WILL BE NECESSARY TO EXAMINE IT LATER ON AT THE SAME TIME AS THE OTHER OBJECTIONS TO THE IMPOSITION OF THIS FINE .

SECOND SUBMISSION : IRREGULARITIES IN THE ADMINISTRATIVE PROCEDURE
7ON THIS POINT THE APPLICANT IN THE FIRST PLACE SUBMITTED IN ITS APPLICATION THAT THE PROCEDURE INITIATED BY THE COMMISSION ITS OWN INITIATIVE AGAINST IT PURSUANT TO ARTICLES 3 AND 15 OF REGULATION NO 17 OF THE COUNCIL WAS IRREGULAR HAVING REGARD TO THE FACT THAT DOCUMENTS FOR INTERNAL USE BY ITS DEPARTMENTS CAME UNLAWFULLY INTO THE POSSESSION OF THE COMMISSION .

HOWEVER DURING THE WRITTEN AND ORAL PROCEDURE BEFORE THE COURT IT STATED THAT IT WITHDREW THIS SUBMISSION AND ITSELF PRODUCED FOR THE COURT ' S FILE WITH OTHER DOCUMENTS THE DOCUMENTS THE USE OF WHICH BY THE COMMISSION IT HAD PREVIOUSLY REGARDED AS BEING UNLAWFUL .

IN THESE CIRCUMSTANCES THIS SUBMISSION MAY BE REJECTED WITHOUT ANY FURTHER EXAMINATION SINCE THE COURT IS OF THE OPINIONS THAT IT NEED NOT EXAMINE IT OF ITS OWN MOTION .

8THE APPLICANT SUBMITS IN THE SECOND PLACE THAT IN THE DISPUTED DECISION DOCUMENTS , PARTICULARS WHEREOF WERE NOT GIVEN DURING THE ADMINISTRATIVE PROCEDURE , AND OTHER EVIDENCE WHICH THE COMMISSION REFUSED TO LET IT INSPECT BECAUSE OF THE DUTY TO RESPECT PROFESSIONAL SECRECY WERE TAKEN INTO ACCOUNT .

THUS THE APPLICANT FIRST OF ALL REFERS TO THE DOCUMENTS MENTIONED IN RECITAL 12 TO THE CONTESTED DECISION , NAMELY FOUR INTERNAL CIRCULARS ISSUED BY ROCHE , WHICH ACCORDING TO THE DECISION WERE DATED SEPTEMBER 1970 ( ACTUALLY 8 SEPTEMBER 1972 ), DECEMBER 1970 , MAY 1971 ( ACTUALLY MID-AUGUST 1971 ) AND AUGUST 1971 AND ALSO TO THE MINUTES OF THE EUROPEAN BULK MANAGERS MEETING ON 12 AND 13 OCTOBER 1971 ( ACTUALLY ON 12 AND 13 OCTOBER 1972 ).

IT REFERS IN THE SECOND PLACE TO THE EVIDENCE WHICH THE COMMISSION OBTAINED FROM OTHER VITAMIN MANUFACTURERS AND WITH THE HELP OF WHICH IT CALCULATED THE MARKET SHARES WHICH IT CLAIMS ROCHE HAS , AND ALSO TO THE INFORMATION REQUESTED AND OBTAINED FROM THE APPLICANT ' S CUSTOMERS FOR THE PURPOSE OF DETERMINING WHETHER OR NOT THE CONTRACTS , THE CONCLUSION WHEREOF IS REGARDED BY THE COMMISSION AS AN ABUSE OF A DOMINANT POSITION HAD AS THEIR EFFECT THE RESTRICTION OF COMPETITION AND OF TRADE BETWEEN MEMBER STATES .

9OBSERVANCE OF THE RIGHT TO BE HEARD IS IN ALL PROCEEDINGS IN WHICH SANCTIONS , IN PARTICULAR FINES OR PENALTY PAYMENTS , MAY BE IMPOSED A FUNDAMENTAL PRINCIPLE OF COMMUNITY LAW WHICH MUST BE RESPECTED EVEN IF THE PROCEEDINGS IN QUESTION ARE ADMINISTRATIVE PROCEEDINGS .

ARTICLE 19 ( 1 ) OF COUNCIL REGULATION NO 17 OBLIGES THE COMMISSION , BEFORE TAKING A DECISION IN CONNEXION WITH FINES , TO GIVE THE PERSONS CONCERNED THE OPPORTUNITY OF PUTTING FORWARD THEIR POINT OF VIEW WITH REGARD TO THE COMPLAINTS MADE AGAINST THEM .

SIMILARLY ARTICLE 4 OF REGULATION NO 99/63 OF THE COMMISSION OF 25 JULY 1963 ( OFFICIAL JOURNAL , ENGLISH SPECIAL EDITION 1963 , P . 47 ) ON THE HEARING PROVIDED FOR ARTICLE 19 OF REGULATION NO 17 PROVIDES THAT THE COMMISSION SHALL IN ITS DECISIONS DEAL ONLY WITH THOSE OBJECTIONS RAISED AGAINST UNDERTAKINGS AND ASSOCIATIONS OF UNDERTAKINGS IN RESPECT OF WHICH THEY HAVE BEEN AFFORDED THE OPPORTUNITY OF MAKING KNOWN THEIR VIEWS .

10ALTHOUGH THE COURT IN ITS JUDGMENT OF 15 JULY 1970 IN CASE 45/69 ( BOEHRINGER MANNHEIM GMBH V COMMISSION OF THE EUROPEAN COMMUNITIES ( 1970 ) ECR 769 ) HELD THAT THESE REQUIREMENTS ARE SATISFIED AS FAR AS CONCERNS THE NOTIFICATION OF COMPLAINTS - THE FIRST STAGE OF THE ADMINISTRATIVE PROCEDURE - IF THE NOTIFICATION SETS FORTH CLEARLY , ALBEIT SUCCINCTLY , THE ESSENTIAL FACTS UPON WHICH THE COMMISSION RELIES , THIS RULING IS SUBJECT TO THE PROVISO THAT ' ' IN THE COURSE OF THE ADMINISTRATIVE PROCEDURE IT SUPPLIES THE DETAILS NECESSARY TO THE DEFENCE . ' '
11THUS IT EMERGES FROM THE PROVISIONS QUOTED ABOVE AND ALSO FROM THE GENERAL PRINCIPLE TO WHICH THEY GIVE EFFECT THAT IN ORDER TO RESPECT THE PRINCIPLE OF THE RIGHT TO BE HEARD THE UNDERTAKINGS CONCERNED MUST HAVE BEEN AFFORDED THE OPPORTUNITY DURING THE ADMINISTRATIVE PROCEDURE TO MAKE KNOWN THEIR VIEWS ON THE TRUTH AND RELEVANCE OF THE FACTS AND CIRCUMSTANCES ALLEGED AND ON THE DOCUMENTS USED BY THE COMMISSION TO SUPPORT ITS CLAIM THAT THERE HAS BEEN AN INFRINGEMENT OF ARTICLE 86 OF THE TREATY .

12THE COMMISSION DOES NOT DENY THAT , SINCE IT TOOK THE VIEW THAT IT WAS

BOUND TO OBSERVE PROFESSIONAL SECRECY , IT REFUSED TO PASS ON THE DATA THAT IT HAD OBTAINED FROM COMPETITORS OR CUSTOMERS OF ROCHE WHICH FORMED THE BASIS , TOGETHER WITH OTHER DATA , OF ITS ASSESSMENT OF THE MARKET SHARES AND OF THE VIEW THAT THE DISPUTED CONTRACTS RESTRICT COMPETITION .

13ALTHOUGH ARTICLE 20 ( 2 ) OF REGULATION NO 17 PROVIDES THAT ' ' WITHOUT PREJUDICE TO THE PROVISIONS OF ARTICLES 19 AND 21 , THE COMMISSION AND THE COMPETENT AUTHORITIES OF THE MEMBER STATES , THEIR OFFICIALS AND OTHER SERVANTS SHALL NOT DISCLOSE INFORMATION ACQUIRED BY THEM AS A RESULT OF THE APPLICATION OF THIS REGULATION AND OF THE KIND COVERED BY PROFESSIONAL SECRECY ' ' , THIS RULE MUST , AS THE EXPRESS REFERENCE TO ARTICLE 19 CONFIRMS , BE RECONCILED WITH THE RIGHT TO BE HEARD .

14THE SAID ARTICLE 20 BY PROVIDING UNDERTAKINGS FROM WHOM INFORMATION HAS BEEN OBTAINED WITH A GUARANTEE THAT THEIR INTERESTS WHICH ARE CLOSELY CONNECTED WITH OBSERVANCE OF PROFESSIONAL SECRECY , ARE NOT JEOPARDIZED , ENABLES THE COMMISSION TO COLLECT ON THE WIDEST POSSIBLE SCALE THE REQUISITE DATA FOR THE FULFILMENT OF THE TASK CONFERRED UPON IT BY ARTICLES 85 AND 86 OF THE TREATY WITHOUT THE UNDERTAKINGS BEING ABLE TO PREVENT IT FROM DOING SO , BUT IT DOES NOT NEVERTHELESS ALLOW IT TO USE , TO THE DETRIMENT OF THE UNDERTAKINGS INVOLVED IN A PROCEEDING REFERRED TO IN REGULATION NO 17 , FACTS , CIRCUMSTANCES OR DOCUMENTS WHICH IT CANNOT IN ITS VIEW DISCLOSE IF SUCH A REFUSAL OF DISCLOSURE ADVERSELY AFFECTS THAT UNDERTAKING ' S OPPORTUNITY TO MAKE KNOWN EFFECTIVELY ITS VIEWS ON THE TRUTH OR IMPLICATIONS OF THOSE CIRCUMSTANCES , ON THOSE DOCUMENTS OR AGAIN ON THE CONCLUSIONS DRAWN BY THE COMMISSION FROM THEM .

15HOWEVER IF SUCH IRREGULARITIES HAVE IN FACT BEEN PUT RIGHT DURING THE PROCEEDINGS BEFORE THE COURT THEY DO NOT NECESSARILY LEAD TO THE ANNULMENT OF THE CONTESTED DECISION IN SO FAR AS REMEDYING THEM AT A LATER STAGE HAS NOT AFFECTED THE RIGHT TO BE HEARD .

16THE DOCUMENTS TO WHICH THE APPLICANT HAS REFERRED ARE , ON THE ONE HAND , THOSE MENTIONED IN RECITAL 12 TO THE CONTESTED DECISION , THAT IS TO SAY THE SAME DOCUMENTS AS THOSE IN THE CASE OF WHICH IT HAD CRITICIZED THE MANNER OF THEIR COMING INTO THE POSSESSION OF THE COMMISSION , ALTHOUGH IT LATER PRODUCED THEM FOR THE COURT ' S FILE SO THAT BOTH PARTIES COULD AND DID MAKE THEIR SUBMISSIONS CONCERNING THEM .

ON THE OTHER HAND AS FAR AS CONCERNS THE DATA ON THE BASIS OF WHICH THE COMMISSION HAS CALCULATED THE MARKET SHARES AND ITS ANALYSES OF THE EFFECTS OF THE DISPUTED CONTRACTS THE PARTIES , DURING THE WRITTEN PROCEDURE AT THE REQUEST OF THE COURT PRODUCED , FOLLOWING AN EXCHANGE OF INFORMATION , AN AGREED DOCUMENT WHICH SHOWS THAT THE COMMISSION IN THE CASE OF ALL THE VITAMINS IN QUESTION HAS DISCLOSED THE BASES OF ITS CALCULATION OF THE MARKET SHARES ACCORDING TO THEIR VALUE FOR 1972 , 1973 AND 1974 WITH THE RESULT THAT ROCHE WAS IN A POSITION TO ESTIMATE ITS MARKET SHARES ACCORDING TO THE QUANTITIES SOLD ON THE BASIS OF THE SALES ATTRIBUTED TO CERTAIN COMPETITORS IN THE DOCUMENTS PRODUCED BY THE COMMISSION .

17THUS THE PARTIES HAVE BEEN ABLE TO AGREE ON AN ESTIMATE OF THE MARKET SHARES ACCORDING TO QUANTITY AND VALUE - ALTHOUGH THEY HAVE REMAINED IN DESAGREEMENT AS TO WHICH OF THE TWO CRITERIA IS DETERMINATIVE - AS FAR AS CONCERNS VITAMINS A , B3 AND H AND ALSO VITAMINS C AND E SUBJECT IN THE CASE OF THE LATTER TO AN EXAMINATION OF THE MARKET TO BE TAKEN INTO CONSIDERATION FROM THE STANDPOINT OF THE INTERCHANGEABILITY FOR CERTAIN USES OF THESE TWO

VITAMINS WITH OTHER PRODUCTS , ONLY THE MARKET SHARES OF VITAMINS B2 AND B6
REMAINING UNAGREED .

18FINALLY THE COMMISSION ALSO PRODUCED DURING THE WRITTEN PROCEDURE AT THE
REQUEST OF THE COURT THE MINUTES OF THE MEETING BETWEEN UNILEVER AND ROCHE
MENTIONED IN RECITAL 3 TO THE CONTESTED DECISION AS WELL AS THE REPORTS OF
THE INQUIRIES CARRIED OUT BY ITS OFFICIALS WITH SOME OF ROCHE ' S CUSTOMERS ,
WHO ENTERED INTO THE DISPUTED CONTRACTS , OR , IN THE CASE OF THOSE
UNDERTAKINGS WHICH WISHED TO REMAIN ANONYMOUS , A NOTE SUMMARIZING THE
SAID REPORTS .

19IN THESE CIRCUMSTANCES THE SUBMISSION BASED ON THE ALLEGED BREACH OF THE
PRINCIPLE OF THE RIGHT TO BE HEARD CANNOT BE UPHELD .

THIRD SUBMISSION : INFRINGEMENT OF ARTICLE 86 OF THE TREATY
20IN THE APPLICANT ' S VIEW THE COMMISSION HAS INFRINGED ARTICLE 86 OF THE
TREATY IN THE FOLLOWING RESPECTS :
I THE CONTESTED DECISION WRONGLY ASSUMES THAT THE APPLICANT HAS A DOMINANT
POSITION , INTERPRETS THIS CONCEPT INCORRECTLY AND WRONGLY APPLIES THAT
INTERPRETATION TO THE CASE IN POINT , ESPECIALLY AS FAR AS CONCERNS THE
ASSESSMENT AND RELEVANCE BOTH OF THE MARKET SHARES AND ALSO OF THE OTHER
FACTORS USED TO ESTABLISH THE EXISTENCE OF THE ALLEGED DOMINANT POSITION .

IITHE CONTESTED DECISION ASSUMES , IN ANY CASE INCORRECTLY , THAT THE
APPLICANT HAS ABUSED SUCH A POSITION , SINCE THE COMMISSION HAS MADE A
WRONG ANALYSIS OF THE CONTRACTS THE CONCLUSION WHEREOF IS SUPPOSED ,
ACCORDING TO IT TO CONSTITUTE AN ABUSE AND OF THE RESTRICTIVE EFFECTS ON
COMPETITION OF THE SAID CONTRACTS .

IIITHE CONTESTED DECISION WRONGLY ASSUMES THAT THE APPLICANT ' S CONDUCT
WAS SUCH AS TO HAVE AN APPRECIABLE EFFECT ON INTRA-COMMUNITY TRADE .

I - THE EXISTENCE OF A DOMINANT POSITION
SECTION 1 : THE DELIMITATION OF THE RELEVANT MARKETS
21IN ORDER TO DETERMINE WHETHER ROCHE HAS THE DOMINANT POSITION AS ALLEGED
, IT IS NECESSARY TO DELIMIT THE RELEVANT MARKETS BOTH FROM THE GEOGRAPHICAL
STANDPOINT AND FROM THE STANDPOINT OF THE PRODUCT .

22RECITALS 3 AND 6 TO THE CONTESTED DECISION SHOW THAT THE GEOGRAPHICAL
MARKET TO BE CONSIDERED COMPRISES THE WHOLE OF THE COMMON MARKET , THAT IS
TO SAY THE SIX MEMBER STATES UP TO 31 DECEMBER 1972 AND THE NINE MEMBER
STATES THEREAFTER .

23THE CONTESTED DECISION REFERS TO BULK VITAMINS BELONGING TO 13 GROUPS ,
OF WHICH ROCHE MANUFACTURES AND MARKETS EIGHT ( A , B1 , B2 , B3 ( PANTOTHENIC
ACID ), B6 , C , E AND H ( BIOTIN ) AND FIVE PURCHASED BY ROCHE FROM THE
PRODUCERS AND RESOLD BY IT , B12 , D , PP , K AND M ).

THE COMMISSION FOUND THAT THERE WAS A DOMINANT POSITION IN THE CASE OF
SEVEN OF THE EIGHT GROUPS OF VITAMINS MANUFACTURED BY ROCHE , NAMELY A , B2 ,
B3 , B6 , C , E AND H .
THE PARTIES ARE AGREED , ON THE ONE HAND , THAT EACH OF THESE GROUPS HAS
SPECIFIC METABOLIZING FUNCTIONS AND FOR THIS REASON IS NOT INTERCHANGEABLE
WITH THE OTHERS AND , ON THE OTHER HAND , THAT IN THE CASE OF THE POSSIBLE
USES WHICH THESE THREE GROUPS HAVE IN COMMON , NAMELY FOR FOOD , ANIMAL
FEED AND FOR PHARMACEUTICAL PURPOSES , THE VITAMINS IN QUESTION DO NOT
ENCOUNTER THE COMPETITION OF OTHER PRODUCTS .

24THE COMMISSION AFTER TAKING THESE FACTORS INTO ACOUNT CONSIDERED ( RECITAL 20 TO THE CONTESTED DECISION ) THAT EACH GROUP OF VITAMINS CONSTITUTES A SEPARATE MARKET AND ROCHE , AFTER HAVING FIRST OF ALL SUGGESTED THAT SEVERAL GROUPS MIGHT TOGETHER FORM A SINGLE MARKET , ACCEPTED THIS POINT OF VIEW WITH THE RESERVATION THAT IN ITS OPINION THE C AND E GROUPS OF VITAMINS , AS FAR AS EACH OF THEM IS CONCERNED , TOGETHER WITH OTHER PRODUCTS FORM PART OF A WIDER MARKET .

THEREFORE THE QUESTION WHETHER THE COMMISSION HAS CORRECTLY DELIMITED THE MARKETS TO WHICH THE C AND E GROUPS OF VITAMINS BELONG MUST BE EXAMINED .

25IT IS AN ESTABLISHED FACT THAT VITAMINS C AND E APART FROM THEIR USES IN THE PHARMACEUTICAL INDUSTRY AND IN FOOD AND ANIMAL FEED - CALLED BIO-NUTRITIVE USES - ARE ALSO SOLD , INTER ALIA , AS ANTIOXIDANTS , FERMENTATION AGENTS AND ADDITIVES - USES COVERED BY THE WORD ' ' TECHNOLOGICAL ' ' AND , TO THE EXTENT TO WHICH THERE IS ANY DEMAND FOR THESE VITAMINS FOR THE PURPOSE OF THE SAID TECHNOLOGICAL USES , THEY ARE EXPOSED TO THE COMPETITION OF OTHER PRODUCTS SUITABLE FOR THE SAME USES .

26ACCORDING TO ROCHE THE CONCLUSION TO BE DRAWN FROM THIS IS THAT THE C AND E GROUPS OF VITAMINS ARE PART OF A MUCH LARGER MARKET COMPRISING THESE OTHER PRODUCTS AND THAT THE COMMISSION HAS EXAGGERATED ROCHE ' S SHARE OF THE SAID MARKETS , BY FAILING TO INCLUDE THE LATTER .

27THE COMMISSION ON THE OTHER HAND TAKES THE VIEW THAT THE PRODUCTS WHICH CAN BE SUBSTITUTED FOR VITAMINS C AND E FOR TECHNOLOGICAL USES CANNOT BE INCLUDED IN THE SAME MARKETS AS THESE VITAMINS BECAUSE THE TWO POSSIBLE USES OF THE LATTER MEAN THAT THE DEGREE OF INTERCHANGEABILITY OF THE SAID PRODUCTS WITH THE VITAMINS IN QUESTION IS NOT SUFFICIENT .

NEITHER CAN THE VITAMINS USED IN THE END FOR BIO-NUTRITIVE PURPOSES AND THOSE USED FOR TECHNOLOGICAL PURPOSES BE DIVIDED INTO TWO SEPARATE MARKETS , BECAUSE , BY REASON OF THE TWO USES TO WHICH THESE PRODUCTS LEND THEMSELVES , THE MANUFACTURERS AND PURCHASERS ARE ENTIRELY FREE , ESPECIALLY ON AN EXPANDING MARKET , TO USE THEM FOR THE PURPOSE WHICH THEY REGARD AS THE MOST PROFITABLE .

HOWEVER ASSUMING THAT THE VITAMINS SOLD BY ROCHE FOR TECHNOLOGICAL PURPOSES HAD TO BE EXCLUDED FROM THE MARKETS IN QUESTION THE SAME WOULD HAVE TO BE DONE IN THE CASE OF ITS COMPETITORS WITH THE RESULT THAT THE MARKET SHARES WOULD REMAIN UNCHANGED .

28IF A PRODUCT COULD BE USED FOR DIFFERENT PURPOSES AND IF THESE DIFFERENT USES ARE IN ACCORDANCE WITH ECONOMIC NEEDS , WHICH ARE THEMSELVES ALSO DIFFERENT , THERE ARE GOOD GROUNDS FOR ACCEPTING THAT THIS PRODUCT MAY , ACCORDING TO THE CIRCUMSTANCES , BELONG TO SEPARATE MARKETS WHICH MAY PRESENT SPECIFIC FEATURES WHICH DIFFER FROM THE STANDPOINT BOTH OF THE STRUCTURE AND OF THE CONDITIONS OF COMPETITION .

HOWEVER THIS FINDING DOES NOT JUSTIFY THE CONCLUSION THAT SUCH A PRODUCT TOGETHER WITH ALL THE OTHER PRODUCTS WHICH CAN REPLACE IT AS FAR AS CONCERNS THE VARIOUS USES TO WHICH IT MAY BE PUT AND WITH WHICH IT MAY COMPETE , FORMS ONE SINGLE MARKET .

THE CONCEPT OF THE RELEVANT MARKET IN FACT IMPLIES THAT THERE CAN BE EFFECTIVE COMPETITION BETWEEN THE PRODUCTS WHICH FORM PART OF IT AND THIS

PRESUPPOSES THAT THERE IS A SUFFICIENT DEGREE OF INTERCHANGEABILITY BETWEEN ALL THE PRODUCTS FORMING PART OF THE SAME MARKET IN SO FAR AS A SPECIFIC USE OF SUCH PRODUCTS IS CONCERNED .

THERE WAS NO SUCH INTERCHANGEABILITY , AT ANY RATE DURING THE PERIOD UNDER CONSIDERATION , BETWEEN ALL THE VITAMINS OF EACH OF THE GROUPS C AND E AND ALL THE PRODUCTS WHICH , ACCORDING TO THE CIRCUMSTANCES , MAY BE SUBSTITUTED FOR ONE OR OTHER OF THESE GROUPS OF VITAMINS FOR TECHNOLOGICAL USES WHICH ARE THEMSELVES EXTREMELY VARIED .

29ON THE OTHER HAND THERE MAY BE SOME DOUBT WHETHER , FOR THE PURPOSE OF DELIMITING THE RESPECTIVE MARKETS OF THE C AND E GROUPS OF VITAMINS , IT IS NECESSARY TO INCLUDE ALL THE VITAMINS OF EACH OF THESE GROUPS IN A MARKET CORRESPONDING TO THAT GROUP , OR WHETHER , ON THE CONTRARY , EACH OF THESE GROUPS MUST BE PLACED IN A SEPARATE MARKET , ONE COMPRISING VITAMINS FOR BIO-NUTRITIVE USE AND THE OTHER VITAMINS FOR TECHNOLOGICAL PURPOSES .

30HOWEVER IN ORDER TO CALCULATE THE MARKET SHARES OF ROCHE AND OF ITS COMPETITORS CORRECTLY THIS QUESTION DID NOT HAVE TO BE ANSWERED BECAUSE , AS THE COMMISSION HAS RIGHTLY POINTED OUT , IF IT HAD BEEN NECESSARY TO DRAW THIS DISTINCTION , IT WOULD HAVE HAD TO BE DRAWN FOR ROCHE ' S COMPETITORS AS WELL AS FOR ROCHE ITSELF , AND - IN THE ABSENCE OF ANY INDICATION TO THE CONTRARY BY THE APPLICANT - IN SIMILAR PROPORTIONS WITH THE RESULT THAT THE MARKET SHARES IN PERCENTAGES WOULD REMAIN UNCHANGED .

FINALLY ROCHE , IN ANSWER TO A QUESTION PUT TO IT BY THE COURT , HAS STATED THAT ALL THE VITAMINS OF EACH GROUP , IRRESPECTIVE OF THE ULTIMATE INTENDED USE OF THE PRODUCT , WERE SUBJECT TO THE SAME PRICE SYSTEM SO THAT THEY COULD NOT BE SPLIT UP INTO SPECIFIC MARKETS .

IT FOLLOWS FROM THE FOREGOING THAT THE COMMISSION HAS CORRECTLY DELIMITED THE RELEVANT MARKETS IN ITS CONTESTED DECISION .

SECTION 2 : THE STRUCTURE OF THE RELEVANT MARKETS
31ALTHOUGH EACH GROUP OF VITAMINS CONSTITUTES A MARKET OF ITS OWN , THESE SEPARATE MARKETS NEVERTHELESS , AS FAR AS CONCERNS PRODUCTION AND MARKETING STRUCTURES , HAVE COMMON FEATURES WHICH MUST BE BROUGHT OUT .

32IN THE FIRST PLACE THE PARTIES AGREE THAT THE MARKETS OF ALL THE GROUPS OF VITAMINS EXPANDED VERY CONSIDERABLY BETWEEN 1950 AND 1974 - ALTHOUGH ON A DIFFERENT SCALE - WITH PRODUCTION INCREASING ALL THE TIME .

33IN PARTICULAR AS FAR AS CONCERNS PRODUCTION THE PARTIES ALSO AGREE THAT , ALTHOUGH THE SYNTHESIS OF VITAMINS , ABOVE ALL AFTER THE EXPIRATION OF THE PATENTS , A NOT INCONSIDERABLE NUMBER OF WHICH WAS HELD BY ROCHE , DOES NOT RAISE ANY ESPECIALLY DIFFICULT TECHNICAL PROBLEMS , PRODUCTION NEVERTHELESS PRESUPPOSES LARGE CAPITAL INVESTMENT AND NECESSITATES SPECIAL EQUIPMENT , WHICH IS TO A VERY GREAT EXTENT PECULIAR TO EACH GROUP OF VITAMINS , WITH THE RESULT THAT THE CAPACITY OF THE FACTORIES DURING THE ABOVE-MENTIONED PERIOD WAS GEARED TO THE ESTIMATED GROWTH IN DEMAND OVER A PERIOD OF TEN YEARS .

IN SPITE OF THE VIGOROUS GROWTH MENTIONED ABOVE THIS MARKET STRUCTURE IN THE CASE OF MOST OF THE GROUPS OF VITAMINS BROUGHT IN ITS WAKE A SURPLUS PRODUCTION CAPACITY THROUGHOUT THE WORLD .

THIS SITUATION IS ILLUSTRATED IN A STRIKING MANNER BY THE OBSERVATION RECORDED IN THE MINUTES OF THE MEETING BETWEEN UNILEVER AND ROCHE ON 11

DECEMBER 1972 THAT ROCHE ' S CAPACITY AS A WHOLE WAS ALONE SUFFICIENT TO
MEET WORLD DEMAND AND THAT ROCHE AT THAT TIME WAS ONLY OPERATING AT 50%
OF THIS CAPACITY .

34AS FAR AS PRODUCERS OPERATING WITHIN THE COMMON MARKET ARE CONCERNED
THIS PRODUCTION CAPACITY WAS CONCENTRATED DURING THE PERIOD TAKEN INTO
CONSIDERATION BY THE COMMISSION IN THE HANDS OF A LIMITED NUMBER OF
UNDERTAKINGS - NINE ALTOGETHER ACCORDING TO THE TABLE IN RECITAL 4 TO THE
CONTESTED DECISION - THE NUMBER OF MANUFACTURERS IN EACH GROUP BEING EVEN
SMALLER NAMELY , FOUR IN THE CASE OF VITAMIN A , THREE IN THE CASE OF VITAMIN
B2 , THREE IN THE CASE OF VITAMIN B3 , FOUR IN THE CASE OF VITAMIN B6 , FIVE IN
THE CASE OF VITAMIN C , FOUR IN THE CASE OF VITAMIN E AND TWO IN THE CASE OF
VITAMIN H .
SOME OF THESE PRODUCERS WERE MOREOVER PURCHASERS AND RESELLERS OF
VITAMINS WHICH THEY DID NOT PRODUCE THEMSELVES , WHILE UNSPECIFIED
QUANTITIES OF VITAMINS WERE MARKETED BY LARGE COMMERCIAL FIRMS WHICH
OBTAINED THEIR SUPPLIES FROM SOURCES OTHER THAN THE NINE PRODUCERS
MENTIONED IN THE DECISION .

35AS FAR AS CONCERNS THE DEMAND FOR BULK VITAMINS THE SPECIAL FEATURE OF THE
SITUATION WITH THE COMMON MARKET IS THE PRESENCE OF A RELATIVELY LARGE
NUMBER OF PURCHASERS - ABOUT 5 000 WHO BUY FROM ROCHE - BUT A CONSIDERABLE
PROPORTION OF THIS DEMAND , WHICH IN THE CASE OF ROCHE MAY BE ESTIMATED AT
APPROXIMATELY 25% OF ITS SALES WITHIN THE COMMON MARKET , WAS AT THE PERIOD
UNDER CONSIDERATION CONCENTRATED IN THE HANDS OF 22 LARGE FIRMS , OF WHICH
SEVEN BELONGED TO THE PHARMACEUTICAL INDUSTRY , FIVE TO THE FOOD INDUSTRY
AND 10 TO THE ANIMAL FEED INDUSTRY .

ALL THESE CUSTOMERS , IRRESPECTIVE OF THE SECTOR OF THE ECONOMY TO WHICH
THEY BELONGED , WERE BUYERS OF A GOOD DEAL , IF NOT ALL OF THE VITAMINS IN
QUESTION , THE ONLY APPARENT EXCEPTION IN THIS CONNEXION , AT ALL EVENTS AS
FAR AS CONCERNS ITS RELATIONS WITH ROCHE , BEING UNILEVER WHICH ONLY
PURCHASED VITAMINS IN GROUP A .
SECTION 3 : THE RELEVANCE OF THE FACTORS USED BY THE COMMISSION TO ESTABLISH
THE EXISTENCE OF A DOMINANT POSITION
36THE COMMISSION IS OF THE OPINION THAT ROCHE HAS A DOMINANT POSITION ON
THE SEVEN MARKETS ( A , B2 , B3 , B6 , C , E , H ) AND BASES THIS VIEW ON THE ONE
HAND , ON THE RELATIONSHIP BETWEEN THE APPLICANT ' S MARKET SHARES AND THOSE
OF ITS COMPETITORS AND , ON THE OTHER HAND , ON THE EXISTENCE OF A NUMBER OF
FACTORS WHICH , IF THE MARKET SHARE IS NOT IN ITSELF THE DETERMINATIVE
CRITERION , NEVERTHELESS SECURE ROCHE A MARKED ASCENDANCY ON THE RELEVANT
MARKETS .

THE COMMISSION DRAWS THE FOLLOWING CONCLUSION FROM THIS ( RECITAL 21 TO
THE DECISION ): ' ' ROCHE ENJOYS SUCH COMPLETE FREEDOM OF ACTION ON THE
RELEVANT MARKETS ENABLING IT TO IMPEDE EFFECTIVE COMPETITION WITHIN THE
COMMON MARKET THAT IT HAS A DOMINANT POSITION ON SUCH MARKETS ' ' .

37ROCHE CHALLENGES THE ASSESSMENT OF ITS MARKET SHARES AND ALSO THE TRUTH
AND RELEVANCE OF THE OTHER FACTORS USED IN THE CONTESTED DECISION .

IT ALSO BLAMES THE COMMISSION FOR HAVING OMITTED TO EXAMINE AND TAKE INTO
CONSIDERATION ROCHE ' S CONDUCT ON THE RELEVANT MARKETS AND IN PARTICULAR
THE CONTINUAL LARGE FALLS IN THE PRICES OF VITAMINS WHICH PROVE THAT THERE
WAS EFFECTIVE COMPETITION AND THAT ROCHE HAD TO YIELD TO ITS PRESSURE .

38ARTICLE 86 IS AN APPLICATION OF THE GENERAL OBJECTIVE OF THE ACTIVITIES OF

THE COMMUNITY LAID DOWN BY ARTICLE 3 ( F ) OF THE TREATY NAMELY , THE INSTITUTION OF A SYSTEM ENSURING THAT COMPETITION IN THE COMMON MARKET IS NOT DISTORTED .

ARTICLE 86 PROHIBITS ANY ABUSE BY AN UNDERTAKING OF A DOMINANT POSITION IN A SUBSTANTIAL PART OF THE COMMON MARKET IN SO FAR AS IT MAY AFFECT TRADE BETWEEN MEMBER STATES .

THE DOMINANT POSITION THUS REFERRED TO RELATES TO A POSITION OF ECONOMIC STRENGTH ENJOYED BY AN UNDERTAKING WHICH ENABLES IT TO PREVENT EFFECTIVE COMPETITION BEING MAINTAINED ON THE RELEVANT MARKET BY AFFORDING IT THE POWER TO BEHAVE TO AN APPRECIABLE EXTENT INDEPENDENTLY OF ITS COMPETITORS , ITS CUSTOMERS AND ULTIMATELY OF THE CONSUMERS .

39 SUCH A POSITION DOES NOT PRECLUDE SOME COMPETITION , WHICH IT DOES WHERE THERE IS A MONOPOLY OR A QUASI-MONOPOLY , BUT ENABLES THE UNDERTAKING WHICH PROFITS BY IT , IF NOT TO DETERMINE , AT LEAST TO HAVE AN APPRECIABLE INFLUENCE ON THE CONDITIONS UNDER WHICH THAT COMPETITION WILL DEVELOP , AND IN ANY CASE TO ACT LARGELY IN DISREGARD OF IT SO LONG AS SUCH CONDUCT DOES NOT OPERATE TO ITS DETRIMENT .

A DOMINANT POSITION MUST ALSO BE DISTINGUISHED FROM PARALLEL COURSES OF CONDUCT WHICH ARE PECULIAR TO OLIGOPOLIES IN THAT IN AN OLIGOPOLY THE COURSES OF CONDUCT INTERACT , WHILE IN THE CASE OF AN UNDERTAKING OCCUPYING A DOMINANT POSITION THE CONDUCT OF THE UNDERTAKING WHICH DERIVES PROFITS FROM THAT POSITION IS TO A GREAT EXTENT DETERMINED UNILATERALLY .

THE EXISTENCE OF A DOMINANT POSITION MAY DERIVE FROM SEVERAL FACTORS WHICH , TAKEN SEPARATELY , ARE NOT NECESSARILY DETERMINATIVE BUT AMONG THESE FACTORS A HIGHLY IMPORTANT ONE IS THE EXISTENCE OF VERY LARGE MARKET SHARES .

40 A SUBSTANTIAL MARKET SHARE AS EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION IS NOT A CONSTANT FACTOR AND ITS IMPORTANCE VARIES FROM MARKET TO MARKET ACCORDING TO THE STRUCTURE OF THESE MARKETS , ESPECIALLY AS FAR AS PRODUCTION , SUPPLY AND DEMAND ARE CONCERNED .

EVEN THOUGH EACH GROUP OF VITAMINS CONSTITUTES A SEPARATE MARKET , THESE DIFFERENT MARKETS , AS HAS EMERGED FROM THE EXAMINATION OF THEIR STRUCTURE , NEVERTHELESS HAVE A SUFFICIENT NUMBER OF FEATURES IN COMMON TO MAKE IT POSSIBLE FOR THE SAME CRITERIA TO BE APPLIED TO THEM AS FAR AS CONCERNS THE IMPORTANCE OF THE MARKET SHARES FOR THE PURPOSE OF DETERMINING WHETHER THERE IS A DOMINANT POSITION OR NOT .

41 FURTHERMORE ALTHOUGH THE IMPORTANCE OF THE MARKET SHARES MAY VARY FROM ONE MARKET TO ANOTHER THE VIEW MAY LEGITIMATELY BE TAKEN THAT VERY LARGE SHARES ARE IN THEMSELVES , AND SAVE IN EXCEPTIONAL CIRCUMSTANCES , EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION .

AN UNDERTAKING WHICH HAS A VERY LARGE MARKET SHARE AND HOLDS IT FOR SOME TIME , BY MEANS OF THE VOLUME OF PRODUCTION AND THE SCALE OF THE SUPPLY WHICH IT STANDS FOR - WITHOUT THOSE HAVING MUCH SMALLER MARKET SHARES BEING ABLE TO MEET RAPIDLY THE DEMAND FROM THOSE WHO WOULD LIKE TO BREAK AWAY FROM THE UNDERTAKING WHICH HAS THE LARGEST MARKET SHARE - IS BY VIRTUE OF THAT SHARE IN A POSITION OF STRENGTH WHICH MAKES IT AN UNAVOIDABLE TRADING PARTNER AND WHICH , ALREADY BECAUSE OF THIS SECURES FOR IT , AT THE VERY LEAST DURING RELATIVELY LONG PERIODS , THAT FREEDOM OF ACTION WHICH IS

THE SPECIAL FEATURE OF A DOMINANT POSITION .

42THE CONTESTED DECISION HAS MENTIONED BESIDES THE MARKET SHARES A NUMBER OF OTHER FACTORS WHICH TOGETHER WITH ROCHE ' S MARKET SHARES WOULD SECURE FOR IT IN CERTAIN CIRCUMSTANCES , A DOMINANT POSITION .

THESE FACTORS WHICH THE DECISION CLASSIFIES AS ADDITIONAL CRITERIA ARE AS FOLLOWS :
( A ) ROCHE ' S MARKET SHARES ARE NOT ONLY LARGE BUT THERE IS ALSO A BIG DISPARITY BETWEEN ITS SHARES AND THOSE OF ITS NEXT LARGEST COMPETITORS ( RECITALS 5 AND 21 TO THE DECISION );

( B ) ROCHE PRODUCES A FAR WIDER RANGE OF VITAMINS THAN ITS COMPETITORS ( RECITAL 21 TO THE DECISION );

( C ) ROCHE IS THE WORLD ' S LARGEST VITAMIN MANUFACTURER WHOSE TURNOVER EXCEEDS THAT OF ALL THE OTHER PRODUCERS AND IS AT THE HEAD OF A MULTINATIONAL GROUP WHICH IN TERMS OF SALES IS THE WORLD ' S LEADING PHARMACEUTICALS PRODUCER ( RECITALS 5 , 6 AND 21 TO THE DECISION );

( D ) ALTHOUGH ROCHE ' S PATENTS FOR THE MANUFACTURE OF VITAMINS HAVE EXPIRED ROCHE , SINCE IT HAS PLAYED A LEADING ROLE IN THIS FIELD , STILL ENJOYS TECHNOLOGICAL ADVANTAGES OVER ITS COMPETITORS OF WHICH THE HIGHLY DEVELOPED CUSTOMER INFORMATION AND ASSISTANCE SERVICE WHICH IT HAS IS EVIDENCE ( RECITALS 7 AND 8 TO THE DECISION );

( E ) ROCHE HAS A VERY EXTENSIVE AND HIGHLY SPECIALIZED SALES NETWORK ( RECITAL 21 TO THE DICISION );

( F ) THERE IS NO POTENTIAL COMPETITION ( RECITAL 21 TO THE DECISION ).

FURTHERMORE DURING THE PROCEEDINGS BEFORE THE COURT THE COMMISSION ADDUCED AS A FACTOR ESTABLISHING ROCHE ' S DOMINANT POSITION THE LATTER ' S ABILITY , NOTWITHSTANDING LIVELY COMPETITION , TO MAINTAIN ITS MARKET SHARES SUBSTANTIALLY INTACT .

43BEFORE CONSIDERING WHETHER THE FACTORS TAKEN INTO ACCOUNT BY THE COMMISSION CAN IN FACT BE CONFIRMED IN ROCHE ' S CASE IT IS NECESSARY TO ASCERTAIN , SINCE THE APPLICANT CHALLENGES THEIR RELEVANCE , WHETHER THESE FACTORS , IN THE LIGHT OF THE SPECIAL FEATURES OF THE RELEVANT MARKETS AND OF THE MARKET SHARES , ARE OF SUCH A KIND AS TO DISCLOSE THE EXISTENCE OF A DOMINANT POSITION .

44IN THIS CONNEXION IT IS NECESSARY TO REJECT THE CRITERION BASED ON RETENTION OF MARKET SHARES , SINCE THIS MAY JUST AS WELL RESULT FROM EFFECTIVE COMPETITIVE BEHAVIOUR AS FROM A POSITION WHICH ENSURES THAT ROCHE CAN BEHAVE INDEPENDENTLY OF COMPETITORS , AND THE COMMISSION , WHILE ADMITTING THAT THERE IS COMPETITION , HAS NOT MENTIONED THE FACTORS WHICH MAY ACCOUNT FOR THE STABILITY OF MARKET SHARES WHERE IT HAS BEEN FOUND TO EXIST .

HOWEVER IF THERE IS A DOMINANT POSITION THEN RETENTION OF THE MARKET SHARES MAY BE A FACTOR DISCLOSING THAT THIS POSITION IS BEING MAINTAINED , AND , ON THE OTHER HAND , THE METHODS ADOPTED TO MAINTAIN A DOMINANT POSITION MAY BE AN ABUSE WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY .

45THE FACT THAT ROCHE PRODUCES A FAR WIDER RANGE OF VITAMINS THAN ITS

COMPETITORS MUST SIMILARLY BE REJECTED AS BEING IMMATERIAL .

THE COMMISSION REGARDS THIS AS A FACTOR ESTABLISHING A DOMINANT POSITION AND ASSERTS THAT ' ' SINCE THE REQUIREMENTS OF MANY USERS EXTEND TO SEVERAL GROUPS OF VITAMINS , ROCHE IS ABLE TO EMPLOY A SALES AND PRICING STRATEGY WHICH IS FAR LESS DEPENDENT THAN THAT OF THE OTHER MANUFACTURERS ON THE CONDITIONS OF COMPETITION IN EACH MARKET ' ' .

46HOWEVER THE COMMISSION HAS ITSELF FOUND THAT EACH GROUP OF VITAMINS CONSTITUTES A SPECIFIC MARKET AND IS NOT , OR AT LEAST NOT TO ANY SIGNIFICANT EXTENT , INTERCHANGEABLE WITH ANY OTHER GROUP OR WITH ANY OTHER PRODUCTS ( RECITAL 20 TO THE DECISION ) SO THAT THE VITAMINS BELONGING TO THE VARIOUS GROUPS ARE AS BETWEEN THEMSELVES PRODUCTS JUST AS DIFFERENT AS THE VITAMINS COMPARED WITH OTHER PRODUCTS OF THE PHARMACEUTICAL AND FOOD SECTOR .

MOREOVER IT IS NOT DISPUTED THAT ROCHE ' S COMPETITORS , IN PARTICULAR THOSE IN THE CHEMICAL INDUSTRY , MARKET BESIDES THE VITAMINS WHICH THEY MANUFACTURE THEMSELVES , OTHER PRODUCTS WHICH PURCHASERS OF VITAMINS ALSO WANT , SO THAT THE FACT THAT ROCHE IS IN A POSITION TO OFFER SEVERAL GROUPS OF VITAMINS DOES NOT IN ITSELF GIVE IT ANY ADVANTAGE OVER ITS COMPETITORS , WHO CAN OFFER , IN ADDITION A LESS OR MUCH LESS WIDE RANGE OF VITAMINS , OTHER PRODUCTS WHICH ARE ALSO REQUIRED BY THE PURCHASERS OF THESE VITAMINS .

47SIMILAR CONSIDERATIONS LEAD ALSO TO THE REJECTION AS A RELEVANT FACTOR OF THE CIRCUMSTANCE THAT ROCHE IS THE WORLD ' S LARGEST VITAMIN MANUFACTURER , THAT ITS TURNOVER EXCEEDS THAT OF ALL THE OTHER MANUFACTURERS AND THAT IT IS AT THE HEAD OF THE LARGEST PHARMACEUTICALS GROUP IN THE WORLD .

IN THE VIEW OF THE COMMISSION THESE THREE CONSIDERATIONS TOGETHER ARE A FACTOR SHOWING THAT THERE IS A DOMINANT POSITION , BECAUSE ' ' IT FOLLOWS THAT THE APPLICANT OCCUPIES A PREPONDERANT POSITION NOT ONLY WITHIN THE COMMON MARKET BUT ALSO ON THE WORLD MARKET ; IT THEREFORE ENJOYS VERY CONSIDERABLE FREEDOM OF ACTION , SINCE ITS POSITION ENABLES IT TO ADAPT ITSELF EASILY TO THE DEVELOPMENTS OF THE DIFFERENT REGIONAL MARKETS . AN UNDERTAKING OPERATING THROUGHOUT THE MARKETS OF THE WORLD AND HAVING A MARKET SHARE WHICH LEAVES ALL ITS COMPETITORS FAR BEHIND IT DOES NOT HAVE TO CONCERN ITSELF UNDULY ABOUT ANY COMPETITORS WITHIN THE COMMON MARKET ' ' .

SUCH REASONING BASED ON THE BENEFITS REAPED FROM ECONOMICS OF SCALE AND ON THE POSSIBILITY OF ADOPTING A STRATEGY WHICH VARIES ACCORDING TO THE DIFFERENT REGIONAL MARKETS IS NOT CONCLUSIVE , SEEING THAT IT IS ACCEPTED THAT EACH GROUP OF VITAMINS CONSTITUTES A GROUP OF SEPARATE PRODUCTS WHICH REQUIRE THEIR OWN PARTICULAR PLANT AND FORM A SEPARATE MARKET , IN THAT THE VOLUME OF THE OVERALL PRODUCTION OF PRODUCTS WHICH ARE DIFFERENT AS BETWEEN THEMSELVES DOES NOT GIVE ROCHE A COMPETITIVE ADVANTAGE OVER ITS COMPETITORS , ESPECIALLY OVER THOSE IN THE CHEMICAL INDUSTRY , WHO MANUFACTURE ON A WORLD SCALE OTHER PRODUCTS AS WELL AS VITAMINS AND HAVE IN PRINCIPLE THE SAME OPPORTUNITIES TO SET OFF ONE MARKET AGAINST THE OTHER AS ARE OFFERED BY A LARGE OVERALL PRODUCTION OF PRODUCTS WHICH DIFFER FROM EACH OTHER AS MUCH AS THE VARIOUS GROUPS OF VITAMINS DO .

48ON THE OTHER HAND THE RELATIONSHIP BETWEEN THE MARKET SHARES OF THE UNDERTAKING CONCERNED AND OF ITS COMPETITORS , ESPECIALLY THOSE OF THE NEXT LARGEST , THE TECHNOLOGICAL LEAD OF AN UNDERTAKING OVER ITS COMPETITORS ,

THE EXISTENCE OF A HIGHLY DEVELOPED SALES NETWORK AND THE ABSENCE OF POTENTIAL COMPETITION ARE RELEVANT FACTORS , THE FIRST BECAUSE IT ENABLES THE COMPETITIVE STRENGTH OF THE UNDERTAKING IN QUESTION TO BE ASSESSED , THE SECOND AND THIRD BECAUSE THEY REPRESENT IN THEMSELVES TECHNICAL AND COMMERCIAL ADVANTAGES AND THE FOURTH BECAUSE IT IS THE CONSEQUENCE OF THE EXISTENCE OF OBSTACLES PREVENTING NEW COMPETITORS FROM HAVING ACCESS TO THE MARKET .

AS FAR AS THE EXISTENCE OR NON-EXISTENCE OF POTENTIAL COMPETITION IS CONCERNED IT MUST HOWEVER BE OBSERVED THAT , ALTHOUGH IT IS TRUE - AND THIS APPLIES TO ALL THE GROUPS OF VITAMINS IN QUESTION - THAT BECAUSE OF THE AMOUNT OF CAPITAL INVESTMENT REQUIRED THE CAPACITY OF THE FACTORIES IS DETERMINED ACCORDING TO THE ANTICIPATED GROWTH OVER A LONG PERIOD SO THAT ACCESS TO THE MARKET BY NEW PRODUCERS IS NOT EASY , ACCOUNT MUST ALSO BE TAKEN OF THE FACT THAT THE EXISTENCE OF CONSIDERABLE UNUSED MANUFACTURING CAPACITY CREATES POTENTIAL COMPETITION BETWEEN ESTABLISHED MANUFACTURERS .

NEVERTHELESS ROCHE IS IN THIS RESPECT IN A PRIVILEGED POSITION BECAUSE , AS IT ADMITS ITSELF , ITS OWN MANUFACTURING CAPACITY WAS , DURING THE PERIOD COVERED BY THE CONTESTED DECISION , IN ITSELF SUFFICIENT TO MEET WORLD DEMAND WITHOUT THIS SURPLUS MANUFACTURING CAPACITY PLACING IT IN A DIFFICULT ECONOMIC OR FINANCIAL SITUATION .

49IT IS IN THE LIGHT OF THE PRECEDING CONSIDERATIONS THAT ROCHE ' S SHARES OF EACH OF THE RELEVANT MARKETS , COMPLEMENTED BY THOSE FACTORS WHICH IN CONJUNCTION WITH THE MARKET SHARES MAKE IT POSSIBLE TO SHOW THAT THERE MAY BE A DOMINANT POSITION , MUST BE EVALUATED .

FINALLY IT WILL ALSO BE NECESSARY TO CONSIDER WHETHER ROCHE ' S SUBMISSIONS RELATING TO THE IMPLICATION OF ITS CONDUCT ON THE MARKET , MAINLY AS FAR AS CONCERNS PRICES , ARE OF SUCH A KIND AS TO ALTER THE FINDINGS TO WHICH THE EXAMINATION OF THE MARKET SHARES AND THE OTHER FACTORS TAKEN INTO ACCOUNT MIGHT LEAD .

SECTION 4 : APPLICATION OF THE RELEVANT CRITERIA TO THE DIFFERENT GROUPS OF VITAMINS
( A ) THE VITAMIN A GROUP
50THE PARTIES BOTH CONCEDE THAT ROCHE ' S MARKET SHARE WITHIN THE COMMON MARKET MAY BE PUT AT 47 % BOTH AS TO VALUE AND QUANTITY .

ACCORDING TO THE DATA PRODUCED BY THE COMMISSION , WHICH ROCHE DOES NOT DISPUTE , THE SHARES OF THE OTHER PRODUCERS IN 1974 MAY BE PUT AT 27 % , 18 % , 7 % , AND 1 % .

51SINCE THE RELEVANT MARKET THUS HAS THE PARTICULAR FEATURES OF A NARROW OLIGOPOLISTIC MARKET IN WHICH THE DEGREE OF COMPETITION BY ITS VERY NATURE HAS ALREADY BEEN WEAKENED , ROCHE ' S SHARE , WHICH IS EQUAL TO THE AGGREGATE OF THE SHARES OF ITS TWO NEXT LARGEST COMPETITORS , PROVES THAT IT IS ENTIRELY FREE TO DECIDE WHAT ATTITUDE TO ADOPT WHEN CONFRONTED BY COMPETITION .

ROCHE ' S TECHNICAL LEAD OVER ITS COMPETITORS DUE TO THE FACT THAT IT IS THE PROPRIETOR OF SEVERAL PATENTS RELATING TO VITAMIN A , EVEN AFTER THE EXPIRATION OF THESE PATENTS , IS A FURTHER INDICATION THAT IT OCCUPIES A DOMINANT POSITION .

AS HAS BEEN INDICATED ABOVE THE SAME APPLIES TO THE ABSENCE OF POTENTIAL

# EXHIBIT C
# 2 OF 2

COMPETITION FROM NEW MANUFACTURERS , WHEREAS THE COMPETITION DERIVED FROM THE SURPLUS MANUFACTURING CAPACITY OF EXISTING UNDERTAKINGS RATHER FAVOURS ROCHE AS IS APPARENT FROM AN EXTRACT FROM MANAGEMENT INFORMATION OF THE MIDDLE OF AUGUST 1971 WHICH READS ' ' ALTHOUGH BASF WILL CONTINUE TO INTENSIFY ITS ACTIVITIES , WE EXPECT TO ACHIEVE A FURTHER STEADY INCREASE OF OUR TURNOVER . HOWEVER , THE PRESENT OVERCAPACITY OF PRODUCTION IS SUCH THAT A FIXING OF PRICES CANNOT BE EXPECTED FOR THE NEXT FEW YEARS . SUCH A DEVELOPMENT WOULD , OF COURSE , BE ACCELERATED IF ONE OF OUR SMALLER COMPETITORS CEASED PRODUCTION ' ' .

52THEREFORE THE COMMISSION WAS RIGHT TO FIND THAT THE APPLICANT OCCUPIES A DOMINANT POSITION ON THE MARKET IN VITAMIN A .
THE FACT THAT ROCHE HAD TO OBTAIN ITS SUPPLIES OF RAW MATERIALS FOR THE MANUFACTURE OF VITAMINS OF GROUP A FROM AN UNDERTAKING OF THE CHEMICAL INDUSTRY WHICH ALSO MANUFACTURED VITAMIN A AND WHICH WAS CONSEQUENTLY ITS COMPETITOR IS NOT OF SUCH A KIND AS TO ALTER THE COMMISSION ' S CONCLUSIONS , SINCE ROCHE HAS NEVER CLAIMED THAT IT WAS IN ANY DIFFICULTIES AT ALL EITHER AS REGARDS THE FREQUENCY OF THE DELIVERIES OF ITS SUPPLIES OR AS REGARDS PRICES .

( B ) THE VITAMIN B GROUP
53THE COMMISSION IN ITS CONTESTED DECISION HAD EVALUATED ROCHE ' S MARKET SHARE AT 86 % .

IN THE DOCUMENT WHICH WAS JOINTLY PREPARED DURING THE WRITTEN PROCEDURE IT DISCLOSED THE BASES OF ITS CALCULATIONS OF ROCHE ' S MARKET SHARES BOTH IN VALUE AND IN QUANTITY , AND IT APPEARS FROM THE TABLES WHICH IT PRODUCED THAT ALL THE IMPORTS OF VITAMINS INTO THE COMMON MARKET FOR WHICH THERE ARE STATISTICS HAVE BEEN TAKEN INTO CONSIDERATION .

ON THE BASIS OF THESE DATA IT ARRIVES AT THE FOLLOWING FIGURES :
54ROCHE SIMPLY ASSERTS IN SUBSTANCE ' ' THAT SINCE , AS FAR AS CONCERNS COMPETITION , IT HAS TO RELY ON MERE ESTIMATES IT IS UNABLE TO ADDUCE ANY EVIDENCE TO THE CONTRARY ' ' , BUT IT ESTIMATES ITS SHARE OF THE WORLD MARKET AS BEING CONSIDERABLY LESS AND ITS SHARE OF THE COMMON MARKET AT NOT MORE THAN 50 % .

IN ORDER TO JUSTIFY THE DIFFERENCE BETWEEN THE LATTER ESTIMATE AND THE COMMISSION ' S IT REFERS TO THE FACT THAT ' ' IF THE FERMENTATION PRODUCTION CAPACITY , ESPECIALLY IN THE USA , OF 200 TO 300 TONNES PER ANNUM , WHICH WAS REDUCED TO A MINIMUM AT THE BEGINNING OF 1970 BUT WHICH MAY AT ANY MOMENT BE REACTIVATED , IS ADDED TO THESE FIGURES ITS SHARE IS ONLY ABOUT 50 % ' ' , THUS PLEADING - WITHOUT GIVING ANY OTHER PARTICULARS - EITHER THE EXISTENCE OF POTENTIAL COMPETITION OR A REDUCTION OF ITS OWN MANUFACTURING CAPACITY IN THE USA .
55IF THE FIRST ASSUMPTION PROVED TO BE CORRECT IT WOULD BE SUCH AS TO RAISE THE PRESUMPTION THAT AFTER 1970 SOME OF ROCHE ' S COMPETITORS WERE ELIMINATED FROM THE MARKET .

EVEN IF IT IS ASSUMED - THE POSITION IS NOT CLEAR - THAT THE REFERENCE IS TO THE CLOSING DOWN OF ROCHE ' S MANUFACTURING CAPACITY , THIS FACT CANNOT BE RELIED ON FOR THE PURPOSE OF CHALLENGING THE COMMISSION ' S CALCULATIONS AS LONG AS IT HAS NOT BEEN ESTABLISHED THAT COMPETITORS DID NOT ALSO CLOSE DOWN THEIR MANUFACTURING CAPACITY , AND THAT , IN ANY CASE , THE INEVITABLE OUTCOME OF THIS WAS A REDUCTION OF ROCHE ' S MARKET SHARES WITHIN THE COMMON MARKET RATHER THAN A RATIONALIZATION OF PRODUCTION .

FURTHERMORE ALTHOUGH THE EXISTENCE OF SURPLUS MANUFACTURING CAPACITY MAY IN CERTAIN CIRCUMSTANCES BE A CONSISTENT ELEMENT OF POTENTIAL COMPETITION LIKELY TO HAVE AN EFFECT ON THE QUESTION WHETHER THERE IS A DOMINANT POSITION - ALTHOUGH IT HAS ALREADY BEEN CONFIRMED ABOVE THAT THIS FACTOR DID NOT APPLY TO ROCHE DURING THE PERIOD UNDER CONSIDERATION - IT CANNOT AFFECT THE EVALUATION OF THE MARKET SHARES WHICH HAVE IN FACT BEEN ACQUIRED .

56IN THESE CIRCUMSTANCES THE COMMISSION ' S CALCULATIONS AS CORRECTED , WHICH MOREOVER ARE SUFFICIENTLY DEPENDABLE TO BE CAPABLE OF ACCEPTANCE , CANNOT BE CALLED IN QUESTION ON THE STRENGTH OF THE ABOVE-MENTIONED OBJECTIONS AND THE MARKET SHARES WHICH THEY DISCLOSE ARE SO LARGE THAT THEY ARE IN THEMSELVES EVIDENCE OF A DOMINANT POSITION .

( C ) THE VITAMIN B3 ( PANTOTHENIC ACID ) GROUP
57THE COMMISSION HAS ADMITTED THAT THE FIGURES USED IN THE CONTESTED DECISION HAD TO BE CORRECTED AND THE TWO PARTIES AGREE THE FOLLOWING EVALUATIONS OF THE MARKET SHARES :
58MARKET SHARES OF THIS SIZE EITHER IN VALUE OR IN QUANTITY , COMPLEMENTED BY THE STATEMENT IN THE DOCUMENT JOINTLY PREPARED BY THE PARTIES THAT THE FIGURES FOR 1971 WERE 6 % LOWER STILL THAN THOSE FOR 1972 DO NOT IN THEMSELVES CONSTITUTE A FACTOR SUFFICIENT TO ESTABLISH THE EXISTENCE OF A DOMINANT POSITION FOR MOST OF THE PERIOD CONSIDERED BY THE COMMISSION .

ON THE CONTRARY IT HAS BECOME APPARENT THAT THE RECTIFICATION WHICH THE LATTER HAD TO CARRY OUT WAS DUE TO ITS OMISSION TO TAKE ACCOUNT OF THE IMPORTS OF A JAPANESE COMPETITOR WHICH IN 1973 ACCOUNTED FOR 30 % OF THE MARKET .

ON THE OTHER HAND THE COMMISSION , IN THE CASE OF THIS PARTICULAR MARKET , HAS NOT INDICATED WHAT THE ADDITIONAL FACTORS WOULD BE , WHICH , TOGETHER WITH THE MARKET SHARE AS CORRECTED , NEVERTHELESS WOULD BE OF SUCH A KIND AS TO ADMIT OF THE EXISTENCE OF A DOMINANT POSITION .

THESE FINDINGS LEAD TO THE CONCLUSION THAT , AS FAR AS CONCERNS VITAMIN B3 , THERE IS INSUFFICIENT EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION HELD BY ROCHE FOR THE PERIOD UNDER CONSIDERATION .

( D ) THE VITAMIN B6 GROUP
59THE COMMISSION HAD EVALUATED ROCHE ' S MARKET SHARE AT 95 % WHEREAS ROCHE , WHICH HAS NOT SUPPLIED ANY PARTICULARS RELATING TO THE COMMON MARKET , ADMITS THAT IT HAS A MARKET SHARE OF ABOUT 60 TO 70 % OF THE WORLD MARKET .

AFTER THE PARTIES HAD COMPARED THEIR FIGURES ( ANNEXES 1 ( E ) AND 2 ( G ) TO THE DOCUMENT RELATING TO MATTERS AGREED BY THE PARTIES ) THEY WERE UNABLE TO AGREE A JOINT EVALUATION AND THE COMMISSION PRODUCED THE FOLLOWING FIGURES AFTER HAVING CORRECTED ITS OWN EVALUATION :
60IT MUST BE NOTED THAT , ALTHOUGH THE MARKET SHARES COVER THE TWO GROUPS B6 AND H , AT LEAST IN TERMS OF VALUE , BECAUSE THE VITAMINS OF GROUPS B6 AND H FALL WITHIN THE SAME CUSTOMS HEADING , ROCHE HAS NEVERTHELESS NOT CONTENDED THAT THIS FACT IS NOT OF SUCH A KIND AS TO ALTER THE RESULTING ORDERS OF MAGNITUDE .

ROCHE MAINTAINS , WITHOUT GOING INTO A MORE DETAILED EXPLANATION , THAT THIS ESTIMATE MUST BE REDUCED BY AT LEAST 20 % , BUT EVEN IF THIS VIEW WERE TO BE ACCEPTED WITHOUT QUALIFICATION , ROCHE ' S MARKET SHARES ARE NEVERTHELESS SO LARGE THAT THEY PROVE THE EXISTENCE OF A DOMINANT POSITION .

THIS IS ALL THE MORE TRUE BECAUSE AT THE RELEVANT TIME THE MARKET SHARE OF NONE OF ROCHE ' S FOUR NEXT LARGEST COMPETITORS REACHED 10 % AND THE SHARES OF SOME OF THEM WERE PROBABLY LESS THAN 5 % .

( E ) THE VITAMIN C GROUP
61THE COMMISSION IN THE CONTESTED DECISION HAD ESTIMATED ROCHE ' S MARKET SHARE AT 68 % , WHEREAS ROCHE DURING THE PROCEEDINGS PUT FORWARD THE FIGURE OF 50% .

THE PARTIES , AFTER HAVING COMPARED THEIR VIEWS , AGREED ON THE FOLLOWING ESTIMATES OF THE MARKET SHARES ON THE ASSUMPTION THAT ONLY THE MARKET IN VITAMINS IS TAKEN INTO CONSIDERATION :
62ROCHE TAKES THE VIEW THAT THIS ESTIMATE SHOULD BE CORRECTED BY ALLOWING FOR THE FACT THAT THE MARKET IN QUESTION SHOULD ALSO INCLUDE PRODUCTS COMPETING WITH THE TECHNOLOGICAL USES OF VITAMIN C AND IT ASSERTS THAT IN THOSE CIRCUMSTANCES ITS MARKET SHARE WOULD NOT EXCEED 47% .

63SINCE THE CONSIDERATIONS SET OUT ABOVE RELATING TO THE DELIMITATION OF THE RELEVANT MARKET FOR VITAMINS INTENDED BOTH FOR BIONUTRITIVE AND TECHNOLOGICAL USES HAVE LED TO THE ARGUMENT DEVELOPED BY ROCHE BEING REJECTED , THE MARKET SHARES WHICH THE PARTIES HAVE AGREED OF THE VITAMIN C MARKET AS SUCH MUST BE ACCEPTED . THEY ARE EVIDENCE OF THE EXISTENCE OF A DOMINANT POSITION .

AS FAR AS CONCERNS THIS MARKET TOO - ON WHICH MOREOVER THERE WAS A SHORTAGE IN 1971 - THE GAP BETWEEN ROCHE ' S SHARES ( 64.8% ) AND THOSE OF ITS NEXT LARGEST COMPETITORS ( 14.8% AND 6.3% ) WAS SUCH AS TO CONFIRM THE CONCLUSION WHICH THE COMMISSION REACHED .

( F ) THE VITAMIN E GROUP
64THE COMMISSION IN ITS CONTESTED DECISION HAD EVALUATED ROCHE ' S SHARE OF THE VITAMIN E MARKET AT 70% , WHEREAS ROCHE DURING THE PROCEEDINGS PUT FORWARD THE FIGURE OF 40% .

THE PARTIES , AFTER HAVING COMPARED THEIR VIEWS , JOINTLY AGREED TO EVALUATE THE MARKET SHARES , ON THE ASSUMPTION THAT ONLY THE VITAMIN E MARKET HAS TO BE TAKEN INTO CONSIDERATION , AS FOLLOWS :
MOREOVER ROCHE ESTIMATES THAT ITS SHARE FOR 1970 AND 1971 IS 7% LOWER STILL THAN THAT FOR 1972 .
65ROCHE TAKES THE VIEW , FOR THE SAME REASONS WHICH IT PUT FORWARD IN RELATION TO VITAMIN C , THAT THE RELEVANT MARKET SHOULD ALSO INCLUDE PRODUCTS COMPETING WITH THE TECHNOLOGICAL USES OF VITAMIN E AND IT ASSERTS THAT IN THOSE CIRCUMSTANCES ITS MARKET SHARE FOR 1974 WOULD NOT EXCEED 40% .

66SINCE ROCHE ' S ARGUMENT AS FAR AS CONCERNS THE DELIMITATION OF THE RELEVANT MARKET HAS BEEN REJECTED FOR THE REASONS MENTIONED ABOVE IT IS NECESSARY TO TAKE INTO CONSIDERATION THE MARKET SHARES WHICH THE PARTIES HAVE AGREED .

THE SIZE OF THESE SHARES , WHICH IS IN ITSELF SIGNIFICANT , IS MADE THE MORE SO BY THE FACT THAT THE SHARES OF ROCHE ' S COMPETITORS MUST BE ESTIMATED , AFTER THE BEFORE-MENTIONED RECTIFICATION , FOR 1974 , ACCORDING TO VALUE , AT 16% , 6% AND 1% IN THE CASE OF THE OTHER PRODUCERS AND AT 19% FOR ONE OR MORE IMPORTERS WHO WERE IN GENERAL FIRMS OPERATING FROM NON-MEMBER STATES .

SUCH A POSITION AS THE ONE WHICH HAS BEEN ESTABLISHED CONFORMS EVEN MORE
TYPICALLY THAN THE ONE ESTABLISHED IN THE CASE OF VITAMIN A TO THE PATTERN OF
A NARROW OLIGOPOLISTIC MARKET IN WHICH ROCHE ' S SHARE IS MUCH LARGER THAN
THE COMBINED SHARES OF THE TWO NEXT LARGEST COMPETITORS .

THEREFORE THE COMMISSION WAS RIGHT TO FIND THAT THERE WAS A DOMINANT
POSITION ON THIS MARKET .

( G ) THE VITAMIN H GROUP
67THE APPLICANT HAS ADMITTED THAT IT HAD A 100% SHARE OF THIS MARKET AND
THAT DURING THE PERIOD UNDER CONSIDERATION ITS SHARE AMOUNTED TO 93% WITH
THE RESULT THAT IT IN FACT HAS A MONOPOLY .

( H ) SUMMARY
68IT FOLLOWS FROM THE FOREGOING THAT , AS FAR AS CONCERNS THE GROUPS OF
VITAMINS A , B2 , B6 , C , E AND H , ALL THE CONSTITUENT ELEMENTS OF A DOMINANT
POSITION WERE PRESENT WHEREAS THE EXISTENCE OF SUCH A POSITION IN THE CASE
OF VITAMIN B3 HAS NOT BEEN ESTABLISHED .

SECTION 5 : THE APPLICANT ' S CONDUCT ON THE MARKET
69IT IS HOWEVER NECESSARY TO CONSIDER WHETHER THE PRECEDING CONCLUSIONS
ARE BELIED BY THE APPLICANT ' S BEHAVIOUR ON THE RELEVANT MARKETS , WHICH IN
ITS VIEW SHOWS THAT THERE WAS NOT ONLY LIVELY COMPETITION BUT ALSO THAT
SUCH COMPETITION BROUGHT PRESSURE TO BEAR ON IT .

ON THIS POINT IT PLACES SPECIAL RELIANCE ON THE FACT THAT THE PRICES OF THE
VARIOUS GROUPS OF VITAMINS CONTINUALLY FELL AND ALSO THAT IN CERTAIN MEMBER
STATES ITS MARKET SHARES DECREASED .

IT ALSO REFERS TO THE INFORMATION CONTAINED IN VARIOUS INTERNAL DOCUMENTS
AND ESPECIALLY IN ' ' MANAGEMENT INFORMATION ' ' AND ' ' MARKETING NEWS ' '
WHICH IT CIRCULATED REGULARLY AND WHICH CONTAIN AN ANALYSIS OF THE MARKET
SITUATION OF EACH GROUP OF VITAMINS AND ALSO TO THE INFORMATION RELATING TO
THE EUROPEAN BULK MANAGERS MEETING ORGANIZED BY ROCHE IN BASLE IN OCTOBER
1972 .
70THE COURT HAS ALREADY HELD INTER ALIA IN ITS JUDGEMENT OF 14 FEBRUARY 1978
IN CASE 27/76 UNITED BRANDS COMPANY AND UNITED BRANDS CONTINENTAAL B.V . V
COMMISSION OF THE EUROPEAN COMMUNITIES ( 1978 ) ECR 207 THAT EVEN THE
EXISTENCE OF LIVELY COMPETITION ON A PARTICULAR MARKET DOES NOT RULE OUT THE
POSSIBILITY THAT IS A DOMINANT POSITION ON THIS MARKET SINCE THE PREDOMINANT
FEATURE OF SUCH A POSITION IS THE ABILITY OF THE UNDERTAKING CONCERNED TO
ACT WITHOUT HAVING TO TAKE ACCOUNT OF THIS COMPETITION IN ITS MARKET
STRATEGY AND WITHOUT FOR THAT REASON SUFFERING ANY DETRIMENTAL EFFECTS
FROM SUCH BEHAVIOUR .

71HOWEVER , THE FACT THAT AN UNDERTAKING IS COMPELLED BY THE PRESSURE OF ITS
COMPETITORS ' PRICE REDUCTIONS TO LOWER ITS OWN PRICES IS IN GENERAL
INCOMPATIBLE WITH THAT INDEPENDENT CONDUCT WHICH IS THE HALLMARK OF A
DOMINANT POSITION .

THE APPLICANT HAS PRODUCED IN THE ANNEXES TO ITS APPLICATION A NUMBER OF
GRAPHS WITH TWO DIFFERENT CURVES , THE ONE FOR MEASURING FALLS IN PRICES AND
THE OTHER FOR MEASURING INCREASES IN PRODUCTION OF ROCHE ' S DIFFERENT
GROUPS OF VITAMINS ON THE WORLD MARKET DURING A PERIOD WHICH COVERS , AS
THE CASE MAY BE , THE YEARS FROM 1940 TO 1954 UP TO THE END OF 1974 .
72IT MUST HOWEVER BE NOTED THAT THESE GRAPHS RELATE TO THE WORLD MARKET

AND THAT ROCHE , WHICH HAS SEVERAL TIMES STRESSED THE DISPARITIES BETWEEN THE PRICE FLUCTUATIONS FROM ONE MEMBER STATE TO ANOTHER , CANNOT THEREFORE MAINTAIN THAT THE VARIATIONS ON THE WORLD MARKET ARE NECESSARILY REPRESENTATIVE OF PRICE TRENDS IN THE COMMUNITY .

EVEN IF IT IS ASSUMED THAT THE RECORDED WORLD PRICE TRENDS MAY BE REGARDED AS REFLECTING THE GENERAL TREND OF PRICES WITHIN THE COMMON MARKET , AN EXAMINATION OF THE GRAPHS HOWEVER MAKES IT CLEAR THAT , TO A VERY GREAT EXTENT , THE PRICES OF DIFFERENT GROUPS OF VITAMINS FELL CONSIDERABLY SO LONG AS PRODUCTION ONLY INCREASED SLOWLY , BUT THAT THESE FALLS WERE GREATLY REDUCED AND EVEN GRADUALLY SUPERSEDED BY A VERY HIGH DEGREE OF STABILITY AS FROM THE TIME WHEN THERE WAS A BIG INCREASE IN THE PRODUCTION OF EACH SPECIFIC GROUP OF VITAMINS , NAMELY : FROM 1964 IN THE CASE OF VITAMIN A , FROM 1956 IN THE CASE OF VITAMIN B2 ; FROM 1966 IN THE CASE OF VITAMIN B6 ; FROM 1958 IN THE CASE OF VITAMIN C ; FROM 1950 IN THE CASE OF VITAMIN B3 ; FROM 1965 IN THE CASE OF VITAMIN E , WHILE IN THE CASE OF VITAMIN H ( BIOTIN ), THE PRICE CURVE , WHICH HAD BEEN STABLE UP TO 1970 , AS FROM THAT TIME FALLS SLIGHTLY WHILE AT THE SAME TIME PRODUCTION EXPANDS .

THESE DATA SHOW THAT THERE IS A CORRELATION BETWEEN PRICES ON THE ONE HAND , AND THE VOLUME OF PRODUCTION AND COSTS ON THE OTHER , RATHER THAN BETWEEN PRICES AND THE PRESSURE OF COMPETITION .

73 ROCHE , IN ANSWER TO QUESTIONS PUT BY THE COURT , PRODUCED A NUMBER OF TABLES ( ANNEX 4 ( A-I ) OF THE DOCUMENT RELATING TO MATTERS AGREED BY THE PARTIES ) SETTING OUT THOSE VARIATIONS IN THE PRICES OF VITAMINS CONSIDERED BY ROCHE TO BE THE MOST REPRESENTATIVE IN EACH GROUP BETWEEN 1970 AND 1976 FOR EACH MEMBER STATE AS WELL AS THE AVERAGE PRICES BASED ON NATIONAL PRICES THROUGHOUT THE COMMUNITY .

74THESE TABLES IN FACT SHOW THAT THE PRICE RISES AND FALLS VARIED CONSIDERABLY .

HOWEVER , THE PRICE VARIATIONS OF THE SAME PRODUCT DURING THE SAME PERIOD DIFFER MARKEDLY IN THE VARIOUS MEMBER STATES AND THIS DISCLOSES A PARTITIONING OF THE MARKETS AND WOULD BE LIKELY TO RAISE THE PRESUMPTION OF A CORRESPONDING PRICE STRATEGY .

IT IS NOTEWORTHY THAT IN THE CASE OF VITAMIN H ( BIOTIN ), IN RESPECT OF WHICH ROCHE ADMITS THAT ITS MARKET SHARE WAS 100% IN 1970 AND 93% IN 1974 , ANNEX 4 TO THE DOCUMENT RELATING TO MATTERS AGREED BY THE PARTIES SHOWS THAT THERE WERE ALSO CONSIDERABLE PRICE REDUCTIONS , WHICH , EXPRESSED IN SWISS FRANCS AND TAKING AVERAGE FIGURES , RECORD FALLS THROUGHOUT THE WHOLE OF THE COMMON MARKET FROM 40.54 SWISS FRANCS IN 1970 TO 30.72 SWISS FRANCS IN 1973 AND TO 29.85 SWISS FRANCS IN 1974 . SUCH FALLS IN PRICES CANNOT IN THE CASE OF AN UNDERTAKING HAVING A MARKET SHARE OF BETWEEN 93% AND 100% BE ATTRIBUTED TO THE PRESSURE OF COMPETITION BUT ARE DETERMINED RATHER BY A PRICE POLICY INTENTIONALLY AND FREELY ADOPTED AND ARE NOT IN ANY CASE INCONSISTENT WITH THE EXISTENCE OF A DOMINANT POSITION .

75THIS FINDING IS SUBSTANTIALLY CONFIRMED BY THE INTERNAL DOCUMENTS MENTIONED ABOVE .

AS FAR AS CONCERNS IN PARTICULAR VITAMIN H ( BIOTIN ), MANAGEMENT INFORMATION OF 8 SEPTEMBER 1972 DISCLOSES THAT , ALTHOUGH A COMPETITOR - THE SUMITOMI UNDERTAKING - FIRST BEGAN TO MANUFACTURE BIOTIN AT THE END OF 1971 , IT PREFERRED TO SELL PART OF ITS PRODUCTION TO ROCHE AND THE REST IN THE

UNITED STATES AND THAT ROCHE , ANTICIPATING THE APPEARANCE OF ANOTHER PRODUCER DURING 1973 , DECIDED TO STRIKE FIRST AND DROP ITS ' ' INFLEXIBLE PRICE POLICY AT ONCE ' ' .

IT IS IN FACT IN THE YEAR 1973 THAT A SIGNIFICANT FALL IN THE PRICE OF VITAMIN H HAS BEEN RECORDED .

76THESE FACTORS SHOW THAT ROCHE IS CERTAINLY NOT SUBJECTED TO ANY COMPETITIVE PRESSURE BUT BY MEANS OF ITS POSITION IS ABLE TO ADOPT A PRICE POLICY DESIGNED TO FORESTALL SUCH PRESSURE .

FURTHERMORE THE SAME NUMBER OF MANAGEMENT INFORMATION RECOMMENDS AMONG OTHER PRECAUTIONS TO BE TAKEN THE USE OF FIDELITY CONTRACTS .

77AS FAR AS CONCERNS VITAMIN C , OF WHICH ROCHE ' S MARKET SHARE BETWEEN 1972 AND 1974 MAY BE ESTIMATED AT ABOUT 65% , MARKETING NEWS OF 6 DECEMBER 1971 STATES THAT , IN VIEW OF THE SHORTAGE OF THIS PRODUCT , THE REPRESENTATIVES AND SUBSIDIARIES OF ROCHE , HAVING REGARD TO THE LONG-TERM MARKET STRATEGY , ARE ADVISED ' ' TO GIVE PREFERENCE TO THE FOOD INDUSTRY , BOTH IN RESPECT OF SUPPLIES AND PRICE ADVANTAGES ' ' AS OPPOSED TO THE PHARMACEUTICAL INDUSTRY WHICH WILL HAVE TO OBTAIN PART OF ITS SUPPLIES FROM THE BROKERS .

78ALTHOUGH THE FIGURES AND DOCUMENTS PRODUCED SHOW THAT PRICE VARIATIONS , WHICH WERE SOMETIMES CONSIDERABLE , MAY BE RECORDED ON THE MARKETS FOR ALL THE DIFFERENT VITAMINS , THESE VARIATIONS APPEAR IN CERTAIN CASES TO BEAR NO RELATION TO THE EXISTENCE OF COMPETITION , WHILE IN OTHER CASES IT IS USUALLY ROCHE WHICH AT LEAST PLAYS THE PART OF THE PRICE LEADER .

FURTHERMORE THE DOCUMENTS PRODUCED TAKEN AS A WHOLE DISCLOSE THE EXISTENCE OF A FIRST-RATE COMMERCIAL AND MARKETING ORGANIZATION , THROUGH WHICH IT IS POSSIBLE NOT ONLY TO CARRY OUT A SYSTEMATIC SURVEY OF THE MARKETS BUT ALSO TO DETECT THE SLIGHTEST INTENTION ON THE PART OF ANY POSSIBLE COMPETITOR TO ENTER THE MARKET FOR ONE OR OTHER OF THE PRODUCTS , AND WHICH IS CAPABLE NOT ONLY OF REACTING INSTANTANEOUSLY BUT ALSO OF FORESTALLING SUCH ENDEAVOURS BY TAKING APPROPRIATE STEPS .

ALL THESE CONSIDERATIONS SHOW THAT THE PRICE VARIATIONS ALLEGED AND IN FACT CONFIRMED DO NOT PROVE THAT THERE WAS ANY COMPETITIVE PRESSURE WHICH WAS LIKELY TO JEOPARDIZE THE MARKED DEGREE OF INDEPENDENCE ENJOYED BY ROCHE AS FAR AS CONCERNS ITS MARKET STRATEGY AND THAT SUCH VARIATIONS ARE NOT OF SUCH A KIND AS TO INVALIDATE THE FINDINGS THAT THERE IS A DOMINANT POSITION BASED , IN THE CASE OF EACH GROUP OF VITAMINS , ON THE COMBINATION OF THE MARKET SHARES AND THE OTHER FACTORS USED .

79CONSEQUENTLY THE COMMISSION WAS RIGHT TO FIND IN THE CONTESTED DECISION THAT THERE WAS SUCH A POSITION AS FAR AS CONCERNS THE MARKETS IN VITAMINS A , B2 , B6 , C , E AND H .
ON THE OTHER HAND IT WAS WRONG TO FIND THAT THERE WAS SUCH A POSITION ON THE VITAMIN B3 MARKET .

II - THE EXISTENCE OF AN ABUSE OF A DOMINANT POSITION
SECTION 1 : PRELIMINARY OBSERVATIONS
80ACCORDING TO THE CONTESTED DECISION THE APPLICANT HAS ABUSED ITS DOMINANT POSITION BY CONCLUDING WITH 22 LARGE PURCHASERS OF VITAMINS CONTRACTS OF SALE - ABOUT 30 ( SOME OF THEM MOREOVER WERE RENEWALS WITH OR WITHOUT AMENDMENTS OF A PREVIOUS CONTRACT ) - UNDER WHICH THESE

PURCHASERS UNDERTOOK TO OBTAIN ALL OR MOST OF THEIR REQUIREMENTS OF VITAMINS OR CERTAIN VITAMINS EXPRESSLY MENTIONED THEREIN EXCLUSIVELY FROM ROCHE OR WHICH GAVE THEM AN INCENTIVE TO DO SO BY INCLUDING A PROMISE OF A DISCOUNT WHICH THE COMMISSION CLASSIFIES AS A FIDELITY REBATE .

ACCORDING TO THE COMMISSION ( RECITALS 22 TO 24 OF THE CONTESTED DECISION ) THE EXCLUSIVITY AGREEMENTS AND THE FIDELITY REBATES COMPLAINED OF ARE AN ABUSE WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , ON THE ONE HAND , BECAUSE THEY DISTORT COMPETITION BETWEEN PRODUCERS BY DEPRIVING CUSTOMERS OF THE UNDERTAKING IN A DOMINANT POSITION OF THE OPPORTUNITY TO CHOOSE THEIR SOURCES OF SUPPLY AND , ON THE OTHER HAND , BECAUSE THEIR EFFECT WAS TO APPLY DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS WITH OTHER TRADING PARTNERS , THEREBY PLACING THEM AT A COMPETITIVE DISADVANTAGE , IN THAT ROCHE OFFERS TWO PURCHASERS TWO DIFFERENT PRICES FOR AN IDENTICAL QUANTITY OF THE SAME PRODUCT DEPENDING ON WHETHER THESE TWO BUYERS AGREE OR NOT TO FOREGO OBTAINING THEIR SUPPLIES FROM ROCHE ' S COMPETITORS .

81THE CONTRACTS AT ISSUE ARE FOR THE SALE OF VITAMINS WHICH BELONG TO ONE OR MORE OF THE GROUPS IN RESPECT OF WHICH A DOMINANT POSITION HAS BEEN FOUND TO EXIST TO PURCHASERS OWNING WITHIN THE COMMON MARKET UNDERTAKINGS FOR WHICH PART OR ALL OF THESE VITAMINS ARE INTENDED .

THESE CONTRACTS MAY BE CATALOGUED AS FOLLOWS AND WILL BE REFERRED TO LATER BY THE NAME OF THE PURCHASER :
1 . AFICO/NESTLE : ONE CONTRACT FOR ONE YEAR COMMENCING ON 1 JANUARY 1968 RENEWABLE BY TACIT AGREEMENT .

2 . AMERICAN CYANAMID : ONE CONTRACT FOR ONE YEAR COMMENCING ON 1 JANUARY 1971 RENEWABLE BY TACIT AGREEMENT .

3 . ANIMEDICA . TWO CONTRACTS , ONE A MULTI-NATIONAL CONTRACT OF 12 JANUARY 1973 , THE OTHER FOR SUPPLIES TO THE FEDERAL REPUBLIC OF GERMANY OF 9 MAY 1972 , EACH OF THEM FOR ONE YEAR RENEWABLE BY TACIT AGREEMENT .

4 . BEECHAM : THREE SUCCESSIVE AGREEMENTS DATED 1 APRIL 1972 , 1 APRIL 1973 AND 31 DECEMBER 1973 COVERING THE PERIODS 1 APRIL 1972 TO 31 MARCH 1973 ; 1 APRIL 1973 TO 31 DECEMBER 1973 RESPECTIVELY AND THE YEAR 1974 .
5 . CAPSUGEL/PARKE DAVIS : ONE CONTRACT OF 22 MARCH 1967 WHICH TOOK EFFECT AS FROM 15 MARCH 1967 .
6 . DAWE ' S : ONE CONTRACT WHICH TOOK EFFECT FROM 1 AUGUST 1971 WITHOUT ANY STIPULATION AS TO ITS DURATION .

7 . GUYOMARC ' H : ONE CONTRACT WHICH TOOK EFFECT AS FROM 1 MAY 1972 FOR A PERIOD OF ONE YEAR AND RENEWABLE BY TACIT AGREEMENT .

8 . ISAAC SPENCER : TWO CONTRACTS , THE FIRST COVERING THE PERIOD FROM 1 JULY 1973 TO 31 DECEMBER 1973 , THE SECOND COVERING THE YEAR 1974 .
9 . MERCK : THREE CONTRACTS , THE FIRST DATED 3 MARCH 1972 , RELATING TO VITAMIN A , FOR A PERIOD OF FIVE YEARS , RENEWABLE BY TACIT AGREEMENT FOR FURTHER PERIODS OF TWO YEARS ; THE SECOND OF 3 MARCH 1972 , RELATING TO VITAMIN E AND CONTAINING A CLAUSE CONCERNING ITS DURATION ALMOST IDENTICAL TO THAT IN THE PRECEDING CONTRACT ; THE THIRD , DATED 5 JULY 1971 , RELATING TO VITAMIN B6 FOR A PERIOD UP TO 31 DECEMBER 1966 , THEN RENEWABLE BY TACIT AGREEMENT FOR SUCCESSIVE PERIODS OF TWO YEARS .

10 . NITROVIT/IMPERIAL FOODS : TWO CONTRACTS , ONE OF 22 DECEMBER 1972 , THE OTHER OF 11 JANUARY 1974 , EACH FOR A PERIOD OF ONE YEAR .

11 . ORGANON : ONE CONTRACT OF 15 APRIL 1970 , AMENDED ON 10 OCTOBER 1974 , FOR PERIODS OF ONE YEAR RENEWABLE BY TACIT AGREEMENT .

12 . PAULS AND WHITES : THREE CONTRACTS DATED 2 MARCH 1972 , 16 JULY 1973 AND 22 JANUARY 1974 FOR THE PERIODS 1 APRIL 1972 TO 31 MARCH 1973 , 1 APRIL 1973 TO 31 DECEMBER 1973 AND FOR 1974 RESPECTIVELY .

13 . PROTECTOR : ONE CONTRACT WHICH TOOK EFFECT AS FROM 1 JULY 1968 FOR THE YEAR 1968 , WHICH WAS IN FACT RENEWED EACH YEAR AND IN ANY CASE UNTIL THE END OF 1972 .
14 . PROVIMA : ONE CONTRACT OF 30 SEPTEMBER 1972 , AMENDED ON 27 NOVEMBER 1974 , WITH NO STIPULATION AS TO DURATION .

15 . RADAR : ONE CONTRACT OF 23 FEBRUARY 1971 , FOR THE YEAR 1971 WHICH REFERS TO A SIMILAR AGREEMENT ENTERED INTO PREVIOUSLY FOR 1970 .
16 . RALSTON PURINA : ONE CONTRACT OF 19 JANUARY 1970 , FOR THE YEAR 1970 , RENEWED AT LEAST UNTIL THE END OF 1974 .
17 . RAMIKAL : ONE CONTRACT OF 22 AUGUST 1972 , WHICH TOOK EFFECT AS FROM 1 JANUARY 1972 FOR AN INDEFINITE PERIOD AND REPLACED A CONTRACT GOING BACK TO 1964 .
18 . SANDOZ : ONE CONTRACT WHICH TOOK EFFECT IN 1965 FOR A CALENDAR YEAR RENEWABLE BY TACIT AGREEMENT FROM YEAR TO YEAR .

19 . TROUW : ONE CONTRACT OF 1 JULY 1971 , WHICH TOOK EFFECT AS FROM 1 JANUARY 1971 AND WAS AMENDED ON 27 NOVEMBER 1972 .
20 . UNILEVER : THREE CONTRACTS OF 9 JANUARY 1974 , THE FIRST TWO RELATING TO SUPPLIES OF VITAMINS TO THE UNITED KINGOOM , VITAMIN A , TYPE B IN THE CASE OF THE FIRST CONTRACT , OTHER TYPES OF VITAMIN A IN THE CASE OF THE SECOND CONTRACT , WHILE THE THIRD COVERS SUPPLIES OF VITAMIN A ON THE CONTINENT , IN THE CASE OF ALL THREE CONTRACTS FOR THE YEARS 1974 AND 1975 .
21 . UPJOHN : ONE CONTRACT WHICH TOOK EFFECT ON 1 NOVEMBER 1967 WITHOUT ANY STIPULATION AS TO DURATION .

22 . WYETH : ONE CONTRACT WHICH COMMENCED ON 1 JANUARY 1964 WITHOUT ANY STIPULATION AS TO DURATION .

SECTION 2 : ANALYSIS OF THE CONTRACTS AT ISSUE
82ALTHOUGH THESE CONTRACTS WERE DRAWN UP AT DIFFERENT TIMES AND IN TERMS WHICH ARE NOT ALWAYS IDENTICAL , THEY MAY BE DIVIDED INTO THREE CATEGORIES AS FAR AS CONCERNS THE SCOPE OF THE UNDERTAKING BY THE PURCHASER TO OBTAIN ITS SUPPLIES .

83SOME OF THEM CONTAINED A SPECIFIC UNDERTAKING BY THE PURCHASER TO OBTAIN EXCLUSIVELY FROM ROCHE EITHER :
( A ) ALL OR ALMOST ALL OF ITS REQUIREMENTS OF BULK VITAMINS MANUFACTURED BY ROCHE : AFICO/NESTLE , DAWE ' S , ORGANON , PROVIMI ( EXCEPT FOR 10% THEREOF FOR THE PURPOSE OF COMPARISON ), RALSTON , PURINA , UPJOHN ( ALL VITAMINS EXCEPT FOUR SPECIAL VITAMIN A PRODUCTS INTENDED FOR ANIMAL FEED IN RESPECT OF WHICH ROCHE HAS GRANTED UPJOHN A LICENCE UNDER ITS TRADEMARK INJACOM );

( B ) ON ALL ITS REQUIREMENTS OF CERTAIN VITAMINS THEREIN EXPRESSLY MENTIONED : MERCK ( VITAMIN A , VITAMIN B6 OVER AND ABOVE THE 200 TONNES MANUFACTURED BY MERCK ITSELF , AND VITAMIN E );

( C ) ON A PERCENTAGE STIPULATED IN THE CONTRACT OF ITS TOTAL REQUIREMENTS ( AMERICAN CYANAMID , ANIMEDICA ALLEMAGNE AND ANIMEDICA INTERNATIONAL : 80% )

OR OF ITS REQUIREMENTS OF CERTAIN SPECIFIED VITAMINS ( GUYOMARC ' H : 75% OF
ITS REQUIREMENTS OF VITAMINS A , B , C , E );

( D ) ON ' ' THE MAJOR PART ' ' ( ' ' LA MAJEURE PARTIE ' ' , ' ' UBERWIEGENDER TEIL ' ' )
OF ITS REQUIREMENTS OF VITAMINS OR OF CERTAIN VITAMINS ( BEECHAM , ISAAC
SPENCER , NITROVIT , PAULS AND WHITES , RAMIKAL , TROUW ).


GROUNDS CONTINUED UNDER DOC.NUM : 676J0085.184IN SOME OF THE CONTRACTS THE
PURCHASER UNDERTOOK TO ' ' GIVE PREFERENCE TO ROCHE ' ' ( WYETH ) OR EXPRESSED
ITS ' ' INTENTION ' ' TO OBTAIN ITS SUPPLIES EXCLUSIVELY FROM ROCHE (
CAPSUGEL/PARKE DAVIS ) OR AGREED TO RECOMMEND ITS SUBSIDIARIES TO DO THE
SAME ( SANDOZ ), EITHER IN RESPECT OF ALL THEIR VITAMIN REQUIREMENTS OR OF
CERTAIN VITAMINS THEREIN SPECIFIED ( CAPSUGEL/PARKE DAVIS : A , B1 , B2 , B6 , C ,
E , H ) OR AGAIN IN RELATION TO A FIXED PERCENTAGE OF THEIR TOTAL REQUIREMENTS
( PROTECTOR : 80% ).

85FINALLY THE CONTRACTS CONCLUDED WITH MERCK AND UNILEVER RESPECTIVELY HAD
SPECIAL FEATURES WHICH MAKES IT DESIRABLE TO EXAMINE SEPARATELY THE
UNDERTAKINGS WHICH THEY CONTAINED .

86THE DURATION OF MOST OF THE CONTRACTS WAS FOR AN INDEFINITE PERIOD ,
EITHER ACCORDING TO THE TERMS THEREOF OR BECAUSE OF THE OPERATION OF A
CLAUSE PROVIDING FOR RENEWAL BY TACIT AGREEMENT , AND THEY WERE CLEARLY
DESIGNED TO ESTABLISH TRADING RELATIONS FOR SEVERAL YEARS .

MOST OF THE CONTRACTS WERE ENTERED INTO AS FAR BACK AS 1970 AND WERE IN
FORCE DURING THE WHOLE OR PART OF THE PERIOD 1970 TO 1974 .
87ALL THE ABOVE-MENTIONED CONTRACTS WITH THE EXCEPTION OF THOSE ENTERED
INTO WITH UNILEVER PROVIDED FOR THE GRANT , UNDER VARIOUS NAMES , OF
DISCOUNTS OR REBATES CALCULATED ON THE TOTAL PURCHASES OF VITAMINS ,
WHATEVER GROUP THE LATTER BELONG TO , DURING A GIVEN PERIOD USUALLY OF A
YEAR OR SIX MONTHS .

IT WAS A SPECIAL FEATURE OF THE CONTRACTS WITH BEECHAM , ISAAC SPENCER ,
NITROVIT , PAULS AND WHITES , SANDOZ AND WYETH THAT THE PERCENTAGE OF THE
REBATES PROVIDED FOR WAS NOT FIXED BUT INCREASED - IN GENERAL FROM 1% TO 3%
- ACCORDING TO THE AMOUNTS PURCHASED EVERY YEAR .

EXCEPT IN THE CASE OF ANIMEDICA INTERNATIONAL , GUYOMARC ' H , MERCK B6 ,
PROTECTOR AND UPJOHN , THE CONTRACTS CONTAINED A CLAUSE , CALLED THE
ENGLISH CLAUSE , UNDER THE TERMS OF WHICH THE CUSTOMERS COULD - BY ADOPTING
VARIOUS METHODS WHICH WILL BE EXAMINED LATER ON - BRING TO ROCHE ' S NOTICE
BY WAY OF COMPARISON MORE FAVOURABLE OFFERS FROM COMPETITORS WITH THE
RESULT THAT , IF ROCHE DID NOT ADJUST ITS PRICES , THE CUSTOMER AFFECTED WAS
RELEASED , AS FAR AS THAT PURCHASE WAS CONCERNED , FROM ITS OBLIGATION TO
OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE , OR , IF NO SUCH SPECIFIC OBLIGATION
HAD BEEN STIPULATED , COULD PURCHASE FROM THE SAID COMPETITORS WITHOUT
THEREBY LOSING IN EITHER CASE , AS FAR AS CONCERNS PAST OR FUTURE PURCHASES ,
THE BENEFIT OF THE ABOVE-MENTIONED REBATE .

88IT IS IN THE LIGHT OF THESE SPECIAL FEATURES THAT IT IS NECESSARY TO CONSIDER
WHETHER THE DISPUTED CONTRACTS WERE AN ABUSE BY ROCHE OF ITS DOMINANT
POSITION .

SECTION 3 : THE DETERMINATION , IN THE LIGHT OF ARTICLE 86 OF THE TREATY , OF
THE LEGAL NATURE OF THE UNDERTAKINGS TO OBTAIN SUPPLIES EXCLUSIVELY FROM

ROCHE AND OF THE SYSTEM OF REBATES

89 AN UNDERTAKING WHICH IS IN A DOMINANT POSITION ON A MARKET AND TIES PURCHASERS - EVEN IF IT DOES SO AT THEIR REQUEST - BY AN OBLIGATION OR PROMISE ON THEIR PART TO OBTAIN ALL OR MOST OF THEIR REQUIREMENTS EXCLUSIVELY FROM THE SAID UNDERTAKING ABUSES ITS DOMINANT POSITION WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY , WHETHER THE OBLIGATION IN QUESTION IS STIPULATED WITHOUT FURTHER QUALIFICATION OR WHETHER IT IS UNDERTAKEN IN CONSIDERATION OF THE GRANT OF A REBATE .

THE SAME APPLIES IF THE SAID UNDERTAKING , WITHOUT TYING THE PURCHASERS BY A FORMAL OBLIGATION , APPLIES , EITHER UNDER THE TERMS OF AGREEMENTS CONCLUDED WITH THESE PURCHASERS OR UNILATERALLY , A SYSTEM OF FIDELITY REBATES , THAT IS TO SAY DISCOUNTS CONDITIONAL ON THE CUSTOMER ' S OBTAINING ALL OR MOST OF ITS REQUIREMENTS - WHETHER THE QUANTITY OF ITS PURCHASES BE LARGE OR SMALL - FROM THE UNDERTAKING IN A DOMINANT POSITION .

90 OBLIGATIONS OF THIS KIND TO OBTAIN SUPPLIES EXCLUSIVELY FROM A PARTICULAR UNDERTAKING , WHETHER OR NOT THEY ARE IN CONSIDERATION OF REBATES OR OF THE GRANTING OF FIDELITY REBATES INTENDED TO GIVE THE PURCHASER AN INCENTIVE TO OBTAIN HIS SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION , ARE INCOMPATIBLE WITH THE OBJECTIVE OF UNDISTORTED COMPETITION WITHIN THE COMMON MARKET , BECAUSE - UNLESS THERE ARE EXCEPTIONAL CIRCUMSTANCES WHICH MAY MAKE AN AGREEMENT BETWEEN UNDERTAKINGS IN THE CONTEXT OF ARTICLE 85 AND IN PARTICULAR OF PARAGRAPH ( 3 ) OF THAT ARTICLE , PERMISSIBLE - THEY ARE NOT BASED ON AN ECONOMIC TRANSACTION WHICH JUSTIFIES THIS BURDEN OR BENEFIT BUT ARE DESIGNED TO DEPRIVE THE PURCHASER OF OR RESTRICT HIS POSSIBLE CHOICES OF SOURCES OF SUPPLY AND TO DENY OTHER PRODUCERS ACCESS TO THE MARKET .

THE FIDELITY REBATE , UNLIKE QUANTITY REBATES EXCLUSIVELY LINKED WITH THE VOLUME OF PURCHASES FROM THE PRODUCER CONCERNED , IS DESIGNED THROUGH THE GRANT OF A FINANCIAL ADVANTAGE TO PREVENT CUSTOMERS FROM OBTAINING THEIR SUPPLIES FROM COMPETING PRODUCERS .

FURTHERMORE THE EFFECT OF FIDELITY REBATES IS TO APPLY DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS WITH OTHER TRADING PARTIES IN THAT TWO PURCHASERS PAY A DIFFERENT PRICE FOR THE SAME QUANTITY OF THE SAME PRODUCT DEPENDING ON WHETHER THEY OBTAIN THEIR SUPPLIES EXCLUSIVELY FROM THE UNDERTAKING IN A DOMINANT POSITION OR HAVE SEVERAL SOURCES OF SUPPLY .

FINALLY THESE PRACTICES BY AN UNDERTAKING IN A DOMINANT POSITION AND ESPECIALLY ON AN EXPANDING MARKET TEND TO CONSOLIDATE THIS POSITION BY MEANS OF A FORM OF COMPETITION WHICH IS NOT BASED ON THE TRANSACTIONS EFFECTED AND IS THEREFORE DISTORTED .

91 FOR THE PURPOSE OF REJECTING THE FINDING THAT THERE HAS BEEN AN ABUSE OF A DOMINANT POSITION THE INTERPRETATION SUGGESTED BY THE APPLICANT THAT AN ABUSE IMPLIES THAT THE USE OF THE ECONOMIC POWER BESTOWED BY A DOMINANT POSITION IS THE MEANS WHEREBY THE ABUSE HAS BEEN BROUGHT ABOUT CANNOT BE ACCEPTED .

THE CONCEPT OF ABUSE IS AN OBJECTIVE CONCEPT RELATING TO THE BEHAVIOUR OF AN UNDERTAKING IN A DOMINANT POSITION WHICH IS SUCH AS TO INFLUENCE THE STRUCTURE OF A MARKET WHERE , AS A RESULT OF THE VERY PRESENCE OF THE UNDERTAKING IN QUESTION , THE DEGREE OF COMPETITION IS WEAKENED AND WHICH , THROUGH RECOURSE TO METHODS DIFFERENT FROM THOSE WHICH CONDITION NORMAL COMPETITION IN PRODUCTS OR SERVICES ON THE BASIS OF THE TRANSACTIONS OF

COMMERCIAL OPERATORS , HAS THE EFFECT OF HINDERING THE MAINTENANCE OF THE DEGREE OF COMPETITION STILL EXISTING IN THE MARKET OR THE GROWTH OF THAT COMPETITION .

SECTION 4 : THE NATURE OF THE REBATES AT ISSUE
92THE APPLICANT NEVERTHELESS SUBMITS THAT THE AGREED REBATES ARE QUANTITY AND NOT FIDELITY REBATES OR THAT THEY CORRESPOND TO AN ECONOMIC TRANSACTION WITH THE CUSTOMER JUSTIFYING CONSIDERATION OF THIS KIND .

93IN CONSIDERING THIS SUBMISSION IT IS NECESSARY TO DISTINGHUISH BETWEEN THOSE CONTRACTS WHICH PROVIDE FOR REBATES AT A FIXED RATE AND THOSE IN WHICH REBATES AT PROGRESSIVE RATES ARE PROVIDED FOR .

( A ) CONTRACTS WHICH PROVIDE FOR REBATES AT A FIXED RATE
94FIRST THE APPLICANT ' S ARGUMENT CANNOT BE ACCEPTED IN THE CASE OF THOSE CONTRACTS WHICH PROVIDE FOR A REBATE AT A FIXED RATE .

95IN FACT - AND WITHOUT PREJUDICE TO THE OBSERVATION THAT WHERE EXCLUSIVITY HAS BEEN FORMALLY ACCEPTED THE GRANTING OR NOT OF A REBATE IS IN THE FINAL ANALYSIS IRRELEVANT - NONE OF THE SAID CONTRACTS INCLUDES ANY UNDERTAKING RELATING TO FIXED OR ONLY ESTIMATED QUANTITIES OR LINKED TO THE VOLUME OF PURCHASES BUT THEY ALL REFER TO ' ' REQUIREMENTS ' ' OR A PROPORTION OF THE SAID REQUIREMENTS .

MOREOVER IN MOST OF THEM THE PARTIES HAVE THEMSELVES DESCRIBED THE CLAUSE AS A FIDELITY REBATE CLAUSE ( AMERICAN CYANAMID , ORGANON , PROVIMI , RALSTON PURINA , TROUW ) OR USED TERMS WHICH STRONGLY UNDERLINE THE LINK BETWEEN THE EXCLUSIVITY AND THE REBATES ALLOWED .

96THE DAWE ' S CONTRACT STIPULATES THAT THE REBATE IS GRANTED ' ' IN RETURN ' ' FOR THE EXCLUSIVITY WHICH HAS BEEN ACCEPTED ; THE RAMIKAL CONTRACT PROVIDES FOR A CONFIDENTIAL ANNUAL BONUS ( VERTRAULICHER JAHRESBONUS ) , ' ' WHICH IS A GENUINE BONUS FOR YOUR PURCHASES FROM ROCHE ' ' ( EINE ECHTE VERGUTUNG AUF IHRE BEZUGE VON ROCHE ) AND IS INDEPENDENT OF THE QUANTITY REBATES TO WHICH RAMIKAL REMAINS ENTITLED .

IT IS TRUE THAT IN FOUR OF THE CONTRACTS , NAMELY THE AFICO/NESTLE , CAPSUGEL/PARKE DAVIS , PROVIMI ( AS FROM 1974 ) AND UPJOHN CONTRACTS , THE REASON WHY THE REBATE IS ALLOWED ON ALL PURCHASES , ACCORDING TO THE TERMS OF THE SAID CONTRACTS , IS THAT THESE CUSTOMERS GUARANTEE TO ROCHE PAYMENT OF THE BILLS RESULTING FROM ORDERS PLACED DIRECTLY BY SUBSIDIARIES OF THOSE CUSTOMERS .

IT IS NEVERTHELESS DIFFICULT TO ACCEPT THAT REBATES CALCULATED IN ALL RESPECTS ON THE SAME BASIS AS THOSE WHICH IN THE OTHER CONTRACTS ARE ACKNOWLEDGED TO BE FIDELITY REBATES , CAN BE CONSIDERATION FOR AN UNDERTAKING BY INTERNATIONAL COMPANIES SUCH AS NESTLE , PARKE DAVIS AND UPJOHN DESIGNED TO REASSURE ROCHE THAT THEIR SUBSIDIARIES ARE SOLVENT .

NOR IS IT POSSIBLE TO ACCEPT ROCHE ' S ARGUMENT THAT , AT LEAST IN THE CASE OF CERTAIN VITAMINS SUCH AS BIOTIN ( VITAMIN H ), THE REBATE WAS AN INTRODUCTORY REBATE , SINCE THE CONTRACTS NEITHER DISTINGUISH BETWEEN THE DIFFERENT REBATES ACCORDING TO THEIR FUNCTION FIXED IN A GENERAL AND UNIFORM WAY FOR ALL OR A LARGE PROPORTION OF EACH CUSTOMER ' S REQUIREMENTS NOR ALLOW ANY SUCH DISTINCTION TO BE DRAWN .

( B ) CONTRACTS WHICH PROVIDE FOR REBATES AT PROGRESSIVE RATES

97A NUMBER OF THE CONTRACTS AT ISSUE , NAMELY BEECHAM ( 1972 , 1973 , 1974 ), ISAAC SPENCER ( 1973 , 1974 ), NITROVIT ( 1973 , 1974 ), PAULS AND WHITES ( 1972 , 1973 , 1974 ) CONTAIN , ON THE ONE HAND , AN UNDERTAKING RELATING TO ' ' THE MAJOR PART ' ' OF THE PURCHASER ' S REQUIREMENTS AND , ON THE OTHER HAND , A REBATE CLAUSE PROVIDING FOR A DISCOUNT , THE PERCENTAGE WHEREOF INCREASES - IN GENERAL FROM 1% TO 2% , AND THEN TO 3% - DEPENDING ON WHETHER DURING THE PERIOD OF ONE YEAR A GREATER OR LESSER PERCENTAGE OF THE PURCHASER ' S ESTIMATED REQUIREMENTS HAS BEEN MET , EACH OF THE CONTRACTS CONTAINING A VALUE ESTIMATE ( IN POUNDS STERLING ) OF THE TOTAL REQUIREMENTS AND , IN ADDITION , IN THE CASE OF TWO OF THE CONTRACTS ( PAULS AND WHITES 1972 , BEECHAM 1972 ) A QUANTITATIVE ESTIMATE OF EACH OF THE TYPES OF VITAMINS REFERRED TO IN THE CONTRACT .

BY WAY OF EXAMPLE REFERENCE MAY BE MADE TO THE BEECHAM CONTRACT ( 1 APRIL 1972 TO 31 MARCH 1973 ) WHEREBY , SINCE THE ANNUAL REQUIREMENTS WERE ESTIMATED AT A MAXIMUM OF POUNDS 300 000 , THE REBATE PROVIDED FOR WAS 1% IF THE TURNOVER REACHED 60% , NAMELY POUNDS 180 000 , 1.5% IF IT REACHED 70% , NAMELY POUNDS 210 000 , AND 2% IF IT REACHED 80% , NAMELY POUNDS 240 000 . THERE ARE SIMILAR FORMULAE IN THE OTHER CONTRACTS , THE ESTIMATE OF REQUIREMENTS DIFFERING FROM CONTRACT TO CONTRACT AND FROM YEAR TO YEAR , OBVIOUSLY TO ALLOW FOR THE CUSTOMER ' S CAPACITY OF ABSORPTION .

98ALTHOUGH THE CONTRACTS AT ISSUE CONTAIN ELEMENTS WHICH APPEAR AT FIRST SIGHT TO BE OF A QUANTITATIVE NATURE AS FAR AS CONCERNS THEIR CONNEXION WITH THE GRANTING OF A REBATE ON AGGREGATE PURCHASES , AN EXAMINATION OF THEM HOWEVER SHOWS THAT THEY ARE IN FACT A SPECIALLY WORKED OUT FORM OF FIDELITY REBATE .

99IN THE FIRST PLACE IT IS NOTICEABLE THAT THIS PARTICULAR FORM OF REBATE IS INCORPORATED IN THOSE VERY CONTRACTS IN WHICH THE UNDERTAKING BY THE PURCHASER TO OBTAIN SUPPLIES WAS DRAWN UP IN THE FORM WHICH PLACED HIM UNDER THE LEAST CONSTRAINT , NAMELY THAT THE PURCHASER WAS TO OBTAIN ' ' MOST OF HIS REQUIREMENTS ' ' , SO THAT THE PURCHASER CONCERNED WAS LEFT WITH CONSIDERABLE FREEDOM OF ACTION .

THE INDETERMINATE NATURE OF THE UNDERTAKING THUS WORDED IS TO A GREAT EXTENT OFFSET BY AN ESTIMATE OF ANNUAL REQUIREMENTS AND BY THE GRANTING OF A REBATE INCREASING IN ACCORDANCE WITH THE PERCENTAGE OF THE REQUIREMENTS WHICH ARE MET AND THIS PROGRESSIVE RATE IS CLEARLY A POWERFUL INCENTIVE TO OBTAIN THE MAXIMUM PERCENTAGE OF THE SAID REQUIREMENTS FROM ROCHE .

100THIS METHOD OF CALCULATING THE REBATES DIFFERS FROM THE GRANTING OF QUANTITATIVE REBATES , LINKED SOLELY TO THE VOLUME OF PURCHASES FROM THE PRODUCERS CONCERNED IN THAT THE REBATES AT ISSUE ARE NOT DEPENDENT ON QUANTITIES FIXED OBJECTIVELY AND APPLICABLE TO ALL POSSIBLE PURCHASERS BUT ON ESTIMATES MADE , FROM CASE TO CASE , FOR EACH CUSTOMER ACCORDING TO THE LATTER ' S PRESUMED CAPACITY OF ABSORPTION , THE OBJECTIVE WHICH IT IS SOUGHT TO ATTAIN BEING NOT THE MAXIMUM QUANTITY BUT THE MAXIMUM REQUIREMENTS .

101CONSEQUENTLY THE COMMISSION WAS ALSO RIGHT TO REGARD THE SAID CONTRACTS CONTAINING FIDELITY REBATES AS AN ABUSE OF A DOMINANT POSITION .

SECTION 5 : THE ENGLISH CLAUSE
102ALL THE CONTRACTS IN QUESTION EXCEPT FIVE ( THE ANIMEDICA INTERNATIONAL , GUYOMARC ' H , MERCK B6 , PROTECTOR AND UPJOHN CONTRACTS ) CONTAIN A CLAUSE , CALLED THE ENGLISH CLAUSE , UNDER WHICH THE CUSTOMER , IF HE OBTAINS FROM COMPETITORS OFFERS AT PRICES WHICH ARE MORE FAVOURABLE THAN THOSE UNDER

THE CONTRACTS AT ISSUE MAY ASK ROCHE TO ADJUST ITS PRICES TO THE SAID OFFERS ; IF ROCHE DOES NOT COMPLY WITH THIS REQUEST , THE CUSTOMER , IN DEROGATION FROM HIS UNDERTAKING TO OBTAIN HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE , IS ENTITLED TO GET HIS SUPPLIES FROM THE SAID COMPETITOR WITHOUT FOR THAT REASON LOSING THE BENEFIT OF THE FIDELITY REBATES PROVIDED FOR IN THE CONTRACTS IN RESPECT OF THE OTHER PURCHASES ALREADY EFFECTED OR STILL TO BE EFFECTED BY HIM FROM ROCHE .

103IN THE APPLICANT ' S VIEW THIS CLAUSE DESTROYS THE RESTRICTIVE EFFECT ON COMPETITION BOTH OF THE EXCLUSIVITY AGREEMENTS AND OF THE FIDELITY REBATES .

IN PARTICULAR IN THE CASE OF THOSE CONTRACTS WHICH DO NOT CONTAIN AN EXPRESS UNDERTAKING BY THE PURCHASER TO OBTAIN HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE THE ENGLISH CLAUSE ELIMINATES ' ' THE ATTRACTIVE EFFECT ' ' OF THE REBATES AT ISSUE SINCE THE CUSTOMER DOES NOT HAVE TO CHOOSE BETWEEN ACCEPTANCE OF ROCHE ' S LESS ATTRACTIVE OFFERS OR LOSING THE BENEFIT OF THE FIDELITY REBATES ON ALL PURCHASES WHICH HE HAS ALREADY EFFECTED FROM ROCHE .

104THERE IS NO DOUBT WHATEVER THAT THIS CLAUSE MAKES IT POSSIBLE TO REMEDY SOME OF THE UNFAIR CONSEQUENCES WHICH UNDERTAKINGS BY PURCHASERS TO OBTAIN THEIR REQUIREMENTS EXCLUSIVELY FROM ROCHE OR THE PROVISION FOR FIDELITY REBATES ON ALL PURCHASES ACCEPTED FOR RELATIVELY LONG PERIODS , MIGHT HAVE IN SO FAR AS THOSE PURCHASERS ARE CONCERNED .

NEVERTHELESS IT IS NECESSARY TO POINT OUT THAT THE PURCHASER ' S OPPORTUNITIES FOR EXPLOITING COMPETITION FOR HIS OWN BENEFIT ARE MORE RESTRICTED THAN APPEARS AT FIRST SIGHT .

105APART FROM THE FACT THAT THE ENGLISH CLAUSE IS NOT IN THE GUYOMARC ' H , MERCK B6 , ANIMEDICA INTERNATIONAL , PROTECTOR AND UPJOHN CONTRACTS IT IS SUBJECT TO CONDITIONS WHICH LIMIT ITS SCOPE AND IN FACT LEAVE ROCHE WITH A WIDE DISCRETION AS TO THE POSSIBILITY OF THE CUSTOMER ' S INVOKING IT .

A NUMBER OF CONTRACTS STIPULATE NOT ONLY THAT THE OFFER MUST COME FROM IMPORTANT COMPETITORS BUT ALSO FROM LARGE COMPETITORS OPERATING ON THE SAME SCALE AS ROCHE OR AGAIN PROVIDE THAT THE OFFERS MUST NOT ONLY BE COMPARABLE AS TO THE QUALITY OF THE PRODUCT BUT ALSO AS TO THEIR CONTINUITY AND SUCH A CONDITION , BY ELIMINATING A MORE FAVOURABLE BUT OCCASIONAL METHOD OF OBTAINING SUPPLIES , STRENGTHENS THE EXCLUSIVITY .

OTHER CONTRACTS STIPULATE THAT THE OFFER MUST COME FROM PRODUCERS TO THE EXCLUSION OF BROKERS OR COMMERCIAL AGENTS AND SUCH A CONDITION IN FACT ELIMINATES NON-EUROPEAN COMPETITORS WHO OPERATE ON THE MARKET THROUGH COMMERCIAL FIRMS AS WAS FOUND WHEN THE PARTIES AT THE REQUEST OF THE COURT SEPARATELY UNDERTOOK AN INVESTIGATION OF THE MARKET SHARES .

IN SOME CONTRACTS THE ENGLISH CLAUSE IS LINKED DIRECTLY WITH ROCHE ' S PLEDGE TO GUARANTEE THE BEST PRICES ' ' ON THE LOCAL MARKET ' ' AND IT ONLY OPERATES WITHIN THESE LIMITS , AND THIS NOT ONLY RESTRICTS ITS SCOPE BUT BRINGS ABOUT A PARTITIONING OF THE MARKETS WHICH IS INCOMPATIBLE WITH THE COMMON MARKET .

106FURTHERMORE THE ENGLISH CLAUSE DOES NOT REMOVE THE DISCRIMINATION RESULTING FROM THE FIDELITY REBATES BETWEEN PURCHASERS IN SIMILAR CIRCUMSTANCES DEPENDING ON WHETHER OR NOT THEY RESERVE THEIR FREEDOM TO CHOOSE THEIR SUPPLIERS .

107IT IS PARTICULARLY NECESSARY TO STRESS THAT , EVEN IN THE MOST FAVOURABLE CIRCUMSTANCES , THE ENGLISH CLAUSE DOES NOT IN FACT REMEDY TO A GREAT EXTENT THE DISTORTION OF COMPETITION CAUSED BY THE CLAUSES OBLIGING PURCHASERS TO OBTAIN THEIR REQUIREMENTS EXCLUSIVELY FROM ROCHE AND BY THE FIDELITY REBATES ON A MARKET WHERE AN UNDERTAKING IN A DOMINANT POSITION IS OPERATING AND WHERE FOR THIS REASON THE STRUCTURE OF COMPETITION HAS ALREADY BEEN WEAKENED .

IN FACT THE ENGLISH CLAUSE UNDER WHICH ROCHE ' S CUSTOMERS ARE OBLIGED TO INFORM IT OF MORE FAVOURABLE OFFERS MADE BY COMPETITORS TOGETHER WITH THE PARTICULARS ABOVE MENTIONED - SO THAT IT WILL BE EASY FOR ROCHE TO IDENTIFY THE COMPETITOR - OWING TO ITS VERY NATURE , PLACES AT THE DISPOSAL OF THE APPLICANT INFORMATION ABOUT MARKET CONDITIONS AND ALSO ABOUT THE ALTERNATIVES OPEN TO , AND THE ACTIONS OF , ITS COMPETITORS WHICH IS OF GREAT VALUE FOR THE CARRYING OUT OF ITS MARKET STRATEGY .

THE FACT THAT AN UNTERTAKING IN A DOMINANT POSITION REQUIRES ITS CUSTOMERS OR OBTAINS THEIR AGREEMENT UNDER CONTRACT TO NOTIFY IT OF ITS COMPETITOR ' S OFFERS , WHILST THE SAID CUSTOMERS MAY HAVE AN OBVIOUS COMMERCIAL INTEREST IN NOT DISCLOSING THEM , IS OF SUCH A KIND AS TO AGGRAVATE THE EXPLOITATION OF THE DOMINANT POSITION IN AN ABUSIVE WAY .

FINALLLY BY VIRTUE OF THE MACHINERY OF THE ENGLISH CLAUSE IT IS FOR ROCHE ITSELF TO DECIDE WHETHER , BY ADJUSTING ITS PRICES OR NOT , IT WILL PERMIT COMPETITION .

108IT IS ABLE IN THIS WAY , OWING TO THE INFORMATION WHICH ITS OWN CUSTOMERS SUPPLY , TO VARY ITS MARKET STRATEGY IN SO FAR AS IT AFFECTS THEM AND ITS COMPETITORS .

IT FOLLOWS FROM ALL THESE FACTORS THAT THE COMMISSION ' S VIEW THAT THE ENGLISH CLAUSES INCORPORATED IN THE CONTRACTS AT ISSUE WERE NOT OF SUCH A KIND AS TO TAKE THEM OUT OF THE CATEGORY OF ABUSE OF A DOMINANT POSITION HAS BEEN ARRIVED AT BY MEANS OF A PROPER CONSTRUCTION AND APPLICATION OF ARTICLE 86 OF THE TREATY .

SECTION 6 : APPLICATION OF THE CRITERIA ADOPTED IN THE CONTRACTS AT ISSUE ( OTHER THAN UNILEVER AND MERCK )
109THE CONTRACTS WHICH CONTAIN AN EXPRESS OBLIGATION BY PURCHASERS TO OBTAIN FROM ROCHE ALL ( AFICO , DAWE ' S , ORGANON , PROVIMI , RALSTON , PURINA , UPJOHN ) OR A VERY LARGE PERCENTAGE ( ANIMEDICA ALLEMAGNE , ANIMEDICA INTERNATIONAL , AMERICAN CYANAMID , GUYOMARC ' H ) OF THEIR REQUIREMENTS OF VITAMINS OR OF THEIR REQUIREMENTS OF CERTAIN GROUPS OF VITAMINS DESIGNATED IN THE CONTRACTS , SATISFY THE CONDITIONS AMOUNTING TO CONDUCT RESTRICTING COMPETITION AS SET OUT ABOVE AND REPRESENT AN ABUSE OF A DOMINANT POSITION .

THE SAME APPLIES TO CONTRACTS WHEREBY THE PURCHASER UNDERTAKES TO RESERVE TO ROCHE THE SUPPLYING OF THE '' MAJOR PART '' ( '' MAJEURE PARTIE '' , '' UBERWIEGENDER TEIL '' ) OF ITS REQUIREMENTS ( BEECHAM , PAULS AND WHITES , NITROVIT , ISAAC SPENCER , RAMIKAL AND TROUW ) ESPECIALLY AS THE LESS RESTRICTIVE NATURE OF THE WORDING USED IS OFFSET , AS HAS BEEN SHOWN ABOVE , BY THE GRANTING OF REBATES WHICH ARE SPECIALLY DESIGNED TO HAVE SUCH A CORRECTIVE EFFECT .

110THE SAME FINDINGS HAVE TO BE RECORDED IN RESPECT OF THE CONTRACTS WHICH , ALTHOUGH IT MAY BE DOUBTFUL WHETHER THEY CONTAIN A FIRM UNDERTAKING BY

THE PRODUCERS TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE , OFFER , BY MEANS OF THE GRANTING OF THE REBATES ANALYSED ABOVE , A STRONG INCENTIVE TO PURCHASERS TO LET ROCHE ALONE SUPPLY THE WHOLE OR PART OF THEIR REQUIREMENTS OF VITAMINS OR OF CERTAIN GROUPS OF VITAMINS .

THE COMMISSION WAS JUSTIFIED IN POINTING OUT ( RECITALS 11 AND 24 TO CONTESTED DECISION ) THAT THIS INCENTIVE IS MADE MORE ATTRACTIVE BY THE FACT THAT THE REBATE IS GRANTED ON ALL PURCHASES OF THE DIFFERENT GROUPS OF VITAMINS SO THAT IF THE PURCHASER WANTED TO APPROACH - IN CIRCUMSTANCES OTHER THAN THOSE TO WHICH THE ENGLISH CLAUSE , THE SCOPE OF WHICH HAS BEEN EXAMINED ABOVE , APPLIES - A COMPETING PRODUCER FOR A PARTICULAR VITAMIN HE WILL HOWEVER BE PREVENTED FROM DOING SO BECAUSE HE WOULD THEREBY LOSE THE BENEFIT OF THE REBATE ON ALL THE OTHER VITAMINS WHICH HE CONTINUES TO BUY FROM ROCHE .

111 HAVING REGARD TO THE FACT , WHICH BOTH THE APPLICANT AND THE COMMISSION ADMIT , THAT THE VARIOUS GROUPS OF VITAMINS ARE PRODUCTS WHICH ARE NOT INTERCHANGEABLE AND REPRESENT SEPARATE MARKETS , THIS SYSTEM OF REBATES ON OVERALL PURCHASES IS FURTHERMORE AN ABUSE WITHIN THE MEANING OF SUBPARAGRAPH ( D ) OF THE SECOND PARAGRAPH OF ARTICLE 86 OF THE TREATY IN THAT IT AIMS AT ' ' MAKING THE CONCLUSION OF CONTRACTS SUBJECT TO ACCEPTANCE BY THE OTHER PARTIES OF SUPPLEMENTARY OBLIGATIONS WHICH , BY THEIR NATURE OR ACCORDING TO COMMERCIAL USAGE , HAVE NO CONNEXION WITH THE SUBJECT OF SUCH CONTRACTS ' ' .

FINALLY IT MUST BE BORNE IN MIND THAT , EVEN IF , AS ROCHE SUBMITS , THE PURCHASER ' S NON-COMPLIANCE WITH HIS UNDERTAKING TO OBTAIN HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE DID NOT MAKE HIM LIABLE TO BE SUED FOR BREACH OF CONTRACT BUT ONLY CAUSED HIM TO LOSE THE BENEFIT OF THE PROMISED REBATES , SUCH CONTRACTS NEVERTHELESS CONTAIN A SUFFICIENT INCENTIVE TO RESERVE TO ROCHE THE SOLE RIGHT TO SUPPLY THE PURCHASER FOR THEM TO BE , FOR THIS REASON ALONE , AN ABUSE OF A DOMINANT POSITION .

SECTION 7 : APPLICATION OF THE CRITERIA ADOPTED IN THE MERCK AND UNILEVER CONTRACTS
( A ) THE MERCK CONTRACTS
112 ROCHE HAS ENTERED INTO THREE CONTRACTS WITH MERCK , THE FIRST DATED 5 JULY 1971 FOR SUPPLYING MERCK WITH VITAMIN B6 , THE SECOND DATED 3 MARCH 1972 FOR SUPPLYING IT WITH VITAMIN A AND THE THIRD OF THE SAME DATE FOR SUPPLYING IT WITH VITAMIN E .
113 THE RECITALS TO THE FIRST CONTRACT , RELATING TO A PRODUCT IN RESPECT OF WHICH THE APPLICANT ' S MARKET SHARE IS APPROXIMATELY 80 % , STATE THAT ' ' ROCHE IS SHORTLY GOING TO DOUBLE THE MANUFACTURING CAPACITY OF ITS PLANT WHICH AT THE PRESENT TIME IS ABOUT 500 TONNES PER ANNUM AND THEREFORE HAS AN INTEREST IN MEETING PART OF MERCK ' S REQUIREMENTS ' ' AND THAT ' ' MERCK IS WILLING TO COVER THESE REQUIREMENTS FROM ROCHE UPON THE FOLLOWING TERMS AND CONDITIONS IN SO FAR AS THEY EXCEED ITS PRESENT MANUFACTURING CAPACITY OF ABOUT 200 TONNES PER ANNUM ' ' .

UNDER CLAUSES 6 AND 7 OF THIS CONTRACT THE DELIVERY PRICE PAYABLE BY MERCK IS THE AVERAGE SELLING PRICE OF THE SAME PRODUCT TO THIRD PARTIES LESS A REBATE OF 20 % , IT BEING UNDERSTOOD THAT ROCHE ' ' WILL IN ANY CASE APPLY TO MERCK THE MOST FAVOURABLE PRICES AND/OR CONDITIONS ' ' .

UNDER CLAUSE 12 THEREOF MERCK IS FORBIDDEN TO RESELL THE SAID VITAMINS TO ROCHE ' S COMPETITORS WITHOUT ROCHE ' S CONSENT .

UNDER CLAUSE 14 ROCHE AGREES TO OBTAIN ALL ITS SUPPLIES OF ' ' PHOSPHORIC ESTER OF PYRODOXINE 5 ' ' FROM MERCK AND MERCK AGREES TO SUPPLY THE LATTER THEREWITH UPON THE SAME CONDITIONS AS THOSE STIPULATED FOR SUPPLYING MERCK WITH VITAMIN B6 .
CLAUSE 13 OF THE CONTRACT PROVIDES THAT THE CONTRACT SHALL BE FOR A PERIOD OF FIVE YEARS AND THEREAFTER RENEWABLE BY TACIT AGREEMENT FOR PERIODS OF TWO YEARS .

THE CONTRACT DOES NOT CONTAIN AN ENGLISH CLAUSE .

114THE OTHER TWO CONTRACTS DATED 3 MARCH 1972 FOR SUPPLYING MERCK WITH VITAMINS A AND E ARE IN GENERAL IN THE SAME FORM AS THE CONTRACT ANALYSED ABOVE .

THE DIFFERENCE BETWEEN THESE TWO CONTRACTS IS THAT IN THE ONE RELATING TO VITAMIN E THE RECITALS RESTATE THAT ' ' ROCHE IS SHORTLY TO INCREASE SUBSTANTIALLY ITS PRODUCTION CAPACITY FOR VITAMIN E ' ' AND ' ' WOULD THEREFORE LIKE TO BE A REGULAR SUPPLIER OF MERCK ' ' , WHEREAS THE CONTRACT RELATING TO VITAMIN A DOES NOT CONTAIN SUCH A RECITAL .

THE TWO CONTRACTS DATED 3 MARCH 1972 - UNLIKE THE ONE DATED 5 JULY 1971 - DO NOT PROVIDE FOR THE PARTIES SUPPLYING EACH OTHER EXCLUSIVELY ON A RECIPROCAL BASIS BUT CONTAIN A CLAUSE TO THE EFFECT THAT MERCK IS RELEASED FROM ITS OBLIGATION TO PURCHASE ITS REQUIREMENTS EXCLUSIVELY FROM ROCHE IF IT RECEIVES A MORE FAVOURABLE OFFER AND ROCHE DOES NOT ADJUST ITS PRICES .

FINALLY , THESE TWO CONTRACTS FORBID MERCK TO RESELL THE SAID VITAMINS WHICH ARE THE SUBJECT-MATTER THEREOF TO ROCHE ' S COMPETITORS WITHOUT ROCHE ' S CONSENT .

115THE SPECIAL FACTORS SET OUT ABOVE INDICATE THAT THE PURPOSE OF MERCK ' S UNDERTAKING TO OBTAIN ITS REQUIREMENTS EXCLUSIVELY FROM ROCHE WAS , AS FAR AS CONCERNS VITAMINS B6 AND E , TO SECURE ROCHE IN ADVANCE A STABLE MARKET FOR THE INCREASED PRODUCTION WHICH WAS PLANNED AND TO REMOVE AT THE VERY LEAST A NOT INCONSIDERABLE PART OF THIS ADDITIONAL PRODUCTION FROM THE RISKS OF COMPETITION .

SUCH AN OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FOR SUCH A PERIOD OF TIME FROM AN UNDERTAKING IN A DOMINANT POSITION , FOR THE LATTER ' S BENEFIT , IS AN ABUSE BY THAT UNDERTAKING OF ITS DOMINANT POSITION WITHIN THE MEANING OF ARTICLE 86 OF THE TREATY .

ALTHOUGH THE SAME PURPOSE HAS NOT BEEN EXPRESSED AS FAR AS VITAMIN A IS CONCERNED AND ALTHOUGH THE POSSIBILITY CANNOT BE RULED OUT THAT THIS CONTRACT - AS SEVERAL PRECISE , TECHNICAL DEFINITIONS INCORPORATED IN THE TEXT LEAD ONE TO SUPPOSE - MEETS MERCK ' S WISH TO SECURE REGULAR AND CONTINUOUS SUPPLIES OF A PRODUCT OF WHICH IT ONLY MANUFACTURES SMALL QUANTITIES ITSELF , THIS FACT DOES NOT REMOVE THE PROHIBITION ON AN UNDERTAKING IN A DOMINANT POSITION FROM TYING ITS PURCHASERS BY OBLIGATIONS TO OBTAIN THEIR SUPPLIES EXCLUSIVELY FROM IT , ESPECIALLY FOR PERIODS AS LONG AS THOSE PROVIDED FOR IN THE SAID CONTRACT .

THE OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE TOGETHER WITH THE GRANTING OF VERY LARGE REBATES , ACCORDING TO THE CIRCUMSTANCES , OF 12.5 % TO 20 % ( VITAMIN A ) , 15 % TO 20 % ( VITAMIN E ) AND 20 % ( VITAMIN B6 ) , AND THE BAN ON RESALE TO PRODUCERS OF VITAMINS PROVES THE INTENTION TO RESTRICT COMPETITION .

116 IT IS NECESSARY TO POINT OUT THAT IN CIRCUMSTANCES SUCH AS THOSE IN THIS CASE , AND ESPECIALLY WITH REFERENCE TO THE CONTRACT OF 5 JULY 1971 , IN WHICH THE PARTIES UNDERTAKE TO SUPPLY EACH OTHER EXCLUSIVELY ON A RECIPROCAL BASIS , THE QUESTION MIGHT BE ASKED WHETHER THE CONDUCT IN QUESTION DOES NOT FALL WITHIN ARTICLE 85 OF THE TREATY AND POSSIBLY WITHIN PARAGRAPH ( 3 ) THEREOF .

HOWEVER , THE FACT THAT AGREEMENTS OF THIS KIND MIGHT FALL WITHIN ARTICLE 85 AND IN PARTICULAR WITHIN PARAGRAPH ( 3 ) THEREOF DOES NOT PRECLUDE THE APPLICATION OF ARTICLE 86 , SINCE THIS LATTER ARTICLE IS EXPRESSLY AIMED IN FACT AT SITUATIONS WHICH CLEARLY ORIGINATE IN CONTRACTUAL RELATIONS SO THAT IN SUCH CASES THE COMMISSION IS ENTITLED , TAKING INTO ACCOUNT THE NATURE OF THE RECIPROCAL UNDERTAKINGS ENTERED INTO AND TO THE COMPETITIVE POSITION OF THE VARIOUS CONTRACTING PARTIES ON THE MARKET OR MARKETS IN WHICH THEY OPERATE TO PROCEED ON THE BASIS OF ARTICLE 85 OR ARTICLE 86 .
( B ) THE UNILEVER CONTRACTS
117 ROCHE ENTERED INTO THREE CONTRACTS WITH UNILEVER ON 9 JANUARY 1974 .
118 THE FIRST , EXECUTED BY FOOD INDUSTRIES LTD ., ACTING AS UNILEVER ' S AGENT , WITH ROCHE ' S UK SUBSIDIARY , CONTAINS FIRST OF ALL AN ESTIMATE OF THE PURCHASER ' S REQUIREMENTS OF SYNTHETIC VITAMIN A , TYPE B , ASSESSED AT 130-134 THOUSAND MILLIARD ( M.M .) INTERNATIONAL UNITS FOR 1974 .
THE CONTRACT ALSO PROVIDES THAT IT SHALL CONTINUE DURING 1975 AND THAT THE PURCHASER SHALL GIVE AN ESTIMATE OF ITS REQUIREMENTS DURING DECEMBER 1974 AT THE LATEST .

THE SECOND , EXECUTED BY THE SAME PARTIES , COVERS DELIVERIES OF VITAMIN A , OTHER THAN TYPE B , AND AS FAR AS CONCERNS THE REST OF THE AGREEMENT CONTAINS THE SAME TERMS AND CONDITIONS AS THE FIRST .

THE THIRD CONTRACT IS CONCLUDED DIRECTLY BETWEEN ROCHE , BASLE , AND UNILEVER INKOOP MIJ , ROTTERDAM , AND PROVIDES THAT ROCHE HAS ' ' AGREED TO SUPPLY THE REQUIREMENTS OF YOUR GROUP ( CONTINENT ONLY ) FOR THE FOLLOWING PRODUCTS : VITAMIN A FOR MARGARINE ABOUT 30 M.M . IN 1974 , BETWEEN 27 AND 33 M.M . IN 1975 ; BETA-CAROTENE ( ALL FORMS ) ABOUT 6 000 KG IN 1974 , BETWEEN 5 400 KG AND 6 600 KG IN 1975 ' ' .

119 THE THREE CONTRACTS STATE THE PRICES WHICH HAVE BEEN AGREED , SUBJECT MOREOVER IN THE CASE OF THE CONTRACTS WITH FOOD INDUSTRIES LTD . TO A CLAUSE DEALING WITH EXCHANGE RATES .

THESE THREE CONTRACTS DO NOT PROVIDE FOR ANY REBATES BUT IN ITS TWO CONTRACTS WITH FOOD INDUSTRIES LTD . ROCHE GIVES AN ASSURANCE THAT IT WILL CHARGE UNILEVER ANY MORE-FAVOURABLE PRICE WHICH IT CHARGES THIRD PARTIES , WHEREAS THE CONTRACT FOR THE CONTINENT ONLY PROVIDES THAT IF UNILEVER RECEIVES MORE-FAVOURABLE OFFERS FROM COMPETITORS ROCHE WILL ADJUST ITS PRICES OR PERMIT THE PURCHASER TO BUY THE QUANTITY CONCERNED FROM COMPETITORS .

120 THE TERMS OF THE CONTRACTS MAKE IT ABSOLUTELY CLEAR THAT THEIR PURPOSE IS THE SUPPLY BY ROCHE OF ALL UNILEVER ' S REQUIREMENTS OF THE VITAMIN IN QUESTION FOR A PERIOD COVERING THE YEARS 1974 AND 1975 .
SINCE THE CONTRACTS IN QUESTION CONTAIN A FORMAL UNDERTAKING TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE THE QUESTION WHETHER OR NOT THEY ALSO CONTAIN A PROVISION GRANTING A REBATE IS NOT DETERMINATIVE WHEN DECIDING WHETHER THEY ARE CAUGHT BY ARTICLE 86 OF THE TREATY .

THE FACT THAT ROCHE ' S CONTRACTING PARTNER IS ITSELF A POWERFUL UNDERTAKING

AND THAT THE CONTRACT IS CLEARLY NOT THE OUTCOME OF PRESSURE BROUGHT TO BEAR BY ROCHE ON ITS PARTNER DOES NOT PRECLUDE THE EXISTENCE OF AN ABUSE OF A DOMINANT POSITION , SUCH AN ABUSE CONSISTING IN THIS CASE OF THE ADDITIONAL INTERFERENCE , DUE TO THE OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FROM ROCHE , WITH THE STRUCTURE OF COMPETITION IN A MARKET IN WHICH IN CONSEQUENCE OF THE PRESENCE THERE OF AN UNDERTAKING OCCUPYING A DOMINANT POSITION THE DEGREE OF COMPETITION HAS ALREADY BEEN WEAKENED .

SUCH AGREEMENTS COULD ONLY POSSIBLY BE ADMISSIBLE IN THE CONTEXT OF , AND SUBJECT TO THE CONDITIONS LAID DOWN IN , ARTICLE 85 ( 3 ) OF THE TREATY BUT NONE OF THE CONTRACTING PARTIES HAS THOUGHT IT NECESSARY TO AVAIL ITSELF OF THIS POSSIBILITY .

121THE EXAMINATION OF THE CONTRACTS AT ISSUE CONCLUDED BOTH WITH MERCK AND UNILEVER DOES NOT DISCLOSE ANY SPECIAL FEATURES WHICH WOULD PREVENT THEM FROM FALLING WITHIN THE CONCEPT OF AN ABUSE WHICH IN PRINCIPLE INCLUDES ANY OBLIGATION TO OBTAIN SUPPLIES EXCLUSIVELY FROM AN UNDERTAKING IN A DOMINANT POSITION WHICH BENEFITS THAT UNDERTAKING .

III - THE EFFECT ON COMPETITION AND TRADE BETWEEN MEMBER STATES
122THE APPLICANT DENIES THAT THE DIFFERENCE BETWEEN THE PRICES WHICH BY MEANS OF THE FIDELITY REBATES IT ALLOWS ITS VARIOUS CUSTOMERS TO PAY AND WHICH VARY ACCORDING TO WHETHER THOSE CUSTOMERS AGREE TO OBTAIN ALL THEIR REQUIREMENTS EXCLUSIVELY FROM IT OR NOT , IS OF SUCH A KIND AS TO PLACE THEM AT A COMPETITIVE DISADVANTAGE WITHIN THE MEANING OF SUBPARAGRAPH ( C ) OF THE SECOND PARAGRAPH OF ARTICLE 86 OF THE TREATY , SINCE THIS DIFFERENCE CANNOT HAVE AN APPRECIABLE EFFECT ON THE COMPETITION INTER SE OF ROCHE ' S PURCHASERS .

FURTHERMORE IN ITS REPLY IT SEEMS TO BE MAINTAINING THAT THE CONDUCT FOR WHICH IT IS CENSURED IS NOT OF SUCH A KIND AS TO HINDER TRADE BETWEEN MEMBER STATES .

123AS FAR AS THE FIRST POINT IS CONCERNED THE TERMS OF THE CONTRACTS AT ISSUE AS WELL AS THE CONSIDERATIONS SET OUT IN MANAGEMENT INFORMATION AND IN THE MINUTES OF THE MEETING BETWEEN UNILEVER AND ROCHE IN LONDON ON 11 DECEMBER 1972 SHOW CLEARLY THE IMPORTANCE WHICH ROCHE ITSELF ATTACHES TO THE REBATES WHICH IT GRANTS .

IN THESE CIRCUMSTANCES IT CANNOT BE ACCEPTED THAT THESE REBATES ARE NOT OF IMPORTANCE TO THE CUSTOMERS .

MOREOVER SINCE THE COURSE OF CONDUCT UNDER CONSIDERATION IS THAT OF AN UNDERTAKING OCCUPYING A DOMINANT POSITION ON A MARKET WHERE FOR THIS REASON THE STRUCTURE OF COMPETITION HAS ALREADY BEEN WEAKENED , WITHIN THE FIELD OF APPLICATION OF ARTICLE 86 ANY FURTHER WEAKENING OF THE STRUCTURE OF COMPETITION MAY CONSTITUTE AN ABUSE OF A DOMINANT POSITION .

124AS FAR AS CONCERNS THE QUESTION WHETHER TRADE BETWEEN MEMBER STATES HAS BEEN AFFECTED IT IS IN THE FIRST PLACE AN ESTABLISHED FACT THAT THE MARKET FOR EACH OF THE VITAMINS CONSIDERED COMPRISES THE WHOLE OF COMMUNITY TERRITORY WHICH COVERED , TO BEGIN WITH , SIX AND THEN NINE MEMBER STATES .

125THE PROHIBITIONS CONTAINED IN ARTICLES 85 AND 86 MUST BE INTERPRETED AND APPLIED IN THE LIGHT OF ARTICLE 3 ( F ) OF THE TREATY WHICH PROVIDES THAT THE ACTIVITIES OF THE COMMUNITY SHALL INCLUDE THE ' ' INSTITUTION OF A SYSTEM ENSURING THAT COMPETITION IN THE COMMON MARKET IS NOT DISTORTED ' ' AND

ARTICLE 2 OF THE TREATY WHICH GIVES THE COMMUNITY THE TASK OF PROMOTING ' ' THROUGHOUT THE COMMUNITY A HARMONIOUS DEVELOPMENT OF ECONOMIC ACTIVITIES ' ' .

BY PROHIBITING THE ABUSE OF A DOMINANT POSITION WITHIN THE MARKET IN SO FAR AS IT MAY AFFECT TRADE BETWEEN MEMBER STATES , ARTICLE 86 THEREFORE COVERS NOT ONLY ABUSE WHICH MAY DIRECTLY PREJUDICE CONSUMERS BUT ALSO ABUSE WHICH INDIRECTLY PREJUDICES THEM BY IMPAIRING THE EFFECTIVE COMPETITIVE STRUCTURE AS ENVISAGED BY ARTICLE 3 ( F ) OF THE TREATY .

126FURTHERMORE THE ACTUAL WORDING OF A NUMBER OF THE ENGLISH CLAUSES IMPLIED THAT THE PARTITIONING OF THE MARKETS WOULD BE MAINTAINED MAKING IT POSSIBLE IN PARTICULAR TO CHARGE DIFFERENT PRICES FROM ONE MEMBER STATE TO ANOTHER , AND THIS FINDING IS CONFIRMED BY THE FACT , TO WHICH ATTENTION HAS ALREADY BEEN DRAWN ABOVE , THAT THE PRICE VARIATIONS FOR A PARTICULAR VITAMIN AT A PARTICULAR TIME DIFFERED MARKEDLY FROM ONE MEMBER STATE TO ANOTHER .

127THE FOREGOING SHOWS THAT THE COURSE OF CONDUCT AT ISSUE WAS CAPABLE OF BOTH AFFECTING COMPETITION AND AFFECTING TRADE BETWEEN MEMBER STATES .

FOURTH SUBMISSION : THE FINE
( A ) THE IMPRECISION OF THE RULES CONTAINING PENALTIES
128THE APPLICANT SUBMITS THAT BECAUSE OF THE GENERAL NATURE AND IMPRECISION OF THE CONCEPTS ' ' DOMINANT POSITION ' ' AND ' ' ABUSE ' ' OF SUCH A POSITION , WHICH ARE SET OUT IN ARTICLE 86 OF THE TREATY , THE COMMISSION COULD ONLY HAVE IMPOSED FINES UPON IT FOR INFRINGING THIS ARTICLE AFTER THESE CONCEPTS HAD BEEN GIVEN A SPECIFIC MEANING EITHER BY ADMINISTRATIVE PRACTICE OR BY CASE-LAW SO THAT THOSE PERSONS LIABLE TO BE FINED KNOW WHERE THEY STAND .

129BY VIRTUE OF ARTICLE 87 OF THE TREATY THE COUNCIL HAD TO ADOPT THE NECESSARY REGULATIONS OR DIRECTIVES ESPECIALLY WITH A VIEW TO ENSURING ' ' COMPLIANCE WITH THE PROHIBITIONS LAID DOWN IN ARTICLE 85 ( 1 ) AND IN ARTICLE 86 BY MAKING PROVISION FOR FINES AND PERIODIC PENALTY PAYMENTS ' ' .

IN PURSUANCE OF THIS PROVISION IT ADOPTED REGULATION NO 17 OF 6 FEBRUARY 1962 ARTICLE 15 ( 2 ) WHEREOF PROVIDES THAT THE COMMISSION MAY BY DECISION IMPOSE ON UNDERTAKINGS OR ASSOCIATIONS OF UNDERTAKINGS FINES UP TO A MAXIMUM FIXED BY THAT ARTICLE IF THEY EITHER INTENTIONALLY OR NEGLIGENTLY INFRINGE ARTICLE 85 ( 1 ) OR ARTICLE 86 OF THE TREATY .

ON THE OTHER HAND UNDER ARTICLE 2 OF THE SAME REGULATION : ' ' UPON APPLICATION BY THE UNDERTAKINGS OR ASSOCIATIONS OF UNDERTAKINGS CONCERNED , THE COMMISSION MAY CERTIFY THAT , ON THE BASIS OF THE FACTS IN ITS POSSESSION , THERE ARE NO GROUNDS UNDER ARTICLE 85 ( 1 ) OR ARTICLE 86 OF THE TREATY FOR ACTION ON ITS PART IN RESPECT OF AN AGREEMENT , DECISION OR PRACTICE ' ' .

130THUS FROM 1962 ONWARDS UNDERTAKINGS KNEW , ON THE ONE HAND , THAT IF THEY IGNORED THE PROHIBITIONS OF ARTICLE 86 THEY WOULD RENDER THEMSELVES LIABLE TO FINES AND , ON THE OTHER HAND , THAT BY MEANS OF A SPECIALLY ARRANGED PROCEDURE THEY WERE IN A POSITION TO OBTAIN CLARIFICATION OF THE APPLICATION OF THE SAID PROHIBITIONS TO THEIR PARTICULAR CASE .

MOREOVER THE NATURE OF THESE PROHIBITIONS AND THE CONDITIONS WHICH MUST BE FULFILLED FOR THEM TO APPLY , IN SPITE OF ARTICLE 86 BEING INEVITABLY COUCHED IN GENERAL TERMS , ARE NOT IMPRECISE AND IMPOSSIBLE TO FORESEE AS ROCHE CLAIMS .

131 THE WAY IN WHICH ARTICLE 86 HAD BEEN APPLIED BEFORE PROVIDED ROCHE DURING THE PERIOD 1970 TO 1974 , WHICH THE COMMISSION CONSIDERED FOR THE PURPOSE OF FIXING THE FINE , WITH A DEGREE OF ANTICIPATION WHICH WAS AMPLY SUFFICIENT TO ENABLE ROCHE TO TAKE ACCOUNT OF THIS TO ITS ADVANTAGE WHEN DECIDING HOW TO ACT IN RELATION BOTH TO ITS DOMINANT POSITION AND TO THE PRACTICES FOR WHICH IT IS BLAMED .

132 WHEN ARTICLE 86 REFERS TO THE EXISTENCE OF A DOMINANT POSITION AND FORBIDS ANY ABUSE OF IT , THAT ARTICLE HAS TO BE CONSIDERED IN THE LIGHT OF A COMPREHENSIVE SYSTEM OF PROVISIONS - SUCH AS ARTICLE 3 ( F ) , ARTICLE 37 ( 1 ) , THE SECOND SUBPARAGRAPH OF ARTICLE 40 ( 3 ) , ARTICLE 85 AND ARTICLE 90 OF THE TREATY - ALL OF WHICH ARE DESIGNED TO ESTABLISH ON A MARKET HAVING THE PARTICULAR FEATURES OF A SINGLE MARKET COMPETITION WHICH IS EFFECTIVE AND NOT DISTORTED .

MOREOVER WHERE ARTICLE 86 USES THE EXPRESSIONS ' ' DOMINANT POSITION ' ' AND ' ' ABUSE ' ' IT REFERS TO CONCEPTS WHICH ARE NOT NEW , BUT WHICH HAVE IN ESSENCE BEEN GIVEN A SPECIFIC MEANING AS A RESULT OF THE PRACTICE OF THE AUTHORITIES RESPONSIBLE IN MOST OF THE MEMBER STATES FOR EXAMINING AND CURBING CONDUCT WHICH RESTRICTS COMPETITION .

133 AS FAR AS CONCERNS IN PARTICULAR THE CONCEPT OF A DOMINANT POSITION A PRUDENT COMMERCIAL OPERATOR IS IN NO DOUBT THAT , ALTHOUGH POSSESSION OF LARGE MARKET SHARES IS NOT NECESSARILY AND IN EVERY CASE THE ONLY FACTOR ESTABLISHING THE EXISTENCE OF A DOMINANT POSITION , IT HAS HOWEVER IN THIS CONNEXION A CONSIDERABLE SIGNIFICANCE WHICH MUST OF NECESSITY BE TAKEN INTO CONSIDERATION IN RELATION TO HIS POSSIBLE CONDUCT ON THE MARKET .

SUCH AN EVALUATION OF THE SCOPE OF ARTICLE 86 DID NOT MEAN THAT IN ROCHE ' S CASE , AT ALL EVENTS ON MOST OF THE MARKETS AT ISSUE , THERE WAS ANY FACTOR WHICH IT WAS IMPOSSIBLE TO FORESEE OR WHICH GAVE RISE TO UNREASONABLE DOUBT .

134 AS FAR AS CONCERNS THE COMPATIBILITY OF FIDELITY REBATES WITH THE PROHIBITIONS OF ARTICLE 86 THE APPLICATION OF THIS ARTICLE TO A SYSTEM OF OBTAINING SUPPLIES EXCLUSIVELY FROM THE APPLICANT AND OF REBATES OF THE KIND IT HAS WORKED OUT WAS NOT IMPOSSIBLE TO FORESEE AND THIS IS SHOWN NOT ONLY BY THE EXPERIENCE WHICH EVERY UNDERTAKING OF THE SIZE OF THE APPLICANT OPERATING THROUGHOUT THE COMMON MARKET OUGHT TO HAVE OF THE PRACTICE OF THE AUTHORITIES RESPONSIBLE IN THE MEMBER STATES FOR APPLYING COMPETITION LAW BUT ALSO BY THE PRECISE WORDING OF SUBPARAGRAPH ( B ) OF THE SECOND PARAGRAPH OF ARTICLE 86 DIRECTED AGAINST LIMITING MARKETS , OF SUBPARAGRAPH ( D ) OF THE SECOND PARAGRAPH OF ARTICLE 86 WHICH PROHIBITS MAKING THE CONCLUSION OF CONTRACTS SUBJECT TO ACCEPTANCE BY THE OTHER PARTIES OF SUPPLEMENTARY OBLIGATIONS WHICH HAVE NO CONNEXION WITH THE SUBJECT OF SUCH CONTRACTS AND , IN PARTICULAR , OF SUBPARAGRAPH ( C ) OF THE SECOND PARAGRAPH OF ARTICLE 86 WHICH IS DIRECTED AGAINST APPLYING DISSIMILAR CONDITIONS TO EQUIVALENT TRANSACTIONS .

THERE IS EVEN LESS REASON TO ACCEPT ROCHE ' S CLAIM THAT IT WAS IMPOSSIBLE TO FORESEE THE RESULT OF ITS ACTIONS BECAUSE AT THE VERY LEAST THE POSSIBILITY , IF NOT THE PROBABILITY , OF THIS APPLICATION OF THE LAW HAD TO BE TAKEN INTO CONSIDERATION BY A VIGILANT COMMERCIAL OPERATOR AND BECAUSE ARTICLE 2 OF REGULATION NO 17 ALLOWED A PRECAUTIONARY MEASURE TO BE TAKEN FOR A RULING ON THE APPLICATION OF ARTICLE 86 TO DOUBTFUL CASES . THE APPLICANT DID NOT HOWEVER CONSIDER THAT IT SHOULD AVAIL ITSELF OF THIS OPPORTUNITY IN ORDER TO

OBTAIN THAT LEGAL CERTAINTY OF WHICH IT CLAIMS IT HAS BEEN DEPRIVED .

135FINALLY , THE APPLICANT QUOTES THE COMMISSION ' S DECISION OF 5 DECEMBER 1969 ( JOURNAL OFFICIEL L 323 , P . 21 ) RELATING TO A PROCEEDING UNDER ARTICLE 85 OF THE EEC TREATY ( IV-24 , 470-1 , PIRELLI/DUNLOP ).

IN ITS VIEW THAT DECISION INDICATES THAT AGREEMENTS UNDER WHICH THE PARTIES SUPPLY EACH OTHER ON A RECIPROCAL BASIS ARE ADMISSIBLE AS SOON AS THEY INCLUDE AN ENGLISH CLAUSE .

136THE DECISION WHICH THE APPLICANT HAS QUOTED WAS CONCERNED WITH AN AGREEMENT ENTERED INTO BY TWO UNDERTAKINGS , WHICH DID NOT OCCUPY A DOMINANT POSITION ON THE MARKET , RELATING TO THE MANUFACTURE ON RECIPROCAL ACCOUNT OF TYRES AND WHICH WAS INTENDED TO MAKE IT EASIER FOR EACH OF THE TWO PARTIES TO PENETRATE THE MARKET OF THE OTHER .

FURTHERMORE THE CLAUSE PROVIDING FOR ADJUSTMENT OF PRICES IN THE DUNLOP/PIRELLI AGREEMENT WAS NOT SUBJECT TO THE MANY RESTRICTIONS AND CONDITIONS WHICH ARE FOUND IN THE CONTRACTS AT ISSUE AND WHICH MARKEDLY RESTRICT THE SCOPE OF THAT CLAUSE .

AN UNDERTAKING IN A DOMINANT POSITION CANNOT REASONABLY BELIEVE THAT A NEGATIVE CLEARANCE ISSUED IN SUCH CIRCUMSTANCES WOULD SERVE AS A PRECEDENT FOR JUSTIFYING ITS OWN BEHAVIOUR IN THE CONTEXT OF ARTICLE 86 . 137IT FOLLOWS FROM THE FOREGOING CONSIDERATIONS THAT THE SUBMISSION BASED ON THE IMPRECISE NATURE OF THE CONCEPTS IN ARTICLE 86 MUST BE REJECTED .

( B ) THE APPLICATION OF ARTICLE 15 ( 2 ) OF REGULATION NO 17
138THE APPLICANT ALSO SUBMITS THAT IT WOULD APPEAR FROM THE CONTENTS AS A WHOLE OF THE FILE AND FROM ITS OWN CONDUCT THAT IT COULD NOT BE REGARDED AS HAVING ACTED EITHER INTENTIONALLY OR NEGLIGENTLY IF IT WAS OF THE OPINION , ON THE ONE HAND , THAT IT DID NOT OCCUPY A DOMINANT POSITION ON THE MARKETS IN QUESTION AND , ON THE OTHER HAND , THAT THE CONTRACTS AT ISSUE WERE COMPATIBLE WITH ARTICLE 86 OF THE TREATY .

139THE SUGGESTIONS AND INSTRUCTIONS CONTAINED IN MANAGEMENT INFORMATION AND THE OTHER INTERNAL DOCUMENTS RELATING TO THE IMPORTANCE AND THE ANTICIPATED EFFECTS OF ENTERING INTO CONTRACTS , WHICH PROVIDE FOR THE PURCHASER OBTAINING HIS REQUIREMENTS EXCLUSIVELY FROM ROCHE AND FOR A SYSTEM OF FIDELITY REBATES , IN RELATION TO THE RETENTION BY ROCHE OF ITS MARKET SHARES PROVE THAT THE APPLICANT INTENTIONALLY PURSUED A COMMERCIAL POLICY DESIGNED TO BAR THE ACCESS TO THE MARKET OF NEW COMPETITORS .

THE INCREASE FROM 1970 ONWARDS OF CONTRACTS UNDER WHICH THE PURCHASER OBTAINS HIS SUPPLIES EXCLUSIVELY FROM ROCHE OR IS INDUCED TO SO CONFIRMS THIS INTENTION .

ON THE OTHER HAND THE SIZE OF THE APPLICANT ' S MARKET SHARES , IN ANY EVENT IN THE CASE OF MOST OF THE GROUPS OF VITAMINS , IMPLIES THAT ITS CONVICTION IT DID NOT OCCUPY A DOMINANT POSITION COULD ONLY BE THE OUTCOME OF AN INADEQUATE STUDY OF THE STRUCTURES OF THE MARKETS ON WHICH IT OPERATES OR OF A REFUSAL TO TAKE THESE STRUCTURES INTO CONSIDERATION .

THE CONDITIONS FOR THE APPLICATION OF ARTICLE 15 OF REGULATION NO 17 WERE THEREFORE FULFILLED .

( C ) THE AMOUNT OF THE FINE

140HOWEVER , THE PREPARATORY INQUIRIES IN THIS CASE HAVE DISCLOSED THAT THE COMMISSION HAS MADE SOME MISTAKES IN ITS EVALUATION OF THE APPLICANT ' S DOMINANT POSITION ON THE MARKET FOR VITAMINS IN GROUP B3 .
FURTHERMORE AS FAR AS CONCERNS THE MARKET SHARES WHICH ARE EVIDENCE OF A DOMINANT POSITION THE COMMISSION ONLY SUPPLIED PARTICULARS FOR THE YEARS 1972 , 1973 , 1974 AND TO A CERTAIN EXTENT FOR 1971 , SO THAT THE DURATION OF THE INFRINGEMENT TO WHICH REGARD IS TO BE HAD IN FIXING THE AMOUNT OF THE FINE MUST BE REDUCED TO A PERIOD WHICH IS ONLY A LITTLE OVER THREE YEARS AND SO LESS THAN THE FIVE YEARS WHICH THE COMMISSION TOOK INTO CONSIDERATION .

FINALLY IT IS AN ESTABLISHED FACT THAT AS FAR BACK AS THE STAGE OF THE ADMINISTRATIVE PROCEDURE ROCHE STATED THAT IT WAS READY TO AMEND THE CONTRACTS AT ISSUE AND IN FACT AMENDED THEM IN CONJUNCTION WITH THE COMMISSION ' S DEPARTMENTS .

141IN VIEW OF THE FOREGOING IT IS APPROPRIATE TO REDUCE THE AMOUNT OF THE FINE AND IT APPEARS JUSTIFIABLE TO FIX IT AT 200 000 UNITS OF ACCOUNT , BEING DM 732 000 , THE REMAINDER OF THE APPLICATION BEING DISMISSED .

### Decision on costs
COSTS
142UNDER ARTICLE 69 ( 2 ) OF THE RULES OF PROCEDURE THE UNSUCCESSFUL PARTY SHALL BE ORDERED TO PAY THE COSTS IF THEY HAVE BEEN ASKED FOR IN THE SUCCESSFUL PARTY ' S PLEADING .

UNDER PARAGRAPH ( 3 ) OF THAT ARTICLE , WHEN EACH PARTY SUCCEEDS ON SOME AND FAILS ON OTHER HEADS , OR WHERE THE CIRCUMSTANCES ARE EXCEPTIONAL , THE COURT MAY ORDER THAT THE PARTIES BEAR THEIR OWN COSTS IN WHOLE OR IN PART .

EACH PARTY HAS FAILED ON SOME HEADS AND MUST THEREFORE BEAR ITS OWN COSTS .

### Operative part
ON THOSE GROUNDS
THE COURT
HEREBY
1 . REDUCES THE AMOUNT OF THE FINE IMPOSED ON HOFFMANN-LA ROCHE AG , FIXED UNDER ARTICLE 3 ( 1 ) OF COMMISSION DECISION OF 9 JUNE 1976 ( IV/29.020 ) AT 300 000 UNITS OF ACCOUNT , BEING DM 1 098 000 TO 200 000 UNITS OF ACCOUNT , BEING DM 732 000 ;

2 . DISMISSES THE REMAINDER OF THE APPLICATION ;

3 . ORDERS EACH PARTY TO BEAR ITS OWN COSTS .

© European Communities, 2004. All rights reserved

# EXHIBIT D

22.12.2005     EN     Official Journal of the European Union     C 325/7

**Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004**

(2005/C 325/07)

(Text with EEA relevance)

## I. INTRODUCTION AND SUBJECT-MATTER OF THE NOTICE

1. Access to the Commission file is one of the procedural guarantees intended to apply the principle of equality of arms and to protect the rights of the defence. Access to the file is provided for in Article 27(1) and (2) of Council Regulation (EC) No 1/2003 [1], Article 15(1) of Commission Regulation (EC) No 773/2004 ('the Implementing Regulation') [2], Article 18(1) and (3) of the Council Regulation (EC) No 139/2004 ('Merger Regulation') [3] and Article 17(1) of Commission Regulation (EC) No 802/2004 ('the Merger Implementing Regulation') [4]. In accordance with these provisions, before taking decisions on the basis of Articles 7, 8, 23 and 24(2) of Regulation (EC) No 1/2003 and Articles 6(3), 7(3), 8(2) to (6), 14 and 15 of the Merger Regulation, the Commission shall give the persons, undertakings or associations of undertakings, as the case may be, an opportunity of making known their views on the objections against them and they shall be entitled to have access to the Commission's file in order to fully respect their rights of defence in the proceedings. The present notice provides the framework for the exercise of the right set out in these provisions. It does not cover the possibility of the provision of documents in the context of other proceedings. This notice is without prejudice to the interpretation of such provisions by the Community Courts. The principles set out in this Notice apply also when the Commission enforces Articles 53, 54 and 57 of the EEA Agreement [5].

2. This specific right outlined above is distinct from the general right to access to documents under Regulation (EC) No 1049/2001 [6], which is subject to different criteria and exceptions and pursues a different purpose.

3. The term access to the file is used in this notice exclusively to mean the access granted to the persons, undertakings or association of undertakings to whom the Commission has addressed a statement of objections. This notice clarifies who has access to the file for this purpose.

4. The same term, or the term access to documents, is also used in the above-mentioned regulations in respect of complainants or other involved parties. These situations are, however, distinct from that of the addressees of a statement of objections and therefore do not fall under the definition of access to the file for the purposes of this notice. These related situations are dealt with in a separate section of the notice.

5. This notice also explains to which information access is granted, when access takes place and what are the procedures for implementing access to the file.

---

[1] Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty, OJ L 1, 4.1.2003, p. 1-25.

[2] Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty, OJ L 123, 27.4.2004, p. 18-24.

[3] Council Regulation (EC) No 139/2004 of 20 January 2004 on the control of concentrations between undertakings, OJ L 24, 29.1.2004, p. 1-22.

[4] Commission Regulation (EC) No 802/2004 of 21 April 2004 implementing Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings, OJ L 133, 30.4.2004, p. 1-39. Corrected in the OJ L 172, 6.5.2004, p. 9.

[5] References in this Notice to Articles 81 and 82 therefore apply also to Articles 53 and 54 of the EEA Agreement.

[6] Regulation (EC) No 1049/2001 of the European Parliament and of the Council of 30 May 2001 regarding public access to European Parliament, Council and Commission documents, OJ L 145, 31.5.2001, p. 43. See for instance Case T-2/03, Verein für Konsumenteninformation v. Commission, judgment of 13 April 2005, not yet reported.

C 325/8        EN        Official Journal of the European Union        22.12.2005

6. As from its publication, this notice replaces the 1997 Commission notice on access to the file (¹). The new rules take account of the legislation applicable as of 1 May 2004, namely the above referred Regulation (EC) No 1/2003, Merger Regulation, Implementing Regulation and Merger Implementing Regulation, as well as the Commission Decision of 23 May 2001 on the terms of reference of Hearing Officers in certain competition proceedings (²). It also takes into account the recent case law of the Court of Justice and the Court of First Instance of the European Communities (³) and the practice developed by the Commission since the adoption of the 1997 notice.

## II. SCOPE OF ACCESS TO THE FILE

### A. Who is entitled to access to the file?

7. Access to the file pursuant to the provisions mentioned in paragraph 1 is intended to enable the effective exercise of the rights of defence against the objections brought forward by the Commission. For this purpose, both in cases under Articles 81 and 82 EC and in cases under the Merger Regulation, access is granted, upon request, to the persons, undertakings or associations of undertakings (⁴), as the case may be, to which the Commission addresses its objections (⁵) (hereinafter, 'the parties').

### B. To which documents is access granted?

1. *The content of the Commission file*

8. The 'Commission file' in a competition investigation (hereinafter also referred to as 'the file') consists of all documents (⁶), which have been obtained, produced and/or assembled by the Commission Directorate General for Competition, during the investigation.

9. In the course of investigation under Articles 20, 21 and 22(2) of Regulation (EC) No 1/2003 and Articles 12 and 13 of the Merger Regulation, the Commission may collect a number of documents, some of which may, following a more detailed examination, prove to be unrelated to the subject matter of the case in question. Such documents may be returned to the undertaking from which those have been obtained. Upon return, these documents will no longer constitute part of the file.

2. *Accessible documents*

10. The parties must be able to acquaint themselves with the information in the Commission's file, so that, on the basis of this information, they can effectively express their views on the preliminary conclusions reached by the Commission in its objections. For this purpose they will be granted access to all documents making up the Commission file, as defined in paragraph 8, with the exception of internal documents, business secrets of other undertakings, or other confidential information (⁷).

---

(¹) Commission notice on the internal rules of procedure for processing requests for access to the file in cases under Articles 85 and 86 [*now 81 and 82*] of the EC Treaty, Articles 65 and 66 of the ECSC Treaty and Council Regulation (EEC) No 4064/89, OJ C 23, 23.1.1997, p. 3.
(²) OJ L 162, 19.6.2001, p. 21.
(³) In particular Joint Cases T-25/95 et al., *Cimenteries CBR SA et al. v Commission*, [2000] ECR II-0491.
(⁴) In the remainder of this Notice, the term 'undertaking' includes both undertakings and associations of undertakings. The term 'person' encompasses natural and legal persons. Many entities are legal persons and undertakings at the same time; in this case, they are covered by both terms. The same applies where a natural person is an undertaking within the meaning of Articles 81 and 82. In Merger proceedings, account must also be taken of persons referred to in Article 3(1)(b) of the Merger Regulation, even when they are natural persons. Where entities without legal personality which are also not undertakings become involved in Commission competition proceedings, the Commission applies, where appropriate, the principles set out in this Notice *mutatis mutandis*.
(⁵) Cf. Article 15(1) of the Implementing Regulation, Article 18(3) of the Merger Regulation and Article 17(1) of the Merger Implementing Regulation.
(⁶) In this notice the term 'document' is used for all forms of information support, irrespective of the storage medium. This covers also any electronic data storage device as may be or become available.
(⁷) Cf. Article 27(2) of Regulation (EC) No 1/2003, Articles 15(2) and 16(1) of the Implementing Regulation, and Article 17(3) of the Merger Implementing Regulation. Those exceptions are also mentioned in Case T-7/89, *Hercules Chemicals v Commission*, [1991] ECR II-1711, paragraph 54. The Court has ruled that it does not belong to the Commission alone to decide which documents in the file may be useful for the purposes of the defence (Cf. Case T-30/91 *Solvay v. Commission*, [1995] ECR II-1775, paragraphs 81-86, and Case T-36/91 *ICI vs. Commission*, [1995] ECR II-1847, paragraphs 91-96).

22.12.2005     EN     Official Journal of the European Union     C 325/9

11. Results of a study commissioned in connection with proceedings are accessible together with the terms of reference and the methodology of the study. Precautions may however be necessary in order to protect intellectual property rights.

3.    *Non-accessible documents*

3.1.    Internal documents

3.1.1 *General principles*

12. Internal documents can be neither incriminating nor exculpatory [1]. They do not constitute part of the evidence on which the Commission can rely in its assessment of a case. Thus, the parties will not be granted access to internal documents in the Commission file [2]. Given their lack of evidential value, this restriction on access to internal documents does not prejudice the proper exercise of the parties' right of defence [3].

13. There is no obligation on the Commission departments to draft any minutes of meetings [4] with any person or undertaking. If the Commission chooses to make notes of such meetings, such documents constitute the Commission's own interpretation of what was said at the meetings, for which reason they are classified as internal documents. Where, however, the person or undertaking in question has agreed the minutes, such minutes will be made accessible after deletion of any business secrets or other confidential information. Such agreed minutes constitute part of the evidence on which the Commission can rely in its assessment of a case [5].

14. In the case of a study commissioned in connection with proceedings, correspondence between the Commission and its contractor containing evaluation of the contractor's work or relating to financial aspects of the study, are considered internal documents and will thus not be accessible.

3.1.2 *Correspondence with other public authorities*

15. A particular case of internal documents is the Commission's correspondence with other public authorities and the internal documents received from such authorities (whether from EC Member States ('the Member States') or non-member countries). Examples of such non-accessible documents include:

— correspondence between the Commission and the competition authorities of the Member States, or between the latter [6];

— correspondence between the Commission and other public authorities of the Member States [7];

— correspondence between the Commission, the EFTA Surveillance Authority and public authorities of EFTA States [8];

— correspondence between the Commission and public authorities of non-member countries, including their competition authorities, in particular where the Community and a third country have concluded an agreement governing the confidentiality of the information exchanged [9].

---

[1] Examples of internal documents are drafts, opinions, memos or notes from the Commission departments or other public authorities concerned.

[2] Cf. Article 27(2) of Regulation (EC) No 1/2003, Article 15(2) of the Implementing Regulation, and Article 17(3) of the Merger Implementing Regulation.

[3] Cf. paragraph 1 above.

[4] Cf. judgement of 30.9.2003 in Joined Cases T-191/98 and T-212/98 to T-214/98 *Atlantic Container Line and others v Commission* (TACA), [2003] ECR II-3275, paragraphs 349-359.

[5] Statements recorded pursuant to Article 19 or Article 20(2)(e) of Regulation 1/2003 or Article 13(2)(e) of Merger Regulation will also normally belong to the accessible documents (see paragraph 10 above).

[6] Cf. Article 27(2) of Regulation (EC) No 1/2003, Article 15(2) of the Implementing Regulation, Article 17(3) of the Merger Implementing Regulation.

[7] Cf. Order of the Court of First Instance in Cases T-134/94 et al *NMH Stahlwerke and Others v Commission* [1997] ECR II-2293, paragraph 36, and Case T-65/89, *BPB Industries and British Gypsum* [1993] ECR II-389, paragraph 33.

[8] In this notice the term 'EFTA States' includes the EFTA States that are parties to the EEA Agreement.

[9] For example, Article VIII.2 of the Agreement between the European Communities and the Government of the United States of America regarding the application of their competition laws (OJ No L 95, 27.4.1995, p. 47) stipulates that information provided to it in confidence under the Agreement must be protected 'to the fullest extent possible'. That Article creates an international-law obligation binding the Commission.

16.   In certain exceptional circumstances, access is granted to documents originating from Member States, the EFTA Surveillance Authority or EFTA States, after deletion of any business secrets or other confidential information. The Commission will consult the entity submitting the document prior to granting access to identify business secrets or other confidential information.

This is the case where the documents originating from Member States contain allegations brought against the parties, which the Commission must examine, or form part of the evidence in the investigative process, in a way similar to documents obtained from private parties. These considerations apply, in particular, as regards:

— documents and information exchanged pursuant to Article 12 of Regulation (EC) No 1/2003, and information provided to the Commission pursuant to Article 18(6) of Regulation (EC) No 1/2003;

— complaints lodged by a Member State under Article 7(2) of Regulation (EC) No 1/2003.

Access will also be granted to documents originating from Member States or the EFTA Surveillance Authority in so far as they are relevant to the parties' defence with regard to the exercise of competence by the Commission ([1]).

### 3.2.    Confidential information

17.   The Commission file may also include documents containing two categories of information, namely business secrets and other confidential information, to which access may be partially or totally restricted ([2]). Access will be granted, where possible, to non-confidential versions of the original information. Where confidentiality can only be assured by summarising the relevant information, access will be granted to a summary. All other documents are accessible in their original form.

#### 3.2.1   *Business secrets*

18.   In so far as disclosure of information about an undertaking's business activity could result in a serious harm to the same undertaking, such information constitutes business secrets ([3]). Examples of information that may qualify as business secrets include: technical and/or financial information relating to an undertaking's know-how, methods of assessing costs, production secrets and processes, supply sources, quantities produced and sold, market shares, customer and distributor lists, marketing plans, cost and price structure and sales strategy.

#### 3.2.2   *Other confidential information*

19.   The category 'other confidential information' includes information other than business secrets, which may be considered as confidential, insofar as its disclosure would significantly harm a person or undertaking. Depending on the specific circumstances of each case, this may apply to information provided by third parties about undertakings which are able to place very considerable economic or commercial pressure on their competitors or on their trading partners, customers or suppliers. The Court of First Instance and the Court of Justice have acknowledged that it is legitimate to refuse to reveal to such undertakings certain letters received from their customers, since their disclosure might easily expose the authors to the risk of retaliatory measures ([4]). Therefore the notion of other confidential information may include information that would enable the parties to identify complainants or other third parties where those have a justified wish to remain anonymous.

---

([1])   In the merger control area, this may apply in particular to submissions by a Member State under Article 9 (2) of the Merger Regulation with regard to a case referral.

([2])   Cf. Article 16(1) of the Implementing Regulation and Article 17(3) of the Merger Implementing Regulation; Case T-7/89 *Hercules Chemicals NV v Commission*, [1991] ECR II-1711, paragraph 54; Case T-23/99, *LR AF 1998 A/S v Commission*, [2002] ECR II-1705, paragraph 170.

([3])   Judgement of 18.9.1996 in Case T-353/94, *Postbank NV v Commission*, [1996] ECR II-921, paragraph 87.

([4])   The Community Courts have pronounced upon this question both in cases of alleged abuse of a dominant position (Article 82 of the EC Treaty) (Case C-65/89, *BPB Industries and British Gypsum* [1993] ECR II-389; and Case C-310/93P, *BPB Industries and British Gypsum* [1995] ECR I-865), and in merger cases (Case T-221/95 *Endemol v Commission* [1999] ECR II-1299, paragraph 69, and Case T-5/02 *Laval v. Commission* [2002] ECR II-4381, paragraph 98 et seq.).

22.12.2005    [ EN ]    Official Journal of the European Union    C 325/11

20. The category of other confidential information also includes military secrets.

### 3.2.3 *Criteria for the acceptance of requests for confidential treatment.*

21. Information will be classified as confidential where the person or undertaking in question has made a claim to this effect and such claim has been accepted by the Commission [1].

22. Claims for confidentiality must relate to information which is within the scope of the above descriptions of business secrets or other confidential information. The reasons for which information is claimed to be a business secret or other confidential information must be substantiated [2]. Confidentiality claims can normally only pertain to information obtained by the Commission from the same person or undertaking and not to information from any other source.

23. Information relating to an undertaking but which is already known outside the undertaking (in case of a group, outside the group), or outside the association to which it has been communicated by that undertaking, will not normally be considered confidential [3]. Information that has lost its commercial importance, for instance due to the passage of time, can no longer be regarded as confidential. As a general rule, the Commission presumes that information pertaining to the parties' turnover, sales, market-share data and similar information which is more than 5 years old is no longer confidential [4].

24. In proceedings under Articles 81 and 82 of the Treaty, the qualification of a piece of information as confidential is not a bar to its disclosure if such information is necessary to prove an alleged infringement ('inculpatory document') or could be necessary to exonerate a party ('exculpatory document'). In this case, the need to safeguard the rights of the defence of the parties through the provision of the widest possible access to the Commission file may outweigh the concern to protect confidential information of other parties [5]. It is for the Commission to assess whether those circumstances apply to any specific situation. This calls for an assessment of all relevant elements, including:

   — the relevance of the information in determining whether or not an infringement has been committed, and its probative value;

   — whether the information is indispensable;

   — the degree of sensitivity involved (to what extent would disclosure of the information harm the interests of the person or undertaking in question)

   — the preliminary view of the seriousness of the alleged infringement.

   Similar considerations apply to proceedings under the Merger Regulation when the disclosure of information is considered necessary by the Commission for the purpose of the procedure [6].

25. Where the Commission intends to disclose information, the person or undertaking in question shall be granted the possibility to provide a non-confidential version of the documents where that information is contained, with the same evidential value as the original documents [7].

### C. When is access to the file granted?

26. Prior to the notification of the Commission's statement of objections pursuant to the provisions mentioned in paragraph 1, the parties have no right of access to the file.

---

[1] See paragraph 40 below.
[2] See paragraph 35 below.
[3] However, business secrets or other confidential information which are given to a trade or professional association by its members do not lose their confidential nature with regard to third parties and may therefore not be passed on to complainants. Cf. Joined Cases 209 to 215 and 218/78, *Fedetab*, [1980] ECR 3125, paragraph 46.
[4] See paragraphs 35-38 below on asking undertakings to identify confidential information.
[5] Cf. Article 27(2) of Regulation (EC) No 1/2003 and Article 15(3) of the Implementing Regulation.
[6] Article 18(1) of the Merger Implementing Regulation.
[7] Cf. paragraph 42 below.

C 325/12          EN          Official Journal of the European Union          22.12.2005

1.  *In antitrust proceedings under Articles 81 and 82 of the Treaty*

27. Access to the file will be granted upon request and, normally, on a single occasion, following the notification of the Commission's objections to the parties, in order to ensure the principle of equality of arms and to protect their rights of defence. As a general rule, therefore, no access will be granted to other parties' replies to the Commission's objections.

   A party will, however, be granted access to documents received after notification of the objections at later stages of the administrative procedure, where such documents may constitute new evidence — whether of an incriminating or of an exculpatory nature —, pertaining to the allegations concerning that party in the Commission's statement of objections. This is particularly the case where the Commission intends to rely on new evidence.

2.  *In proceedings under the Merger Regulation*

28. In accordance with Article 18(1) and (3) of the Merger Regulation and Article 17(1) of the Merger Implementing Regulation, the notifying parties will be given access to the Commission's file upon request at every stage of the procedure following the notification of the Commission's objections up to the consultation of the Advisory Committee. In contrast, this notice does not address the possibility of the provision of documents before the Commission states its objections to undertakings under the Merger Regulation (¹).

## III. PARTICULAR QUESTIONS REGARDING COMPLAINANTS AND OTHER INVOLVED PARTIES

29. The present section relates to situations where the Commission may or has to provide access to certain documents contained in its file to the complainants in antitrust proceedings and other involved parties in merger proceedings. Irrespective of the wording used in the antitrust and merger implementing regulations (²), these two situations are distinct — in terms of scope, timing, and rights — from access to the file, as defined in the preceding section of this notice.

### A. Provision of documents to complainants in antitrust proceedings

30. The Court of First Instance has ruled (³) that complainants do not have the same rights and guarantees as the parties under investigation. Therefore complainants cannot claim a right of access to the file as established for parties.

31. However, a complainant who, pursuant to Article 7(1) of the Implementing Regulation, has been informed of the Commission's intention to reject its complaint (⁴), may request access to the documents on which the Commission has based its provisional assessment (⁵). The complainant will be provided access to such documents on a single occasion, following the issuance of the letter informing the complainant of the Commission's intention to reject its complaint.

32. Complainants do not have a right of access to business secrets or other confidential information which the Commission has obtained in the course of its investigation (⁶).

---

(¹) This question is dealt with in the Directorate General Competition document 'DG COMP Best Practices on the conduct of EC merger control proceedings', available on the web-site of the Directorate General for Competition: http://europa.eu.int/comm/competition/index_en.html.
(²) Cf. Article 8(1) of the Implementing Regulation, which speaks about 'access to documents' to complainants and Article 17(2) of Merger Implementing Regulation which speaks about 'access to file' to other involved parties 'in so far as this is necessary for the purposes of preparing their comments'.
(³) See Case T-17/93 *Matra-Hachette SA v Commission*, [1994] ECR II-595, paragraph 34. The Court ruled that the rights of third parties, as laid down by Article 19 of the Council Regulation No 17 of 6.2.1962 (now replaced by Article 27 of Regulation (EC) No 1/2003), were limited to the right to participate in the administrative procedure.
(⁴) By means of a letter issued in accordance with Article 7(1) of the Implementing Regulation.
(⁵) Cf. Article 8(1) of the Implementing Regulation.
(⁶) Cf. Article 8(1) of the Implementing Regulation.

22.12.2005          EN          Official Journal of the European Union          C 325/13

**B. Provision of documents to other involved parties in merger proceedings**

33. In accordance with Article 17(2) of the Merger Implementing Regulation, access to the file in merger proceedings shall also be given, upon request, to other involved parties who have been informed of the objections in so far as this is necessary for the purposes of preparing their comments.

34. Such other involved parties are parties to the proposed concentration other than the notifying parties, such as the seller and the undertaking which is the target of the concentration (¹).

## IV. PROCEDURE FOR IMPLEMENTING ACCESS TO THE FILE

### A. Preparatory procedure

35. Any person which submits information or comments in one of the situations listed hereunder, or subsequently submits further information to the Commission in the course of the same procedures, has an obligation to clearly identify any material which it considers to be confidential, giving reasons, and provide a separate non-confidential version by the date set by the Commission for making its views known (²):

a) In antitrust proceedings

— an addressee of a Commission's statement of objections making known its views on the objections (³);

— a complainant making known its views on a Commission statement of objections (⁴);

— any other natural or legal person, which applies to be heard and shows a sufficient interest, or which is invited by the Commission to express its views, making known its views in writing or at an oral hearing (⁵);

— a complainant making known his views on a Commission letter informing him on the Commission's intention to reject the complaint (⁶).

b) In merger proceedings

— notifying parties or other involved parties making known their views on Commission objections adopted with a view to take a decision with regard to a request for a derogation from suspension of a concentration and which adversely affects one or more of those parties, or on a provisional decision adopted in the matter (⁷);

— notifying parties to whom the Commission has addressed a statement of objections, other involved parties who have been informed of those objections or parties to whom the Commission has addressed objections with a view to inflict a fine or a periodic penalty payment, submitting their comments on the objections (⁸);

— third persons who apply to be heard, or any other natural or legal person invited by the Commission to express their views, making known their views in writing or at an oral hearing (⁹);

— any person which supplies information pursuant to Article 11 of the Merger Regulation.

---

(¹) Cf. Article 11(b) of the Merger Implementing Regulation.
(²) Cf. Article 16(2) of the Implementing Regulation and Article 18(2) of the Merger Implementing Regulation.
(³) pursuant to Article 10(2) of the Implementing Regulation.
(⁴) pursuant to Article 6(1) of the Implementing Regulation.
(⁵) pursuant to Article 13(1) and (3) of the Implementing Regulation.
(⁶) pursuant to Article 7(1) of the Implementing Regulation.
(⁷) Article 12 of the Merger Implementing Regulation.
(⁸) Article 13 of the Merger Implementing Regulation.
(⁹) pursuant to Article 16 of the Merger Implementing Regulation.

C 325/14    [ EN ]    Official Journal of the European Union    22.12.2005

36. Moreover, the Commission may require undertakings ([1]), in all cases where they produce or have produced documents, to identify the documents or parts of documents, which they consider to contain business secrets or other confidential information belonging to them, and to identify the undertakings with regard to which such documents are to be considered confidential ([2]).

37. For the purposes of quickly dealing with confidentiality claims referred to in paragraph 36 above, the Commission may set a time-limit within which the undertakings shall: (i) substantiate their claim for confidentiality with regard to each individual document or part of document; (ii) provide the Commission with a non-confidential version of the documents, in which the confidential passages are deleted ([3]). In antitrust proceedings the undertakings shall also provide within the said time-limit a concise description of each piece of deleted information ([4]).

38. The non-confidential versions and the descriptions of the deleted information must be established in a manner that enables any party with access to the file to determine whether the information deleted is likely to be relevant for its defence and therefore whether there are sufficient grounds to request the Commission to grant access to the information claimed to be confidential.

## B. Treatment of confidential information

39. In antitrust proceedings, if undertakings fail to comply with the provisions set out in paragraphs 35 to 37 above, the Commission may assume that the documents or statements concerned do not contain confidential information ([5]). The Commission may consequently assume that the undertaking has no objections to the disclosure of the documents or statements concerned in their entirety.

40. In both antitrust proceedings and in proceedings under the Merger Regulation, should the person or undertaking in question meet the conditions set out in paragraphs 35 to 37 above, to the extent they are applicable, the Commission will either:

— provisionally accept the claims which seem justified; or

— inform the person or undertaking in question that it does not agree with the confidentiality claim in whole or in part, where it is apparent that the claim is unjustified.

41. The Commission may reverse its provisional acceptance of the confidentiality claim in whole or in part at a later stage.

42. Where the Directorate General for Competition does not agree with the confidentiality claim from the outset or where it takes the view that the provisional acceptance of the confidentiality claim should be reversed, and thus intends to disclose information, it will grant the person or undertaking in question an opportunity to express its views. In such cases, the Directorate General for Competition will inform the person or undertaking in writing of its intention to disclose information, give its reasons and set a time-limit within which such person or undertaking may inform it in writing of its views. If, following submission of those views, a disagreement on the confidentiality claim persists, the matter will be dealt with by the Hearing Officer according to the applicable Commission terms of reference of Hearing Officers ([6]).

---

([1]) In merger proceedings the principles set out in the present and subsequent paragraphs also apply to the persons referred to in Article 3(1)(b) of Merger Regulation.
([2]) Cf. Article 16(3) of the Implementing Regulation and Article 18(3) of the Merger Implementing Regulation. This also applies to documents gathered by the Commission in an inspection pursuant to Article 13 of the Merger Regulation and Articles 20 and 21 of Regulation (EC) No 1/2003.
([3]) Cf. Article 16(3) of the Implementing Regulation and Article 18(3) of the Merger Implementing Regulation.
([4]) Cf. Article 16(3) of the Implementing Regulation.
([5]) Cf. Article 16 of the Implementing Regulation.
([6]) Cf. Article 9 of the Commission Decision of 23.5.2001 on the terms of reference of hearing officers in certain competition proceedings, OJ L 162 19.6.2001, p. 21.

43. Where there is a risk that an undertaking which is able to place very considerable economic or commercial pressure on its competitors or on its trading partners, customers or suppliers will adopt retaliatory measures against those, as a consequence of their collaboration in the investigation carried out by the Commission ([1]), the Commission will protect the anonymity of the authors by providing access to a non-confidential version or summary of the responses in question ([2]). Requests for anonymity in such circumstances, as well as requests for anonymity according to point 81 of the Commission Notice on the handling of complaints ([3]) will be dealt with according to paragraphs 40 to 42 above.

### C. Provision of access to file

44. The Commission may determine that access to the file shall be granted in one of the following ways, taking due account of the technical capabilities of the parties:

— by means of a CD-ROM(s) or any other electronic data storage device as may become available in future;

— through copies of the accessible file in paper form sent to them by mail;

— by inviting them to examine the accessible file on the Commission's premises.

The Commission may choose any combination of these methods.

45. In order to facilitate access to the file, the parties will receive an enumerative list of documents setting out the content of the Commission file, as defined in paragraph 8 above.

46. Access is granted to evidence as contained in the Commission file, in its original form: the Commission is under no obligation to provide a translation of documents in the file ([4]).

47. If a party considers that, after having obtained access to the file, it requires knowledge of specific non-accessible information for its defence, it may submit a reasoned request to that end to the Commission. If the services of the Directorate General for Competition are not in a position to accept the request and if the party disagrees with that view, the matter will be resolved by the Hearing Officer, in accordance with the applicable terms of reference of Hearing Officers ([5]).

48. Access to the file in accordance with this notice is granted on the condition that the information thereby obtained may only be used for the purposes of judicial or administrative proceedings for the application of the Community competition rules at issue in the related administrative proceedings ([6]). Should the information be used for a different purpose, at any point in time, with the involvement of an outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action.

49. With the exception of paragraphs 45 and 47, this section C applies equally to the grant of access to documents to complainants (in antitrust proceedings) and to other involved parties (in merger proceedings).

———————

---

([1]) Cf. paragraph 19 above.
([2]) Cf. Case T-5/02, *Tetra Laval vs. Commission*, [2002] ECR II-4381, paragraph 98, 104 and 105.
([3]) Commission Notice on the handling of complaints by the Commission under Articles 81 and 82 of the EC Treaty, OJ C 101, 27.4.2004, p. 65.
([4]) Cf. Case T-25/95 et al. *Cimenteries*, paragraph 635.
([5]) Cf. Article 8 of the Commission Decision of 23.5.2001 on the terms of reference of hearing officers in certain competition proceedings, OJ L 162, 19.6.2001, p. 21.
([6]) Cf. Articles 15(4) and 8(2) of the Implementing Regulation, respectively, and Article 17(4) of the Merger Implementing Regulation.

# EXHIBIT E
# 1 OF 3

**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a <u>disclaimer and a copyright notice.</u>

JUDGMENT OF THE COURT (Fifth Chamber)

7 January 2004 <u>(1)</u>

(Appeal - Competition - Cement market - Article 85(1) of the EC Treaty (now Article 81(1) EC) - Jurisdiction of the Court of First Instance - Rights of the defence - Access to the file - Single and continuous infringement - Liability for an infringement - Evidence of participation in the general agreement and measures of implementation - Fine - Determination of the amount)

In Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P,

**Aalborg Portland A/S,** established in Aalborg (Denmark), represented by K. Dyekjær-Hansen and K. Høegh, advokaterne (C-204/00 P),

**Irish Cement Ltd,** established in Dublin (Ireland), represented by P. Sreenan SC, instructed by J. Glackin, Solicitor, with an address for service in Luxembourg (C-205/00 P),

**Ciments français SA,** established in Paris (France), represented by A. Winckler, avocat, with an address for service in Luxembourg (C-211/00 P),

**Italcementi - Fabbriche Riunite Cemento SpA,** established in Bergamo (Italy), represented by A. Predieri, M. Siragusa, M. Beretta, C. Lanciani and F. Moretti, avvocati, with an address for service in Luxembourg (C-213/00 P),

**Buzzi Unicem SpA,** formerly Unicem SpA, established in Casale Monferrato (Italy), represented by C. Osti and A. Prastaro, avvocati, with an address for service in Luxembourg (C-217/00 P),

and

**Cementir - Cementerie del Tirreno SpA,** established in Rome (Italy), represented by G.M. Roberti and P. Criscuolo Gaito, avvocati (C-219/00 P),

appellants,

APPEAL against the judgment of the Court of First Instance of the European Communities in Joined Cases T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95, T-42/95 to T-46/95, T-48/95, T-50/95 to T-65/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95 *Cimenteries CBR and Others* v *Commission* [2000] ECR II-491, seeking to have that judgment set aside in part,

the other party to the proceedings being:

**Commission of the European Communities,** represented in Case C-204/00 P by R. Lyal and by H.P. Hartvig, acting as Agents, and in the other cases by R. Lyal, and also by N. Coutrelis, avocat (C-211/00 P) and by A. Dal Ferro, avvocato (C-213/00 P, C-217/00 P and C-219/00 P), with an address for service in Luxembourg,

defendant at first instance,

THE COURT (Fifth Chamber),

composed of: P. Jann, acting for the President of the Fifth Chamber, D.A.O. Edward (Rapporteur) and A. La Pergola, Judges,

Advocate General: D. Ruiz-Jarabo Colomer,

Registrars: H. von Holstein, Deputy Registrar, and H.A. Rühl, Principal Administrator,

having regard to the Report for the Hearing,

after hearing oral argument from the parties at the hearing on 4 July 2002, when Aalborg Portland A/S was represented by K. Dyekjær-Hansen, Irish Cement Ltd by P. Sreenan SC, Ciments français SA by A. Winckler and by F. Brunet, avocat, Italcementi - Fabbriche Riunite Cemento SpA by M. Siragusa, C. Lanciani and F.M. Moretti, Buzzi Unicem SpA by C. Osti, Cementir - Cementerie del Tirreno SpA by G.M. Roberti and by G. Bellitti, avvocato, and the Commission, in Case C-204/00 P, by R. Lyal and H.P. Hartvig and, in the other cases, by R. Lyal, and also by N. Coutrelis (C-211/00 P) and by A. Dal Ferro (C-213/00 P, C-217/00 P C-219/00 P)

after hearing the Opinion of the Advocate General at the sitting on 11 February 2003,

gives the following

## Judgment

1.  By applications lodged at the Court Registry between 24 and 31 May 2000, Aalborg Portland A/S (Aalborg), Irish Cement Ltd (Irish Cement), Ciments français SA (Ciments français), Italcementi - Fabbriche Riunite Cemento SpA (Italcementi), Buzzi Unicem SpA (Buzzi Unicem), which, resulting from the merger between Fratelli Buzzi SpA and Unicem SpA (Unicem), is relying in the present proceedings only on the interests of Unicem, and Cementir - Cementerie del Tirreno SpA (Cementir) each brought an appeal under Article 49 of the EC Statute of the Court of Justice against the judgment of the Court of First Instance of 15 March 2000 in Joined Cases T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95, T-42/95 to T-46/95, T-48/95, T-50/95 to T-65/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95 *Cimenteries CBR and Others v Commission* [2000] ECR II-491 (the judgment under appeal), whereby the Court of First Instance, inter alia, confirmed most of the infringements found against them in Commission Decision 94/815/EC of 30 November 1994 relating to a proceeding under Article 85 of the EC Treaty (Cases IV/33.126 and 33.322 - Cement) (OJ 1994 L 343, p. 1, hereinafter the Cement Decision), but over a shorter period than that determined in that decision.

### I - Facts

2.  From April 1989 to July 1990, the Commission carried out investigations into European cement producers and trade associations in the sector pursuant to Article 14 of Regulation No 17 of the Council of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-62, p. 87).

*The Statement of Objections*

3.

On 25 November 1991, the Commission sent to the 76 undertakings and associations of undertakings concerned a Statement of Objections (SO) pursuant to Article 2(1) of Regulation No 99/63/EEC of the Commission of 25 July 1963 on the hearings provided for in Article 19(1) and (2) of Council Regulation No 17 (OJ, English Special Edition 1963-64, p. 47).

4.

The SO draws a basic distinction between two types of objectionable practices, namely practices at international level and practices at national level in certain Member States. However, the full text of the SO, which is contained in a single document, was not sent to each of the undertakings and associations involved in the proceeding. Each received only the part of the SO setting out the infringements established against it. The chapters relating to practices engaged in at international level were sent to only 61 undertakings and associations, while the chapters relating to conduct at national level were only sent to the undertakings and associations established in the Member State in question.

5.

The Commission did not append to the SO the documents supporting its conclusions or the other documents which it considered relevant. In view of the large number of documents in question, it prepared a box of documents (the Box), which was made available to each addressee of the SO when it inspected the file at the end of 1991.

6.

The Commission drew up a list of all the documents itemised under file numbers IV/33.126, IV/33.322 and IV/27.997 specifying which documents were accessible to each addressee of the SO (the List). As regards access to the file relating to the administrative procedure (the investigation file), each undertaking or association had access to the documents which the Commission had obtained from that undertaking or association together with the documents relating to the chapters of the SO which had been sent to it. The addressees had access only to the national file of the Member State on whose territory they were established.

7.

As the Commission refused to accede to the addressees' requests that it send them the chapters of the SO which they had not received and to grant them access to all the documents in the investigation file, except for internal or confidential documents, certain undertakings and associations brought actions before the Court of First Instance seeking annulment of the Commission's refusal to send the documents requested and, in proceedings for interim measures, sought the suspension of the procedure initiated against them by the Commission (Joined Cases T-10/92 R, T-11/92 R, T-12/92 R, T-14/92 R and T-15/92 R *Cimenteries CBR and Others* v *Commission* [1992] ECR II-1571).

8.

By 31 March 1992 all the applicants in the present proceedings had submitted observations on the SO sent to them by the Commission. They were heard between 1 March and 1 April 1993. The hearings were divided into three series of sessions: one on the cement market, which all the undertakings and associations of undertakings were able to attend; one on the international part of the SO, which only those undertakings and associations of undertakings which received that part of the SO were able to attend; and one on each of the national chapters, which the undertakings and associations of undertakings of the relevant Member State were able to attend separately.

9.

Following the written replies to the SO and the oral explanations provided at the hearings, the Commission decided on 23 September 1993 to drop the objections relating to the national agreements (the decision to drop the national objections). It also decided to drop the objections relating to the international part of the SO as against 12 German undertakings and also six Spanish undertakings and, consequently, to discontinue the proceeding against them.

10.

On 5 October and 23 November 1994, the Commission consulted the Advisory Committee on Restrictive Practices and Dominant Positions.

*The Cement Decision*

11.

At the close of the administrative procedure, on 30 November 1994, the Commission adopted the Cement Decision, whereby it imposed fines on 42 undertakings and associations active in the grey cement market. The amounts of the fines imposed varied between ECU 40 000 and ECU 32 492 000 and came to a total of ECU 242 420 000. The Cement Decision also ordered six undertakings active in the white cement market to pay fines of between ECU 554 000 and ECU 1 088 000 and coming to a total of ECU 5 546 000.

12.

As regards the grey cement market, Article 1 of the Cement Decision found the existence of a general agreement designed to ensure non-transhipment to home markets and to regulate cement transfers from one country to another, in breach of Article 85(1) of the Treaty. In the case of the six appellants, the Commission found that the infringement had begun on 14 January 1983, the date on which a meeting took place of the Head Delegates of European cement producers who were members of Cembureau - European Cement Association (Cembureau). Apart from Ciments français, all the appellants were members of that association.

13.

The Cembureau Agreement was considered by the Commission to be a single and continuous agreement in that it was implemented in the framework of bilateral or multilateral agreements and concerted practices, the existence of which is found in Articles 2 to 6 of the Cement Decision (the implementing measures). Essentially, according to that decision, those measures consisted of:

- agreements between Cembureau and its members on the exchange of price information in order to facilitate the implementation of the Cembureau Agreement (Article 2(1) of the Cement Decision);

- concerted practices between Cembureau and its members on the circulation of information on prices designed to facilitate the implementation of the Cembureau Agreement (Article 2(2) of the Cement Decision);

- concerted practices between French undertakings and an Italian undertaking (Article 3(1) of the Cement Decision); an agreement concerning the Spanish and Portuguese markets (Article 3(2) of the Cement Decision); agreements and concerted practices concerning the French and German markets (Article 3(3) of the Cement Decision);

- collusion between a number of European producers in reaction to imports of Greek cement and clinker into the Member States in the mid-1980s. That collusion led to the setting-up of the European Task Force (the ETF) (Article 4(1) of the Cement

Decision), the setting-up of Interciment SA (Interciment), having as its purpose the carrying-out of the persuasive and dissuasive measures against those threatening the stability of the markets (Article 4(2) of the Cement Decision) and participation in agreements and concerted practices on the adoption of measures to prevent and/or reduce imports of Greek cement and clinker into the Member States, in particular on the Italian market (Article 4(3) and (4) of the Cement Decision); and

- concerted practices within the framework of two committees, the European Cement Export Committee (ECEC) (Article 5 of the Cement Decision) and the European Export Policy Committee (EPC), relating in particular to the exchange of information on prices and to the supply and demand situation in the importing non-member countries and on the home markets and designed to prevent incursions by competitors on respective national markets in the Community.

14.

As regards the white cement market, Article 7 of the Cement Decision finds that six undertakings participated in agreements and concerted practices within the framework of the White Cement Committee, relating in particular to non-transhipment to home markets.

15.

According to the operative part of the Cement Decision, the appellants in the present proceedings all participated, either directly or indirectly, in the Cembureau Agreement in the grey cement market sector. More particularly, that decision describes their participation in the implementing measures as follows:

- all the appellants in the present proceedings, with the exception of Ciments français, participated in the exchanges of information referred to in Article 2 of that decision;

- Ciments français participated in the concerted practices referred to in Article 3(1)(b) and (3)(a) of that decision;

- all the appellants in the present proceedings participated in the setting-up of the ETF referred to in Article 4(1) of that decision;

- Ciments français, Italcementi, Unicem and Cementir participated in the setting-up of Interciment, referred to in Article 4(2) of that decision;

- all the appellants in the present appeals participated in the concerted practices designed to withdraw Calcestruzzi SpA (Calcestruzzi) as a customer from the Greek producers referred to in Article 4(3)(a) of that decision, but only Italcementi, Unicem and Cementir participated in an agreement relating to the contracts having as their aim the prevention of imports of Greek cement by Calcestruzzi, as referred to in Article 4(3)(b) of that decision;

- all the appellants, with the exception of Ciments français, participated in the concerted practices within the framework of the ECEC, referred to in Article 5 of that decision; and

- Ciments français participated in the concerted practices within the framework of the EPC referred to in Article 6 of that decision.

16.

The Cement Decision set an aggregate fine on each undertaking, taking into account the role played by each of them in concluding the Cembureau Agreement or in adopting implementing measures, and also the duration of the infringements.

17.

Article 9 of the Cement Decision imposes on the appellants, in respect of the infringement found in Article 1, which was put into effect, in particular, by the conduct set out in Articles 2-6, in the grey cement market sector, fines of the following amounts:

- for Aalborg, ECU 4 008 000,

- for Irish Cement, ECU 3 524 000;

- for Ciments français, ECU 24 716 000;

- for Italcementi, ECU 32 492 000;

- for Unicem, ECU 11 652 000;

- for Cementir, ECU 8 248 000.

18.

As regards the white cement market sector, Ciments français and Italcementi were fined ECU 1 052 000 and ECU 1 088 000 respectively for their participation in the agreements referred to in Article 7 of the Cement Decision.

**II - Procedure before the Court of First Instance and the judgment under appeal**

19.

By applications lodged at the Registry of the Court of First Instance between 14 February and 12 April 1995, 41 of the undertakings and associations concerned by the Cement Decision, including the present appellants, brought proceedings before the Court of First Instance.

20.

They claimed, inter alia, that the Cement Decision should be annulled in whole or in part and, in the alternative, that the fines imposed on them by that decision should be annulled or reduced.

21.

Between 1996 and 1997, the Court of First Instance, following complaints alleging infringements of essential procedural requirements during the administrative procedure, ordered various measures of organisation of procedure (measures of organisation of procedure) in order to enable the applicants at first instance to identify the passages of the SO and the relevant documents which had not been sent to them during the administrative procedure.

22.

More particularly, the Court of First Instance requested:

- the Commission to produce various documents, including the SO as notified to each undertaking or association concerned, the minutes of the hearing of that party, the List, the Box and the correspondence exchanged during the administrative procedure between the Commission and the undertaking or association concerned during the administrative procedure (the measures of 19 January to 2 February 1996);

- the Commission to authorise the applicants at first instance in question to consult the national chapters of the SO at its premises and, in regard to each of the national

agreements and concerted practices, to give them access to the same national file as
that sent during the administrative procedure to the addressees of the SO established in
the Member State concerned (the measure of 2 October 1996);

- the applicants at first instance to identify the passages of the SO and the relevant
documents which had not been sent to them during the administrative procedure and to
explain in what respect the outcome of the administrative procedure might have been
different if those items had been made available to them during that procedure;

- the Commission (by decision notified on 27 February 1997) to specify exactly which
documents were rendered accessible to the applicants at first instance following the
adoption of the measure of 2 October 1996 and to identify them on the List. It follows
in that regard from the Commission's reply of 8 and 17 April 1997 that it gave them
access, however, to only around a quarter of files IV/33.126 and IV/33.322 as a whole;

- the Commission, by decisions notified on 18 and 19 June 1997, to lodge at the
Registry, by 30 September 1997 at the latest, the originals of all documents itemised
on the List in files IV/33.126 and IV/33.322 except for documents containing business
secrets or other confidential information and the Commission's internal documents.
The Commission was requested to specify the nature of each internal document on the
List. It was also requested to replace the confidential documents in the investigation
file with non-confidential versions or non-confidential summaries;

- the 39 applicants at first instance concerned to consult, at the Registry of the Court of
First Instance, the original, non-confidential versions of the documents lodged by the
Commission. They were allowed to lodge a pleading specifying any document to
which they had not had access during the administrative procedure which could have
affected their defence and explain briefly why the outcome of the administrative
procedure might have been different if the document in question had been made
available to them. The Commission was allowed to lodge a response in those cases.

23.

The hearings took place before the Court of First Instance on 16, 18, 23, 25 and 30
September 1998 and on 2, 7, 9, 14, 16 and 21 October 1998.

24.

On 15 March 2000, the Court of First Instance delivered the judgment under appeal,
joining for the purposes of the judgment all the cases relating to the Cement Decision.

25.

In Case T-39/95 *Ciments français* v *Commission*, the Court of First Instance, at
paragraph 12 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had]
participated in the infringement after 17 February 1989 and in so far as it [found] that
the applicant [had] implemented the Cembureau agreement by participating in the
infringement referred to in Article 3(1)(b);

- annul[led] Article 3(3)(a) of Decision 94/815 in so far as it [found] that the applicant
[had] participated in an agreement on the sharing of the Saarland market and in so far
as it [found] that the applicant [had] participated in an infringement of Article 85(1) of
the Treaty after 12 August 1987;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant
[had] participated in the infringement after 31 May 1987;

- annul[led] Article 4(2) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 7 November 1988;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it concern[ed] the applicant;

- annul[led] Article 6 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 18 November 1983;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 12 519 000;

- fixe[d] the amount of the fine imposed on the applicant by Article 10 of Decision 94/815 at EUR 1 051 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

26.
In Case T-44/95 *Aalborg Portland* v *Commission* the Court of First Instance, at paragraph 15 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 31 December 1988;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement after 19 March 1984;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 31 May 1987;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 2 349 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

27.

In Case T-50/95 *Unicem* v *Commission*, the Court of First Instance, at paragraph 19 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 3 April 1992;

- annul[led] Article 2(1) of Decision 94/815 in so far as it concern[ed] the applicant;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer and in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 31 May 1987;

- annul[led] Article 4(2) of Decision 94/815 in so far as it concern[ed] the applicant;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 6 399 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

28.

In Case T-60/95 *Irish Cement* v *Commission*, the Court of First Instance, at paragraph 29 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 31 December 1988;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement after 19 March 1984;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for

supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986 and after 31 May 1987;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 2 065 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

29.

In Case T-65/95 *Italcementi - Fabbriche Riunite Cemento* v *Commission*, the Court of First Instance, at paragraph 34 of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 19 March 1984 and after 3 April 1992;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement before 19 March 1984 and after that date;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members [had] related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer, and in so far as it [found] that the applicant [had] participated in the infringement before 19 March 1984;

- annul[led] Article 4(1) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 31 May 1987;

- annul[led] Article 4(2) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 7 November 1988;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 25 701 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

30.

In Case T-87/95 *Cementir - Cementerie del Tirreno* v *Commission*, the Court of First Instance, at paragraph 39 of the operative part of the judgment under appeal:

- annul[led] Article 1 of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement after 3 April 1992;

- annul[led] Article 2(1) of Decision 94/815 in so far as it [found] that there [had been] agreements on the exchange of price information at the meetings of the Executive Committee of Cembureau - The European Cement Association, and in so far as it [found] that the applicant [had] participated in the infringement after 14 January 1983;

- annul[led] Article 2(2) of Decision 94/815 as regards the applicant in so far as it [found] that the periodic circulation of information between Cembureau - The European Cement Association and its members related, so far as concern[ed] the Belgian and Netherlands prices, to those two countries' producers' minimum prices for supplies of cement by lorry and, so far as concern[ed] Luxembourg, the prices, inclusive of rebates, of that country's producer;

- annul[led] Article 4(1) and (2) of Decision 94/815 in so far as they concern[ed] the applicant;

- annul[led] Article 4(3)(a) of Decision 94/815 in so far as it [found] that the applicant [had] participated in the infringement before 9 September 1986;

- annul[led] Article 5 of Decision 94/815 in so far as it concern[ed] the applicant;

- fixe[d] the amount of the fine imposed on the applicant by Article 9 of Decision 94/815 at EUR 7 471 000;

- dismisse[d] the remainder of the application;

- order[ed] the applicant to bear its own costs and to pay one third of the costs incurred by the Commission;

- order[ed] the Commission to bear two thirds of its own costs.

**III - Forms of order sought in the appeals**

31.

Aalborg claims that the Court should:

- primarily, set aside the judgment under appeal in so far is it concerns Aalborg, in so far as it upholds the Cement Decision in regard to it, and refer the case back to the Court of First Instance for a fresh adjudication;

- in the alternative, set aside the judgment under appeal in part in so far as it concerns Aalborg, in so far as it confirms the Cement Decision in regard to it, and refer the case back to the Court of First Instance for a fresh adjudication;

- primarily, annul the fine in its entirety and, in the alternative, annul it in part; and

- order the Commission to pay the costs incurred in the present case by Aalborg before the Court of First Instance and the Court of Justice.

32.

Irish Cement claims that the Court should:

- set aside the judgment under appeal in whole or in part in so far as it confirms the Cement Decision in regard to Irish Cement;

- in the alternative, declare the Cement Decision void and/or reduce the fine imposed on Irish Cement; and

- order the Commission to pay the costs.

33.

Ciments français claims that the Court should:

- set aside the judgment under appeal in part, on the basis of Article 225 EC and Article 54 of the EC Statute of the Court of Justice;

- annul the Cement Decision on the basis of Article 230 EC;

- in the alternative, reduce the fine imposed on Ciments français on the basis of Article 229 EC and Article 17 of Regulation No 17; and

- order the Commission to pay the costs.

34.

Italcementi claims that the Court should:

- primarily, set aside the judgment under appeal in its entirety;

- in the alternative, set that judgment aside in part;

- annul the Cement Decision in part, in so far as the Court should allow the appeal against that judgment;

- reduce the fine to such amount as the Court should deem appropriate;

- refer the case back to the Court of First Instance should the Court consider that the state of the matter does not allow it, in whole or in part, to give final judgment in the matter; and

- order the Commission to pay the costs incurred before the Court of First Instance and the Court of Justice.

35.

Buzzi Unicem claims that the Court should:

- primarily, set aside the judgment under appeal and annul the Cement Decision and order the Commission to pay the costs;

- in the alternative, should the Court decide not to set aside the judgment under appeal, reduce the penalty imposed on Unicem; and

- in any event, adopt such other provision as may be necessary or as the Court may consider appropriate or just.

36.

Cementir claims that the Court should:

- primarily, set aside the judgment under appeal in whole or in part and, consequently, annul the Cement Decision in whole or in part and annul, or at least reduce, the fine imposed on Cementir;

- in the alternative, set aside the judgment under appeal in whole or in part and refer the case back to the Court of First Instance for an adjudication on the substance in the light of the guidance which the Court will provide to it; and

- order the Commission to pay the costs incurred before the Court of First Instance and the Court of Justice.

37.

The Commission contends that the Court should:

- as regards the appeal introduced by Ciments français, declare the application for annulment of the Cement Decision inadmissible and dismiss the remainder of the action as unfounded; and, in the alternative, dismiss the action as unfounded in its entirety;

- as regards the other appeals, dismiss them as inadmissible in so far as the pleas put forward cannot be examined in an appeal and, for the remainder, dismiss them as unfounded; and

- order all the appellants to pay the costs incurred by the Commission in connection with these appeals.

**IV - Procedure before the Court of Justice and pleas in law**

38.

By reasoned orders of 5 June 2002, the Court dismissed at the outset as manifestly inadmissible and/or manifestly unfounded, under Article 119 of the Rules of Procedure, a number of the pleas in law and arguments put forward by the appellants.

39.

The pleas in law put forward by Aalborg which were not dismissed at the outset by the order of 5 June 2002 in Case C-204/00 P *Aalborg Portland* v *Commission*, not published in the ECR, allege:

- breach of the rights of defence owing to the lack of access to documents liable to contain exculpatory evidence;

- incorrect imputation of liability for the infringements of Article 85 of the Treaty;

- breach of the basic principles applicable to the setting of fines;

- infringement of Regulation (EEC) No 2988/74 of the Council of 26 November 1974 concerning limitation periods in proceedings and the enforcement of sanctions under the rules of the European Economic Community relating to transport and competition (OJ 1974 L 319, p. 1).

40.

The pleas in law put forward by Irish Cement which were not dismissed entirely at the outset by the order of 5 June 2002 in Case C-205/00 P *Irish Cement* v *Commission*, not published in the ECR, relate to:

- lack of competence of the Court of First Instance;

- a procedural defect;

- infringement of Community law and manifest errors of assessment as regards the procedural rules protecting the rights of the defence and the relevance of certain documentary evidence;

- a failure to state reasons and a failure to respond to the appellant's arguments.

41.

The only pleas in law put forward by Ciments français which were not dismissed at the outset by the order of 5 June 2002 in Case C-211/00 P *Ciments français* v *Commission*, not published in the ECR, concerned:

- an error of assessment in respect of the turnover used in calculating the amount of the fine imposed on Ciments français;

- breach of the principle of proportionality in relation to the amount of that fine.

42.

The pleas in law put forward by Italcementi that were not dismissed at the outset by the order of 5 June 2002 in Case C-213/00 P *Italcementi - Fabbriche Riunite Cemento* v *Commission*, not published in the ECR, allege:

- breach of the rights of the defence owing to incomplete access to the documents in the investigation file;

- breach of the rights of the defence, insufficient reasoning and inconsistency with an earlier decision in respect of the dropping of the national complaints;

- incorrect application of Community law and a contradiction in the reasoning as regards the assessment of the unlawful nature of the agreement relating to the agreements signed with Calcestruzzi in 1987;

- breach of the principles of fairness, proportionality and non-discrimination as regards the intangibility of the fine;

- breach of Article 15(2) of Regulation No 17 and inadequate reasoning as regards the assessment of the gravity of the infringement found in Italcementi's case;

- breach of that provision as regards the assessment of the duration of the infringement found in Italcementi's case.

43.

The pleas in law put forward by Buzzi Unicem that were not entirely dismissed at the outset by the order of 5 June 2002 in Case C-217/00 P *Buzzi Unicem* v *Commission*, not published in the ECR, concern:

- breach of the rights of the defence, misapplication of the legal provisions and incorrect and contradictory reasoning in respect of:

- the refusal to authorise access to the SO and to the documents in the investigation file;

- the dropping of the national objections;

- the contracts concluded between Calcestruzzi and the Italian producers;

- Unicem's participation in the ETF;

- the link between the ETF and the Cembureau Agreement.

- an alleged breach of the principle *ne bis in idem* and of the principle of equal treatment;

- an alleged breach of the right of non-self-incrimination;

- a manifest error in assessing probative documents;

- an error of law and insufficient reasoning concerning the designation of Unicem as a direct member of Cembureau;

- an alleged infringement of Article 190 of the EC Treaty (now Article 253 EC), of Article 15(2) of Regulation No 17, of the principle of equal treatment and of the principle of proportionality as regards:

- the imposition of a single fine for all the infringements established on the market for grey cement;

- the assessment of liability in the infringement relating to participation in the Cembureau Agreement;

- the calculation of the duration of the infringement.

44.
  The pleas in law put forward by Cementir that were not wholly dismissed at the outset by the order of 5 June 2002 in Case C-219/00 P *Cementir - Cementerie del Tirreno* v *Commission*, not published in the ECR, concern:

- breach of the rights of the defence as regards access to the investigation file;

- error of law, defective reasoning and breach of the rights of the defence as regards:

- the existence of the Cembureau agreement;

- the exchanges of price information;

- the measures referred to in Article 4(3) and (4) of the Cement Decision;

- an error of law and defective reasoning as regards the concept of a single and continuous agreement;

- an error of law and an incorrect assessment of the criteria for the calculation of the penalty imposed on Cementir.

45.
  On account of the connection between them, the present cases should be joined for the purposes of the final judgment, in accordance with Article 43 of the Rules of Procedure.

### V - The review exercised by the Court in the present appeals

46.
  It is appropriate to make a number of preliminary observations concerning the judicial review carried out in an appeal and also the legal and factual context in which anti-competitive conduct is investigated and sanctions imposed. The purpose of these

observations is to shed light on the legal framework within which the Court will examine the present appeals.

*The role of the Court in an appeal*

47.

In an appeal, the Court's task is limited to examining whether, in exercising its power of review, the Court of First Instance made an error of law. Under Article 225 EC and Article 51, first paragraph, of the EC Statute of the Court of Justice, an appeal must be limited to points of law and must lie on grounds of lack of competence of the Court of First Instance, a breach of procedure before it which adversely affects the interests of the applicant or infringement of Community law by the Court of First Instance.

48.

An appeal may therefore be based only on grounds relating to the infringement of rules of law, to the exclusion of any appraisal of the facts. The Court of First Instance has exclusive jurisdiction, first, to establish the facts except where the substantive inaccuracy of its findings is apparent from the documents submitted to it and, second, to assess those facts (see, *inter alia*, Case C-284/98 P *Parliament* v *Bieber* [2000] ECR I-1527, paragraph 31.

49.

It follows that the appraisal of the facts by the Court of First Instance does not constitute, save where the clear sense of the evidence produced before it is distorted, a question of law which is subject, as such, to review by the Court of Justice (see, *inter alia*, Joined Cases C-280/99 P to C-282/99 P *Moccia Irme and Others* v *Commission* [2001] ECR I-4717, paragraph 78).

50.

Article 225 EC, Article 51, first paragraph, of the EC Statute of the Court of Justice and Article 112(1)(c) of the Rules of Procedure of the Court of Justice provide, in particular, that where the appellant alleges distortion of the evidence by the Court of First Instance, he must indicate precisely the evidence alleged to have been distorted by that Court and show the errors of appraisal which, in his view, led to that distortion.

51.

The requirements resulting from those provisions are not satisfied by an appeal which, without even including an argument specifically identifying the error of law allegedly vitiating the judgment of the Court of First Instance, simply repeats or reproduces verbatim the pleas in law and arguments already put forward before that Court, including those which were based on facts expressly rejected by that Court. Such an appeal amounts in reality to no more than a request for re-examination of the application submitted to the Court of First Instance, which the Court of Justice does not have jurisdiction to undertake (see, inter alia, the order in Case C-317/97 P *Smanor and Others* v *Commission* [1998] ECR I-4269, paragraph 21, and the judgment in Case C-352/98 P *Bergaderm and Goupil* v *Commission* [2000] ECR I-5291, paragraph 35).

52.

It is on the basis of those considerations, in particular, that the Court rejected at the outset as manifestly inadmissible certain of the pleas in law and arguments put forward by the appellants (see paragraph 38 of this judgment).

*The legal and factual context of the review of anti-competitive practices and agreements*

53.

Participation by an undertaking in anti-competitive practices and agreements constitutes an economic infringement designed to maximise its profits, generally by an intentional limitation of supply, an artificial division of the market and an artificial increase in prices. The effect of such agreements or of such practices is to restrict free competition and to prevent the attainment of the common market, in particular by hindering intra-Community trade. Such harmful effects are passed directly on to consumers in terms of increased prices and reduced diversity of supply. Where an anti-competitive practice or agreement is adopted in the cement sector, the entire construction and housing sector, and the real-estate market, suffer such effects.

54.

The aim of the powers given to the Commission by Regulation No 17 is to enable it to carry out its duty under Article 89 of the EC Treaty (now, after amendment, Article 85 EC) of ensuring that the rules on competition are applied in the common market. As may be seen from the preceding paragraph, it is consistent with the general interest to avoid anti-competitive practices and agreements, to discover them and to impose sanctions.

55.

Since the prohibition on participating in anti-competitive agreements and the penalties which offenders may incur are well known, it is normal for the activities which those practices and those agreements entail to take place in a clandestine fashion, for meetings to be held in secret, most frequently in a non-member country, and for the associated documentation to be reduced to a minimum.

56.

Even if the Commission discovers evidence explicitly showing unlawful contact between traders, such as the minutes of a meeting, it will normally be only fragmentary and sparse, so that it is often necessary to reconstitute certain details by deduction.

57.

In most cases, the existence of an anti-competitive practice or agreement must be inferred from a number of coincidences and indicia which, taken together, may, in the absence of another plausible explanation, constitute evidence of an infringement of the competition rules.

58.

Furthermore, the Commission may be faced with difficulties inherent in the complex structures of certain operators, with restructuring and with changes in the legal personality of undertakings.

59.

It is appropriate, in that context, to observe that Article 85 of the Treaty refers to the activities of undertakings. For that provision to apply, a change in the legal form and name of an undertaking does not necessarily have the effect of creating a new undertaking free of liability for the anti-competitive behaviour of its predecessor when, from an economic point of view, the two are identical (see, to that effect, Joined Cases 29/83 and 30/83 *CRAM and Rheinzink* v *Commission* [1984] ECR 1679, paragraph 9).

60.

However, the statement of objections must specify unequivocally the legal person on whom fines may be imposed and be addressed to that person (Case C-176/99 P *ARBED* v *Commission* [2003] ECR I-0000, paragraph 21).

61.

In order to ensure the effectiveness of the investigative power conferred on it by Article 11(1) and (5) of Regulation No 17, the Commission is entitled to compel an undertaking, if necessary by adopting a decision, to provide all necessary information concerning such facts as may be known to it and to disclose to it, if necessary, such documents relating thereto as are in that undertaking's possession, even if the latter may be used to establish, against it or another undertaking, the existence of anti-competitive conduct.

62.

Regulation No 17 places the undertaking being investigated under a duty of active cooperation, which means that it must be prepared to make any information relating to the object of the inquiry available to the Commission (Case 374/87 *Orkem* v *Commission* [1989] ECR 3283, paragraph 27).

63.

In carrying out its task, the Commission must however ensure that the rights of the defence are not impaired during preliminary inquiry procedures, which may be decisive in providing evidence of the unlawful nature of conduct engaged in by undertakings for which they may be liable (Joined Cases 46/87 and 227/88 *Hoechst* v *Commission* [1989] ECR 2859, paragraph 15).

64.

The rights of the defence are fundamental rights forming an integral part of the general principles of law, whose observance the Court ensures (see, to that effect, Case C-7/98 *Krombach* [2000] ECR I-1935, paragraphs 25 and 26), drawing inspiration for that purpose from the constitutional traditions common to the Member States and from the guidelines supplied by international treaties for the protection of human rights on which the Member States have collaborated or to which they are signatories, such as the European Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome on 4 November 1950 (the ECHR) (see Case C-274/99 P *Connolly* v *Commission* [2001] ECR I-1611, paragraphs 37 and 38).

65.

Thus, when requesting information, the Commission may not compel an undertaking to provide it with answers which might involve an admission on its part of the existence of an infringement which it is incumbent upon the Commission to prove (see *Orkem* v *Commission*, cited above, paragraph 35).

66.

Equally, respect for the rights of the defence requires that the undertaking concerned must have been afforded the opportunity, during the administrative procedure, to make known its views on the truth and relevance of the facts and circumstances alleged and on the documents used by the Commission to support its claim that there has been an infringement of the Treaty (see Joined Cases 100/80 to 103/80 *Musique Diffusion française and Others* v *Commission* [1983] ECR 1825, paragraph 10, and Case C-310/93 P *BPB Industries and British Gypsum* v *Commission* [1995] ECR I-865, paragraph 21).

67.

In that sense, Regulation No 17 provides that the parties are to be sent a statement of objections which must set forth clearly all the essential facts upon which the Commission is relying at that stage of the procedure. However, that may be done summarily and the decision is not necessarily required to be a replica of the Commission's statement of objections (*Musique Diffusion française and Others* v *Commission*, cited above, paragraph 14), since the statement of objections is a preparatory document containing assessments of fact and of law which are purely

provisional in nature (see, to that effect, Joined Cases 142/84 and 156/84 *BAT and Reynolds v Commission* [1987] ECR 4487, paragraph 70). For that reason, the Commission may, and even must, take into account the factors emerging from the administrative procedure in order, inter alia, to abandon such objections as have been shown to be unfounded (*Musique Diffusion française and Others v Commission*, cited above, paragraph 14).

*The right of access to the file*

68.

A corollary of the principle of respect for the rights of the defence, the right of access to the file means that the Commission must give the undertaking concerned the opportunity to examine all the documents in the investigation file which may be relevant for its defence (see, to that effect, Case T-30/91 *Solvay v Commission* [1995] ECR II-1775, paragraph 81, and Case C-199/99 P *Corus UK v Commission* [2003] ECR I-0000, paragraphs 125 to 128). Those documents include both incriminating evidence and exculpatory evidence, save where the business secrets of other undertakings, the internal documents of the Commission or other confidential information are involved (see Case 85/76 *Hoffmann-La Roche v Commission* [1979] ECR 461, paragraphs 9 and 11; Case C-51/92 P *Hercules Chemicals v Commission* [1999] ECR I-4235, paragraph 75; and Joined Cases C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P *Limburgse Vinyl Maatschappij and Others v Commission* [2002] ECR I-8375, paragraph 315).

69.

It may be that the undertaking draws the Commission's attention to documents capable of providing a different economic explanation for the overall economic assessment carried out by the Commission, in particular those describing the relevant market and the importance and the conduct of the undertakings acting on that market (see, to that effect, *Solvay v Commission*, cited above, paragraphs 76 and 77).

70.

The European Court of Human Rights has none the less held that, just like observance of the other procedural safeguards enshrined in Article 6(1) of the ECHR, compliance with the adversarial principle relates only to judicial proceedings before a tribunal and that there is no general, abstract principle that the parties must in all instances have the opportunity to attend the interviews carried out or to receive copies of all the documents taken into account in the case of other persons (see, to that effect, Euro. Court H.R., the *Kerojärvi v Finland* judgment of 19 July 1995, Series A No 322, § 42, and the *Mantovanelli v France* judgment of 18 March 1997, *Reports of Judgments and Decisions* 1997-II, § 33).

71.

The failure to communicate a document constitutes a breach of the rights of the defence only if the undertaking concerned shows, first, that the Commission relied on that document to support its objection concerning the existence of an infringement (see, to that effect, Case 322/81 *Michelin v Commission* [1983] ECR 3461, paragraphs 7 and 9) and, second, that the objection could be proved only by reference to that document (see Case 107/82 *AEG v Commission* [1983] ECR 3151, paragraphs 24 to 30, and *Solvay v Commission*, cited above, paragraph 58).

72.

If there were other documentary evidence of which the parties were aware during the administrative procedure that specifically supported the Commission's findings, the fact that an incriminating document not communicated to the person concerned was inadmissible as evidence would not affect the validity of the objections upheld in the

contested decision (see, to that effect, *Musique Diffusion française and Others* v *Commission*, cited above, paragraph 30, and *Solvay* v *Commission*, cited above, paragraph 58).

73.

It is thus for the undertaking concerned to show that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence.

74.

On the other hand, where an exculpatory document has not been communicated, the undertaking concerned must only establish that its non-disclosure was able to influence, to its disadvantage, the course of the proceedings and the content of the decision of the Commission (see *Solvay* v *Commission*, paragraph 68).

75.

It is sufficient for the undertaking to show that it would have been able to use the exculpatory documents in its defence (see *Hercules Chemicals* v *Commission*. paragraph 81, and *Limburgse Vinyl Maatschappij and Others* v *Commission*, paragraph 318), in the sense that, had it been able to rely on them during the administrative procedure, it would have been able to put forward evidence which did not agree with the findings made by the Commission at that stage and would therefore have been able to have some influence on the Commission's assessment in any decision it adopted, at least as regards the gravity and duration of the conduct of which it was accused and, accordingly, the level of the fine (see, to that effect, *Solvay* v *Commission*, paragraph 98).

76.

The possibility that a document which was not disclosed might have influenced the course of the proceedings and the content of the Commission's decision can be established only if a provisional examination of certain evidence shows that the documents not disclosed might - in the light of that evidence - have had a significance which ought not to have been disregarded (see *Solvay* v *Commission*, paragraph 68).

77.

In the context of that provisional analysis, it is for the Court of First Instance alone to assess the value which should be attached to the evidence produced to it (see order of 17 September 1996 in Case C-19/95 P *San Marco* v *Commission* [1996] ECR I-4435, paragraph 40). As stated at paragraph 49 of this judgment, its assessment of the facts does not, provided the evidence is not distorted, constitute a question of law which is subject, as such, to review by the Court of Justice.

*Establishment of the liability of the undertakings*

78.

As the Council very recently stated in the fifth recital of Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ 2003 L 1, p. 1), it should be for the party or the authority alleging an infringement of the competition rules to prove the existence thereof and it should be for the undertaking or association of undertakings invoking the benefit of a defence against a finding of an infringement to demonstrate that the conditions for applying such defence are satisfied, so that the authority will then have to resort to other evidence.

79.

Although according to those principles the legal burden of proof is borne either by the Commission or by the undertaking or association concerned, the factual evidence on

which a party relies may be of such a kind as to require the other party to provide an explanation or justification, failing which it is permissible to conclude that the burden of proof has been discharged.

80.

In the Cement Decision, the Commission concluded that there was a cartel in the cement sector in which, it claimed, 42 undertakings and associations, including the present appellants, had participated. That decision was essentially upheld by the Court of First Instance, which, in the exercise of its power to review the Commission's findings as to the degree of the undertakings' involvement and participation in the cartel, amended the fines. Apart from alleging errors of law and in the reasoning in the judgment under appeal, the appellants essentially dispute the Court of First Instance's findings concerning their participation in the cartel and the degree or duration of that participation.

81.

According to settled case-law, it is sufficient for the Commission to show that the undertaking concerned participated in meetings at which anti-competitive agreements were concluded, without manifestly opposing them, to prove to the requisite standard that the undertaking participated in the cartel. Where participation in such meetings has been established, it is for that undertaking to put forward evidence to establish that its participation in those meetings was without any anti-competitive intention by demonstrating that it had indicated to its competitors that it was participating in those meetings in a spirit that was different from theirs (see Case C-199/92 P *Hüls* v *Commission* [1999] ECR I-4287, paragraph 155, and Case C-49/92 P *Commission* v *Anic* [1999] ECR I-4125, paragraph 96).

82.

The reason underlying that principle of law is that, having participated in the meeting without publicly distancing itself from what was discussed, the undertaking has given the other participants to believe that it subscribed to what was decided there and would comply with it.

83.

The principles established in the case-law cited at paragraph 81 of this judgment also apply to participation in the implementation of a single agreement. In order to establish that an undertaking has participated in such an agreement, the Commission must show that the undertaking intended to contribute by its own conduct to the common objectives pursued by all the participants and that it was aware of the actual conduct planned or put into effect by other undertakings in pursuit of the same objectives or that it could reasonably have foreseen it and that it was prepared to take the risk (*Commission* v *Anic*, paragraph 87).

84.

In that regard, a party which tacitly approves of an unlawful initiative, without publicly distancing itself from its content or reporting it to the administrative authorities, effectively encourages the continuation of the infringement and compromises its discovery. That complicity constitutes a passive mode of participation in the infringement which is therefore capable of rendering the undertaking liable in the context of a single agreement.

85.

Nor is the fact that an undertaking does not act on the outcome of a meeting having an anti-competitive purpose such as to relieve it of responsibility for the fact of its participation in a cartel, unless it has publicly distanced itself from what was agreed in

the meeting (see Case C-291/98 P *Sarrió* v *Commission* [2000] ECR I-9991, paragraph 50).

86.

Neither is the fact that an undertaking has not taken part in all aspects of an anti-competitive scheme or that it played only a minor role in the aspects in which it did participate material to the establishment of the existence of an infringement on its part. Those factors must be taken into consideration only when the gravity of the infringement is assessed and if and when it comes to determining the fine (see, to that effect, *Commission* v *Anic*, paragraph 90).

87.

Where the liability of undertakings for anti-competitive conduct results, according to the Commission, from their participation in meetings having such conduct as their purpose, it is for the Court of First Instance to ascertain whether those undertakings had the opportunity, both during the administrative procedure and before that Court, to rebut the findings thus made and, where appropriate, to prove circumstances which cast the facts established by the Commission in a different light and thus allow another explanation of the facts to be substituted for the one adopted by the Commission.

88.

In an appeal, it is for the Court to ascertain that the Court of First Instance did not make any errors of law or in its reasoning or distort the evidence.

*The criteria material to the setting of the fine*

89.

Article 15(2) of Regulation No 17 lays down the conditions which must be fulfilled to enable the Commission to impose fines for anti-competitive conduct. The infringement must thus have been committed intentionally or negligently. Furthermore, the amount of the fine is set according to the gravity of the infringement and, where appropriate, to its duration (see Case C-219/95 P *Ferriere Nord* v *Commission* [1997] ECR I-4411, paragraph 32).

90.

As regards the gravity of the infringement, the Court has held that it has to be determined by reference to criteria such as the particular circumstances of the case, its context and the dissuasive effect of the fines (see *Ferriere Nord* v *Commission*, paragraph 33).

91.

Objective factors such as the content and duration of the anti-competitive conduct, the number of incidents and their intensity, the extent of the market affected and the damage to the economic public order must be taken into account. The analysis must also take into consideration the relative importance and market share of the undertakings responsible and also any repeated infringements.

92.

Where an infringement has been committed by a number of persons, the relative gravity of the participation of each of them will be examined (see Joined cases 40/73 to 48/73, 50/73, 54/73 to 56/73, 111/73, 113/73 and 114/73 *Suiker Unie and Others* v *Commission* [1975] ECR 1663, paragraphs 622 and 623).

**VI - Pleas in law**

*A - Pleas alleging procedural defects and breach of the rights of the defence*

1. Pleas concerning the role of the Court of First Instance in the organisation of the procedure

Arguments of the parties

93.

Aalborg, Irish Cement, Italcementi, Buzzi Unicem and Cementir claim that the Court of First Instance infringed procedural or substantive rules by not automatically annulling the Cement Decision even though it expressly acknowledged at paragraph 152 of the judgment under appeal that the Commission had not given proper access to the investigation file, since it had denied access to approximately three quarters of the documents therein.

94.

Italcementi and Buzzi Unicem refer to the judgment in *Hercules Chemicals* v *Commission*, cited above, and claim that the parties' right to peruse the documents in the investigation file is the essential corollary of the right of defence, which is closely linked to the right to be heard, to the presumption of innocence, to the need to respect the principle andi alteram partem during the procedure and to the fundamental principle of equality of arms between the Commission and the undertakings concerned. The right of access to those documents should be regarded as a fundamental right for the purposes of Article F of the Treaty on European Union (now, after amendment, Article 6 EU) and also under Article 6 of the ECHR and Article 42 of the Charter of Fundamental Rights of the European Union proclaimed in Nice on 7 December 2000 (OJ 2000 C 364, p. 1).

95.

The right of access to the file must therefore be effective in the context of the administrative procedure, which takes place before the Commission, and not in the context of a subsequent stage. It cannot be accepted that the Commission, in its double role of notifying authority and anthority which determines whether the alleged infringements did in fact exist, should be authorised to decide unilaterally whether the documents in its possession are useful and to prevent the undertaking concerned from having knowledge of them in order to prepare its defence strategy in the adversarial proceedings in which it participates with the Commission services. That is *a fortiori* the case since the Court of First Instance has no jurisdiction to reserve to itself the right, in the judicial context, to make assessments of the relevance of documents, for the purposes of taking evidence, which should have been made at the level of the administrative investigation.

96.

Irish Cement, Italcementi, Buzzi Unicem and Cementir emphasise that a breach of the rights of the defence at the stage of the administrative procedure cannot be put right during the procedure before the Court of First Instance and accuse the Court of First Instance of having attempted, by adopting measures of organisation of procedure, to make good the Commission's failure to comply with procedural requirements. That approach is inconsistent with *Hercules Chemicals* v *Commission* and *Solvay* v *Commission* and with Case T-36/91 *ICI* v *Commission* [1995] ECR II-1847 and Case T-37/91 *ICI* v *Commission* [1995] ECR II-1901, and also with the Opinion of Advocate General Warner in Case 30/78 *Distillers Company* v *Commission* [1980] ECR 2229.

97.

That approach does not fall within the jurisdiction conferred on the Court of First Instance and therefore alters the balance of powers and of functions established by the Treaty.

98.

# EXHIBIT E
# 2 OF 3

While the Commission recognises that the organisation of access to the investigation file was not as transparent as it should have been, it claims that the argument that non-disclosure of documents during the administrative procedure constitutes a procedural defect automatically entailing annulment of the decision taken at the close of that procedure is contrary both to the case-law referred to in the preceding paragraph and to the general principles of law.

99.

The Court of First Instance ascertained whether and to what extent a procedural irregularity of such a kind as to entail annulment of the Cement Decision had actually occurred. In ordering the measures of organisation of procedure referred to, it did not organise access to the file at a subsequent stage with the intention of making good any defects in the access granted by the Commission but sought to examine whether, by not making available to the parties documents which would have been of use in their defence, the Commission had indeed adversely affected the rights of the defence. Consequently, it did not exceed its jurisdiction.

Findings of the Court

100.

It is common ground that during the administrative procedure the Commission did not communicate the great majority of the documents in the investigation file and that it did not give the present appellants proper access to the investigation file, so that the administrative procedure was indeed irregular in that regard.

101.

However, as the Court of First Instance pointed out at paragraph 240 of the judgment under appeal, it could not annul the contested decision in whole or in part unless it was found that the lack of proper access to the investigation file given to the undertakings concerned during the administrative procedure had prevented them from perusing documents which were likely to be of use in their defence and had thus infringed their rights of defence.

102.

In the context of an action brought before the Court of First Instance against the decision closing an administrative procedure, it is open to that Court to order measures of organisation of procedure and to arrange full access to the file, in order to determine whether the Commission's refusal to disclose or communicate a document may be detrimental to the defence of the undertaking concerned.

103.

As that examination is limited to a judicial review of the pleas in law, it has neither the object nor the effect of replacing a full investigation of the case in the context of an administrative procedure (see *Solvay* v *Commission*, paragraphs 98 and 103). It is common ground that belated disclosure of documents in the file does not put the undertaking which has brought the action against the Commission decision back into the situation it would have been in if it had been able to rely on those documents in presenting its written and oral observations to the Commission (see *Hercules Chemicals* v *Commission*, paragraph 79).

104.

Nor can it be denied that an infringement of the rights of the defence at the stage of the administrative procedure cannot be remedied by the mere fact that access was made possible at a later stage, in particular during the judicial proceedings relating to an action in which annulment of the contested decision is sought (see *Hercules Chemicals* v *Commission*, paragraph 78, and *Limburgse Vinyl Maatschappij and Others* v *Commission*, paragraph 318).

105.

In the present case, contrary to what the appellants maintain, the Court of First Instance did not in any way attempt to replace the Commission in its investigative role or to remedy the procedural defects attributable to the Commission when it ordered the measures of organisation of procedure. In that regard, it merely carried out, within the framework of the tasks assigned to it, a provisional examination of the evidence in order to ascertain whether there had been an infringement of the rights of the defence.

106.

As the Court of First Instance did not err in law in ordering the measures of organisation of procedure rather than in annulling the Cement Decision at the outset, the pleas concerning the role of the Court of First Instance in the organisation of the procedure are unfounded.

2. Pleas concerning the Court of First Instance's assessment of the usefulness of the documents in the defence of the undertakings concerned

Arguments of the parties

107.

The appellants put forward a number of arguments whereby they challenge the analytical framework set out by the Court of First Instance at paragraphs 241 to 248 of the judgment under appeal.

- The objective link criterion

108.

Italcementi and Cementir maintain that the requirement, as stated by the Court of First Instance, for an objective link between the documents which were not disclosed and an objection adopted against the undertaking concerned in the Cement Decision is wholly arbitrary and unfounded. Its application amounts essentially to depriving the fundamental right of access to the investigation file of all meaning.

109.

First, that requirement ignores the general nature of the right of access to the investigation file, which extends to all the documents in the file. Thus, it means that even such a serious restriction of the exercise of the rights of the defence during the investigation does not necessarily constitute a procedural defect capable of rendering the final decision invalid. Second, by excluding documents which, although having no direct link with the objections specifically adopted against the undertaking concerned, are such as to cast a different light on the context of the market and also on the undertaking's conduct and the degree of its participation in the facts in issue, the Court of First Instance failed to have regard to the principle that any infringement must be assessed in its economic and factual context.

110.

That is *a fortiori* the case when the documents might contain exonerating evidence and therefore assume essential importance for the merits of the objections adopted against a specific undertaking. By providing useful information about the market, they could influence the very meaning and probative force of documents considered to contain proof of the infringement.

111.

On the other hand, the Commission fully approves the condition of an objective link applied by the Court of First Instance in the judgment under appeal. A document having no link with objections raised in the Cement Decision cannot be associated with the infringement found in that decision and it is difficult to make out how a