Exhibit D
to
**SUPPLEMENTAL DECLARATION OF JAMES N. PENROD IN SUPPORT OF RESPONSE TO
MICROSOFT CORPORATION'S OBJECTIONS TO MAGISTRATE'S ORDER**

# Exhibit D

# Part 1 of 2

Exhibit D
to
**SUPPLEMENTAL DECLARATION OF JAMES N. PENROD IN SUPPORT OF RESPONSE TO
MICROSOFT CORPORATION'S OBJECTIONS TO MAGISTRATE'S ORDER**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ——————————————— ) | |
| In re Application of ) | |
| ) | |
| Microsoft Corporation. ) | Civil Action 06-MBD-10061 (MLW) |
| ) | |
| ) | |
| ——————————————— ) | |

**RESPONSE OF NOVELL, INC. TO (1) MICROSOFT'S RESPONSE TO**
**MEMORANDUM OF COMMISSION OF THE EUROPEAN COMMUNITIES,**
**AND (2) MICROSOFT CORPORATION'S SUPPLEMENTAL STATEMENT**

Novell, Inc. ("Novell") submits this response to two recent submissions by Microsoft

Corporation ("Microsoft") in order to apprise the Court of what Novell believes are certain

inaccuracies contained in Microsoft's Response to the Commission's Memorandum, filed on

April 6, 2006, and to advise the Court of Novell's position on the propriety of Microsoft's

Supplemental Statement filed on April 4, 2006.

**ARGUMENT**

**1.      The Commission Has The Authority To Obtain Any Relevant Documents**
**From Novell.**

Microsoft wrongly suggests in its Response to the Commission's Memorandum that "the

Commission's power under Article 18. . . does not extend to requiring the production of the

documents that Microsoft seeks from Novell." (Response at 2)  As the Commission

authoritatively states, it has the power to lawfully obtain from Novell all documents relevant to

its investigation (Comm'n Memo at 10).  Microsoft's misstatement is particularly surprising

since the extent of the Commission's powers in this respect has been established law for many

years.  When dealing with the identical power to Article 18 under the predecessor to Regulation

1/2003 (Article 11 of Regulation 17), the European Court of Justice ruled as early as 1989 that

1

the power to request information is independent from the procedure for inspections of company

premises (Article 14 of Regulation 17, now Article 20 of Regulation 1/2003), and that it includes

the power to require the disclosure of documents (Case 374/87 *Orkem v. Commission*, [1989]

ECR 3283, paragraphs 14, 34, attached as Exhibit A). The general principle established in

*Orkem* has been applied by the European Court of Justice and the Court of First Instance in

numerous subsequent cases.[1]

Microsoft's mischaracterization of applicable precedent is also surprising in light of the

fact that the authority Microsoft cites for the proposition that the information the Commission

can gather under Article 18 takes the form of written requests and written responses, analogous

to interrogatories in American proceedings, rather than the document requests that Microsoft has

posed here, in fact makes no such comparison. On the contrary, it explicitly discusses the

Commission's power to require the production of documents, in particular with respect to the

*SEP* judgment cited above. *See* V. Korah, An Introductory Guide to EC Competition Law and

Practice 221-24 (2004), excerpt attached as Exhibit E hereto.

> **2.  The Commission's Rules Strike a Balance Between the Party Under
> Investigation, Third Parties, and the Commission's Investigative Process and
> This Balance Should Not Be Upset.**

Given that the Commission has the power to require Novell to produce documents in its

possession, the Court should not exercise its discretion under § 1782 in such a way as could risk

circumventing the balance struck by the rules of the foreign tribunal between the rights of the

party under investigation, the rights of third parties, and the proper functioning of the

Commission's investigatory activities.

---

[1] *See*, for example, Case C-36/92 *SEP v. Commission*, [1994] ECR I-1911, paragraph 21, referring to paragraphs 21-
42 of the Advocate General's Opinion, attached as Exhibit B; Case T-112/98 *Mannesmannröhren-Werke v.
Commission*, [2001] ECR II-729, paragraph 65, attached as Exhibit C; Joined Cases T-236/01, etc., *Tokai Carbon
v. Commission*, April 29, 2004, not yet reported, paragraph 404, attached as Exhibit D.

In particular, the European Court of Justice has held that, with regard to the correspondence with third parties and answers to a request for information, it must be recognized that a party under investigation who holds a dominant market position might adopt retaliatory measures against competitors, suppliers or customers who have assisted in an investigation carried out by the Commission. That being so, it is clear that third parties who submit documents to the Commission in the course of its investigations and consider that reprisals might be taken against them as a result can do so only if they know that the Commission will respect their request for confidentiality. The Commission was therefore entitled to refuse access to such documents on the ground that they were confidential. *See* Case C-310/93 P *BPB Industries and British Gypsum v. Commission* [1995] I-865, paragraphs 26-27, attached as Exhibit F. This concern is expressly recognized at paragraph 19 of the Commission's notice on access to the file on which Microsoft relies (Burt Decl. Exhibit O).

If a cooperating third party chooses to protect itself from retaliation as envisaged by the European Court of Justice by not submitting documents for inclusion within the Commission's file, and instead communicating certain information orally, this Court should not circumvent the protection from retaliation that is viewed as essential by European law. In the proceedings leading to the adoption of the 2004 Decision, Microsoft acknowledged that it held a dominant position in the supply of operating systems that run on personal computers (PCs). *See* recital 429 of the 2004 Decision, attached as Exhibit G. Similarly, it was found by the Commission to be dominant in the market for work group server operating systems. *See* recital 541 of the 2004 Decision at Exhibit G.

By seeking to obtain documents exclusively within Novell's possession which relate to communications with the Commission (or others), Microsoft is attempting to circumvent the

protection offered to Novell by the law of the foreign tribunal. This Court should not exercise its discretion in such circumstances.[2]

These issues highlight the difficulties that this Court faces in enforcing the terms of a subpoena without interfering with the sovereign policy choices made by the foreign tribunal in the handling of competition law proceedings in the European Community. The balance struck by the rules of the foreign tribunal between the rights of the party under investigation, the rights of cooperating witnesses, and the proper functioning of the Commission's investigatory activities should be respected by this Court in accordance with the principle of international comity. The Court should therefore decline to exercise its discretion under § 1782 and should quash the subpoena.

### 3.    Microsoft Has Improperly Publicized Novell's Observations on the SO.

On April 4, 2006, Microsoft submitted a supplemental statement to apprise the Court of recent developments in connection with the proceeding against Microsoft before the European Commission. The Supplemental Statement was supported by a Supplemental Declaration of Joshua Wolson attaching three (3) exhibits, A through C. Exhibit C to the Supplemental Declaration is a copy of Novell's Observations on the Statement of Objections of 21 December 2005 ("Novell's Observations"). Novell's Observations were submitted to the Commission on February 13, 2006 pursuant to its request.

---

[2] It would similarly be inappropriate for Microsoft to seek documents in Novell's possession which refer to the internal views of Commission staff on the investigation and its possible future evolution. First, internal documents of the Commission such as drafts, opinions, memos or notes have no evidential value in themselves, as explained at paragraph 12 of the Commission's notice on access to the file (Burt Decl. Exhibit O). Second, the Commission's rules provide that internal documents of the Commission will not be disclosed to the party under investigation. *See* paragraph 12 of the Commission's notice on access to the file (Burt Decl. Exhibit O); also Case C-310/93 P *BPB Industries and British Gypsum v. Commission* [1995] I-865, paragraph 25 (Exhibit F). This includes minutes or notes which the Commission may have made of a meeting with a complainant. Thus ordering Novell to produce documents referring to the Commission's internal views would circumvent the procedural rules of the foreign tribunal and would undermine the proper functioning of the Commission when dealing with infringements of European Community competition rules.

By letter dated March 28, 2006, the Commission provided Microsoft with access to the file, which includes Novell's Observations. In that letter, Microsoft was explicitly instructed <u>not</u> to make public any of the documents being provided to it.[3] The Commission's letter clearly states:

> "I would like to remind you that Microsoft is not entitled to use the information contained in the enclosed correspondence for purposes other than your client's defence under this procedure. In this respect, third parties have expressed serious concerns, based on Microsoft's previous behaviour, that portions of the material disclosed might be made public, in breach of the provisions laid down in Regulation 773/2004. I trust that Microsoft will by abide by its obligations under Regulation 773/2004."

Article 15(4) of Regulation 773/2004 provides that "Documents obtained through access to the file. . .shall only be used for the purposes of judicial or administrative proceedings for the application Articles 81 and 82 of the Treaty." Microsoft nevertheless deliberately made use of Novell's Observations in the § 1782 application proceedings pending before this Court, which are not proceedings for the application of Articles 81 and 82 of the EC Treaty. By filing Novell's Observations in these proceedings, in plain violation of the Commission's directive, Microsoft has made Novell's Observations publicly available for download to anyone with a PACER account. Novell has brought this matter to the attention of the Hearing Officer by letter dated April 10, 2006, stating Novell's position that Microsoft's conduct constitutes an infringement of Article 15(4) of Regulation 773/2004. *See* Letter from Novell's counsel, Christopher Thomas, Esq., to Hearing Officer, attached as Exhibit H.

To the extent that a remedy is available to Novell as a result of Microsoft's improper use of Novell's Observations, Novell looks exclusively to the Hearing Officer for any such remedy.

---

[3]  Indeed, Microsoft even filed a copy of this letter with the Court as Ex. B to the Supplemental Declaration.

## CONCLUSION

Enforcing the subpoena at issue here would undermine important limits in European Community law that are intended to protect third parties like Novell from the prospect of burdensome and possibly retaliatory subpoenas by suspected anticompetitive parties like Microsoft. Accordingly, the Court should grant Novell's Motion to Quash.

Respectfully submitted,

**NOVELL, INC.**

By its attorneys:

/s/ Rebecca R. Hayes

Anthony M. Feeherry, BBO #160860
Rebecca R. Hayes, BBO #654607
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated: April 11, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 11, 2006.

/s/ Rebecca R. Hayes
Rebecca R. Hayes

LIBA/1690316.1

6

# EXHIBIT A



**61987J0374**

**Judgment of the Court of 18 October 1989. - Orkem v Commission of the European Communities. - Competition - Commission's investigative powers - Rights of the defence. - Case 374/87.**

*European Court reports 1989 Page 03283*
*Swedish special edition Page 00217*
*Finnish special edition Page 00231*

Summary
Parties
Grounds
Decision on costs
Operative part

## Keywords

++++
*1.Measures adopted by the institutions - Individual decision - "Notification" - Meaning*

*2.Competition - Administrative procedure - Request for information - Powers of the Commission*

*( Council Regulation No 17, Arts 11 and 14 )*

*3.Community law - Principles - Rights of the defence - Observance in administrative procedures - Competition - Decision requesting information addressed to an undertaking - Right to refuse to provide an answer implying recognition of the existence of an infringement*

*( Council Regulation No 17, Art . 11 )*

## Summary

*1.A decision is properly notified if it reaches the addressee and the latter is in a position to take cognizance of it .*

*Accordingly, a company notified of a decision requiring information to be provided pursuant to Article 11 (5 ) of Regulation No 17 cannot challenge the legality of the decision on the ground that the prior request for information provided for in Article 11(1 ) was addressed to its subsidiary if it had full knowledge of that request, as evidenced by the fact that throughout the procedure conducted by the Commission both companies, each of which has its registered office at the same address, replied to requests addressed by the Commission to one or the other of them, without their at any time mentioning any problem resulting from the existence of two distinct legal persons .*

*2.Articles 11 and 14 of Regulation No 17 establish two entirely independent procedures . The fact that an investigation under Article 14 has already taken place cannot in any way diminish the powers of investigation available to the Commission under Article 11 . No consideration of a procedural nature inherent in Regulation No 17 thus prevents the Commission from requiring, for the purposes of a request for information, the disclosure of documents of which it was unable to take a copy or extract when carrying out a previous investigation .*

*It is for the Commission to decide whether particular information is necessary to enable it to bring to light an infringement of the competition rules . Even if it already has evidence, or indeed proof, of the existence of an infringement, the Commission may legitimately take the view that it is necessary to request further information to enable it better to define the scope of the infringement, to determine its duration or to identify the circle of undertakings involved .*

*3.The rights of the defence, as a fundamental principle, must be observed, not only in administrative procedures which may lead to the imposition of penalties, but also during preliminary inquiry procedures,*

*such consequences for conduct under a more rigorous article of the Regulation, provided*
*evidence of the unlawful nature of conduct engaged in by undertakings and for which they may be liable .*

*Accordingly, whilst the Commission is entitled, in the course of a request for information under Article 11*
*of Regulation No 17, to compel an undertaking to provide all necessary information concerning such facts*
*as may be known to it and to disclose to it, if necessary, such documents relating thereto as are in its*
*possession, even if the latter may be used to establish, against it or another undertaking, the existence of*
*anti-competitive conduct, it may not, by means of a decision calling for information, undermine the rights*
*of the defence .*

*It follows that, although in the case of infringements in the economic sphere, in particular of competition*
*law, an undertaking cannot be said to have the right not to give evidence against itself by virtue of a*
*principle common to the laws of the Member States or by virtue of the rights guaranteed by the European*
*Convention for the Protection of Human Rights and Fundamental Freedoms or by the International*
*Covenant on Civil and Political Rights, the Commission may not compel an undertaking to provide it with*
*answers which might involve an admission on its part of the existence of an infringement which it is*
*incumbent upon the Commission to prove .*

## Parties

*In Case 374/87*

*Orkem, formerly called CdF Chimie, a limited liability company ( société anonyme ) whose registered office*
*is in Paris, represented by Dominique Voillemot and Joëlle Salzmann, of the Paris Bar, and Marc Loesch, of*
*the Luxembourg Bar, with an address for service in Luxembourg at the Chambers of Jacques Loesch, 8*
*rue Zithe,*

*applicant,*

*v*

*Commission of the European Communities, represented by its Legal Adviser, Anthony Mc Clellan, acting as*
*Agent, assisted by Nicole Coutrelis, of the Paris Bar, with an address for service in Luxembourg at the*
*office of Georgios Kremlis, a member of its Legal Department, Wagner Centre,*

*defendant,*

*supported by the*

*French Republic, represented by Edwige Belliard, sous-directeur du droit économique, Ministry of Foreign*
*Affairs, with an address for service in Luxembourg at the French Embassy,*

*intervener,*

*APPLICATION for a declaration that the Commission Decision IV/31 866 of 9 November 1987 relating to a*
*proceeding under Article 11(5 ) of Regulation No 17 of the Council is void,*

*THE COURT*

*composed of : O . Due, President, Sir Gordon Slynn, F . A . Schockweiler and M . Zuleeg ( Presidents of*
*Chambers ), T . Koopmans, G . F . Mancini, R . Joliet, J . C . Moitinho de Almeida, G . C . Rodríguez*
*Iglesias, F . Grévisse and M . Díez de Velasco, Judges,*

*Advocate General : M . Darmon*

*Registrar : H . A . Ruehl, Principal Administrator*

*having regard to the Report for the Hearing and further to the hearing on 16 March 1989,*

*after hearing the Opinion of the Advocate General delivered at the sitting on 18 May 1989,*

*gives the following*

*Judgment*

## Grounds

*1 By application received at the Court Registry on 16 December 1987, CdF Chimie SA, now called Orkem*
*SA, brought an action under the second paragraph of Article 173 of the EEC Treaty for the annulment of*
*Commission Decision IV/31 866 of 9 November 1987 relating to a proceeding under Article 11(5 ) of*
*Regulation No 17 of the Council of 6 February 1962, the first regulation implementing Articles 85 and 86*
*of the Treaty ( Official Journal, English Special Edition 1959-62, p . 87 ).*

*2 The decision was adopted as a result of an inquiry into the existence of agreements or concerted practices contrary to Article 85(1) of the EEC Treaty in the thermoplastics industry . After carrying out the investigations referred to in Article 14 of Regulation No 17 and unsuccessfully requesting information under Article 11(1) of that regulation, the Commission, by means of the contested decision, required CdF Chimie SA to reply to the questions set out in the request for information .*

*3 In support of its application, the applicant makes a number of submissions, based on :*

*( i ) the absence of a prior request for information,*

*( ii ) the claim that the decision is in reality a statement of objections,*

*( iii ) the Commission' s unlawful use of its power to request information,*

*( iv ) breach of the rights of the defence, in so far as the Commission sought to compel the applicant to give evidence against itself .*

*4 Reference is made to the Report for the Hearing for a fuller account of the facts of the case, the course of the procedure and the submissions and arguments of the parties, which are mentioned or discussed hereinafter only in so far as is necessary for the reasoning of the Court .*

*The absence of a prior request for information*

*5 The applicant criticizes the Commission for addressing the contested decision to it when the request for information under Article 11(1), which must without fail precede a request by way of decision, was addressed to its subsidiary, CdF Chimie EP, at which undertaking the investigation was also carried out .*

*6 The Court has held that a decision is properly notified if it reaches the addressee and the latter is in a position to take cognizance of it ( judgments of 14 July 1972 in Case 48/69 ICI v Commission (( 1972 )) ECR 619 and of 21 February 1973 in Case 6/72 Continental Can v Commission (( 1973 )) ECR 215 ). In the present case, without its being necessary to decide whether, by virtue of the concept of unity of undertakings, it may be regarded as proper to address a request for information under Article 11(1) to a subsidiary company and the decision under Article 11(5) to the parent company, it need merely be stated, first, that the contested decision was notified to the applicant and, secondly, that the latter in fact had full knowledge of the prior request for information . Throughout the procedure conducted by the Commission, the applicant and its subsidiary, each of which has its registered office at the same address, both replied to requests addressed by the Commission to one or the other of them, without their at any time mentioning any problem resulting from the existence of two distinct legal persons . The confusion between the parent company and its subsidiary persisted until the stage of the written procedure before the Court in so far as the parent company answered a question addressed by the Court to its subsidiary .*

*7 The submission as to the absence of a prior request for information must therefore be dismissed .*

*The allegation that the contested decision was a "statement of objections"*

*8 The applicant maintains that the contested decision, which contains precise charges as to its participation in an infringement of Article 85 of the EEC Treaty, in reality constitutes a statement of objections and that the applicant was not given an opportunity to express its views .*

*9 In considering whether that submission is well founded, it must be recalled that Article 11(3) of Regulation No 17 requires the Commission to state in its request for information the legal basis and the purpose of the request .*

*10 In its judgment of 26 June 1980 in Case 136/79 National Panasonic ( UK ) Ltd v Commission (( 1980 )) ECR 2033, the Court held, in relation to Article 14(3), an analogous provision relating to investigations, that a decision which indicated that its purpose was to check facts which might show the existence of an act contrary to the Treaty satisfied the requirements of Regulation No 17 concerning the statement of the reasons on which it was based .*

*11 By disclosing its suspicion of the existence of agreements contrary to Article 85(1) of the EEC Treaty, the Commission merely complied with the obligation imposed on it by Article 11(3) to state the purpose of its request .*

*12 The submission that the contested decision constitutes a statement of objections must therefore be dismissed .*

*The unlawful exercise of the power to request information*

*13 The applicant claims that the Commission exercised the powers conferred on it by Article 11 in an unlawful manner by endeavouring to obtain documents - a measure authorized only by Article 14 - and by asking for information which was unnecessary, thus infringing the principle of proportionality .*

*14 It must be stated, with respect to the Commission' s right to require the disclosure of documents in connection with a request for information, that Articles 11 and 14 of Regulation No 17 establish two entirely independent procedures . The fact that an investigation under Article 14 has already taken place cannot in any way diminish the powers of investigation available to the Commission under Article 11 . No consideration of a procedural nature inherent in Regulation No 17 thus prevents the Commission from*

requiring the Commission's staff, at the request for a document, the disclosure of which was unable to take a copy or extract when carrying out a previous investigation .

15 With regard to the necessity of the information requested, it must be borne in mind that Regulation No 17 confers on the Commission wide powers to make investigations and to obtain information by providing in the eighth recital in its preamble that the Commission must be empowered, throughout the common market, to require such information to be supplied and to undertake such investigations as are necessary to bring to light infringements of Articles 85 and 86 of the Treaty . As the Court held in its judgment of 18 May 1982 in Case 155/79 AM & S Europe Limited v Commission (( 1982 )) ECR 1575, it is for the Commission to decide, for the purposes of an investigation under Article 14, whether particular information is necessary to enable it to bring to light an infringement of the competition rules . Even if it already has evidence, or indeed proof, of the existence of an infringement, the Commission may legitimately take the view that it is necessary to request further information to enable it better to define the scope of the infringement, to determine its duration or to identify the circle of undertakings involved .

16 In the present case it does not appear that the information requested falls outside those limits or exceeds what might be regarded as necessary in the light of the purpose of the investigation .

17 The submissions as to the unlawful use by the Commission of the powers conferred on it by Article 11 of Regulation No 17 must therefore be dismissed .

Breach of the rights of the defence

18 The applicant claims, essentially, that the Commission used the contested decision to compel it to incriminate itself by confessing to an infringement of the competition rules and to inform against other undertakings . By doing so, the Commission has, in its view, infringed the general principle that no one may be compelled to give evidence against himself, which forms part of Community law in so far as it is a principle upheld by the laws of the Member States, by the European Convention for the Protection of Human Rights and Fundamental Freedoms of 4 November 1950 ( hereinafter referred to as "the European Convention ") and by the International Covenant on Civil and Political Rights of 19 December 1966 ( United Nations Treaty Series, Vol . 999, p . 71 ), hereinafter referred to as "the International Covenant ). It has thus, in the applicant' s view, infringed the rights of the defence .

19 In considering whether that submission is well founded, it should be recalled that, as the Court held in its judgment in Case 136/79 National Panasonic, supra, the aim of the powers given to the Commission by Regulation No 17 is to enable it to carry out its duty under the EEC Treaty of ensuring that the rules on competition are applied in the common market . The function of those rules, as is apparent from the fourth recital in the preamble to the Treaty, Article 3(f ) and Articles 85 and 86, is to prevent competition from being distorted to the detriment of the public interest, individual undertakings and consumers . The exercise of the powers given to the Commission by Regulation No 17 contributes to the maintenance of the system of competition intended by the Treaty which undertakings have an absolute duty to comply with .

20 The rules necessary for the application of Articles 85 and 86, introduced by the Council, prescribe two successive but clearly separate procedures : first, a preparatory investigation procedure, and secondly, a procedure involving submissions by both parties initiated by the statement of objections .

21 The sole purpose of the preliminary investigation procedure is to enable the Commission to obtain the information and documentation necessary to check the actual existence and scope of a specific factual and legal situation ( National Panasonic, supra ).

22 For that purpose, Regulation No 17 conferred on the Commission wide powers of investigation and imposed on undertakings the obligation to cooperate in the investigative measures .

23 Thus, Article 11(1 ) of Regulation No 17 empowers the Commission to obtain all necessary information from undertakings and Article 11(5 ) authorizes it to require, by decision, that information be supplied to it where an undertaking does not supply the information requested or supplies incomplete information .

24 If the Commission considers that the information thus obtained justifies such a course of action, it sends a statement of objections to the undertaking concerned, thus initiating the inter partes procedure governed by Regulation No 99/63 of the Commission of 25 July 1963 on the hearings provided for in Article 19(1 ) and ( 2 ) of Council Regulation No 17 ( Official Journal, English Special Edition 1963-64, p . 47 ).

25 For the purposes of that inter partes procedure, Article 19 of Regulation No 17 and Regulation No 99/63 provide in particular that the undertaking concerned is entitled to make known in writing and, if appropriate, orally its views on the objections raised against them ( see also the judgments of 13 February 1979 in Case 85/76 Hoffmann-La Roche v Commission (( 1979 )) ECR 461, and of 7 June 1983 in Joined Cases 100 to 103/80 Musique Diffusion française and Others v Commission (( 1983 )) ECR 1825 ). In any decision which the Commission might be prompted to adopt on conclusion of the procedure, it will be entitled to set out only those objections on which the undertaking concerned has had an opportunity of making known its views .

*26 In the course of the preliminary investigation procedure, Regulation No 17 expressly accords only certain guarantees to the undertaking under investigation . Thus, a decision requiring information to be supplied may be taken only after a prior request has proved unsuccessful . Similarly, a decision fixing the definitive amount of a fine or penalty payment, in a case where the undertaking concerned fails to supply the information required by the decision, may be adopted only after the undertaking in question has been given an opportunity to make its views known .*

*27 On the other hand, Regulation No 17 does not give an undertaking under investigation any right to evade the investigation on the ground that the results thereof might provide evidence of an infringement by it of the competition rules . On the contrary, it imposes on the undertaking an obligation to cooperate actively, which implies that it must make available to the Commission all information relating to the subject-matter of the investigation .*

*28 In the absence of any right to remain silent expressly embodied in Regulation No 17, it is appropriate to consider whether and to what extent the general principles of Community law, of which fundamental rights form an integral part and in the light of which all Community legislation must be interpreted, require, as the applicant claims, recognition of the right not to supply information capable of being used in order to establish, against the person supplying it, the existence of an infringement of the competition rules .*

*29 In general, the laws of the Member States grant the right not to give evidence against oneself only to a natural person charged with an offence in criminal proceedings . A comparative analysis of national law does not therefore indicate the existence of such a principle, common to the laws of the Member States, which may be relied upon by legal persons in relation to infringements in the economic sphere, in particular infringements of competition law .*

*30 As far as Article 6 of the European Convention is concerned, although it may be relied upon by an undertaking subject to an investigation relating to competition law, it must be observed that neither the wording of that article nor the decisions of the European Court of Human Rights indicate that it upholds the right not to give evidence against oneself .*

*31 Article 14 of the International Covenant, which upholds, in addition to the presumption of innocence, the right ( in paragraph 3( g ) ) not to give evidence against oneself or to confess guilt, relates only to persons accused of a criminal offence in court proceedings and thus has no bearing on investigations in the field of competition law .*

*32 It is necessary, however, to consider whether certain limitations on the Commission' s powers of investigation are implied by the need to safeguard the rights of the defence which the Court has held to be a fundamental principle of the Community legal order ( judgment of 9 November 1983 in Case 322/82 Michelin v Commission (( 1983 )) ECR 3461, paragraph 7 ).*

*33 In that connection, the Court observed recently, in its judgment of 21 September 1989 in Joined Cases 46/87 and 227/88 Hoechst v Commission (( 1989 )) ECR 2859, paragraph 15, that whilst it is true that the rights of the defence must be observed in administrative procedures which may lead to the imposition of penalties, it is necessary to prevent those rights from being irremediably impaired during preliminary inquiry procedures which may be decisive in providing evidence of the unlawful nature of conduct engaged in by undertakings and for which they may be liable . Consequently, although certain rights of the defence relate only to contentious proceedings which follow the delivery of the statement of objections, other rights must be respected even during the preliminary inquiry .*

*34 Accordingly, whilst the Commission is entitled, in order to preserve the useful effect of Article 11(2 ) and ( 5 ) of Regulation No 17, to compel an undertaking to provide all necessary information concerning such facts as may be known to it and to disclose to it, if necessary, such documents relating thereto as are in its possession, even if the latter may be used to establish, against it or another undertaking, the existence of anti-competitive conduct, it may not, by means of a decision calling for information, undermine the rights of defence of the undertaking concerned .*

*35 Thus, the Commission may not compel an undertaking to provide it with answers which might involve an admission on its part of the existence of an infringement which it is incumbent upon the Commission to prove .*

*36 The foregoing criteria must be observed in considering the questions to which the Commission, by means of the contested decision, required the applicant to give an answer .*

*37 The questions in Section I relating to meetings of producers, which are intended only to secure factual information on the circumstances in which such meetings were held and the capacity in which the participants attended them, and also the requirement of disclosure of documents in the applicant' s possession relating thereto, are not open to criticism .*

*38 The questions on prices in Section II relate essentially to the measures taken in order to determine and maintain price levels satisfactory to all the participants at the meetings . Whilst those questions are not open to criticism in so far as the Commission seeks factual clarification as to the subject-matter and*

*implementation of those measures. The position is different as regards those which relate to the purpose*

*implementation of those measures. The position is different as regards those which relate to the purpose of the action taken and the objective pursued by those measures . In that respect, sub-question 1(c ), which seeks clarification on "every step or concerted measure which may have been envisaged or adopted to support such price initiatives", is such as to compel the applicant to acknowledge its participation in an agreement whose object was to fix selling prices and which was capable of preventing or restricting competition, or to state that it intended to achieve that objective .*

*39 The same finding applies to Questions 1 and 2 of Section III concerning the quotas, targets or shares allocated to the producers . By requiring disclosure of the "details of any system or method which made it possible to attribute sales targets or quotas to the participants" and details of "any method facilitating annual monitoring of compliance with any system of targets in terms of volume or quotas", the Commission endeavoured to obtain from the applicant an acknowledgment of its participation in an agreement intended to limit or control production or outlets or to share markets .*

*40 No such criticism may be made against Question 3 in Section III, which deals with the information disclosed by the undertaking to the other producers regarding the production and sale of the product in question or against the questions in Section IV on the statements forwarded to, and statistics provided by, Fides, since those questions were intended only to elicit factual information on the functioning of the system for the exchange of statistical and other information .*

*41 It must be concluded that, by requiring the undertaking to which the decision was addressed to acknowledge, in response to Questions II(1)(c ) and III(1 ) and ( 2 ) of the request for information, that it had infringed Article 85 of the EEC Treaty, the Commission undermined the applicant' s rights of defence .*

*42 The contested decision must therefore be annulled as regards Questions II(1)(c ) and III(1 ) and ( 2 ); the remainder of the application must be dismissed .*

## Decision on costs

*Costs*

*43 Under Article 69(2 ) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs . However, pursuant to Article 69(3 ) of those rules, where each party succeeds on some and fails on other heads, the Court may order the parties to bear their own costs . Since each of the parties has failed in some of its submissions, they must be ordered to bear their own costs .*

## Operative part

*On those grounds,*

*THE COURT*

*hereby :*

*( 1 ) Annuls Questions II(1)(c ) and III(1 ) and ( 2 ) of Commission Decision IV/31.866 of 9 November 1987 relating to a proceeding under Article 11(5 ) of Regulation No 17 of the Council of 6 February 1962, the first regulation implementing Articles 85 and 86 of the EEC Treaty;*

*( 2 ) Dismisses the remainder of the application;*

*( 3 ) Orders the parties to bear their own costs .*

# EXHIBIT B



Important legal notice

# 61992C0036

**Opinion of Mr Advocate General Jacobs delivered on 15 December 1993. - Samenwerkende Elektriciteits-Produktiebedrijven (SEP) NV v Commission of the European Communities. - Competition - Administrative procedure - Decision requiring an undertaking to provide information - Necessary information - Principle of proportionality and Member States' obligation to observe professional secrecy. - Case C-36/92 P.**

*European Court reports 1994 Page I-01911*
*Swedish special edition Page I-00155*
*Finnish special edition Page I-00191*

## Opinion of the Advocate-General

++++

*My Lords,*

*1. In this case a Dutch producer of electricity is appealing against a judgment whereby the Court of First Instance dismissed its application for the annulment of a Commission decision requiring it to disclose certain documents to the Commission. The case raises an important issue. The issue itself is straightforward, but has been greatly complicated by the course of the proceedings.*

*The background to the case*

*2. The appellant is NV Samenwerkende Elektriciteits-produktiebedrijven (hereafter "SEP"). As its name implies, SEP takes the form of a naamloze vennootschap (a public limited company governed by Dutch law). According to the judgment appealed against, SEP groups together the four "public utility" undertakings which produce electricity in the Netherlands. The parties disagree on whether SEP is privately owned or is a State enterprise; but the argument has proceeded, in part, on the basis that it is private. It is not disputed that SEP is under a statutory duty to endeavour to produce electricity at the lowest possible price to the consumer, having regard to the security of supplies.*

*3. In the Netherlands 50% of electricity is generated with natural gas. SEP's principal supplier of natural gas is NV Nederlandse Gasunie (hereafter "Gasunie"), which enjoys a de facto monopoly in the supply of natural gas in the Netherlands. It appears that all natural gas extracted from Netherlands territory must be offered to Gasunie for sale. Gasunie is a mixed company, in the sense that 50% of its share capital is owned by the Dutch State and 50% by the Shell and Esso petroleum companies. Its major decisions of commercial policy are subject to the approval of the Dutch Ministry of Economic Affairs.*

*4. On 16 June 1989 SEP entered into a contract for the supply of gas with a Norwegian undertaking called Statoil. I shall refer to that contract as the "Statoil contract". Statoil had never previously gained access to the Dutch gas market and SEP had never previously concluded such a contract with anyone other than Gasunie, which none the less remains SEP's principal supplier.*

*5. The conclusion of the Statoil contract led Gasunie to negotiate a "cooperation code" with SEP. The negotiations began in the second quarter of 1989 and the final version of the code was concluded on 9 April 1990. Towards the end of 1989 the Commission learned of the Statoil contract and of the negotiations between SEP and Gasunie. The Commission opened an investigation with a view to determining whether the dealings between SEP and Gasunie were compatible with the competition rules of the EEC Treaty.*

*6. On 6 March 1990 the Commission requested SEP to disclose certain documents to it, including the cooperation code and the Statoil contract. The request was made pursuant to Article 11(1) of Council Regulation (EEC) No 17, (1) which authorizes the Commission to "obtain all necessary information from the Governments and competent authorities of the Member States and from undertakings and associations of undertakings". In response, on 9 April 1990, SEP sent the Commission the final version of the cooperation code concluded between itself and Gasunie, together with an earlier draft version of the code, but it refused to send the Statoil contract. It contended that the contract had nothing to do with the*

cooperation code, but it did not say that this was one of its main concerns.
Case 1:06-mc-00036-JJF    Document 20    Filed 04/11/2006    Page 3 of 17

7. After a further exchange of correspondence between SEP and the Commission, the latter adopted the contested decision on 2 August 1990 pursuant to Article 11(5) of Regulation No 17. The decision required SEP to send to the Commission, within 10 days, the Statoil contract and the correspondence relating to it. In a letter dated 16 August 1990 SEP persisted in its refusal to produce the Statoil contract, invoking for the first time the confidential nature of the contract. It also offered to explain its attitude in a personal meeting with the Commission's Director General for Competition. By letter of 30 August 1990 the Commission declined that offer and stated that the confidential nature of the Statoil contract could not justify SEP's refusal to hand it over to the Commission, which was under an obligation to respect business secrets by virtue of Article 20 of Regulation No 17. Paragraphs (1) and (2) of Article 20 have played a key role in this dispute and it is convenient to set them out in full at this point. They provide as follows:

"1. Information acquired as a result of the application of Articles 11, 12, 13 and 14 shall be used only for the purpose of the relevant request or investigation.

2. Without prejudice to the provisions of Articles 19 and 21, the Commission and the competent authorities of the Member States, their officials and other servants shall not disclose information acquired by them as a result of the application of this Regulation and of the kind covered by the obligation of professional secrecy."

8. In a letter of 12 September 1990 SEP made it clear that it was raising the issue of confidentiality because it was anxious that the terms of the Statoil contract should not be made known to the Dutch Government, which was Gasunie's largest shareholder. That, however, was likely to happen if the contract was sent to the Commission since the Commission would be required to send a copy of it to the Dutch competition authorities in accordance with Article 10(1) of Regulation No 17, which requires the Commission to "transmit to the competent authorities of the Member States a copy of ... the most important documents lodged with the Commission for the purpose of establishing the existence of infringements of Articles 85 or 86 of the Treaty". In the same letter SEP offered to show the Statoil contract to the Commission, on condition that no copy should be made of it; the Commission would then realize that it was not necessary for it to examine the Statoil contract in order to appraise the cooperation code agreed upon between SEP and Gasunie.

9. In a letter dated 24 September 1990 the Commission rejected that offer on the ground that it did not satisfy the requirements of Article 11 of Regulation No 17. The Commission also stated in that letter that Article 10 of the same regulation left it a sufficient margin of appraisal as regards the transmission of documents to the Member States and that it would have no reason to send them the Statoil contract if, as SEP maintained, the application of the contract could not be influenced by the cooperation code.

The procedural history of the case

10. On 26 September 1990 SEP commenced proceedings in the Court of First Instance for the annulment of the Commission's decision of 2 August 1990. That action was registered as Case T-39/90. On the same date it also applied for an interim order suspending the operation of the decision. The application for interim measures was dismissed by the President of the Court of First Instance on 21 November 1990. By a decision dated 26 November 1990 the Commission, acting under Articles 11(5) and 16(1)(c) of Regulation No 17, imposed a periodic penalty payment of ECU 1 000 for each day of delay in complying with the decision of 2 August 1990. SEP thereupon sent the Statoil contract to the Commission, expressly reserving all its rights.

11. On 14 December 1990 SEP appealed to the Court of Justice against the order of the President of the Court of First Instance. On the same date SEP also applied to the Court for an order suspending the operation of the Commission's decision of 2 August 1990. In the alternative, it asked the Court to order the Commission not to send a copy of the Statoil contract to the Member States until the Court of First Instance had ruled on SEP's action for the annulment of the contested decision or until the Court of Justice had given judgment on SEP's appeal against the order made by the President of the Court of First Instance. Finally, on 23 January 1991 SEP lodged a second appeal against the order of the President of the Court of First Instance; in this appeal it sought an order requiring the Commission to return the Statoil contract to it.

12. By order of 3 May 1991 the President of the Court took note of SEP's discontinuance of its claims for interim measures, as a result of the Commission's undertaking not to disclose the contents of the Statoil contract to the authorities of the Member States until the Court of First Instance had ruled on SEP's action for the annulment of the contested decision. The Court of First Instance dismissed that action by judgment of 12 December 1991. (2) That judgment forms the subject-matter of the present appeal.

The judgment appealed against

13. Before the Court of First Instance SEP pleaded three submissions: (a) the contested decision infringed Article 11 of Regulation No 17, (b) the contested decision did not contain a sufficient statement of the reasons on which it was based and (c) the contested decision infringed the principle of proportionality.

Case 1:06-mc-10061-MLW    Document 27    Filed 04/11/2006    Page 4 of 17

*14. As regards the first submission, SEP argued that the Statoil contract was not necessary within the meaning of Article 11 of Regulation No 17 - to the Commission' s inquiry, the object of which was to assess whether the cooperation code concluded by SEP and Gasunie was compatible with Article 85 of the Treaty. By demanding disclosure of the Statoil contract, the Commission had modified the object of its enquiry. According to SEP, the Commission was carrying out a sectoral inquiry into the Dutch gas market; such an inquiry was governed by Article 12 of Regulation No 17.*

*15. By its second submission SEP argued that the contested decision was insufficiently reasoned because the reasons relied on by the Commission could not justify the demand for disclosure of the Statoil contract in so far as they modified the object of the inquiry.*

*16. By its third submission SEP argued that the request for disclosure of the Statoil contract infringed the principle of proportionality on account of the confidential nature of the contract. Under Article 10(1) of Regulation No 17 the Commission would be required to send a copy of the contract to the competent authorities of the Member States. In the Netherlands the competent authority was the Directorate General for Competition in the Ministry of Economic Affairs. Another department of the same ministry - the Directorate General for Energy - was responsible for determining the commercial policy of Gasunie. SEP argued that its negotiating position as a purchaser of natural gas would be impaired if the persons responsible for determining the commercial policy of its main supplier (Gasunie) knew of the terms of business offered by its alternative supplier (Statoil).*

*17. In its judgment of 12 December 1991 the Court of First Instance held that SEP' s three submissions were all unfounded. As regards the first submission, the Court held that the subject-matter of the Commission' s investigation had at all times been the relations between SEP and Gasunie, which had culminated in an agreement (the cooperation code) suspected of infringing Article 85 of the Treaty. The Commission was entitled to demand any document that could legitimately be regarded as presenting a relationship with the alleged infringement. There was a sufficient relationship between the Statoil contract and the cooperation code because the two agreements had been concluded by SEP with two of its suppliers of natural gas. Moreover, in addition to the proximity in time between the two agreements, SEP had admitted that the Statoil contract had induced Gasunie to negotiate the cooperation code. The Statoil contract constituted "necessary information", within the meaning of Article 11(1) of Regulation No 17, since it formed part of the economic context of the cooperation code.*

*18. As regards the second submission, the Court of First Instance noted that in the contested decision the Commission had expressly referred to the need to know the economic context of the cooperation code and had mentioned that an earlier draft of the code had envisaged the possibility that supplies by Statoil to SEP might be subject to the approval of Gasunie. The Court held that that was a sufficient statement of reasons for considering there to be a link between the Statoil contract and the cooperation contract.*

*19. As regards the third submission, the Court observed that the application of Article 11 of Regulation No 17 was indeed subject to compliance with the principle of proportionality; the obligation to supply information must not therefore impose on the undertaking concerned a disproportionate burden, having regard to the needs of the investigation. The Court held, however, that the disclosure of the Statoil contract did not impose a disproportionate burden on SEP. Even if the Commission sent the contract to the Dutch authorities under Article 10(1) of Regulation No 17, the confidentiality of that document would be guaranteed by Article 20 of the regulation, which required the Commission and the competent authorities of the Member States to respect the confidentiality of documents containing business secrets.*

*SEP' s appeal*

*20. In its appeal SEP pleads eight separate grounds of appeal arranged in three groups corresponding to the three submissions pleaded before the Court of First Instance. SEP' s eight grounds of appeal are advanced in support of two essential contentions: first, that the disclosure of the Statoil contract was not necessary for the purposes of the Commission' s investigation into the relations between SEP and Gasunie (grounds of appeal 1 to 5); secondly, that the disclosure of the Statoil contract would impose a disproportionate burden on SEP in view of the confidential nature of the contract and the obvious risk that it would find its way into the hands of those who determine Gasunie' s commercial policy (grounds of appeal 6 to 8).*

*The first ground of appeal: the Court of First Instance misinterpreted Article 11 of Regulation No 17 by considering that the requirement of "necessity" merely implies a "correlation between the request for information and the alleged infringement"*

*21. I do not think that this ground of appeal can succeed. It is true that there are certain passages in the Court of First Instance' s judgment that suggest too wide a definition of the term "necessary" in Article 11 (1) of Regulation No 17. Thus, for example, in the last sentence of paragraph 29 the Court refers to the "requirement of a correlation between the request for information and the alleged infringement" and says that that requirement is satisfied if the request "may legitimately be regarded as displaying a relationship with the alleged infringement". A mere relationship between a document and the alleged infringement is not sufficient to justify a request for disclosure of the document; the relationship must be such that the*

Commission could reasonably suppose, at the time of the request, that the document would help it to determine whether the alleged infringement had taken place.

22. However, in the present case it cannot be doubted that the relationship between the Statoil contract and the cooperation code is sufficiently close to justify the Commission's request. On that point the reasons given by the Court of First Instance in paragraph 31 of its judgment are convincing. There the Court observed that SEP was a party to both the Statoil contract and the cooperation code and that in each case the other party was one of its suppliers of natural gas. The Court also noted the proximity in time between the contract and the code, the latter having been concluded shortly after the former. The Court held that the contract was therefore necessary in order to enable the Commission to appraise the economic context in which the code was situated.

23. But the decisive point is the one noted by the Court of First Instance in the third subparagraph of paragraph 31: namely, that - as SEP had itself recognized - the conclusion of the Statoil contract led Gasunie to negotiate the cooperation code with SEP. In view of that direct causal connection between the contract and the code I do not see how it can be seriously argued that the one was not relevant to an investigation into the alleged illegality of the other.

*Second ground of appeal: the reasons given by the Court of First Instance for its finding that Article 11 of Regulation No 17 had not been infringed are inadequate and incorrect*

24. SEP criticizes the Court of First Instance for finding that the Commission had not extended the subject-matter of its investigation in the contested decision. According to SEP, the Court's reasoning is defective in several respects.

25. In particular, SEP contends that the Court disregarded its argument to the effect that in the contested decision the Commission treated the cooperation code and the Statoil contract as together forming the subject-matter of its investigation. According to SEP, the Commission had recognized that in certain passages of its pleadings before the Court of First Instance.

26. SEP refers to paragraph 27 of the Court's judgment in which the Court observed that the disclosure of the Statoil contract was requested by the Commission because it was needed in order to appraise the legality of the cooperation code in view of the possible effect of the code on the contract. The Court referred in that regard to point 6 of the preamble to the contested decision. According to SEP, point 6 of the preamble does not support that finding. SEP complains in particular that in point 6 the Commission stated that the Statoil contract might be an agreement capable of affecting competition within the common market.

27. SEP also contends that the Court of First Instance's judgment was insufficiently reasoned in so far as the Court failed to appreciate that the Commission should have demonstrated necessity at the time when it requested disclosure of the contract. SEP refers to paragraph 28 of the judgment, in which the Court held that the supplementary reference, in the contested decision, to the possible illegality of the Statoil contract cannot have had the effect of modifying the subject-matter of the investigation in view of the clear terms of the initial request for documents and of the contested decision "in the light of the clarification provided by the Commission at the hearing". According to SEP, the clarification provided by the Commission at the hearing came too late to be of any relevance for the purpose of justifying the request for disclosure of the Statoil contract.

28. According to the Commission, this ground of appeal is doomed to failure, since it concerns an appraisal of the facts, for which moreover the Court of First Instance gave adequate reasons.

29. This ground of appeal is complex and raises several issues, but all are essentially concerned with the definition of the subject-matter of the Commission's investigation. SEP's basic argument is that the Commission has created confusion about the subject-matter of its investigation as a result of ambiguous statements in its original request for documents (the letter of 6 March 1990) and in the contested decision.

30. According to SEP, it is not clear whether the subject-matter of the investigation is the cooperation code alone, or both the code and the Statoil contract, or whether the Commission is carrying out a sectoral investigation into the Dutch gas market. The relevance of this point is that when the Commission requests information under Article 11 of Regulation No 17 it is required by Article 11(3) to state "the purpose of the request", meaning of course that it must identify the suspected infringement of the competition rules. The necessity of the information must be judged in relation to the purpose stated in the request for information. The purpose must be indicated with reasonable precision, otherwise it will be impossible to determine whether the information is necessary and the Court will be prevented from exercising judicial review. As regards SEP's claim that the Commission is in reality carrying out a sectoral inquiry into the Dutch gas market under Article 12 of Regulation No 17, the relevance of that is that the Commission does not, in the context of such an inquiry, have to confine its attention to a specific alleged infringement.

31. Although the Commission now insists that the subject-matter of its investigation was the cooperation code between SEP and Gasunie and that disclosure of the Statoil contract was required solely because of

the light that it bears on the second ground of appeal. When considered in that light they give the
impression that the Statoil contract, instead of being purely of ancillary interest, might itself constitute an infringement of Article 85.

32. Thus in the letter of 6 March 1990, the subject-matter of which is described as being the "agreement between SEP and Gasunie", the Commission referred to that agreement (the cooperation code) and to the Statoil contract and then stated that it wished to receive information about both agreements and that the information requested should enable it to appraise the compatibility, of "that agreement (those agreements)" (3) with the competition rules of the Treaty. Further confusion was caused by point 6 in the preamble to the contested decision, which expressly stated that the Statoil contract might be an agreement capable of affecting competition within the common market.

33. In paragraphs 27 and 28 of the judgment under appeal the Court of First Instance recognized that the Commission had created a certain amount of confusion about the subject-matter of its enquiry and recorded that the Commission had acknowledged at the hearing the potential for misunderstanding caused by point 6 in the preamble to the contested decision. The Court found none the less that the Commission had made it sufficiently clear, both in its letter of 6 March 1990 and in the contested decision, that the main object of its enquiry was the cooperation code between SEP and Gasunie and that the Statoil contract was of ancillary interest inasmuch as it formed part of the economic context and might enable the Commission to assess the effects of the cooperation code on competition.

34. I do not think that it can be said that that finding by the Court of First Instance was erroneous or that it was not supported by an adequate statement of reasons. Admittedly, it is questionable whether the Court was right to suggest (in the third subparagraph of paragraph 28) that clarification about the subject-matter of the enquiry could usefully be provided by the Commission at the hearing before the Court. The Commission must make the subject-matter of its enquiry clear in its initial request for documents and in the formal decision (if there is one) requiring disclosure of documents under Article 11 (5) of Regulation No 17. If the subject-matter of the enquiry is not clear at those stages, the undertaking concerned will be unable to determine whether there are grounds for refusing to comply with the initial request and for challenging the formal decision before the Court of First Instance. It is not sufficient to provide clarification at the hearing.

35. But I do not think that that weakness in the Court of First Instance's reasoning is serious enough to justify quashing the judgment under appeal. Even without the clarification provided by the Commission in the course of the proceedings before the Court of First Instance, that Court was justified in taking the view that it was clear from the terms of the letter of 6 March 1990 and of the contested decision that the Commission's enquiry was concerned principally with the cooperation code between SEP and Gasunie and that the Statoil contract was of purely ancillary interest.

The third ground of appeal: the Court of First Instance wrongly failed to pay heed to SEP's argument to the effect that, since the Commission had admitted that it was carrying out an enquiry into the Dutch gas market, that enquiry should have been based on Article 12 - rather than Article 11 - of Regulation No 17

36. SEP's contention is that the Commission is in reality investigating the Dutch gas market in general, rather than the relations between SEP and Gasunie. It should therefore proceed under Article 12 of Regulation No 17, rather than Article 11. Article 12(1) empowers the Commission to request "undertakings in the sector concerned to supply the information necessary for giving effect to the principles formulated in Articles 85 and 86 of the Treaty and for carrying out the duties entrusted to the Commission". When acting under Article 12 the Commission is still required to state "the legal basis and the purpose" of a request for information because Article 11(3) is rendered applicable by virtue of Article 12(4). It would not, however, have to refer to a specific alleged infringement but would simply have to indicate that certain circumstances suggest that in the economic sector concerned competition is being restricted or distorted (see Article 12(1)). By purporting to act under Article 11 when it is really acting under Article 12, the Commission is - if I understand SEP's argument correctly - acting unlawfully.

37. The weakness in this argument is that it is difficult to see what advantage the Commission might gain by disguising the true nature of its investigation in the manner alleged. On the contrary, its powers of investigation under Article 12 of Regulation No 17 are, if anything, wider and less fettered than under Article 11.

38. It is of course possible that the Commission might wish to investigate a specific alleged infringement in the gas industry and at the same time carry out a general inquiry into the gas market. If the Commission is able to establish that it is entitled to have access to a document for the purpose of investigating the specific infringement, I do not see how it can lose the right to see the document on the ground that the document is also relevant to the general inquiry. I would therefore dismiss this ground of appeal.

The fourth ground of appeal: the Court of First Instance wrongly applied Article 190 of the Treaty by declaring that the contested decision was sufficiently reasoned

39. This ground of appeal need not detain us for long, since it seems to raise no argument that was not

40. SEP complains that the contested decision was based on an ambiguous statement of reasons in so far as the Commission failed to make it clear whether the Statoil contract was itself the subject-matter of the investigation or whether it was of purely ancillary interest in the context of an investigation into the legality of the cooperation code. Hence, the contested decision is contrary to Article 190 of the Treaty, according to SEP, since it does not contain an adequate statement of the reasons on which it is based.

41. It will be clear from what I have said with regard to the second ground of appeal that, while I accept that the Commission created a certain amount of confusion about the subject-matter of its investigation, it was clear from the letter of 6 March 1990 and from the contested decision that the principal subject-matter of the Commission' s investigation was the cooperation code and that the Statoil contract was of ancillary interest. It follows that the contested decision cannot be insufficiently reasoned in the manner alleged by SEP.

*The fifth ground of appeal: the Court of First Instance did not give sufficient reasons for dismissing SEP' s submission that the contested decision was not sufficiently reasoned*

42. This ground of appeal simply repeats arguments pleaded under the fourth ground of appeal, which - as I have already observed - repeated arguments pleaded under the second ground of appeal. I do not think it necessary to state for a third time why I am not persuaded by those arguments.

*The sixth, seventh and eighth grounds of appeal: the Court of First Instance infringed or misinterpreted Article 20 of Regulation No 17 and gave an incorrect statement of reasons for the finding that the contested decision did not breach the principle of proportionality*

43. The final three grounds of appeal overlap considerably and I shall deal with them jointly. Their common theme is that the contested decision breached the principle of proportionality by requiring SEP to disclose to the Commission a confidential document which would then be transmitted to the competent national authorities, including the Directorate General for Competition at the Netherlands Ministry of Economic Affairs; the document was thus likely to find its way into the hands of the officials in the Directorate General for Energy at the same ministry who have responsibility for determining Gasunie' s commercial policy. SEP maintains that it has a legitimate interest in not allowing the persons who determine the commercial policy of its main supplier (Gasunie) to become acquainted with the terms of a contract which SEP concluded with an alternative supplier (Statoil).

44. The Court of First Instance held that the risk of such a breach of confidentiality could be excluded because the Dutch authorities would, like the Commission, be subject to Article 20 of Regulation No 17. According to the Court of First Instance, Article 20 prohibits the Dutch authorities not only from disclosing confidential documents to persons outside the sector of the administration in question but also from circulating such documents within the sector concerned. Thus officials in the Directorate General for Competition would be prohibited from divulging the terms of the Statoil contract to officials in the Directorate General for Energy. The Court also observed that Article 20 of Regulation No 17 prohibited the national authorities to which the Statoil contract might be sent from using information contained in it for the purpose of establishing the commercial policy of Gasunie.

45. As regards the emphasis placed by SEP on the special nature of the present dispute, the Court stated (in paragraph 57) that the same issue was likely to arise whenever an inquiry by the Commission involved the commercial relationship between a private undertaking and a public undertaking or a private company with government participation; such situations, which arose very frequently in practice, did not bestow upon the Commission' s inquiry any specific characteristic and could not therefore result in any special factors being taken into account in the application of Regulation No 17.

46. As regards the alleged absence of administrative rules ensuring that confidential information would not circulate between the various directorates of the Netherlands Ministry of Economic Affairs, the Court held that that did not justify the assumption that the Netherlands authorities would fail to comply with their obligations under Article 20 of Regulation No 17.

47. The Court concluded that the restrictions imposed on Member States by Article 20, as regards both the disclosure and the use of information sent to them pursuant to Article 10(1) of Regulation No 17, constituted an adequate safeguard for SEP. It followed that the contested decision did not involve the excessive risk alleged by SEP and did not therefore infringe the principle of proportionality (paragraph 60).

48. SEP directs a number of criticisms against that part of the Court' s judgment. First, it contends that Article 20(2) of Regulation No 17 does not contain the prohibition read into by the Court, regarding the circulation of documents within a national authority.

49. Secondly, SEP suggests that Article 20(1) of Regulation No 17, according to which information received as a result of the application of Articles 11 to 14 may be used only for the purpose of the relevant request or investigation, simply means that the national authorities may not commence proceedings against the undertaking concerned on the basis of the information acquired. That limitation cannot help SEP, whose concern is not that the Dutch authorities will use the information for that purpose

but simply that Gasunie in 1988 passed to it a document, like it did in April 2000 determining the
commercial policy of Gasunie.

50. Thirdly, SEP argues that there is a contradiction in the reasoning of the Court of First Instance. In the
first part of paragraph 56 of the judgment the Court interprets Article 20 of Regulation No 17 as
prohibiting one section of an administrative authority from sending a document to another; in the second
part of the same paragraph the Court assumes that the document may properly come to the notice of that
other section but that that does not pose any problem since the section in question would be prohibited
from making use of the document.

51. Fourthly, SEP contends that the Court was wrong to state that the same problem will arise whenever
the Commission's investigation concerns the commercial relations between a private undertaking and a
public undertaking. According to SEP, the problem will only arise when the competent authority within the
meaning of Regulation No 17 is the same as the authority which determines the policy of the public
undertaking.

52. Fifthly, the Court's judgment is insufficiently reasoned because it took no account of SEP's argument
to the effect that the Commission infringed the principle of proportionality by immediately demanding
disclosure of the Statoil contract instead of first addressing questions to SEP.

53. Sixthly, SEP argues that the Court's judgment was insufficiently reasoned in so far as the Court
wrongly considered SEP's argument to be founded on a risk that the Dutch authorities would commit a
breach of confidence. SEP insists that its argument was that the Statoil contract might find its way
legitimately into the hands of officials of the Directorate General for Energy. In Dutch law there is nothing
to prevent officials who work for the same minister from communicating freely with each other if the
minister so desires.

54. On the issue of confidentiality, which emerges as the central issue in this case, a difficulty arises which
is fundamental to the entire argument, but which it is convenient to mention at this point. In my view, it
might have been questioned whether SEP could rely on the issue of confidentiality at all in challenging the
Commission's decision, since, as I observed earlier, (4) SEP did not raise the issue with the Commission
until after that decision was taken. Consequently, the Commission had no opportunity to deal with the
issue in setting out the reasons for its decision. However, the Commission did not object to the issue
being raised before the Court of First Instance, nor has it objected to the issue being raised in this appeal.
In those circumstances I think that it is appropriate to deal with it.

55. It cannot be doubted that SEP has a legitimate interest in ensuring that the Statoil contract is not seen
by the officials within the Dutch Ministry of Economic Affairs who are responsible for determining Gasunie's
commercial policy. Gasunie is SEP's main supplier. Statoil is its leading alternative supplier. SEP's
negotiating position vis-à-vis Gasunie would obviously be compromised if those who determine Gasunie's
commercial policy were familiar with the precise terms of business offered to SEP by Statoil.

56. The factual situation in the present case is atypical in so far as the two principal suppliers of the
undertaking which has been asked to disclose documents by the Commission are both State enterprises,
one of them being controlled by the government of a Member State. The authors of Regulation No 17 do
not appear to have had in mind that type of situation when they drafted the regulation, the terms of
which assume that the national authorities are entitled to receive any information disclosed to the
Commission by undertakings whose affairs are being investigated.

57. In my view, the regulation should not be construed so as to have the effect of granting a particular
national authority access to confidential information which, for imperative reasons of business secrecy,
should not be divulged to that authority. Any other interpretation of Regulation No 17 would be
incompatible with Article 214 of the Treaty, which requires the institutions and their servants "not to
disclose information of the kind covered by the obligation of professional secrecy, in particular information
about undertakings, their business relations or their cost components".

58. The Court of First Instance took the view that Article 20(2) of Regulation No 17 provides a satisfactory
solution to the problem alluded to above. That provision, which implements Article 214 of the Treaty, (5)
requires the Commission and the competent authorities of the Member States "not to disclose information
acquired by them as a result of the application of the regulation and of the kind covered by the obligation
of professional secrecy". The Court of First Instance did not construe that provision as prohibiting the
Commission from disclosing confidential documents to national authorities; instead it considered that,
since Article 20(2) imposed an obligation to respect professional secrecy not only on the Commission but
also on the "competent authorities of the Member States", that provision prevented one branch of the
Dutch Ministry of Economic Affairs from disclosing the Statoil contract to another branch of the same
ministry.

59. What this means in practice is as follows: The Directorate General for Competition in the Ministry of
Economic Affairs is the competent Dutch authority for the purposes of Regulation No 17 and is therefore
entitled, under Article 10(1), to receive documents lodged with the Commission for the purpose of
establishing infringements of the competition rules of the Treaty. The Directorate General for Energy in

the same inasmuch as it is not itself at that moment one of the addressees of the documents; it is not entitled to receive such documents. The Directorate General for Competition would be prohibited by Article 20(2) of Regulation No 17 from disclosing the Statoil contract to the Directorate General for Energy in view of its confidential nature.

60. I do not find the reasoning followed by the Court of First Instance on this point wholly convincing. In the first place, it is not clear that the Directorate General for Energy is not part of the competent authority in the Netherlands for the purposes of Article 10(1) of Regulation No 17. It is for the national law of each Member State to determine which of its authorities is entitled to receive information from the Commission under Article 10(1). SEP asserts in its reply that in the Netherlands the competent authority for competition matters is the Ministry of Economic Affairs acting in conjunction with whatever other ministry is concerned by the case in question. SEP also asserts in its reply that in the event of an investigation into competition in the energy sector the Directorate General for Energy at the Ministry of Economic Affairs would be involved. Those assertions, for which there is some support in an article by Professor K.J.M. Mortelmans, (6) were not challenged by the Commission in its rejoinder.

61. But let us suppose, for the sake of argument, that the somewhat technical argument about the meaning of the term "competent authorities" in Article 10(1) of Regulation No 17 is resolved in the sense contrary to SEP's assertion (i.e. in the sense that, in the Netherlands Ministry, only the Directorate General for Competition is entitled, as "competent authority", to receive documents from the Commission under Article 10(1)). It still remains difficult to see how Article 20(2) of Regulation No 17 can guarantee de facto that the terms of the Statoil contract will not be disclosed to officials of the Directorate General for Energy. Professor Mortelmans remarks that there are no "Chinese walls" in the Dutch Ministry of Economic Affairs. (7) Internal rotation of staff takes place and it is therefore possible for an official who had access to confidential documents while assigned to the Directorate General for Competition to be posted to the Directorate General for Energy, where he might find himself helping to determine the commercial policy of Gasunie. Thus even if we assume that the utmost propriety is observed by the officials concerned and that no breach of confidence takes place, it is possible for the Statoil contract to come into the wrong hands through perfectly legitimate channels.

62. The Court of First Instance sees a solution to that problem in Article 20(1) of Regulation No 17, which provides that "information acquired as a result of the application of Articles 11, 12, 13 and 14 shall be used only for the purpose of the relevant request or investigation". But I do not see how that provision can confer on SEP the protection to which it is entitled in the present case. To say that the officials in the Directorate General for Energy would be precluded by Article 20(1) from "using" information contained in the Statoil contract for the purpose of formulating the commercial policy of Gasunie is futile; it presupposes that those officials can simply erase the information from their minds. Article 20(1) does not, and could not, require officials to engage in self-induced amnesia. The Court of Justice recognized that in its judgment in Asociación Española de Banca Privada. (8)

63. In that case the Court recognized that the national authorities may take into account information acquired by them under Article 10(1) of Regulation No 17 for the purpose of deciding whether to initiate a procedure under national law, but that those authorities may not rely on such information in the context of a preliminary investigation or to justify a decision taken on the basis of provisions of competition law. It is clear from that judgment that the prohibition contained in Article 20(1) is aimed primarily at reliance on the information in question for evidential purposes in administrative or judicial proceedings; Article 20(1) does not prohibit national authorities from having regard to information when deciding whether to adopt a particular course of action. Thus, if officials in the Directorate General for Energy became acquainted with the terms of the Statoil contract, Article 20(1) could not prevent them from taking such information into account when determining the policy of Gasunie.

64. It follows that the judgment of the Court of First Instance must, in my view, be quashed on the ground that that Court committed an error of law by holding that, in the circumstances of the present case, Article 20(1) and (2) provided a sufficient guarantee that the confidentiality of the Statoil contract would be respected.

65. In view of that finding I shall not examine in detail all the remaining arguments pleaded by SEP. I shall however consider the argument, advanced by SEP as part of its eighth and final ground of appeal, that the Commission infringed the principle of proportionality by immediately demanding disclosure of the Statoil contract instead of first taking steps less detrimental to SEP's interests, such as asking questions.

66. The Commission contends that that argument is inadmissible, in accordance with Article 113(2) of the Rules of Procedure, since it modifies, at the appeal stage, the subject-matter of the proceedings before the Court of First Instance. According to the Commission, the argument was not raised by SEP before the Court of First Instance, which explains why the Court did not refer to it in its judgment. In SEP's view, the argument is simply an amplification of the submission alleging an infringement of the principle of proportionality, which was pleaded in its application to the Court of First Instance. SEP contends that such an amplification in the course of the proceedings is permissible according to the case-law of the Court of Justice. (9)

Case 1:06-mc-10061-MLW     Document 27     Filed 04/11/2006     Page 10 of 17

67. The argument does not seem to have been raised expressly in SEP's written pleadings before the Court of First Instance. In its appeal SEP states that it made the point at the hearing before the Court of First Instance, at which stage a new issue could not of course be raised. (10) In my view, the argument that the Commission could have attained the desired aim by less drastic means than those employed may legitimately be regarded as amplification of the argument based on an infringement of the principle of proportionality, rather than as a new issue. Since the argument about the confidentiality of the Statoil contract was presented as an issue of proportionality, it was implicit in that argument that the result pursued by the Commission could be obtained by other means less likely to lead to a breach of confidentiality. The Court's failure to consider the issue of alternative means can perhaps be explained by its conviction that the danger of a breach of confidentiality was in any event minimal on account of the terms of Article 20 of Regulation No 17.

68. In my view, there is much merit in the substance of SEP's complaint. By reason of the confidential nature of the Statoil contract and having regard to the unusually delicate situation that arose in this case, the Commission should - once the issue of confidentiality had been brought to its notice - have shown a greater willingness to allay SEP's fears and to consider means of preventing confidential information from reaching officials in the Directorate General for Energy of the Dutch Ministry of Economic Affairs. Once SEP had made clear its legitimate concern about the confidentiality of the contract, the Commission should have made it clear that it would apply Article 10(1) of Regulation No 17 in such a way as to meet that concern. It was not sufficient to suggest that the contract might prove not to be among "the most important documents" which are, under that provision, to be transmitted to the national authorities, or that the Commission had a margin of appraisal in the matter.

69. However I do not think that SEP can be right in suggesting that the Commission should have refrained from requiring production of the contract and instead should, for example, have asked questions about it. That suggestion seems to be based on an incorrect view of the effect of Article 10(1) of Regulation No 17. In my view, in cases (which will probably be rare) where the need for commercial confidentiality is established vis-à-vis the national authorities, then the protection of that confidentiality must be regarded not as a limitation on the Commission's power to require the production of documents under Article 11 of Regulation No 17, but as a limitation on the Commission's obligation, under Article 10(1) of the regulation, to transmit documents to the national authorities. Article 10(1) does not impose an absolute obligation to send "the most important documents" to the national authorities. It must be interpreted in the light of the duty of confidentiality laid down in Article 214 of the Treaty. It cannot therefore be interpreted as imposing on the Commission a duty to commit a breach of confidentiality.

70. Nor does the purpose of Article 10(1) require that it should be so interpreted. The purpose of that provision is explained in the seventh recital in the preamble to the regulation, according to which the Commission, in applying Articles 85 and 86 of the Treaty, is to act in close liaison with the competent authorities of the Member States. In Asociación Española de Banca Privada the Court noted (in paragraph 34) that the twin concerns of Article 10(1) are to inform Member States of Community procedures concerning undertakings situated within their territory and to ensure that the Commission is better informed by enabling it to compare the information given by undertakings with information and comments supplied by the Member State concerned. There is no reason to believe that the pursuit of those aims cannot be reconciled with the protection of confidentiality.

71. In my view, in the rare cases where the problem of confidentiality vis-à-vis the national authorities arises, the Commission is entitled to require production of the document but must then consider whether on grounds of confidentiality it would be appropriate to refrain from transmitting the document to the national authorities or to transmit to them an edited version of the document from which the confidential information is deleted. If all other means fail, and if transmission of the entire document seems essential, then the Commission could take a decision setting out the reasons why, notwithstanding the alleged confidentiality, the document should be sent to the national authorities; such a decision would enable the parties affected to challenge the decision and if necessary seek interim measures. But protection of the type of confidentiality claimed in this case cannot in principle be invoked as a limitation on the Commission's power to require production of documents. That would be to protect such confidentiality at the wrong point. An undertaking could perhaps justify refusing to produce a document to the Commission on the ground that it contains information which is confidential vis-à-vis the national authorities if the Commission had made it clear in advance that it would transmit the document regardless: that would show that the Commission intended to act unlawfully by failing to apply the principle of proportionality. That principle requires that the undertaking's interest in confidentiality must be given due weight against the public interest in the documents being seen in their entirety by the national authorities.

72. It is not contended by SEP that the Commission acted unlawfully in the way which, I have suggested, might have entitled SEP to refuse to produce the contract. Nor has the case been argued on the basis of Article 10(1) of Regulation No 17, which seems to me to provide the solution to the problem raised. Since, on the view I take, the judgment of the Court of First Instance must be quashed, and since the approach which I advocate is different from the approach taken by the parties throughout the course of the dispute,

*it seems to me formally necessary that the case should be referred back to the Court of First Instance for judgment under Article 54 of the Statute. From a practical point of view, however, any further proceedings may be unnecessary: on the view I take, the Commission will have established its right to require production of the document in question, while SEP will have established its right to protection, as against the national authorities, of commercially confidential information the disclosure of which could be damaging to it. Any further proceedings, therefore, might be a waste of time and resources, both for the parties and for the Courts.*

*Costs*

*73. Since the case must be referred back to the Court of First Instance, costs must be reserved. If a decision on costs were to be taken at this stage, I would consider it appropriate in all the circumstances to order the parties to bear their own costs, in accordance with Articles 69(3) and 122 of the Rules of Procedure.*

*Conclusion*

*74. Accordingly, I am of the opinion that the Court should:*

*1. quash the judgment of the Court of First Instance of 12 December 1991 in Case T-39/90;*

*2. refer the case back to the Court of First Instance;*

*3. reserve the costs.*

*(*) Original language: English.*

*(1) - OJ, English Special Edition 1962, p. 87.*

*(2) - [1991] ECR II-1497.*

*(3) - In paragraph 27 of its judgment the Court of First Instance cites this part of the letter of 6 March 1990 and indicates that it construes the words those agreements as referring exclusively to agreements between SEP and Gasunie. It seems clear, however, that the Commission was referring to the cooperation code and to the Statoil contract.*

*(4) - See paragraphs 6 and 7.*

*(5) - Case C-67/91 Asociación Española de Banca Privada [1992] ECR I-4785.*

*(6) - K.J.M. Mortelmans, Het Ministerie van Economische Zaken: gasbeleid en EEG-mededingingsrecht, Ars Aequi 1992, p. 277, at pp. 281 and 282.*

*(7) - Op. cit. (note 6), at p. 281.*

*(8) - Cited in note 5 above, paragraph 39 of the judgment; see also paragraph 26 of my Opinion in that case.*

*(9) - Case 306/81 Verros v Parliament [1983] ECR 1755.*

*(10) - Article 48(2) of the Rules of Procedure of the Court of First Instance.*



## 61992J0036

**Judgment of the Court (Fifth Chamber) of 19 May 1994. - Samenwerkende Elektriciteits-Produktiebedrijven (SEP) NV v Commission of the European Communities. - Competition - Administrative procedure - Decision requiring an undertaking to provide information - Necessary information - Principle of proportionality and Member States' obligation to observe professional secrecy. - Case C-36/92 P.**

*European Court reports 1994 Page I-01911*
*Swedish special edition Page I-00155*
*Finnish special edition Page I-00191*

<table>
Summary
Parties
Grounds
Decision on costs
Operative part
</table>

Summary
Parties
Grounds
Decision on costs
Operative part

## Keywords

++++

*1. Competition ° Administrative procedure ° Information obtained by the Commission pursuant to Regulation No 17 ° Transmission to the competent authorities of the Member States ° Observance of professional secrecy ° Obligation on the authorities of the Member States to observe the confidentiality of the information transmitted by the Commission ° Extent ° Limits*

*(Council Regulation No 17, Arts 10 and 20)*

*2. Appeals ° Pleas in law ° Grounds of a judgment disclosing a breach of Community law ° Operative part well founded for other reasons of law ° Dismissal*

*3. Competition ° Administrative procedure ° Protection of business secrets ° Whether valid as against the national authorities ° Powers of assessment of the Commission ° Rights of the undertaking concerned ° Right to effective judicial protection ° Possibility of relying on the protection of business secrets against a decision ordering a document to be produced to the Commission ° None*

*(EEC Treaty, Art. 214; Council Regulation No 17, Arts 10, 11 and 20)*

## Summary

*1. Although, in the context of the procedure for the application of the rules on competition, the Commission is obliged under Article 10 of Regulation No 17 to transmit to the competent authorities of the Member States copies of the most important documents lodged with it, those authorities are obliged under Article 20 of that regulation not to disclose information which is acquired by them as a result of the application of that regulation and which is of the kind covered by the obligation of professional secrecy. That prohibition of disclosure does not, however, guarantee that the information in question will not be taken into consideration by the authorities which receive it or their officials who learn of it in the performance of their duties. The procedural safeguard given to undertakings by the fact that the authorities cannot use the information received by them for a purpose other than that for which it has been obtained may not go so far as to call for the information transmitted to be actually ignored.*

*In a case where the Commission has ordered the production of a contract between undertakings and where the Member State to which it is to be communicated is the supervisory authority of a third undertaking which is a competitor of one of the undertakings which are parties to the contract, the restriction imposed by Article 20 of the regulation on the use of the information received could not avert*

the increasing consequences of their commercial policy or the terms of their various contracts. The national authorities who had legitimately consulted the contract could not effectively be required to disregard those terms if it fell to them to determine the commercial policy of the competing undertaking supervised by them. Article 20 therefore does not constitute an effective safeguard for the undertaking in question.

2. If the grounds of a judgment of the Court of First Instance disclose a breach of Community law but the operative part appears well founded for other reasons of law, the appeal must be dismissed.

3. Although, in the context of the procedure for the application of the rules on competition, the Commission is obliged under Article 10 of Regulation No 17 to transmit to the competent authorities of the Member States copies of the documents it considers to be the most important of those lodged with it, that obligation may be limited by the general principle of the right of undertakings to protection of their business secrets, a principle which finds expression in Article 214 of the Treaty and in various provisions of the said regulation. That may be the case where an undertaking raises before the Commission the confidential nature of a document as against the competent national authorities and that argument is not irrelevant.

Consequently, it is for the Commission to judge whether or not a particular document contains business secrets. After giving the undertaking an opportunity to state its views, it is required to adopt a decision in that connection which contains an adequate statement of the reasons on which it is based and which must be notified to the undertaking concerned. Having regard to the extremely serious damage which could result from the improper communication of documents, if the Commission wishes to transmit a document to the national authorities notwithstanding the claim that that document is of a confidential nature with respect to those authorities, it must, before implementing its decision, give the undertaking an opportunity to bring an action before the Court with a view to having the assessments made reviewed by it and to preventing the contested disclosure.

It is therefore in an action for the annulment of such a decision, and not in an action brought against the decision under Article 11 of the regulation ordering the document to be produced to the Commission, that the undertaking might effectively rely on its right to protection of its business secrets, since the obligation to produce the document does not necessarily mean that it can be transmitted to the competent national authorities.


## Parties

In Case C-36/92 P,

Samenwerkende Elektriciteits-produktiebedrijven NV ("SEP"), a Netherlands company whose registered office is at Arnhem, represented by M. van Empel and O.W. Brouwer, of the Amsterdam Bar, with an address for service in Luxembourg at the Chambers of M. Loesch, 11 Rue Goethe,

appellant,

APPEAL against the judgment of the Court of First Instance of the European Communities of 12 December 1991 in Case T-39/90 SEP v Commission [1991] ECR II-1497, seeking to have that judgment set aside,

the other party to the proceedings being:

Commission of the European Communities, represented by B.J. Drijber, of its Legal Service, acting as Agent, with an address for service in Luxembourg at the office of Georgios Kremlis, of its Legal Service, Wagner Centre, Kirchberg,

THE COURT (Fifth Chamber),

composed of: J.C. Moitinho de Almeida, President of the Chamber, R. Joliet, G.C. Rodríguez Iglesias (Rapporteur), F. Grévisse and M. Zuleeg, Judges,

Advocate General: F.G. Jacobs,

Registrar: R. Grass,

having regard to the report of the Judge-Rapporteur,

after hearing the Opinion of the Advocate General at the sitting on 15 December 1993,

gives the following

Judgment


## Grounds

*1 By application lodged at the Court Registry on 12 February 1992 SEP appealed, pursuant to Article 49 of the Statute of the Court of Justice of the EEC, against the judgment of the Court of First Instance of 12 December 1991 in Case T-39/90 SEP v Commission [1991] ECR II-1497 in so far as it dismissed SEP's application and ordered it to pay the costs.*

*2 In its judgment the Court of First Instance found as follows (paragraphs 2 to 9):*

*- SEP is a limited company comprising the four Netherlands public electricity-generating utilities. About 50% of the electricity produced in the Netherlands is made from natural gas.*

*- Nederlandse Gasunie NV (hereinafter "Gasunie") has a de facto monopoly in the Netherlands of the supply of natural gas. The Netherlands State owns 50% of it directly or indirectly. Fundamental decisions on Gasunie's sales policy are subject to approval by the Minister for Economic Affairs.*

*- On 16 June 1989 SEP for the first time concluded a contract for the supply of gas with a supplier other than Gasunie, namely the Norwegian undertaking Statoil ("the Statoil contract").*

*- Following the conclusion of the Statoil contract, Gasunie agreed a code of cooperation with SEP on 9 April 1990, with the aim of providing in the future against any unforeseen consequences which might arise from the subsequent conclusion between SEP and third parties of contracts for the supply of gas.*

*- The conclusion of the Statoil contract and the negotiations between SEP and Gasunie on the code of cooperation came to the knowledge of the Commission, which opened an investigation, pursuant to Article 11 of Council Regulation No 17 of 6 February 1962, First Regulation Implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87, hereinafter "Regulation No 17"), to establish whether the agreements or concerted practices between SEP and Gasunie relating to the supply of gas were compatible with the competition rules of the EEC Treaty, in particular Article 85.*

*- In a letter of 6 March 1990 the Commission requested SEP to produce to it inter alia the code of cooperation with Gasunie and the Statoil contract. SEP produced the code of cooperation but not the Statoil contract.*

*- The Commission then adopted the decision of 2 August 1990 relating to a proceeding under Article 11(5) of Council Regulation No 17 (IV/33.539 - SEP/Gasunie, hereinafter "the decision"). The decision required SEP to send to the Commission within 10 days the Statoil contract and the correspondence relating to it.*

*- SEP raised the issue of the confidential nature of the Statoil contract. The Commission argued that the confidential nature of the contract could not justify the refusal to produce it, in view of the obligation of professional secrecy binding on the Commission under Article 20 of Regulation No 17; SEP replied that it was concerned above all about the Netherlands State, in that Article 10 of Regulation No 17 provides that the Commission is to transmit forthwith to the competent authorities of the Member States copies of the most important documents lodged with the Commission.*

*3 Attempts to reach a settlement of the dispute were unsuccessful, and on 26 September 1990 SEP brought an action against the decision of 2 August 1990. That action was concluded by the judgment under appeal.*

*4 Concurrently with that action SEP made an application for interim measures. That application was dismissed by an order of the President of the Court of First Instance of 21 November 1990 (T-39/90 R SEP v Commission [1990] ECR II-649). SEP brought several appeals against that order, but withdrew them following the Commission's undertaking not in any way to communicate the contents of the Statoil contract to the authorities of the Member States until the Court of First Instance had given judgment on SEP's application for annulment (order of the President of the Court of Justice of 3 May 1991 in Cases C-372/90 P, C-372/90 P-R and C-22/91 P [1991] ECR I-2043, paragraph 7).*

*5 The appellant puts forward eight grounds of appeal.*

*6 The first ground of appeal is that there was an infringement of Article 11(1) of Regulation No 17 in that the Court of First Instance interpreted "necessary information" which the Commission could request as meaning merely that there had to be "a correlation between the request for information and the putative infringement".*

*7 The second ground of appeal is that the Court of First Instance did not give adequate and correct reasons for its finding that Article 11 of Regulation No 17 had not been infringed by the Commission.*

*8 The third ground of appeal is that there was an infringement of Article 12 of Regulation No 17, which relates to inquiries into sectors of the economy, in that the Court of First Instance did not accept that the Commission's inquiry should have been based on that article, even though the Commission expressly admitted that it was inquiring into the Dutch gas market.*

*9 The fourth ground of appeal is that there was an infringement of Article 190 of the EEC Treaty in that the Court of First Instance declared that the Commission's decision of 2 August 1990 was adequately reasoned.*

*10 The fifth ground of appeal is that the Court of First Instance did not give correct and adequate reasons*

*11 The sixth ground of appeal is that there was an infringement or misinterpretation of Article 20 of Regulation No 17.*

*12 SEP considers that, contrary to what was held by the Court of First Instance, that article does not prohibit transmission of the information to other departments by the department which receives the communication from the Commission. The safeguard which the Court of First Instance took into account in concluding that the Commission had not infringed the principle of proportionality does not exist. In SEP's opinion, the Court of First Instance thus deprived itself of the possibility of correctly applying the principle of proportionality.*

*13 SEP states, without being contradicted by the Commission, that the Directorate General for Energy in the Ministry of Economic Affairs, which deals with Gasunie, forms part of the "competent authorities" in the Netherlands with respect to matters such as this one which fall within the energy sector, that the Ministry of Economic Affairs rotates its staff, with the consequence that officials in charge of competition cases are abruptly moved to other departments, and that higher ranking officials coordinate competition policy and energy policy.*

*14 The seventh ground of appeal is that there was an infringement of Article 20(1) of Regulation No 17.*

*15 SEP argues that the Court of First Instance committed an error of law by interpreting that provision as containing a general prohibition on using the information obtained pursuant to Regulation No 17 otherwise than for the purposes of the application of Articles 85 and 86 of the Treaty. In SEP's opinion that prohibition is not so extensive and applies only to the Commission. SEP adds that if the competent authority in question merely benefits from the information received from the Commission, without taking action against the undertaking concerned, that does not constitute "use" as referred to in that provision.*

*16 The eighth ground of appeal is that the reasons given in the judgment by the Court of First Instance for finding that the Commission, when adopting the decision, had not infringed the principle of proportionality were inadequate.*

*17 Firstly, SEP criticizes the contradiction which it claims to find in the judgment between the Court's interpretation of Article 20, to the effect that a department regarded as the competent authority within the meaning of Regulation No 17 cannot communicate the information which it receives to another department, and the Court's argument to the effect that that information can circulate without causing problems since the recipient cannot use it in any other way.*

*18 Secondly, SEP disagrees with the statement in the judgment that the problem raised in the present case will recur whenever an inquiry by the Commission concerns the commercial relations between a private undertaking and a public undertaking. According to SEP, the problem will in fact recur whenever the competent authority within the meaning of Regulation No 17 is the same as the authority which determines the policy of the public undertaking in question. SEP therefore criticizes the finding by the Court of First Instance that there can be no derogation from the obligations of the Member States, which are laid down in general and absolute terms in Article 20.*

*19 Thirdly, SEP complains that the Court of First Instance did not address the argument that there was a breach of the principle of proportionality in that the Commission immediately demanded the Statoil contract instead of first asking questions.*

*20 Fourthly, SEP considers that the Court of First Instance was wrong to regard its argument as based on a risk that the Dutch authorities might commit a breach of business secrecy. SEP states that on the contrary it always argued that once it had communicated the Statoil contract to the Commission, there would be no rule of law to prevent it from finding its way to the persons who determine Gasunie policy.*

*The first five grounds of appeal*

*21 For the reasons stated in paragraphs 21 to 42 of the Advocate General's Opinion, the first, second, third, fourth and fifth grounds of appeal must be rejected as unfounded.*

*The sixth, seventh and eight grounds of appeal*

*22 In these grounds of appeal, which may be taken together, SEP contests the conclusion of the Court of First Instance that Article 20 of Regulation No 17 provides an effective safeguard against the disproportionate damage allegedly caused it by the Commission's decision.*

*23 SEP argued before the Court of First Instance (paragraph 41 of the judgment) that the Statoil contract was of a particularly confidential nature and that, since Article 10(1) of Regulation No 17 provides for the transmission by the Commission to the competent authorities of the Member States, including the Netherlands, of "the most important documents lodged with the Commission", it would suffer damage in that the persons who direct the commercial policy of Gasunie, its principal supplier of gas, would be able by means of the Statoil contract to learn the terms of business granted by Statoil.*

*24 In reply to that argument, the Court of First Instance held that "the restrictions imposed on Member States by Article 20 of Regulation No 17, as regards both the disclosure and the use of information sent to*

*there, pursuant to Article 20(1), which regulates in strict and adequate terms the use of information obtained pursuant to that regulation. It concluded for these reasons* that the contested decision, whereby the Commission calls for the disclosure by it of the Statoil contract, does not involve the excessive risk alleged by [SEP] and does not therefore infringe the principle of proportionality" (paragraph 60 of the judgment).

25 In reaching the conclusion that Article 20 provides an adequate safeguard, the Court of First Instance held (paragraph 55) that:

"The protection provided by Article 20 is twofold. First, paragraph 2 of that article prohibits the disclosure of information acquired as a result of the application of Regulation No 17 and of the kind covered by the obligation of professional secrecy. Secondly, Article 20(1) prohibits the use of information acquired as a result of the application of Regulation No 17 for any purpose other than that for which it has been requested. Those two safeguards, which are of a complementary nature, are intended to ensure the confidential treatment of information transmitted to Member States as a result of the application of Article 10(1) of Regulation No 17."

26 The Court of First Instance thus held, in paragraph 56, that the twofold protection provided by Article 20 prohibited national officials not only from disclosing the contents of the Statoil contract but also from "using the information contained in it in order to establish the commercial policy pursued by certain public undertakings".

27 It should be noted that according to Article 20(2) the competent authorities of the Member States, their officials and other servants are required not to disclose information which is acquired by them as a result of the application of Regulation No 17 and which is of the kind covered by the obligation of professional secrecy (judgment in Case C-67/91 Dirección General de Defensa de la Competencia v Asociación Española de Banca Privada and Others [1992] ECR I-4785, paragraph 21). That prohibition of disclosure does not, however, guarantee that the information in question will not be taken into consideration by the authorities which receive it or the officials who learn of it in the performance of their duties.

28 As regards Article 20(1), which states that "information acquired as a result of the application of Articles 11, 12, 13 and 14 [of Regulation No 17] shall be used only for the purpose of the relevant request or investigation", the Court of Justice held in its judgment in Asociación Española de Banca Privada (cited above, paragraph 37) that professional secrecy involves the need for authorities lawfully in possession of information to be unable to use it for a reason other than that for which it has been obtained. It concluded (paragraph 42) that such information may not be relied on by the authorities of the Member States either in a preliminary investigation procedure or to justify a decision based on provisions of competition law.

29 The procedural safeguard thus given to undertakings may not, however, go so far as to call for the information transmitted to be actually ignored by the national authorities. Thus the Court also held in that judgment that the authorities of the Member States were not required to ignore the information disclosed to them and thereby suffer "acute amnesia"; that information constituted circumstantial evidence which might, if necessary, be taken into account in order to justify the initiation of a national procedure (paragraph 39).

30 In the present case the restriction imposed by Article 20(1) on the use of the information received could not avert the irreversible consequences of the mere fact that a supplier (or its supervisory authority) has knowledge of the terms of business accorded to its customer by a rival supplier. Thus in the present case the Dutch authorities and officials who had legitimately consulted the Statoil contract transmitted by the Commission could not effectively be required to disregard the terms granted by Statoil to SEP, if it fell to them to determine the commercial policy of Gasunie.

31 Whichever paragraph is referred to, Article 20, contrary to what was held by the Court of First Instance, therefore does not prevent the use of that information in connection with the determination of the commercial policy of Gasunie, with the possible consequence that damage might be caused to SEP. That article therefore does not constitute an effective safeguard for SEP.

32 By interpreting Article 20 as it did, the Court of First Instance therefore infringed Community law.

33 It does not necessarily follow that the appeal must be upheld. As the Court of Justice held in its judgment in Case C-30/91 P Lestelle v Commission [1992] ECR I-3755 (paragraph 28), if the grounds of a judgment of the Court of First Instance disclose a breach of Community law but the operative part appears well founded for other reasons of law, the appeal must be dismissed.

34 In the appeal, the appellant wrongly assumes that Article 10 of Regulation No 17, which states that "the Commission shall forthwith transmit to the competent authorities of the Member States ... copies of the most important documents lodged with the Commission ...", obliges the Commission automatically to transmit the Statoil contract to the Netherlands authorities.

35 Firstly, the wording of Article 10 itself gives the Commission power to determine which are the most important documents, with a view to transmitting them to the authorities of the Member States.

*36 Secondly, Article 10(1) must be interpreted in the light of the general principle of the right of undertakings to the protection of their business secrets, a principle which finds expression in Article 214 of the Treaty and various provisions of Regulation No 17, such as Articles 19(3), 20(2) and 21(2) (see the judgment in Case 53/85 AKZO Chemie v Commission [1986] ECR 1965, paragraph 28).*

*37 In cases such as the present one where an undertaking has expressly raised before the Commission the confidential nature of a document as against the competent national authorities, on the ground that it contains business secrets, and where that argument is not irrelevant, the general principle of the protection of business secrets, referred to above, may limit the Commission's obligation under Article 10 (1) to transmit the document to the competent national authorities.*

*38 In proceedings between the Commission and an undertaking relating to the communication by the Commission to a third party who had submitted a complaint of documents which the undertaking claimed were of a confidential nature, the Court held that it is for the Commission to judge whether or not a particular document contains business secrets. After giving an undertaking an opportunity to state its views, the Commission is required to adopt a decision in that connection which contains an adequate statement of the reasons on which it is based and which must be notified to the undertaking concerned. Having regard to the extremely serious damage which could result from improper communication of documents to a competitor, the Commission must, before implementing its decision, give the undertaking an opportunity to bring an action before the Court with a view to having the assessments made reviewed by it and to preventing disclosure of the documents in question (AKZO Chemie v Commission, cited above, paragraph 29).*

*39 In the present case, analogous considerations require the Commission, if it wishes to transmit a document to the competent national authorities, notwithstanding the claim that in the particular circumstances of the case that document is of a confidential nature with respect to those authorities, to adopt a properly reasoned decision amenable to judicial review by means of an action for annulment.*

*40 It is in an action for the annulment of such a decision that SEP might effectively rely on its right to protection of its business secrets.*

*41 It follows that the obligation to produce the Statoil contract, imposed on SEP by the contested decision, does not necessarily mean that the contract can be transmitted to the Netherlands authorities.*

*42 Accordingly, notwithstanding legally defective reasoning, the judgment under appeal rightly rejected the plea alleging breach of the principle of proportionality.*

*43 The appeal must therefore be dismissed in its entirety.*

## Decision on costs

*Costs*

*44 Under Article 69(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the appeal has been dismissed, the appellant ought to be ordered to pay all the costs. However, as examination of the judgment under appeal has disclosed an error of law pleaded by the appellant in its appeal, the parties should be ordered to bear their own costs, pursuant to Article 69(3).*

## Operative part

*On those grounds,*
*THE COURT (Fifth Chamber)*
*hereby:*
*1. Dismisses the appeal;*
*2. Orders the parties to bear their own costs.*

# EXHIBIT C



# 61998A0112

**Judgment of the Court of First Instance (First Chamber, extended composition) of 20 February 2001. - Mannesmannröhren-Werke AG v Commission of the European Communities. - Action for annulment - Competition - Decision to request information - Periodic penalty payments - Right to refuse to provide answers that imply admission of an infringement - Convention for the Protection of Human Rights and Fundamental Freedoms. - Case T-112/98.**

*European Court reports 2001 Page II-00729*

Summary
Parties
Grounds
Decision on costs
Operative part

## Keywords

*1. Community law - Principles - Fundamental rights - Guaranteed by the Community judicature - European Convention on Human Rights taken into account*

*(Treaty on European Union, Paragraph 2 of Art. F (now Article 6(2) EU)*

*2. Competition - Administrative proceedings - Request for information - Rights of the defence - Absolute right of silence - None - Right to refuse to provide answers that imply admission of an infringement - Questions asking an undertaking to describe the purpose of certain meetings and the decisions adopted during them - Breach of the rights of the defence*

*(EC Treaty, Art. 89 (now, after amendment, Art. 85 EC), Council Regulation No 17, Art. 11(5))*

## Summary

*1. The Court of Justice and the Court of First Instance have no jurisdiction to assess the legality of an investigation under competition law by reference to the provisions of the European Convention on Human Rights because the convention is not as such part of Community law. However, fundamental rights form an integral part of the general principles of law whose observance is ensured by the Community judicature. For this purpose, the Court of Justice and the Court of First Instance draw inspiration from the constitutional traditions common to the Member States and from the guidelines supplied by international treaties for the protection of human rights on which the Member States have collaborated and to which they are signatories. The European Convention on Human Rights has special significance in this respect. Furthermore, paragraph 2 of Article F of the Treaty on European Union (now Article 6(2) EU) provides that the Union shall respect fundamental rights, as guaranteed by the [European Convention on Human Rights] and as they result from the constitutional traditions common to the Member States, as general principles of Community law.*

*( see paras 59-60 )*

*2. An undertaking in receipt of a request for information pursuant to Article 11(5) of Regulation No 17 can be recognised as having a right of silence only to the extent that it would be compelled to provide answers which might involve an admission on its part of the existence of an infringement which it is incumbent upon the Commission to prove. To acknowledge the existence of an absolute right of silence would go beyond what is necessary in order to preserve the rights of defence of undertakings and would constitute an unjustified hindrance to the Commission's performance of its duty under Article 89 of the Treaty (now, after amendment, Article 85 EC) to ensure that the rules on competition within the common market are observed.*

Case 1:06-mc-10061-MLW    Document 27    Filed 04/11/2006    Page 3 of 13

Moreover, there is nothing to prevent the addressee of such questions or requests from showing, whether later during the administrative procedure or in proceedings before the Community courts, when exercising his rights of defence, that the facts set out in his replies or the documents produced by him have a different meaning from that ascribed to them by the Commission.

Questions whereby the Commission calls upon an undertaking to describe the purpose of meetings which it attended and the decisions adopted during them, even though it is clear that the Commission suspects that the purpose of the meetings was to arrive at agreements, in respect of selling prices, of a nature such as to prevent or restrict competition, are such that they may compel the undertaking to admit its participation in an unlawful agreement contrary to the Community rules on competition and thus breach the rights of the defence.

( see paras 66-67, 71, 73, 78 )

## Parties

In Case T-112/98,

Mannesmannröhren-Werke AG, established in Mülheim an der Ruhr (Germany), represented by M. Klusmann and K. Moosecker, lawyers, with an address for service in Luxembourg,

applicant,

v

Commission of the European Communities, represented by K. Wiedner, acting as Agent, assisted by M. Hilf, Professor, with an address for service in Luxembourg,

defendant,

APPLICATION for annulment of Commission Decision C(98) 1204 of 15 May 1998 relating to a procedure under Article 11(5) of Council Regulation No 17,

THE COURT OF FIRST INSTANCE

OF THE EUROPEAN COMMUNITIES (First Chamber, Extended Composition),

composed of: B. Vesterdorf, President, A. Potocki, A.W.H. Meij, M. Vilaras and N.J. Forwood, Judges,

Registrar: H. Jung,

having regard to the written procedure and further to the hearing on 23 May 2000,

gives the following

Judgment

## Grounds

Relevant legislation

1 Paragraphs 1, 4 and 5 of Article 11, headed Requests for information, of Council Regulation No 17 of 6 February 1962: First regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87) provide as follows:

1. In carrying out the duties assigned to it by Article 89 and by provisions adopted under Article 87 of the Treaty, the Commission may obtain all necessary information from the governments and competent authorities of the Member States and from undertakings and associations of undertakings.

...

4. The owners of the undertakings or their representatives and, in the case of legal persons, companies or firms, or of associations having no legal personality, the persons authorised to represent them by law or by their constitution shall supply the information requested.

5. Where an undertaking or association of undertakings does not supply the information requested within the time-limit fixed by the Commission, or supplies incomplete information, the Commission shall by decision require the information to be supplied. The decision shall specify what information is required, fix an appropriate time-limit within which it is to be supplied and indicate the penalties provided for in Article 15(1)(b) and Article 16(1)(c) and the right to have the decision reviewed by the Court of Justice.

2 Article 16 of Regulation No 17, entitled Periodic penalty payments, provides:

1. The Commission may by decision impose on undertakings or associations of undertakings periodic

*penalty payments of ECU 50 to ECU 1 000 units of account per day, calculated from the date adopted in the decision, in order to compel them:*

*...*

*(c) to supply complete and correct information which it has requested by decision taken pursuant to Article 11(5);*

*....*

*3 Furthermore, Article 6(1) and (2) of the Convention for the Protection of Human Rights and Fundamental Freedoms of 4 November 1950 (the Convention) provides:*

*1. In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law. ...*

*2. Everyone charged with a criminal offence shall be presumed innocent until proved guilty according to law.*

*Background*

*4 The Commission initiated an investigation procedure with respect to the applicant and other producers of steel tubes in the course of which, on a number of occasions, it carried out inspections at the premises of the applicant, amongst others.*

*5 On 13 August 1997, following those inspections, the Commission sent the applicant a request for information in which it asked questions regarding presumed infringements of the competition rules in which the applicant was thought to have taken part.*

*6 That request for information contained, inter alia, the following four questions:*

*1.6 Meetings between European and Japanese producers*

*According to the Commission's information, your firm participated in meetings between European and Japanese producers of seamless tubes. The meetings took place within the framework of what the trade calls the "Europe-Japan Club". Meetings were held at president level ("Presidents Meetings" or "P-Meetings"), at manager level ("Managers Committee" or "Managers Meetings" or "M-Meetings"), at expert level ("Experts Meetings" or "E-Meetings") and at working group level ("Working Group").*

*Please provide, for the period from 1984 to the present day:*

*- the dates, places and names of the firms participating in each of the meetings between European and Japanese seamless tube producers at president, manager, expert and working group level;*

*- the names of the persons who represented your firm at the abovementioned meetings and the travel documents (breakdown of travel costs, air tickets, etc.) of such persons;*

*- copies of all the invitations, agendas, minutes, internal memoranda, records and any other document in the possession of your firm and/or its employees concerning the abovementioned meetings;*

*- in the case of meetings for which you are unable to find the relevant documents, please describe the purpose of the meeting, the decisions adopted and the type of documents received before and after the meeting.*

*1.7 "Special Circle" meetings*

*According to the Commission's information, your firm participated in meetings between European seamless tube producers within what is called the "Special Circle".*

*Please provide, for the period from 1984 to the present day:*

*- the dates, places and names of the firms participating in each of the meetings between European and Japanese seamless tube producers at president, manager, expert and working group level;*

*- the names of the persons who represented your firm at the abovementioned meetings and the travel documents (breakdown of travel costs, air tickets, etc.) of such persons;*

*- copies of all the invitations, agendas, minutes, internal memoranda, records and any other document in the possession of your firm and/or its employees concerning the abovementioned meetings;*

*- in the case of meetings for which you are unable to find the relevant documents, please describe the purpose of the meeting, the decisions adopted and the type of documents received before and after the meeting.*

*1.8 1962 agreement*

*Between 1 January 1962 and July 1996, your firm was party to four agreements concerning OCTG and linepipe (Quota agreement for OCTG [stainless steel extraction and transport tubes], Price agreement for OCTG, Price agreement for Linepipe, Supplementary agreement). What is the relationship between these agreements and the Europe-Japan Club mentioned above and the "Special Circle"?*

*To what extent did the existence and implementation of these agreements influence the decisions adopted within the Europe-Japan Club and/or within the Special Circle?*

*To what extent did the decisions adopted within the Europe-Japan Club and/or within the Special Circle influence the implementation of the abovementioned agreements?*

*...*

*2.3 Meetings between European and Japanese producers*

*According to the Commission's information, your firm participated in meetings between European and Japanese producers of large-diameter welded tubes.*

*Please provide, for the period from 1984 to the present day:*

*- the dates, places and names of the firms participating in each of the meetings between European and Japanese large-diameter welded tube producers at president, manager, expert and working group level;*

*- the names of the persons who represented your firm at the abovementioned meetings and the travel documents (breakdown of travel costs, air tickets, etc.) of such persons;*

*- copies of all the invitations, agendas, minutes, internal memoranda, records and any other document in the possession of your firm and/or its employees concerning the abovementioned meetings;*

*- in the case of meetings for which you are unable to find the relevant documents, please describe the purpose of the meeting, the decisions adopted and the type of documents received before and after the meeting.*

*7 By letter of 14 October 1997, the applicant's lawyers replied to certain of the questions in the request for information and declined to reply to the four questions set out above. By letter of 23 October 1997, the applicant confirmed the content of the reply given by its lawyers.*

*8 In its reply of 10 November 1997, the Commission rejected the applicant's argument that it was not obliged to answer the said four questions and, on the basis of Article 11(4) of Regulation No 17, set a time-limit of 10 days from the date of receipt of its letter for answers to be given to the four questions. It added that, should the applicant fail to answer the questions within the given time, a periodic penalty payment could be imposed on it.*

*9 In a letter dated 27 November 1997 from its lawyers, the applicant reiterated its refusal to provide the information requested.*

*10 On 15 May 1998 the Commission adopted a decision pursuant to Article 11(5) of Regulation No 17 (hereinafter the contested decision), Article 1 of which provided that the applicant must, within 30 days of notification of the contested decision, reply to the four questions at issue, which were set out in an annex to the decision. Article 2 provided that should [the applicant] fail to provide the information requested in the manner specified in Article 1, a fine of ECU 1 000 per day of delay [would] be imposed on it as from the end of the period laid down in Article 1.*

*Procedure*

*11 By application lodged at the Registry of the Court of First Instance on 23 July 1998 the applicant brought the present action.*

*12 Pursuant to Article 14 of the Rules of Procedure of the Court of First Instance, and on the proposal of the First Chamber, the Court decided, after hearing the parties in accordance with Article 51 of those Rules, to refer the case to a Chamber sitting in extended composition.*

*13 Upon hearing the report of the Judge-Rapporteur, the Court (First Chamber, Extended Composition) decided to open the oral procedure.*

*14 The parties presented oral argument and their replies to the Court's questions at the hearing on 23 May 2000.*

*15 By facsimile letter received at the Registry of the Court of First Instance on 18 December 2000 the applicant asked the Court to have regard to the Charter of fundamental rights of the European Union (OJ 2000 C 364, p. 1) proclaimed in Nice on 7 December 2000 (hereinafter the Charter) in determining the present case, on the ground that the Charter constituted a new point of law concerning the applicability of Article 6(1) of the Convention to the facts of the case. In the alternative, the applicant asked for the oral procedure to be re-opened.*

*16 On being invited to submit its observations on that request, the Commission rejected the applicant's arguments by letter of 15 January 2001, contending that the Charter is of no consequence for the purpose of the determination of the present case.*

*Forms of order sought by the parties*

*17 The applicant claims that the Court should:*

*- annul the contested decision;*

*- in the alternative, annul Article 1 of the contested decision;*

*- order the Commission to pay the costs.*

*18 The Commission contends that the Court should:*

*- dismiss the action as manifestly inadmissible in so far as it seeks the annulment of Article 2 of the contested decision;*

*- dismiss the action as unfounded in so far as it seeks the annulment of Article 1 of the contested decision;*

*- order the applicant to pay the costs.*

*19 At the hearing, the Commission confirmed that it had neither the intention nor the power to enforce Article 2 of the contested decision, whereupon the applicant withdrew its claim for annulment of that article and, consequently, its pleas in relation thereto, of which formal note was taken.*

*Substance*

*20 In support of its claim for annulment of Article 1 of the contested decision, the applicant puts forward four pleas in law. It is appropriate to begin by considering together the first three of those pleas, all of which concern an alleged infringement of the rights of defence.*

*Arguments of the parties*

*The first plea*

*21 The applicant's first plea is based on the judgment of the Court of Justice in Case 374/87 Orkem v Commission [1989] ECR 3283.*

*22 The applicant argues that, whilst an undertaking is indeed required to provide the Commission with all necessary information concerning such facts as may be known to it and to disclose to the Commission, if necessary, such documents relating thereto as are in its possession, even if those documents may be used to establish, against it or another undertaking, the existence of anti-competitive conduct, that obligation, and the corresponding right of the Commission, have been made conditional by the Court of Justice on the rights of defence of the undertaking concerned not being undermined by a decision requiring the provision of information (the judgments in Orkem, paragraph 34, and in Case T-34/93 Société Générale v Commission [1995] ECR II-545, paragraph 73 et seq.). Those principles, according to the applicant, have been extended to the preliminary-investigation stage. The applicant adds that, in Orkem, the Court of Justice held that the rights of defence were undermined where the Commission not only requested factual information, but also asked questions about the purpose of a given action or the object of meetings. Thus the Court of Justice has held to be unlawful a question that might force the applicant to admit its participation in an agreement liable to prevent or restrict competition. The applicant maintains that, in the present case, the questions at issue in the contested decision have that same unlawful purpose.*

*23 The applicant submits that the unlawful nature of question 1.6 is evident, first of all, from its wording, which shows that the Commission was already in possession of factual information regarding the meetings it mentions. The unlawfulness of the question is also evident from the request made in the fourth indent thereof, which asks the applicant to describe, in the event that it does not have the relevant documents, the purpose of the meetings and the decisions adopted at them. That requirement necessarily relates to the objective of the meetings and to any unlawful content and/or purpose they may have had. Had any anti-competitive agreement or concerted practice been discussed or decided upon during the meetings, the applicant would necessarily have been led, by answering this part of the question, to make a direct admission that those participating in the meetings were pursuing an anti-competitive objective. The information furnished in response to the fourth indent of question 1.6 would also enable the Commission to interpret the answers given to the questions asked in the first three indents as confirmation of an admission of unlawful conduct. Therefore, an obligation to reply to those requests would also, in respect of each of them, lead to an infringement of the applicant's rights of defence.*

*24 The applicant submits that the same is true as regards question 1.7, which in similar terms calls for information on the aim pursued by the participants at the European seamless tube producers' meetings within the Special Circle, and on the matters discussed and decisions adopted at certain of those meetings.*

*25 Question 1.8 does not deal with fact and, given the nature of the powers conferred by Article 11(1) and (5) of Regulation No 17, this renders it unlawful. The Commission is permitted only to demand information relating to factual situations. It is not entitled to ask for opinions or value judgments, or to invite the applicant to make assumptions or draw conclusions. In the present case, the question relating to the relationship between certain legal agreements of which the Commission has copies and certain presumed infringements is concerned exclusively with appraisal of a factual situation. Furthermore, if the meetings within the Europe-Japan Club and Special Circle had an anti-competitive purpose and if there were a relationship between those meetings and the agreements known to the Commission, the Commission could be informed in regard to this only through an admission of anti-competitive conduct,*

26 As regards question 2.3, which is worded in the same way as the first two questions, the same arguments apply, mutatis mutandis, as were put forward in relation to the first two.

27 Furthermore, the applicant states that in Société Générale (at paragraph 75) the Court of First Instance did no more than observe that a question which is in principle factual does not become unlawful simply because, in order to answer it, it is necessary also to consider the interpretation of agreements that are presumed to be anti-competitive. However, it may not in any circumstances be inferred from that observation that questions designed to obtain interpretations or appraisals are always lawful and must therefore be answered. The Court of First Instance specifically stated in Société Générale that, under Article 11(5) of Regulation No 17, undertakings are only required to give purely factual answers.

28 The Commission contends that, during the preliminary-investigation procedure, undertakings are required to communicate to it all facts of which they are aware and about which the Commission has questioned them in a request for information. Undertakings are also under an obligation to send the Commission all documents relating to those facts. The purpose of that obligation is to guarantee both the effectiveness of Community law relating to restrictive agreements and practices and the maintenance of the system of competition intended by the EC Treaty, which undertakings have an absolute duty to comply with. The applicant cannot successfully set up against that obligation the rights of defence. Regulation No 17 offers undertakings certain procedural safeguards during the course of the preliminary-investigation procedure, but it does not authorise them to refrain from answering certain questions on the ground that their answers might be used to establish that they have infringed the competition rules and so constitute self-incrimination. The Commission nevertheless accepts that it cannot compel an undertaking to provide answers which might involve an admission on its part of the existence of an infringement which it is incumbent on the Commission to prove.

29 Thus, according to the Commission, all undertakings are required, on receiving a request for information, to communicate all facts which may be relevant in the light of the law relating to restrictive agreements and practices. On the other hand, they may not be questioned on the intention, aim or purpose of particular practices or measures, given that such questions might constrain them to admit infringements.

30 The Commission states that questions 1.6, 1.7 and 2.3 correspond, in large measure, to the questions which it asked in the case which gave rise to the judgment in Orkem, and which the Court held to be unobjectionable. Those questions are directed at obtaining information concerning meetings that were held, the capacity in which the participants attended them, and the disclosure of documents relating to them. Thus, all the information requested concerns objective facts and none of it implies an admission of unlawful conduct. The questions are therefore not open to criticism.

31 Question 1.8 relates to four agreements concluded by the applicant in 1962 and notified to the Bundeskartellamt (Federal Cartel Office). According to the Commission, the question is purely factual and thus lawful. It would remain so even if it also called for an interpretation of those agreements (Société Générale, paragraph 75).

32 Lastly, the Commission contends that the Court of Justice has manifestly not acknowledged the existence of any right to abstain from incriminating oneself (Orkem, paragraph 27).

The second plea, alleging infringement of Article 6(1) of the Convention

33 The applicant submits that, in procedures before it, the Commission is required to comply with Article 6 of the Convention (Case T-213/95 and T-18/96 SCK and FNK v Commission [1997] ECR II-1739, paragraphs 41, 42 and 53). The fundamental rights guaranteed by the Convention, as general principles of Community law, take precedence over the ordinary rules of law laid down by Regulation No 17. Furthermore, it is clear from the 11th recital in the preamble to the contested decision that the Commission regards itself as being obliged to comply with the Convention.

34 On the conditions governing the application of Article 6(1) of the Convention, the applicant states that the provision confers a right upon, inter alios, anyone against whom a criminal charge has been brought. Anyone should be understood as meaning both natural and legal persons (the opinion of the European Commission of Human Rights annexed to Eur. Court H. R., Stenuit judgment of 27 February 1992, Series A, no. 232-A). The applicant adds that the Court of Justice had ruled to this effect in Orkem where it expressly acknowledged that not only natural persons, but also undertakings under investigation in a competition-law matter may invoke the fundamental rights guaranteed by Article 6(1) of the Convention. The Court of Justice also implicitly acknowledged that the fact that the Commission is not a court does not constitute a valid ground for disapplying that provision.

35 An investigation procedure conducted with a view to imposing a penalty also constitutes a criminal charge within the meaning of Article 6 of the Convention (Eur. Court H. R. Öztürk judgment of 21 February 1984, Series A, no. 73, § 56). The European Commission of Human Rights, in its opinion mentioned above, adopted that approach with regard to a procedure under the law on restrictive agreements and practices, which resulted in the imposition of a fine.

Case 1:06-mc-10061-MLW    Document 27    Filed 04/11/2006    Page 9 of 13

*36 According to the applicant, the protection afforded by Article 6 of the Convention goes appreciably beyond the principles recognised in Orkem. Article 6 not only enables persons who are the subject of a procedure that might lead to the imposition of a fine to refuse to answer questions or to provide documents containing information on the objective of anti-competitive practices, but also establishes a right not to incriminate oneself by positive action.*

*37 Thus, in its judgment of 25 February 1993 in Funke (Series A, no. 256-A), the European Court of Human Rights (hereinafter the ECHR) held that any measure intended to compel a natural or legal person who is the subject of an investigation procedure to incriminate himself or itself by positive action infringes Article 6(1) of the Convention, regardless of what is laid down by the provision of national law relied upon by the administrative authority conducting the investigation.*

*38 Accordingly, not only demanding admissions as such, or disclosure of the anti-competitive purpose of certain meetings, but also applying pressure, with the threat of penalties, with a view to enabling the Commission to obtain incriminating evidence against the applicant, must be regarded as an unlawful measure. To demand, with the threat of penalties, the search for and the production of documents relating to meetings which the Commission suspects the applicant attended and which, in the Commission's view, involved illegality possibly warranting the imposition of penalties under Article 15 of Regulation No 17, has the effect of forcing the applicant to incriminate itself. The minutes, notes and documents relating to travel costs or to other aspects of the meetings whose object was, according to the Commission, contrary to Article 85 of the EC Treaty (now Article 81 EC), must be regarded as not having to be sought for or produced by the applicant.*

*39 The applicant claims that, on the basis of Article 6(1) of the Convention, it may lawfully refrain from any positive action that would compel it to give evidence directly against itself in an investigation procedure, quite independently of whether or not, in the light of the principles recognised in Orkem (which are now partially superseded), such action would lead it to supply incriminating evidence, or to admit unlawful objectives or anti-competitive designs. For this reason too, the contested decision should therefore not have been adopted.*

*40 The applicant makes seven additional points in order to demonstrate the applicability of the Convention to the present case.*

*41 Firstly, it maintains that it is clear from the judgments of the Court of Justice in Case C-299/95 Kremzow [1997] ECR I-2629, at paragraph 14, and Case C-185/95 P Baustahlgewebe v Commission [1998] ECR I-8417 that measures are not acceptable in the European Community which are incompatible with observance of the human rights recognised and guaranteed by the Convention.*

*42 Secondly, it points out that the ECHR recognised, in Funke and Öztürk, cited above, as did the European Commission of Human Rights in its opinion, mentioned above, the right not to incriminate oneself in national proceedings or in proceedings governed by Community law. The applicant adds that, in Baustahlgewebe v Commission, the Court of Justice accepted that Article 6 of the Convention is applicable in proceedings which may lead to the imposition of a fine pursuant to Regulation No 17.*

*43 Thirdly, the applicant maintains that the principles laid down in Orkem were not confirmed either in the judgment of the Court of Justice in Case C-60/92 Otto [1993] ECR I-5683 or in the judgment in Société Générale.*

*44 Fourthly, there is no foundation for the Commission's assertion that its ability to perform its role and the implementation of Community law on restrictive agreements and practices in its entirety are partly dependent upon whether or not the Commission can compel undertakings to incriminate themselves.*

*45 Fifthly, the applicant maintains that, as the Court of Justice held in Orkem, at paragraph 30, and in Baustahlgewebe v Commission, at paragraph 21, whether or not the rights guaranteed by the Convention apply is in no way dependent upon any distinction between natural and legal persons.*

*46 Sixthly, the applicant contends that, within Community law, contrary to the position taken by the Commission, the field of criminal law in the strict sense, with special rights and obligations, is not a very limited one. For the purposes of the Convention, the determination of the question whether the concept criminal charge also encompasses fines and administrative sanctions depends solely upon whether or not they are punitive in nature. That concept is taken and construed independently by the ECHR and the European Commission of Human Rights (Eur. Court H. R. Neumeister judgment of 27 June 1968, Series A, no. 8, § 18, and Öztürk, cited above, § 50). The Commission's submission that it has no criminal jurisdiction is, therefore, irrelevant to the interpretation of Article 6(1) of the Convention. According to the applicant, it follows from the foregoing that European law on restrictive agreements and practices, and its application, also come within criminal law within the meaning of the Convention.*

*47 Lastly, the applicant argues that the Commission must be regarded as a court within the meaning of Article 6(1) of the Convention.*

*48 The Commission argues, first of all, that, whilst the rights guaranteed by the Convention are a source of inspiration for the general principles of Community law and, in particular, for fundamental rights, in so*

*far as the Member States adhere to the Convention, and that the Commission refers to Article 6, in the matter of fundamental rights, which is common to all the Member States, the legality of acts of the Community institutions can nevertheless not be appraised by direct reference to the Convention. The contested decision cannot, therefore, have been adopted in breach of Article 6 of the Convention.*

*49 Furthermore, the Commission acknowledges that the ECHR has held that, pursuant to Article 6 of the Convention, anyone who is examined, within the meaning of the Convention, is entitled to maintain silence or to decline to give evidence against himself. Notwithstanding this, the Commission puts forward five arguments in order to show that Article 6(1) of the Convention is not applicable in the circumstances of the present case.*

*50 First of all, the Commission points out that hitherto the ECHR has never ruled that the right not to incriminate oneself must be recognised in national or Community procedures concerning restrictive agreements or practices.*

*51 As far as the Community procedures are concerned, the Commission draws attention, in particular, to the features that are peculiar to them, namely the fact that they are concerned only with legal persons and that in no case can they lead to a criminal charge or to the imposition of criminal penalties in the true sense.*

*52 Secondly, it claims that the ECHR has not yet ruled that the right not to incriminate oneself can apply with regard to legal persons.*

*53 Thirdly, the Commission claims that the right for a person to refuse to provide information exposing him to the risk of incriminating himself has been acknowledged by the ECHR only in the very limited field of criminal law in the strict, traditional sense, that is to say in the context of proceedings in which a sentence entailing loss of liberty could be imposed and which, in view of the particular nature of the penalty incurred, could plainly be characterised as criminal proceedings within the meaning of Article 6(1) of the Convention.*

*54 Fourthly, the Commission contends that it is not a court and that, consequently, the principles deriving from Article 6(1) of the Convention do not apply in this case (see, inter alia, Case T-348/94 Enso Española v Commission [1998] ECR II-1875, paragraph 56). The fact that the Commission does not have the jurisdiction of a court means that a procedure concerning restrictive agreements or practices is not a criminal procedure. The principles deriving from Article 6 of the Convention are therefore not applicable to the preliminary-investigation procedure conducted by the Commission.*

*55 Lastly, the Commission states that it would in practice be impossible to apply Community law on restrictive agreements and practices if undertakings were not under an obligation to cooperate actively in the investigation of the facts. It is therefore necessary for it to be able, in preliminary-investigation proceedings, to require undertakings to furnish information that may incriminate them. That necessity has been recognised by the Court of Justice and the Court of First Instance (Société Générale, paragraph 71 et seq., and the Opinion of Advocate General Warner in Case 155/79 AM & SL v Commission [1982] ECR 1575). According to the Commission, the procedure laid down by Article 11 of Regulation No 17 could no longer achieve its purpose if the undertaking concerned were accorded the right to refuse to make statements or produce documents where it is possible that they could be used to prove the unlawfulness of its conduct.*

*56 Nor, finally, according to the Commission, do the applicant's other arguments provide any basis for concluding that Article 1 of the contested decision is inconsistent with the principles flowing from Article 6 (1) of the Convention.*

*The third plea, alleging infringement of Articles 6(2) and 10 of the Convention*

*57 The applicant contends that the right not to give evidence against oneself is protected by the presumption of innocence as laid down in Article 6(2) of the Convention and by the right to freedom of expression provided for in Article 10 (opinion of the European Commission of Human Rights annexed to Eur. Court H. R., K. v Austria judgment of 2 June 1993, Series A, no. 255-B). The applicant indicates in its application that it limits itself to that statement because the ECHR held, in Funke, that infringement of Article 6(1) of the Convention relieved it of the need to consider the alleged infringement of another principle of the Convention.*

*58 The Commission accepts that, because of the close relationship between the presumption of innocence and the right not to incriminate oneself, that right is based, in the case-law of the ECHR, on the provisions of Article 6(1) of the Convention, read in conjunction with Article 6(2). Nevertheless, Article 6(2) of the Convention does not give the right in question any different tenor or broader scope than that resulting from Article 6(1) in so far as concerns any entitlement to refuse to provide information.*

*Findings of the Court*

*59 It must be emphasised at the outset that the Court of First Instance has no jurisdiction to apply the Convention when reviewing an investigation under competition law, inasmuch as the Convention as such is not part of Community law (Case T-374/94 Mayr-Melnhof v Commission [1998] ECR II-1751, paragraph*

*60 However, it is settled case-law that fundamental rights form an integral part of the general principles of Community law whose observance is ensured by the Community judicature (see, in particular, Opinion 2/94 the Court of Justice of 28 March 1996 [1996] ECR I-1759, paragraph 33, and the judgment in Kremzow, cited above, paragraph 14). For that purpose, the Court of Justice and the Court of First Instance draw inspiration from the constitutional traditions common to the Member States and from the guidelines supplied by international treaties for the protection of human rights on which the Member States have collaborated and to which they are signatories. The Convention has special significance in that respect (Case 222/84 Johnston [1986] ECR 1651, paragraph 18, and Kremzow, cited above, paragraph 14). Furthermore, paragraph 2 of Article F of the Treaty on European Union (now Article 6(2) EU) provides that the Union shall respect fundamental rights, as guaranteed by the [Convention] and as they result from the constitutional traditions common to the Member States, as general principles of Community law.*

*61 Next, it must be borne in mind that the purpose of the powers conferred on the Commission by Regulation No 17 is to enable that institution to fulfil its duty under the Treaty to ensure that the rules on competition within the common market are observed.*

*62 During the preliminary-investigation procedure, Regulation No 17 does not give an undertaking that is subjected to an investigative measure any right to avoid the application of that measure on the ground that the results thereof might provide evidence of an infringement by it of the competition rules. On the contrary, it places the undertaking under a duty of active cooperation, which means that it must be prepared to make available to the Commission any information relating to the subject-matter of the investigation (Orkem, paragraph 27, and Société Générale, paragraph 72).*

*63 In the absence of any right to silence expressly provided for in Regulation No 17, it is necessary to consider whether certain limitations on the Commission's powers of investigation during a preliminary investigation are, however, implied by the need to safeguard the rights of defence (Orkem, paragraph 32).*

*64 In this respect, it is necessary to prevent the rights of defence from being irremediably impaired during preliminary-investigation procedures which may be decisive in providing evidence of the unlawful nature of conduct engaged in by undertakings (Orkem, paragraph 33, and Société Générale, paragraph 73).*

*65 However, it is settled case-law that, in order to ensure the effectiveness of Article 11(2) and (5) of Regulation No 17, the Commission is entitled to compel an undertaking to provide all necessary information concerning such facts as may be known to it and to disclose to the Commission, if necessary, such documents relating thereto as are in its possession, even if the latter may be used to establish, against it or another undertaking, the existence of anti-competitive conduct (Orkem, paragraph 34, and Case 27/88 Solvay v Commission [1989] ECR 3355, summary publication, and Société Générale, paragraph 74).*

*66 To acknowledge the existence of an absolute right to silence, as claimed by the applicant, would go beyond what is necessary in order to preserve the rights of defence of undertakings, and would constitute an unjustified hindrance to the Commission's performance of its duty under Article 89 of the EC Treaty (now, after amendment, Article 85 EC) to ensure that the rules on competition within the common market are observed.*

*67 It follows that an undertaking in receipt of a request for information pursuant to Article 11(5) of Regulation No 17 can be recognised as having a right to silence only to the extent that it would be compelled to provide answers which might involve an admission on its part of the existence of an infringement which it is incumbent upon the Commission to prove (Orkem, paragraph 35).*

*68 Those are the limits within which the arguments raised by the applicant must be assessed.*

*69 It is appropriate in this case to review first of all the legality of questions 1.6, 1.7 and 2.3, which are almost identical, and then that of question 1.8.*

*70 In their first three indents, questions 1.6, 1.7 and 2.3 contain requests for purely factual information and the production of documents already in existence. Comparable questions were not held to be unlawful by the Court of Justice in its judgment in Orkem. The applicant was therefore under an obligation to provide answers in response to those requests.*

*71 By contrast, the last indent of each of those three questions does not concern exclusively factual information. In the last indent, the Commission calls upon the applicant, in identical terms, to describe in particular the purpose of the meetings it attended and the decisions adopted during them, even though it is clear that the Commission suspected that their purpose was to arrive at agreements, in respect of selling prices, of a nature such as to prevent or restrict competition. It follows that requests of this kind are such that they may compel the applicant to admit its participation in an unlawful agreement contrary to the Community rules on competition.*

*72 On this point, it must be observed that the Commission expressly indicated in the last indent of the three questions at issue that the applicant was to provide it with the information in question only in the*

*eveGreber 1, lesmmc.A806inWMa Vrelevanecdocment37equeEtekin0414/pr2,2006g inPargeTK4 aplh1c3nt was therefore required to reply to the last indent of the questions only in so far as it was unable to produce the documents requested. Nevertheless, because of the order and content of the first three indents of the questions, it cannot be excluded that the applicant would have been obliged to reply to the last indent.*

*73 Consequently, it must be held that the last indent of each of questions 1.6, 1.7 and 2.3 infringes the applicant's rights of defence.*

*74 As far as question 1.8 is concerned, it should be observed that the Commission is requiring the applicant to comment, first, on the relationship between, on the one hand, the four OCTG and linepipe agreements concluded in 1962 and notified to the Bundeskartellamt and, on the other hand, the Europe-Japan Club and Special Circle, and, second, on the decisions adopted within the Europe-Japan Club and the Special Circle, that is to say, decisions which the Commission regards as possibly constituting infringements of the rules laid down by the Treaty. Answering this question would require the applicant to give its assessment of the nature of those decisions. It must be held that, in accordance with the judgment in Orkem, question 1.8 also constitutes an infringement of the applicant's rights of defence.*

*75 As regards the arguments to the effect that Article 6(1) and (2) of the Convention enables a person in receipt of a request for information to refrain from answering the questions asked, even if they are purely factual in nature, and to refuse to produce documents to the Commission, suffice it to repeat that the applicant cannot directly invoke the Convention before the Community courts.*

*76 As regards the potential impact of the Charter, to which the applicant refers (see paragraph 15 above), upon the assessment of this case, it must be borne in mind that that Charter was proclaimed by the European Parliament, the Council and the Commission on 7 December 2000. It can therefore be of no consequence for the purposes of review of the contested measure, which was adopted prior to that date. That being so, there is no reason to accede to the applicant's request for the oral procedure to be re-opened.*

*77 However, it must be emphasised that Community law does recognise as fundamental principles both the rights of defence and the right to fair legal process (see Baustahlgewebe v Commission, cited above, paragraph 21, and Case C-7/98 Krombach [2000] ECR I-1935, paragraph 26). It is in application of those principles, which offer, in the specific field of competition law, at issue in the present case, protection equivalent to that guaranteed by Article 6 of the Convention, that the Court of Justice and the Court of First Instance have consistently held that the recipient of requests sent by the Commission pursuant to Article 11(5) of Regulation No 17 is entitled to confine himself to answering questions of a purely factual nature and to producing only the pre-existing documents and materials sought and, moreover, is so entitled as from the very first stage of an investigation initiated by the Commission.*

*78 The mere fact of being obliged to answer purely factual questions put by the Commission and to comply with its requests for the production of documents already in existence cannot constitute a breach of the principle of respect for the rights of defence or impair the right to fair legal process. There is nothing to prevent the addressee of such questions or requests from showing, whether later during the administrative procedure or in proceedings before the Community courts, when exercising his rights of defence, that the facts set out in his replies or the documents produced by him have a different meaning from that ascribed to them by the Commission.*

*79 It follows that the contested decision must be annulled in so far as it obliges the applicant to answer the last indent of each of questions 1.6, 1.7 and 2.3 and all of question 1.8, which may involve the applicant in admitting that it was party to an agreement liable to prevent or restrict competition.*

*The fourth plea, alleging disregard for the applicability of national procedural safeguards*

*Arguments of the parties*

*80 The applicant argues that its right not to be required to incriminate itself by positive action is derived not only from Community law, but also from German law, which, it maintains, must not be disregarded in the present case. In German law, the principle that no natural or legal person may be required to incriminate himself or itself before an investigating authority is applicable. The applicant states that, in accordance with that principle, it is entitled to refuse to provide any information and cannot be required to produce any documentary evidence adverse to itself. According to the applicant, in criminal or administrative investigation proceedings anyone who is charged with an offence or is otherwise concerned by those proceedings may, pursuant to Paragraph 136(1) of the Strafprozeßordnung (the German code of criminal procedure), adopt a purely passive stance, because no-one may be forced to contribute actively to his own punishment.*

*81 According to the applicant, that safeguard afforded by German law is significant in the present case in that the imposition of a fine on it in the investigation procedure conducted under Community law may have consequences under national law. Other investigation procedures, in particular, might follow, because the imposition of a fine under Article 15 of Regulation No 17 does not preclude new or complementary procedures from being initiated under national law (Case 14/68 Walt Wilhelm and Others*

*v Bundeskartellamt [1989] ECR I-V), In connection, it imposes a fine, the Commission closes the procedure by drawing up a reasoned decision which is subsequently published in the Official Journal of the European Communities, setting out all the factual circumstances relied upon in establishing the infringement. The applicant adds that the publication of such material may also lead the competent national authority to initiate, in respect of the same facts, other investigation procedures of a criminal or administrative nature.*

*82 The Commission argues that the requirements of German law are relevant to the legality of the contested decision only to the extent that there can be identified within the national laws of the Member States a common principle that one may refuse to incriminate oneself. That is precisely what the Court of Justice rejected in Orkem, at paragraph 29, where it observed that the laws of the majority of the Member States recognise the right not to give evidence against oneself only to natural persons charged with an offence in criminal proceedings.*

*83 Moreover, the Commission states that, according to the case-law of the Court of Justice, it alone is empowered to use information obtained in a procedure under Article 11 of Regulation No 17 (Case C-67/91 AEB and Others [1992] ECR I-4785, paragraph 38). Such information cannot be relied on by the authorities of the Member States either in a preliminary-investigation procedure or to justify a decision based on provisions of competition law, be it national law or Community law. It must remain internal to those authorities and may be used only to decide whether or not it is appropriate to initiate a national procedure (AEB and Others, paragraph 42).*

*Findings of the Court*

*84 In the field of competition law, the national laws of the Member States do not, in general, recognise a right not to incriminate oneself. It is, therefore, immaterial to the result of the present case whether or not, as the applicant claims, there is such a principle in German law.*

*85 As regards the applicant's argument that there is a risk that information obtained by the Commission and communicated to the national authorities may be used by those authorities against it, it is sufficient to refer to the judgment in AEB and Others, where, at paragraph 42, the Court of Justice, after pointing out that information obtained by the Commission must be communicated to the national authorities, gave the following clear statement of the law in this respect:*

*Such information cannot be relied on by the authorities of the Member States either in a preliminary investigation procedure or to justify a decision based on provisions of competition law, be it national law or Community law. Such information must remain internal to those authorities and may be used only to decide whether or not it is appropriate to initiate a national procedure.*

*86 It follows that the German authorities cannot rely on information obtained by the Commission by means of its request for information pursuant to Article 11 of Regulation No 17 in order to justify a decision taken against the applicant on the basis of the provisions of competition law.*

*87 Consequently, should the German authorities take the view that the information thus obtained by the Commission is relevant for the purpose of a procedure in respect of the same facts, they must make their own request for information regarding those facts.*

*88 The fact that information obtained by the Commission may alert the German authorities to the possibility of an infringement of German law and that the German authorities might use that information for the purpose of determining whether or not it is appropriate to initiate national procedures, does not alter the conclusion that, as is clear from paragraph 42 of the judgment in AEB and Others, the plea now under consideration cannot be upheld.*

*89 That plea must therefore be rejected.*

*90 Having regard to all the foregoing considerations, the contested decision must be annulled in so far as it relates to the last indent of each of questions 1.6, 1.7 and 2.3 and to question 1.8 of the request for information sent to the applicant on 13 August 1997, and the remainder of the application must be dismissed.*

## Decision on costs

*Costs*

*91 Under Article 87(2) of the Rules of Procedure of the Court of First Instance, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. However, under the first subparagraph of Article 87(3), where each party succeeds on some and fails on other heads, or where the circumstances are exceptional, the Court of First Instance may order that the costs be shared or that each party bear its own costs.*

*92 In the present case, account should be taken, firstly, of the fact that both the applicant and the*

defendant have been largely unsuccessful, security it should be taken that, by reason of its
reply to the requests made in the last indent of each of questions 1.6, 1.7 and 2.3 and in question 1.8, the
Commission infringed the applicant's rights of defence, contrary to the judgment in Orkem, and
constrained the applicant to bring the present action. That being so, the Court takes the view that the
Commission must pay two thirds of the applicant's costs.

## Operative part

On those grounds,

THE COURT OF FIRST INSTANCE (First Chamber, Extended Composition)

hereby:

1. Annuls Commission Decision C(98) 1204 of 15 May 1998 relating to a procedure under Article 11(5) of
Council Regulation No 17, in so far as it relates to the last indent of each of questions 1.6, 1.7 and 2.3 and
to question 1.8 of the request for information sent to the applicant on 13 August 1997;

2. Dismisses the remainder of the application;

3. Orders the defendant to bear its own costs and to pay two thirds of the costs of the applicant, which
shall bear the remaining third.

# EXHIBIT D

29 April 2004

Languages of the case: German and English.Appeal Cartel Graphite electrodes market Price-fixing and market-sharing Calculation of fines Concurrent sanctions Guidelines on the method of setting fines Applicability Gravity and duration of the infringement Aggravating circumstances Attenuating circumstances Ability to pay Cooperation during the administrative procedure ArrangementsforpaymentIn Joined Cases T-236/01, T-239/01, T-244/01 to T-246/01, T-251/01 and T-252/01,

**Tokai Carbon Co. Ltd**, established in Tokyo (Japan), represented initially by G. Van Gerven, T. Franchoo and M. De Grave, and, subsequently, by G. Van Gerven and T. Franchoo, lawyers, with an address for service in Luxembourg,

**SGL Carbon AG**, established in Wiesbaden (Germany), represented by M. Klusmann, F. Wiemer and C. Canenbley, lawyers,

**Nippon Carbon Co. Ltd**, established in Tokyo (Japan), represented by H. Gilliams, lawyer,

**Showa Denko KK**, established in Tokyo (Japan), represented by M. Dolmans and P. Werdmuller, lawyers, and J. Temple Lang, Solicitor,

**GrafTech International Ltd**, formerly UCAR International Inc., established in Nashville, Tennessee (United States), represented by K. Lasok QC and B. Hartnett BL, with an address for service in Luxembourg,

**SEC Corp.**, established in Amagasaki, Hyogo (Japan), represented by K. Platteau, lawyer,

**The Carbide/Graphite Group, Inc.**, established in Pittsburgh (United States), represented initially by M. Seimetz and J. Brücher, and, subsequently, P. Grund, lawyers, with an address for service in Luxembourg,

applicants, v

**Commission of the European Communities**, represented by W. Mölls and P. Hellström, and, in Case T-246/01, by W. Wils, acting as Agents, with, in Case T-239/01, H.-J. Freund, lawyer, and, in Cases T-244/01, T-246/01, T-251/01 and T-252/01, J. Flynn and C. Kilroy, Barristers, with an address for service in Luxembourg,

defendant,

APPLICATIONS for annulment, in whole or in part, of Commission Decision 2002/271/EC of 18 July 2001 relating to a proceeding under Article 81 of the EC Treaty and Article 53 of the EEA Agreement – Case COMP/E-1/36.490 – Graphite electrodes (OJ 2002 L 100, p. 1)

THE COURT OF FIRST INSTANCE OF THE EUROPEAN COMMUNITIES (Second Chamber)composed of: N.J. Forwood, President, J. Pirrung and A.W.H. Meij, Judges, Registrar: J. Plingers, Administrator,

having regard to the written procedure and further to the hearing on

3 July 2003,

gives the followingJudgment

**Facts and procedure**

1     By Decision 2002/271/EC of 18 July 2001 relating to a proceeding under Article 81 of the EC Treaty and Article 53 of the EEA Agreement – Case COMP/E-1/36.490 – Graphite electrodes (OJ 2002 L 100, p. 1) ('the

Decision'), the Commission found that various undertakings had participated in a series of agreements and concerted practices within the meaning of Article 81(1) EC and Article 53(1) of the Agreement on the European Economic Area ('the EEA Agreement') in the graphite electrodes sector.

2    Graphite electrodes are used primarily in the production of steel in electric arc furnaces. Electric arc furnace steelmaking is essentially a recycling process whereby scrap steel is converted into new steel, as opposed to the 'traditional' blast furnace/oxygen process of production from iron ore. Nine electrodes, joined in columns of three, are used in the electric arc furnace to melt scrap steel. Because of the intensity of the melting process, one electrode is consumed approximately every eight hours. The processing time for an electrode is approximately two months. There are no product substitutes for graphite electrodes in this production process.

3    The demand for graphite electrodes is directly linked to the production of steel in electric arc furnaces. The customers are principally steel producers, which account for approximately 85% of demand. In 1998, world crude steel production was 800 million tonnes, of which 280 million tonnes was produced in electric arc furnaces. In the past 20 years, electric arc furnace production has become increasingly important (35% of world output in 1998, up from 18% of world output 20 years ago).

4    Graphite electrodes are priced in the appropriate national currency per tonne. In 1998, the price was DEM 5 600 (approximately EUR 2 863) per tonne. For larger-sized electrodes, the price is subject to a premium of 15% to 30%.

5    During the 1980s, technological improvements led to a substantial decline in the specific consumption of electrodes per tonne of steel produced. The steel industry was also undergoing major restructuring in that period. The fall in demand for electrodes led to the restructuring of the world electrodes industry, with a number of factories being closed.

6    In 2001, nine Western producers supplied the European market with graphite electrodes: SGL Carbon AG ('SGL'), established in Germany, and UCAR International Inc. ('UCAR'), established in the United States of America, together satisfied more than […] (1) of demand; while the two smaller European producers, VAW Aluminium AG ('VAW') and Conradty, established in Germany, together held approximately […]% of the market. The Carbide/Graphite Group, Inc. ('C/G'), with approximately 7%, supplied the European market from the United States. The Japanese producers Showa Denko K.K. ('SDK'), Tokai Carbon Co. Ltd ('Tokai'), Nippon Carbon Co. Ltd ('Nippon') and SEC Corporation ('SEC') together held 3% to 4% of the European market.

7    On 5 June 1997, acting under Article 14(3) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles [81] and [82] of the Treaty (OJ, English Special Edition 1959-62, p. 87), Commission officials carried out simultaneous and unannounced investigations at the premises of SGL, Conradty and VAW in Germany and UCAR in France.

8    On the same date, Federal Bureau of Investigation (FBI) agents executed judicial search warrants at the premises of a number of producers. These investigations led to criminal proceedings for conspiracy being brought against SGL, SDK, Tokai and UCAR. All the accused pleaded guilty to the charges and agreed to pay fines, which were set at United States dollars (USD) 135 million for SGL, USD 110 million for UCAR, USD 32.5 million for SDK and USD 6 million for Tokai, while C/G received an amnesty. Subsequently, SEC and Nippon also pleaded guilty and agreed to pay fines set at USD 4.8 million and USD 2.5 million respectively.

9    In January 2000, a criminal charge was also filed in the United States against the Japanese company Mitsubishi Corporation, which held 50% of UCAR's capital between 1991 and 1995. In February 2001, Mitsubishi was convicted of having encouraged and supported the unlawful cartel between producers of graphite electrodes. It was fined USD 134 million.

10    Civil proceedings were filed in the United States on behalf of a class of purchasers claiming triple damages against UCAR, SGL, C/G and SDK.

11    In Canada, UCAR was sentenced in March 1999 to a fine of Canadian dollars (CAD) 11 million for an

offence against the Canadian Competition Act of 1985, SGL pleaded guilty and agreed to a fine of CAD 12.5 million for the same offence. Civil proceedings were instituted by purchasers of steel in Canada in June 1998 against UCAR, SGL, C/G and SDK for conspiracy.

12    On 24 January 2000, the Commission sent a statement of objections to the undertakings concerned. The administrative procedure culminated in the adoption, on 18 July 2001, of the Decision, in which the applicant undertakings and VAW are found to have been involved, on a worldwide scale, in price fixing and also in sharing the national and regional markets in the product in question according to the 'home producer' principle: UCAR and SGL were responsible for the United States; in addition, UCAR was responsible for certain parts of Europe and SGL for the rest of Europe; SDK, Tokai, Nippon and SEC were responsible for Japan and for certain parts of the Far East, while C/G, which was active on the United States and European markets, was essentially content to follow the prices set by UCAR and SGL.

13    Still according to the Decision, the basic principles of the cartel were as follows:

–    prices for graphite electrodes should be set on a global basis;

–    decisions on each company's pricing had to be taken by the Chairman/General Manager only;

–    the 'home producer' was to establish the market price in its home area and the other producers would 'follow' it;

–    for 'non-home' markets, i.e. markets where there was no 'home' producer, prices would be decided by consensus;

–    non-home producers should not compete aggressively and would withdraw from the other producers' home markets;

–    there was to be no expansion of capacity (the Japanese were supposed to reduce their capacity);

–    there should be no transfer of technology outside the circle of producers participating in the cartel.

14    The Decision goes on to state that those basic principles were implemented by meetings of the cartel, held at a number of levels: 'Top Guy' meetings, 'Working Level' meetings , 'European group' meetings (without the Japanese undertakings), national or regional meetings dedicated to specific markets and bilateral contacts between undertakings.

15    As regards the duration of the cartel, Article 1 of the operative part of the Decision sets the beginning of the infringement at May 1992 for all the undertakings concerned, with the exception of C/G, whose participation in the infringement was held to have begun in January 1993. The infringement was held to have ended on the following dates: March 1998 for SGL and UCAR, February 1998 for Tokai, Nippon and SEC, April 1997 for SDK, the end of 1996 for VAW and November 1996 for C/G.

16    On the basis of the findings of fact and the legal assessments made in the Decision, the Commission imposed on the undertakings concerned fines set according to the methodology described in the Guidelines on the method of setting fines imposed pursuant to Article 15(2) of Regulation No 17 and Article 65(5) of the ECSC Treaty (OJ 1998 C 9, p. 3, 'the Guidelines') and the Notice on the non-imposition or reduction of fines in cartel cases (OJ 1996 C 207, p. 4, 'the Leniency Notice').

17    Article 3 of the operative part of the Decision imposes the following fines:

SGL:             EUR 80.2 million;

UCAR: EUR 50.4 million;

VAW:    Case JR00-m-m-1006.1-MLW    Document 27    Filed 04/11/2006    Page 5 of 36

SDK:        EUR 17.4 million;

Tokai:      EUR 24.5 million;

Nippon: EUR 12.2 million;

SEC:            EUR 12.2 million;

C/G:            EUR 10.3 million.

18    In Article 4 of the operative part, the undertakings concerned are ordered to pay the fines within three months of the date of notification of the Decision, failing which interest of 8.04% will be payable.

19    The Decision was notified to the various applicant parties between 24 and 30 July 2001.

20    It was sent with a covering letter, dated 23 July 2001, stating the amount of the fine imposed and the payment terms ('the July letter'). The letter stated that, upon expiry of the period for payment stated in the Decision, the Commission would recover the amount in question; however, should an action be brought before the Court of First Instance, no enforcement measure would be taken, provided that interest at 6.04% was paid and a bank guarantee constituted.

21    The July letter was notified to SGL on 24 July 2001 and to UCAR on 26 July 2001. In reply to comments submitted by UCAR concerning the payment terms, the Commission answered by letter of 9 August 2001 ('the August letter'), refusing to accept, first, a proposal for payment which did not cover the whole fine and did not take account of the interest payable and, second, a lien on UCAR's assets designed to guarantee payment of the fine. The August letter was notified to UCAR on 10 August 2001.

22    It was in those circumstances that, by separate applications lodged at the Registry of the Court of First Instance between 1 and 9 October 2001, the addressees of the Decision, with the exception of VAW, brought the present actions.

23    Upon hearing the Report of the Judge-Rapporteur, the Court of First Instance (Second Chamber) decided to open the oral procedure and to put certain questions to the parties. The parties replied within the prescribed period. Then, after the parties had expressed their views on this point, the President of the Second Chamber, by order of 5 June 2003, joined the seven cases for the purposes of the oral procedure and the judgment, in accordance with Article 50 of the Rules of Procedure of the Court of First Instance. The President of the Second Chamber also granted confidential treatment for certain documents in the case-files. At the hearing on 3 July 2003, the parties, with the exception of C/G, which did not take part in the hearing, submitted oral argument and answered the questions put by the Court.

24    By document lodged at the Registry of the Court of First Instance on 26 September 2003, Graftech International Ltd (formerly UCAR) introduced an application for suspension of execution of the Decision and for interim measures in respect of the arrangements for payment of its fine set out in the July and August letters (Case T-246/01 R). Following Graftech's withdrawal of its application for interim relief, the President of the Court of First Instance, by order of 24 March 2004, decided that Case T-246/01 R must be removed from the Register of the Court of First Instance and ordered Graftech to pay the costs associated with that case.

**Forms of order sought by the parties**

25    Tokai (T-236/01) claims that the Court should:

–    annul Article 3 (and, in so far as necessary, Article 4) of the Decision in so far as it imposes a fine of EUR 24.5 million on Tokai, or, in the alternative, substantially reduce that fine;

Case 1:06-mc-10061-MLW    Document 27    Filed 04/11/2006    Page 6 of 36

— order the Commission to pay the costs.

26    SGL (T-239/01) claims that the Court should:

— annul the Decision in so far as it concerns SGL;

— in the alternative, reduce the fine as appropriate;

— order the Commission to pay the costs.

27    Nippon (T-244/01) claims that the Court should:

— annul Article 1 of the Decision in so far as it finds that Nippon participated in an infringement of Article 81 EC and Article 53(1) EEA between May 1992 and March 1993;

— annul Article 3 of the Decision in so far as it imposes a fine of EUR 12.2 million on Nippon;

— in the alternative, substantially reduce the fine;

— order the Commission to pay the costs.

28    SDK (T-245/01) claims that the Court should:

— annul Article 3(d) of the Decision;

— in the alternative, reduce the fine to EUR 2.95 million or to such other amount as the Court may deem reasonable;

— request the Commission, pursuant to Article 65(b) of the Rules of Procedure, to produce all the documents showing how the fine was calculated;

— order the Commission to pay the costs.

29    UCAR (T-246/01) claims that the Court should:

— order such measures of enquiry as appear necessary;

— annul Article 3 of the Decision in so far as it imposes a fine on the applicant, or, in the alternative, reduce the fine;

— annul Article 4 of the Decision in so far as it applies to UCAR, or, in the alternative, modify the terms of payment applicable to the fine payable in accordance with the terms and conditions set out in Annex 50 to the application;

— annul the July letter, or, in the alternative, modify the conditions set out therein in accordance with the conditions set out in Annex 50 to the application;

— annul the August letter, or, in the alternative, modify the conditions set out therein in accordance with the conditions set out in Annex 50 to the application;

— order any other measure which justice may require;

— order the Commission to pay the costs.

30    SEC (T-251/01) claims that the Court should:

Case 5:06-mc-80038-JF    Document 27    Filed 01/11/2006    Page 7 of 36

— annul Article 3 of the Decision in so far as it imposes a fine of EUR 10.3 million on UCAR;

— in the alternative, substantially reduce the fine;

— order the Commission to pay the costs.

31    C/G (T-252/01) claims that the Court should:

— annul the Decision in so far as it imposes a fine on C/G;

— in the alternative, reduce the fine;

— order the Commission to pay the costs.

32    In Cases T-236/01, T-239/01, T-245/01, T-251/01 and T-252/01, the Commission contends that the Court should:

— dismiss the actions as unfounded;

— order the applicants to pay the costs.

33    In Cases T-244/01 and T-246/01 the Commission contends that the Court should:

— dismiss the actions as unfounded;

— increase the fines;

— order the applicants to pay the costs.

**Law**

34    In most of the cases, the applicants seek, in essence, only cancellation or reduction of the amount of the fines imposed, on the ground that the Commission failed to take into account the fines already imposed in other countries and that it misapplied its Guidelines and its Leniency Notice, but they do not contest the substantive truth of the facts established in the Decision. However, certain applications also seek annulment of the Decision in its entirety and are based on pleas alleging that the Decision is unlawful in its entirety and/or on pleas alleging that the Commission erred in establishing the facts constituting the infringement. Last, in two cases the arrangements for payment of the fines are disputed.

35    It is therefore appropriate to examine, first of all, the claims seeking annulment of the Decision in its entirety or of certain findings of fact contained therein. The Court will then examine the claims seeking annulment of Article 3 of the Decision or a reduction in the fines set in application of the Guidelines and the Leniency Notice. Last, it will examine the complaints relating to the arrangements for payment of the fines.

A — *Claims for annulment of the Decision in its entirety or of certain findings of fact*

1.    *The claims for annulment of the Decision in its entirety*

a)    Case T-239/01

36    SGL is the only applicant to claim formally, as its principal submission, that the Decision should be annulled in its entirety in so far as it concerns that undertaking. The pleas put forward in support of that submission allege a number of procedural defects.

The alleged refusal to grant full access to the file

37    SGL criticises the Commission's refusal to grant access to its internal documents or its failure to provide any list or non-confidential summary of those documents or of its documents containing business secrets or confidential matters. Owing to that breach of its rights of defence, SGL was unable to have an overall view of the contacts which took place between the Commission and the other undertakings concerned in the context of their cooperation. The Decision must therefore be annulled.

38    In that regard, the Court observes that, according to settled case-law, in order to allow the undertakings concerned to defend themselves effectively against the objections raised against them in the statement of objections, the Commission is required to make available to them the entire investigation file, except for documents containing business secrets of other undertakings, other confidential information and internal documents of the Commission (see Case T-23/99 *LR AF 1998* v *Commission* [2002] ECR II-1705, paragraph 170, and the case-law cited there).

39    In so far as SGL claims, before the Court, that the Commission should have communicated to it at least a list or a non-confidential summary of its documents containing secret or confidential matters, it must be held that, during the administrative procedure, the applicant submitted no request to that effect. Its letter of 9 March 2000 and its reply of 4 April 2000 to the statement of objections refer solely to the Commission's internal documents; in its letter of 9 March, SGL even acknowledged that the Commission had provided it with a list of the documents that could be consulted. In those circumstances, the Commission was not under an obligation to make available, of its own initiative, the lists and summaries in question (see, to that effect, Joined Cases T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95, T-42/95 to T-46/95, T-48/95, T-50/95 to T-65/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95 *Cimenteries CBR and Others* v *Commission* [2000] ECR II-491, 'the *Cement* judgment', paragraph 383).

40    As regards the request for access to internal documents, which the Commission is not required to make available (*LR AF 1998* v *Commission*, cited above, paragraph 170), that restriction on access is justified by the need to ensure the proper functioning of the Commission when it deals with infringements of the Treaty competition rules; internal documents can be made available only if the exceptional circumstances of the case so require, on the basis of serious evidence which it is for the party concerned to provide, both before the Community Court and in the administrative procedure conducted by the Commission (see the *Cement* judgment, paragraph 420, and the case-law cited there). In claiming generally that the Commission's internal documents might show that the applicant was treated unfavourably by comparison with other undertakings when its cooperation was assessed, SGL has provided no serious evidence of circumstances requiring that it be given access to the documents in question.

41    Furthermore, the Commission stated, without being contradicted by SGL on that point, that the documents relating to cooperation by the undertakings did not form part of its internal file but were in the investigation file to which the undertakings had access. Last, as is apparent from a number of complaints directed against the calculation of its fine (see paragraph 384 et seq. below), SGL did in fact make a comparison of its own cooperation with that of the other members of the cartel, which confirms the Commission's argument.

42    In those circumstances, the Commission cannot be criticised for not having disclosed its internal documents to SGL or for having failed to send it a list or non-confidential summaries of those documents.

43    The plea must therefore be rejected.

The allegation that the statement of objections was not definitive

44    SGL claims that the statement of objections of 24 January 2000 was not definitive. Although the Commission stated, by letter of 4 May 2000, that the replies of certain undertakings to the statement of objections contained inaccuracies and contradictions, it omitted to replace the statement of objections before adopting the Decision. SGL was therefore not in a position to exercise its right to be heard on the final outcome of the investigation.

45    In that regard, the Court observes that there is no provision that prevents the Commission from sending to the parties concerned after the statement of objections fresh documents which it considers support its argument,

subject to giving the undertakings the necessary guarantee to submit their views on the subject of *PVC* 1998 v *Commission*, cited at paragraph 38 above, paragraph 190, and the case-law cited there).

46    In this case, the Commission acknowledges that certain replies to the statement of objections contained contradictions and accusations against other undertakings. For that reason, it gave access to a non-confidential version of those replies and allowed the undertakings to submit their comments thereon during the hearing on 25 May 2000. However, it did not draw the slightest adverse conclusion from them.

47    According to settled case-law, the statement of objections must allow those concerned to have effective knowledge of the conduct in respect of which they are accused by the Commission. That requirement is met when the final decision does not find that the undertakings concerned have committed infringements different from those referred to in the statement of objections and establishes only facts on which the persons concerned have had the opportunity to explain themselves (Case T-213/00 *CMA CGM and Others* v *Commission* [2003] ECR II-913, 'the *FETTCSA* judgment', paragraph 109). In the present case, there was nothing to prevent SGL from comparing the statement of objections with the text of the Decision in order to ascertain whether the Commission had relied on fresh objections which were not in the statement of objections and on which SGL had not been able to comment before the adoption of the Decision. However, SGL does not claim that there was any such discrepancy between the statement of objections and the Decision.

48    In any event, it is sufficient that the Commission allows the undertakings to comment specifically on the observations made on the statement of objections. In the present case, SGL does not accuse the Commission of having infringed its right to be heard on that precise point. It complains only about the purely oral nature of the observations allowed by the Commission, but fails to show that only written observations would have allowed it to defend its point of view effectively.

49    This plea must therefore be rejected.

The allegedly unlawful report of the Hearing Officer

50    The Court notes that, on 28 May 2001, the Hearing Officer submitted, pursuant to Article 15 of Commission Decision 2001/462/EC, ECSC on the terms of reference of hearing officers in certain competition proceedings (OJ 2001 L 162, p. 21), a final report which reads as follows: 'The draft decision does not call for any particular comment on the right to be heard. The undertakings have not raised any procedural point. The draft decision does not include any complaint on which the undertakings concerned were not first able to adopt a decision.'

51    In that context, SGL maintains that the Hearing Officer was wrong to state that SGL had not raised any procedural point. The Decision itself recognises that SGL had complained that it was given only incomplete access to the file. Contrary to Article 8 of Decision 2001/462, the Hearing Officer did not comment on SGL's request for access to the file in the reply to the statement of objections. His final report therefore contained errors which may have influenced, to SGL's detriment, the outcome of the deliberations of the College of the Members of the Commission. Nor did the Hearing Officer address the problem of the replies of certain undertakings to the statement of objections, which contained contradictions and charges on which SGL was only able to comment orally at the hearing. Although SGL complained about that approach, the Hearing Officer's report does not refer to that procedural defect.

52    The Court recalls that, according to recitals 2, 3 and 8 of Decision 2001/462, the Commission is required to ensure that the right of persons concerned by competition proceedings to be heard throughout the procedure is guaranteed; and it must entrust the conduct of administrative proceedings to an independent person experienced in such matters who has the integrity necessary to contribute to the objectivity, transparency and efficiency of the proceedings. According to Articles 15 and 16(1) of that decision, the hearing officer is to prepare a final report on the respect of the right to be heard, which also considers whether the draft decision deals only with objections in respect of which the parties have been afforded the opportunity of making known their views and which is to be attached to the draft decision submitted to the Commission, in order to ensure that, when it reaches a decision, the Commission is fully apprised of all relevant information as regards the course of the procedure and respect of the right to be heard.

53    It is apparent from the provisions that the hearing officer is responsible for selecting the objections of a procedural nature put forward by the parties concerned during the administrative procedure. He is required to communicate to the College of Members of the Commission only the objections relevant to the assessment of the lawfulness of the conduct of the administrative procedure. As stated above, the two pleas put forward by SGL concerning access to the Commission's internal documents and the problem of the replies to the statement of objections are unfounded. Accordingly, in his capacity as an objective and independent officer, the hearing officer was not required to communicate those two irrelevant objections to the College of Members of the Commission.

54    This complaint therefore cannot be upheld either.

55    It follows that none of the pleas whereby SGL maintains that the Decision is vitiated by procedural defects can be upheld.

b)    Case T-246/01

56    Without presenting any formal submission for the annulment of the Decision in its entirety, UCAR claimed in its application that the Decision should be 'annulled in whole or in part'. It submits that, by not examining the role played by Mitsubishi and Union Carbide, its parent companies between 1992 and 1995, in the creation of the cartel and during the initial period of its operation, the Commission was in breach of its obligation to carry out an impartial investigation and breached UCAR's rights of defence. In its reply, however, UCAR stated that it sought not annulment of the entire Decision for breach of an essential procedural requirement but cancellation or reduction of the amount of the fine imposed on it by Article 3 of the Decision and that the abovementioned passage in its application was presented solely in the latter context.

57    The Court concludes that UCAR's action does not seek annulment of the Decision in its entirety. The complaint that the Commission failed to have regard to the role played by Mitsubishi and Union Carbide in UCAR's participation in the cartel will therefore be examined in the context of UCAR's pleas concerning the calculation of its fine.

2.    *The claims for partial annulment of Article 1 of the Decision and of certain findings of fact made in the Decision*

a)    The plea alleging, in Case T-239/01, an incorrect finding concerning the implementation of a Central Monitoring System

58    In the context of the group of pleas alleging that its fine was calculated incorrectly, SGL accuses the Commission of having discriminated against it by comparison with SDK by reducing the fine imposed on SDK on the ground that it had revealed the existence and functioning of a Central Monitoring System ('CMS') implemented within the framework of the cartel. SGL claims that that system was never implemented and that it informed the Commission to that effect in its reply to the statement of objections.

59    In that regard, the Court notes that SGL claims, in its application, that it expressly refrained in its reply to the statement of objections from disputing the facts as presented by the Commission. In that reply, SGL had none the less corrected certain findings of fact; as regards the CMS, it had stated that 'the Central Monitoring System was … never completed'.

60    The Court observes that, in the Decision, the Commission considered, in spite of SGL's reply on that point, that the infringement established consisted, in particular, in the setting-up of machinery for monitoring and enforcing the cartel agreements (recital 2). It described the details of the CMS (recitals 72, 73, 91 and 92) and stated that SGL's argument was contradicted by the documentary evidence and by the statements of other producers such as Tokai and UCAR. The Commission's defence refers to those passages in the Decision, whereas SGL's reply merely maintains that the CMS had not been implemented.

61    In the circumstances of the present case, the fact that SGL merely repeats, in general terms, a simple unsupported assertion that the CMS was not implemented does not suffice to undermine the findings of fact to

62    The plea concerning the findings of fact relating to the application of the CMS must therefore be rejected.

b)    Plea alleging, in Case T-236/01, an incorrect finding that the cartel operated on a global scale

63    In the context of the plea alleging that the Commission was wrong to rely on its worldwide turnover, Tokai maintains that the geographic market for graphite electrodes is not worldwide. In any event, the Commission did not properly analyse the relevant geographic market. In its decision of 4 January 1991 (Mitsubishi/UCAR, IV M 024), adopted pursuant to the Merger Regulation, the Commission concluded that the graphite electrodes market was a Community market.

64    In that regard, the Court observes that Tokai expressly stated in its application that its action does not seek to contest the substantive truth of the facts stated in the Decision. The findings of fact to the effect that the cartel organised the world market in graphite electrodes are made both in the Decision (see, for example, recitals 14 to 18, 46, 47, 49, 51, 71, 72 and 73) and in the statement of objections (points 33, 34, 35, 37, 39, 59, 60 and 61). It follows that the very essence of the cartel consisted, according to the Commission's findings, in structuring the graphite electrodes sector in the world according to a system of three 'legs': SGL representing Europe, UCAR representing the United States and SDK, Tokai, Nippon and SEC representing Japan (recital 47 of the Decision). Furthermore, the basic principles of the cartel identified by the Commission included that of the 'home producer', which was to establish prices on its territory, while the other producers followed it (see paragraphs 12 and 13 above), it being stipulated that 'non-home' producers were to withdraw from the others' 'home' markets (recital 50 of the Decision). Last, the Commission gave the example of the United States company C/G, which, without having any production site outside the United States, succeeded in obtaining a market share of approximately 7% in Europe and in selling almost one third of its output in the EEA (recitals 16, 30 and 85 of the Decision), which in the Commission's view revealed the existence of a market on a worldwide scale and demonstrated that even a 'non-home' producer was capable of disrupting the functioning of the cartel.

65    The present plea is manifestly incompatible with Tokai's recognition of the factual details just set out, which Tokai did not convincingly challenge either during the administrative procedure or before the Court. When placed in the context of the other pleas alleging that the fines were not correctly calculated, the plea is directed, rather, at the Commission's assessment of the real impact of Tokai's conduct on competition in the EEA. In the context of those pleas, Tokai places particular emphasis on its passive conduct and on the fact that it had no economic interest in selling the product in question on the European market. The real scope of the plea therefore consists in criticising the Commission for having failed to appreciate, in setting the amount of the fine, the purely passive role which Tokai played.

66    That conclusion is not contradicted by Tokai's reference to the decision of 4 January 1991 (Mitsubishi/UCAR, IV M 024) in which the Commission considered, in respect of a merger between undertakings, that the graphite electrodes market had a Community dimension. In that regard, it is sufficient to observe that that decision was adopted in a different context from that applicable to the present case and dates from an era which precedes both the Commission's investigation in the present case and the infringement period established in the Decision. It was specifically the detection, as from 1997, of the cartel in which Tokai participated that enabled the Commission to establish that the members of the cartel had shared the graphite electrodes market on a worldwide scale. The reference to the 1991 decision is therefore irrelevant.

67    Consequently, the plea must be rejected in so far as it challenges the findings of fact concerning the worldwide nature of the graphite electrodes market.

c)    The plea alleging, in Case T-239/01, incorrect assessment of the duration of the infringement found in the Decision

68    In the context of the group of pleas alleging that its fine was incorrectly calculated, SGL criticises the Commission, first, for having established, without any evidence, an overlong period for its participation in the infringement: the Commission wrongly found that SGL had continued the infringement after the investigations

carried out between 1997 and 2001 down to December/March 2001. Consequently, the determination of its fine is incorrect in so far as it includes an increase for that period. The Commission was also wrong to consider the alleged continuation of the infringement after the investigations as an aggravating circumstance to SGL's detriment. In that context, SGL claims that the meetings held within the cartel during the period in issue concerned not the European market but only the Asiatic markets, and that it had already informed the Commission of that fact during the administrative procedure. The evidence on which the Commission relies in support of its theory is not reliable.

69    Second, SGL complains of the incorrect finding at recital 57 of the Decision, where it is stated that the European group of the cartel met again from '1999'. It maintains that it cannot be precluded that that error had negative effects on the setting of its fine. At recital 124 of the Decision, moreover, the Commission states that there are indications on which it may be concluded that the infringement had still not ceased in 2001. SGL requests the Court to ascertain, by means of a measure of organisation of procedure, whether the incorrect figure 1999 was transmitted to the College of Members of the Commission for the purpose of the adoption of the Decision.

70    As regards the first part of SGL's plea, it is appropriate to set out the chronology and the precise thrust of the observations formulated by SGL in response to the Commission's findings.

71    First, it was in reply to a request for information from the Commission that SGL, by memorandum of 8 June 1999, stated that the largest producers of graphite electrodes, including SGL and UCAR, coordinated their conduct in competition matters from 1992 'to 1998'. Next, it listed the meetings held within the cartel. As regards the meetings held after June 1997, it referred, each time in a single sentence, to a meeting held in Malaysia in July 1997, a meeting held in Hong Kong in November 1997 and a meeting held in Bangkok in February 1998 and stated that those meetings dealt with specifically Asian topics.

72    Second, the statement of objections of 24 January 2000 established that the infringement in SGL's case had lasted until March 1998 and stated that the Hong Kong and Bangkok meetings had concerned the updating of the CMS tables on sales volumes for all regions and all markets and also that SGL and UCAR had informed the Japanese members of the cartel of the new prices applied in Europe (points 78 and 79). According to the statement of objections, bilateral contacts between SGL and UCAR also took place until March 1998 (point 80). Most of those findings were based on a statement of UCAR's former European sales director, Mr [...]. Last, the statement of objections included a voluminous list of annexed documents, used as evidence, including Mr [...]'s statement.

73    Third, SGL's reply of 4 April 2000 to the statement of objections, after confirming that the facts underlying the statement of objections were not disputed in principle ('grundsätzlich'), merely referred to the memorandum of 8 June 1998 and remained silent as regards the new findings and documentary evidence relating to the infringement period as set out in the statement of objections. In particular, it did not dispute Mr [...]'s statement, although SGL had access to that statement.

74    Before the Court, SGL added nothing of substance to the argument raised during the administrative procedure. It merely contended that the value of Mr [...]'s statement should be evaluated in the light of the circumstances prevailing when it was drawn up. That observation refers to the fact, stated by the Commission, that UCAR, after dismissing Mr [...], made any amicable resolution of the dismissal proceedings brought by Mr [...] conditional on his agreeing to cooperate with the Commission in its investigation.

75    However, the text of Mr [...]'s supplemental statement, on which the Commission placed particular reliance, contains nothing to justify SGL's suspicions; Mr [...] mentions the names of a number of representatives of other members of the cartel, including Mr [...] of SGL and Mr [...] of UCAR, so that the truth of his statement could have been ascertained if those persons had been called as witnesses. However, SGL did not request that they be called; nor did it contact the Commission during the administrative procedure in order to communicate counter-statements, for example, on the part of its former sales director, Mr [...]. Last, it follows from Mr [...]'s statement, which was also transmitted to the Commission at UCAR's request, that his statements were not intended to clear UCAR to the detriment of other members of the cartel, with the aim of obtaining a favourable outcome of his dispute with UCAR. Mr [...] states that his unlawful conduct was known

76    It follows that SGL has not succeeded in establishing to the requisite legal standard that the Commission's findings of fact concerning its participation in the infringement during the period June 1997 to March 1998 (recitals 91 to 93 of the Decision) are incorrect. The first part of the plea must therefore be rejected.

77    As regards the second part, directed against recital 57 of the Decision, the Commission has acknowledged that the sentence in the German version of the Decision notified to the applicant, to the effect that meetings of the European group within the cartel were held 'from 1999', contained a typographical error. That error is quite clear, first, from a comparison with the English version of the Decision, the other authentic version (apart from the German version), which correctly states '1992'. Second, the German version of recital 57 (with the incorrect date 1999) is in itself incomprehensible: according to UCAR, the meetings in question were discontinued 'after about a year' (i.e. in 2000, following the logic of the incorrect text), there being no longer any perceived need (still according to UCAR) for the European producers to meet in '1993'. That sentence clearly makes sense only if the reference year is 1992.

78    Last, and above all, Article 1 and recitals 3, 114 and 155 of the Decision clearly designate March 1998 as the end of the infringement committed by SGL. That finding is not contradicted by recital 124 of the Decision, which states that the infringement may not even have ceased in 2001. That passage does not alter the findings of fact concerning the duration of the infringement, but serves merely to justify Article 2 of the operative part of the Decision, which, as a precaution, orders the undertakings concerned to bring the infringements to an end immediately, in so far as they have not already done so.

79    Owing to its manifest nature, the typographical error was not capable of adversely affecting SGL's interests as regards the setting of its fine: the chapter 'Duration of the infringement', in the section of the Decision on the fixing of the fines, indicates 'February/March 1998' as marking the end of the infringement by SGL, UCAR, Tokai, Nippon and SEC (recital 155).

80    Consequently, such an error cannot justify the annulment of the findings of fact concerning the duration of the infringement by SGL. In those circumstances, there is no need to adopt the measure of organisation of procedure proposed by SGL.

81    Both parts of SGL's plea must therefore be rejected.

d)    The pleas alleging, in Case T-244/01, breach of essential procedural requirements owing to the absence of sufficient evidence of Nippon's participation in the infringement during the period May 1992 to March 1993, and failure to state reasons on that point

Arguments of the parties

82    In support of its claim that Article 1 of the Decision should be annulled in part, Nippon maintains that the burden of proof is borne by the Commission when it adopts a decision accusing an undertaking of infringing provisions of Community law. In the present case, the assertion in the Decision that Nippon participated in the infringement between May 1992 and March 1993 is unsupported by sufficient conclusive proof. In so far as the Commission maintains that Nippon had participated in the meetings held during that period, its assertion is not made out. Nippon submits that the Commission's accusation is wholly based on statements made by certain of Nippon's competitors (SDK, UCAR and SGL) for the sole purpose of benefiting from the application of the Leniency Notice. In those circumstances, the Commission is not entitled to place any probative value on those statements, whose reliability is limited.

83    As regards the first 'Top Guy' meeting held in London on 21 May 1992, Nippon maintains that the assertion in the Decision that Tokai represented Nippon's interests is not supported by any evidence. In the Cement judgment (cited at paragraph 39 above, paragraphs 2773 to 2782), the Court of First Instance held that, having failed to demonstrate that a party had given instructions to be represented at a meeting, the Commission was not entitled to infer that that party was effectively present, or represented, or that it had subscribed to the agreement concluded at that meeting. In the applicant's submission, such reasoning must also apply in the

present case as part of the Commission annexes to evidence that the applicant did in fact instruct Tokai to
present case as part of the Commission annexes to evidence that the applicant did in fact instruct Tokai to represent it at that meeting.

84    In so far as the Commission relies on a statement by SDK concerning a meeting which was apparently held in the context of preliminary contacts before the meeting of 21 May 1992, Nippon is unable to understand how the reference to a meeting which took place before the setting-up of the cartel can possibly prove its assertion. As regards SGL's statement, it is drafted in general terms, without the slightest nuance, and constitutes a general admission by SGL of its own participation in the alleged infringement between 1992 and 1998. That statement cannot be interpreted as referring to Nippon's participation in the various meetings that took place during the period in question. Nor does it state that Nippon's interests were represented by Tokai.

85    Nippon further states that the imprecise statements by UCAR, to the effect that 'certain Japanese competitors' and 'several Japanese competitors' attended the meeting, cannot serve as a basis for the Commission's assertion that it was in fact Nippon that was represented by a specific undertaking which attended the meeting.

86    As regards the 'Working group' meetings held on 25 May and 19 September 1992, Nippon states that the Commission's assertions concerning its presence at those meetings are based wholly on imprecise and inconsistent statements by Nippon's competitors. In the Decision, the Commission provides no factual or documentary proof in that regard.

87    As regards, more particularly, the meeting held in Zurich on 25 May 1992, Nippon's alleged presence is based on a single statement of SDK which maintains that 'representatives of Nippon' attended the meeting, without indicating who actually represented it on that occasion. On the other hand, in its statements concerning other companies, SDK provides that information in detail. As regards UCAR's statement, it makes to reference at all to the Zurich meeting. SGL's statement does not mention Nippon's presence at that meeting.

88    As regards the meeting held in Lugano on 19 September 1992, Nippon's alleged presence is once again based entirely on a single statement by SGL. That statement in inconsistent with those made by SDK and UCAR, which do not mention the Lugano meeting.

89    In so far as the Decision claims that the travel records supplied by Nippon prove that it was present at the meetings in question (recital 48), Nippon observes that it sent those records to the Commission following a formal request for information under Article 11 of Regulation No 17. However, the Commission has no power to gather information outside the Community. Accordingly, that information was obtained illegally and cannot serve as a basis for establishing that Nippon participated in the alleged infringement. In any event, the request sent to Nippon in the present case does not satisfy the requirements laid down in Regulation No 17, since the Commission did not mention the penalties provided for in Article 15(1)(b), as required by Article 11(3) of Regulation No 17. Last, the travel records in question do not prove that Nippon participated in the meetings held between May 1992 and March 1993.

90    Nippon claims that it never admitted in its correspondence with the Commission that it had attended either of the meetings held between May 1992 and March 1993. In that regard, it states that its letters of 30 March and 17 May 2000 in reply to the statement of objections must be read in the context of its letter of 18 December 1998.

91    By that letter, Nippon replied to a request sent by the Commission with a view to ascertaining whether Nippon had participated in the meetings held by the cartel. The reply was clear and detailed in respect of each of the periods indicated by the Commission. However, Nippon made no reference to any meeting held between May 1992 to March 1993, although the Commission expressly asked about that period.

92    Nippon admits having acknowledged in its letter of 30 March 2000 that its administrators or managers had participated 'on several occasions' in international meetings between competitors and had stated that it would not discuss its participation in the meetings. However, that general assertion cannot be interpreted as an admission on Nippon's part that it participated in all the meetings, in particular those held specifically between May 1992 and March 1993.

93    In its <s>Case 5:06-mc-10097-MJ-Y000-Document 27-Filed 04/11/2006-Page 58 of</s> the facts set out in the statement of objections. That letter does not mean that Nippon had participated in all the meetings. On the contrary, it refers expressly to its letter of 18 December 1998 and therefore reiterates that Nippon was involved in only a certain number of meetings.

94    Nippon further submits that the Decision is not properly reasoned on that point. Even on the assumption that its participation during that period were established, the Commission has failed to provide the reason why an increase in the basic amount of its fine is justified, regard being had to the fact that its fine had already been increased because of the alleged continuation of the infringement after the Commission's investigation. The Decision fails to explain that twofold increase.

95    As regards the Commission's submission that the Court should increase the fine imposed on Nippon, Nippon maintains that that request is inappropriate and unfounded.

96    The Commission contends that Nippon did not at any time before lodging its application before the Court of First Instance deny having participated in the meetings held between May 1992 and March 1993. On the contrary, Nippon relied on its failure to challenge the facts on which the Commission based its allegations in order to obtain a reduction under the Leniency Notice. In any event, Nippon's participation in the meetings in question is proved by SDK's and SGL's statements.

97    The Commission admits that it has no travel records from Nippon covering the period in issue. However, in the light of the evidence referred to above, there is no need to resort to those records.

98    Last, the Commission requests the Court of First Instance, in the exercise of its unlimited jurisdiction, to increase the fine imposed on Nippon. Contrary to its reply to the statement of objections, Nippon is now challenging the findings in respect of the duration of its infringement. In the Commission's submission, the fine should be increased by an amount at least equal to the 10% granted to Nippon under the Leniency Notice.

Findings of the Court

99    It should be borne in mind, first of all, that in the Decision (recital 113) the Commission limited its assessment under the competition rules and the application of any fines to the period from May 1992, this being the date of the first 'Top Guy' meeting in London at which the basic principles for the cartelisation of the market were agreed. The Commission observed that the fact that Nippon did not attend that meeting was immaterial since it was present at the first 'Working Level' meeting only four days later.

100   In order to determine the scope of the present plea in the light of that finding, it is appropriate to refer again to the chronology of the various stages of the administrative procedure and to analyse the tenor of the documents submitted by the Commission and of the statements made by Nippon.

101   In that regard, it is important to note, first, that in reply to a request for information from the Commission, Nippon, by letter of 18 December 1998 ..., provided information on the journeys made by its Managing Director, Mr [...], and some other managers. It is true that that letter does not mention any movements during the period concerned.

102   Second, the statement of objections of 24 January 2000 states at points 36, 37, 39, 40 and 101, with reference to the statements of SGL, SDK and UCAR:

–    that the participants in the first 'Top Guy' meeting held in London on 21 May 1992 were SGL, UCAR, Mitsubishi, SDK and Tokai, 'the latter also representing the interests of Nippon and SEC', and that the basic principles of the cartel were fixed at that meeting;

–    that that meeting was followed almost immediately by a 'Working Level' meeting in Zurich on 25 May 1992, attended by all the addressees of the statement of objections, including Nippon, and at which the world graphite electrodes market was reviewed region by region (Far East; Middle East and Africa; Western Europe; Eastern Europe; Latin America and North America) and market shares were allocated;

— that Nippon and SDC denied claim that they did not attend the meeting on 21 May 1992 satisfies they were both represented by Tokai and were themselves present at the first 'Working Level' meeting only four days later;

— that a second 'Working Level' meeting took place in Lugano on 19 September 1992 'with the Japanese producers' at which the minimum prices for the European market were communicated to those producers and volumes and quotas were set for each region.

103    Third, Nippon's reply to the statement of objections was drafted on 30 March 2000 when Nippon had not consulted the Commission's investigation file although the Commission had given access to that file between 14 and 23 February 2000 (recital 38 of the Decision); nor did Nippon attend the hearing held by the Commission on 25 May 2000 (recital 40 of the Decision). In that reply, Nippon accepts that its representatives attended 'on a number of occasions' international meetings between competitors and stated that, 'as regards the initial stage [of the cartel]', it did not participate on every occasion although invited to do so. Next, it states, 'in the light of the statement of objections', that 'it does not contest, in factual terms, having attended the meetings' and that it offers to cooperate with the Commission as much as possible.

104    Fourth, the subsequent letter of 17 May 2000, in which Nippon requests application of the Leniency Notice, recalls, with reference to point 6 of the reply of 30 March 2000, that Nippon 'does not essentially dispute the substantive truth of the facts established in the statement of objections'. As an example of its full cooperation with the Commission, it cites, in particular, its letter of 18 December 1998, which it states mentioned all the meetings which its representatives had attended. Last, Nippon expressly states that it put an end to the infringement after February 1998.

105    The documentary evidence just summarised is not of such a kind as to support Nippon's argument. While it is true that Nippon did not state on its own initiative (letter of 18 December 1998) that it had participated in the meetings held during the relevant period, the subsequent statement of objections contained very specific indications that Nippon had attended the meetings or had been represented at them by Tokai, and further stated that questions crucial to the operation of the cartel had been discussed on those occasions. Those indications were based on the statements of undertakings other than Nippon. Nippon must therefore have reasonably concluded, on reading the statement of objections, that the Commission regarded those statements as more significant and more credible than Nippon's letter of 18 December 1998.

106    In those circumstances, if Nippon did not accept either the statements to the effect that it had attended or been represented at the meetings held during the relevant period, as set out in the statement of objections, or the significance and probative value of the statements of SGL, SDK and UCAR on which the Commission based its allegations, it should have disputed them in its reply to the statement of objections. Only such a specific challenge, submitted at the stage of the administrative procedure, would have enabled the Commission to investigate the matter more thoroughly and to attempt to adduce further evidence.

107    In fact, Nippon's letters of 30 March and 17 May 2000 contain no specific challenge against the abovementioned assertions and statements. On the contrary, in the hope of obtaining a reduction in its fine, Nippon expresses its willingness to cooperate and states that it does not dispute the substantive truth of the facts established in the statement of objections. The only specific remark in respect of the duration of the infringement concerns the final stage, namely the cessation of any unlawful activity after February 1998. Placed in context, the fact that Nippon does not challenge the Commission's assertion relating to the first 10 months of the infringement – taken together with its failure to consult the Commission's investigation file or to attend the hearing organised by the Commission – could reasonably be interpreted by the Commission as meaning that Nippon, in the context of its proposed cooperation with the Commission, intended to facilitate the Commission's task of establishing the duration of the infringement by accepting the findings in respect of its commencement and commenting only on its conclusion.

108    As to whether Nippon can go back on that cooperation and claim before the Court that it had not participated in the infringement between May 1992 and March 1993, it has consistently been held that where the undertaking involved does not expressly acknowledge the facts, the Commission must prove the facts and the undertaking is free to put forward, in the procedure before the Court, any plea in its defence which it deems

appropriate Case C-207/98 P CEI-Mülling v Commission [2005] EC R4-10200 paragraph 37). It may be
appropriate to conclude, *a contrario*, that that is not the case where the undertaking expressly, clearly and specifically acknowledges the facts: where it explicitly admits during the administrative procedure the substantive truth of the facts which the Commission alleges against it in the statement of objections, those facts must thereafter be regarded as established and the undertaking estopped in principle from disputing them during the procedure before the Court.

109   In the present case, Nippon's participation in the cartel between May 1992 and March 1993 was inferred by the Commission not from a clear and precise statement made by Nippon, referring expressly to that period, but from a range of evidence such as its conduct towards the Commission during the administrative procedure and its rather general no-contest statements. In those circumstances, Nippon cannot be prevented from pleading before the Court that that range of evidence was misinterpreted as proving its participation during the abovementioned period.

110   However, that belated challenge cannot succeed on the substance. As stated above, the Commission was entitled to take the view that Nippon, faced with the evidence set out in the statement of objections, had not disputed that it had participated in the cartel during the relevant period. Consequently, the Commission could confine itself to referring, before the Court, to Nippon's conduct during the administrative procedure and to the evidence consisting, in particular, of the statements made by SGL, SDK and UCAR. On the basis of those statements – which, in answer to a written question put by the Court, were submitted by the Commission in summary form – it is possible to establish to the requisite legal standard that Nippon participated in the cartel during the relevant period.

111   It follows that the Commission was not required to adduce fresh evidence before the Court or to comment on the arguments first put forward by Nippon before the Court with a view to undermining the abovementioned evidence. In particular, Nippon's submissions concerning its travel records could be regarded as irrelevant. The Commission's task of establishing the facts constituting the infringement, which had been made easier during the administrative procedure by Nippon's conduct and statements, was therefore not objectively rendered more difficult by being subsequently challenged by Nippon before the Court.

112   However, it cannot be overlooked that the Commission, against any expectation that it could reasonably base on Nippon's objective cooperation during the administrative procedure, was required to draft and submit a defence before the Court of First Instance dealing specifically with Nippon's challenge of the facts constituting the infringement, which it had rightly considered that Nippon would no longer call in question. In those circumstances, the Court considers that it should exercise its unlimited jurisdiction under Article 17 of Regulation No 17 and increase Nippon's fine by two percentage points (see paragraph 457 below).

113   That conclusion is not inconsistent with the judgment of the Court of First Instance of 28 February 2002 in Case T-354/94 *Stora Kopparbergs Bergslags* v *Commission* [2002] ECR II-843, paragraph 85. In that judgment, the Court of First Instance held, after the case had been referred back to it following an appeal, that the risk that an undertaking which has been granted a reduction in its fine in exchange for its cooperation will subsequently seek annulment of the decision imposing a penalty for the infringement of the competition rules and will succeed before the Court of First Instance or the Court of Justice is a normal consequence of the exercise of the remedies provided for in the Treaty; accordingly, the mere fact that that undertaking has been successful before the Community judicature cannot justify a fresh review of the size of the reduction granted to it. It should be pointed out, in that regard, that the judgment of the Court of First Instance of 14 May 1998 in Case T-354/94 *Stora Kopparbergs Bergslags* v *Commission* [1998] ECR II-2111, against which the appeal had been brought, had not adjudicated on the appropriateness or otherwise of the reduction of the fine granted to the undertaking in return for its cooperation and that the judgment of the Court of Justice of 16 November 2000 in Case C-286/98 P *Stora Kopparbergs Bergslags* v *Commission* [2000] ECR I-9925, which set aside in part the judgment of the Court of First Instance, had likewise not dealt with the problem of the reduction of the fine. Having regard to that particular procedural situation, the fact that the Court of First Instance refused in its judgment of 28 February 2002 to embark upon a 'fresh review of the size of the reduction granted' to the applicant in that case must not be interpreted as meaning that the Court of First Instance cannot in any circumstances, in the exercise of its unlimited jurisdiction, increase the amount of the fine imposed on an undertaking which, after having the benefit of a reduction in its fine in return for not having disputed the

substantive scope of the facts established by the Commission during the administrative procedure, calls in question the veracity of those facts for the first time before the Court of First Instance.

114   In so far as Nippon further claims that recital 48 of the Decision wrongly claims that its travel records establish that it attended the 'Top Guy' and 'Working Level' meetings, it is sufficient to refer to the wording of that recital, which states that the presence at meetings of representatives of Tokai, Nippon and SEC 'is either admitted or is demonstrated by their travel records'. Since Nippon objectively admitted having participated in the cartel during the whole of its duration, that passage cannot be interpreted as meaning that the Commission intended to base the participation in the infringement, specifically between May 1992 and March 1993, of Nippon alone solely on that undertaking's travel records.

115   Last, the complaint alleging failure to state reasons is not directed against either the Decision in its entirety or the finding of fact concerning the period of Nippon's participation. It is directed only against the increase of 55% in the basic amount of the fine imposed on Nippon. Consequently, even on the assumption that the complaint were well founded, it would entail not the annulment of the entire Decision or of the finding of fact in issue, but only its amendment in so far as it provides for an increase of 55%.

116   It follows from the foregoing that the pleas alleging breach of essential procedural requirements owing to the absence of sufficient evidence of Nippon's participation in the infringement during the period May 1992 to March 1993, and a failure to state reasons, must be rejected.

117   Examination of the first group of pleas has revealed that no factor put forward by the applicants provides grounds for annulment of the Decision in its entirety or for annulment of the findings of fact which it contains. Consequently, the claims that the Decision should be annulled in its entirety or annulled in part as regards Article 1 must all be rejected.

118   The following examination of the submissions and pleas directed against the setting of the fines will therefore take all of those findings of fact into account.

B --   *The claims for annulment of Article 3 of the Decision or a reduction in the fines*

1.   *Pleas alleging breach of the principle prohibiting concurrent sanctions and of the Commission's obligation to take the fines imposed previously into account, and also failure to state reasons on that point*

a)   Arguments of the parties

119   All of the applicants, with the exception of C/G, claim that by refusing to deduct from the fines set by the Decision the amount of the fines already imposed in the United States and in Canada, and also the amount of the punitive damages already paid in those countries, the Commission has breached the rule prohibiting concurrent sanctions for the same infringement. That rule is based on the principles of equity and proportionality entrenched in the constitutional law of the Community; it is confirmed by Article 50 of the Charter of Fundamental Rights of the European Union, proclaimed in Nice on 7 December 2000 (OJ 2000 C 364, p. 1) and by Articles 53 to 58 of the Convention implementing the Schengen Agreement of 14 June 1985 between the Governments of the States of the Benelux Economic Union, the Federal Republic of Germany and the French Republic on the gradual abolition of checks at their common borders (OJ 2000 L 239, p. 19), signed on 19 June 1990 in Schengen (Luxembourg). The principle *ne bis in idem* is also enshrined in Article 4 of Protocol No 7 to the European Convention for the Protection of Human Rights and Fundamental Freedoms ('ECHR'), signed in Rome on 4 November 1950, as interpreted, in particular, in the judgment of the European Court of Human Rights of 29 May 2000 in *Fischer* v *Austria.*

120   It follows from the judgment of the Court of Justice in Case 7/72 *Boehringer* v *Commission* [1972] ECR 1281 that the Commission is required to take account of a penalty imposed by the authorities of a non-member country if the facts established against the applicant undertaking by the Commission, on the one hand, and by those authorities, on the other, are identical. That is precisely the situation in the present case, since, contrary to the position in *Boehringer* v *Commission*, the cartel sanctioned by the United States and Canadian authorities was the same, as regards its object, its locality and its duration, as that sanctioned by the Commission.

Case 1:06-mc-10061-MLW    Document 27    Filed 04/11/2006    Page 18 of 36

121  Furthermore, the failure to take into consideration the principle of imputation is inconsistent with the judgment of the Court of Justice in Case 14/68 *Wilhelm and Others* [1969] ECR 1, paragraph 11, and also with the judgments of the Court of First Instance in Case T-149/89 *Sotralentz v Commission* [1995] ECR II-1127, paragraph 29, and in Joined Cases T-305/94 to T-307/94, T-313/94 to T-316/94, T-318/94, T-325/94, T-328/94, T-329/94 and T-335/94 *Limburgse Vinyl Maatschappij and Others v Commission* [1999] ECR II-931, paragraph 96, where it was held that the general requirement of equity implies that, in setting a fine, the Commission is required to take into account penalties already borne by the same undertaking for the same act.

122  In that context, SGL disputes the assessment in the Decision to the effect that the fines imposed in the United States and in Canada only took into consideration the anti-competitive effects of the cartel in those jurisdictions (recitals 179 and 180 of the Decision). In order to establish that identical facts were the subject of penalties in the United States and in Europe, SGL refers to the findings of fact made in the Decision. Thus, recitals 14, 17, 18, 71 to 73, 106 and 149 of the Decision show that the Commission generally accepted that the infringements consisted of agreements at worldwide level, based on a global plan, in which the undertakings concerned participated. The Commission did not assert that the facts in respect of which it imposed a fine constitute events capable of being separated from the facts in respect of which fines had already been imposed in the United States. As regards the material complaint to which the sanction imposed on the applicant in the United States refers, it is stated in the plea agreement, approved by the courts, that the agreements on prices and quotas concerned took place 'in the United States and elsewhere', between 1992 and June 1997.

123  SGL further submits that the criminal penalty imposed on it in the United States, amounting to USD 135 million, already exceeds the maximum limit of the penalties (10% of worldwide turnover) provided for in Article 15(2) of Regulation No 17. The Commission was therefore prevented from imposing on it a further penalty amounting to EUR 80.2 million.

124  SGL further emphasises that by failing to take into account the penalties already imposed in other countries, the Commission failed to have regard to the former Director General of the Directorate-General for Competition, Mr Alexander Schaub, who at an interview on 1 December 1998 had promised that, in calculating the fine, the Commission would take account of the penalties imposed in the United States.

125  The applicants maintain, moreover, that the Commission infringed the principle that a second penalty may not be imposed for the same offence by taking account of their global turnover, including turnover achieved in the United States and in Canada. That turnover had already been taken into account by the United States and Canadian authorities for the purpose of setting the fines. In order to avoid a double penalty, they submit, the Commission ought therefore to have taken into account only the proportion of their turnover resulting from sales of graphite electrodes in Europe.

126  The applicants go on to claim that the Commission ignored the deterrent effect of the fines already imposed. When determining the amount of the fines, it failed to take account of the fact that the applicants had already been ordered, in non-member countries, to pay fines and damages in an amount sufficient to deter them from committing any further breaches of competition law. The applicants have therefore been punished enough.

127  Last, Tokai and Nippon criticise the Commission's failure to provide sufficient reasons in the Decision on that point. First, the Commission failed to reply to Tokai's argument concerning the principle *ne bis in idem* set out in its reply to the statement of objections, when it emphasised the need for a 'territorial localisation' sufficient for the calculation of the fine. Second, according to Nippon, the obligation to state reasons was particularly important in this case, since the Commission imposed fines calculated on the basis of global turnover, a method which constituted a new step in the Commission's decision-making practice.

128  The Commission argues, essentially, that fines imposed by authorities in non-member States penalise infringements only of those countries' domestic competition law; such authorities have no jurisdiction to punish breaches of Community competition law. It is of no relevance that various authorities have examined the same facts: a single act can constitute a violation of several legal systems.

129  As regards the deterrent nature of the fines, the Commission observes that the main criterion for the purposes of calculating a fine is the gravity of the infringement. There is no reason to conclude that the fines

must be reduced because the applicants have allegedly already been subject to determination of penalties imposed in other jurisdictions. The applicants were penalised because they failed to comply with the Community competition rules by committing an infringement in Europe. Those competition rules must be taken as seriously as those of other jurisdictions if they are to have the desired deterrent effect.

b)    Findings of the Court

130   It follows from the case-law that the principle *ne bis in idem*, also enshrined in Article 4 of Protocol No 7 to the ECHR, is a general principle of Community law upheld by the Community judicature (Joined Cases 18/65 and 35/65 *Gutmann* v *Commission* [1966] ECR 103, 119, and Joined Cases C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P *Limburgse Vinyl Maatschappij and Others* v *Commission* [2002] ECR I-8375, paragraph 59, and *Boehringer* v *Commission*, cited at paragraph 120 above, paragraph 3).

131   In the field of Community competition law, the principle precludes an undertaking from being sanctioned by the Commission or made the defendant to proceedings brought by the Commission a second time in respect of anti-competitive conduct for which it has already been penalised or of which it has been exonerated by a previous decision of the Commission that is no longer amenable to challenge.

132   None the less, the Court of Justice has held that the possibility of concurrent sanctions, one a Community sanction, the other a national one, resulting from two sets of parallel proceedings, each pursuing distinct ends, is acceptable because of the special system of sharing jurisdiction between the Community and the Member States with regard to cartels. However, a general requirement of natural justice demands that, in determining the amount of a fine, the Commission must take account of any penalties that have already been borne by the undertaking in question in respect of the same conduct where these were imposed for infringement of the law relating to cartels of a Member State and where, consequently, the infringement was committed within the Community (*Wilhelm and Others*, cited at paragraph 121 above, paragraph 11; *Boehringer* v *Commission*, cited at paragraph 120 above, paragraph 3; Case T-141/89 *Tréfileurope* v *Commission* [1995] ECR II-791, paragraph 191; and *Sotralentz* v *Commission*, cited at paragraph 121 above, paragraph 29).

133   In so far as the applicants claim that, by imposing on them a fine for their participation in a cartel in respect of which they have already been penalised by the United States and Canadian authorities, the Commission has violated the principle *ne bis in idem*, according to which a second penalty may not be imposed on the same person in respect of the same infringement, it should be recalled that the Community judicature has held that an undertaking may be made the defendant to two parallel sets of proceedings concerning the same infringement and thus incur a double penalty, one imposed by the competent authority of the Member State concerned and the other a Community penalty. That possibility of concurrent sanctions is justified where the two sets of proceedings pursue different ends (*Wilhelm and Others*, cited above, paragraph 11; *Tréfileurope* v *Commission*, cited above, paragraph 191; and *Sotralentz* v *Commission*, cited above, paragraph 29).

134   In those circumstances, the principle *ne bis in idem* cannot, *a fortiori*, apply in the present case because the procedures conducted and penalties imposed by the Commission on the one hand and the United States and Canadian authorities on the other clearly did not pursue the same ends. The aim of the first was to preserve undistorted competition within the European Union or the EEA, whereas the aim of the second was to protect the United States or the Canadian market (see, to that effect, Case 44/69 *Buchler* v *Commission* [1970] ECR 733, paragraphs 52 and 53). The application of the principle *ne bis in idem* is subject not only to the infringements and the persons sanctioned being the same, but also to the unity of the legal right being protected (Opinion of Advocate General Ruiz-Jarabo in Case C-213/00 P *Italcementi* v *Commission* [2004] ECR I-0000, point 89).

135   That conclusion is supported by the scope of the principle that a second penalty may not be imposed for the same offence, as laid down in Article 4 of Protocol No 7 to the ECHR. It is clear from the wording of Article 4 that the intended effect of the principle is solely to prevent the courts of any given State from trying or punishing an offence for which the person concerned has already been acquitted or convicted in that same State. On the other hand, the principle *ne bis in idem* does not preclude a person from being tried or punished more than once in two or more different States for the same conduct. Consequently, the judgment in *Fischer* v