Exhibit D
to
**SUPPLEMENTAL DECLARATION OF JAMES N. PENROD IN SUPPORT OF RESPONSE TO MICROSOFT CORPORATION'S OBJECTIONS TO MAGISTRATE'S ORDER**

# Exhibit D

# Part 2 of 2

Exhibit D
to
**SUPPLEMENTAL DECLARATION OF JAMES N. PENROD IN SUPPORT OF RESPONSE TO MICROSOFT CORPORATION'S OBJECTIONS TO MAGISTRATE'S ORDER**

Dockets.Justia.com

Case 5:06-mc-80038-JF     Document 27     Filed 04/14/2006     Page 2 of 3

*Austria* cited by SCJ has no relevance to the present case, since it was delivered in application of Article 4 of Protocol No 7 and concerned two convictions in the same country.

136  It is also important to emphasise that the applicants have relied on no convention or rule of public international law that prevents the authorities or courts of different States from trying and convicting the same person on the basis of the same facts. Such a prohibition could arise today only through very close international cooperation leading to the adoption of common rules such as those contained in the abovementioned Convention implementing the Schengen Agreement. The applicants have not pointed to any binding agreement between the Community and non-member countries such as the United States or Canada that lays down such a prohibition.

137  It is true that Article 50 of the Charter of Fundamental Rights provides that no one may be tried or punished again in criminal proceedings for an offence of which he has already been finally acquitted or convicted within the Union in accordance with the law. However, that charter is clearly intended to apply only within the territory of the Union and the scope of the right laid down in Article 50 is expressly limited to cases where the first acquittal or conviction was handed down within the Union.

138  It follows that the Court must reject the applicants' allegation of infringement of the principle *ne bis in idem* on the ground that the cartel in question was also penalised outside the Community or that the Commission, in its Decision, took account of their worldwide turnover, including turnover achieved in the United States and Canada already taken into consideration by the United States and Canadian authorities, in fixing their fines.

139  In so far as the applicants allege that the Commission misconstrued *Boehringer* v *Commission*, cited at paragraph 120 above, according to which the Commission has a duty to set off a penalty imposed by the authorities of a non-member country if the actions alleged against the applicant by the Commission are the same as those alleged by those authorities, it should be remembered that, in that judgment, the Court held (paragraph 3) that:

'[i]t is only necessary to decide the question whether the Commission may also be under a duty to set a penalty imposed by the authorities of a third State if in the case in question the actions of the applicant complained of by the Commission, on the one hand, and by the [United States] authorities, on the other, are identical'.

140  It is clear from that passage that the Court, far from deciding the question whether the Commission is required to set off a penalty imposed by the authorities of a non-member State where the facts with which the Commission charges an undertaking are the same as those alleged by those authorities, regarded the identity of the facts alleged by the Commission and the authorities of a non-member State as being a precondition of that question.

141  Furthermore, it was in view of the particular situation which arises from the close interdependence between the national markets of the Member States and the common market and from the special system for the division of jurisdiction between the Community and the Member States with regard to cartels on the same territory, namely the common market, that the Court, having acknowledged the possibility of dual sets of proceedings and having regard to the possibility of double sanctions flowing from them, held it to be necessary, in accordance with a requirement of natural justice, for account to be taken of the first decision imposing a penalty (*Wilhelm and Others*, cited at paragraph 121 above, paragraph 11, and Opinion of Advocate General Mayras in *Boehringer* v *Commission*, cited at paragraph 120 above, p. 1293, at 1301 to 1303).

142  The circumstances of the present case, however, are obviously different. Given that the applicants point to no express provision of a convention requiring the Commission, when determining the amount of a fine, to take into account penalties already imposed on the same undertaking in respect of the same conduct by the authorities or courts of a non-member State, such as the United States or Canada, they cannot validly complain that, in the present case, the Commission failed to satisfy any such alleged obligation.

143  In any event, even if it should be inferred *a contrario* from the judgment in *Boehringer* v *Commission* that the Commission is in fact required to set off any penalty imposed by the authorities of a non-member country

where the facts alleged against the undertaking in question by the Commission are the same as those alleged by the first authorities, it must be emphasised that, notwithstanding that the judgment delivered against SGL in the United States states that the purpose of the graphite electrodes cartel was to limit production and increase the prices of those products 'in the United States and elsewhere', it has in no way been shown that the penalty imposed in the United States related to applications of the cartel or its effects other than in the United States (see, to that effect, *Boehringer* v *Commission*, paragraph 6) and in the EEA in particular, an extension which, moreover, would have clearly encroached on the territorial jurisdiction of the Commission. That observation applies equally to the judgment handed down in Canada.

144   As regards the deterrent effect of the fines already imposed, according to the case-law, the Commission's power to impose fines on undertakings which, intentionally or negligently, infringe the provisions of Article 81 (1) EC or Article 82 EC is one of the means conferred on the Commission to enable it to carry out the task of supervision entrusted to it by Community law. That task certainly includes the duty to investigate and punish individual infringements, but it also encompasses the duty to pursue a general policy designed to apply, in competition matters, the principles laid down by the Treaty and to guide the conduct of undertakings in the light of those principles (Joined Cases 100/80 to 103/80 *Musique diffusion française and Others* v *Commission* [1983] ECR 1825, paragraph 105).

145   It follows that the Commission has power to decide the level of fines so as to reinforce their deterrent effect where infringements of a given type, although established as being unlawful at the outset of Community competition policy, are still relatively frequent on account of the profit that certain of the undertakings concerned are able to derive from them (*Musique diffusion française* v *Commission*, cited above, paragraph 108).

146   The applicants cannot validly argue that there was in their case no such deterrent effect because they had already been sanctioned on the basis of the same facts by the courts of non-member States. That argument is a restatement of the applicants' argument concerning breach of the principle *ne bis in idem*, which was rejected above.

147   Furthermore, as is clear from the case-law cited above, the objective of deterrence which the Commission is entitled to pursue when setting fines is intended to ensure that undertakings comply with the competition rules laid down in the Treaty when conducting their activities within the Community or the EEA. Consequently, the deterrent effect of a fine imposed for infringement of the Community competition rules cannot be assessed by reference solely to the particular situation of the undertaking sanctioned or by reference to whether it has complied with the competition rules in non-member States outside the EEA.

148   It was therefore permissible for the Commission to impose on SGL a fine of a sufficiently deterrent level within the limits laid down in Article 15(2) of Regulation No 17, without being required to take account of the sanctions imposed in the United States and Canada for the purpose of determining those limits.

149   As regards the plea alleging failure to state reasons, according to settled case-law the statement of reasons must disclose in a clear and unequivocal fashion the reasoning followed by the institution which adopted the measure in question in such a way as to enable the persons concerned to ascertain the reasons for the measure so as to defend their rights and to enable the Community judicature to carry out its review (see Case T-171/97 *Swedish Match Philippines* v *Council* [1999] ECR II-3241, paragraph 82, and the case-law cited there, and Joined Cases T-12/99 and T-63/99 *UK Coal* v *Commission* [2001] ECR II-2153, paragraph 196).

150   In the present case, recitals 179 to 183 of the Decision expressly rejected the line of argument that SGL had developed during the administrative procedure with a view to benefiting from the application of the principle *ne bis in idem*. The Commission thus stated that in its view the principle was not to apply as regards the sanctions imposed by the United States and Canadian authorities. Even supposing that those recitals did not adopt a position on a specific argument put forward by Tokai (see paragraph 127 above) and that the Commission's approach did in fact constitute a new step in its decision-making practice, there was nothing to prevent the applicants from effectively defending their interests before the Court of First Instance by putting forward whatever pleas and arguments seemed relevant for the purpose of challenging the Commission's theory. Furthermore, the Court of First Instance was in a position to carry out a judicial review by examining

the various aspects of the principle. MUN in *Document 27*     Filed 04/11/2006     Page 23 of 36

151  It follows from the foregoing that the pleas alleging breach of the principle prohibiting concurrent sanctions and of the Commission's obligation to take into account the sanctions previously imposed, and a failure to state reasons on that point, must be rejected.

152  As regards SGL's specific complaint that the competent Director-General of the Commission promised it that the United States sanctions would be imputed to the fine imposed by the Commission, the applicant relies on the principle of protection of its legitimate expectations. That principle extends to any individual in a situation where the Community authorities have caused him to entertain legitimate expectations (Case 265/85 *Van den Bergh en Jurgens v Commission* [1987] ECR 1155, paragraph 44, and Case C-152/88 *Sofrimport v Commission* [1990] ECR I-2477, paragraph 26), it being understood that no one may plead infringement of that principle unless he has been given precise, unconditional and consistent assurances, from authorised, reliable sources, by the administration (Case T-203/97 *Forvass v Commission* [1999] ECR-SC I-A-129, II-705, paragraph 70, and the case-law cited there, and Case T-290/97 *Mehibas Dordtselaan v Commission* [2000] ECR II-15, paragraph 59).

153  In that regard, it is sufficient to state that the Decision was adopted by the College of Members of the Commission, in accordance with the principle of collegiality established in Article 1 of the Rules of Procedure of the Commission of 29 November 2000 (OJ 2000 L 308, p. 6) and not by a Director General (see, in that regard, Case T-31/99 *ABB Asea Brown Boveri v Commission* [2002] ECR II-1881, paragraph 104). Nor could SGL reasonably expect that the decision imposing a fine on it in order to sanction its participation in the cartel active, on a worldwide scale, on the graphite electrodes market would be delegated, as a 'management or administrative measure' within the meaning of Article 14 of the Rules of Procedure, to the Director General competent for competition matters. Consequently, the Director General cannot have provided 'precise assurances from [an] authorised, reliable source' as regards the imputation of the sanctions imposed on it in the United States and Canada, as his powers were limited to submitting proposals to the College which the College was at liberty to accept or reject.

154  Furthermore, SGL appears to have itself doubted the precise nature of the assurances allegedly given by Mr Schaub on 1 December 1998. In its reply of 4 April 2000 to the statement of objections, SGL does not refer to those assurances, but, on the contrary, criticises the Commission for not revealing whether and to what extent it would take account, under the principle *ne bis in idem*, of the sanctions already imposed in the United States. In any event, SGL did not claim to have been encouraged by Mr Schaub's alleged promise to cooperate with the Commission and to recognise the substantive truth of the impugned facts.

155  It follows that the complaint alleging breach of the principle of protection of legitimate expectations as regards the imputation of the sanction imposed on SGL in the United States cannot be upheld either.

2.  *The pleas alleging failure to have regard to the Guidelines, the illegality of the Guidelines and failure to state reasons on that point*

a)  Preliminary observations on the legal framework of the fines imposed on the applicants

156  Article 15(2) of Regulation No 17 provides that '[t]he Commission may by decision impose on undertakings ... fines of from [EUR] 1 000 ... to [EUR] 1 000 000 ..., or a sum in excess thereof but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement where, either intentionally or negligently[,] they infringe Article [81](1) ... of the Treaty'. Article 15(2) also provides that '[i]n fixing the amount of the fine, regard shall be had both to the gravity and to the duration of the infringement'.

157  That provision confers on the Commission a discretion in fixing fines (Case T-229/94 *Deutsche Bahn v Commission* [1997] ECR II-1689, paragraph 127), which is, in particular, a function of its general policy in competition matters (*Musique diffusion française v Commission*, cited at paragraph 144 above, paragraphs 105 and 109). It was against that background that, in order to ensure the transparency and objectivity of its fining decisions, the Commission adopted its Guidelines in 1998. The Guidelines constitute an instrument intended to

define, while complying with higher-ranking law, the manner in which it proposes to exercise of its discretion; the consequence is a self-limitation of that power (Case T-214/95 *Vlaams Gewest v Commission* [1998] ECR II-717, paragraph 89), in so far as the Commission must comply with the Guidelines which it has itself laid down (Case T-380/94 *AIUFFASS and AKT v Commission* [1996] ECR II-2169, paragraph 57).

158   In the present case, according to recitals 126 to 144 of the Decision, the Commission imposed fines on all the applicants on account of the infringement of Article 81(1) EC and Article 53(1) of the EEA Agreement. It follows from those recitals that the fines were imposed pursuant to Article 15(2) of Regulation No 17 and that the Commission – although the Decision does not make express reference to the Guidelines – determined the amount of the fines in application of the method defined therein.

159   According to that method, the Commission takes as its starting point for calculating the amount of the fines to be imposed on the undertakings concerned a basic amount determined according to the gravity of the infringement. In assessing the gravity of the infringement, account must be taken of its nature, its actual impact on the market, where this can be measured, and the size of the relevant geographic market (point 1.A, first paragraph). Within that context, infringements are put into one of three categories, namely 'minor infringements', for which the likely fine will be between EUR 1 000 and EUR 1 000 000, 'serious infringements', for which the likely fine will be between EUR 1 000 000 and EUR 20 000 000, and 'very serious infringements', for which the likely fines will be above EUR 20 000 000 (point 1.A, second paragraph, first to third indents). Within each of these categories, the proposed scale of fines makes it possible to apply differential treatment to undertakings according to the nature of the infringements committed (point 1.A, third paragraph). It is also necessary to take account of the effective economic capacity of offenders to cause significant damage to other operators, in particular consumers, and to set the fine at a level which ensures that it has a sufficiently deterrent effect (point 1.A, fourth paragraph).

160   Within each of the three categories of infringement thus defined, it may be necessary, according to the Commission, to apply weightings in certain cases to the amounts determined in order to take account of the specific weight and, therefore, the real impact of the offending conduct of each undertaking on competition, particularly where there is considerable disparity between the sizes of the undertakings committing infringements of the same type and, consequently, to adjust the starting point of the basic amount according to the specific nature of each undertaking (hereinafter 'the starting amount') (point 1.A, sixth paragraph).

161   As regards the factor relating to duration, the Guidelines draw a distinction between infringements of short duration (in general, less than one year), for which the amount determined for gravity should not be increased, infringements of medium duration (in general, one to five years), for which that amount may be increased by up to 50%, and infringements of long duration (in general, more than five years), for which the amount may be increased by up to 10% per year (point 1.B, first paragraph, first to third indents).

162   The Guidelines then set out, by way of example, a list of aggravating circumstances and attenuating circumstances that may be taken into consideration as grounds for increasing or reducing the basic amount.

163   Last, the Guidelines state that the final amount calculated according to this method (basic amount increased or reduced on a percentage basis) may not in any case exceed 10% of the worldwide turnover of the undertakings, as laid down by Article 15(2) of Regulation No 17 (point 5(a)). The Guidelines further provide that, depending on the circumstances, account should be taken, once the calculations described above have been made, of certain objective factors such as a specific economic context, any economic or financial benefit derived by the offenders, the specific characteristics of the undertakings in question and their real ability to pay in a specific social context, and the fines should be adjusted accordingly (point 5(b)).

164   It is against that background that it is necessary to determine whether, as the applicants claim, the fines imposed in Article 3 of the Decision are excessive and were determined on the basis of an incorrect methodology.

165   Although the Commission has a discretion when determining the amount of each fine, and is not required to apply a precise mathematical formula (Case T-150/89 *Martinelli v Commission* [1995] ECR II-1165, paragraph 59), the Court none the less has, pursuant to Article 17 of Regulation No 17, unlimited jurisdiction

within the meaning of Article 229 EC, an action brought against the decision whereby the Commission has fixed a fine and may therefore cancel, reduce or increase the fine imposed. In that context, its assessment of the appropriateness of the fine may, independently of any manifest errors of assessment made by the Commission, justify the production and taking into account of additional information which is not mentioned in the Commission decision (*SCA Holding* v *Commission*, cited at paragraph 108 above, paragraph 55).

b)    The starting amounts according to gravity established in the Decision

 Summary of the Decision

166  At recitals 129 to 154 of the Decision, the Commission determined the starting amount of each fine according to the gravity of the infringement. In that context, it took account of

—    the nature of the infringement (market-sharing and price-fixing in a significant sector of the industry), taking the view that this was a very serious infringement of Article 81(1) EC and Article 53(1) of the EEA Agreement;

—    the actual impact of the infringement on the graphite electrodes market in the EEA, taking the view that prices were not only agreed but also announced and implemented and observing that prices applied (in particular price increases) largely followed those agreed by the cartel over a period of six years;

—    the size of the relevant geographic market, taking the view that the cartel covered the whole of the common market and, following its creation, the whole of the EEA.

167  In the light of those factors, the Commission concluded that the undertakings concerned had committed a 'very serious infringement'.

168  Then, in order to take account of the actual economic capacity of each undertaking to cause significant harm to competition and in the light of the great disparity in size between the undertakings concerned, the Commission applied differentiated treatment. To that end, it divided the undertakings concerned into three categories, on the basis of the worldwide turnover of each undertaking in sales of the product concerned. The comparison was based on the figures for turnover attributable to the product in question during the final year of the infringement, 1998, as shown in the table at recital 30 of the Decision.

| Company | Worldwide turnover in graphite electrodes (1998), EUR million + market share in the worldwide graphite electrodes market (1992 to 1998) | | EEA-wide turnover in graphite electrodes (1998) + market share in the EEA-wide graphite electrodes market (1992 to 1998) | | Total worldwide turnover (2000, EUR million) |
|---|---|---|---|---|---|
| SGL | [...] | [...]% | [...] | [...]% | 1 262 |
| UCAR | [...] | [...]% | [...] | [...]% | 841 |
| VAW | [...] | [...]% | [...] | [...]% | 3 693 |
| C/G | [...] | [...]% | [...] | [...]% | 225 |
| SDK | [...] | [...]% | [...] | [...]% | 7 508 |
| Tokai | [...] | [...]% | [...] | [...]% | 652 |
| SEC | [...] | [...]% | [...] | [...]% | 155 |
| Nippon | [...] | [...]% | [...] | [...]% | 189 |

169  On the basis of the figures in that table, SGL and UCAR, the two main producers of graphite electrodes at worldwide level and at EEA level, were placed in the first category (starting amount EUR 40 million). C/G, SDK and Tokai, with much smaller market shares at worldwide level (between 5% and 10%), were placed in the second category (starting amount EUR 16 million). VAW, SEC and Nippon, whose worldwide market

170   Last, in order to take account of the size and global resources of VAW and SDK, the Commission adjusted VAW's starting amount by a weighting of 1.25, making a total of EUR 10 million, and SDK's starting amount by a weighting of 2.5, making a total of EUR 40 million.

Arguments of the parties

171   SGL contends that the Guidelines are not applicable. It claims that the calculation method defined therein marks a complete departure from the previous approach by ignoring proportionality to turnover. Only a penalty that is proportionate to worldwide turnover is compatible with Article 15 of Regulation No 17. Otherwise, undertakings such as SGL whose turnover is achieved mainly through sales of the product concerned are placed at a disadvantage by comparison with undertakings whose turnover is for the most part achieved with other products.

172   UCAR, on the other hand, criticises the Commission for having taken worldwide turnover as a criterion of the relative importance of the undertakings concerned. That method penalised UCAR, a United States company, since the level of its economic activities in the United States is necessarily reflected in its worldwide turnover.

173   SGL proceeds to denounce a lack of transparency and failure to provide reasons as regards the establishment of the three categories in which the undertakings concerned were placed, in particular as regards the choice of the amounts and the criteria used for classification purposes. It maintains that the amounts thus determined are arbitrary and that, moreover, it is impossible to tell from the Decision whether the Commission relied on the worldwide turnover of the undertakings concerned or on their turnover in the relevant product. Furthermore, the very high starting amount of EUR 40 million determined for SGL according to the gravity of the infringement is incompatible with the Commission's former decision-making practice.

174   Nor, in SGL's submission, has the Commission demonstrated that the cartel actually caused a genuine increase in prices. The Commission ignored the fact that there was an alternative explanation for the price increases between 1992 and 1996: during the crippling structural crisis in the early 1990s, prices were significantly below retail costs; the subsequent increases were therefore necessary for the survival of the sector and the financing of quality improvements. Furthermore, the Commission itself acknowledges (recital 139 of the Decision) that it is difficult to say whether and to what extent prices would have been different without the cartel.

175   SGL submits that the Commission justified the significant starting amounts only by the need to ensure a 'deterrent effect' (recitals 146, 148 and 152 of the Decision). It therefore ignored the fact that the principle of fairness requires that account also be taken of the circumstances particular to each undertaking, such as the aspects of specific prevention and proportionality.

176   The four Japanese undertakings and C/G, for whom the EEA was not their 'home market', claim that instead of ascribing disproportionate significance to worldwide turnover and market shares in the product concerned, the Commission should have based itself on turnover and market shares in the EEA. Only such a method would have observed the limited territorial competence of the Commission and made it possible to measure the real capacity of each undertaking to cause serious harm to competition in the EEA.

177   The EEA market shares of Tokai [...]%, Nippon [...]%, SDK [...]%, SEC [...]% and C/G [...]% were only marginal by comparison with the shares held by SGL and UCAR; their participation in the cartel's European activities was purely passive. In that context, they make numerous comparisons between the starting amounts, the basic amounts and the final amounts of their fines with the corresponding figures of the ringleaders, SGL and UCAR, and between the various turnover figures of the undertakings concerned in order to show that their fines were excessive in relation to their economic presence in the EEA. They also compare the method of calculation applied by the Commission with what they claim to be the fairer method used by the United States authorities.

178   Their marginal and passive presence on the EEA market is, they submit, in no way the result of the effects

of the cartel, and in consequence were in a position to take decisions which they had taken long before the beginning of the infringement period, in their own economic interest. The Commission has not succeeded in proving that they refrained from selling graphite electrodes in the EEA precisely because of the cartel. In particular, it has not established that their market shares or sales in the EEA would have been significantly higher in the absence of the cartel.

179  Tokai, Nippon, SEC and C/G further claim that even on the basis of the Commission's logic and accepting that their starting amount should be fixed on the basis of worldwide turnover in 1998 for the relevant product, by placing them in the three categories referred to above and setting the corresponding figures (EUR 40 million, EUR 16 million and EUR 8 million) the Commission breached the principles of proportionality and equal treatment. They contend that their starting amounts are proportionally, i.e. by comparison with their worldwide turnover and market shares, much higher than SGL's, UCAR's and SDK's.

180  As regards its individual participation in the infringement, C/G further explains that its situation may be distinguished from that of the other members of the cartel on a number of points. It refers, in addition to its marginal role, to a number of factors from which it concludes that its conduct could not be described as 'very serious'.

181  SDK criticises the Commission for having artificially inflated its fine by applying a deterrent factor of 2.5, which increased its starting amount by EUR 24 million. Such a factor was not applied either to the ringleaders of the cartel, or to the members of the cartel with larger market shares in the EEA, or to those who had obstructed the Commission's investigation and who had continued the infringement even after that investigation. Thus SDK alone has been subjected to a double discrimination that is both discriminatory and disproportionate, whereas the multiplier applied to VAW was only 1.25 and increased that company's starting amount by only EUR 2 million.

182  In so far as the Commission relies on SDK's size and its global resources (recitals 152 to 154 of the Decision), SDK refers to an economic expert's report in order to demonstrate that economic force does not depend on size in itself. First, large companies with small market shares on a relevant market, such as SDK, derive no power from their presence on other markets which have no connection with the relevant market. Nor, second, can a large conglomerate with a weak market position be regarded as being economically strong solely because of its size. An undertaking with a limited market share for the product in question does not derive greater benefit from a cartel solely because it also sells products which have no connection with the cartel and are not affected by it. In any event, even on the assumption that a deterrent factor must be applied, it should depend on the position on the EEA market, on which SDK occupies only a marginal position, and take account only of the likelihood of the cartel being discovered and of the profits which the members of the cartel stood to make.

183  In SDK's submission, the application of the multiplier of 2.5 is also impossible to reconcile with several decisions previously taken by the Commission. The Commission is therefore treating the different cases inconsistently. Last, SDK claims that its rights of defence were breached in that it was not given the opportunity to express its views on the reasons for and the criteria of the choice of a multiplier of 2.5.

184  All the Japanese applicants claim that the Commission failed to provide sufficient reasons in relation to the various points just summarised.

185  The Commission contends that it is clear from the reasons set out in the Decision and from the case-law that none of the pleas is well founded.

186  As regards, in particular, the division of the undertakings into three categories and the fixing of the starting amounts, the Commission denies that it based itself solely on worldwide turnover derived from the relevant product. The starting point for calculating the fines was the gravity of the infringement (nature and impact and also size of the relevant geographic market). Worldwide turnover and market shares merely served as a basis for determining the relative importance within the EEA of the undertakings involved in the cartel. The Commission's approach therefore took numerous factors into account and is not a simple calculation based on turnover.

187  As regards the multiplier 2.5 applied to the starting amount of DM 40 for SDK, the Commission disputes the argument that that adjustment was supposed to have an additional deterrent effect. On the contrary, the adjustment factor merely recognises the fact that different financial resources require different fines if the fines are supposed to have equivalent deterrent effect. That means a differentiated treatment of the members of the cartel. In the case of large conglomerates, such as that of which SDK forms part, it is not sufficient to use turnover on the market where the infringement took place.

188  As regards the precise figure of 2.5, the Commission states that it was not based on the worldwide turnover of the group to which the applicant belonged. Rather, the Commission applied a rough adjustment which took account of SDK's size and global resources, since it was by far the largest undertaking concerned by the Decision.

Findings of the Court

–       The applicability of the Guidelines for the purpose of determining the turnover to be employed

189  In so far as SGL claims that the Guidelines are incompatible with the Commission's previous decision-making practice, which was based on worldwide turnover, the fines which the Commission is able to impose for infringement of the Community rules on competition are defined in Article 15 of Regulation No 17, which was adopted before the infringement was committed. As stated at paragraphs 159 to 164 above, the general method for setting fines described in the Guidelines is based on the two criteria referred to in Article 15(2) of Regulation No 17, namely the gravity of the infringement and its duration, and observes the upper limit determined by reference to the turnover of each undertaking, as laid down in that provision (*LR AF 1998* v *Commission*, cited at paragraph 38 above, paragraph 231).

190  Consequently, the Guidelines do not go beyond the legal framework for fines set out in Article 15(2) (*LR AF 1998* v *Commission*, paragraph 232).

191  Nor, contrary to what the applicants claim, does the change in the Commission's administrative practice brought about by the Guidelines constitute an alteration of the legal framework determining the level of fines which can be imposed that is contrary to the principles of non-retroactivity of legislation and legal certainty. First, the Commission's previous practice does not itself serve as a legal framework for the fines imposed in competition matters, since that framework is defined solely in Regulation No 17. Second, having regard to the wide discretion which Regulation No 17 leaves the Commission, the fact that the latter introduces a new method of calculating fines, which may lead to an increase in the general level of fines, cannot be regarded as an aggravation, with retroactive effect, of the fines as provided for in Article 15(2) of Regulation No 17 (*LR AF 1998* v *Commission*, paragraphs 233 to 235).

192  Furthermore, the fact that in the past the Commission imposed fines of a certain level for certain types of infringement does not mean that it is estopped from raising that level within the limits indicated in Regulation No 17 if that is necessary to ensure the implementation of Community competition policy (*Musique diffusion française and Others* v *Commission*, cited at paragraph 144 above, paragraph 109). The proper application of the Community competition rules in fact requires that the Commission may at any time adjust the level of fines to the needs of that policy (*Musique diffusion française and Others* v *Commission*, paragraph 109, and *LR AF 1998* v *Commission*, paragraphs 236 and 237).

193  It follows that the complaint that the Guidelines are inapplicable must be rejected.

194  Consequently, the reference made by the four Japanese applicants and by C/G to the allegedly more equitable calculation methods applied in the United States is inoperative, since the Commission could lawfully apply the calculation method set out in the Guidelines.

–       The turnover used by the Commission in determining the starting amount

195  In so far as the Commission is criticised for not having determined the various starting amounts on the basis of either turnover from sales of graphite electrodes in the EEA or worldwide turnover for all products, it

should be observed, first, that the only express reference to turnover in Article 15(2) of Regulation No 17 concerns the upper limit that a fine cannot exceed and, second, that that limit is taken to refer to worldwide turnover (*Musique diffusion française* v *Commission*, cited at paragraph 144 above, paragraph 119). Provided that it remains within that limit, the Commission may in principle choose which turnover to take in terms of territory and products in order to determine the fine (the *Cement* judgment, cited at paragraph 39 above, paragraph 5023), without being obliged to adhere precisely to the worldwide turnover or turnover in the geographic market or the relevant product market. Last, although the Guidelines do not provide that fines are to be calculated according to a specific turnover, they do not preclude such a figure from being taken into account, provided that the choice made by the Commission is not vitiated by a manifest error of assessment.

196   In the present case, contrary to SGL's argument, it is clear from recitals 149 to 151 of the Decision that the Commission chose the worldwide turnover achieved from sales of the relevant product so that the starting amounts would reflect the nature of the infringement, its actual impact on the market and the scope of the geographic market, having regard to the considerable disparity in size between the members of the cartel.

197   Having regard to the intrinsic nature of the cartel, the Commission was correct to use that turnover, without making an error of assessment, in that it allowed the Commission to take account of 'the effective economic capacity of offenders to cause significant damage to other operators, in particular consumers', within the meaning of point 1.A, fourth paragraph, of the Guidelines.

198   According to the findings made in the Decision, the cartel had a global dimension and included, in addition to price fixing, market sharing on the basis of the 'home producer' principle: producers not originating in the EEA, instead of providing aggressive competition on the EEA market, were ultimately to withdraw from that market, which was not their 'home market' (see paragraphs 64 and 67 above). If the Commission had calculated Tokai's, SDK's, Nippon's, SEC's and C/G's starting amounts on the basis of their low turnover in the EEA for the relevant product, it would have rewarded them for having complied with one of the basic principles of the cartel and for having agreed not to compete on the EEA market, while their conduct in accordance with that principle of the cartel enabled the 'home' producers in Europe, namely, in particular, SGL and UCAR, to fix prices in the EEA unilaterally. In doing so, the Japanese applicants and C/G impeded competition on the EEA market regardless of their actual turnover on that market.

199   In that regard, it should be made clear that the worldwide cartel found in the Decision harmed consumers in the EEA because SGL and UCAR in particular had been able to increase their prices in the EEA without being threatened by the Japanese applicants or by C/G, which, owing to the principle of reciprocity at global level, were able to do likewise on their home markets, namely Japan and the Far East and in C/G's case the United States. As one of the objects of the cartel was to prevent the competitive forces of 'non-home' producers from being deployed in the EEA, the participation of those producers was necessary for the successful operation of the cartel as a whole, i.e. on the other regional markets in the world. Consequently, the real impact on the EEA of the infringement committed by all the members of the cartel, including those applicants for whom the EEA was not the 'home market', consisted in their contribution to the overall effectiveness of the cartel, as each of the three 'legs' – the United States, the EEA and the Far East/Japan – was essential to the effective functioning of the cartel on a worldwide level.

200   Furthermore, the fact that the Commission has the power to impose sanctions only within the EEA does not preclude it from taking into consideration worldwide turnover derived from sales of the relevant product in order to evaluate the economic capacity of the members of the cartel to harm competition within the EEA. The Commission may carry out that evaluation in the same way as it takes into account, in accordance with Article 15 of Regulation No 17 and the relevant case-law, the financial capacity of the undertaking concerned by relying on its total worldwide turnover.

201   It is true that it is well established in the case-law that disproportionate importance must not be ascribed to one or other of the various turnover figures by comparison with the other elements of assessment, so that an appropriate fine cannot be fixed merely by a simple calculation based on the total turnover, especially where the goods concerned represent only a small proportion of that turnover (*Musique diffusion française* v *Commission*, cited at paragraph 144 above, paragraphs 120 and 121, and Case T-77/92 *Parker Pen* v *Commission* [1994] ECR II-549, paragraph 94). Thus, the Court of First Instance upheld in *Parker Pen* v *Commission* the plea

alleging breach of the principle of proportionality on the ground that the Commission did not take into account
the fact that the turnover accounted for by the products to which the infringement related had been relatively
low by comparison with the turnover resulting from the total sales of the undertaking concerned.

202  The four Japanese applicants and C/G rely on that case-law when referring to their weak presence in the
EEA. However, the approach adopted by the Court in *Parker Pen v Commission* related to the final amount of
the fine rather than the starting amount determined in the light of the gravity of the infringement, which is in
issue in the present case. In the present case the Commission did not base the final amount of the fines on
worldwide turnover alone, but took into account a whole series of factors other than turnover and, as regards the
starting amount, it was specifically not worldwide turnover that was taken into consideration. The case-law
cited by the applicants is therefore irrelevant (see, to that effect, *ABB Asea Brown Boveri v Commission*, cited at
paragraph 153 above, paragraph 156).

203  In so far as C/G further contends that its participation in the infringement cannot be described as 'very
serious' owing to the specific nature of its situation in the EEA, it is sufficient to observe that specific data
relating to a given undertaking may indeed constitute aggravating or attenuating circumstances (points 2 and 3
of the Guidelines) or justify the final adjustment of the fine (point 5(b) of the Guidelines). However, where the
Commission relies on the impact of the infringement in order to assess its gravity, in accordance with point 1.A,
first and second paragraphs, of the Guidelines, the effects to be taken into account in that regard are those
resulting from the entire infringement in which all the undertakings participated (Case C-49/92 P *Commission* v
*Anic* [1999] ECR I-4125, paragraphs 150 to 152), so that consideration of the individual conduct or figures
particular to each undertaking is not relevant in that regard. The special factors put forward by C/G are therefore
of no relevance in the present context.

204  It follows that the pleas alleging failure to have regard to the turnover to be used in determining the
starting amount must be rejected.

–    The real impact of the cartel on the price increases and on the market shares of certain members of the
cartel

205  In so far as the Japanese applicants and C/G claim that their unlawful conduct had no 'real impact' in the
EEA, for the purposes of point 1.A, penultimate indent, of the Guidelines, since the fact that they did not sell
the product concerned was based on autonomous decisions taken before the cartel came into existence, the
Court finds that that argument ignores the intrinsic nature of the cartel of market-sharing at global level and the
fact that the applicants did not properly challenge the Commission's findings of fact in that regard.

206  The applicants accepted the basic principles of the cartel that the prices of the product in question would
be fixed at world level and the 'non-home' producers would withdraw from the markets reserved for 'home'
producers (recital 50 of the Decision). The Commission also established that those basic principles had been
implemented by the various meetings of the cartel (recitals 51 to 93 of the Decision) and the applicants did not
validly challenge those findings.

207  As regards the actual impact of the unlawful conduct of each undertaking on the market and on
competition, that impact must be taken into consideration, in accordance with point 1.A, first paragraph, of the
Guidelines, 'where this can be measured'. In this case, the non-aggressive conduct in the EEA of the five
applicants in question corresponded faithfully with the principles and the correct functioning of the cartel. It is
therefore difficult to 'measure' to what extent the specific impact of the infringement committed by the
applicants, namely their lack of aggression on the EEA market, exceeds the purely contractual level, i.e. their
undertaking to remain passive.

208  Nor is it sufficient, in order to challenge properly the actual impact of the infringement, to rely on
'alternative explanations' for the conduct consistent with the infringing agreements, namely the autonomous
decisions allegedly taken in the economic interest of the undertakings. The concept of 'alternative explanation'
can serve only to preclude the existence of a concerted practice, where parallel and passive conduct may be
explained by plausible reasons other than collusion between the undertakings concerned (see Case T-30/91
*Solvay* v *Commission* [1995] ECR II-1775, paragraph 75, and the case-law of the Court of Justice cited there).

Case 5:06-mc-80038-JF    Document 52-8    Filed 04/17/2006    Page 12 of 69

In the present case, far from constituting simple parallel conduct, the unlawful conduct of the five undertakings in question corresponds precisely to the collusive agreements whose existence and content they have not disputed.

209  As the Commission correctly stated, moreover, the object of the cartel was to ensure stability on the world market in such a way as to permit concerted price increases. By agreeing to stay away from the EEA market, the five applicants in question made a significant contribution to stability in the worldwide market which had the effect of seriously harming competition in the EEA. The consideration for the protection guaranteed by SGL and UCAR to those applicants on their 'home' markets was their promise to remain outside the EEA. Had that promise not been valuable, there would have been no need for those applicants to participate in the cartel.

210  Last, according to the findings made in the Decision, the cartel was not a European cartel in which some Japanese and United States participants were associated, but was a cartel active on a worldwide scale. In order to preclude the risk of any disturbance of the smooth operation of the cartel, each party had undertaken to respect existing market shares at worldwide level, in spite of any future trends and developments, and thus to ensure regular price increases in each region of the world, increases which, had it not been for the 'home' producer principle, might have encouraged access by 'non-home' producers to regions with their own 'home' producers.

211  The applicants' reference to their autonomous decisions, taken in their economic interest, to concentrate on their respective 'home' markets, is therefore irrelevant. The circumstances that determined such decisions may change at any time, so that the undertaking to remain outside a region which at a particular moment presented no economic interest remains valid. In addition, while it is always difficult to imagine what developments would have taken place on a given market in the absence of the cartel active on that market, such prognoses are particularly problematic where the markets are shared according to the 'home' producer principle, which obliges the members of the cartel to be passive in certain geographic areas.

212  In any event, it is not sufficient to wonder, in such a situation, about the market shares that the 'non-home' producers might reasonably have been able to acquire, in the absence of the cartel, on a market reserved for another member of the cartel. It cannot be precluded that, in the absence of the security conferred by the cartel, the 'home' producer would, under the simple threat of access to that market by other producers, have applied quite low prices so that those other producers would choose to remain outside the market in question and thus not acquire the slightest market share. In such a situation, the free play of competition would have been to the advantage of consumers, in the form of a price reduction, without market shares changing at all.

213  The Commission was therefore right to conclude that the passive conduct in the EEA of the five applicants concerned was the actual consequence of the cartel, so that those applicants too had participated in a 'very serious infringement'.

214  The same applies to the price increases prompted by the cartel between 1992 and 1996. In so far as SGL relies on 'alternative explanations' in that regard, it is sufficient to state, once again, that the present case does not concern the hypothesis of mere 'parallel conduct'. Furthermore, recitals 136 and 137 of the Decision summarise the Commission's findings of fact concerning the fixing of target prices and actual increases in prices in application of the basic principle of the cartel that graphite electrode prices were fixed on a world level (recitals 50 and 61 to 70 of the Decision). It follows that the prices agreed at the meetings of the cartel were gradually imposed on purchasers and increased by almost 50% between 1992 and 1996. Those specific and detailed findings were not disputed by SGL. The Commission therefore validly established a link between the price increases and the application of the unlawful agreements by the eight members of the cartel which controlled almost 90% of the world market in graphite electrodes (recital 135 of the Decision) and which had succeeded in agreeing on prices for five to six years (recital 3 of the Decision), in sharing the markets and in taking a whole series of related measures (recital 2 of the Decision).

215  It follows that the pleas alleging failure to have regard to the real impact of the cartel on the price increases and on the market shares of certain members of the cartel cannot be upheld.

–    The division of the members of the cartel into three categories and the fixing of the respective starting

216   As regards the complaint relating to the arbitrary and excessive nature of the starting amounts and, in particular, the amount of EUR 40 million fixed for SGL, on the ground that that high amount is incompatible with the Commission's previous decision-making practice, it is sufficient to observe that the Commission has a margin of discretion when fixing fines, in order that it may direct the conduct of undertakings towards compliance with the competition rules (*Deutsch Bahn* v *Commission*, cited at paragraph 157 above, paragraph 127). The fact that the Commission, in the past, imposed fines of a certain level for certain types of infringements does not mean that it is estopped from raising that level at any moment in order to ensure the implementation of Community competition policy (*Musique diffusion française* v *Commission*, cited at paragraph 144 above, paragraph 109) and to strengthen the deterrent effect of the fines (Case T-327/94 *SCA Holding* v *Commission* [1998] ECR II-1373, paragraph 179) (see paragraphs 191 and 192 above). It follows that the complaint relating to the change in practice as regards the level of the basic amounts must be rejected.

217   As regards the division of the members of the cartel into several categories, which had the consequence that a flat-rate starting amount was fixed for all the undertakings in the same category, although such an approach by the Commission ignores the differences in size between undertakings in the same category, it cannot in principle be condemned. The Commission is not required, when determining fines, to ensure, where fines are imposed on a number of undertakings involved in the same infringement, that the final amounts of the fines resulting from its calculations for the undertakings concerned reflect any distinction between the undertakings concerned in terms of their overall turnover (see *FETTCSA*, cited at paragraph 47 above, paragraph 385, and the case-law cited there).

218   The Commission did not therefore err in fact or in law in dividing the applicants into categories when determining the gravity of the infringement.

219   The fact none the less remains that such a division by categories must comply with the principle of equal treatment, according to which it is prohibited to treat similar situations differently and different situations in the same way, unless such treatment is objectively justified (*FETTCSA*, paragraph 406). Likewise, the Guidelines provide in point 1.A, sixth indent, that a 'considerable' disparity between the sizes of the undertakings committing infringements of the same type may justify a differentiation for the purposes of the assessment of the gravity of the infringement. Furthermore, according to the case-law, the amount of the fine must at least be proportionate in relation to the factors taken into account in the assessment of the gravity of the infringement (Joined Cases T-202/98, T-204/98 and T-207/98 *Tate & Lyle and Others* v *Commission* [2001] ECR II-2035, paragraph 106).

220   Consequently, where the Commission divides the undertakings concerned into categories for the purpose of setting the amount of the fines, the thresholds for each of the categories thus identified must be coherent and objectively justified (*FETTCSA*, paragraph 416, and *LR AF 1998* v *Commission*, cited at paragraph 38 above, paragraph 298).

221   In that regard, the Commission, in stating in the introduction to the Guidelines that the margin of discretion which it enjoys when setting the amount of fines must follow 'a coherent and non-discriminatory policy which is consistent with the objectives pursued in penalising infringements of the competition rules', undertook to be guided by those principles when it determines the amount of fines imposed for infringements of the competition rules.

222   It is therefore necessary to examine whether in the present case the thresholds separating the three categories identified by the Commission on the basis of the table set out at recital 30 of the Decision (see paragraph 168 above) were determined in a manner that was coherent and objectively justified.

223   In that regard, it is quite plain from recitals 148 to 151 of the Decision that, in order to establish the three categories and to set the different starting amounts, the Commission relied on a single criterion, namely the actual turnover and market shares which the members of the cartel achieved through sales of the relevant product on the world market. To that end, the Commission referred to turnover figures for 1998 and changes in market shares between 1992 and 1998, as set out in the abovementioned table. It is further apparent that the

arithmetical method applied consisted in proceeding in steps of approximately EUR 8 million, each step corresponding to an amount of approximately EUR 8 million. Thus, SGL and UCAR, with a market share of approximately […], were given a starting amount of […] EUR 40 million each. VAW, SEC and Nippon, whose market share was below 5%, were given EUR 8 million each, while the amount ascribed to SDK, C/G and Tokai, with a market share of between 5% and 10%, came to EUR 16 million each.

224  As regards the starting point for that method, namely the choice of steps of EUR 8 million, in order to arrive at the precise maximum figure of EUR 40 million in the case of SGL and UCAR, it is true that the Commission does not state anywhere in the Decision its reasons for choosing the precise figure of EUR 40 million for undertakings in the first category. However, that choice on the Commission's part cannot be described as arbitrary and does not exceed the discretion which it enjoys in that regard.

225  The Guidelines allow an amount of EUR 20 million to be set for 'very serious' infringements. Horizontal price agreements have always been regarded as particularly injurious under Community competition law and may therefore be described in themselves as 'very serious' (*FETTCSA*, cited at paragraph 47 above, paragraph 262). That is doubly true of the cartel penalised in the present case, which involved a cartel on prices and also on market sharing which covered the entire territory of the common market and the EEA.

226  It must be added that the relevant turnover for SGL and UCAR came to EUR […] million and EUR […] million respectively, while their respective market shares fluctuated between […]% and […]% and between […]% and […]%. The Commission was therefore correct to take the view that those two undertakings should be placed in the same category, consistent with an average turnover of EUR […] million and a market share of approximately […]%.

227  As the lawfulness of the first category and the associated starting amount has thus been established, it is appropriate to examine whether the second category, consisting of SDK, C/G and Tokai, was constituted in a manner that was coherent and objectively justified. In that regard, it transpires that the arithmetical method applied by the Commission leads to a coherent result in the case of SDK, whose relevant turnover and market share were EUR […] million and approximately […]% respectively. The ratio between SDK, on the one hand, and the category composed of SGL and UCAR, on the other, may therefore be put at 1:2.5, which justifies setting a starting amount of EUR 16 million for SDK (40:2.5).

228  However, the fact that SDK and Tokai were placed in the same category, when Tokai's turnover and market share were only EUR […] million and approximately […]% respectively, i.e. one half of the relevant figures for SDK, exceeds the acceptable limits from the aspect of the principles of proportionality and equal treatment, more particularly since the difference in size between Tokai and SDK, which belong to the same category, is greater than that between Tokai and Nippon (turnover: EUR […] million and market share: approximately […]%), which are in two different categories. Contrary to the Commission's argument, such a manner of classification cannot be described as coherent (see, to that effect, *FETTCSA*, cited at paragraph 47 above, paragraphs 415, 422 and 426).

229  In ascertaining whether the Commission's approach may be objectively justified, it must be borne in mind that the Decision, after referring to the worldwide turnover derived by each undertaking from sales of the relevant product in 1998 and to world market shares (recitals 149 and 150), merely states that 'C/G, SDK and Tokai, which had significantly lower market shares in the worldwide market (5% to 10%) [than SGL's and UCAR's], are placed in the second category' (recital 150). That passage does not state any specific reason which would allow the Commission, in spite of the size ratios referred to above, to bracket Tokai specifically with SDK and not with Nippon.

230  Before the Court, the Commission claimed that, in establishing the three categories and setting the different starting amounts, it took note of orders of size rather than of arithmetical formulae, as a fine should be proportionate not to the turnover of a given undertaking but to the gravity and duration of the infringement. In any event, the cartel as a whole had a considerable impact in the EEA, so that even a participant with a modest market share was able to make a significant contribution to that result. Market share and turnover therefore do not necessarily reflect the entire impact on competition of each member of the cartel. Last, the Commission is not required to draw any distinction between undertakings on the basis of their turnover; consequently, where

such a distinction is drawn, the Commission cannot be criticised for not having applied a ratio between the relative turnovers.

231   That argument cannot be accepted. As the Commission decided to apply in this particular case the differentiation method laid down in the Guidelines, it was required to adhere to them, and where it departs from them it must set out expressly the reasons justifying such a departure (*FETTCSA*, cited at paragraph 47 above, paragraph 271). Since the members of the cartel were, in the words of the Decision, placed in categories solely on the basis of their turnover and market shares, the Commission cannot properly go back, before the Court, on its own method of differentiation and claim that it was a question only of rather vague orders of size and that neither market share nor turnover necessarily reflected the impact of each undertaking on competition. Nor does the Decision contain any specific element which explains why the latter argument would provide grounds for bracketing Tokai specifically with SDK and not with Nippon.

232   While it is true that the Commission may take a multitude of factors into consideration in determining the final amount of a fine and that it is not required to apply mathematical formulae when doing so, the fact remains that, where it deemed it appropriate and equitable to have recourse, at a certain stage of that exercise, to mathematical calculations, it must apply its own method in a manner which is correct, coherent and, in particular, non-discriminatory. Once it has voluntarily chosen to apply such an arithmetical method, it is bound by the rules inherent therein, unless it provides express reasons for not doing so, in regard to all members of the same cartel.

233   It follows from the foregoing that Tokai cannot be classified in the same category as SDK. In the exercise of its unlimited jurisdiction, the Court considers that it is indeed appropriate to remain within the general logic of the Commission and to retain the system of categories employed by the Commission for members of the cartel. However, the second category must be dismantled and SDK and Tokai must be placed at the outset in two different categories: SDK must retain the starting amount of EUR 16 million ascribed by the Commission, whereas Tokai must be given a starting amount of EUR 8 million.

234   Consequently, there is no need to adjudicate on the two further pleas put forward by Tokai with a view to being given a starting amount of EUR 8 million, whereby it alleged that the Commission had provided no valid indication of the size of the relevant market and that it had failed to take account of the fact that Tokai's market share was slightly below the 5% threshold.

235   Still in the exercise of its unlimited jurisdiction, the Court considers, second, that C/G, whose turnover was EUR [...] million and whose market share was approximately [...]%, is so close to Tokai, in terms of size on the relevant worldwide market, that it should be placed in the same category as that undertaking. C/G's starting amount will therefore also be fixed at EUR 8 million.

236   As regards the former third category, consisting of Nippon, SEC and VAW, it appears to be sufficiently coherent from the aspect of the difference in size both between the first three undertakings concerned and by comparison with the undertakings in the next category (Tokai and C/G). That category of the smallest undertakings must therefore remain as it is.

237   However, the average turnover (EUR [...] million) and average market share (approximately [...]%) of that category comes to only half of the corresponding average figures of the next category, consisting of Tokai and C/G, and to one tenth of the figures of the first category, consisting of SGL and UCAR. Consequently, the Court considers, in the exercise of its unlimited jurisdiction, that the starting amount for Nippon and SEC should be fixed at EUR 4 million.

–   The 'deterrent factor' applied in the Decision

238   It should be noted, first of all, that SGL's allegation that, instead of taking account of the particular circumstances of the undertaking, the Commission sought only to impose a deterrent effect, is factually incorrect. It was only in referring to the general rules governing its calculation that the Commission mentioned the sufficiently deterrent level of the starting amounts (recitals 146 and 148 of the Decision). Those amounts were adjusted in order to provide them with a specific deterrent effect only in the case of VAW and SDK

(recitals 152 to 154 of the Decision). Whereas no such adjustment was made to SKL's figure. 35 of 36

239  As regards SDK's complaint, it has consistently been held that when calculating an undertaking's fine the Commission may take into consideration, inter alia, its size and economic power (*Musique diffusion française* v *Commission*, cited at paragraph 144 above, paragraph 120, and Case T-48/98 *Acerinox* v *Commission* [2001] ECR II-3859, paragraphs 89 and 90). Furthermore, as regards measuring the financial capacity of the members of a cartel, the case-law has recognised the relevance of worldwide turnover (Case C-291/98 P *Sarrió* v *Commission* [2000] ECR I-9991, paragraphs 85 and 86), and in its judgment in *ABB Asea Brown Boveri* v *Commission* (cited at paragraph 151 above, paragraphs 154, 155 and 162 to 167), the Court of First Instance actually recognised the lawfulness of the principle of a multiplier of precisely 2.5 and emphasised that the Commission may take the sufficiently deterrent effect of the fine imposed into account.

240  In those circumstances, SDK's complaint alleging breach of its rights of defence must be rejected. At point 110 of the statement of objections, the Commission stated that it proposed to 'set fines at a level sufficient to ensure deterrence'. SDK was plainly aware of the wording of Article 15(2) of Regulation No 17 and of its high worldwide turnover. Furthermore, SDK could infer from Commission Decision 1999/60/EC of 21 October 1998 relating to a proceeding under Article 85 of the EC Treaty (Case No IV/35.691/E-4: – Pre-Insulated Pipe Cartel) (OJ 1999 L 24, p. 1, 'the pre-insulated pipes decision'), in which a multiplier of precisely 2.5 had been applied to Asea Brown Boveri, that it was not precluded that the Commission would also apply to it a multiplier of that order. There was therefore nothing to prevent SDK from referring, during the administrative procedure, to its size and its financial resources or from expressing its views on the deterrent effect of the penalty that the Commission would take against it.

241  In the light of the case-law referred to at paragraph 239 above, the Commission was therefore entitled to take the view that, owing to its enormous worldwide turnover by comparison with the turnovers of the other members of the cartel, SDK could more readily raise the necessary funds to pay its fine, which, if the fine was to have a sufficiently deterrent effect, justified the application of a multiplier. None of SDK's arguments to the contrary can be upheld.

242  First, while it is true that the mere size of an undertaking is not automatically synonymous with financial power, that general observation is irrelevant in the present case, since SDK, unlike the other applicants, has not claimed that it lacks the financial capacity to pay the fine. Second, in claiming that a just fine can seek only to make good the harm caused to the free play of competition and that it is necessary, to that effect, to evaluate the likelihood that the cartel will be discovered and also the profits reckoned on by the members of the cartel, SDK is referring to hypothetical parameters that are too uncertain for an evaluation of an undertaking's actual financial resources.

243  In any event, SDK's argument is not capable of invalidating the rule that an infringement committed by an undertaking with vast financial resources may, in principle, be sanctioned by a fine proportionately higher than that imposed in respect of the same infringement committed by an undertaking without such resources. Last, as regards the reference to other undertakings which, although in situations comparable to SDK's, were given less severe penalties, it is sufficient to observe that, provided that the Commission complies with the maximum limit in Article 15(2) of Regulation No 17, it is not required to perpetuate a given practice in setting the level of fines.

244  As it is thus recognised that a multiplier may be applied to SDK, it is appropriate to examine whether the figure of 2.5 is compatible with the principles of proportionality and equal treatment.

245  In that regard, the sole point of reference in the Decision which permits an examination of the merits of the figure of 2.5 applied to SDK is a comparison between that figure and the figure of 1.25 applied to VAW, which must be made in the light of the figures and reasons set out in recitals 30 and 152 to 154 of the Decision (see paragraphs 168 and 170 above).

246  It follows from those recitals that the Commission deemed it fair, in VAW's case, to increase the starting amount 'in order to take account of the size and global resources' of that undertaking. However – as the turnover and market shares relating to worldwide sales of the product between 1992 and 1998 had been exhausted for the purposes of the differentiation between the members of the cartel in respect of the gravity of

the infringement and the figures relating to the EEA market are of no relevance in the present context –, the only factor capable of justifying that finding in respect of VAW is its total worldwide turnover in 2000, which, as stated in the table in recital 30 of the Decision, is three times as much as SGL's. As regards the factor of 1.25 fixed for VAW, it is clear that multiplication by the figure 1 has a completely neutral effect, the only real multiplying effect being introduced by the figure 0.25 added to the figure 1.

247   As regards SDK's situation, the Decision states that it is 'by far the largest undertaking concerned', and for that reason its starting amount was weighted by 2.5 (recital 154). The only factor which justifies that description of SDK is its total worldwide turnover in 2000, which is twice as much as VAW's and six times as much as SGL's. According to the logic which the Commission itself followed in VAW's case, it was therefore appropriate to adjust SDK's starting amount by twice the real increase applied to VAW, in order to take account of the fact that SDK was twice as large and had twice as many global resources. The only multiplier to satisfy that criterion is 0.5 (2 x 0.25) added to the figure 1.

248   None of the arguments to the contrary put forward by the Commission can upset that conclusion. The Decision contains no finding other than those relating to the undertaking's size and global resources which would justify the application to SDK of a multiplier greater than 1.5. In particular, it does not explain why the circumstances of the present case would require the application to SDK of a multiplier six times that applied to VAW, although its relevant turnover for the purposes of that operation is only twice VAW's. In so far as the Commission stated before the Court that it had not relied on SDK's exact turnover, but that it had simply made a rough adjustment in order to give certain guidance, it is sufficient to state that that argument is contradicted both by the figures and by the grounds set out in that regard in the Decision. The Commission cannot therefore depart from them before the Court (see paragraph 232 above). In any event, that argument cannot justify the application of the multiplier of 2.5.

249   In the light of the foregoing, the Court, in the exercise of its unlimited jurisdiction, considers that the starting amount fixed for SDK must be weighted by 1.5 and thus become EUR 24 million.

–     The reasons stated in the Decision

250   It is settled case-law that the statement of reasons on which an individual decision is based must disclose in a clear and unequivocal fashion the reasoning followed by the institution which adopted the measure in question in such a way as to enable the persons concerned to ascertain the reasons for the measure and to enable the competent Community court to exercise its power of review. The assessment of the requirement to state reasons depends on the circumstances of each case. It is not necessary for the reasoning to go into all the relevant facts and points of law, since the question whether the statement of reasons meets the requirements of Article 253 EC must be assessed with regard not only to the wording of the measure but also to the context in which the measure was adopted (see, in particular, Case C-367/95 P Commission v Sytraval and Brink's France [1998] ECR I-1719, paragraph 63).

251   Having regard to the information provided in recitals 129 to 154 of the Decision on the calculation of the fines for the gravity of the infringement, to the Guidelines, and also to the case-law and the decision-making practice on the matter, discussed by the parties before the Court, it must be held that the applicants were quite capable of raising the numerous pleas alleging illegality as to the substance as regards the calculations in respect of the gravity of the infringement. If they claim that one or other of those factors is not sufficiently reasoned, they are at the same time complaining of the inaccuracy or unfairness of that factor and present data which the Commission should in their opinion have taken into consideration. In those circumstances, the applicants were not placed in a situation where the Commission's failure to provide exhaustive reasoning denied them adequate judicial protection (see, to that effect, UK Coal v Commission, cited at paragraph 149 above, paragraph 206).

252   In any event, the Court of Justice has held that the Commission fulfils its obligation to state reasons when it indicates in its decision the factors which enabled it to measure the gravity of the offence, without being required to set out a more detailed account or the figures relating to the method of calculating the fine (Case C-279/98 P Cascades v Commission [2000] ECR I-9693, paragraphs 38 to 47, and Sarrió v Commission, cited at paragraph 239 above, paragraphs 76 and 80).

# EXHIBIT D
## Part 2

253  It follows that the pleas alleging failure Document read.sons carried 04/11/2006     Page 2 of 37

254  It follows from the foregoing that the pleas raised by SGL and UCAR must be rejected, although the other applicants' starting amounts will be fixed as follows: for Tokai and C/G, at EUR 8 million each, for SEC and Nippon at EUR 4 million each and for SDK at EUR 24 million.

c)     The basic amounts determined in the decision on the basis of the duration of the infringement

Summary of the Decision

255  At recitals 155 to 157 of the Decision, the Commission found that SGL, UCAR, Tokai, Nippon and SEC had infringed Article 81(1) EC and Article 53(1) of the EEA Agreement between May 1992 and February/March 1998. As they had committed a long-term infringement of 5 years and 9 to 10 months, their starting amounts, calculated on the basis of the gravity of the infringement, were increased by 55%. The Commission considered that SDK and VAW had committed a medium-term infringement of 4 years and 7 to 11 months, and their starting amounts were therefore increased by 45%. As C/G had committed a medium-term infringement of 3 years and 10 months, its starting amount was increased by 35%.

Case T-239/01

256  SGL claims that the increase of its starting amount by 55% for an infringement lasting 5 years and 10 months is inconsistent with the *Pre-insulated pipes* decision (cited at paragraph 240 above), where the Commission merely applied an increase of 40% for duration where the infringement had lasted for five years.

257  SGL further submits that quota cartels, classified as 'very serious' infringements in the Guidelines, regularly last for a number of years. That typically long-term nature is inherent in infringements of that type. Consequently, a quota cartel which by its very nature is long-lasting cannot be treated in the same way for the purposes of duration as an infringement which, as for example an abuse of a dominant position, is in itself 'very serious' where it is of much shorter duration. The duration of a quota cartel can therefore lawfully be taken into account only where it is significantly in excess of the typical duration of an infringement of that type. On that point, SGL disputes the legality of the Guidelines in that they envisage the duration of an infringement in the same way, irrespective of the nature of the infringement.

258  In that regard, the Court recalls, first of all, that the plea which SGL directs against the Commission's findings of fact concerning the duration of the infringement was rejected above (paragraphs 71 to 77).

259  As regards the objection of illegality raised in the present context, Article 15(2) of Regulation No 17 expressly provides that for the purposes of determining the amount of the fine, regard is to be had 'both to the gravity and to the duration of the infringement'. In the light of that provision, even on the assumption that quota cartels are intrinsically conceived as long-term arrangements, the Commission cannot be prohibited from taking their actual duration in each particular case into account. It is sufficient to think of cartels which, in spite of their planned longevity, are detected by the Commission or reported by a participant after having been in operation for a short time. Their harmful effect is necessarily less than in a situation where they have been in operation for a long period. Consequently, a distinction must always be drawn between the duration of an infringement and its gravity as resulting from its particular nature (see, to that effect, *FETTCSA*, cited at paragraph 47 above, paragraph 283).

260  The Commission was therefore entitled to state, at point 1.B, third paragraph, of the Guidelines that the increase in the fine for long-term infringements would represent a considerable strengthening of the previous practice with a view to imposing effective sanctions on restrictions 'which have had a harmful impact on consumers over a long period'.

261  Accordingly, there is no reason why the Commission should not have taken account of the Guidelines in order to increase the starting amount calculated in SGL's case by 55% for duration of an infringement lasting 5 years and 9 months.

262  That conclusion is not called in question by the *Pre-insulated pipes* decision, where the Commission applied an increase of only 40% for duration where the infringement had lasted five years. That case entailed a particular weighting which was expressly justified by the specific circumstances of the case: at the beginning of the infringement period, the collusive arrangements had been incomplete or had had a limited effect; subsequently, they had been suspended for a certain period and had reached their most complete form only after several years (recital 170 of the *Pre-insulated pipes* decision). SGL's situation is not marked by such specific circumstances.

263  It follows that the plea alleging failure to have proper regard to the infringement found in SGL's case must be rejected.

Case T-246/00

--    Arguments of the parties

264  As regards the final period of operation of the cartel, UCAR claims that it provided the evidence of its participation in the infringement after the investigations carried out by the Commission in June 1997, in particular the evidence which enabled the Commission to establish that the meetings of the cartel on November 1997 and 13 February 1998 had taken place and that the bilateral contacts had been maintained until March 1998. In application of its draft new Leniency Notice published in 2001, the Commission was prevented from using that information to increase its fine by 55%. In that draft, the Commission suggested that, where an undertaking provides evidence relating to facts previously unknown to the Commission which have a direct bearing on the gravity or duration of the suspected infringement, the Commission would not take those elements into account when setting any fine to be imposed on the undertaking which provided that evidence. That, in the applicant's submission, is an appropriate approach that the Commission should have taken. In any event, the Court could take it into consideration by virtue of its unlimited jurisdiction.

265  UCAR concludes that the evidence of its participation in the cartel after the meeting held in April 1997 must not be taken into account, which would reduce the duration of its infringement to 4 years and 11 months. Its starting amount should therefore be increased by 45% at the most for duration.

266  As regards the initial period of the cartel (1992 to 1995), UCAR states that the Commission should have imposed fines on Mitsubishi and Union Carbide, its parent companies at that time, and not on UCAR. Those companies held control of UCAR and played a significant role by initiating the first contacts between competitors and facilitating UCAR's participation in the cartel. Legally, Mitsubishi and Union Carbide controlled UCAR until 1995. In the context of a recapitalisation effected in January 1995, Mitsubishi and Union Carbide literally 'plundered' it and provoked its indebtedness. UCAR submits that the Commission has never investigated the role of Mitsubishi and Union Carbide and that the Decision contains no reasoning concerning the problem of the control exercised by Mitsubishi and Union Carbide over UCAR during the relevant period.

267  UCAR further submits that the Commission should also have taken into consideration the fact that, since the date of the investigations, UCAR's management board sought, by means of a systematic and intensive internal investigation, to detect actively and to put an end to any unlawful contacts with competitors.

268  As regards the final period of the cartel, the Commission states that its new policy on cooperation had not yet been adopted on the date of the Decision. UCAR cannot therefore have based a legitimate expectation on the fact that the Commission would apply such a policy. The fact that the Commission acknowledges that its policy on cooperation may be amended and improved does not prevent it from applying in the meantime the provisions in force. Before formally adopting its draft revisal to which UCAR refers, the Commission was therefore not compelled to take that draft into account.

269  The questions raised by UCAR as regards the role of Mitsubishi and Union Carbide were not raised either in UCAR's reply to the statement of objections or at any time in the proceedings before the Commission. Until it lodged its application, it acted as though it fully recognised that it had infringed the competition rules and deserved a fine; it did not claim that it should not receive a sanction for the infringement committed before 1995 because its conduct should be imputed to Mitsubishi and Union Carbide.

270  Even in the letter which it sent to the Commission on 23 February 2001, disclosing the record of the proceedings against Mitsubishi in the United States, UCAR did not put forward any of the arguments raised before the Court. Even at that time, therefore, when it had all the relevant evidence, it did not claim that Mitsubishi's role had the slightest bearing on the facts established in respect of its participation in the infringement. The letter concentrated rather on the question of UCAR's real capacity to pay.

271  As regards Union Carbide, UCAR did not at any time claim that that company had participated directly in the infringement. Even before the Court, Union Carbide is not clearly implicated, except in respect of the financial advantages which it is alleged to have derived from the cartel.

272  The Commission therefore contends that the Court, in the exercise of its unlimited jurisdiction in relation to fines, should increase the fine imposed on UCAR to reflect what the Commission describes as that unacceptable change in viewpoint on the part of an undertaking which has had a substantial reduction in its fine under the Leniency Notice on the ground that it did not dispute the Commission's allegations.

–    Findings of the Court

273  As regards the complaint relating to the final period of the cartel, it is based exclusively on the draft of a new Leniency Notice which, on the date of adoption of the Decision (18 July 2001), had not even been published in the Official Journal; the draft appeared only in the Official Journal of 21 July 2001 (OJ 2001 C 205, p. 18). As regards the new 'Commission notice on immunity from fines and reduction of fines in cartel cases', which, at point 23, final paragraph, incorporated the draft on which UCAR relies, it was only published in the Official Journal of 19 February 2002 (OJ 2002 C 45, p. 3) and, pursuant to point 28, replaced the former Leniency Notice of 1996 only from 14 February 2002. In those circumstances, it is clear that the Commission did not err in not applying the new policy on cooperation, on which UCAR relies, in the context of the Decision.

274  In so far as UCAR claims that the Court is not prevented from taking the new Leniency Notice of 2002 into account as an expression of the principle of fairness, the Court, in the exercise of its unlimited jurisdiction, may take it into account as additional information not set out in the Decision (Case C-297/98 P *SCA Holding* v *Commission*, cited at paragraph 108 above, paragraph 55). In the circumstances of the present case, however, the Court considers that it is not appropriate to exercise its jurisdiction and award a reduction in the rate applied to UCAR for the duration of its participation in the infringement.

275  It is clear from the answer to a written question put by the Court and from the argument at the hearing that the parties are agreed that the evidence which UCAR was the first undertaking to have provided to the Commission covers only the period between the middle of November 1997 and March 1998. Even if the duration of UCAR's participation in the infringement were reduced to the period between May 1992 and the middle of November 1997, it would still have participated in a long-term infringement, lasting five and a half years, for which point 1.B, first paragraph, of the Guidelines allows an additional amount to be fixed, determined by the application of a rate of 55%. Furthermore, the Commission has already taken account of all the evidence supplied by UCAR, which had enabled it to establish 'important aspects of the case', by granting it a reduction of 40% of its fine under the Leniency Notice (recitals 200 to 202 of the Decision), which – after the reduction of 70% granted to SDK for having provided the first evidence of the entire cartel (recital 217 of the Decision) – represents the second largest of all the reductions granted under that head.

276  The principle of fairness therefore does not require any adjustment, for the final period of the cartel, of the rate of 55% applied to UCAR for the duration of its participation in the infringement.

277  As regards the measures which UCAR's management board took immediately following the Commission's investigations in order to put an end to the infringement, it is sufficient to observe that efforts to put an end to an infringement cannot automatically be assimilated to the definitive cessation of the infringement. It is a fact that UCAR did not dispute the Commission's finding as a fact that it had participated in the cartel in 1997 and in 1998. The Commission's power to impose a sanction on an undertaking where it has committed an infringement presumes only the unlawful action of a person who is generally authorised to act on behalf of the undertaking (*Musique diffusion française* v *Commission*, cited at paragraph 144 above, paragraph

Case 5:06-mc-80038-JF    Document 52-8    Filed 04/17/2006    Page 22 of 69

97). The action taken by UCAR's management boards is therefore relevant to the consideration of the duration of the infringement.

278   As regards the complaint relating to the initial period of the cartel (1992 to 1995), when UCAR was under the control of Mitsubishi and Union Carbide, it is common ground that UCAR participated in the cartel between May 1992 and March 1998, as 'UCAR International Inc.'. It is on that company, UCAR International Inc., that the Commission imposed a fine for that infringement, and not on the natural or legal persons who allegedly influenced it. Consequently, it was not required to take into consideration any changes which might have taken place during the infringement period in the composition of the legal or economic owners of the company.

279   The fact that UCAR may have formed an economic unit with Mitsubishi and/or Union Carbide, so that it was unable to take autonomous decisions, which the Commission disputes, plays no role in that context. That fact would have been relevant only if the Commission had used its power to impose a sanction on UCAR's parent company for UCAR's conduct, as, moreover, it did in the case of VAW (recitals 117 to 123 of the Decision), with reference to Case C-286/98 P *Stora Kopparbergs Bergslags* v *Commission* (cited at paragraph 113 above, paragraphs 26 to 29). In the present case, on the other hand, the point of whether UCAR's conduct could be attributed to another undertaking did not arise (Joined Cases T-45/98 and T-47/98 *Krupp Thyssen Stainless and Acciai speciali Terni* v *Commission* [2001] ECR II-3757, hereinafter '*Krupp*', paragraph 189), since the Commission decided to address itself only to UCAR.

280   Nor does the present case concern the questions which may arise as a result of an economic succession in the control of an undertaking, where it is necessary to determine who is accountable for the undertaking's actions, namely the transferor or the transferee (judgment of the Court of First Instance, following appeal and referral back to the Court of First Instance, in Case T-354/94 *Stora Kopparbergs Bergslags* v *Commission*, cited at paragraph 113 above, paragraphs 60 and 70; judgment in Case T-9/99 *HFB and Others* v *Commission* [2002] ECR II-1487, paragraphs 101 to 108). While it is true that the application of the rule laid down in the case-law that '[i]t falls, in principle, to the natural or legal person managing the undertaking in question when the infringement was committed to answer for that infringement, even if, when the Decision finding the infringement was adopted, another person had assumed responsibility for operating the undertaking' (*HFB and Others* v *Commission*, paragraph 101) may prove difficult in certain circumstances, in the present case the Commission imposed a penalty only on UCAR and was therefore not required to examine the questions of the operation and control of UCAR.

281   In any event, the judicially determined rule just referred to must be interpreted as meaning that an undertaking – that is to say, an economic unit consisting of personal, tangible and intangible elements (Case 19/61 *Mannesmann* v *High Authority* [1962] ECR 357, 371) – is directed by the organs provided for in its articles of association and that any decision imposing a fine on it may be addressed to the management as provided for in the undertaking's articles of association (management board, management committee, chairman, manager, etc.), even though the financial consequences of the fine are ultimately borne by its owners. That rule would not be observed if the Commission, faced with unlawful conduct on the part of an undertaking, were always required to ascertain who is the owner exercising a decisive influence on the undertaking and were allowed to impose a sanction only on that owner.

282   If UCAR claims to have been 'plundered' by its former owners Mitsubishi and Union Carbide, who, it alleges, encouraged it to set up the cartel in respect of which it is now subject to a sanction, the Commission has rightly stated that the solution to that dispute must be sought in the relations between Mitsubishi and Union Carbide, on the one hand, and UCAR and its present owner on the other, and not at the level of the application of competition law by the Commission. Thus, even if Mitsubishi and Union Carbide had in fact used UCAR as an instrument intended to realise the profits derived from the actions of the cartel, the Commission was entitled to impose a fine only on that 'instrument', while UCAR and/or its owners are free to bring proceedings for damages against Mitsubishi and Union Carbide. Furthermore, UCAR took action against Mitsubishi and Union Carbide in the United States in order to recover money allegedly extracted from it (recital 42 of the Decision).

283   In so far as UCAR further claims that the Commission should have examined the role played by Mitsubishi and Union Carbide in setting up the cartel, it is sufficient to recall that, according to a consistent line of decisions, even on the assumption that the situation of another economic operator to which the Decision was

not addressed was comparable, that UCAR could not rely on a new complaint alleging a ground for setting aside the finding of an infringement by UCAR, provided that that infringement was properly established on the basis of documentary evidence. Owing to the fact that it infringed Article 81 EC, UCAR cannot escape any penalty on the ground that no fine was imposed on other economic operators such as Mitsubishi and Union Carbide when, as in the present case, those other undertakings' circumstances are not even the subject of proceedings before the Court (Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 *Ahlström Osakeyhtiö and Others* v *Commission* [1993] ECR I-1307, paragraphs 146 and 197; *Acerinox* v *Commission*, cited at paragraph 239 above, paragraphs 156 and 157; and Case T-17/99 *KE KELIT* v *Commission* [2002] ECR II-1647, paragraph 101).

284   In those circumstances, the fact that Mitsubishi was convicted in the United States in February 2001 of aiding and abetting a conspiracy among graphite electrode producers and was fined USD 134 million (recital 42 of the Decision) is of no relevance for the purpose of examining the calculation of the fine imposed on UCAR. Nor is there any need to examine whether the Commission had been duly informed of Mitsubishi's or Union Carbide's involvement in the cartel or whether UCAR was actually controlled by Mitsubishi or Union Carbide.

285   Last, as the Commission was entitled to impose a sanction on the undertaking that participated directly in the infringement, i.e. UCAR, it was not required to justify that choice by setting out its reasons for not imposing sanctions on Mitsubishi and Union Carbide. The Commission did not therefore breach its obligation to state reasons under Article 253 EC.

286   On the other hand, the Commission's submission that the fine imposed on UCAR should be increased cannot be upheld.

287   It follows from the foregoing that the Commission was not required to adduce further evidence before the Court of the duration of UCAR's participation in the infringement found in the Decision. In response to the plea alleging failure to have regard to the role played by Mitsubishi and Union Carbide between 1992 and 1995, the Commission was entitled merely to present the legal arguments which have just been set out.

288   Furthermore, it was in February and April 2001, and therefore before the adoption of the Decision, that UCAR had sent the Commission evidence of the participation of, in particular, Mitsubishi in the cartel being investigated by the Commission. The Decision also mentions UCAR's statement that its former parent companies, Union Carbide and Mitsubishi, benefited from the cartel (recital 204). In those circumstances, it cannot be claimed that UCAR challenged for the first time before the Court the accuracy of the facts relating to the duration of its participation in the infringement, within the meaning of point E.4, second subparagraph, of the Leniency Notice. Rather, UCAR put a fresh legal complexion on documentary evidence which it had already made available to the Commission during the administrative procedure.

289   It follows from the foregoing that the pleas put forward by SGL and UCAR must be rejected.

290   As regards the other applicants whose starting amounts for the gravity of the infringement were reduced, the Court sees no reason to depart from the rates applied by the Commission for the duration of their participation in the infringement. The basic amounts fixed at recital 158 of the Decision will be corrected as follows: Tokai = EUR 12.4 million; Nippon = EUR 6.2 million; SEC = EUR 6.2 million; SDK = EUR 34.8 million and C/G = EUR 10.8 million.

d)    Aggravating circumstances

Summary of the Decision

291   In the case of SGL, UCAR, Tokai, SEC and Nippon, the Commission considered that the gravity of the infringement was aggravated by the fact that they had continued that clear-cut and indisputable infringement after the investigations carried out by the Commission. A further aggravating circumstance was established on the part of SGL and UCAR owing to the fact that they were the two ringleaders and instigators of the cartel. Last, the Commission classified as an aggravating circumstance SGL's attempt to obstruct the Commission proceedings by giving warnings to other companies of the forthcoming investigations. The Commission

therefore increased SGL's basic amount by 85%, UCAR's by 60% and Tokai's, SEC's and Nippon's by 10% (recitals 160, 164, 187, 192, 209 and 210 of the Decision).

Cases T-244/01 and T-251/01

292   Nippon and SEC criticise the Commission for having increased their fines by 10% for having allegedly continued the infringements after the investigations carried out in June 1997. However, by letter of 15 December 1997 the Commission informed the Japanese producers that they were not directly concerned by the cartel in question. It was only two years later, in the statement of objections, that the Commission informed them of its suspicions concerning their possible involvement. Nippon and SEC therefore had a legitimate expectation that they would not be fined in respect of the period after the June 1997 investigations, and the Commission cannot maintain that they should have put an end to the infringement following investigations which did not concern them. Nippon and SEC further complain of a failure to state reasons, in that the Decision is silent as to the question of their legitimate expectation.

293   SEC further claims that the increase of 55% in its starting amount for the duration of the infringement already covered the period following the investigations. The additional increase of 10% means that it was penalised twice for its participation in the infringement during that period.

294   In that regard, the Court observes that it is common ground that Nippon and SEC participated in the infringement until February 1998. By the abovementioned letter of 15 December 1997, they were informed that the Commission was investigating the cartel without being aware at the material time that they too were directly participating in it. The letter cannot therefore be regarded as having given rise to valid expectations, still less as having given precise assurances, that they would not receive a sanction (see paragraph 152 above). On the contrary, Nippon and SEC had to expect that once their involvement in the cartel was detected the Commission would impose a sanction for their participation in the infringement and would take account, in particular, that they had not ceased the infringement immediately upon being warned that the Commission was investigating the cartel.

295   Nor can there be any question that a double sanction was imposed on SEC for the relevant period. The increase of 55% concerns only the duration of the infringement, whereas the increase of 10% is intended to represent a sanction for the additional unlawful energy which it expended in continuing the infringement even though it was informed that the Commission had launched an investigation targeted at that very infringement.

296   In those circumstances, the Commission cannot be criticised for not having provided in the Decision any specific reasons devoted to the problem of any possible legitimate expectation on the part of Nippon and SEC, still less because the Decision's silence in that regard did not prevent those two applicants from presenting their arguments on that point.

297   The pleas put forward by Nippon and SEC cannot therefore be upheld.

Cases T-239/01 and T-246/01

298   UCAR maintains that the Commission was wrong to regard as an aggravating circumstance the continuation of the infringement after its investigations in June 1997, since UCAR's management board made concerted efforts to put an end to any collusive activity. Nor should the Commission have held UCAR accountable for having set up and implemented the cartel, since Mitsubishi and Union Carbide had been the real instigators of the cartel. Last, SGL was the only genuine ringleader of the cartel. In so far as the Commission attempts to ascribe that role to UCAR too, it is not entitled to rely on events preceding the beginning of the relevant period, i.e. before May 1992.

299   SGL submits that the increase of 85% in its basic amount for aggravating circumstances is wholly disproportionate and inconsistent with the Commission's previous decision-making practice, in which such an exorbitant increase has never been known. First, no increase was possible for allegedly continuing the infringement after the investigations of June 1997, as the Commission failed to produce sufficient evidence in that regard. Second, the fact that SGL warned other members of the cartel that those investigations were about

to take place. Cannot be penalised by an increase in the fine. Article 15 of Regulation No 17 allows fines to be increased only for infringements of Articles 81 EC and 82 EC or for breach of one of the conditions and charges imposed pursuant to Article 8 of Regulation No 17. The warnings in question do not constitute such breaches of the law.

300   Nor are those warnings covered by the Guidelines, since the second indent of point 2 provides for an increase in the fine only for attempts to obstruct the Commission 'in carrying out its investigations'. The warnings were issued before the investigations commenced. In any event, SGL has suffered discrimination by comparison with UCAR. UCAR even destroyed incriminating documents but did not receive a sanction for an aggravating circumstance. In SGL's submission, destroying documents is more serious than giving oral warnings about possible investigations.

301   In that regard, the Court recalls that, according to a well-established line of decisions, where an infringement has been committed by a number of undertakings, it is necessary, in determining the amount of the fines, to establish their respective roles in the infringement throughout the duration of their participation in it (*Commission v Anic*, cited at paragraph 203 above, paragraph 150, and Case T-6/89 *Enichem Anic* v *Commission* [1991] ECR II-1623, paragraph 264). It follows, in particular, that the role of 'ringleader' played by one or more undertakings in a cartel must be taken into account for the purposes of calculating the amount of the fine, in so far as the undertakings which played such a role must therefore bear special responsibility in comparison with the other undertakings (Case C-298/98 P *Finnboard* v *Commission* [2000] ECR I-10157, paragraph 45).

302   In accordance with those principles, point 2 of the Guidelines sets out, under the head of aggravating circumstances, a non-exhaustive list of circumstances which may lead to an increase in the basic amount of the fine, including the 'role of leader in, or instigator of the infringement'.

303   In the present case, SGL and UCAR accused each other during the administrative procedure of having been the ringleader and instigator of the cartel (recitals 161 and 188 of the Decision). However, it appears that the Commission established to the requisite legal standard in the Decision that SGL and UCAR were, more or less equally, the joint driving forces of the cartel which, since the first contacts in 1991, had conceived its basic principles and which organised the first 'Top Guy' meetings in May 1992 (recitals 44 to 51 of the Decision).

304   In that context, there was nothing to prevent the Commission from taking account of the steps preparatory to the setting-up *stricto sensu* of the cartel, in order to establish the economic situation which preceded and provided the reasons for the setting-up of the cartel or in order to establish and evaluate the respective roles played by the members of the cartel in conceiving, setting up and implementing it. It is on the same basis, moreover, that the Commission may take account of the stage subsequent to the infringement period *stricto sensu*, in order to evaluate, under the Leniency Notice or on account of any attenuating circumstances, the actual cooperation of the undertakings in reporting their cartel.

305   According to those findings made by the Commission, the joint direction of the cartel by SGL and UCAR was also revealed in the fixing of prices in the EEA, their 'home' market, in that SGL took the initiative for price increases in Scandinavia and Germany, while UCAR did likewise in France and the United Kingdom, while they both decided on each occasion which would take the initiative in Italy and Spain (recitals 62 and 66 of the Decision).

306   Those findings have not been validly challenged by either UCAR or SGL.

307   UCAR reiterates its argument based on the role of Mitsubishi and Union Carbide and states that those two companies were really the instigators – and, until 1995, the ringleaders – of the cartel. On that point, it is sufficient to state that Mitsubishi and Union Carbide are not among the undertakings whose participation in the cartel was established and penalised by the Commission and they are not involved in the proceedings before the Court. The reference to Mitsubishi and Union Carbide cannot therefore affect the finding that, among the members of the cartel identified by the Commission, SGL and UCAR were the instigators and ringleaders.

308   As regards UCAR's reference to the efforts made by its management board to put an end to the

infringement, and its efforts to find out what caused it, but it does not alter its participation in that infringement or the aggravating circumstance constituted by the fact that, by warning the other undertakings, SGL sought to conceal the existence of the cartel and to keep it in operation, an aim which was successfully achieved until March 1998.

309  As to SGL's argument that the increase of 85% is excessive and more than that generally applied in previous decisions of the Commission, it does not establish a breach of the principle of proportionality or of the principle of equal treatment. In that regard, it is sufficient to reiterate that, according to a consistent line of decisions, the Commission has a discretion when determining the amount of each fine and is not required to apply a precise mathematical formula for that purpose (*Martinelli v Commission*, cited at paragraph 165 above, paragraph 59). The fact that the role of instigator played by a company in other cases has been penalised by a specific rate of increase does not therefore mean that that rate can never be exceeded in future, whatever the circumstances of the present case (*Musique diffusion française v Commission*, cited at paragraph 144 above, paragraphs 106 and 109).

310  Even from the aspect of the Court's unlimited jurisdiction, it does not appear disproportionate or discriminatory to apply to SGL an increase of 50% for its role as ringleader (like the 50% applied to UCAR), an increase of 10% for continuing the infringement after June 1997 (like the 10% applied to UCAR, SEC, Nippon and Tokai) and an increase of 25% for having warned other members of the cartel of the forthcoming Commission investigations.

311  On the last two points, the plea which SGL directs against the findings of fact made by the Commission concerning the duration of its participation in the cartel, and in particular the continuation of the infringement after the investigations, has been rejected (see paragraphs 70 to 76 above). The Commission was therefore correct to increase the fine by 10% for continuation of the infringement.

312  The fact that SGL warned other undertakings of the forthcoming investigations may also be properly characterised as an aggravating circumstance (see, to that effect, Case T-334/94 *Sarrió v Commission* [1998] ECR II-1439, paragraph 320). Contrary to SGL's assertion, that conduct does not constitute a specific and autonomous infringement for which no provision is made in the Treaty or in Regulation No 17, but conduct which added to the gravity of the initial infringement. By thus warning other members of the cartel, SGL sought to conceal the existence of the cartel and to keep it in operation, an aim which was successfully achieved until March 1998.

313  In that context, SGL's reference to Article 15(1)(c) of Regulation No 17 – from which it infers that the Community legislature sought to penalise only obstructions of investigations which the Commission had already commenced, and not acts preceding the investigation – is irrelevant. That provision is aimed at obstructions *qua* autonomous infringements, independent of the existence of a cartel, which, moreover, explains the relatively lenient fine of between EUR 100 and EUR 5 000 that may be imposed for such an infringement. In the present case, on the other hand, the warnings given by SGL sought to ensure the continuation of a cartel which is accepted as having constituted a flagrant and undisputed breach of Community competition law.

314  Nor is the fact that the warnings were taken into account as an aggravating circumstance contrary to point 2 of the Guidelines. A simple reading of that provision ('such as' and 'other') shows that the list of aggravating circumstances is not exhaustive.

315  Last, SGL's reliance on the principle of equal treatment by comparison with UCAR – whose destruction of documents was not taken into consideration as an aggravating circumstance – is not capable of altering the characterisation of the warnings as an aggravating circumstance. As they were issued to other undertakings, the warnings went beyond the purely internal sphere of SGL and sought to frustrate the Commission's entire investigation in order to ensure that the cartel could continue, whereas UCAR had destroyed its documents in order to prevent its involvement in the cartel from being discovered. Those are two completely different types of conduct and for that reason the Commission cannot be criticised for having treated similar situations differently.

316  Furthermore, even if the Commission had improperly favoured UCAR by not increasing its fine, the aggravating nature of SGL's conduct would not be affected. SGL cannot legitimately demand that UCAR's fine

be increased or rely on its advantage on any unlawful treatment of it (see, to that effect, Case T-327/94 *SCA Holding* v *Commission*, cited at paragraph 216 above, paragraph 160).

317  At the hearing, SGL further maintained that the fact that it warned other undertakings of the forthcoming investigations could not be characterised as an aggravating circumstance since those warnings originated within the Commission itself. SGL thus refers to UCAR's disclosure of a leak within the Commission's services, one of whose officials, mentioned by name, supposedly informed SGL of forthcoming unannounced investigations at the premises of the members of the cartel. In that regard, it is clear that that information, on the assumption that it was in fact provided, cannot in any way be attributed to the Commission as an expression of its official competition policy. It represented the fraudulent acts of an official intended to maintain the operation of the cartel. SGL cannot therefore validly rely on those acts with a view to minimising the seriousness of its own conduct.

318  As all the pleas put forward by Nippon, SEC, UCAR and SGL must be rejected, the rates which the Commission applied to the basic amounts fixed for those applicants will be maintained.

319  As regards the applicants whose amounts have been altered under the head of the duration of the infringement, it is appropriate to determine, in order to take account of the aggravating circumstances established by the Commission, the following figures: Tokai = EUR 13.64 million; Nippon = EUR 6.82 million and SEC = EUR 6.82 million.

e)    Attenuating circumstances

 Summary of the Decision

320  The Commission considered that no attenuating circumstance justified a reduction in the basic amount in the case of SGL, UCAR, Tokai, SEC, Nippon and SDK. In C/G's case, however, it applied a reduction of 40% owing to the exclusively passive role played by that undertaking and to the fact that it did not apply the unlawful agreements in part (recitals 165, 166, 193 to 198, 211 to 215 and 234 to 238 of the Decision).

 Cases T-236/01, T-239/01, T-244/01, T-246/01, T-251/01 and T-252/01

--    Arguments of the parties

321  C/G contends that it should have been granted a much larger reduction than the 40% granted by the Commission. It points to its marginal and passive role in the cartel. It had only bilateral contacts with SGL and was not invited to the 'Top Guy' or 'Working Group' meetings or to the local meetings; no one even informed it that those meetings were to be held. None of the other members of the cartel named it as a participant in the infringement. Nor did it participate in either the Central Monitoring System set up to implement the cartel or the system of code names drawn up to conceal the identity of the members of the cartel. Contrary to one of the principles of the cartel, the fixing of C/G's prices was not reserved for the senior management within the undertaking. Furthermore, it went directly against a basic principle of the cartel by increasing its production capacity and sales on the EEA market.

322  C/G further claims that in 1994 it sold its manufacturing technology to a Chinese producer for USD 4 million. This transfer of technology, contrary to the interests of the cartel, was the cause of such concern to SGL that SGL complained to C/G. Last, it put an end, on its own initiative, to its relations with the cartel, before the Commission opened its investigation. C/G further states that it acted under economic pressure caused by its particular situation as a producer depending on other members of the cartel and also pleads the structural overcapacity of the graphite electrodes industry in the 1970s and 1980s, which led to significant falls in prices.

323  On this last point, SGL states that the structural crisis in the graphite electrodes sector is comparable with that in the steel sector in the early 1990s, which affected steel producers and graphite electrodes producers in the same way. In the *Seamless steel tubes and pipes* decision of 8 December 1999 and the *Alloy Surcharge* decision of 21 January 1998, the Commission characterised that crisis as an attenuating circumstance. That characterisation cannot be refused in the present case, concerning the same economic crisis.

324  UCAR also refers to the settlement reached with the US authorities in June 1998 and argues that the Commission, in its previous decision-making practice, and the Court of First Instance have considered that such a situation may constitute an attenuating circumstance. UCAR further submits that its exemplary internal inquiry aimed at detecting the infringement and putting an end to it as quickly as possible merited recognition as an attenuating circumstance. In that context, C/G refers to the introduction of a programme designed to ensure that its commercial policy complies with competition law.

325  UCAR also claims that the cartel did not provide it with any financial advantage, since Mitsubishi and Union Carbide 'harvested' all the profits made by the cartel. The Commission should have taken into account the considerable sums which UCAR paid its customers in the United States by way of damages for the artificially high prices charged during the infringement period.

326  Nippon, SEC and Tokai emphasise the passive role which they played in the cartel. Nippon did not participate in the first meetings of the cartel during which the basic principles of market-sharing were fixed; even during the other meetings in which it did participate, it remained purely passive. SEC claims that it never participated itself in a single 'Top Guy' meeting; at that level, it was only represented, on two occasions, by Tokai. Furthermore, it submits, the Commission characterised as 'active' only the roles of Tokai and SDK, and not SEC's (recital 212 of the Decision). In the particular case of SEC, the smallest Japanese producer, moreover, there is no causal link between the worldwide cartel and the failure to act in the EEA. Tokai claims that it was not actively involved in the collusive agreements in respect of the European market and had not participated in any of the meetings of the European Group. No agreement on European prices was concluded at the 'Top Guy' or 'Working Level' meetings.

327  Nippon and Tokai contend, in particular, that they should have been treated in the same way as C/G, since they, like C/G, did not reduce the volume of their sales in the EEA and did not apply the cartel agreements in full.

328  Last, Nippon, SEC and Tokai criticise the Commission for not having explained in the Decision its reasons for not affording them any attenuating circumstance. They maintain that the Commission has thus infringed Article 253 EC.

329  The Commission refutes each of the pleas and arguments put forward by the applicants.

–    Findings of the Court

330  First of all, according to the third indent of point 3 of the Guidelines, an 'exclusively passive or "follow-my-leader" role' played by an undertaking in the infringement may, if established, constitute an attenuating circumstance.

331  In that regard, it has been held that the factors capable of revealing the passive role of an undertaking within a cartel include the significantly more sporadic nature of its participation in the meetings by comparison with the ordinary members of the cartel (Case T-311/94 *BPB de Eendracht* v *Commission* [1998] ECR II-1129, paragraph 343), and also the existence of express declarations to that effect made by representatives of other undertakings which participated in the infringement (Case T-317/94 *Weig* v *Commission* [1998] ECR II-1235, paragraph 264). In any event, it is necessary to take account of all the relevant circumstances in each particular case.

332  As regards C/G's conduct, the Decision satisfies those criteria. It is clear from recitals 81 to 86 and 234 to 238 that the Commission properly assessed the passive role played by C/G within the cartel and made due allowance therefor by granting a reduction of 40% of its fine and that it was not required to grant C/G a higher reduction. According to the Commission's findings, although C/G had not participated in the 'Top Guy' or 'Working Level' meetings of the cartel, it none the less maintained bilateral contacts with the other members of the cartel and gained from the information which it obtained from them concerning the decisions taken by the 'home producers' on price-fixing within the cartel. In its application, moreover, C/G expressly stated that it did not dispute either the existence of or its participation in the cartel. That conclusion is not affected by the fact that C/G's prices were not fixed at the highest level within its structure; owing to C/G's passive and 'follow-

my-leader' role, the hierarchical level at which its prices, which, like the prices fixed by the other
members of the cartel, were calculated was irrelevant.

333  As regards the role played by Tokai, SEC and Nippon, the Commission could properly distinguish that
role from the role played by C/G, since the Japanese producers actually participated in numerous 'Top Guy' and
'Working Level' meetings (recitals 49 to 56 of the Decision). The Commission's findings of fact concerning
that participation were not disputed by either SEC or Tokai, while Nippon's objection to the findings in respect
of the period May 1992 to March 1993 has been rejected (see paragraphs 100 to 116 above). Where an
undertaking has, even without playing an active role, participated in one or more meetings having an anti-
competitive objective, it must be regarded as having participated in the cartel unless it proves that it openly
distanced itself from the unlawful collusion (*Cement* judgment, cited at paragraph 39 above, paragraph 3199,
and the case-law cited there). Tokai, SEC and Nippon do not claim to have openly opposed the setting-up and
the implementation of the cartel.

334  By way of example, at the 'Working Level' meeting in Zurich, the world graphite market was reviewed
region by region, including the Far East, and market shares were also allocated to the Japanese producers. At
the Vienna meeting, the participants again exchanged information on the graphite electrodes market region by
region (recitals 51, 53 and 71 of the Decision).

335  The non-passive nature of SEC's and Nippon's conduct is not called in question by the fact that they were
represented by Tokai at one or two meetings: far from having opposed such 'inappropriate interference' in their
commercial policy, they agreed to that representation and demonstrated their adherence to the cartel by
participating, represented by their own staff, in the other meetings affecting their interests, which was clearly
not the case of the meetings of the European Group, consisting of the 'home' producers responsible for the
EEA, which is why it was sufficient to inform the Japanese members of the cartel of the European prices fixed
at those meetings. In view of the worldwide nature of the cartel, which attributed to the Japanese producers the
role of concentrating on their 'home' market in Asia, the Commission was therefore entitled to take the view
that they had not played a passive role in the infringement. In those circumstances, the Commission was not
required to state in the Decision its reasons for not affording them any attenuating circumstance in that regard.

336  Contrary to the objection that the reduction in C/G's fine to reflect the fact that it did not apply the
unlawful agreements in part was not sufficient, the Commission took sufficient account of the fact that C/G had
increased its sales in the EEA market, thereby not respecting the basic principle of the cartel of restricting sales
in 'non-home' markets (recital 235 of the Decision). In doing so, it was not required also to take into
consideration the increase in C/G's production capacity. First, the Commission stated in its defence, without
being contradicted on that point in C/G's reply, that C/G's production capacity had remained essentially
unaltered during the infringement period established in its case (1993 to 1996). Second, it is permissible to take
the view that the increase in European sales sufficiently reflects, as regards the EEA market, any increase in
production capacity.

337  In that context, Nippon and Tokai plead the principle of equal treatment and claim that they are in the
same situation as C/G, which had been 'compensated' for having increased its sales volume in the EEA.

338  Nippon's argument must be rejected in so far as it merely claims that it 'had not reduced its sales volumes
within the EEA', without providing any figures. The Commission was entitled to draw a distinction between
Nippon's unsupported assertion that it had maintained its sales volumes and the undisputed fact that C/G had
more than doubled its sales between 1993 and 1996.

339  In the case of Tokai, which claims that it penetrated the German market, one of SGL's and UCAR's
'home' markets, in 1996 and quadrupled its EEA sales between 1992 and 1997 (from 200 tonnes in 1992 to 900
tonnes in 1997), it must be held that Tokai, unlike C/G, obtained only a minimal market share in the EEA, less
then 2%, whereas C/G's market share was almost 8%. In those circumstances, the Commission was entitled to
conclude, without making an error of assessment and without infringing the principle of equal treatment, that in
spite of Tokai's non-implementation of the offending agreements, that non-implementation remained below a
threshold of reasonable effectiveness for the purposes of the second indent of point 3 of the Guidelines. The
Court does not consider it appropriate to review that assessment, even in the exercise of its unlimited

340  The same applies to C/G's argument that it sold its manufacturing technology to a Chinese producer for USD 4 million in 1994, contrary to one of the basic principles of the cartel (recital 50, last indent, of the Decision). The details of that transfer of technology were not provided by C/G during the administrative procedure – its corporate statement of 11 October 1999 and its reply of 6 April 2000 to the statement of objections each contain only a single sentence to that effect – so that the Commission did not err in refusing to take it into consideration in the Decision. The Court sees no reason to review the Commission's assessment, even in the exercise of its unlimited jurisdiction, still less so as the proposed factory in China has never been built.

341  Last, the fact that C/G voluntarily put an end to the infringement before the Commission had opened its investigation was sufficiently taken into account in the calculation of the duration of the infringement period found in C/G's case (recital 157 of the Decision). In particular, C/G cannot rely on the third indent of point 3 of the Guidelines, as the cessation of its anti-competitive conduct was not incited by the Commission's involvement.

342  As regards the other arguments whereby the applicants seek to obtain reductions in their fines for attenuating circumstances, they must all be rejected too.

343  First, the fact that in the wake of the investigation initiated by the Commission C/G and UCAR set up, respectively, a competition compliance programme and an internal inquiry designed to put an end to the infringement does not alter the reality of the infringement. Consequently, the mere fact that in certain of its previous decisions the Commission took such measures into consideration as attenuating circumstances does not mean that it is obliged to act in the same manner in every case (Case T-7/89 *Hercules Chemicals* v *Commission* [1991] ECR II-1711, paragraph 357, and Case T-352/94 *Mo och Domsjö* v *Commission* [1998] ECR II-1989, paragraphs 417 and 419). That is *a fortiori* so where, as here, the infringement constitutes a manifest breach of Article 81(1)(a) and (c) EC. Furthermore, in so far as UCAR's internal investigation encouraged its cooperation with the Commission, the Commission took that into account by granting it a reduction in fine of 40% under the Leniency Notice.

344  As regards, second, C/G's argument concerning the economic pressure brought to bear on it, the only information which it provided in that regard concerned the contacts which it had had with SGL in 1996 (recital 82 of the Decision), i.e. after the implementation of the cartel. It is sufficient therefore to point out that C/G freely decided to comply with the decisions of the members of the cartel on prices. It did not claim to have been pressured into adhering to the cartel; even if that had been the case, moreover, it could have informed the competent authorities instead of supporting the cartel. The argument cannot therefore be upheld.

345  The same applies as regards, third, the reference by C/G, SGL and UCAR to the structural crisis in the graphite electrodes sector. In that regard, it is sufficient to note that in Case T-16/99 *Lögstör Rör* v *Commission* [2002] ECR II-1633, paragraphs 319 and 320, one of the *Pre-insulated pipes* cases, the Court of First Instance held that the Commission is not required to regard as an attenuating circumstance the poor financial state of the sector in question. The Court of First Instance has also stated that just because the Commission has taken account in earlier cases of the economic sector as an attenuating circumstance it does not necessarily have to continue to observe that practice (Case T-13/89 *ICI* v *Commission* [1992] ECR II-1021, paragraph 372). As the Commission properly observed, as a general rule cartels come into being when a sector encounters problems. If the applicants' reasoning were to be followed, the fine would have to be reduced as a matter of course in virtually all cases. It is therefore unnecessary to investigate further whether the facts of this case and those forming the background to other decisions in which structural crises were regarded as attenuating circumstances were in fact comparable.

346  Fourth, and in the alternative, SGL's argument that a crisis affecting manufacturers of graphite electrodes in particular owing to a crisis in the steel tubes industry is not convincing. The Commission emphasised, without being contradicted on that point, that the volume of steel produced in electric arc furnaces grew from 196 million tonnes in 1987 to 270 million tonnes in 1997 (recital 9 of the Decision). It may be inferred that any fall in world steel production did not primarily affect the production of electric steelworks but that of traditional

347   Fifth, as regards the economic advantage that only Mitsubishi and Union Carbide, and not UCAR, are alleged to have derived from the cartel, the fact that an undertaking did not benefit from an infringement cannot constitute an attenuating circumstance, as otherwise the fine would lose its deterrent character (see, to that effect, *FETTCSA*, cited at paragraph 47 above, paragraphs 340 to 342, and the case-law cited there). Such an absence of economic advantage does not limit the gravity of the infringement. Furthermore, if UCAR criticises the conduct of Mitsubishi and Union Carbide, it must take proceedings against those companies in order to enforce its rights, as it has already done by lodging a complaint in the United States.

348   In so far as UCAR relies, last, on the civil-law settlements concluded in the United States and Canada, those settlements do not in any way alter the gravity of the infringement either and cannot therefore be taken into consideration as attenuating circumstances. Although in the *Pre-insulated pipes* decision the Commission took into account the damages paid to a competitor whose elimination from the Community market had been one of the main objectives of the cartel, that competitor was established in the Community and was therefore one of the economic operators protected by Community competition law. That fact does not mean that the Commission is obliged to take into account, for the benefit of UCAR, the damages paid to customers in the United States and Canada because of the losses sustained on those markets. The settlements in question have no impact on the infringement committed by UCAR in the EEA.

349   It follows from the foregoing that the pleas and arguments put forward by Tokai, C/G, SGL, Nippon, UCAR and SEC must be rejected.

f)   The maximum limit of the fines and the ability to pay of certain applicants within the meaning of point 5 of the Guidelines

Cases T-239/01 and T-245/01

350   SDK and SGL observe that the basic fine calculated for UCAR was reduced by 15.2% in order to comply with the maximum limit of 10% of UCAR's worldwide turnover (recital 199 of the Decision) and accuse the Commission of having given UCAR the benefit of that adjustment before applying the Leniency Notice, and therefore at an intermediate stage rather than at the end of its fine-fixing procedure. The fines imposed on the other participants in the cartel were not reduced in that way. SDK and SGL complain of that unequal treatment and demand the same reduction in their fines so that a consistent and proportionate relation with UCAR's fine will be maintained.

351   SDK further claims that it has been punished excessively because its worldwide turnover is significantly greater than its turnover from sales of graphite electrodes; it is therefore being penalised because it has a greater number of other activities not connected with sales of that product. If SDK's graphite electrodes business had been a separate undertaking, the application of the 10% ceiling would have reduced the final fine to EUR 6.6 million.

352   In that regard, the Court finds that in applying to UCAR the maximum limit of 10% not at the stage of the calculation of the 'final amount' but at an earlier stage, namely before applying the Leniency Notice, the Commission failed to comply with the wording of point 5(a) of the Guidelines. Once the Commission decided to apply in this case the method laid down by the Guidelines it was required to adopt that method when calculating the amount of the fines, and was required to set out expressly its reasons should it depart from those Guidelines in any particular regard (see the case-law cited at paragraph 157 above and *FETTCSA*, cited at paragraph 47 above, paragraph 271).

353   In so far as it merely refers to the maximum limit of fines provided for in Article 15(2) of Regulation No 17, recital 199 of the Decision does not contain an express explanation of the Commission's reasons for departing from the Guidelines. However, the Commission stated before the Court that it had applied the reduction of 15.2% to UCAR not because it considered that the infringement committed by that undertaking deserved a lower penalty than that imposed on the other members of the cartel, but because it wished to take account of the fact that in UCAR's case alone the basic amount fixed before the application of the Leniency

Notice exceeds the maximum 10% limit (see point 371 million or, by 2006%). In those circumstances, the Commission considered that it was necessary to anticipate the application of that limit in order to ensure that the Leniency Notice could be fully effective: if the basic amount was significantly in excess of the 10% limit before the application of that notice and the limit could not be applied immediately, the incentive for the undertaking concerned to cooperate with the Commission would be much less, since the final fine would be reduced to 10% in any event, with or without the undertaking's cooperation.

354   The Court considers that that explanation justifies the approach taken by the Commission in UCAR's case. The reasons for that approach were not required to be stated in the Decision itself, since that approach did not adversely affect the undertaking concerned, namely UCAR. Even if the measure in favour of UCAR were unlawful for failure to state reasons, SDK and SGL could not rely on that illegality committed in favour of another (see, to that effect, Case T-327/94 *SCA Holding v Commission*, cited at paragraph 216 above, paragraph 160).

355   In any event, it is common ground that SDK and SGL were not in a similar situation to UCAR's as regards worldwide turnover, as the basic amount fixed for those two undertakings did not exceed the maximum limit before application of the Leniency Notice. Consequently, they cannot validly maintain that the Commission was required, under the principle of equal treatment, to grant them the same reduction as that applied in favour of UCAR. It follows that the pleas alleging breach of that principle must be rejected.

356   The same applies to the plea raised by SDK that its fine would have had to be significantly reduced if its graphite electrodes business had been a separate undertaking. That plea is based on speculations wholly unconnected with the real legal status of the company which the Commission was required to take into account in applying, in accordance with a well-established line of decisions (see, for example, *Musique diffusion française v Commission*, cited at paragraph 144 above, paragraphs 118 and 119, and the *Cement* judgment, cited at paragraph 39 above, paragraph 5022), the maximum limit of 10% to SDK's total turnover (for all products). If SDK chose a vertical 'unitary' structure for its company, the Commission was required to take note of that fact and to assume that that structure was in SDK's economic interest. At the present stage, moreover, there is no means of knowing what would have been the precise status and the position of a separate undertaking within the SDK group. This plea must therefore be rejected too.

Cases T-239/01, T-246/01, T-251/01 and T-252/01

—   Arguments of the parties

357   SEC claims that its fine corresponds to 11.3% of its total turnover in 1999 and therefore exceeds the 10% ceiling laid down in Article 15(2) of Regulation No 17.

358   SGL maintains that the Commission was not entitled to calculate its fine on the basis of its turnover for 2000. That turnover rose by EUR 180 million following the acquisition of another company in January 2000. The *Cement* judgment, cited at paragraph 39 above, paragraph 5045, precludes the taking into consideration of an increase in turnover after the end of the infringement (March 1998). In that context, SGL complains of the over-long period of the administrative procedure; the resulting delay adversely affected its financial interests, since its 1999 turnover was lower than its 2000 turnover.

359   SGL further claims that the maximum limit of 10% is absolute, in the sense that it could not even be exceeded by the 'intermediate' (starting and basic) amounts fixed by the Commission in the course of its calculations. The contrary reasoning set out by the Court of First Instance in *LR AF 1998 v Commission*, cited at paragraph 38 above, is flawed.

360   SGL criticises the Commission, last, for not having taken account of its very difficult financial situation. Its failure to do so infringed point 5(b) of the Guidelines.

361   UCAR and C/G also claim that they are unable to pay the fine. They emphasise the difficult situation in the graphite electrodes sector and their own precarious financial situation.

Case 1:06-CR-10061-ML-W    Document 27    whith is 401612000 United artside

362   In that context, UCAR recalls to mind the heavy debt which its restructuring caused it to incur in its restructuring in 1995. It further refers to the heavy fines imposed on it by the United States and Canadian authorities. UCAR is now unable to borrow more money, as its lines of credit have been frozen. UCAR states that the Commission has repeatedly taken account in its previous practice in taking decisions of the profitability of the addressees of its decisions, either when setting the amount of the fines or when determining the payment terms. In the present case, it has failed to follow its own administrative practice.

363   C/G further states that its financial difficulties obliged it to initiate an insolvency procedure in the United States shortly after the Decision was adopted.

364   The Commission objects to the pleas and arguments put forward by the applicants.

—   Findings of the Court

365   As regards SEC's plea, it is sufficient to observe that the 10% maximum laid down in Article 15(2) of Regulation No 17 refers to the financial year preceding the date of the Decision, namely, in this case, 2000 (see, to that effect, Case C-291/98 P *Sarrió* v *Commission*, cited at paragraph 239 above, paragraph 85, and *FETTCSA*, cited at paragraph 47 above, paragraph 506). SEC expressly acknowledges that for the year 2000 that ceiling was observed in its case. The plea must therefore be rejected.

366   In so far as SGL claims that the Commission was required to calculate its fine on the basis of its total turnover for 1999, as that figure was considerably lower than its total turnover for 2000, it is sufficient to observe that the starting point for the calculation of the fines was worldwide turnover in 1998 from sales of the relevant product and the market shares of the undertakings concerned between 1992 and 1998 (recitals 30, 149 and 150 of the Decision). Those turnover figures do not refer either to 1999 or to 2000. SGL's argument is therefore inoperative.

367   Next, it is settled case-law that the maximum limit of 10% referred to in Article 15(2) of Regulation No 17 refers to the total turnover of the undertaking concerned, which alone gives an indication of that undertaking's size and influence on the market (see the *Cement* judgment, cited at paragraph 39 above, paragraph 5022 and the case-law cited there). Furthermore, it is only the fine ultimately imposed that must be reduced to that 10% limit, in accordance with Article 15 of Regulation No 17; that provision does not prohibit the Commission from referring, during its calculation, to an intermediate amount higher than that limit, provided that the amount of the fine eventually imposed does not exceed it (*LR AF 1998* v *Commission*, cited at paragraph 38 above, paragraphs 287 and 288). In SGL's case, the final fine of EUR 80.2 million is under the limit of 10% with respect both to 1999 (EUR 980 million) and to 2000 (EUR 1 262 million). The arguments which SGL derives from an excessively long administrative procedure and from the *Cement* judgment (paragraph 5045) are therefore irrelevant.

368   The criticism concerning the judgment in *LR AF 1998* v *Commission* is unfounded. If SGL is referring to criminal law, which does not allow the court to exceed the maximum penalty prescribed for a specific offence, it must be emphasised that no provision of Community law lays down administrative sanctions, either minimum or maximum, for the various categories of infringements of competition law. The Commission is therefore free, in principle, to determine the amount of the fines imposed in respect of such infringements according to their gravity and duration. The only maximum limit on the power to impose sanctions conferred on the Commission concerns the financial capacity of the undertaking concerned in terms of its global turnover. Therefore there is nothing to prevent the Commission from exceeding the maximum limit of 10% referred to in Article 15(2) of Regulation No 17 in the course of purely intermediate calculations relating to the gravity and duration of the infringement.

369   The difficult situation in the graphite electrodes sector does not constitute a 'specific' economic context within the meaning of point 5(b) of the Guidelines. As stated above, cartels come into being, in particular, at a time when a sector is experiencing difficulties. If that circumstance did not justify the grant of an attenuating circumstance (see paragraph 345 above), it cannot justify a reduction in the fine in the present context either.

370   The same applies to the precarious financial situation of SGL, UCAR and C/G. According to settled case-

law, the Commission is not required when determining the amount of the fine to take account of an undertaking's financial losses since recognition of such an obligation would have the effect of conferring an unfair competitive advantage on the undertakings least well adapted to the conditions of the market (*LR AF 1998* v *Commission*, cited at paragraph 38 above, paragraph 308; *HFB and Others* v *Commission*, cited at paragraph 280 above, paragraph 596; and *FETTCSA*, cited at paragraph 47 above, paragraph 351, and the case-law cited there). The fact that the Commission has found in previous decisions that it was appropriate to take account of the financial difficulties of a given undertaking does not mean that it is obliged to do so in subsequent decisions as well (*FETTCSA*, paragraphs 353 and 354).

371   That line of decisions is not called in question by point 5(b) of the Guidelines, which states that an undertaking's real ability to pay must be taken into consideration. That ability applies only in a 'specific social context' consisting of the consequences which payment of the fine would have, in particular, by leading to an increase in unemployment or deterioration in the economic sectors upstream and downstream of the undertaking concerned. In that regard, the applicants have adduced no evidence capable of determining the 'specific social context'.

372   Furthermore, the fact that a measure taken by a Community authority leads to the insolvency or liquidation of a given undertaking is not prohibited as such by Community law (see, to that effect, Case 52/84 *Commission* v *Belgium* [1986] ECR 89, paragraph 14, and Case C-499/99 *Commission* v *Spain* [2002] ECR I-6031, paragraph 38). Although the liquidation of an undertaking in its existing legal form may adversely affect the financial interests of the owners, investors or shareholders, it does not mean that the personal, tangible and intangible elements represented by the undertaking would also lose their value.

373   At the hearing, SGL maintained that the Commission's failure to take account of its poor financial situation is contrary to the Commission's very recent practice, which in Decision C (2002) 5083 final of 17 December 2002 relating to a procedure under Article 81 of the EC Treaty and Article 53 of the EEA Agreement (COMP/E-2/37.667 – Speciality graphites), expressly reduced the fine imposed on SGL owing to its serious financial situation. SGL maintains that the same reduction should therefore have been granted in this case.

374   In that regard, it is sufficient to observe that the decision of 17 December 2002 took into consideration both SGL's financial situation and the fact that a large fine had already been imposed on SGL for its participation in the cartel on the graphite electrodes market, so that the Commission considered that 'in these particular circumstances, imposing the full amount of the fine did not appear necessary in order to ensure effective deterrence' (recital 558). SGL cannot therefore rely on that feature of the decision of 17 December 2002 and allege that the Commission made an error of law or a manifest error of assessment in failing, in the present context in which that particular feature is not present, to depart from the case-law referred to at paragraph 370 above.

375   In so far as C/G lists further economic handicaps which the Commission should have taken into account, namely the fact that it has no production site outside the United States and its inability to provide high-level technical services, its high labour costs, the poor quality of its products and the vertical integration of its production activities, the Commission has correctly observed that those disadvantages are reflected in its turnover and, accordingly, in its being placed in a category for which a starting amount lower than SGL's and UCAR's was fixed. Furthermore, since C/G, in spite of those handicaps, was able to increase its sales in Europe, a significant reduction in its fine was granted for attenuating circumstances. Consequently, no additional reduction in the fine is justified in this context.

376   UCAR's references to the penalties imposed in the United States and Canada, and to the harmful conduct of Mitsubishi and Union Carbide, merely reiterate, in the present context, pleas which have already been rejected above. It is sufficient to restate, therefore, that UCAR has not shown that it was placed in a 'specific social context' which required that the Commission refrain, at least in part, from imposing a fine on it. As regards the conduct of Mitsubishi and Union Carbide, which were not identified and fined in the Decision as having committed the infringement, the Commission was under no obligation to reduce, for that reason, the fine imposed on UCAR, whose role in committing the infringement was established, and thus to relieve it of the need to bring an action against those two undertakings before the competent national courts for compensation for the financial loss allegedly suffered as a result of their conduct.

377   As none of the pleas or arguments put forward in this context has been upheld, the base amounts as
377   As none of the pleas or arguments put forward in this context has been upheld, the base amounts as determined thus far will not be altered.

3.   *Pleas alleging failure to comply with the Leniency Notice*

378   SGL, UCAR and C/G maintain that the reductions in their fines which the Commission granted pursuant to point D of the Leniency Notice were insufficient.

379   Point D of the Leniency Notice states: 'Where an enterprise cooperates without having met all the conditions set out in [points] B or C, it will benefit from a reduction of 10% to 50% of the fine that would have been imposed if it had not cooperated' (paragraph 1).

'Such cases may include the following:

--    before a statement of objections is sent, an enterprise provides the Commission with information, documents or other evidence which materially contribute to establishing the existence of the infringements;

--    after receiving a statement of objections, an enterprise informs the Commission that it does not substantially contest the facts on which the Commission bases its allegations' (paragraph 2).

380   In the Decision, the Commission applied point D, paragraph 2, first indent, of the Leniency Notice to the cases of SGL (recitals 169 and 172 to 175), UCAR (recitals 200 to 202) and C/G (recitals 239 and 240).

a)   Case T-239/01

Summary of the Decision

381   The Commission reduced SGL's fine by 30% because SGL had cooperated at an early stage of the procedure (recitals 167 to 169 and 175). However, SGL did not really cooperate after the initial contacts in April 1998, so that the Commission had to send it a formal request for information and a reminder in which it reserved the right to adopt a formal decision pursuant to Article 11(5) of Regulation No 17. In reply, SGL sent a statement on 8 June 1999 concerning its participation in the cartel (recital 173). The Commission took the view that any cooperation on the part of undertakings must be voluntary and in particular outside the exercise of any investigatory power. Consequently, a substantial part of the information provided in the statement of 8 June 1999 in fact constituted SGL's reply to the Commission's formal request for information. Only information which went beyond that requested under Article 11 would be regarded as a voluntary contribution within the meaning of the Leniency Notice (recital 174).

Arguments of the parties

382   SGL maintains that it was not required to reply to certain questions in the Commission's request for information as it would otherwise have had to incriminate itself. In its statement of 8 June 1999, it none the less provided full and accurate replies. In the light of the case-law of the European Court of Human Rights (the *Funke* judgment of 25 February 1993, Series A No 256-A, § 44), SGL was even entitled to object to any contribution to the establishing of its own guilt. By concluding incorrectly that SGL was obliged to answer all the questions, the Commission undervalued its voluntary cooperation.

383   SGL further submits that the Commission was also required to take account of its reply of 30 July 1997 to a request for information. By that reply, SGL confirmed that it had warned others of the Commission's forthcoming investigation. That request for information was aimed at obtaining SGL's admission concerning an infringement, so that SGL was not in any event required to respond. Its voluntary admission should therefore have been reflected in the form of a larger reduction in its fine.

384   SGL is of the view that its statement of 8 June 1999 came at the same stage of the administrative procedure as SDK's and UCAR's cooperation. It presented the facts in a manner as detailed as they did and the

scope and content of the information were objectively equivalent. Consequently, the Commission should not
scope and content of the information were objectively equivalent. Consequently, the Commission should not
have ascribed to the cooperation by SGL a more limited value than it did to the earlier cooperation by SDK and
UCAR (*Krupp*, cited at paragraph 279 above, paragraph 237 et seq.).

385  SGL further claims that the Commission discriminated against it by comparison with UCAR, C/G and
SDK.

386  First, the fact that it reduced UCAR's fine by 40%, whereas SGL's fine was reduced by only 30%,
constitutes unequal treatment, since UCAR's cooperation was not substantially greater than SGL's. SGL
informed the Commission from the outset of its intention to collaborate as quickly as possible, while stating that
the parallel criminal proceedings under way against it in the United States prevented it from communicating in
writing all the factual details of the cartel. It had to await the conclusion of a plea agreement in May 1999
before it was able to send the Commission its statement of 8 June 1999. UCAR and SDK also awaited the
conclusion of such plea agreements before sending their information to the Commission. SGL should not have
been placed at a disadvantage because SDK and UCAR were in a position to conclude their plea agreements
earlier, as SGL had no influence on the conduct of the United States authorities. SGL adds that the statements of
two employees of UCAR sent to the Commission on 25 March 1999 cannot be regarded as cooperation on the
part of UCAR, since only the undertaking itself may be concerned by the procedure and be entitled to be
rewarded for cooperation. Furthermore, the value of UCAR's cooperation was lower than the Commission
credited it with.

387  Second, the reduction in fine of 40% awarded to C/G reflects an error of assessment in so far as C/G's
partial non-application of the unlawful agreements was considered to justify such a reduction. C/G's conduct
was comparable to that of the other participants in the cartel.

388  Third, the Commission subjected SGL to unequal treatment by reducing by 70%, under point C of the
Leniency Notice, the amount of the fine imposed on SDK. The Decision does not state whether the conditions
of the Leniency Notice were actually satisfied in SDK's case and were not in SGL's. In any event, SDK's
contribution does not justify the considerable level of favourable treatment given to that undertaking.

389  The Commission replies that most of the matters put forward by SGL to demonstrate the extent of its
cooperation constitute information which it was obliged to provide under Article 11 of Regulation No 17,
namely the dates, places, participants and procedures for the preparation and organisation of meetings with
competitors, figures and deliveries of graphite electrodes in the Community and tables showing price changes.
Consequently, all of that information had to be disregarded for the purposes of the Leniency Notice. Even on
the assumption that SGL was not required to provide certain information requested on 31 March 1999, its
contribution must not be overvalued. When the Commission received SGL's statement on 8 June 1999, it
already had most of the information at its disposal owing to the cooperation of SDK and two highly-placed
employees of UCAR. In any event, SGL did not take the initiative to cooperate but merely replied to a request
for information.

390  SGL's reference to *Krupp* (cited at paragraph 279 above) is irrelevant, in the Commission's submission,
since the chronology of the replies provided in that case corresponded to the order in which the Commission
had questioned the undertakings concerned; according to the Court of First Instance, in those conditions, the
mere fact that one of the undertakings recognised the alleged facts by being the first to answer the questions
could not constitute an objective reason for differentiated treatment. In the present case, on the other hand, the
order in which the documents reached the Commission is not explained by the order in which the Commission
questioned SGL, SDK and UCAR.

391  The Commission further submits that SGL provided it with an incomplete answer to the question as to
which undertakings had been informed by SGL about the forthcoming investigations by the Commission: SGL
did not state that it had also warned UCAR. It was perfectly capable of informing the Commission that it had
warned three undertakings without at the same time acknowledging the existence of an infringement. The fact
of telling other undertakings that investigations are going to take place does not in itself constitute an
infringement of Article 81 EC.

392   In so far as SGL criticises the Commission for having discriminated against it by comparison with UCAR, C/G and SDK, the Commission replies that UCAR made a greater contribution than SGL to the establishment of the infringement. As regards C/G's role, the Commission emphasises that the passive nature of C/G's conduct and the fact that it increased its sales in Europe earned it a reduction of 40% in its fine for attenuating circumstances. C/G's and SGL's situations are therefore not comparable. The same applies to the comparison with SDK. Unlike SGL, SDK benefited from the application of point C of the Leniency Notice, since it was the first company actually to provide conclusive evidence of the existence of the cartel and it withdrew from the cartel in April 1997.

393   The Commission observes that SGL did not dispute during the administrative procedure the objection that it had continued the infringement after the investigations and that its failure to dispute the facts was taken into consideration in the reduction of its fine by 30%. Before the Court, however, SGL denied for the first time having continued the infringement after the investigations. In doing so, it restricted *ex post facto* the extent of its cooperation. Accordingly, a further reduction by the Court, in the exercise of its unlimited jurisdiction, is not appropriate.

Findings of the Court

394   As regards the complaint alleging breach of the principle of equal treatment, it is settled case-law that, when assessing the cooperation provided by the undertakings concerned, the Commission cannot ignore that principle, which is infringed where comparable situations are treated differently or different situations are treated in the same way, unless such treatment is objectively justified (*Krupp*, cited at paragraph 279 above, paragraph 237, and *ABB Asea Brown Boveri* v *Commission*, cited at paragraph 153 above, paragraph 240, and the case-law cited there).

395   In that regard, it must be held that SDK and C/G are not in a situation comparable with SGL's.

396   The Commission found in the Decision that C/G did not participate in the 'Top Guy' meetings or in the 'Working Level' meetings, that it merely followed the prices fixed by the other members of the cartel and that, in breach of one of the basic principles of the cartel (the 'home producer' principle), it increased its sales in Europe. SGL neither disputed those findings of fact (recitals 81 to 86 of the Decision) nor claimed that it had acted in a similar manner to that of C/G as just described.

397   As regards the situation of SDK, which benefited from the application of point C of the Leniency Notice and whose fine was reduced by 70%, SGL does not claim that it too should have benefited from point C; it merely complains that the Decision does not state why the conditions of point C were satisfied in SDK's case and not in its own case. As stated above, the Commission properly found that SGL had been one of the instigators and ringleaders of the cartel; furthermore, SGL does not even claim that it was the first undertaking to provide conclusive evidence of the existence of the cartel. Consequently, the conditions laid down in point B (b) and (e), read together with point C, of the Leniency Notice were not satisfied by SGL. SGL cannot therefore receive a reduction in fine as provided for in point C and its arguments concerning SDK are therefore inoperative.

398   Also inoperative is the argument that SDK's contribution – and also UCAR's – was in reality of less value than that accorded to it by the Commission and did not justify the reduction in fine. In endeavouring to deprecate the cooperation of other undertakings, SGL is seeking not to maintain that its own cooperation had the same value as that provided by another undertaking and therefore deserved the same reduction as that granted to that undertaking, but to denounce what it alleges to be the over-favourable, i.e. unlawful, treatment of those undertakings. That argument cannot therefore secure a greater reduction in SGL's fine.

399   As regards whether the cooperation provided by SGL, which was rewarded by a reduction of 30%, was objectively of a value comparable with that provided by UCAR, which was rewarded by a reduction of 40%, it is apparent from the papers before the Court that both SGL and UCAR, in their capacity as instigators and ringleaders of the cartel, provided instructive and detailed information which made the Commission's task much easier, although the substantial part of SGL's cooperation was provided several months later than that of the two employees of UCAR, Mr [...] and Mr [...], who had been encouraged by UCAR to send their

statements to the Commission, so that the Commission was entitled to consider the cooperation of GCAR itself.

400   In that context, SGL cannot successfully claim that its cooperation was 'delayed' by the parallel proceedings in the United States. As the Commission correctly stated (recital 172 of the Decision), it was at its own risk that SGL preferred to await the closure of the United States proceedings, in the hope of receiving a lighter penalty in the United States, before collaborating with the Commission, so that it had to expect that the Commission would already have been informed by other undertakings and that its own contribution would thus have lost its value as information.

401   Next, the essential reason why the Commission granted SGL a reduction of only 30% is set out in recital 174 of the Decision: according to the Commission, an undertaking deserves a reduction in its fine only if its cooperation is 'voluntary' and is outside the exercise of 'any investigatory power': the Commission considered that 'a substantial part of the information provided [by SGL] in fact constitute[d] SGL's reply to the Commission's formal request for information [and that] SGL's statement [would] be regarded as a voluntary contribution within the meaning of the Leniency Notice only where the information provided went beyond that requested under Article 11'. Furthermore, SGL sent its statement of 8 June 1999 only after it had received a reminder in which the Commission reserved the right to adopt a formal decision under Article 11(5) (recital 173 of the Decision). Relying on the judgment of the Court of Justice in Case 374/87 *Orkem v Commission* [1989] ECR 3283, paragraphs 27, 28 and 32 to 35, the Commission therefore did not make recompense for the information which it considered that SGL was required to provide in any event in reply to a request for information or to a decision ordering, under threat of penalties, communication of the information requested.

402   In that context, it is appropriate to observe that the absolute right to silence on which SGL relies in support of its contention that it was not required to respond to any request for information, cannot be recognised. To acknowledge the existence of such a right would be to go beyond what is necessary in order to preserve the rights of defence of undertakings, and would constitute an unjustified hindrance to the Commission's performance of its duty to ensure that the rules on competition within the common market are observed. A right to silence can be recognised only to the extent that the undertaking concerned would be compelled to provide answers which might involve an admission on its part of the existence of an infringement which it is incumbent upon the Commission to prove (Case T-112/98 *Mannesmannröhren-Werke v Commission* [2001] ECR II-729, paragraphs 66 and 67).

403   In order to ensure the effectiveness of Article 11 of Regulation No 17, the Commission is therefore entitled to compel the undertakings to provide all necessary information concerning such facts as may be known to them and to disclose to the Commission, if necessary, such documents relating thereto as are in their possession, even if the latter may be used to establish the existence of anti-competitive conduct (see *Mannesmannröhren-Werke v Commission*, cited at paragraph 402 above, paragraph 65, and the case-law cited there).

404   This power of the Commission to obtain information, enshrined in *Orkem v Commission* and *Mannesmannröhren-Werke v Commission*, cited at paragraphs 401 and 402 above respectively, does not fall foul of either Article 6(1) and (2) of the ECHR (*Mannesmannröhren-Werke v Commission*, cited above, paragraph 75) or the case-law of the European Court of Human Rights.

405   Although the Court of Justice has held (*LVM*, cited at paragraph 130 above, paragraph 274) that after the judgment in *Orkem v Commission*, cited at paragraph 401 above, the case-law of the European Court of Human Rights, of which the Community Courts must take account, has gone through new developments with the *Funke* judgment, cited at paragraph 382 above, the *Saunders v United Kingdom* judgment of 17 December 1996 (Reports of Judgments and Decisions 1996-VI, p. 2044, §§ 69, 71 and 76), and the *J.B. v Switzerland* judgment of 3 May 2001 (not yet published in the Reports, §§ 64 to 71), the Court of Justice did not reverse its previous case-law in *LVM*.

406   In any event, the mere fact of being obliged to answer purely factual questions put by the Commission and to comply with its requests for the production of documents already in existence cannot constitute a breach of the principle of respect for the rights of defence or impair the right to fair legal process, which offer, in the specific field of competition law, protection equivalent to that guaranteed by Article 6 of the Convention. There

is nothing to prevent the addressee of a request for information from showing, whether during the
administrative procedure or in proceedings before the Community Courts, when exercising his rights of
defence, that the facts set out in his replies or the documents produced by him have a different meaning from
that ascribed to them by the Commission (*Mannesmannrohren-Werke* v *Commission*, cited at paragraph 402
above, paragraphs 77 and 78).

407   As regards, next, the extent to which SGL was required to reply, in accordance with the case-law referred
to above, to the request for information of 31 March 1999, it must be observed that, in addition to the purely
factual questions and the requests to produce documents already in existence, the Commission requested SGL
to describe the object of and what occurred at a number of meetings in which SGL participated and also the
results/conclusions of those meetings, when it was clear that the Commission suspected that the object of the
meetings was to restrict competition. It follows that a request of that nature was of such a kind as to require
SGL to admit its participation in an infringement of the Community competition rules.

408   The same applies to the requests for the protocols of those meetings, the working documents and the
preparatory documents concerning them, the handwritten notes relating to them, the notes and the conclusions
pertaining to the meetings, the planning and discussion documents and also the implementing projects
concerning the price increases put into effect between 1992 and 1998.

409   As SGL was not required to answer questions of that type in the request for information of 31 March
1999, the fact that it none the less provided information on those points must be regarded as voluntary
collaboration on the part of the undertaking apt to justify a reduction in the fine under the Leniency Notice.

410   That conclusion cannot be affected by the Commission's argument that the information in question was
not provided voluntarily but in reply to a request for information. point D, paragraph 2, first indent, of the
Leniency Notice does not require a voluntary act taken solely on the initiative of the undertaking concerned, but
merely requires information which contributes to establishing the existence of the infringement. Even point C,
moreover, which relates to a more substantial reduction in the fine than that referred to in point D, makes it
possible to reward cooperation provided 'after the Commission has undertaken an investigation ordered by
decision on the premises of the parties to the cartel'. Accordingly, the fact that a request for information was
sent to SGL under Article 11(1) of Regulation No 17 cannot minimise the cooperation provided by that
undertaking under point D, paragraph 2, first indent, of the Leniency Notice, especially not as a request for
information is a less coercive measure than an investigation ordered by decision.

411   It follows that the Commission failed to appreciate the importance of SGL's cooperation in that context.

412   In so far as the Commission criticises SGL for having given an incomplete answer to the question as to
which undertakings SGL had informed of the forthcoming investigations by the Commission in June 1997, it is
true that, by letter of 30 July 1997, SGL admitted only to having informed VAW and another undertaking and
failed to state that it had also informed UCAR. However, the Commission itself stated that SGL's warning
increased the gravity of the infringement, gave rise to a fine whose deterrent effect was greater than normal and
justified being regarded as an aggravating circumstance, as SGL's conduct had created the conditions necessary
to keep the cartel active and to prolong its injurious effects. Consequently, SGL was not required to inform the
Commission that it had warned other undertakings. That information was likely to increase the penalty which
the Commission would impose on SGL. On this point too, therefore, the Commission failed to appreciate SGL's
conduct by criticising it for having provided an incomplete reply.

413   Last, it is clear from the Decision that none of the undertakings involved, including SGL, substantially
contested the facts on which the Commission had based its statement of objections (recital 41). Although recital
168 reproduces in full point D of the Leniency Notice and although the Commission expressly granted Tokai,
SEC and Nippon a reduction of 10% of their fines pursuant to the second indent of point D(2) for not having
contested the facts (recitals 219 and 222), it did not apply that provision to SGL and only reduced its fine
pursuant to the first indent of point D(2) (recital 175).

414   In answer to a written question put by the Court, the Commission endeavoured to explain that omission by
stating that, when the undertakings' cooperation was limited to not contesting the facts, it applied a reduction

Case 06-mc-10061-MLW   Document 27   Filed 04/11/2006   Page 23 of 37

based solely on that type of cooperation and referred expressly to the second indent of that provision of the Leniency Notice, whereas, for the undertakings which also cooperated under the first indent of that provision, namely SGL, UCAR, VAW and C/G, it applied only a single reduction, thus grouping each of the two types of cooperation together; that single reduction was exclusively, and incorrectly, based on the first indent. In any event, it is clear from the context of the decision that the reduction granted to SGL was based on the fact that it provided information and documents as well as on the fact that it did not contest the facts.

415   In that regard, it is sufficient to state that that explanation was provided for the first time before the Court by the representatives of the Commission and that it does not appear anywhere in the Decision adopted by the College of Members of the Commission. The assessment of SGL's conduct in not contesting the facts should have appeared in the recitals relating to its cooperation, in the same way as it was expressly stated – apart from in recital 41, describing the course of the administrative procedure – in recitals 219 and 222 as regards Tokai, SEC and Nippon (see, to that effect, *ABB Asea Brown Boveri* v *Commission*, cited at paragraph 153 above, paragraph 244). In the light of the passage of the Decision concerning SGL, the Court cannot but note that the Commission did not give that undertaking the benefit of the second indent of point D(2) of the Leniency Notice, although SGL satisfied the conditions of that provision.

416   It follows from the foregoing that the Commission failed, on a number of points, to appreciate the significance of the cooperation provided by SGL before the adoption of the Decision. In the exercise of its unlimited jurisdiction, the Court considers it appropriate to reduce, on that basis, the fine imposed by 10% in addition to the 30% already granted by the Commission.

417   In so far as the Commission requests the Court not to apply that reduction, on the ground that SGL first substantially contested before the Court the facts which it had previously admitted during the administrative procedure, it must be held that SGL is actually complaining that the Commission had incorrectly found that it continued the infringement after June 1997. The findings made by the Commission in that regard were essentially based on SGL's objective conduct during the administrative procedure and on its rather general no-contest statements. Before the Court, SGL merely claimed, in substance, that the Commission had been mistaken as to the meaning of its conduct and its statements. In order to refute that complaint, the Commission could merely refer to that conduct and those statements on SGL's part and also the chronology of the administrative procedure (see paragraphs 71 to 77 above). The Commission's task of establishing the facts constituting an infringement, which had been made easier during the administrative procedure by SGL's conduct and statements, was not therefore objectively made more difficult when SGL subsequently contested the facts before the Court.

418   However, it cannot be overlooked that the Commission, against any expectation that it could reasonably base on SGL's objective cooperation during the administrative procedure, was required to draft and submit a defence before the Court of First Instance dealing specifically with SGL's challenge of the facts constituting the infringement, which it had rightly considered that SGL would no longer call in question. In those circumstances, the Court considers that it should exercise its unlimited jurisdiction under Article 17 of Regulation No 17 and reduce the reduction in fine granted to SGL by two percentage points. That reduction in its fine therefore comes to only 8%.

419   As held at paragraph 113 above, that conclusion is not inconsistent with the judgment in *Stora Kopparbergs Bergslags* v *Commission*.

420   It follows that the final amount of the fine imposed on SGL must be fixed at EUR 69.114 million.

b)   Case T-246/01

Summary of the Decision

421   The Commission applied a reduction of 40% to UCAR's fine because, although it was not the first company to provide the Commission with decisive evidence, it contributed substantially to establishing important aspects of the case and it was the first company to acknowledge illicit contacts with competitors, in reply to a formal request for information (recitals 200 to 202).

Arguments of the parties    Case 1:06-mc-10061-MLW    Document 27    Filed 04/11/2006    Page 24 of 37

422  UCAR claims that the 40% reduction in its fine which the Commission granted is insufficient by
comparison with the reductions of 30% granted to SGL and 70% granted to SDK. Owing to the fact that UCAR
cooperated as much as possible with the Commission, it submits that it is entitled to the maximum reduction
possible. UCAR provided decisive information for an understanding of the operation of the cartel. SDK's
disclosures did, admittedly, provide the Commission with evidence that there was a cartel, but UCAR provided
evidence which filled the many gaps in the Commission's information.

423  UCAR criticises the Commission, first, for not having taken account of the independent and thorough
internal investigation which its management board conducted for the purpose of establishing all the relevant
facts and communicating them to the Commission. That investigation was decisive, since its managing director
and its sales director for Europe were directly involved in the cartel and had the means of preventing the
communication of the information.

424  Second, UCAR claims that it communicated all of the relevant information to the Commission
immediately after it became aware of the infringement which it had committed. It worked with the
Commission's staff to draft a request for information pursuant to Article 11 of Regulation No 17. UCAR
expressed its reluctance to provide the Commission with written documents, as there was a risk that those
documents might be used in parallel proceedings initiated against UCAR in the United States. UCAR therefore
proposed that it should communicate information to the Commission orally. In June 1998, the Commission sent
UCAR a request for information structured in agreement with UCAR in order to correspond with the oral
information already provided to the Commission. Following the closure of the proceedings initiated in the
United States, UCAR voluntarily communicated all the relevant information to the Commission in June 1999.

425  UCAR states, third, that it informed the Commission that the warning about unannounced investigations
originated in contacts between SGL and a Commission official mentioned by name. The inquiry into that
official led to criminal proceedings. UCAR further states that its cooperation concerning the warning about
those unannounced investigations played a significant role in the assessment of the gravity of the infringement
committed by SGL.

426  The Commission contends that the 40% reduction in fine granted to UCAR remains within the 10% to
50% bracket provided for in point D(2) of the Leniency Notice. UCAR has not succeeded in showing that the
Commission made a manifest error on that point. The cooperation provided by UCAR was given sufficient
recognition in the Decision, since the purely oral information could not be used as reliable evidence.

427  As regards UCAR's role in discovering possible leaks from the Commission's services, the Commission
claims that it is necessary to distinguish two aspects of the assistance provided. First, UCAR informed it that
SGL had alerted the other undertakings; that fact constitutes an element of the infringement and the
Commission took it into account as an aggravating circumstance for the purpose of calculating the fine imposed
on SGL, while that cooperation on UCAR's part was taken into consideration in the context of the reduction of
its fine by 40%. Second, the information about the possible involvement of one of the Commission's officials
was of no relevance to the application of the Leniency Notice to the infringement committed by UCAR in the
context of these proceedings, as that information did not help the Commission to implicate the members of the
cartel.

Findings of the Court

428  In so far as UCAR claims that the reduction of its fine was insufficient by comparison with the reductions
granted to SGL and SDK, that argument does not suffice to establish a manifest error of assessment on the part
of the Commission. SDK received a reduction in its fine pursuant to point C of the Leniency Notice. Its
situation is therefore not comparable with that of UCAR, which received a reduction under point D and does not
claim to satisfy the conditions of point C. As regards SGL, UCAR has not demonstrated in detail that its own
cooperation, rewarded by a reduction of 40%, was of a much higher value than SGL's, which was rewarded by
a reduction of 30%. As regards UCAR's reference to the parallel proceedings in the United States, it is not
capable of establishing that the Commission failed to appreciate the value of its cooperation during the

429   UCAR's argument based on the internal investigation carried out by its management board cannot succeed either. In so far as that investigation is reflected in UCAR's cooperation, the Commission took it into account in granting a reduction of 40% of its fine. The fact of having implemented an internal investigation does not as such justify an increase in that rate. It must not be forgotten that, at the same time as that investigation was being carried out, other representatives of UCAR continued the infringement on behalf of the undertaking, even after the Commission's unannounced investigations.

430   As regards the oral contacts between UCAR and the Commission, the Commission stated, in answer to a written question put by the Court, that the oral information provided by UCAR on 25 March, 2 April and 11 June 1998 had been reported in detail in the internal memoranda drawn up by officials of the Commission. Those memoranda do not form part of the investigation file. At the material time, UCAR did not wish the information which it had provided orally to be used as evidence. The Commission inferred that this oral information did not constitute valid evidence for the purposes of the first indent of point D(2) of the Leniency Notice, which is why UCAR was not granted a specific reduction in its fine for having supplied it.

431   That argument cannot be accepted. First, the first indent of point D(2) of the Leniency Notice states that not only 'documents' but also 'information' may serve as 'evidence' which materially contributes to establishing the existence of the infringement. It follows that the information need not necessarily be provided in documentary form. Second, the practical utility of purely oral information is indisputable when it allows the Commission, for example, to find direct evidence of the infringement or when, owing to its precision, it encourages the Commission to continue an investigation which, not having sufficient evidence available at that time, it would have abandoned without that information.

432   In the present case, as is apparent from the internal memoranda referred to above, UCAR had provided orally, inter alia, the names of other undertakings which were members of the cartel, the names of a number of representatives of those members, code names used to conceal contacts (see recital 59 of the Decision) and also a number of dates and places of meetings, including the participants, organised within the framework of the cartel. That information in itself allowed the Commission to send requests for information to the undertakings identified by UCAR, inviting them to confirm whether their named representatives had participated in the meetings mentioned by UCAR, and thus to inform them that it already had a source of reliable information, which might induce the addressee undertakings to cooperate with the Commission at that early stage of the investigation.

433   As the oral information provided by UCAR was subsequently confirmed by the written statements produced by the undertaking itself or at its initiative (the statements of Mr [...] and Mr [...]), it appears that UCAR provided its cooperation in two stages: first, in the context of several oral communications and then by the communication of documentary evidence. By not taking account of the oral information provided by UCAR in March, April and June 1998, the Commission therefore failed to appreciate the importance of the cooperation provided by that undertaking.

434   As regards the role played by UCAR in revealing a possible leakage from the Commission's services, the Commission stated at the hearing its view that that disclosure did not help it to implicate the members of the cartel. It submits that the sole purpose of the Leniency Notice is to recompense the provision of evidence which would otherwise expose the cooperating undertaking to sanctions. The source of the warnings in question in the present case is not part of an infringement which would expose UCAR to a fine.

435   That argument cannot be accepted. A reduction in the fine may be granted in respect of any cooperation which enabled the Commission to establish the existence of an infringement more easily and, where relevant, to bring it to an end (Case C-297/98 SCA Holdings v Commission, cited at paragraph 108 above, paragraph 36). While it is true that the Leniency Notice provides, in point 3, only for a reduction 'in the fine which would have been imposed upon [the undertakings cooperating with the Commission]', it does not require that each individual item of information must relate to an infringement of competition law in respect of which a separate sanction may be imposed. In order to be able to benefit from the Leniency Notice, it is sufficient that, by revealing its involvement in an infringement, the undertaking minded to cooperate exposes itself to sanctions,

while whether the various items of information may be taken into consideration for the purposes of a possible reduction in the fine depends on how useful they are to the Commission in its task of establishing the existence of the infringement and putting an end to it.

436  In that last regard, it is clear that a disloyal Commission official is in a position to sabotage its mission by supporting the members of an illegal cartel. Thus, he may considerably complicate the investigation carried out by the Commission, for example by destroying or manipulating evidence, by informing the members of the cartel of a forthcoming unannounced investigation and by revealing the entire investigation strategy drawn up by the Commission. Consequently, information about the existence of such an official must, in principle, be regarded as being capable of making it easier for the Commission to carry out its task of establishing an infringement and putting an end to it. Such information is particularly useful when it is provided at the beginning of the investigation opened by the Commission into possible anti-competitive conduct.

437  In the present case, UCAR submitted, in its application and in annex 47 thereto, the factual details of the leak from the Commission's services, stating in particular that it had informed the Commission of the leak in January 1999, that the European Anti-Fraud Office (OLAF) had intervened and that a criminal investigation had been undertaken in Italy against the official concerned. Throughout the written procedure before the Court and again in reply to a written question put by it, the Commission did not dispute any of that factual evidence. It was only at the hearing that the Commission first stated that the internal investigation carried out in that context had not borne fruit and that the official reported by UCAR was still in the Commission's service. It would therefore not be possible today to identify an official as being responsible for the leak in question.

438  In that regard, it must be held that the Commission, which was advised by UCAR in January 1999, should have informed UCAR no later than the date on which it adopted the Decision whether it was going to take that piece of information into account in the context of the application of the Leniency Notice. As the Court is unable to ascertain whether the Commission's internal investigation aimed at detecting the official in question was conducted properly and whether it produced a correct result, it can only draw the necessary consequences from the Commission's procedural conduct: the contestation of the facts first presented at the hearing must be characterised as a new plea in law and rejected as being out of time, pursuant to Article 48(2) of the Rules of Procedure. The Court must therefore take as its basis the facts as presented by UCAR and accept that the information on the leak from the Commission's services was objectively useful to the Commission in dealing with the file concerning the cartel active on the graphite electrodes market. By failing to take account of that information, the Commission therefore failed to appreciate the importance of the cooperation provided by UCAR.

439  The same applies to the fact that the Commission applied to UCAR only the first indent of point D(2) of the Leniency Notice (recital 202 of the Decision), although UCAR did not substantially contest the facts on which the Commission based its statement of objections (recital 41 of the Decision) (see, to that effect, paragraphs 413 to 415 above).

440  It follows from the foregoing that the Commission failed, on various points, to appreciate the importance of the cooperation provided by UCAR before the adoption of the Decision. In the exercise of its unlimited jurisdiction, the Court considers that UCAR's fine should be reduced by 10% in addition to the 40% already allowed by the Commission.

441  It follows that the final amount of the fine imposed on UCAR must be fixed at EUR 42.05 million.

c)    Case T-252/01

Summary of the Decision

442  The Commission reduced C/G's fine by 20% because C/G provided it with certain information. However, it considered that C/G was not entitled to a larger reduction. Although it provided the Commission in July 1998 with certain documents relating to the contacts between competitors, it did not transmit a corporate statement until October 1999, in which it remained ambiguous about its role in the cartel. In the Commission's view, the undertaking's reply of 21 July 1999 to the formal request for information pursuant to Article 11 of Regulation

No 17 did not constitute a voluntary contribution within the meaning of the Leniency Notice (recitals 239 and 240).

Arguments of the parties

443  C/G criticises the Commission for having erred in awarding it a reduction in its fine of only 20% for its cooperation. C/G claims that it provided the Commission with all the relevant information. In addition, it did not substantially contest the facts which the Commission established in the statement of objections. In C/G's submission, that cooperation was more valuable than that of the other addressees of the Decision which received the same or greater reductions.

444  C/G states that, in reality, all the evidence established against it comes from C/G itself. Had it not cooperated, the Commission would not have obtained that evidence. In so far as the Commission claims that other undertakings also incriminated it, C/G emphasises that the statements of the other undertakings are mere flimsy and hesitant suppositions.

445  C/G further compares its own situation with that of Conradty, which, unlike C/G, refused to cooperate with the Commission, although that did not prevent the Commission from fining C/G and not Conradty. Last, C/G complains that SGL and VAW received reductions of 30% and 20% respectively for their cooperation, whereas SGL had warned VAW, and also other undertakings, of the Commission's forthcoming unannounced investigations. It is not logical that SGL, the ringleader of the cartel, should receive a greater reduction than C/G.

446  The Commission contends that C/G received a reduction of 20%, which is within the prescribed bracket of 10% to 50%. Its legitimate expectation was therefore observed.

447  In so far as C/G claims that it itself provided all the evidence established against it, the Commission states that it was already in possession of the evidence provided by SGL, VAW and UCAR, which also showed that C/G had participated in the infringement. In that context, it refers to the statement by SGL which contains the direct minute of a meeting between SGL and C/G held to discuss the problem of 'ever-increasing [United States] exports' to the European market. That statement bore out those made by UCAR and its employees.

448  In the Commission's submission, the situation of C/G, on the one hand, and those of Conradty, SGL and VAW, on the other, are completely different: Conradty did not cooperate and the Commission did not succeed in establishing its participation in the infringement. SGL received a reduction in its fine because it had provided valuable information on the operation of the cartel, while C/G's contribution essentially concerned the nature of its own participation. Last, C/G was the last undertaking to make a statement, at a time when virtually all the information about the cartel, in particular that provided by SGL and VAW, was known to the Commission.

Findings of the Court

449  In so far as C/G compares its own situation with Conradty's, it is sufficient to state that C/G itself acknowledged that it had participated in the infringement, whereas Conradty – just like Mitsubishi and Union Carbide – was not identified in the Decision as an author of the infringement and is not a party to the proceedings before the Court concerning the Decision. The reference to Conradty cannot therefore justify any additional reduction in C/G's fine.

450  Nor are the arguments based on a comparison between C/G and SGL or VAW of such a kind as to justify such a reduction. Far from demonstrating in detail that its own cooperation was undervalued by comparison with those two undertakings' cooperation, C/G merely deprecates their cooperation.

451  As regards C/G's assertion that it itself provided virtually all the evidence established against it, which the Commission has disputed, it has become apparent before the Court that the evidence relied on by the Commission, other than that provided by C/G itself, consisted of two statements by UCAR that 'Mr […] assumed on the basis of statements by Mr […] [of SGL] that Mr […] was continuing his contacts with … C/G' and 'UCAR's representative … thinks that SGL may have had direct contacts … possibly with C/G's German

agent', a statement by MHW, who named that person, and a statement by SGL to the effect that, at a meeting between the representatives of SGL and C/G at Frankfurt airport on 21 November 1996, the constant increase in United States exports to Europe was discussed and information on the situation of the European market was exchanged.

452   The only actual information that is not mere supposition is in SGL's statement concerning the meeting on 21 November 1996. However, C/G's participation in the infringement, as found in the Decision, ended precisely in November 1996. It follows that C/G in reality provided all the relevant evidence as regards the nature and the duration of its participation in the infringement. By awarding it only a 20% reduction in its fine, the Commission manifestly failed to appreciate the importance of the voluntary cooperation given by C/G in that regard.

453   The same applies to the fact that the Commission applied to C/G only the first indent of point D(2) of the Leniency Notice (recital 239 of the Decision), although C/G did not substantially contest the facts on which the Commission based its statement of objections (recital 41 of the Decision) (see, to that effect, paragraphs 413 to 415 above).

454   Last, in taking the view that C/G's reply to a formal request for information did not constitute a voluntary contribution within the meaning of the Leniency Notice, which reduced its value, the Commission also underestimated the cooperation provided by C/G (see, to that effect, paragraph 410 above).

455   It follows from the foregoing that the Commission failed, on various points, to appreciate the importance of the cooperation provided by C/G before the adoption of the Decision. In the exercise of its unlimited jurisdiction, the Court considers that the fine imposed on C/G must be reduced, on that ground, by 20% in addition to the 20% already granted by the Commission.

456   Consequently, the final amount of C/G's fine must be set at EUR 6.48 million.

457   It follows from the foregoing that the final amount of the fines imposed on SGL, UCAR and C/G must be set at EUR 69.114 million, EUR 42.05 million and EUR 6.48 million respectively. However, the Court sees no reason to depart from the rates which the Commission applied to the other applicants under the Leniency Notice, with the exception of Nippon, whose fine will be reduced not by 10% but, because it was late in contesting the duration of the infringement (see paragraph 112 above), by only 8% and will be set at EUR 6.2744 million.

458   Following the analysis which the Court has carried out above, the fines referred to in Article 3 of the Decision must be reduced as follows:

–    the fine imposed on SGL is reduced to EUR 69.114 million;

–    the fine imposed on UCAR is reduced to EUR 42.05 million;

–    the fine imposed on Tokai is reduced to EUR 12.276 million;

–    the fine imposed on SDK is reduced to EUR 10.44 million;

–    the fine imposed on C/G is reduced to EUR 6.48 million;

–    the fine imposed on Nippon is reduced to EUR 6.2744 million;

–    the fine imposed on SEC is reduced to EUR 6.138 million.

C –   *The claims in Cases T-239/01 and T-246/01 for annulment of Article 4 of the Decision and of the July and August letters*

459  SGL seeks annulment of Article 4 of the Decision; it disputes the legality of the rate of interest and claims that it was fixed without any reference to a legal basis. The Decision was sent to it by letter of the Commission dated 23 July 2001, in which the Commission informed it that, upon expiry of the period prescribed for payment, it would proceed to recover its debt and would apply interest at a rate of 8.04%, and stated that, should proceedings be initiated before the Court, it would not seek to recover the debt while the judicial proceedings continued, on condition that SGL agreed that interest at the rate of 6.04% should be applied and constituted a bank guarantee. SGL also disputes the legality of that rate of interest. It contends that the right to apply interest for late payment is intended solely to prevent abusive actions and to ensure that the undertakings which pay 'late' are not put at an advantage. Although the Commission may therefore refer to the conditions of rates actually applied in practice, there are no grounds for applying a further 3.5 percentage points to such a market rate. That amounts to a prohibitive interest rate which acts, without any basis in authority, as an additional sanction penalising the use of a means of legal protection.

460  UCAR also seeks annulment of Article 4 of the Decision, claiming that there is no indication in the Decision that its ability to pay was taken into consideration, although it provided the Commission with detailed information of its precarious financial situation. UCAR states that it is unable to pay either the fine within the period prescribed in Article 4 or the rate of interest payable in the event of late payment. It claims that the Commission has not taken into account UCAR's real ability to pay in a specific social context, contrary to its own Guidelines. In the alternative, UCAR claims that Article 4 should be replaced by a requirement that UCAR give a charge over its unencumbered real assets. The rate of interest should be either cancelled or significantly reduced.

461  UCAR further seeks annulment of the letter of 23 July 2001 whereby the Decision was served on it and in which the amount of the fine imposed and the terms of payment were set out. It disputes, in particular, the condition that, should an action be brought before the Court, no enforcement measure will be taken, provided that interest at the rate of 6.04% is paid and a bank guarantee constituted.

462  Last, UCAR seeks annulment of the letter of 9 August 2001 whereby the Commission, in reply to UCAR's observations on the terms of payment, refused to accept, first, a proposal to pay in instalments and, second, a lien on UCAR's assets to guarantee payment of the fine.

463  The Commission replies that the imposition of an increase of 3.5% over the refinancing rate applied by the European Central Bank is consistent with its normal practice and does not go beyond what is necessary to avoid delaying tactics. It maintains that it is not required to take account of an undertaking's ability to pay when determining the method of payment of a fine or the period within which it must be paid. Nor is it required to provide any justification for Article 4.

464  The Commission considers that the claims for annulment of the July and August letters are inadmissible. In its July letter, it made an offer to UCAR which UCAR could accept or reject. The letter produced no binding legal effect capable of adversely affecting UCAR's interests. Nor is the August letter an act intended to produce mandatory legal effects. The refusal in that letter to accept the terms of payment proposed by UCAR left UCAR in exactly the same legal position as it had been in before the letter was written, i.e. in the position in which it had been placed by Article 4 of the Decision.

465  As regards the substance, the Commission states that the case-law has accepted its practice of requiring the provision of a bank guarantee together with interest and that it is only in exceptional circumstances that an applicant is able to avoid providing a bank guarantee. UCAR has not established the existence of exceptional circumstances that would justify waiving the condition concerning the bank guarantee. In the Commission's submission, the appropriate legal procedure for challenging its position on the provision of a bank guarantee is an application for interim measures under Articles 242 EC and 243 EC.

466  UCAR contends that the July letter lays down conditions concerning the implementation of the Decision which are not set out in the Decision. The letter must therefore be amenable to judicial review. The August letter contains a position taken by the Commission on whether payment of the fine by instalments and the

Case 1:06-mc-10061-MLW    Document 27    Filed 04/11/2006    Page 39 of 37

provision of a lien on the company's assets may be accepted. The letter does not therefore confirm an earlier decision but determines, for the first time, that the circumstances of the present case are not sufficiently exceptional to justify alternative payment terms.

467   As regards the substance, UCAR criticises the Commission for having insisted on the provision of a bank guarantee without having considered whether the circumstances of the present case were such that a different security might be considered appropriate. In that context, it states that it has assets in France which are not mortgaged to its banks and the value of which is in excess of USD 50 million. However, the Commission merely stated in the August letter that it would not consider any proposal other than payment of the fine in full or the provision of a bank guarantee. It gave no reasons for its refusal to take UCAR's particular situation into consideration. UCAR further submits that the provision of a bank guarantee, unlike that of a real security, would constitute a default under its principal credit facilities as agreed with its lending banks.

2.   *Findings of the Court*

468   As regards the admissibility of the claims for annulment of the July and August letters, it is appropriate first of all to define the precise object of those claims.

469   In that regard, it is a fact that UCAR, before receiving the July letter and the Decision on 26 July 2001, contacted the Commission with a view to discussing possible payment arrangements should it receive a fine and that the Commission refused to discuss the matter at that stage. In those circumstances, UCAR must be recognised as having a legitimate interest in obtaining a review of the new elements – by comparison with Article 4 of the Decision – set out in those letters, namely the preferential rate of 6.04% and the conditions on which that preferential rate was available. That review applies to whether the Commission can validly refuse to allow UCAR to take advantage of the rate of 6.04% on the ground that UCAR had failed to provide a bank guarantee or whether it should have accepted the alternative security offered by UCAR.

470   While it is beyond doubt that the lawfulness of the rate of 8.04% imposed by Article 4 of the Decision may be reviewed by the Court (see, to that effect, Joined Cases T-24/93 to T-26/93 and T-28/93 *Compagnie maritime belge transports and Others* v *Commission* [1996] ECR II-1201, paragraph 250), UCAR must also be permitted to challenge the alternative rate of 6.04% and also the conditions on which that rate is available, as set out in the July and August letters. To that end, it must be able to complain, in particular, of a breach by the Commission of the principle of equal treatment in the event that the Commission has refused to apply that preferential rate to it while granting it to another undertaking in the same situation as UCAR.

471   The same applies as regards the action brought by SGL, which, although it does not formally contest the July letter, challenges the legality of the rate of 6.04% fixed in that letter.

472   On the other hand, it is also a fact that at the time when Case T-246/01 was brought, the Commission had not yet proceeded to recover the fine imposed or to enforce the Decision pursuant to Article 256 EC and Articles 104 to 110 of the Rules of Procedure of the Court of First Instance. Consequently, any request for a review of the actual application of the detailed arrangements for payment vis-à-vis UCAR (the replacement of Article 4 of the Decision by payment in instalments, actual rate of interest, period for payment) must be regarded as premature, since it was impossible to know on the date on which the action was brought what UCAR's situation would be in the event and at the time that the Commission should proceed to take measures of recovery or enforcement (see, to that effect, *Musique diffusion française* v *Commission*, cited at paragraph 144 above, paragraph 135). In particular, as UCAR had not at that time, under threat of imminent recovery, lodged an application for interim measures within the meaning of Article 242 EC and Article 104 et seq. of the Rules of Procedure, the Court is not required to consider, in the present context, whether the balancing of the interests involved precludes the application of those payment arrangements before delivery of the main judgment determining the legality of the fine imposed on UCAR, on the ground that that application would jeopardise the existence of the undertaking.

473   The requests to that effect submitted by UCAR must therefore be declared inadmissible.

474   As regards the substance, it must be held, first, that neither SGL nor UCAR has submitted any plea

475   Second, it is settled case-law (Case 107/82 *AEG* v *Commission* [1983] ECR 3151, paragraphs 141 to 143, Case T-275/94 *CB* v *Commission* [1995] ECR II-2169, paragraphs 46 to 49, and *LR AF 1998* v *Commission*, cited at paragraph 38 above, paragraphs 395 and 396) that the power conferred on the Commission by Article 15(2) of Regulation No 17 covers the power to determine the date on which the fines are payable and that on which default interest begins to accrue, the power to set the rate of such interest and to determine the detailed arrangements for implementing its decision by requiring, where appropriate, the provision of a bank guarantee covering the principal amount of the fines imposed plus interest. If the Commission had no such power, the advantage which undertakings might be able to derive from late payment of fines would weaken the effect of penalties imposed by the Commission when carrying out its task of ensuring that the rules on competition are applied. Thus, the charging of default interest on fines is justified by the need to ensure that the Treaty is not rendered ineffective by practices applied unilaterally by undertakings which delay paying fines imposed on them and to ensure that those undertakings do not enjoy an advantage over those which pay their fines within the period laid down.

476   In that context, the case-law has accepted that the Commission is entitled to fix default interest at the market rate plus 3.5 percentage points (*CB* v *Commission*, cited at paragraph 475 above, paragraph 54, *LR AF 1998* v *Commission*, cited at paragraph 38 above, paragraph 397, and *Compagnie maritime belge transports and Others* v *Commission*, cited at paragraph 470 above, paragraph 250) and, where a bank guarantee is provided, at the market rate plus 1.5 percentage points (*CB* v *Commission*, paragraph 54). In those judgments, the Court of First Instance allowed default interest rates of 7.5%, 13.25% and 13.75%, holding that the Commission is entitled to adopt a point of reference higher than the applicable market rate offered to the average borrower, to an extent necessary to discourage dilatory behaviour (*LR AF 1998* v *Commission*, paragraph 398).

477   In those circumstances, the Commission did not in this case exceed the discretion which it enjoys when setting a default interest rate. SGL and UCAR, as prudent and informed economic operators, were deemed to be aware of the Commission's decision-making practice and the case-law cited above. They could not expect that the Commission would apply more lenient interest rates to them. In this context – which is not referred to in Articles 242 EC and 256 EC or in Articles 104 to 110 of the Rules of Procedure –, the Commission was not required, in particular, to take UCAR's financial situation into consideration (see paragraphs 370 to 372 and 472 above).

478   As regards, more particularly, UCAR's obligation to provide a bank guarantee, the Court has held that, by allowing an undertaking which brings an action against a decision imposing a fine on it to avoid paying the fine immediately by lodging a bank guarantee to ensure payment of the fine and interest thereon, the Commission is granting the undertaking concerned a privilege for which neither the Treaty nor Regulation No 17 provides (*CB* v *Commission*, cited at paragraph 475 above, paragraph 82). That privilege is increased by the fact that the interest rate imposed where a bank guarantee is provided is lower than that required in the event of non-payment of the fine (*CB* v *Commission*, paragraph 83).

479   In the light of that case-law, the Commission was not required to accept UCAR's request for a further privilege, by waiving the requirement for a bank guarantee and accepting, instead, a real security. A bank guarantee is better than any other form of security since in the event of non-payment it is sufficient to call upon the bank in order to obtain the guaranteed sum immediately, whereas the realisation of a different surety may prove more uncertain and require additional efforts and time. In a different context, the Court of Justice has recognised that the Community institutions are entitled to introduce a simple and effective security mechanism (Case 137/85 *Maizena* [1987] ECR 4587, paragraph 10). The Commission is not a bank and has neither the infrastructure nor the specialised staff of a bank which would be necessary in order to value the security in question and to determine how it should be realised in the event of non-payment. It was therefore entitled to refuse, without giving specific reasons, to accept the real security offered by UCAR.

480   Last, as regards UCAR's alleged inability to obtain a bank guarantee, its claim to that effect was not supported to the requisite legal standard. The applicant produced no document issued by its lending banks showing that it applied for a bank guarantee to secure its fine while continuing to enjoy the bank advances intended for the company's current activities and that such application was refused owing to its financial

difficulties. For has UCAR shown that it was impossible to obtain, on the basis of the request offered to
difficulties. Nor has UCAR shown that it was impossible to obtain, on the basis of the request offered to the Commission, a bank guarantee from a financial institution other than its lending banks.

481   As none of the pleas and arguments presented in this context has been upheld, the claims for annulment of Article 4 of the Decision and of the July and August letters, in so far as they are admissible, must be rejected as unfounded.

## The reopening of the oral procedure

482   By a document of 9 January 2004, GrafTech International Ltd, formerly UCAR, requested that the oral procedure be reopened in Case T-246/01. In support of its request, it stated that it had pleaded, during the administrative procedure before the Commission and during the proceedings before the Court, its inability to pay the fine owing to its precarious financial situation, aggravated by the sanctions which had been imposed on it by the authorities of other States. Although it thus established its inability to pay for the purposes of point 5(b) of the Guidelines, the Commission refused to apply that provision to it on the ground that a reduction of the fine on that basis would amount to securing an unjustified competitive advantage on undertakings least adapted to market conditions. However, in its decision of 3 September 2003 relating to a procedure under Article 81 of the EC Treaty (COMP 38.359 – Carbon and graphite-based products for electrical and mechanical applications), the Commission adopted a radically different position on the question of ability to pay within the meaning of point 5(b) of the Guidelines.

483   Referring to a Commission press release of the same date, UCAR states that the Commission reduced by 33% the amount of the fine which would otherwise have been imposed on SGL, owing to the fact that it had already been given high fines for its participation in two previous cartels and because it was in a difficult financial situation. UCAR submits that it is necessary to reopen the oral procedure in the present case in order to invite the Commission to indicate whether it proposes to continue to refuse UCAR's request and, if so, to explain how that refusal may be reconciled with the approach which it took in its decision of 3 December 2003.

484   Faced with that argument, the Court considers that there is no need to order the reopening of the oral procedure pursuant to Article 62 of its Rules of Procedure. The Court, which has a discretion in the matter, is not required to grant a request to reopen the oral procedure unless the party concerned relies on facts which may have a decisive influence on the outcome of the case and which could not be put forward before the close of the oral procedure (Case C-199/92 P *Huls* v *Commission* [1999] ECR I-4287, paragraphs 127 and 128). Although UCAR was unable to rely, at the oral procedure on 3 July 2003, on the Commission decision of 3 December 2003, that decision has no relevance in the present context. As is clear from the case-law cited at paragraph 370 above, the Commission is under no obligation, when determining the amount of a fine, to take account of the financial losses of the undertaking concerned, irrespective of whether it may be induced to take that situation into consideration in the specific circumstances of a given case.

485   The request to reopen the oral procedure must therefore be rejected.

Costs

486   Under Article 87(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Under the first subparagraph of Article 87(3), the Court may, where each party succeeds on some and fails on other heads, order costs to be shared.

487   In the present case, in Cases T-239/01 and T-246/01, as the applicants have been unsuccessful in a significant part of their pleadings, the Court will make an equitable assessment of the case in holding that SGL is to bear seven eighths of its own costs and pay seven eighths of the costs incurred by the Commission and that the Commission is to bear one eighth of its own costs and pay one eighth of those incurred by SGL, while UCAR will bear four fifths of its own costs and pay four fifths of those incurred by the Commission and the Commission will bear one fifth of its own costs and pay one fifth of the costs incurred by UCAR.

488   In Cases T-245/01 and T-252/01, as the applicants have been successful in a significant part of their pleadings, the Court will make an equitable assessment of the case in holding that SDK and C/G are to bear

three fifths of their own costs and pay two fifths of those incurred by the Commission, while the Commission will bear two fifths of its own costs and pay two fifths of those incurred by the applicants.

489   In Cases T-236/01, T-244/01 and T-251/01, as the parties have been unsuccessful and successful in equal parts, the Court will make an equitable assessment of the case in holding that Tokai, Nippon and SEC are to bear one half of their own costs and pay one half of those incurred by the Commission, while the Commission will bear one half of its own costs and pay one half of those incurred by the applicants.

On those grounds, THE COURT OF FIRST INSTANCE (Second Chamber) hereby:

1)    **In Case T-236/01** *Tokai Carbon* v *Commission*:

–    **sets the amount of the fine imposed on the applicant by Article 3 of Decision 2002/271 at EUR 12 276 000;**

–    **dismisses the remainder of the application;**

–    **orders each party to bear one half of its own costs and to pay one half of the costs incurred by the opposing party.**

2)    **In Case T-239/01** *SGL Carbon* v *Commission*:

–    **sets the amount of the fine imposed on the applicant by Article 3 of Decision 2002/271 at EUR 69 114 000;**

–    **dismisses the remainder of the application;**

–    **orders the applicant to bear seven eighths of its own costs and to pay seven eighths of the costs incurred by the Commission and the Commission to bear one eighth of its own costs and to pay one eighth of the costs incurred by the applicant.**

3)    **In Case T-244/01** *Nippon Carbon* v *Commission*:

–    **sets the amount of the fine imposed on the applicant by Article 3 of Decision 2002/271 at EUR 6 274 400;**

–    **dismisses the remainder of the application;**

–    **orders each party to bear one half of its own costs and to pay one half of the costs incurred by the opposing party.**

4)    **In Case T-245/01** *Showa Denko* v *Commission*:

–    **sets the amount of the fine imposed on the applicant by Article 3 of Decision 2002/271 at EUR 10 440 000;**

–    **dismisses the remainder of the application;**

–    **orders the applicant to bear three fifths of its own costs and to pay three fifths of the costs incurred by the Commission and the Commission to bear two fifths of its own costs and to pay two fifths of the costs incurred by the applicant.**

5)    **In Case T-246/01** *GrafTech International*, **formerly UCAR** International v *Commission*:

–    **sets the amount of the fine imposed on the applicant by Article 3 of Decision 2002/271 at EUR**

**42 050 000;**

–    dismisses the remainder of the application;

–    orders the applicant to bear four fifths of its own costs and to pay four fifths of the costs incurred by the Commission and the Commission to bear one fifth of its own costs and to pay one fifth of the costs incurred by the applicant.

6)    In Case T-251/01 *SEC Corporation* v *Commission*:

–    sets the amount of the fine imposed on the applicant by Article 3 of Decision 2002/271 at EUR 6 138 000;

–    dismisses the remainder of the application;

–    orders each party to bear one half of its own costs and to pay one half of the costs incurred by the opposing party.

7)    In Case T-252/01 *The Carbide/Graphite Group* v *Commission*:

–    sets the amount of the fine imposed on the applicant by Article 3 of Decision 2002/271 at EUR 6 480 000;

–    dismisses the remainder of the application;

–    orders the applicant to bear three fifths of its own costs and to pay three fifths of the costs incurred by the Commission and the Commission to bear two fifths of its own costs and to pay two fifths of the costs incurred by the applicant.


Forwood Pirrung Meij

Delivered in open court in Luxembourg on

29 April 2004.

H. Jung J. Pirrung Registrar President Table des matières

Facts and procedure II – 3

Forms of order sought by the parties II – 7

Law   II – 9

A –  Claims for annulment of the Decision in its entirety or of certain findings of fact II – 10

1. The claims for annulment of the Decision in its entirety II – 10

a) Case T-239/01 II – 10

The alleged refusal to grant full access to the file II – 10

The allegation that the statement of objections was not definitive II – 11

The allegedly unlawful report of the Hearing Officer II – 12

2. The claims for partial annulment of Article 1 of the Decision and of certain findings of fact made in the Decision II – 14

a) The plea alleging, in Case T-239/01, an incorrect finding concerning the implementation of a Central Monitoring System II – 14

b) Plea alleging, in Case T-236/01, an incorrect finding that the cartel operated on a global scale II – 15

c) The plea alleging, in Case T-239/01, incorrect assessment of the duration of the infringement found in the Decision II – 16

d) The pleas alleging, in Case T-244/01, breach of essential procedural requirements owing to the absence of sufficient evidence of Nippon's participation in the infringement during the period May 1992 to March 1993, and failure to state reasons on that point II – 19

Arguments of the parties II – 19

Findings of the Court II – 22

B – The claims for annulment of Article 3 of the Decision or a reduction in the fines II – 26

1. Pleas alleging breach of the principle prohibiting concurrent sanctions and of the Commission's obligation to take the fines imposed previously into account, and also failure to state reasons on that point II – 26

a) Arguments of the parties II – 26

b) Findings of the Court II – 29

2. The pleas alleging failure to have regard to the Guidelines, the illegality of the Guidelines and failure to state reasons on that point II – 35

a) Preliminary observations on the legal framework of the fines imposed on the applicants II – 35

b) The starting amounts according to gravity established in the Decision II – 37

Summary of the Decision II – 37

Arguments of the parties II – 38

Findings of the Court II – 42

– The applicability of the Guidelines for the purpose of determining the turnover to be employed II – 42

– The turnover used by the Commission in determining the starting amount II – 43

– The real impact of the cartel on the price increases and on the market shares of certain members of the cartel II – 45

– The division of the members of the cartel into three categories and the fixing of the respective starting amounts II – 48

– The 'deterrent factor' applied in the Decision II – 52

Case 5:06-mc-80038-JF-WSS Document 27   Filed 04/11/2006   Page 36 of 37

– The reasons stated in the Decision II –

c) The basic amounts determined in the decision on the basis of the duration of the infringement II – 56

Summary of the Decision II – 56

Case T-239/01 II – 56

Case T-246/00 II – 57

– Arguments of the parties II – 57

– Findings of the Court II – 59

d) Aggravating circumstances II – 63

Summary of the Decision II – 63

Cases T-244/01 and T-251/01 II – 63

Cases T-239/01 and T-246/01 II – 64

e) Attenuating circumstances II – 68

Summary of the Decision II – 68

Cases T-236/01, T-239/01, T-244/01, T-246/01, T-251/01 and T-252/01 II – 69

– Arguments of the parties II – 69

– Findings of the Court II – 70

f) The maximum limit of the fines and the ability to pay of certain applicants within the meaning of point 5 of the Guidelines II – 75

Cases T-239/01 and T-245/01 II – 75

Cases T-239/01, T-246/01, T-251/01 and T-252/01 II – 76

– Arguments of the parties II – 76

– Findings of the Court II – 77

3. Pleas alleging failure to comply with the Leniency Notice II – 80

a) Case T-239/01 II – 81

Summary of the Decision II – 81

Arguments of the parties II – 81

Findings of the Court II – 83

b) Case T-246/01 II – 89

Summary of the Decision II – 89

Arguments of the parties II – 89

Findings of the Court II – 91

c) Case T-252/01 II – 94

Summary of the Decision II – 94

Arguments of the parties II – 94

Findings of the Court II – 95

C – The claims in Cases T-239/01 and T-246/01 for annulment of Article 4 of the Decision and of the July and August letters II – 97

1. Arguments of the parties II – 97

2. Findings of the Court II – 99

The reopening of the oral procedure II – 102

Costs II – 103

1 – Confidential information omitted.

# EXHIBIT E

# An Introductory Guide to EC Competition Law and Practice

Eighth Edition

VALENTINE KORAH LL.M., Ph.D

Professor Emeritus of Competition Law, University College London;
and a Barrister, Guildford Chambers.



·H·A·R·T·
PUBLISHING

OXFORD – PORTLAND OREGON
2004

Member States once the dealers were permitted to sell to authorised outlets outside their area. Problems might arise, however, should a firm's market share increase.

It is hoped that in future when the Commission considers that an agreement does not infringe Article 81 and is sufficiently moved to send a comfort letter, it will be prepared to do so formally under Article 10, in which event it will be binding. An informal clearance may be taken into account by a national court but is not binding.

**7.3.4.3 Assistance from the Commission—**Regulation 1/2003 provides for the Commission to help national courts.[38] Recital 21 and Article 15 provide that, in the interests of consistency, national courts should be able to ask the Commission about the application of competition law. Within the framework of national procedural rules, the Commission and NCAs may make observations on the application of Articles 81 and 82 to a national court. At the request of the court these may be oral, otherwise only written.

The national court will not have to adjourn if the issue has already been decided by the Commission or on appeal from it. If it does adjourn, the national court may grant interim relief.

In *Postbank v Commission,*[39] the CFI held that by virtue of Article 10 of the EC Treaty (6.1–6.1.6 above), the Commission and national courts owe each other a duty of sincere cooperation and the Commission is required to pass confidential information to a court that requests it. A national court is bound by the duty of confidentiality imposed by Article 287 EC not to disclose confidential information and business secrets, so transmitting the information or documents is not a breach of the Commission's obligation of confidentiality. Such disclosure is pursuant to Article 10 EC and not Article 15 of Regulation 1/2003,[40] so the provisions relating to confidentiality in the Regulation do not apply.[41]

Questions about the state of the Commission's procedure, such as whether it has opened proceedings or contemplates doing so and, if so, what is or will be alleged in the statement of objections, should not give rise to much trouble, but a question relating to an assessment of conduct that does not amount to a hard core restraint with the object of restricting competition may require assessment of complex facts in the context of a market analysis.

Almost certainly, its legal service will monitor the final text sent to a national court or appear orally. Problems are more likely to relate to matters such as the definition of the relevant market, than to pure points of law, and it is doubtful whether members of the legal service would have time to go far

38  Commission's notice on cooperation between the Commission and the National Courts OJ 2004, C101/43.
39  *Postbank v Commission* (T-353/94), [1996] ECR II-921, [1997] 1 CMLR 33, [1997] CEC 454, paras 63–65.
40  Which applies only to NCAs not courts.
41  *Postbank,* paras 66–70.

into the facts. The notice does not state at what level in the hierarchy of DG Competition the observations will be finalised.

The procedure for asking the ECJ for a preliminary ruling (1.1.4.3.2 above) applies to competition cases and a national court may grant interim relief pending an answer, but since such rulings should be limited to points of law and the major difficulties are likely to be in appraising the facts, this will be helpful only occasionally. Some rulings that have been given by the ECJ are extremely important.

**7.3.4.4 Forum shopping—**The Brussels[42] and Lugano conventions provide for the enforcement of foreign judgments and prevent multiple actions in different jurisdictions, but they are of little significance in most competition scenarios as they relate only to actions between the same parties and on the same matter. A judgment in France as to the validity of the agreement with one's French distributor will not have effect when suing the German distributor in Germany on a virtually identical contract. There will be considerable scope for forum shopping and litigating first in a country where the procedural rules are favourable. The ease with which a preliminary injunction is obtainable and the difficulty of dislodging it may be the most important consideration.

## 7.4 The Commission's powers to obtain information (Articles 17–22)

There is no need for the regulation to empower NCAs to obtain information, since their procedure is governed by national law. Member States may have to adopt implementing legislation to provide for this. Article 22 of Regulation 1/2003 provides that an NCA may carry out an inspection in its own territory, using national powers on behalf of itself or for the account of another NCA.

Matters change over time and updating information is sometimes required. In *Coca-Cola v Commission,*[43] the CFI made it clear that market definitions and market power have to be reassessed and reasons given each time; it is not enough to cite earlier case law.

Frequently, the Commission starts proceedings on the basis of a complaint, in which case the complainant may provide information voluntarily both about the market and the conduct of the firm suspected of an infringement. It may even provide a memorandum prepared by consulting economists. The complainant may, however, request that it remain anonymous, in which event the Commission may seek other sources of information to use as evidence.

The Commission may receive replies to informal inquiries, sometimes to a trade association, complaints from Members of the European Parliament, or may read the information in the press. It also has two ways in which it may obtain information under Regulation 1/2003.

42  Brussels Convention 1968, Convention on jurisdiction and the enforcement of judgments in civil and commercial matters OJ 1978, L304/1, amended several times, most recently OJ 2001, L12/1; it is now called the Brussels regulation.
43  22 March 2000, T-125 & 127/97, paras 81-99.

## 222 ENFORCEMENT AFTER REGULATION 1/2003 [7.4.1]

### 7.4.1 Requests for information (Article 18 and recital 23)

Article 18 provides that:

(1) In order to carry out the duties assigned to it by this Regulation, the Commission may, by simple request or by decision, require any undertakings and associations of undertakings to provide all necessary information.

Such requests may be addressed to third parties as well as to the person thought to have infringed Article 81 or 82. NCAs and governments are also required to supply all necessary information (Article 18(6)). There is probably no duty for undertakings to comply with a request for information unless made by decision, but if the information be supplied in answer to a simple request, it must be prepared carefully as it may be difficult to convince officials later that the information was inaccurate. If a mistake is made, it should be corrected in writing as soon as possible.

If no information is supplied, or not as much as is requested and even if the Commission makes a request by mandate, the Commission may take a formal decision, in which case, if the information requested is not supplied within the time allowed, the Commission may impose a fine under Article 23(1)(b) or daily penalties under Article 24(d). This procedure involves two decision, one under Article 18 requiring the information to be furnished and another under Article 23 or 24 imposing the fine or penalty. The amount of the fine under Article 23(1) has been increased to 1% of total turnover for intentional or negligent infringement. The daily penalty under Article 24 has also been increased to 5% of the average daily turnover of the undertaking.

The Commission may not know how many firms keep their files, and it may ask precise questions which would take time to answer. Often a prompt telephone call or email to Brussels analysing the difficulties will result in the case handler agreeing to accept information more readily available that will serve his purpose. Sometimes, the official may ask for the information that can easily be provided to be sent within the deadline but give a longer period to answer other questions. The deadlines for answering questions are short, seldom more than six weeks, less if the questions are simple and short. In many investigations, where the parties usually want the procedure finished fast, the request is often made informally by fax and replied to the same day.

Priority should be given to answering requests for information and the task of supervision should be given to someone intelligent. He may have to delegate a good deal of his normal work to devote time and thought to this. Preliminary estimates should not be lightly given as, if they are later retracted, the Commission may believe the first statement as it did in *United Brands*.[44] More important they may colour the attitude of the official handling the file.

44 [1976] 1 CMLR D28, para 100. The retraction is made clear by the Court on appeal (27/76) [1978] ECR 207, para 243.

## [7.4.1] COMMISSION'S POWERS TO OBTAIN INFORMATION 223

False promises can easily be given through carelessness. One firm, asked for its share of the market in the whole EC and in each Member State, produced figures for its share of sales from America in each area, as those were the figures readily available. These far larger market shares made its conduct appear much more serious. Fortunately, the error was spotted and corrected before the information was sent. It is vital to ask of whoever answers the questions supplementary questions about the sources from which information was obtained.

The Commission's power is to obtain all 'necessary information'. The Commission has wide discretion to decide whether particular information is necessary. It is difficult to establish that information required is not necessary. A mere relationship between a document and an infringement is not enough. The Commission must reasonably suppose that the document would help it to decide whether an infringement had been committed.[45] If some utterly irrelevant information is requested, one may refuse to provide it, giving reasons. The Commission may accept these, but if not, may compel the information by a decision as it did in *RAI/UNITEL*.[46] An appeal under Article 230 EC can be taken to the Court of First Instance against this, but would be advisable only in an extreme case.

Since the information supplied to the Commission may be passed on to the NCAs and used by them in making formal decisions that are published, care must be taken to ensure the confidentiality of some information. Usually the Commission asks informants, especially complainants, to provide it with full and accurate information, but to supply a non-confidential version that may be shown to outsiders.

Under the Commission's inquisitorial procedure the firm being investigated is required to assist it effectively. In *Orkem*,[47] the Court held that the Commission may compel an undertaking to provide information concerning facts known to it, even if the information may be used to establish anti-competitive conduct. It would, however, be contrary to the rights of the defence (7.5.1 below) for the Commission to compel an undertaking to answer questions which might constitute an admission of an infringement which it is for the Commission to establish.[48] The distinction between the two propositions is not always clear, but has been confirmed by the ECJ.[49]

45 SEP C36/92, 12 May 1994, [1994] ECR 1-1911, para 21, referring to para 21-42 of the opinion of Advocate General Jacobs.
46 [1978] 3 CMLR 306.
47 (374/87) [1989] ECR 3343, para 27, confirmed in *PVC II—Limburgse Vinyl and others v Commission*, (C-238/99P and others), [2003] ECR 1-8375, [2003] 4 CMLR 10 para 273-93, referring also to more recent case law of the European Court of Human Rights.
48 See generally, Wouter Wils, 'Self-incrimination in EC Antitrust enforcement: A legal and economic analysis,' (2003) 26 *World Competition Law and Economic Review*, 567.
49 *PVC II (Limburgse Vinyl and others v Commission* (C-238/99P and others), [2003] ECR 1-8375, [2003] 4 CMLR 10, para 267-93. The cases were joined for the purposes of the judgment.

## 224  ENFORCEMENT AFTER REGULATION 1/2003  [7.4.1]

It has been argued that the case law under the European Convention does not permit compulsion to answer even purely factual questions. The recent judgments of the ECJ have not had to address the issue.[50]

The privilege against self-incrimination may induce addressees of a request for information by simple mandate to wait for the Commission to make a decision compelling it to reply. If the Commission does not give way, an appeal may then be taken to the CFI.

### 7.4.2 Inspection (Articles 19–21)

Often the Commission starts an investigation informally or by requesting information under Article 18 but, by virtue of Articles 19–21 it also has powers of inspection: to enter the premises of an undertaking, or other premises including directors' homes, examine and copy books and other business records and ask for oral explanations on the spot. These need not now be limited to questions about the documents. It will now also have power to seal premises when it cannot finish an inspection on the same day.

The Commission does not attempt to download all the contents of a computer on an inspection as this would exceed its mandate, but some of the documents of which it takes a copy may be electronic.

By virtue of Article 19, the Commission may also interview any legal or natural person who consents to be interviewed for the purpose of collecting information on the subject matter of an investigation. It has no power to compel such evidence nor, to punish those giving misleading or false answers. So the power does not give rise to issues of self-incrimination. A secretary might be asked where particular types of files are kept, or the language used in a particular office, so that the right office can be raided by officials able to speak the appropriate language.

The power is broader, however, and includes much loose talk. For instance, a secretary who heard one side of a conversation might tell the inspectors what she thought the conversation was about. Those drafting compliance programmes should consider whether to tell staff not to answer such questions.

There was a further when the Commission's proposal for what became Article 20(2) of Regulation 1/2003 provided power to inspect homes, and the power to inspect premises other than those of the undertaking has been limited in Article 21(2) and (3) by requiring that the decision to inspect be based on specified reasons and that the inspection should be authorised by a national judge who must check that the coercive measures are not arbitrary or excessive having regard to the seriousness of the suspected infringement, to the importance of the evidence sought and other specified matters. This follows the ECJ's judgment in *Roquette Frères*.[51]

50  See Wils, above n 48, 367.
51  (C9/400), [2003] 4 CMLR 46, a case when Regulation 17 was in operation.

## [7.4.2]  COMMISSION'S POWERS TO OBTAIN INFORMATION  225

Article 22 enables the Commission to request an NCA to conduct an inspection in its own territory, or send an official or other person to assist the Commission officials. The latter may be important when investigating a cartel when many offices have to be inspected simultaneously by officials conversant with the appropriate languages.

Simultaneous inspections in several countries may take place without prior notice to the undertakings if the Commission suspects an international cartel to fix prices or allocate markets. Usually the inspectors are accompanied by officials from the national competition authority, but their function is to assist the Commission rather than protect the firm being inspected. Nevertheless, preventing illegal pressure may assist the Commission. The procedures under Articles 17 to 22 are independent of each other and the Commission may request additional documents after it has carried out an inspection of the premises.[52]

There is a two-step procedure,[53] as under Article 18, but no need to make a request under Article 20(3) before making a decision to inspect the premises under paragraph (4).[54] Under paragraph (3), an inspector may come with a simple mandate, but there is no duty to admit him. Where inspectors arrive without warning they will probably be armed with a decision adopted under paragraph (4), and if this is not complied with, the Commission can impose a fine under Article 23(1)(c) or daily penalties under Article 24(1)(e) in much the same way as for non-compliance with a request for information made by decision.

There is, however, no direct power under Community law to enter premises.[55] Therefore, Article 22(2) requires Member States to assist the inspectors and in the United Kingdom the Crown has obtained an injunction from the Commercial Court to assist an inspection when the inspectors have been refused admission. In terms were similar to an Anton Piller order obtainable to discover breaches of copyright law.[56] The Commission will usually ask the OFT to apply for an injunction only after a tentative inspection has taken place and the undertaking has denied access to the premises. Otherwise it would have to bring evidence to the Court of a substantial likelihood of refusal to admit inspectors.[57]

It is seldom sensible to refuse entry to Commission inspectors. The Commission may not unreasonably infer that the undertaking has something to hide and may make adverse findings of fact on the basis of such information

52  *Orkem v Commission* (374/87) [1989] ECR 3343, para 14.
53  The two-step procedure was considered by the Court in *Hoechst* (46/87 & 227/88) [1989] ECR 2859, paras 15–16.
54  *National Panasonic v Commission* (136/79) [1980] ECR 2033.
55  *Hoechst AG and Others v Commission* (46/87 & 227/88) [1989] ECR 2859.
56  See answer to the House of Lords' report of 1982, cited in the bibliography to this chapter (7.8 below).
57  *Roquette Frères v Director General for Competition*, C-94/00, 22 October 2002, [2003] 4 CMLR 46. This is repeated in Art 20(8).

# EXHIBIT F



## 61993J0310

**Judgment of the Court (Sixth Chamber) of 6 April 1995. - BPB Industries plc and British Gypsum Ltd v Commission of the European Communities. - Competition - Abuse of a dominant position - Exclusive purchase contract - Loyalty payments - Effect on trade between Member States - Attributability of the infringement. - Case C-310/93 P.**

*European Court reports 1995 Page I-00865*

Summary
Parties
Grounds
Decision on costs
Operative part

# Keywords

*++++*

*1. Competition ° Administrative procedure ° Observance of the rights of the defence ° Access to the file ° Limits*

*(Council Regulation No 17; Commission Regulation No 99/63)*

*2. Appeals ° Jurisdiction of the Court ° Review, on grounds of fairness, of assessment by the Court of First Instance of amounts of fines imposed on undertakings ° Excluded*

# Summary

*1. In the context of proceedings aimed at establishing infringements of the rules on competition in the Treaty, observance of the rights of the defence requires, inter alia, that the undertaking concerned must have been enabled to express its views effectively on the documents used by the Commission to support its allegation of an infringement.*

*The Commission may, however, justifiably refuse to communicate to undertakings under investigation its own purely internal documents, confidential correspondence with the Member States and published documents and studies, which are, by definition, accessible to them.*

*The Commission may also refuse access to documents which third-party undertakings have submitted, subject to a confidentiality proviso, in the context of correspondence or of a request for information. Since an undertaking holding a dominant position on the market might adopt retaliatory measures against competitors, suppliers or customers who have collaborated in the investigation carried out by the Commission, third-party undertakings which submit documents to the Commission in the course of its investigations and consider that reprisals might be taken against them as a result can do so only if they know that account will be taken of their request for confidentiality.*

*Finally, reports on inspections carried out in third-party undertakings, being documents capable of providing evidence of infringements by third parties, may obviously not be disclosed.*

*2. It is not for the Court of Justice, when ruling on questions of law in the context of an appeal, to substitute, on grounds of fairness, its own assessment for that of the Court of First Instance exercising its unlimited jurisdiction to rule on the amount of fines imposed on undertakings for infringements of Community law.*

# Parties

*In Case C-310/93 P,*

*BPB Industries Plc, a company governed by English law, established in Slough, United Kingdom, and*

*British Gypsum Ltd, a company governed by English law, established in Nottingham, United Kingdom,*

*represented by Michel Waelbroeck and Denis Waelbroeck, of the Brussels Bar, and by Gordon Boyd Buchanan Jeffrey, Solicitor, with an address for service in Luxembourg at the Chambers of Arendt and Medernach, 8-10 Rue Mathias Hardt,*

*appellants,*

*APPEAL against the judgment of the Court of First Instance of the European Communities (Second Chamber) of 1 April 1993 in Case T-65/89 between, on the one hand, BPB Industries Plc and British Gypsum Ltd and, on the other hand, the Commission of the European Communities, [1993] ECR II-389, seeking to have that judgment set aside,*

*the other party to the proceedings being:*

*Commission of the European Communities, represented by Julian Currall, of its Legal Service, acting as Agent, with an address for service in Luxembourg at the office of Georgios Kremlis, of the Legal Service, Wagner Centre, Kirchberg,*

*supported by*

*Iberian UK Ltd, formerly Iberian Trading (UK) Ltd, a company governed by English law, established in London, represented by John E. Pheasant and Simon W. Polito, Solicitors, with an address for service in Luxembourg at the Chambers of Loesch and Wolter, 11 Rue Goethe,*

*intervener,*

*THE COURT (Sixth Chamber),*

*composed of: F.A. Schockweiler, President of the Chamber, P.J.G. Kapteyn (Rapporteur), G.F. Mancini, C.N. Kakouris and J.L. Murray, Judges,*

*Advocate General: P. Léger,*

*Registrar: R. Grass,*

*having regard to the report of the Judge-Rapporteur,*

*after hearing the Opinion of the Advocate General at the sitting on 13 December 1994,*

*gives the following*

*Judgment*

## Grounds

*1 By application lodged at the Registry of the Court of Justice on 8 June 1993, BPB Industries Plc and British Gypsum Ltd (hereinafter "BPB" and "BG"), brought an appeal pursuant to Article 49 of the Statute of the Court of Justice of the EEC against the judgment of 1 April 1993 in Case T-65/89 BPB Industries and British Gypsum v Commission [1993] ECR II-389 ("the judgment under appeal"), in which the Court of First Instance dismissed their application for annulment of Commission Decision 89/22/EEC of 5 December 1988 relating to a proceeding under Article 86 of the EEC Treaty (IV/31.900, BPB Industries Plc, OJ 1989 L 10, p. 50, hereinafter "the Decision") and ordered them to pay the costs.*

*2 In the judgment under appeal (paragraphs 2 to 10), the Court of First Instance found that:*

*° BPB is the United Kingdom holding company of a group which controls about half the production capacity for plasterboard in the Community, having a net consolidated turnover of ECU 1 116 000 000 in the financial year to 31 March 1987. In Great Britain, BPB operates in the building plaster and plasterboard sectors essentially through a wholly-owned subsidiary, BG. In Ireland, gypsum products, in particular building plasters and plasterboard, are produced by BPB's Irish subsidiary Gypsum Industries Plc, which supplies the market in Ireland and, through BG, Northern Ireland.*

*° In Great Britain, BG produces plasterboard at eight plants situated in the Midlands, the South-East and the North of England. BPB normally supplies the British plasterboard market from mills in Great Britain, whereas the mills in Ireland supply the market in Ireland and Northern Ireland.*

*° Plasterboard used in the United Kingdom and Ireland is almost all supplied through builders' merchants. Merchants provide an effective chain of distribution to builders. They also have the function of assuming the credit risk of builders. Over the relevant period, there was an ongoing trend of concentration in the builders' merchanting sector.*

° Before 1982, there were no regular imports of plasterboard into Great Britain. In that year, Lafarge UK Ltd ("Lafarge"), a company in the French Lafarge Coppée group, started importing plasterboard manufactured in France. Lafarge has gradually expanded its imports. However, because of supply difficulties linked with its dependence on its manufacturing plant in France, Lafarge was not able to provide normal deliveries to a large number of customers.

° In May 1984, Iberian Trading (UK) Ltd ("Iberian") started importing plasterboard manufactured in Spain by Española de Placas de Yeso. Its prices were lower than those of BG, the difference generally being in a range of 5 to 7%, although certain larger price discrepancies have been noted. The range of products supplied by Iberian was restricted to a limited range of standard plasterboard sizes from among those most in demand. Iberian also encountered supply difficulties on a number of occasions.

° In 1985 and 1986, BG supplied about 96% of the plasterboard sold in the United Kingdom, the remainder of the market being shared between Lafarge and Iberian.

° On 17 June 1986, Iberian sent the Commission an application requesting that it find, pursuant to Article 3 of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87), that there were infringements of Article 86 of the EEC Treaty on the part of BPB. On 3 December 1987, the Commission decided to initiate a proceeding under Article 3(1) of Regulation No 17.

° After giving the undertakings an opportunity to reply to the objections raised by it, pursuant to Article 19 (1) of Regulation No 17 and Regulation No 99/63/EEC of the Commission of 25 July 1963 on the hearings provided for in Article 19(1) and (2) of Council Regulation No 17 (OJ, English Special Edition 1963-1964, p. 47) and after consulting the Advisory Committee on Restrictive Practices and Dominant Positions, on 5 December 1988 the Commission adopted the contested Decision.

3 The operative part of the Decision is as follows:

"Article 1

Between July 1985 and August 1986 British Gypsum Ltd infringed Article 86 of the EEC Treaty by abusing its dominant position in the supply of plasterboard in Great Britain through a scheme of payments to builders' merchants who agreed to purchase plasterboard exclusively from British Gypsum Ltd.

Article 2

In July and August 1985 British Gypsum Ltd infringed Article 86 of the EEC Treaty by implementing a policy of favouring customers who were not trading in imported plasterboard in the provision of priority orders for the supply of building plasters at a time of extended delivery for that product which constituted an abuse of its dominant position in the supply of plasterboard in Great Britain.

Article 3

BPB Industries plc, through its subsidiary British Gypsum Ltd, infringed Article 86 of the EEC Treaty by abusing its dominant position in the supply of plasterboard in Ireland and Northern Ireland:

° in June and July 1985 by successfully applying pressure on and thereby procuring the agreement of a consortium of importers to renounce importing plasterboard into Northern Ireland,

° by a series of rebates on BG products supplied to builders' merchants in Northern Ireland between June and December 1985 conditional on their not handling any imported plasterboard.

Article 4

The following fines are imposed:

° on British Gypsum Ltd, a fine of ECU 3 million in respect of the infringements of Article 86 of the EEC Treaty referred to in Article 1,

° on BPB Industries plc, a fine of ECU 150 000 in respect of the infringements of Article 86 of the EEC Treaty referred to in Article 3.

... "

4 The action brought by BPB and BG for the annulment of the Decision gave rise to the judgment under appeal, in which the Court of First Instance:

"1. Annuls Article 2 of Commission Decision 89/22/EEC ... in so far as it relates to July 1985;

2. Dismisses the remainder of the claims made in the application;

... "

5 In support of their appeal, the appellants put forward, primarily, four pleas in law and, in the alternative, one further plea.

6 The first plea alleges an infringement of Articles 86 and 190 of the EEC Treaty in that the Court of First Instance considered that it was superfluous to investigate the degree of influence of the parent company over its wholly-owned subsidiary, since control by the parent over the subsidiary could be assumed, and

*that the reasons advanced by the Commission to justify the infringement found in Article 5 of the Decision.*

*7 The second plea alleges an infringement of Articles 85(3) and 86 of the EEC Treaty in that the Court of First Instance considered that the supply contracts and promotional payments came within Article 86 and that an exemption under Article 85(3), even if it could be established, would not prevent the application of Article 86.*

*8 The third plea alleges an infringement of Article 86 in that the Court of First Instance held that the priority deliveries of plaster constituted an abuse of a dominant position.*

*9 The fourth plea alleges an infringement of the rights of the defence in that the Court of First Instance considered that the Commission's refusal to disclose certain documents to the appellants on the ground of their confidential nature could not, in the present case, affect the legality of the Decision.*

*10 In the alternative, the appellants seek a reduction of the amount of the fines imposed upon them.*

*The first three pleas in law*

*11 For the reasons given in, respectively, points 20 to 31, points 42 to 69 and points 76 to 86 of the Advocate General's Opinion, the first, second and third pleas in law must be dismissed as unfounded.*

*The fourth plea in law*

*12 The complaint in the fourth plea concerns the finding by the Court of First Instance that the rights of the defence were observed during the course of the administrative procedure before the Commission.*

*13 The appellants maintained before the Court of First Instance (see paragraph 21 of the judgment under appeal) that the Decision should be annulled since the Commission had failed to disclose to them all the relevant documents which were in its possession, to their considerable detriment.*

*14 In reaching its conclusion that the rights of the defence were observed during the course of the administrative procedure, the Court of First Instance noted that the Commission had, in its Twelfth Report on Competition Policy (pp. 40 and 41), imposed on itself a number of rules concerning access to the file in competition cases and that it had therefore been held, in Case T-7/89 Hercules Chemicals v Commission [1991] ECR II-1711, paragraphs 53 and 54, that the Commission "has an obligation to make available to the undertakings involved in Article 85(1) proceedings all documents, whether in their favour or otherwise, which it has obtained during the course of the investigation, save where the business secrets of other undertakings, the internal documents of the Commission or other confidential information are involved" (paragraph 29 of the judgment under appeal).*

*15 The Court of First Instance further pointed out that, in Joined Cases T-10, T-11 and T-12/92 and T-15/92 Cimenteries CBR and Others v Commission [1992] ECR II-2667, paragraph 38, it had held that "the procedure for access to the file in competition cases is intended to enable the addressees of a statement of objections to examine evidence in the Commission's file so that they are in a position effectively to express their views on the conclusions reached by the Commission in its statement of objections on the basis of that evidence" (paragraph 30 of the judgment under appeal).*

*16 The Court of First Instance went on to note that, in pursuance of the abovementioned commitments which the Commission had imposed upon itself, the statement of objections sent to the appellants was accompanied by an annex containing a list summarizing all the 2 095 documents which made up the Commission's file, specifying, for each document or group of documents, whether it was accessible to the appellants or not and identifying six categories of documents which were not made accessible to them: first, documents for purely internal Commission purposes; secondly, certain correspondence with third-party undertakings; thirdly, certain correspondence with the Member States; fourthly, certain published information and studies; fifthly, certain reports of verifications; and, sixthly, a reply to a request for information made under Article 11 of Regulation No 17 (paragraphs 31 and 32 of the judgment under appeal).*

*17 In paragraph 33, the Court of First Instance held:*

*"It is thus apparent that the applicants have no real grounds for complaining that the Commission did not make accessible to them certain purely internal documents, which the Court of First Instance has already decided did not have to be disclosed. The same applies necessarily to certain correspondence with the Member States and published documents and studies. The same applies again to the reports of verifications, the answer to a request for information made by the Commission and certain correspondence with third-party undertakings, to which the Commission was entitled to refuse access by reason of their confidential nature. An undertaking to which a statement of objections has been addressed, and which occupies a dominant position in the market, may, for that very reason, adopt retaliatory measures against a competing undertaking, a supplier or a customer, who has collaborated in the investigation carried out by the Commission. Finally, for the same reason, the applicants cannot maintain that the complaint submitted to the Commission under Article 3 of Regulation No 17 was wrongly made only partially available to them (documents 1 to 233). Accordingly, the Commission's refusal to disclose those documents to the applicants cannot, in this case, affect the legality of the Decision."*

*18 In support of their plea the appellants state, first, that the Court of First Instance wrongly held that the Commission complied with its obligation to make available all documents, whether in their favour or otherwise, in its files which were not of a confidential nature.*

*19 Secondly, the appellants argue that the Court of First Instance should itself have examined the documents in the file.*

*20 Thirdly, the appellants criticize the Court of First Instance for having upheld the Commission's non-disclosure of certain documents on the sole and inadequate ground that if they had been disclosed, retaliatory measures might have been taken against the supplier of the information. In their view, to deny flatly to the undertakings concerned any access to any of the information contained in a document which is not strictly confidential violates the principle of proportionality.*

*21 When considering whether this plea is well-founded, it must first be borne in mind that observance of the rights of the defence requires, inter alia, that the undertaking concerned must have been enabled to express its views effectively on the documents used by the Commission to support its allegation of an infringement (Case 322/81 Michelin v Commission [1983] ECR 3461, paragraph 7).*

*22 The appellants do not deny that the Court of First Instance could, without infringing the principle of observance of the rights of the defence, hold that the Commission is not obliged to disclose internal documents and other confidential information. They merely allege that the Court of First Instance misapplied that principle when it considered that the documents referred to in paragraph 33 of the judgment under appeal fell within the specified categories of documents not to be disclosed or, at the very least, failed to give sufficient reasons for that finding.*

*23 Finally, as the Advocate General has observed at point 125 of his Opinion, the appellants did not complain before the Court of First Instance that an incriminating document was not disclosed but rather that the documents which were not disclosed might have been helpful to their case. The criterion for non-disclosure, they claimed, should not be whether the Commission relies on a document but whether the document is truly confidential (see paragraph 22 of the judgment under appeal).*

*24 It must therefore be determined whether the Court of First Instance was entitled to find that the documents not disclosed fell within the categories of documents which the Commission may legitimately refuse to disclose by reason of their confidential nature.*

*25 As regards the refusal to disclose to the appellants the purely internal Commission documents, the correspondence with the Member States and the published documents and studies, it is enough to point out that the Court of First Instance was entitled to hold both that the first two categories of documents were of a confidential nature and that the third category concerned documents which were, by definition, accessible to the appellants.*

*26 With regard to the correspondence with third-party undertakings and the answer to a request for information, it must be recognized that an undertaking holding a dominant position on the market might adopt retaliatory measures against competitors, suppliers or customers who have collaborated in the investigation carried out by the Commission. That being so, it is clear that third-party undertakings which submit documents to the Commission in the course of its investigations and consider that reprisals might be taken against them as a result can do so only if they know that account will be taken of their request for confidentiality.*

*27 The Court of First Instance was therefore right to consider that the Commission was entitled to refuse access to such documents on the ground that they were confidential.*

*28 Finally, the appellants have acknowledged in their appeal that the reports of verifications relate to inspections carried out in third-party undertakings. In that regard, suffice it to observe that documents capable of providing evidence of infringements by third parties ° unrelated, moreover, to the present case ° are obviously not to be disclosed to the appellants.*

*29 As regards the appellants' complaint that the Court of First Instance did not give sufficient reasons for its decision concerning the Commission's refusal to make the abovementioned documents available to them, it is to be noted that their allegations concerning a supposed infringement of the rights of the defence were merely "uncertain and hypothetical", as the Court of First Instance found in paragraph 35 of the judgment under appeal.*

*30 In view of that finding, the reasoning of the judgment under appeal, as summarized in paragraphs 14 to 17 above, clearly shows the grounds on which the Court of First Instance based its rejection of those allegations. Nor, in those circumstances, can the Court of First Instance be criticized, as it is by the appellants, for having looked in a general way at the type of documents in issue without of its own accord looking at each document not disclosed in order to verify the arguments relied on by the Commission for not having made them available.*

*31 Finally, the appellants complain that the Court of First Instance did not hold that the Commission should at the very least have made non-confidential summaries of certain documents available to them.*

*32 That complaint, too, must be dismissed, since it has not been established either that such summaries were requested by the appellants or that such a request would have been justified.*

*33 It follows from all the foregoing that the appellants cannot justifiably claim that the Court of First Instance infringed the principle of the observance of the rights of the defence and that their fourth plea in law must be dismissed as unfounded.*

*The alternative plea in law*

*34 With regard to the alternative plea, suffice it to point out that it is not for this Court, when ruling on questions of law in the context of an appeal, to substitute, on grounds of fairness, its own assessment for that of the Court of First Instance exercising its unlimited jurisdiction to rule on the amount of fines imposed on undertakings for infringements of Community law.*

*35 Since none of the appellants' pleas in law can be upheld, the appeal must be dismissed in its entirety.*

## Decision on costs

*Costs*

*36 Under Article 69(2) of the Rules of Procedure, applicable to the procedure on appeal by virtue of Article 118, the unsuccessful party is to be ordered to pay the costs. Since the appellants have been unsuccessful, they must be ordered to pay the costs of these proceedings, including those of the intervener.*

## Operative part

*On those grounds,*

*THE COURT (Sixth Chamber)*

*hereby:*

*1. Dismisses the appeal;*

*2. Orders the appellants to bear the costs, including those of the intervener.*

# EXHIBIT G

> *which can be distinguished from neighbouring areas because the conditions of competition are appreciably different in those areas.*"[545]

(427)   The relevant geographic market for client PC operating systems, work group server operating systems and media players is world-wide. The objective conditions for competition are essentially the same across the world. PCs and servers are manufactured by a large number of companies that operate on a world-wide scale such as IBM, Compaq, or Dell. In order to sell computers with the operating system (and a media player) already installed, such manufacturers obtain the necessary licences from the software manufacturers. Generally, a single world-wide licence agreement is entered into between the computer manufacturer and the software manufacturer. The computers are then sold on a world-wide scale. Neither import restrictions, transport costs or technical requirements constitute significant limitations. Language-specific demand characteristics regarding the relevant software exist but, in so far as the supply-side is concerned, do not constitute an obstacle for swift supply on a global basis in accordance with language-related preferences. The entire world can therefore be regarded as the relevant geographic market.

## 5.2   Dominant position

(428)   A dominant position under Article 82 of the Treaty has been defined by the Court of Justice of the European Communities as "*a position of economic strength enjoyed by an undertaking which enables it to prevent effective competition being maintained on the relevant market by affording it the power to behave to an appreciable extent independently of its competitors, its customers and ultimately of the consumers*".[546]

### 5.2.1   Client PC operating systems

(429)   In its response to the supplementary Statement of Objections, Microsoft acknowledged that it held "*a dominant position in the supply of operating systems that run on personal computers ('PCs')*".[547] The following recitals will show that Microsoft holds a dominant position which exhibits extraordinary features since it controls the quasi-standard of the relevant market in question, and has done so for some time. Microsoft's dominance relies on very high market shares and significant barriers to entry.

---

[545]   Commission notice on the definition of relevant market for the purposes of Community competition law (OJ C 372, 9.12.1997, p.5)

[546]   See judgment in Case 27/76 United Brands v Commission [1978] E.C.R. 207, at paragraph 65.

[547]   Microsoft's submission of 17 October 2003, on page 1.

118

holds a near-monopoly in client PC operating systems is precisely what gives it the ability to leverage from the latter market to that for work group server operating systems through limitations on interoperability.[653]

(540)   Therefore, on the basis of the above-mentioned factors, Microsoft's claim that the analysis established by the Court in *Tetra Pak II* does not apply In this case must be rejected.

5.2.2.5  Conclusion

(541)   In the light of Microsoft's high market shares, the barriers to entry to the market and the links between the client PC operating system market and the work group server operating system market, it is concluded that Microsoft has a dominant position within the meaning of Article 82 of the Treaty in the market for work group server operating systems.[654]

## 5.3  Abuses

(542)   The fact that an undertaking holds a dominant position is not in itself contrary to the competition rules.  However, an undertaking enjoying a dominant position is under a special responsibility not to engage in conduct that may distort competition.[655]

(543)   The Court of Justice defined the concept of abuse under Article 82 of the Treaty in the following terms:

> "The concept of abuse is an objective concept relating to the behaviour of an undertaking in a dominant position which is such as to influence the structure of a market where, as a result of the very presence of the undertaking in question, the degree of competition is weakened and which, through recourse to methods different from those which condition normal competition in products or services on the basis of the transactions of commercial operators, has the effect of hindering the maintenance of the degree of competition still existing in the market or the growth of that competition."[656]

---

[653]  This is without prejudice to the question of whether Microsoft actually does restrict interoperability and the ensuing consequences, which has been discussed above in Section 4.1 and will be further dealt with in Section 5.3.1.

[654]  In light of the market share figures outlined in Section 5.2.2.2, Microsoft can be considered to be dominant in this market since 2002.

[655]  See Judgment of the Court of 9 November 1983 in Case 322/81, Michelin v Commision [1983] ECR 3461, at paragraph 57.  See also above at footnote 560.

[656]  Judgment of the Court of 13 February 1979 in Case 85/76, Hoffmann-La Roche [1979] ECR 461, at paragraph 91.

146